FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
*12:50 pm, Aug 26, 2026*
JEFFREY P. COLWELL, CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________________
(To be supplied by the court)

GREG E. LINDBERG,
Plaintiff,
v.
HUGH STEVEN WILSON;
CHRIS NICKERSON;
UK ATLANTA HOLDINGS LLC;
DAMOVO GLOBAL SERVICES (UK) LIMITED;
DAMOVO DEUTSCHLAND GMBH & CO. KG;
DAMOVO IRELAND LIMITED;
DAMOVO SCHWEIZ AG;
DAMOVO LUXEMBOURG S.à R.L.;
DAMOVO COSTA RICA SRL; and
JOHN DOE BUYER COMPANY,
Defendants.

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

## A. PLAINTIFF INFORMATION

You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.

GREG E. LINDBERG, P.O. Box 159, Thonotosassa, FL 33592
*(Name and complete mailing address)*

919-308-9686 / gelindberg@gmail.com
*(Telephone number and e-mail address)*

## B. DEFENDANT(S) INFORMATION

Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."

**Defendant 1:**
HUGH STEVEN WILSON, 575 Circle Drive, Denver, CO 80206
*(Name and complete mailing address)*

steve@hswilson.com
*(Telephone number and e-mail address if known)*

**Defendant 2:**
CHRIS NICKERSON, 400 N. Park Ave., Breckenridge, CO 80424
*(Name and complete mailing address)*

Unknown
*(Telephone number and e-mail address if known)*

**Defendant 3:**
UK ATLANTA HOLDINGS LLC, registered office 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608; principal place of business c/o Chris Nickerson, 400 N. Park Ave., Breckenridge, CO 80424
*(Name and complete mailing address)*

Unknown
*(Telephone number and e-mail address if known)*

**Defendant 4:**

DAMOVO GLOBAL SERVICES (UK) LIMITED (Co. No. 09377036), International House, 36–38 Cornhill, London EC3V 3NG, United Kingdom
*(Name and complete mailing address)*

Unknown
*(Telephone number and e-mail address if known)*

**Defendant 5:**
DAMOVO DEUTSCHLAND GMBH & CO. KG (HRA 19760), 35 Heerdter Lohweg, 40459 Düsseldorf, Germany
*(Name and complete mailing address)*

Unknown
*(Telephone number and e-mail address if known)*

**Defendant 6:**
DAMOVO IRELAND LIMITED (CRO No. 093134), The Penthouse, Third Floor, Blackthorn Exchange, Bracken Road, Sandyford Business Park, Dublin 18, D18 FH39, Ireland
*(Name and complete mailing address)*

+353 1 429 3000
*(Telephone number and e-mail address if known)*

**Defendant 7:**
DAMOVO SCHWEIZ AG, Zunstrasse 11, 8152 Glattbrugg, Switzerland
*(Name and complete mailing address)*

+41 43 255 7211
*(Telephone number and e-mail address if known)*

**Defendant 8:**
DAMOVO LUXEMBOURG S.À R.L., Campus Contern — Bâtiment Bouvreuil, 17 Rue Edmond Reuter, L-5326 Contern, Luxembourg
*(Name and complete mailing address)*

+352 27171-1
*(Telephone number and e-mail address if known)*

**Defendant 9:**
DAMOVO COSTA RICA SRL, Avenida Escazú, Torre Lexus, 4to piso, Escazú, Costa Rica
*(Name and complete mailing address)*

Unknown
*(Telephone number and e-mail address if known)*

**Defendant 10:**
JOHN DOE BUYER COMPANY, address unknown; identity to be ascertained through discovery
*(Name and complete mailing address)*

Unknown
*(Telephone number and e-mail address if known)*

## C. JURISDICTION

Identify the statutory authority that allows the court to consider your claim(s): (check one)

☒ Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case:

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, and in particular 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c); predicate offenses under 18 U.S.C. §§ 1343, 1346, and 1952. Supplemental jurisdiction over state-law claims is asserted under 28 U.S.C. § 1367(a).

☒ Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of Florida.

Defendant 1 (Wilson) is an individual and is a citizen of Colorado.

Defendant 2 (Nickerson) is an individual and is a citizen of Colorado.

Defendant 3 (UK Atlanta Holdings LLC) is a limited liability company organized under the laws of North Carolina. Its sole member is Hugh Steven Wilson, as Trustee, a citizen of Colorado. It is therefore a citizen of Colorado.

Defendants 4–9 (the foreign Damovo entities) are citizens or subjects of foreign states — respectively the United Kingdom, Germany, Ireland, Switzerland, Luxembourg, and Costa Rica — and each has its principal place of business outside the United States.

Defendant 10 (John Doe Buyer Company) is of presently unknown citizenship.

Additional information supporting jurisdiction and venue is set forth in the attached pages labeled "D. STATEMENT OF CLAIMS," at Section III.

## D. STATEMENT OF CLAIM(S)

State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim.

**CLAIM 1: Violation of RICO, 18 U.S.C. § 1962(c)**
Supporting facts: Additional Paper is attached.

**CLAIM 2: Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**
Supporting facts: Additional Paper is attached.

**CLAIM 3: Breach of Fiduciary Duty (Wilson)**
Supporting facts: Additional Paper is attached.

**CLAIM 4: Breach of Fiduciary Duty (Nickerson)**
Supporting facts: Additional Paper is attached.

**CLAIM 5: Aiding and Abetting Breach of Fiduciary Duty**
Supporting facts: Additional Paper is attached.

**CLAIM 6: Civil Conspiracy**
Supporting facts: Additional Paper is attached.

**CLAIM 7: Conversion**
Supporting facts: Additional Paper is attached.

**CLAIM 8: Accounting and Constructive Trust**
Supporting facts: Additional Paper is attached.

**CLAIM 9: Preliminary and Permanent Injunctive Relief**
Supporting facts: Additional Paper is attached.

## D. STATEMENT OF CLAIMS

## I. NATURE OF THE ACTION

1. This action arises from a scheme to sell the Damovo Group — a multinational technology services business that is a designated Primary Restitution Asset in the federal criminal proceeding United States v. Lindberg, No. 3:23-CR-48-MOC (W.D.N.C.) — for no sale proceeds at all, while a written indication of interest valuing the same business at $400 million sits unanswered.

2. Plaintiff Greg E. Lindberg is the person who owes the restitution that the Damovo Group, as a Primary Restitution Asset, exists to help satisfy. The value realized on the liquidation of a Primary Restitution Asset is applied to the victims and thereby reduces the outstanding balance of the restitution that Plaintiff must personally satisfy; conversely, under the Order Appointing Special Master, any value of the Primary Restitution Assets in excess of the restitution obligation is not liquidated and reverts to Plaintiff. Value destroyed in the disposition of the Damovo Group is therefore value that either is not credited against the balance Plaintiff remains personally liable to pay, or is lost to the surplus that would otherwise revert to him. Either way, Plaintiff's injury is direct, concrete, and personal to him.

3. On July 31, 2026, Twelve Seas Investment Company III ("Twelve Seas"), a special purpose acquisition company listed on the NASDAQ under the ticker "TWLV," delivered a written indication of interest proposing a business combination with the Damovo Group at an enterprise value of $400 million, to be funded through cash in trust, PIPE financing, and newly issued shares. A true and correct copy of the Twelve Seas letter is attached as Exhibit A.

4. Defendants have not engaged with that offer. Instead, upon information and belief, they are pursuing a transaction with Defendant John Doe Buyer Company under which the entire Damovo Group would be transferred for the assumption of debt, generating — by the proposed purchaser's own account — no sale proceeds whatsoever. The only value identified in that transaction consists of approximately $17.5 million in so-called "consent fees": approximately $13 million to the Joint Provisional Liquidators of certain Bermuda insurers, approximately $4.5 million to the New Holding Company, and ten dollars ($10.00) to the North Carolina insurance estates whose policyholders the entire structure exists to protect. Ex. D ¶¶ 3, 6.

5. Upon information and belief, that outcome is not the product of market forces. Upon information and belief, Defendant John Doe Buyer Company has offered, and certain Defendants and other stakeholders have accepted or expect to receive, tens of millions of dollars in "fee payments," "consent fees," and similar consideration in exchange for their cooperation in suppressing competing bids and delivering the Damovo Group at a price far below its value.

6. Upon information and belief, Defendant Chris Nickerson, the Chief Executive Officer of the Damovo Group, is to receive several million dollars in connection with the John Doe transaction, characterized as a "transfer of control payment." Upon information and belief, that payment is in substance consideration paid by a prospective purchaser to the chief executive of the target, contingent on that purchaser acquiring the target, to induce the chief executive to disregard a materially higher competing offer and to breach the duties he owes to the enterprise he serves.

7. This is not the first time. As set forth below, the same trustee, Defendant Hugh Steven Wilson, presided over the same pattern with respect to other Lindberg-related trust assets — driving away qualified bidders, withholding diligence materials, and steering assets to a preferred acquirer at a fraction of their value. Plaintiff previously brought certain of those matters before this Court in Lindberg v. Wilson, No. 1:25-cv-00317-CNS-KAS (D. Colo.), which Plaintiff voluntarily dismissed without prejudice on August 4, 2025.

8. Plaintiff seeks damages, an accounting, and — most urgently — an order preserving the status quo so that no disposition of the Damovo Group occurs until the United States District Court for the Western District of North Carolina, which supervises the restitution assets and into whose Special Master's exclusive possession and control Plaintiff's rights and interests in those assets have been placed, has approved the transaction and its terms.

## II. PARTIES

9. Plaintiff Greg E. Lindberg is a natural person and a citizen of the State of Florida. His mailing address is P.O. Box 159, Thonotosassa, Florida 33592. He appears pro se.

10. Defendant Hugh Steven Wilson ("Wilson") is a natural person residing at 575 Circle Drive, Denver, Colorado 80206, and is a citizen of the State of Colorado. Wilson is the Original Trustee and, upon information and belief, the sole current Trustee of the Damovo Group Trust created by the Irrevocable Trust Instrument dated June 17, 2021 (the "Trust Instrument"). A true and correct copy of the Trust Instrument is attached as Exhibit B.

11. Defendant Chris Nickerson ("Nickerson") is a natural person residing at 400 N. Park Ave., Breckenridge, CO 80424, and is a citizen of the State of Colorado. Nickerson is the Chief Executive Officer of the Damovo Group. Upon information and belief, Nickerson

performs his duties as Chief Executive Officer from his residence in Colorado, and the Damovo Group is directed and managed from Colorado by him.

12. Defendant UK Atlanta Holdings LLC is a limited liability company organized under the laws of North Carolina. Under the Trust Instrument, UK Atlanta Holdings LLC is the “Company” whose entire issued and outstanding ordinary shares are held by Wilson as Trustee. Ex. B, Recital B & cl. 1.1. Its sole member is Wilson in his capacity as Trustee, and it is therefore a citizen of the State of Colorado. Upon information and belief, its principal place of business is in Colorado, c/o Chris Nickerson, 400 N. Park Ave., Breckenridge, CO 80424.

13. Defendant Damovo Global Services (UK) Limited is a private limited company registered in England and Wales under company number 09377036, with its registered office at International House, 36–38 Cornhill, London EC3V 3NG, United Kingdom.

14. Defendant Damovo Deutschland GmbH & Co. KG is a limited partnership organized under the laws of the Federal Republic of Germany, registered in the German Companies Registry under number HRA 19760, with an address at 35 Heerdter Lohweg, 40459 Düsseldorf, Germany.

15. Defendant Damovo Ireland Limited is a private limited company registered in Ireland under company registration number 093134, with its registered office at The Penthouse, Third Floor, Blackthorn Exchange, Bracken Road, Sandyford Business Park, Dublin 18, D18 FH39, Ireland.

16. Defendant Damovo Schweiz AG is a company organized under the laws of Switzerland with an address at Zunstrasse 11, 8152 Glattbrugg, Switzerland.

17. Defendant Damovo Luxembourg S.à r.l. is a company organized under the laws of Luxembourg with an address at Campus Contern — Bâtiment Bouvreuil, 17 Rue Edmond Reuter, L-5326 Contern, Luxembourg.

18. Defendant Damovo Costa Rica SRL is a company organized under the laws of Costa Rica with an address at Avenida Escazú, Torre Lexus, 4to piso, Escazú, Costa Rica.

19. The Defendants identified in paragraphs 13 through 18 are referred to collectively as the "Damovo Defendants." Each is a member of the Damovo Group as that term is defined in the Trust Instrument, meaning the Company and its subsidiaries and subsidiary undertakings from time to time. Ex. B, cl. 1.1.

20. Defendant John Doe Buyer Company is an entity whose identity is presently unknown to Plaintiff and which, upon information and belief, is presently negotiating to acquire the Damovo Group. Plaintiff will amend this Complaint to state the true name, form, and citizenship of this Defendant when that information is ascertained through discovery or otherwise.

21. Upon information and belief, the Damovo Group is directed and managed from Colorado, where both its Chief Executive Officer and the Trustee who holds one hundred percent of its voting equity reside.

## III. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, namely the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, which affords a private right of action under 18 U.S.C. § 1964(c).

23. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as the federal claims.

24. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Florida. Defendants Wilson and Nickerson are citizens of Colorado. Defendant UK Atlanta Holdings LLC is a citizen of Colorado because its sole member is Wilson as Trustee. The remaining Damovo Defendants are, upon information and belief, citizens or subjects of foreign states. No Defendant is a citizen of Florida. The matter in controversy exceeds $75,000, exclusive of interest and costs.

25. This Court has personal jurisdiction over Wilson and Nickerson because each is domiciled in and a resident of Colorado.

26. This Court has personal jurisdiction over the Damovo Defendants because, upon information and belief, the Damovo Group is managed and directed from Colorado by its Colorado-resident Chief Executive Officer and by the Colorado-resident Trustee who holds one hundred percent of its voting equity, and because the conduct complained of — the decision not to engage with the Twelve Seas indication of interest and to pursue the John Doe transaction instead — was made, directed, and carried out in substantial part from Colorado.

27. This Court has personal jurisdiction over Defendant John Doe Buyer Company because, upon information and belief, that Defendant purposefully directed its conduct at Colorado. It negotiated the acquisition of an enterprise managed and directed from Colorado; it directed communications, offers, term sheets, and diligence requests into Colorado; and, upon information and belief, it offered payments to a Colorado-resident chief executive officer for the

purpose of influencing decisions made in Colorado. The claims asserted against John Doe Buyer Company arise directly out of that Colorado-directed conduct, and not merely out of that Defendant's relationships with persons who happen to reside in Colorado.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Wilson, Nickerson, and UK Atlanta Holdings LLC reside in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

29. Venue is also proper under 18 U.S.C. § 1965(a) as to the RICO claims because Defendants Wilson, Nickerson, and the Damovo Defendants reside, are found, have an agent, or transact their affairs in this District.

## IV. FACTUAL ALLEGATIONS

### A. The Damovo Group and the Change of Control Trust

30. The Damovo Group is a multinational technology services company providing communications, cybersecurity, and related services to customers in the defense, healthcare, insurance, retail, and other industries, operating through subsidiaries across Europe, the United Kingdom, the United States, and Costa Rica.

31. On June 17, 2021, Damovo Financial Services, LLC, as Settlor, Robert Gaddy, as Original Beneficiary, and Wilson, as Original Trustee, executed the Trust Instrument establishing the Damovo Group Trust. Ex. B. Plaintiff is not a party to the Trust Instrument.

32. The Trust Instrument was created for a single purpose: to remove Plaintiff from control of the Damovo Group during the pendency of his federal criminal case. It defines the

triggering "Adverse Proceeding" as "the appeal and final resolution of the jury verdict in the trial of Greg Lindberg in the Western District of North Carolina," and it endures only until that conviction is reversed or "a final and binding court order" brings it to an end. Ex. B, Recital A & cll. 1.1, 3.1(a), (e).

33. Under the Trust Instrument, Wilson holds the entire issued and outstanding ordinary shares in UK Atlanta Holdings LLC, representing one hundred percent of the voting rights. Ex. B, Recital B & cl. 1.1. Wilson alone votes those shares and therefore alone controls the composition of the boards of the Damovo Group companies and the management of the enterprise. Ex. B, cll. 12.1, 13.1.

34. The Trust Instrument restricts the Trustee's powers in ways directly relevant here. The Trustee may not "make or enter into an agreement to make a Disposition … without the prior written consent of the Settlor." Ex. B, cl. 5.2(a). "Disposition" is defined to include "a sale … or other disposition or disposal of all or any portion of the Trust Assets directly or indirectly" and "the sale or other disposition of all or a material portion of the assets of the Company or any subsidiary." Ex. B, cl. 1.1.

35. The Trust Instrument further requires the Trustee, to the extent reasonably practicable, to "co-operate with the Settlor in respect of … a transaction involving the sale of all of the equity of the Damovo Group," and requires the Trustee to procure that the Damovo Group likewise co-operate. Ex. B, cll. 5.2(c), 5.3(b).

36. The Trust Instrument does not excuse the Trustee from the ordinary duties of a fiduciary. It expressly provides that "[t]he duty of care imposed upon the Trustees by law is not excluded by any term of this Instrument," Ex. B, cl. 14.5, and it withholds exoneration and

indemnity for loss attributable to a Trustee's own "gross negligence, wilful misconduct, bad faith or fraud." Ex. B, cll. 14.1, 14.3, 15.1.

37. Plaintiff anticipates that Defendants will invoke clause 12.2 of the Trust Instrument, which provides that no Beneficiary and no "Restricted Person" — a defined term that includes Plaintiff — "shall be entitled in any way to compel, control or force the exercise in any particular manner of any voting or other rights" exercisable by the Trustees. That clause does not reach this action. Plaintiff does not seek to compel Wilson to vote the Shares in any particular manner, to direct him to accept the Twelve Seas proposal, or to install any person on any board. Plaintiff seeks damages for tortious conduct causing him personal financial injury, an accounting, and an order that no disposition occur until the federal court supervising the restitution assets has approved it. Clause 12.2 restrains the exercise of control over trust voting rights; it does not immunize a trustee from liability in tort to a non-party injured by his conduct, and it is not a release.

38. Nor does the choice-of-law and forum provision of the Trust Instrument govern this action. Clause 26.1 selects the law of England and Wales, and clause 26.2 provides that "[t]he Parties (and each Group Company) shall submit to the exclusive jurisdiction of the English courts." Ex. B, cll. 26.1, 26.2. By its terms clause 26.2 binds "the Parties" and Group Companies. Plaintiff is not a party to the Trust Instrument, did not agree to that provision, and receives no benefit under the instrument — he is expressly excluded from being a Beneficiary. Ex. B, cl. 1.1 (definition of "Beneficiary"). Plaintiff's claims sound in tort and under federal statute, not under the Trust Instrument. Plaintiff nonetheless expressly reserves all positions regarding choice of law and the enforceability and scope of clause 26.2.

**B. The Damovo Group Is a Primary Restitution Asset Subject to Federal Court Supervision**

39. On January 23, 2025, the United States District Court for the Western District of North Carolina entered an Order Appointing Special Master in United States v. Lindberg, No. 3:23-CR-48-MOC, D.E. 56 (the "Special Master Order"). A true and correct copy is attached as Exhibit C.

40. The Special Master Order appointed Joseph Grier of Grier Wright Martinez PA as Special Master pursuant to 18 U.S.C. § 3664(d)(6), and Scott Avila of Paladin Management as Financial Advisor. Ex. C, Order ¶¶ 1–2.

41. The Special Master Order defines the "Primary Restitution Assets" to comprise "(a) AAPC Holdings, LLC and any related entities or trusts; and (b) New Hold Co. ('NHC') and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding and any related entities or trusts that include Specified Affiliated Companies." Ex. C, Findings ¶ 9.

42. The Damovo Group entities are Specified Affiliated Companies under the June 27, 2019 Memorandum of Understanding, and the Damovo Group is accordingly a Primary Restitution Asset. That is not Plaintiff's characterization alone. In the Consent Motion for Instruction Regarding Proposed Damovo Transaction filed August 17, 2026 in Causey v. Southland National Insurance Corp., No. 19-CVS-008664-910 (N.C. Super. Ct. Wake Cty.), the movants themselves state that the Damovo Group "has been designated a Primary Restitution Asset" in the federal criminal proceeding, and acknowledge that the Damovo transaction "must

be treated going forward under federal restitution law by the Federal Court.” Ex. D ¶¶ 1–2 & exhibits thereto.

43. The Special Master Order empowers the Special Master to “select an appropriate method and timetable and seek Court approval to liquidate and/or repatriate any available assets for the benefit of the victims,” and to “oversee and help accomplish the liquidation with Court approval and/or repatriation of any available assets for the benefit of the victims.” Ex. C, Order ¶¶ 3(c)–(d) (emphasis added). Liquidation of a Primary Restitution Asset is thus committed to that court’s approval.

44. The Special Master Order further directs that Plaintiff “shall take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, … all of Defendant’s, Global Growth Holdings, Inc.’s, and Global Growth Holdings, LLC’s rights and interests, whether held directly or indirectly, in the Primary Restitution Assets.” Ex. C, Order ¶ 4; see also id., Findings ¶ 9 (same undertaking). The Order also contemplates that the Special Master may draw upon “cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets,” id., Order ¶ 14, and reserves to the parties and the Special Master the right to move “to expand or narrow the scope of Primary Restitution Assets,” id., Order ¶ 15.

45. The Special Master Order further provides that if the Special Master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Plaintiff’s restitution obligations, he shall not seek to liquidate additional assets. Ex. C, Order ¶ 7. Any surplus value therefore inures to Plaintiff, and any shortfall falls upon Plaintiff.

46. Upon information and belief, no order approving the John Doe transaction has been sought from or entered by the United States District Court for the Western District of North Carolina.

47. Restitution under the Mandatory Victims Restitution Act is criminal punishment for purposes of the Ex Post Facto Clause. Ellingburg v. United States, 607 U.S. 163 (2026). The disposition of the Damovo Group bears directly upon the causation, offset, and credit determinations that remain to be made in the federal criminal proceeding. Plaintiff expressly reserves and does not waive any right, defense, objection, or constitutional challenge concerning restitution in any forum.

**C. The Twelve Seas Opportunity**

48. In or about early 2026, Plaintiff was approached by the controlling shareholder of Twelve Seas, a special purpose acquisition company listed on the NASDAQ under the ticker symbol "TWLV," which had raised approximately $172 million in its December 2025 initial public offering and was seeking to acquire assets of the kind represented by the Damovo Group.

49. Twelve Seas indicated a possible valuation of approximately $500 million for the Damovo Group — approximately twenty-seven times EBITDA — based on the limited financial information then available to it. Because the Damovo Group's books and records were not made available, no more precise indication was possible at that stage.

50. On March 6, 2026, Plaintiff prepared a written letter addressed to Michael Martinez, copying Paladin Management Group, captioned "Potential acquiror of Damovo." The letter identified Twelve Seas, stated the amount it had raised, stated the indicated valuation of approximately $500 million, and asked Martinez to "instruct Damovo to engage with this SPAC

so a full LOI can be prepared," observing that an offer anywhere near $500 million "would be attractive to all stakeholders." A true and correct copy of that letter is attached as Exhibit E.

51. Paladin Management is the firm whose principal, Scott Avila, was appointed Financial Advisor to the Special Master under the Special Master Order. Ex. C, Order ¶ 2. The letter therefore placed the opportunity squarely before the Special Master's own financial advisor.

52. Plaintiff instructed his then-counsel at Katten Muchin Rosenman LLP to transmit that letter. On the same day, counsel confirmed in writing that the letter had been sent, and advised that a member of the board of the New Holding Company had also been copied. In the course of that exchange, counsel asked whether a point person and contact information could be provided to the recipients.

53. Upon information and belief, no Defendant, and no person administering the Damovo Group or the restitution estate, thereafter contacted Twelve Seas, instructed the Damovo Group to engage with Twelve Seas, or commenced any diligence process with Twelve Seas in response to that letter.

54. On or about July 31, 2026, Twelve Seas delivered a written indication of interest proposing a business combination with the Damovo Group at an enterprise value of $400 million. It was transmitted by Twelve Seas' Chief Executive Officer directly to Plaintiff, asking how best to proceed — not through any process conducted by any Defendant or by any person administering the restitution estate. Ex. A.

55. The Twelve Seas letter states that Twelve Seas is "a special purpose acquisition company listed on the NASDAQ ('TWLV') and currently holding approximately $175 million in trust capital." Ex. A.

56. The Twelve Seas letter reflects that its proposal is based on its "review of the materials previously provided to us about Damovo" and its "independent research," and identifies Damovo's "diversified customer base, its broad geographic presence, and its fast-growing artificial intelligence initiatives" as the basis for its interest. Ex. A.

57. The valuation associated with Twelve Seas therefore declined by approximately $100 million — from the approximately $500 million indicated in March 2026 to the $400 million enterprise value proposed in the July 2026 letter — across the period during which Defendants and those administering the asset made no contact with Twelve Seas and permitted no diligence.

58. Upon information and belief, in the period of more than four months between the March 6, 2026 referral and the July 31, 2026 written indication of interest, and continuing thereafter, no Defendant and no person administering the asset responded substantively to Twelve Seas, facilitated customary due diligence, or negotiated in good faith toward definitive documentation.

59. Upon information and belief, Defendants' failure to engage was not the product of any reasoned business judgment that the Twelve Seas proposal was inferior, inadequately financed, or otherwise not credible. No such analysis was performed or communicated.

**D. The John Doe Transaction and the Payments That Drive It**

60. Upon information and belief, Defendants are instead pursuing a "sale for debt" to Defendant John Doe Buyer Company under which the Damovo Group would be transferred in exchange for the assumption of indebtedness, generating no sale proceeds.

61. The proposed purchaser has represented that the Damovo Group companies "are burdened with debt that exceed[s] the fair market value of the companies," such that the transaction would produce no sale proceeds in the traditional sense. Ex. D ¶ 3.

62. The only value identified in the John Doe transaction consists of approximately $17.5 million in consent fees: approximately $13 million to the Joint Provisional Liquidators of the Bermuda insurers, approximately $4.5 million to the New Holding Company, and ten dollars ($10.00) to the North Carolina insurance estates — an offer by which the North Carolina estates themselves reported they "were shocked." Ex. D ¶ 3.

63. Upon information and belief, the approximately $13 million payment denominated a "consent fee" to the Joint Provisional Liquidators "is in reality a settlement of their adversary proceeding" pending in the United States Bankruptcy Court for the Southern District of New York — that is, value extracted from a designated Primary Restitution Asset and redirected to settle separate litigation for the benefit of a single creditor constituency. Ex. D ¶ 3.

64. Upon information and belief, Defendant John Doe Buyer Company has offered tens of millions of dollars in "fee payments" and similar consideration to various stakeholders in order to induce them to withhold cooperation from the Twelve Seas proposal and to support the John Doe transaction.

65. Upon information and belief, Nickerson is to receive several million dollars in connection with the closing of the John Doe transaction, denominated a "transfer of control payment."

66. Plaintiff's belief as to the preceding paragraph is founded on the following facts: (a) beginning with the March 6, 2026 referral, and for the more than four months until the July 31, 2026 written indication of interest and continuing since, the Damovo Group has failed to engage with a credible, NASDAQ-listed acquirer or to respond to its $400 million indication of interest, a course of conduct that is inexplicable on ordinary commercial terms; (b) the transaction Defendants are instead pursuing yields no sale proceeds and would deliver ten dollars to the insurance estates whose policyholders the structure exists to protect; (c) the transaction is nonetheless structured to generate approximately $17.5 million in payments to persons whose consent is required to close it; (d) it is Nickerson, as Chief Executive Officer, who controls the flow of diligence information to prospective purchasers and who would have been the person to respond to Twelve Seas; and (e) upon information and belief, a payment to Nickerson contingent upon the closing of the John Doe transaction and denominated a "transfer of control payment" has been negotiated and is provided for in the transaction documents. The particulars of any such payment — its amount, its terms, its documentation, and the communications negotiating it — are peculiarly within the knowledge and control of Defendants and are not available to Plaintiff, who is incarcerated and has been excluded from the Damovo Group's books, records, and management.

67. A payment by a prospective purchaser to the chief executive officer of a target company, contingent upon that purchaser's acquisition of the target, and made in circumstances

where the chief executive is simultaneously declining to engage with a materially higher competing offer, is not a lawful transaction bonus. It is consideration paid to corrupt the loyalty of an agent to his principal.

**E. The Pattern: The Clanwilliam, Fleet, ECL, and Beckett Transactions**

68. The conduct alleged above is not isolated. Upon information and belief, Wilson has engaged in a repeated and continuing course of the same conduct with respect to other trusts and assets associated with Plaintiff.

69. With respect to the Clanwilliam Group, held in the Clanwilliam Group Trust of which Wilson was Trustee: in January 2024, Quadro One Acquisition Corp., a special purpose acquisition company trading on NASDAQ, signed a purchase agreement offering to purchase the Clanwilliam Group for $800 million. Wilson refused to provide the standard filings Quadro requested in diligence, and Quadro withdrew in March 2024. A second buyer, Apax Partners, offered $500 million; during Apax's diligence, upon information and belief, a director elected by Wilson advanced false and misleading information calculated to cause Apax to withdraw. In November 2024, two additional qualified buyers approached; Wilson ignored their solicitations and refused to provide information. Wilson then pursued a sale to TA Associates, LLP at a materially lower price, while Wilson's former law firm represented the acquirer.

70. With respect to the ECL Trust: Wilson took control of a portfolio of eye care companies valued in 2021 at approximately $195 million and generating over $10 million in EBITDA annually, placed the portfolio into bankruptcy in February 2024, and then sold the portfolio for approximately $8 million.

71. With respect to the Fleet Assist Group Trust: Wilson refused to provide financial records, tax returns, general ledgers, bank statements, and related documents to the Settlor and Beneficiary, notwithstanding written demand, including a letter delivered December 19, 2023.

72. With respect to the Beckett Collectibles asset, a designated Primary Restitution Asset: upon information and belief, that asset was disposed of at a price of approximately $134 million against a $1 billion valuation — a $866 million loss on the sale.

73. The pattern is consistent across each of these transactions: a credible, higher-value bidder is driven away or ignored; diligence is obstructed; a competitive process is prevented from forming; the asset is delivered to a preferred acquirer at a fraction of its value; and fees flow to the persons who made it happen.

## F. Injury to Plaintiff

74. Plaintiff is the judgment debtor of the restitution obligation that the Primary Restitution Assets, including the Damovo Group, exist to satisfy.

75. The restitution obligation is fixed in amount by the criminal judgment, and it is satisfied, and its outstanding balance reduced, as payments are made to the victims — including payments funded by the liquidation of the Primary Restitution Assets. See 18 U.S.C. § 3664(f), (j). Value realized on the disposition of a Primary Restitution Asset and applied to the victims is therefore credited against, and reduces, the balance Plaintiff must personally satisfy. Value not realized is not. Separately, and independently, 18 U.S.C. § 3664(j)(2) reduces the restitution owed by any amount a victim later recovers as compensatory damages for the same loss.

76. The consequence is the same whether the Primary Restitution Assets ultimately prove sufficient to satisfy the restitution obligation or fall short of it. If they fall short, every

dollar of value destroyed in the disposition of the Damovo Group enlarges the shortfall for which Plaintiff remains personally liable. If they suffice, then under paragraph 7 of the Special Master Order the surplus is not liquidated and reverts to Plaintiff, and every dollar of value destroyed reduces that reverting surplus. In either case the value realized on the Damovo Group bears directly and dollar-for-dollar on Plaintiff's own financial position.

77. If the Damovo Group is disposed of for no proceeds, no value is credited toward Plaintiff's restitution balance and none reverts to him. If the Damovo Group is instead sold at or near the $400 million enterprise value reflected in the Twelve Seas proposal, that value would be available to reduce the restitution balance Plaintiff must satisfy or, to the extent it exceeds that balance, to revert to him.

78. The difference between those two outcomes is a direct, out-of-pocket, personal financial injury to Plaintiff measured by the destroyed value of the Damovo Group — an amount to be proven at trial and, on the figures presently available, not less than $400 million, and, measured against the original approximately $500 million indication, not less than $500 million.

79. Plaintiff's injury is not derivative of any injury to the Damovo Group or to any trust. Plaintiff does not sue on behalf of the Damovo Group, on behalf of any Damovo entity, on behalf of the Damovo Group Trust, or on behalf of Damovo Financial Services, LLC. The injury Plaintiff asserts is the increase in Plaintiff's own personal liability that results directly from Defendants' conduct — an injury no other person suffers and no other person can assert.

80. Under the Special Master Order, any Primary Restitution Asset value in excess of the restitution obligation is not to be liquidated and inures to Plaintiff. Ex. C, Order ¶ 7. Plaintiff therefore holds a direct reversionary economic interest in the value of the Damovo Group.

81. Plaintiff anticipates that Defendants will contend that paragraph 4 of the Special Master Order divested Plaintiff of the claims asserted here and that the Special Master is the real party in interest under Fed. R. Civ. P. 17(a). That contention fails. Paragraph 4 is a directive to Plaintiff to take steps to secure his rights and interests in the Primary Restitution Assets in the Special Master's possession and control; it is not a self-executing assignment of causes of action against third parties. A tort claim against a trustee, a chief executive officer, and a prospective purchaser for conduct injuring Plaintiff personally is not itself an "interest in the Primary Restitution Assets." The reversionary economic interest described above goes to the measure of Plaintiff's injury and his stake in the outcome; it is not the res, and the personal tort and statutory claims pleaded here are not themselves Primary Restitution Assets held by the Special Master. And the injury Plaintiff asserts — the increase in his own restitution liability — is one the Special Master does not and cannot hold. Plaintiff seeks no relief inconsistent with the Special Master Order; to the contrary, he asks that no disposition occur until the supervising court has approved it, which is what that Order contemplates. To the extent any claim asserted here is determined to belong to, or to require prosecution in coordination with, the Special Master, Plaintiff will seek the Special Master's ratification, joinder, or substitution under Fed. R. Civ. P. 17(a)(3) rather than dismissal.

## G. Irreparable Harm

82. If the Damovo Group is sold to Defendant John Doe Buyer Company, the harm to Plaintiff cannot be remedied by an award of money damages.

83. The Damovo Group is a unique asset. It is a specific, going, multinational operating enterprise with a particular customer base, a particular geographic footprint, particular

contracts, and particular personnel. There is no substitute for it and it cannot be repurchased on any market.

84. Once the Damovo Group is transferred to a third-party acquirer, the corporate structure will be dismantled, the enterprise integrated into the acquirer's operations, and the asset placed permanently beyond the reach of any subsequent order of this Court or of the United States District Court for the Western District of North Carolina. Rescission will be impossible as a practical matter.

85. The Twelve Seas opportunity is itself unique and perishable. It is time-limited, it has already declined in value from approximately $500 million to $400 million during the period of Defendants' inaction, and it will be lost entirely if the Damovo Group is transferred to another acquirer.

86. Upon information and belief, Defendants do not have, and will not have, assets sufficient to satisfy a money judgment in the amount of the loss alleged. A damages remedy against them is therefore illusory.

87. The disposition would also occur without the approval that the Special Master Order contemplates for the liquidation of a Primary Restitution Asset, and would deprive the United States District Court for the Western District of North Carolina of the ability to make the causation, valuation, offset, and credit determinations committed to it before the asset is gone.

88. Plaintiff seeks no relief that would prevent a sale of the Damovo Group at fair value. He seeks only that no disposition occur until the court charged with supervising the restitution assets has approved it.

## FIRST CLAIM FOR RELIEF

## Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)

## (Against Wilson, Nickerson, and John Doe Buyer Company)

89. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

90. The Damovo Group — comprising UK Atlanta Holdings LLC and its direct and indirect subsidiaries, together with the Damovo Group Trust through which it is held — constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4). The enterprise is engaged in, and its activities affect, interstate and foreign commerce.

91. Wilson, Nickerson, and John Doe Buyer Company are each persons within the meaning of 18 U.S.C. § 1961(3), and each is distinct from the enterprise.

92. Wilson and Nickerson are associated with and employed by the enterprise. Wilson controls the enterprise through his holding of one hundred percent of the voting shares of the Company. Nickerson directs the enterprise's day-to-day operations as its Chief Executive Officer.

93. Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

94. The predicate acts of racketeering activity include multiple acts indictable under 18 U.S.C. §§ 1343 and 1346 (honest services wire fraud). Nickerson owed the enterprise a duty of honest services. Upon information and belief, he solicited or accepted, and John Doe Buyer Company offered or paid, a bribe or kickback in the form of a purported "transfer of control

payment" contingent upon the closing of the John Doe transaction, in exchange for Nickerson's refusal to engage with the Twelve Seas offer and his delivery of the enterprise to John Doe Buyer Company at a price far below value. In furtherance of that scheme, Defendants transmitted or caused to be transmitted writings, signals, and communications by means of wire in interstate and foreign commerce, including electronic mail, transaction documents, term sheets, and wire transfers of funds.

95. The predicate acts also include multiple acts indictable under 18 U.S.C. § 1952 (the Travel Act), which 18 U.S.C. § 1961(1)(B) designates a racketeering activity. Defendants used and caused the use of facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity — namely, bribery in violation of the laws of the State of Colorado, C.R.S. § 18-5-401 — and thereafter performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate that unlawful activity. Bribery of private employees prohibited by state criminal statutes violates the Travel Act. Perrin v. United States, 444 U.S. 37 (1979).

96. These predicate acts are related. They share the same purpose (to acquire the Damovo Group and other Lindberg-related assets at prices far below value), the same participants, the same methods of commission (obstruction of diligence, suppression of competing bids, and payments to persons whose cooperation was required), and the same victim.

97. These predicate acts amount to and pose a threat of continued criminal activity. The conduct extended over a substantial period of time, encompassing the Clanwilliam, Fleet, ECL, and Beckett matters from 2023 through 2025 and the Damovo matter from 2026 through

the present, and it is ongoing: the John Doe transaction has not closed and Defendants continue to pursue it.

98. Plaintiff was injured in his business or property by reason of the violation. The predicate acts were both the but-for and the proximate cause of Plaintiff's injury: the direct and intended consequence of suppressing the Twelve Seas offer was that the Damovo Group would be disposed of for no proceeds, so that no value would be credited toward the balance of Plaintiff's restitution obligation and none would revert to him as surplus, leaving Plaintiff personally liable for the enlarged shortfall. As set forth in paragraphs 74 through 80 above, that injury is Plaintiff's own and is not derivative of injury to the enterprise, to any trust, or to the victims: no other person bears Plaintiff's restitution liability, and no other person can assert its increase.

99. Plaintiff is entitled under 18 U.S.C. § 1964(c) to recover threefold the damages he has sustained, together with the costs of suit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against Wilson, Nickerson, and John Doe Buyer Company)

100. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

101. Wilson, Nickerson, and John Doe Buyer Company each knowingly agreed to the commission of the violation of 18 U.S.C. § 1962(c) alleged above, and agreed to facilitate the conduct of the enterprise's affairs through the pattern of racketeering activity described. The agreement was not one among a single corporate entity and its own officers acting within the

scope of a single enterprise: it joined a trustee, a chief executive officer, and an outside prospective purchaser, each an independent actor with distinct interests, in a common unlawful objective.

102. Each of them knew of and adopted the goal of the conspiracy: to deliver the Damovo Group to John Doe Buyer Company at a price far below its value, and to compensate those whose cooperation was necessary to that end through payments denominated as consent fees, fee payments, and transfer of control payments.

103. Plaintiff was injured in his business or property by reason of the conspiracy and is entitled to threefold damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**THIRD CLAIM FOR RELIEF**

**Breach of Fiduciary Duty**

**(Against Wilson)**

104. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

105. Wilson, as Trustee holding legal title to one hundred percent of the voting equity of the Damovo Group, owes fiduciary duties of loyalty, care, prudence, and good faith in the administration of the Trust Assets.

106. Those duties include the duty to administer the trust as a prudent person would; to exercise reasonable care, skill, and caution; to take reasonable steps to take control of and protect the trust property; to keep adequate records of the administration of the trust; and to exercise all discretionary powers in good faith. The Trust Instrument expressly does not exclude the duty of care imposed by law. Ex. B, cl. 14.5.

107. Wilson breached those duties by, among other things: (a) failing to respond to, evaluate, or engage with a written indication of interest at a $400 million enterprise value; (b) failing to permit or facilitate customary due diligence by Twelve Seas; (c) supporting or acquiescing in a transaction yielding no sale proceeds while a materially higher offer remained outstanding; (d) failing to conduct any market check before permitting the disposition of the entire enterprise; (e) permitting or acquiescing in payments to persons whose cooperation was required to close the John Doe transaction; (f) failing to obtain the prior written consent of the Settlor to a Disposition as required by clause 5.2(a) of the Trust Instrument; (g) failing to co-operate with the Settlor in respect of a transaction involving the sale of all of the equity of the Damovo Group as required by clauses 5.2(c) and 5.3(b); and (h) proceeding without the approval contemplated by the Special Master Order.

108. Wilson's conduct constitutes gross negligence, wilful misconduct, bad faith, or fraud within the meaning of clauses 14.1, 14.3, and 15.1 of the Trust Instrument, and he is therefore not exonerated or indemnified in respect of it. Ex. B, cll. 14.1, 14.3, 15.1.

109. Plaintiff has been damaged by these breaches in an amount to be proven at trial and not less than $500 million.

110. Plaintiff pleads this claim under the common law of the State of Colorado and, in the alternative, under the Colorado Uniform Trust Code, C.R.S. § 15-5-801 et seq., and, in the further alternative, under whatever body of law this Court determines governs the administration of the Damovo Group Trust. Plaintiff reserves all positions regarding choice of law as set forth in paragraph 38 above.

## FOURTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**

**(Against Nickerson)**

111. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

112. Nickerson, as Chief Executive Officer of the Damovo Group, owes fiduciary duties of loyalty, care, and good faith, including the duty not to place himself in a position where his personal financial interest conflicts with the interest of the enterprise he serves, and the duty not to accept consideration from a counterparty to a transaction he is charged with evaluating.

113. Nickerson breached those duties by, upon information and belief, soliciting or accepting a payment from or on behalf of Defendant John Doe Buyer Company contingent upon the closing of the John Doe transaction, and by thereafter declining to engage with the Twelve Seas offer, obstructing diligence, and steering the enterprise to John Doe Buyer Company at a price far below its value.

114. Nickerson's conduct was intentional, and was undertaken with knowledge that it would cause the loss of value alleged.

115. Plaintiff asserts this claim in his own right and not derivatively. As set forth in paragraphs 74 through 80 above, the injury for which Plaintiff seeks recovery is the increase in his own personal restitution liability, which is distinct from any injury to the enterprise and which no other person may assert.

116. Plaintiff has been damaged by these breaches in an amount to be proven at trial and not less than $500 million.

**FIFTH CLAIM FOR RELIEF**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against John Doe Buyer Company and the Damovo Defendants)**

117. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

118. Wilson and Nickerson each owed and breached fiduciary duties as alleged above.

119. Defendant John Doe Buyer Company knew of those duties and knowingly participated in and substantially assisted their breach by, upon information and belief, offering and paying consideration to Nickerson and to other persons whose cooperation was required, for the purpose and with the effect of inducing them to disregard the Twelve Seas offer and to deliver the enterprise below value.

120. The Damovo Defendants, acting through officers and directors other than Nickerson who knew of the foregoing, knowingly participated in and substantially assisted the breaches by withholding diligence materials from Twelve Seas and by advancing the John Doe transaction.

121. Plaintiff has been damaged thereby in an amount to be proven at trial and not less than $500 million.

## SIXTH CLAIM FOR RELIEF

## Civil Conspiracy

## (Against All Defendants)

122. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

123. Two or more of the Defendants agreed, by words or conduct, to accomplish an unlawful goal, or to accomplish a lawful goal by unlawful means: namely, to suppress the Twelve Seas offer and to transfer the Damovo Group to John Doe Buyer Company at a price far below its value, through commercial bribery and breaches of fiduciary duty.

124. Each Defendant had knowledge of and consented to that object.

125. One or more unlawful overt acts were performed in furtherance of the conspiracy, including the offer and acceptance of the payments alleged, the withholding of diligence materials from Twelve Seas, and the negotiation and documentation of the John Doe transaction.

126. Plaintiff has suffered damages proximately caused by the conspiracy in an amount to be proven at trial and not less than $500 million.

## SEVENTH CLAIM FOR RELIEF

## Conversion

## (Against Wilson, Nickerson, and John Doe Buyer Company)

127. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

128. Plaintiff holds a reversionary economic interest in the Trust Assets, being the entire issued and outstanding ordinary shares of UK Atlanta Holdings LLC, and in the identifiable proceeds of any disposition of those shares.

129. The consent fees, transfer of control payments, and other consideration to be paid in connection with the John Doe transaction are specific, identifiable funds derived from and constituting proceeds of the Trust Assets.

130. Defendants have exercised, and threaten to exercise, dominion and control over those shares and those identifiable proceeds in a manner inconsistent with Plaintiff's rights, by proposing to transfer the shares without the consent required by clause 5.2(a) of the Trust Instrument and without the approval contemplated by the Special Master Order, and by proposing to distribute the identifiable proceeds to themselves and to third parties.

131. Plaintiff has demanded, and hereby demands, the return of that property and those proceeds.

132. Plaintiff has been damaged thereby in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### Accounting and Constructive Trust

### (Against All Defendants)

133. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein.

134. A fiduciary relationship exists between Wilson and the Trust Assets in which Plaintiff holds a reversionary economic interest, and between the Damovo Group and Nickerson.

135. The financial affairs at issue are complex, the records are exclusively within Defendants' possession and control, and Plaintiff has no adequate remedy at law to ascertain the value of the Damovo Group, the terms of the John Doe transaction, or the amounts paid or promised to Defendants and others.

136. Plaintiff has repeatedly demanded financial records and accountings and has received none.

137. Plaintiff is entitled to a full accounting of the Damovo Group's financial records for the past five years, including audited and unaudited financial statements, general ledgers, bank statements, tax returns, board minutes and board reports, and all management and director compensation, together with an accounting of all consideration paid or promised in connection with the John Doe transaction.

138. Any amounts received by Defendants in connection with the John Doe transaction were received in breach of fiduciary duty and in derogation of Plaintiff's rights, and Defendants hold and would hold such amounts as constructive trustees for the benefit of Plaintiff and of the federal restitution estate.

## NINTH CLAIM FOR RELIEF

### Preliminary and Permanent Injunctive Relief

### (Against All Defendants)

139. Plaintiff incorporates and realleges the preceding paragraphs as if fully set forth herein. Plaintiff pleads this Claim as a request for equitable remedy incident to the substantive claims pleaded above.

140. Plaintiff is likely to succeed on the merits of the claims set forth above.

141. Plaintiff will suffer irreparable harm in the absence of preliminary relief for the reasons set forth in paragraphs 82 through 88 above: the Damovo Group is a unique asset that cannot be replaced or repurchased; once transferred it will be beyond recovery and rescission will be impossible; the Twelve Seas opportunity is perishable and will be extinguished; Defendants lack the means to satisfy a money judgment, rendering the legal remedy illusory; and the disposition would defeat the ability of the United States District Court for the Western District of North Carolina to make the determinations committed to it.

142. The balance of equities tips sharply in Plaintiff's favor. Plaintiff does not seek to prevent a sale of the Damovo Group. He seeks only that no disposition occur without the approval that the Special Master Order contemplates. Defendants have no legitimate interest in closing a transaction without the approval of the court that supervises the asset.

143. An injunction serves the public interest. Thousands of insurance policyholders and the federal restitution process depend upon the value of the Damovo Group. The public interest is served by ensuring that a designated Primary Restitution Asset is not disposed of for no proceeds while a $400 million indication of interest stands unanswered, and by ensuring that the orders of a federal court governing restitution assets are respected.

144. Plaintiff has no plain, speedy, or adequate remedy at law.

## E. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Greg E. Lindberg respectfully requests that this Court:

a. Enter a temporary restraining order and preliminary and permanent injunctive relief enjoining Defendants, and all persons acting in concert with them, from consummating, closing, or taking any further step in furtherance of any sale, transfer, encumbrance, or

other disposition of the Damovo Group, or of any material portion of its assets or equity, unless and until the United States District Court for the Western District of North Carolina has entered an order approving that transaction and all of its terms;

b. Enter an order requiring that all consideration of any kind arising from any Damovo transaction — including sale proceeds, consent fees, settlement payments, fee payments, transfer of control payments, affiliate debt repayments, and consideration in any other form — be deposited into the registry of the United States District Court for the Western District of North Carolina pending that court's determination of its treatment;

c. Enter an order directing Defendants to respond to, and to engage in good faith with, the Twelve Seas indication of interest attached as Exhibit A, including by facilitating customary due diligence;

d. Award Plaintiff compensatory damages in an amount to be proven at trial and not less than $500,000,000;

e. Award Plaintiff threefold his damages, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

f. Order a full accounting of the Damovo Group's financial records for the past five years, including audited and unaudited financial statements, general ledgers, bank statements, tax returns, board minutes and board reports, and all management and director compensation, together with a full accounting of all consideration paid or promised to any person in connection with the John Doe transaction;

g. Order the production of all communications between Defendant John Doe Buyer Company (and its agents, advisors, and affiliates) and the Damovo Group and its officers,

directors, and agents, including all communications concerning the Twelve Seas indication of interest and all communications concerning any payment to any officer, director, trustee, or other stakeholder;

h. Impose a constructive trust upon all amounts received by any Defendant in connection with the John Doe transaction;

i. Award pre-judgment and post-judgment interest as allowed by law;

j. Grant Plaintiff leave, following the exchange of initial disclosures and upon a prima facie showing of a triable issue, to amend this Complaint to assert a claim for exemplary damages pursuant to C.R.S. § 13-21-102, which Plaintiff does not assert in this initial claim for relief in view of C.R.S. § 13-21-102(1.5)(a); and

k. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

**F. PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. See 28 U.S.C. § 1746; 18 U.S.C. § 1621.

I further declare that the factual contentions set forth above have evidentiary support or, where specifically identified as made upon information and belief, are likely to have evidentiary

support after a reasonable opportunity for further investigation or discovery. See Fed. R. Civ. P. 11(b)(3).

In accordance with Federal Rule of Civil Procedure 11, all pleadings, motions, and other papers submitted must be signed by the plaintiff, if unrepresented, or otherwise by an attorney. All papers submitted to the court must contain a certificate stating the date a true and correct copy of the pleading, motion, or other paper was mailed or served to each opposing counsel or unrepresented party. Failure to meet these requirements could result in the denial of the motion or the striking of the pleading or other paper submitted.

/s/ Greg E. Lindberg

*(Plaintiff's signature)*

Greg E. Lindberg
Plaintiff, pro se
BOP Register No. 34-828-058
P.O. Box 159
Thonotosassa, FL 33592
919-308-9686
gelindberg@gmail.com

August 26, 2026

*(Date)*

## INDEX OF EXHIBITS

**Exhibit A** Twelve Seas Investment Company III indication of interest dated July 31, 2026

**Exhibit B** Irrevocable Trust Instrument Relating to a Change of Control Trust for the Damovo Group, dated June 17, 2021

**Exhibit C** Order Appointing Special Master, United States v. Lindberg, No. 3:23-CR-48-MOC, D.E. 56 (W.D.N.C. Jan. 23, 2025)

**Exhibit D** Greg E. Lindberg's Response to Consent Motion for Instruction Regarding Proposed Damovo Transaction, Causey v. Southland National Insurance Corp., No. 19-CVS-008664-910 (N.C. Super. Ct. Wake Cty., filed Aug. 19, 2026), together with all exhibits thereto

**Exhibit E** Letter from Greg E. Lindberg to Michael Martinez, copying Paladin Management Group, dated March 6, 2026, captioned "Potential acquiror of Damovo"

**Exhibit F** Declaration of Greg E. Lindberg pursuant to 28 U.S.C. § 1746

# EXHIBIT A

Twelve Seas Investment Company III indication of interest dated July 31, 2026

TWELVE SEAS

July 31, 2026

Mr. Greg Lindberg
Global Growth Holdings
P.O. Box 159
Thonotosassa, FL 33592

**RE: Indication of Interest in Business Combination with Damovo**

Dear Mr. Lindberg,

On behalf of Twelve Seas Investment Company III (the "Company"), a special purpose acquisition company listed on the NASDAQ ("TWLV") and currently holding approximately $175 million in trust capital, I am pleased to submit this letter outlining our interest in pursuing a potential business combination with Damovo, a multinational technology services company that provides communications, cybersecurity and other service to defense, healthcare, insurance, retail and other industries ("Damovo").

Based on our review of the materials previously provided to us about Damovo, and based on our independent research, we believe that Damovo represents a very attractive merger candidates for Twelve Seas. We are especially impressed by Damovo's diversified customer base, its broad geographic presence, and its fast-growing artificial intelligence initiatives.

We would be looking to structure a transaction with an enterprise value of Damovo of $400 million, which would be paid through a combination of our cash in trust, additional funds raised (PIPE) and newly issued shares of our SPAC.

Please accept this letter as a formal indication of our interest in commencing discussions regarding a Twele Seas – Damovo merger. Any potential transaction would, of course, be subject to customary conditions, including the completion of satisfactory due diligence, necessary regulatory reviews and audits, and the execution of definitive transaction documentation.

We look forward to working closely with you and your team on this endeavor in the near future.

Sincerely,

Dimitri Elkin
CEO
Twelve Seas Investment Company III

# EXHIBIT B

Irrevocable Trust Instrument Relating to a Change of Control Trust for the Damovo Group, dated June 17, 2021

EXECUTION VERSION

DATED 17 June 2021

**DAMOVO FINANCIAL SERVICES LLC**

**AND**

**ROBERT GADDY**

**AND**

**HUGH S. WILSON**

---

# IRREVOCABLE TRUST INSTRUMENT

RELATING TO A CHANGE OF CONTROL TRUST
FOR THE DAMOVO GROUP

---

LATHAM & WATKINS

London
99 Bishopsgate
London EC2M 3XF
(44) 020 7710 1000 (Tel)
(44) 020 7374 4460 (Fax)

# TABLE OF CONTENTS

## CONTENTS


| Clause | | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 3 |
| 2. | ESTABLISHMENT OF TRUST | 6 |
| 3. | DURATION OF THE TRUST | 7 |
| 4. | POWERS OF THE TRUSTEE | 7 |
| 5. | EXERCISE OF POWERS AND RESTRICTIONS ON EXERCISE | 8 |
| 6. | TRUSTEE WARRANTIES AND UNDERTAKINGS | 9 |
| 7. | POWERS OF THE BENEFICIARY | 9 |
| 8. | PROVISION OF INFORMATION TO TRUSTEES | 10 |
| 9. | CONFIDENTIALITY | 10 |
| 10. | RESIDUAL TRUSTS AND END OF TRUST PERIOD | 11 |
| 11. | TREATMENT OF DIVIDENDS | 11 |
| 12. | VOTING | 11 |
| 13. | INDEPENDENCE OF DAMOVO GROUP BOARDS | 12 |
| 14. | EXONERATION OF TRUSTEES | 12 |
| 15. | INDEMNITY | 13 |
| 16. | APPOINTMENT, RETIREMENT AND REMOVAL OF TRUSTEES | 13 |
| 17. | REMUNERATION AND PAYMENT OF TRUST COSTS | 14 |
| 18. | CLAIMANT'S OBLIGATIONS | 15 |
| 19. | RIGHTS OF SETTLOR CREDITORS | 15 |
| 20. | TAX MATTERS | 15 |
| 21. | NOTICES | 16 |
| 22. | AMENDMENT OF TRUST INSTRUMENT | 16 |
| 23. | COUNTERPARTS | 16 |
| 24. | ASSIGNMENT | 16 |
| 25. | THIRD PARTY RIGHTS | 17 |
| 26. | LAW | 17 |
| SCHEDULE 1 | ADMINISTRATIVE POWERS | 4 |
| SCHEDULE 2 | TRUSTEE REMUNERATION | 5 |

**THIS TRUST INSTRUMENT** is made the 17 day of June 2021

**BETWEEN:**

(1) **DAMOVO FINANCIAL SERVICES, LLC** a company registered in Delaware whose registered office is at 2140 S Dupont Highway, Camden, Kent County, Delaware 19934 (**"the Settlor"**);

(2) **ROBERT GADDY** whose address is at 7206, Kepley Road, Chapel Hill, North Carolina NC27517, USA (the **"Original Beneficiary"**); and

(3) **HUGH S. WILSON** whose address is at 575 Circle Drive, Denver, Colorado 80206-4112 USA (**"the Original Trustee"**);

each, a **"Party"** and together, the **"Parties"**

**RECITALS**

A. The Settlor, as legal and beneficial owner of the entire issued share capital of the Company (as defined below), has resolved to put in place the trust constituted by this Instrument so that, during its term, GL (as defined below) shall not have any ability to direct or influence save in the limited situations specified by this Instrument, or continue to be the ultimate beneficial owner of, the Damovo Group (as defined below).

B. As more particularly set out in the terms of this Instrument the assets to be acquired by the Trust shall be the entire issued and outstanding ordinary shares in the Company (as defined below) representing 100 per cent of the voting rights available to members of the Company and related rights, the Trust is irrevocable and only capable of dissolution in limited, prescribed circumstances, the Trustees are and will be independent of GL and shall not include a Restricted Person and the Beneficiaries shall not include GL or any GL Affiliate (as defined below).

C. The Settlor and the Original Trustee shall enter into the Trust Note (as defined below).

D. The Trust hereby created shall, save to the extent expressly or impliedly excluded, be made subject to the provisions of the Trustee Act 1925 and the Trustee Act 2000.

**NOW THIS INSTRUMENT WITNESSES** as follows:

**1. DEFINITIONS AND INTERPRETATION**

1.1 In this Instrument unless the context otherwise requires the following expressions have the following meanings respectively:-

**"Adverse Proceeding"** means the appeal and final resolution of the jury verdict in the trial of Greg Lindberg in the Western District of North Carolina;

**"Beneficiary"** means the Original Beneficiary or such other person or persons as designated from time to time by the Settlor as a Beneficiary in addition to or in place of the Original Beneficiary or any other Beneficiary so designated (or both) by giving no less than 5 business days' notice in writing of such designation to the Trustees, provided that such person shall not include GL or any GL Affiliate;

**"Code"** means the Internal Revenue Code of 1986 of the United States, as amended from time to time;

**"Company"** means UK Atlanta Holdings LLC a company registered in North Carolina (no. 1720481) whose registered office is at 2626, Glenwood Avenue, Ste 550, Raleigh, North Carolina, 27713, USA ;

**"Control"** means with respect to any specified person, the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" shall have meanings relative to the foregoing. Without limiting the generality of the foregoing, a person shall be deemed to Control any other person in which it owns, directly or indirectly, more than 50% of the ownership interests;

**"Damovo Group"** means together or separately the Company and any subsidiaries and subsidiary undertakings of the Company from time to time;

**"Disposition"** means a sale encumbrance, lien on or other disposition or disposal of all or any portion of the Trust Assets directly or indirectly; any partial disposition via issuance of shares, restricted shares; any issuance of employee stock-based compensation; the sale or other disposition of all or a material portion of the assets of the Company or any subsidiary; or the merger or other conversion of the Company; other than by reason of the application of such Trust Assets towards the Trust Costs as permitted herein;

**"GL"** means Greg Lindberg whose address is at 410 S. Rampart #390, Las Vegas, NV 89145.

**"GL Affiliate"** means (i) Global Growth Holdings Inc.; (ii) a corporation, limited partnership, general partnership, limited liability company, joint venture, association, company or other organisation under the Control of GL or Global Growth Holdings Inc.; and (iii) any person with a familial relationship with GL including, but not limited to, GL's current, former or (if applicable) future spouse or any of GL's children (natural or adopted);

**"Global Growth Holdings Inc."** means Global Growth Holdings Inc., a company registered in Delaware (no. 7918372) whose registered office is at 251 Little Falls Drive, Wilmington, Delaware 19808, c/o Corporation Service Company, United States;

**"Group Company"** means any company within the Damovo Group;

**"Maturity Date"** means the earlier of:

(a) the occurrence of a Disposition involving the sale or transfer of all Trust Assets; or

(b) the date of 17 June 2031;

**"Original Trustee"** has the meaning given in the Parties section of this Instrument;

**"person"** means a natural person, corporation, limited partnership, general partnership, limited liability company, joint venture, association, company, trust, bank trust company, land trust, business trust, statutory trust, or other organisation, whether or not a legal entity, and a government or agency or political subdivision thereof;

**"Regulations"** means U.S. Treasury Regulations promulgated under the Code;

**"Related Trustee"** means a trustee in respect of a trust settled by Global Growth Holdings, Inc. or any other GL Affiliate or business interest of GL from time to time where such trustee is required pursuant to the relevant terms of the trust to act independently from GL, any GL Affiliate or any business interest of GL provided that such trustee does not have a personal or other relationship (apart from a business relationship in its role as such a trustee);

**"Representatives"** means, in relation to a Party, its respective employees, agents, external legal advisers, accountants, consultants and financial advisers and, in the case of a company, also its respective directors and officers and providers of finance (and any of their respective employees, agents and external advisors);

**"Restricted Person"** means GL, any GL Affiliate and any other person who has personal, contractual, business, familial or other relationship with GL, Global Growth Holdings Inc. or any other of GL's Affiliates or business interests from time to time, in each case extending to any entity that was a GL Affiliate even if they are no longer a GL Affiliate but for the purposes of this definition: (i) a GL Affiliate shall exclude any existing member of the board of directors of an existing Group Company; and (ii) an individual shall not be considered to be a Restricted Person solely by reason of being a Related Trustee (and being party to agreements relating to their performance of that role);

**"Settlor Group"** means together or separately the Settlor and any subsidiaries and subsidiary undertakings of the Settlor from time to time;

**"Shares"** means the entire issued and outstanding ordinary shares in the Company transferred on or around the date of this Instrument from the Settlor to the Trustee to hold pursuant to the terms of the Trust;

**"Share Transfer Note Letter"** means the transfer note dated the same date as this Instrument pursuant to which the Original Trustee subscribes for the Shares;

**"Tax"** means:

(a) all taxes, levies, imposts, duties, social security contributions, surcharges, charges or withholdings, in each case in the nature of taxes, whether of the United Kingdom or elsewhere and shall include any amount payable as a consequence of any claim, direction, order or determination of any tax authority competent to impose, administer, levy, assess or collect any of the foregoing;

(b) any amount of tax which is the subject of or results in a charge, security or right to sell imposed by, or provided by statute to, a tax authority over any of the assets of the Trust; and

(c) all interest, penalties, surcharges, fines and other charges relating to any of the above or to a failure to make any return, comply with any reporting requirements or supply any information in connection with any of the above and the cost of removing any charge or other encumbrance imposed by a tax authority,

whether or not directly or primarily chargeable against or attributable to the Trustees and regardless of whether any Trustees has, or may have any right of reimbursement against any other person;

**"Trust"** means the trust created by this Instrument;

**"Trust Assets"** means the Shares, and all cash, property income, capital accretion or otherwise representing or derived from the Shares, any receivables and all related rights during the Trust Period and such other assets (if any) as the Trustees may come to hold on the terms of the Trust following the date of this Instrument;

**"Trust Costs"** has the meaning given in Clause 17.2;

**"Trust Documents"** means this Instrument and the Trust Note;

**"Trust Note"** means the promissory note dated on or around the date of this Instrument issued to the Settlor by the Trustees;

**"Trust Period"** has the meaning given in Clause 3;

**"Trustees"** means the Original Trustee while serving as trustee and such other person or persons as may be the trustees or trustee in place of or in addition to the Original Trustee for the time being, appointed in accordance with the terms set out in this Instrument and **"Trustee"** means any one of them.

For the purpose of the interpretation of this Instrument:

(a) words denoting the singular shall include the plural and vice versa;

(b) words denoting the masculine gender shall include the feminine gender and vice versa;

(c) no account shall be taken of clause headings which have been inserted for ease of reference only;

(d) references to any statutory provision shall be read and construed to references to such provision as is amended or re-enacted from time to time;

(e) references to clauses and Schedules are to be read and construed as references to clauses and Schedules of this Instrument;

(f) general words shall not be given a restrictive meaning because they are followed by words which are particular examples of the acts, matters or things covered by the general words and "including", "include" and "in particular" shall be construed without limitation;

(g) references to a person's loss of or ceasing to have "capacity" or being subject to an "incapacity" or similar shall mean any legal, physical or mental disability which renders that person incapable of managing his own affairs or in the case of a Trustee the administration of the Trust and the decision of the Settlor reached in good faith and after such inquiry as the Settlor deems appropriate as to when such disability exists or ceased to exist or does not exist shall be conclusive and binding and neither the Settlor nor the Trustees shall be liable for any action which may be taken by them or any other person pursuant to any such decision; and

(h) a reference to the Settlor shall include, where appropriate, any successor company resulting from any reconstruction or amalgamation of the Settlor.

## 2. ESTABLISHMENT OF TRUST

2.1 The Settlor and the Original Trustee by execution of this Instrument intend to and establish the Trust which shall operate as an irrevocable trust and shall be administered by the Trustees in accordance with this Instrument.

2.2 The Trust shall be established under the name "The Damovo Group Trust" and any correspondence, activities and operations in respect of the Trust shall be administered under such name.

2.3 The Original Trustee shall be the first Trustee of the Trust.

2.4 The Settlor shall have the power to designate from time to time any person or persons to be a Beneficiary whether in addition to or in place of the Original Beneficiary or any other Beneficiary so designated (or both) by giving no less than 5 business days' notice in writing of

such designation to the Trustees, provided that such person shall not include GL or any GL Affiliate and such a designation may specify the shares in which the Beneficiaries shall be entitled to the Trust Assets.

2.5 On every change in the Beneficiaries in accordance with Clause 2.3 a memorandum should be endorsed on or permanently annexed to this Instrument stating the names and addresses of the persons who are the Beneficiaries for the time being. The Trustee shall be entitled to rely on such memorandum (of the latest memorandum if more than one) as sufficient evidence that the persons named therein are duly designated Beneficiaries.

2.6 The Trustees shall hold the Trust Assets during the Trust Period on trust for each Beneficiary equally or in such shares as may be designated by the Settlor in any notice designating a Beneficiary.

## 3. DURATION OF THE TRUST

3.1 The Trust shall remain in existence and endure for the period beginning on the date of this Instrument and ending on the first occurring of:

(a) the reversal of the conviction in the Adverse Proceeding via reversal, acquittal, dismissal, final decision of the government to not re-try the case following any mistrial or remand for new trial, pardon, commutation or other exoneration or discharge of any sentence, provided such reversal, acquittal, dismissal or decision is final with no further right to appeal, retrial or other recourse available to the government, together with written confirmation from the Company that the expiration of the Trust will not materially adversely affect the operations of the Group; or

(b) the Trustees being satisfied (having consulted with the board of the Company) that the Trust is no longer required by reason of another trust having been interposed in the ownership structure such that no Restricted Person will become the ultimate beneficial owner of the Group following termination of the Trust; or

(c) the death of GL; or

(d) the Maturity Date; or

(e) the termination of the Trust as required pursuant to a final and binding court order,

(the "**Trust Period**").

## 4. POWERS OF THE TRUSTEE

4.1 Subject to the provisions of Clause 5 below, The Trustees shall have all powers necessary and desirable to exercise all rights, privileges and discretions related to the Trust Assets at their absolute discretion including, but not limited to, those powers as set out in Schedule 1 to this Instrument insofar as the exercise of those powers shall not be inconsistent with the trust created by this Instrument.

4.2 During the Trust Period, without prejudice to Clause 9.1 the Trustees shall use all powers available to them pursuant to this Instrument to procure that no part of the Trust Assets (including the Shares and any other Trust Assets from time to time) shall be transferred directly or indirectly to a Restricted Person, other than as expressly permitted under Clause 11.

4.3 Each power shall be a separate power in addition to and without prejudice to the generality of all other powers vested in the Trustees, subject to the provisions of Clause 5 below and the Trustees may exercise all or any of those powers from time to time, without the intervention of

any Beneficiary, in such manner and to such extent as the Trustees in their absolute discretion see fit.

4.4 In the exercise of their powers and discretions, the Trustees may consider any recommendations made to them by the relevant Company's board of directors but the relevant Company's board of directors shall have no power to direct the Trustees to comply with such recommendations.

4.5 Notwithstanding the powers conferred on the Trustees by virtue of this Instrument or applicable law, none of the Trustees shall be obliged by this Instrument or by applicable law to perform any service or action other than or additional to:

(a) being the legal owner(s) of the Shares and any other Trust Asset, subject to and in accordance with this Instrument for the benefit of the Beneficiary;

(b) attending, in person or by proxy, and voting at the extraordinary general meetings or annual general meetings of the relevant Company;

(c) complying with the obligations of the Trustee under this Instrument; and

(d) making a Disposition of Trust Assets back to the Settlor in accordance with this Instrument,

without prejudice to the foregoing the Trustees shall not owe a duty of care to any Group Company.

## 5. EXERCISE OF POWERS AND RESTRICTIONS ON EXERCISE

5.1 No power, authority or discretion conferred on the Trustees by this Instrument or by law shall (despite anything to the contrary expressed or implied in this Instrument) be exercised if it causes any part of the Trust Assets to become applicable for the benefit of a Restricted Person (provided, however, that it is stipulated that a payment of any amounts owing to the Settlor pursuant to Clause 10.1, or any payments on the Trust Note, whether of principal, fees, or interest, shall not be a violation hereof) and shall not constitute a Disposition.

5.2 The Trustees shall:

(a) not make or enter into an agreement to make a Disposition (including pursuant to paragraph (b) below) without the prior written consent of the Settlor;

(b) not make a Disposition to the Settlor or any Restricted Person other than upon expiry of the Trust Period by reason of the events or circumstances described in sub-Clause 3.1(a); and

(c) to the extent that is reasonably practicable, co-operate with the Settlor in respect of a broader refinancing of the Settlor Group and / or a transaction involving the sale of all of the equity of the Damovo Group.

5.3 The Trustees shall use such powers as are then available to it in their capacity as registered holder of the Shares to procure that:

(a) no Group Company shall enter into any arrangements in respect of any refinancing in respect of the Damovo Group without the prior written approval of the Settlor; and

(b) the Damovo Group shall, to the extent that is reasonably practicable, co-operate with the Settlor in respect of a broader refinancing of the Settlor Group and / or a transaction involving the sale of all of the equity of the Damovo Group.

5.4 The Trustees shall not and are not permitted to perform any business of the Trust in the United Kingdom.

## 6. TRUSTEE WARRANTIES AND UNDERTAKINGS

6.1 Each Trustee hereby warrants, represents and undertakes to the Settlor that:

(a) Save, in the case of a Trustee that is a Related Trustee, in relation the representations below which relate to its business relationship or fees received in connection with any Related Trustee role that the relevant Trustee holds from time to time (and any agreements relating to the performance by the Trustee of that role):

(i) it is independent of, and not associated with, and does not have any personal, business or other relationship with, GL, any GL Affiliate or any Restricted Person;

(ii) it is, independent of, and not associated with, and does not have any personal, business or other relationship with any entity, business, asset or person owned by GL any GL Affiliate or any Restricted Person or, to the best of its knowledge, any entity, business, asset or person controlled, directly or indirectly, GL, any GL Affiliate or any Restricted Person; and

(iii) to the best of its knowledge and belief, it has not received any financial support or assistance, other than the Fees paid or payable by the Trust under this Instrument, from GL, any GL Affiliate or any Restricted Person;

(b) excluding the Trust Assets and any assets of any trust of which the relevant Trustee is a Related Trustee, it does not own, directly or indirectly, any shares, rights, warrants or options to acquire or subscribe for, any shares or other securities, any other voting interest, or any property or interest in property in the Company or any entity owned or controlled by GL, any GL Affiliate or any Restricted Person;

(c) it is capable of and shall at all times perform its duties as Trustee independent of, and without any influence from, GL, any GL Affiliate or any Restricted Person;

(d) it is capable of and shall at all times perform its duties as Trustee in accordance with all applicable laws;

(e) it is not and will not become resident in the United Kingdom for United Kingdom tax purposes and does not and will not act as Trustee in the course of a business which it carries on in the United Kingdom through a branch, agency or permanent establishment there;

(f) it is not and will not become a Restricted Person; and

(g) it is not acting upon and will not act upon any instruction or recommendation from a Restricted Person in the performance of its duties as Trustee.

6.2 Each Trustee covenants and undertakes to the Settlor to ensure that the matters as set out in sub-clauses 6.1(a)(i) to 6.1(f) shall remain true and correct for as long as he remains a trustee of the Trust.

## 7. POWERS OF THE BENEFICIARY

Save as provided by law, the Beneficiaries shall have no powers in the respect of the Trust or the Trust Assets during the Trust Period.

## 8. PROVISION OF INFORMATION TO TRUSTEES

8.1 The Trustees shall be entitled to rely upon any information relevant to the Trust and the Trust Assets supplied to them by the Settlor or by any Group Company, or any Representative or agent thereof, as conclusive evidence of the matter to which it relates and without prejudice to the generality of Clause 15 shall (fraud, wilful misconduct and gross negligence excepted) be in no way liable to the Settlor, the Beneficiary or any other person claiming for any loss caused or allegedly caused as a consequence of the Trustees relying on such information.

8.2 The Settlor shall, upon any reversal of the conviction of the Adverse Proceeding via reversal, acquittal, dismissal, final decision of the government to not re-try the case following any mistrial or remand for new trial, pardon, commutation or other exoneration or discharge of any sentence, as described in Clause 3.1(a), provide to the Trustee such evidence and confirmation from legal counsel that the Trustee may reasonably request that the relevant reversal, acquittal, dismissal or decision has taken place and is final with no further right to appeal, retrial or other recourse available to the government.

8.3 Without prejudice to the Trustee's duties in respect of the Trust, the Trustees may but are not required to retain at the expense of the Trust and to rely upon the expertise of independent consultants in performing their duties.

8.4 The Settlor and the Beneficiary confirm that the Trustees shall be entitled to rely on (i) Principal Amount of the Trust Note as being representative of fair market value for the Shares; (ii) a rate of 25% as being an appropriate rate of interest; and (iii) a valuation multiple of 19.1 x EBITDA as being an appropriate valuation metric for the Company, in each case as at the date of this Instrument for the purpose of agreeing the principal value and rate of interest to be included in the Trust Note and in full satisfaction of the Trustee's duties to agree the same under the Trust.

## 9. CONFIDENTIALITY

9.1 Subject to Clauses 9.2 and 9.3, each Party:

(a) shall treat as strictly confidential the provisions of this Instrument and any confidential information relating to the Damovo Group which they receive in connection herewith (whether before or following the date of this Instrument) (together "**Confidential Information**"); and

(b) shall not, except with the prior written consent of the other Parties (which shall not be unreasonably withheld or delayed), make use of (save for the purposes of performing its obligations under this Instrument) or disclose to any person (other than its Representatives in accordance with Clause 9.2) any Confidential Information.

9.2 Clause 9.1 shall not apply if and to the extent that the Party using or disclosing Confidential Information can demonstrate that:

(a) such disclosure is or reasonably appears to be required by law or by any stock exchange or any supervisory, regulatory, governmental or anti-trust body having applicable jurisdiction, (including, for the avoidance of doubt, any tax authority having applicable jurisdiction); or

(b) the Confidential Information concerned has come into the public domain other than through its fault (or that of its Representatives) or the fault of any person to whom such Confidential Information has been disclosed in accordance with this Clause 8.4.

9.3 Each Party undertakes that it shall (and shall procure that its affiliates shall) only disclose Confidential Information to Representatives where it is reasonably required for the purposes of

exercising its rights or performing its obligations under this Instrument or the other Trust Documents and only where the Representatives are informed of the confidential nature of the Confidential Information and the provisions of this Clause 8.4. In addition, the Parties agree that to the extent that any public communication, press announcement or any formal communication is required to be made in connection with this Instrument and the matters contained herein, each Party shall, acting in good faith, consult with the other Parties and take into account any reasonable feedback prior to making such announcement or communication.

9.4 The provisions of this Clause 10 shall survive termination or lapse, as the case may be, and shall continue for a period of five years from the date of this Instrument or (if later) two years from the date following the termination of this Instrument.

9.5 In no event shall any Trustee be required to make a public announcement or communication, save for any announcements or communication required by applicable laws or regulation.

## 10. RESIDUAL TRUSTS AND END OF TRUST PERIOD

10.1 At the end of the Trust Period, the Trust Assets shall be first used to settle in full all amounts owing on the Trust Note and, subject to full repayment and settlement of the Trust Note having occurred, the Trustees shall (subject to any prior exercise by them of their powers under this Instrument) make arrangements for the distribution of any residual Trust Assets to one or more of the Beneficiaries then living and in such proportion(s) equally or otherwise as may have been designated in writing to the Trustees by the Settlor.

10.2 A transfer by the Trustees to the Settlor of the Trust Assets (including the proceeds of any Disposition) on the Maturity Date or, if earlier, the termination of this Instrument shall constitute the payment to the Settlor by the Original Trustee or any other Trustee who has acceded to the Trust Note as debtor of the Principal Amount (as defined in the Trust Note) plus all accrued but unpaid interest (after provision of all Trust Costs) in full, regardless of whether the value of the Trust Assets shall have decreased below the outstanding balance of the Principal Amount (as defined in the Trust Note) (plus all accrued but unpaid interest) at the time of such payment.

10.3 For the purposes of valuing the Shares at the end of the Trust Period the Trustees shall use a valuation multiple no greater than the valuation multiple used to determine the Principal Amount in the Trust Note (being a valuation multiple of 19.1 x EBITDA on a debt free cash free basis).

## 11. TREATMENT OF DIVIDENDS

11.1 Following any deductions required for all Trust Costs as set forth in Clause 17, the Trustee shall use all net cash from any cash dividends received by the Trust in relation to the Shares to make interest payments or, with the prior consent of the Settlor, principal payments, in respect of the Trust Note pursuant to the terms as set out in therein and such payment shall not be deemed to be Disposition.

## 12. VOTING

12.1 Subject to the provisions in Clause 5, the Trustees shall be entitled to vote in respect of the Shares held in the Trust Assets at any general meeting of the relevant Company.

12.2 None of the Beneficiaries and no Restricted Person shall be entitled in any way to compel, control or force the exercise in any particular manner of any voting or other rights which may from time to time be exercisable by the Trustees.

12.3 The Trustees shall be entitled to rely on all information as set forth in Clause 8 in exercising their rights to vote Shares.

## 13. INDEPENDENCE OF DAMOVO GROUP BOARDS

13.1 During the Trust Period, the Trustees shall use such powers as are available to them in their capacity as registered holder of the Shares to procure that there shall be:

(a) no change to the board of directors of the Company, except in the event of death, resignation or disability of a director; and

(b) no Restricted Person shall become a member of any board of directors of any member of the Damovo Group.

## 14. EXONERATION OF TRUSTEES

14.1 None of the Trustees shall be liable for any loss or damage to the Trust Assets or the income thereof arising from any improper investment or purchase made or retained by the Trustees or other action taken or omitted to be taken by the Trustees (subject to the terms of this Instrument) in good faith unless such loss or damage is attributable to fraud, wilful misconduct or gross negligence on the part of the Trustees (or any of them).

14.2 The Trustees shall:

(a) be under no obligation to procure that the Trust prospers;

(b) be under no obligation to ensure that the Trust Assets increase in value;

(c) be under no obligation to ensure that Trust diversifies or makes any investment for and on behalf of the Trust;

(d) save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, not be liable for any loss, reduction in value, destruction, damage, seizure or sequestration of the Trust Assets (or any part thereof) to the Settlor or any Beneficiary; or

(e) be under no obligation to take any action in relation to the Trust unless that action is appropriately funded in compliance with applicable law from the Trust Assets available to the Trustee.

14.3 Save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, neither the Settlor nor any Beneficiary shall have recourse to any of the personal assets of Trustees as a result of any breach of the terms of this Instrument, including but not limited to any enforcement action brought against the principal private residence or any other residence maintained by any Trustee. Save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, the Trust Assets shall be the only source of funds to satisfy a claim for damages by the Settlor against the Trustee for any reason. None of the Trustees shall be considered to have a conflict of interest by virtue of the fact that any of them have personal investments in industries or businesses of a similar nature of any business or going concern carried out by any part of the Trust Assets from time to time.

14.4 None of the Trustees shall be liable as above for a delegation or appointment made, or permitted to continue, by the Trustees, absent fraud, wilful misconduct or gross negligence.

14.5 The duty of care imposed upon the Trustees by law is not excluded by any term of this Instrument.

## 15. INDEMNITY

15.1 No Trustee shall be liable for any loss or damage to the Trust Assets (or any part thereof) or to the Settlor or any Beneficiary, caused by any act or omission of the Trustee, or other event or thing whatsoever, whether with respect to trust administration, modification, investment, management or distribution, any election, allocation or division, or the purchase or retaining of any property legally requiring remedial action or any other matter pertaining to the Trustee's services as such, unless the loss or damage is due to the Trustee's own gross negligence, wilful misconduct, bad faith or fraud (herein "**Indemnified Acts**"). Each Trustee serving at any time with respect to a trust hereunder shall be fully indemnified from the Trust Assets (and thereafter, if the Trust Assets cannot adequately indemnify the Trustees, will be indemnified by the Settlor and the Settlor shall procure indemnification from the Settlor Group) for any liability, attorneys' fees or other reasonable expenses or costs incurred by, or judgment, amount paid in settlement or other damages assessed against, the Trustee with respect to all Indemnified Acts, and such amounts incurred in defending an action brought or threatened in respect of Indemnified Acts shall be paid out of the Trust Assets (or by the Settlor if the Trust Assets cannot adequately cover such amounts) in advance of final disposition upon delivery to the Settlor of a legal opinion of trust counsel that indemnification is likely to be warranted and the Trustee's written agreement to refund such amounts if it is ultimately determined that indemnification is not warranted.

15.2 Unless the Trustees have actual notice that an event has occurred affecting the beneficial interests in any trust hereunder, the Trustees shall not be liable to any beneficiary for distributions made as though the event had not occurred.

15.3 In addition, the Trustee shall have the benefit of all powers, privileges and immunities conferred upon a trustee by statute or by the law of England and Wales.

15.4 This Clause 15 survives the completion of any Trustee's service as Trustee and the termination of this Instrument.

## 16. APPOINTMENT, RETIREMENT AND REMOVAL OF TRUSTEES

16.1 Any Trustee may, at any time, by written notice given to the Company and any co-trustee, retire from office one month after the date when the notice is received by the Company (or any shorter period agreed in writing by the Company) provided that where the retiring Trustee is the sole Trustee any such retirement shall take effect upon the appointment by the Company of a replacement Trustee pursuant to Clause 16.3.

16.2 The Company may following receipt of the Settlor's consent (such consent not to be unreasonably withheld or delayed):

(a) remove any Trustee from office by giving 30 days' prior written notice to that Trustee (unless such notice is waived by such Trustee and subject to as provided in Clause 16.3) without giving any reason for the removal. This power can only be exercised if there will be, on the removal, at least one remaining person as Trustee, or if the Trustee simultaneously designates a replacement Trustee;

(b) appoint a person (or persons) in place of any Trustee who ceases to be a Trustee for any reason; and

(c) appoint additional Trustees (without limitation as to number),

in each case provided that no Restricted Person shall be appointed as a Trustee at any time and provided that the new Trustee(s) shall accede to this Instrument and the Trust Note.

16.3 In the event that a Trustee gives notice to retire from office, dies, ceases to have capacity, becomes bankrupt or insolvent or unable to pay its debts as they fall due the Company shall, following receipt of the Settlor's consent (such consent not to be unreasonably withheld or delayed) replace the relevant Trustee (and in the event of the Trustee's death, loss of capacity, bankruptcy or insolvency, the removal of the relevant Trustee may be made immediately by written notice) provided that no Restricted Person shall be appointed as a Trustee at any time and provided that the new Trustee(s) shall accede to this Instrument and the Trust Note.

16.4 Subject to the requirements set out in Clause 16.2, any person may be appointed as Trustee, on the terms and conditions the Company agrees with that person, wherever that person is domiciled or resident (or is incorporated or carries on business, if it is a corporation), save that no person may be appointed as Trustee if it is resident in the United Kingdom for United Kingdom tax purposes or if it will act as Trustee in the course of a business which it carries on in the United Kingdom through a branch, agency or permanent establishment there or, if it is a corporation, if it is incorporated in any part of the United Kingdom.

16.5 A retiring or removed Trustee shall execute all transfers or other documents, and do all acts necessary to vest the Trust Assets in the new or continuing Trustees. A retiring or removed Trustee who is liable under this Instrument in any way shall not be bound to transfer the Trust Assets unless reasonable security is provided to indemnify that Trustee against the liability. In the event that the retiring or removed Trustee fails to take such acts the continuing Trustee or, in the case where the sole Trustee has retired or been removed, the Beneficiary shall have the power to execute all transfers or other documents, and do all acts necessary to vest the Trust Assets in the new or continuing Trustees, provided that reasonable security is provided to indemnify the retiring or removed Trustee against the liability.

16.6 Unless there is a sole Trustee, this Clause 16.6 shall govern the proceedings of the Trustees:

(a) the trusts, powers and discretions vested in the Trustees by this Instrument shall be exercised by all the Trustees acting together;

(b) without prejudice to sub-clause 16.6(a), if there are more than two Trustees then any disagreements between Trustees on the exercise of the trusts, powers and discretions vested in them shall be determined by majority vote;

(c) without prejudice to sub-clauses 16.6(a) and 16.6(b), if no majority is reached by the Trustees in respect of a matter between Trustees on the exercise of the trusts, powers and discretions vested in them, then the Company may pursuant to the terms set out in this Instrument (i) appoint a replacement Trustee; or (ii) appoint an additional Trustee, in each case such that a majority vote can be reached; and

(d) unless otherwise agreed by the Trustees, a resolution in writing signed by each Trustee (whether on the same document or in counterparts) shall be as valid as if it has been passed at a meeting of the Trustees.

16.7 On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Instrument stating the names of the persons who are the Trustees for the time being and shall be signed by the persons so named. Any person dealing with the affairs of this Trust shall be entitled to rely upon any such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the persons named therein are duly constituted the Trustees.

## 17. REMUNERATION AND PAYMENT OF TRUST COSTS

17.1 Each Trustee shall be remunerated by the Trust by the Settlor, out of the Trust Assets or, if agreed between the Trustee and Company, by the Company (or any other company in the

Damovo Group as agreed between the Company and the Trustee), in such amount and on such terms as set out in Schedule 2 to this Instrument.

17.2 The Trustees shall pay from the Trust Assets all trust costs and Taxes, including, but not limited to expenses incurred in the establishment of the Trust and any costs and Taxes incurred in connection with the establishment of the Trust, in the administration and devolution of the Trust Assets, the determination and payment of Taxes thereon, the services and expenses of agents retained by the Trustees in execution of their duties and other expenses described in this Instrument (the "**Trust Costs**"), and the Trustees shall be entitled to reimbursement for any Trust Costs incurred and advanced on behalf of the Trust. To the extent that the Trustees consider that there is not sufficient cash in the Trust Assets to pay or reimburse such expenses they shall request payment by the Settlor and the Settlor shall, subject to compliance with applicable laws, make such payment.

## 18. CLAIMANT'S OBLIGATIONS

18.1 Any person entitled to, or claiming, any benefit under the Trust shall produce any evidence and information required by the Trustees for the purposes of the Trust. Payment of any benefit under the Trust to any person shall be conditional on that person producing any evidence or information that the Trustees may require.

18.2 The Trustees shall be entitled to deduct from any benefit payable any Tax or duty for which the Trustees are or may be liable in respect of the benefit concerned.

18.3 The Trustees shall not be accountable for, or obliged to see to, the application of any payment made under this Instrument if it is made:

(a) directly to a minor, to his parent or guardian or to the person with whom he resides; or

(b) to any individual or institution who or which is or appears to be responsible for the care of a person to whom the payment is otherwise to be made;

if the Trustees in their absolute discretion consider that that person's incapacity does not warrant their making the payment to him direct.

## 19. RIGHTS OF SETTLOR CREDITORS

19.1 Nothing in this Instrument and the Trust hereby constituted is intended to impact on the rights of any existing creditors of the Settlor or its affiliates.

## 20. TAX MATTERS

20.1 The Trust shall not constitute a "business trust" within the meaning of Regulations Section 301.7701-4(b) or any other business entity for federal income tax purposes, but shall instead constitute a trust within the meaning of Regulations Section 301.7701-4(c) and a "grantor trust" under Subpart E of Part 1, Subchapter J of the Code (Code Sections 671 and following) in the United States. As such, all income and deductions of the Trust are treated for income tax purposes as income and deductions of the Settlor.

20.2 The Settlor and the Trustees agree that they will file all tax returns in a manner consistent with the intent set out in Clause 20.1 unless otherwise required by a taxing authority. Except as otherwise expressly provided herein, any tax elections required or permitted to be made by the Trust under the Code or otherwise will be made by the Settlor. The Trust will not elect to be treated as a corporation for any tax purpose. In addition, notwithstanding any other provision of this Agreement, the Trustees shall pay to the Settlor such amounts from the net income of the Trust as shall be necessary for the Settlor, or advised by the Settlor to pay any U.S. or non-U.S. federal, state and local income tax on the net income of the Trust that is required to be paid

by the Settlor or its owners pursuant to Subpart E of the Code and the comparable provisions of any state or local income tax law or regulation. For purposes of this Clause 20.2, the "Settlor" shall include the person (individual or entity) ultimately liable for payment of U.S. or non-U.S. federal, state, and local income tax on the income of the Trust that is deemed to pass through the Settlor for Tax law purposes. The amount payable by the Trust to the Settlor for a particular tax period pursuant to this Clause 20.2 shall be determined based on a reasonable estimate of the amount of Tax that would be due based on the highest applicable tax rate applied to the amount of net income of the Trust for that tax period that would be deemed to pass through to the Settlor from the Trust. The Trust shall pay the amount required pursuant to this Clause 20.2 at least 10 days prior to the relevant statutory deadline for payment of the applicable Tax.

20.3 Notwithstanding the foregoing provisions of this Clause 20, if the Trustee shall receive any notice of Tax due or deficiency from any jurisdiction that has or appears to have taxing authority over the Trust, nothing shall prevent the Trustees from satisfying such amounts from the Trust Assets.

## 21. NOTICES

Any notice or information to be given hereunder by the Settlor to the Trustees shall be validly given if it is signed by any member of the board of directors of the Settlor or such person or persons as are authorised by the Board.

## 22. AMENDMENT OF TRUST INSTRUMENT

The Trustees may at any time by deed amend any of the provisions of this Instrument in any respect, provided that such amendment shall not have effect if:

(a) it would affect the purpose of the Trust;

(b) it would confer on the Settlor or any Restricted Person a benefit or possibility of a benefit out of the Trust Assets or income thereof except to the extent contemplated hereunder and pursuant to the Trust Note;

(c) it would extend the power conferred in this Clause 22 to remove the restrictions in this Clause;

(d) it would reduce or adversely affect the right or interest of any Beneficiary insofar as such right or interest has been granted, awarded or allocated pursuant to the prior exercise by the Trustees of their powers under this Instrument; or

(e) the deed making the amendment has not been executed by the Settlor (unless the Settlor is in liquidation or has previously confirmed in writing to the Trustees that its consent to any future amendment is no longer necessary).

## 23. COUNTERPARTS

This Instrument may be executed in any number of counterparts and by the parties on separate counterparts but shall not be effective until each Party has executed at least one counterpart and each counterpart shall constitute an original of this Instrument but all other counterparts shall together constitute one and the same instrument.

## 24. ASSIGNMENT

24.1 No benefits or rights under this Instrument can be assigned, charged or alienated in any way. No payment shall be made in respect of any benefit or right if:

(a) the person entitled to it has, to the knowledge of the Trustees, purported to assign or charge that payment (or any part of it or any interest in it); or

(b) the Trustees know of any act or event which would or may reasonably result in the benefit or right (or any part of or interest in it) belonging to that person to become vested in, or charged in favour of, any person(s) other than that person or his legal personal representatives.

24.2 Subject to other provisions of this Instrument, the Trustees shall have full discretion as to the payment or application of any benefit forfeited to, or for the benefit of, such person.

**25. THIRD PARTY RIGHTS**

25.1 The named beneficiaries shall be entitled to the rights and benefits of, and rely on, Clause 16 and Clause 23 and shall, in each case, have the right to enforce the relevant terms by reason of the Contracts (Rights of Third Parties) Act 1999.

25.2 Except as provided for in Clause 25.1, a person who is not a party to this Instrument shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

25.3 Each party represents to the other that their respective rights to terminate, rescind or agree any amendment, variation, waiver or settlement under this Instrument are not subject to the consent of any person that is not a party to this Instrument.

**26. LAW**

26.1 The Trust and the Instrument and any non-contractual obligations arising out of or in connection therewith shall be governed by and construed in accordance with the laws of England and Wales.

26.2 The Parties (and each Group Company) shall submit to the exclusive jurisdiction of the English courts, in relation to any dispute or claim arising under the Trust, this Instrument or any non-contractual obligation arising out of or in connection therewith, notwithstanding that one or more of the Trustees may from time to time be resident or domiciled elsewhere than in England.

This agreement has been entered into as a deed on the date stated at the beginning of it.

Signed and delivered as a deed by **DAMOVO FINANCIAL SERVICES, LLC**

DocuSigned by:
Greg Lindberg
D94F2DEFCB50443...

Authorised Signatory

In the presence of DocuSigned by: Catia Perry 6650A15977B44EB...

Name: Catia Perry

Address: 2148 Madison Ave
Montgomery, AL 36107

Position: Executive Assistant

SIGNED AND DELIVERED as a Deed by **HUGH S. WILSON** in the presence of Clare Maloney Wilson

**HUGH S. WILSON** [signature]

In the presence of [signature: Clare Maloney Wilson]

Name: Clare Maloney Wilson

Address: 575 Circle Dr

Denver Co 80206

Position: Spouse

SIGNED AND DELIVERED as a Deed by **ROBERT GADDY** in the presence of

**ROBERT GADDY** ..............................

In the presence of ..............................

Name: Janet Chen

Address: 604 Tinkerbell Rd.
Chapel Hill, NC 27517

Position: Assistant Director, NCSU

## SCHEDULE 1

## ADMINISTRATIVE POWERS

Subject to the limitations set forth herein, the Trustees powers shall include, but shall not be limited to:

1.1 the power to receive notice of, attend and vote at any general meeting of the ordinary shareholders of the relevant Company, including all or any adjournment of such meetings;

1.2 the power to sign any resolution as the registered holder of the Shares;

1.3 the power to complete and return proxy cards, consents to short notice and any other documents required to be signed by the registered holder of the Shares;

1.4 the power to otherwise execute, deliver and do all deeds, instruments and acts insofar as may be done in the Trustees' capacity as the registered holder of the Shares in exercising its powers as Trustees under the Trust;

1.5 to power to insure the Trust Assets (to the extent appropriate);

1.6 the power to procure that each of the Trustees obtains professional indemnity insurance for so long as they are a Trustee of the Trust together with any run-off cover deemed prudent by the relevant Trustee in respect of such professional indemnity insurance;

1.7 the power to perform the obligations of the Trustees under the Trust Note;

1.8 the power to perform the obligations of the Trustees under this Instrument;

1.9 the power to open a bank account or bank accounts for and on behalf of the Trust and carry on normal banking processes;

1.10 the power to file any tax returns the Trustees may determine in their absolute discretion are required and pay (or refrain from paying) Taxes and estimated income taxes on any reasonable basis the Trustees may determine in their absolute discretion without any liability whatsoever for overpayment, underpayment or non-payment of such Taxes or for any loss, interest or penalty because of such overpayment, underpayment or non-payment;

1.11 the power to collect, compromise, release or otherwise settle claims; to institute suits (at law or in equity); to collect any property or interest of the Trust Assets; to be reimbursed for expenses of litigation; and to be indemnified out of the Trust Assets for all such expenses prior to instituting any such legal action;

1.12 the power to accept the payment or transfer of further assets to the Trustees to hold on the terms of the Trust whether from the Settlor or a third party, where the Trustees believe that this is necessary or beneficial for the operation of the Trust; and

1.13 the power to amend this Instrument (i) to comply with any relevant court order; or (ii) to cure ambiguities or correct minor errors that are not inconsistent with the other provisions of this Instrument.

## SCHEDULE 2

## TRUSTEE REMUNERATION

1.1 The Original Trustee shall be paid the sum of €20,000 (plus VAT, if applicable) per (whole or partial) calendar month (the "***Fees***"), for as long as he remains a Trustee. The Fees shall be paid by the Settlor or, if agreed between the Trustee and Company, by the Company (or any other company in the Damovo Group as agreed between the Company and the Trustee). To the extent applicable, the Fees shall be paid to the Trustee net of any withholding tax amounts.

1.2 The Fees shall be paid into a bank account nominated in writing by the Original Trustee in arrears each calendar month following the date of this Instrument (or on the Business Day next following such date to the extent that such date is not a Business Day).

1.3 Any other Trustee shall have his or its remuneration determined by the Settlor at the time of appointment of such Trustee and the terms of such remuneration shall be recorded in the relevant deed of accession to this Instrument.

1.4 Any Trustee shall be deemed to be an independent contractor and nothing in this Instrument shall give rise to an employment relationship between the Trustee (or its director or officers) and any other entity. No Trustee shall be required to perform his or its duties in the United Kingdom or any other locale.

# EXHIBIT C

Order Appointing Special Master, United States v. Lindberg, No. 3:23-CR-48-MOC, D.E. 56 (W.D.N.C. Jan. 23, 2025)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3-23-cr-48-MOC**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| GREG E. LINDBERG | ) |

**ORDER APPOINTING SPECIAL MASTER**

**THIS MATTER IS BEFORE THE COURT** on the Joint Motion for Appointment of Special Master, filed by the United States and Defendant Greg E. Lindberg on December 5, 2024. (Doc. No. 54). The motion is **GRANTED**.

**THE COURT HEREBY FINDS AS FOLLOWS:**

1. On February 23, 2023, in a thirteen-count Bill of Indictment, Defendant was charged with conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. (Id. at ¶ 185).

2. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." (Doc. No. 40). In paragraph 10(a) of the plea agreement, Defendant also agreed "to pay full restitution" to all victims of the conduct charged in the Bill of Indictment, including the following

insurance companies and their impacted policyholders: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. (Id.).

3. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, victims are accorded specific rights, and the Act confirms that victims have "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

4. To fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i).

5. In this case, complicated issues are likely to arise in determining an appropriate restitution order because, among other reasons: (a) there are several insurance company victims that collectively have thousands of wronged policyholders; (b) the amount of restitution owed is substantial; (c) several of the insurance company victims are in liquidation proceedings; (d) some of the victims have received, or may before sentencing receive, various amounts of repayment of their outstanding debts; (d) priority of payment, if applicable, amongst victims has yet to be determined; (e) certain property or assets may have joint or overlapping ownership and/or may be subject to various third party claims; (f) certain victims may have civil judgments for money damages against Defendant and his entities; and (g) Defendant's business assets from which restitution will likely be paid are not readily convertible into cash.

6. Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid.

7. It would be unduly burdensome for the Government, the Probation Office, the Clerk of Court, and the investigative agencies to attempt this process. As a result, an experienced, neutral, and disinterested person should be appointed to assist the Court. Section 3664 authorizes courts to "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). It would conserve the resources of this Court and others if a special master is appointed to resolve victim and restitution issues in this case under the Court's supervision and guidance.

8. The parties recommend that the Court appoint Joseph Grier of Grier Wright Martinez PA as the special master pursuant to 18 U.S.C. § 3664(d)(6). The parties further recommend that the Court appoint Scott Avila of Paladin Management as the special master's financial advisor to assist the special master in the performance of all tasks related to this Order. Mr. Grier and Mr. Avila have submitted declarations outlining their qualifications and standard rates. Mr. Grier and Mr. Avila are well-qualified to serve in these roles, and the Court finds that their standard rates appear reasonable.

9. To assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth

Holdings, LLC's rights and interests, whether held directly or indirectly, in the following assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic or controlling interest (collectively referred to as the "Primary Restitution Assets"):

a. AAPC Holdings, LLC and any related entities or trusts; and

b. New Hold Co. ("NHC") and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding and any related entities or trusts that include Specified Affiliated Companies.[1]

10. Defendant has agreed to cooperate with the special master in carrying out the duties and responsibilities of the special master and to take all necessary steps identified by the special master to assist the special master in carrying out his/her duties pursuant to this Order. Defendant has also agreed to refrain from taking and/or cease taking any actions identified by the special master as interfering with the special master carrying out his/her duties.

11. Courts have approved of appointing special masters and have given them responsibilities similar to those being requested in the instant case. See, e.g., United States v. Vaughan, No. 3:01CR11, 2008 U.S. Dist. LEXIS 98817, at *1 (W.D.N.C. Dec. 3, 2008) (Thornburg, J.) (special master appointed in case with losses totaling $33 million involving complicated, offshore, and/or inadequately documented financial transactions to assist in noticing potential victims, setting percentages for their losses, and ultimately distributing $3 million to more than 500 victims); United States v. Olivares, No. 3:13-CR-335, 2014 U.S. Dist. LEXIS 76743, at *2 (W.D.N.C. June 5, 2014) (Cogburn, J.) (special master, who was receiver in parallel civil case

[1] See Exhibit A to the Memorandum of Law in Support of the Joint Motion for Appointment of Special Master (Doc. No. 55-1).

brought by U.S. Securities and Exchange Commission, appointed in $850 million Ponzi scheme with 900,000 potential victims in over 150 countries). Here, the requested relief is administratively reasonable; will further the interests of justice as to victim rights; will promote cooperative efforts between the parties, the Court, and others involved or interested; and will increase efficiency in the collection and timely distribution of restitution. Accordingly, for the aforementioned reasons, a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims.

**IT IS THEREFORE ORDERED** that the Joint Motion For Appointment of Special Master is **GRANTED**.

**IT IS FURTHER ORDERED** that:

1. Joseph Grier of Grier Wright Martinez PA (the "Special Master") is appointed as Special Master pursuant to 18 U.S.C. § 3664(d)(6).

2. Scott Avila of Paladin Management (the "Financial Advisor") is appointed as the Special Master's Financial Advisor. The Financial Advisor shall assist the Special Master in the performance of all tasks related to this Order. In so assisting the special master, the financial advisor shall be allowed to utilize such other personnel at Paladin Management as reasonably necessary for the performance of his duties as Financial Advisor, and Paladin Management and such personnel should also be granted the rights and protections of "Financial Advisor" under terms of this Order.

3. The Special Master is hereby empowered to perform the following necessary tasks:

a. verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses;[2]

b. identify all assets available for liquidation and/or repatriation for the benefit of the victims, including any such assets held by GBIG Capital, LLC, GBIG Holdings, Inc., PBX Holdings, LLC, PBX Bermuda Holdings, Ltd., BMX Holdings, LLC., BMX Bermuda Holdings, Ltd. and any of their subsidiaries, and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets;

c. select an appropriate method and timetable and seek Court approval to liquidate and/or repatriate any available assets for the benefit of the victims;

d. oversee and help accomplish the liquidation with Court approval and/or repatriation of any available assets for the benefit of the victims;

e. clear title to all assets for transfer to bona-fide buyers;

f. fashion a proposed restitution order;

g. apportion any available funds among the victims in accordance with the Court's restitution order and, if necessary, propose an apportionment methodology to be applied to future restitution payments received;

h. receive and distribute restitution payments to victims in accordance with the Court's restitution order;

---

[2] Defendant has reserved all rights with regard to any arguments regarding calculating loss amount. See U.S.S.G. § 2B1.1Note 3(E)(formerly 2F1.1); see also U.S. v. Lane, 323 F.3d 568, 585-89 (7th Cir. 2003); United States v. Monk, No. 2:20-CR-22-WKW, 2020 WL 5219534 at **8–9 (M.D. Ala. Sept. 1, 2020). Restitution amounts should be reduced by any amount victims have recovered for the same losses. See 18 U.S.C. § 3664(j)(2).

i. cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims, such cooperation and coordination to include seeking modifications, if necessary, of any existing restraining orders and/or injunctions;

j. retain a law firm, including his own, and/or other professionals to assist the Special Master in carrying out his duties;

k. provide periodic reports to the Court about the status of Defendant's restitution obligations; and

l. pay Defendant's outstanding and future legal fees if such fees and expenses have been approved by the Court.

4. Defendant shall take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the Primary Restitution Assets.

5. The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the Special Master deems it helpful in fulfilling his duties under this Order.

6. In accomplishing the tasks enumerated above, the Special Master shall attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets.

7. If the Special Master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Defendant's restitution obligations, he shall not seek to liquidate additional assets owned, controlled, and/or associated with Defendant and/or his entities or in

which Defendant and/or his entities have an economic interest (the "Secondary Restitution Assets") until and unless he determines, and so notifies the Court, that the Primary Restitution Assets are not likely to be sufficient to fully satisfy Defendant's restitution obligations.

8. Defendant shall cooperate with the Special Master in carrying out the duties and responsibilities of the Special Master and take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order. Defendant shall also refrain from taking and/or cease taking any actions identified by the Special Master as interfering with the Special Master carrying out his/her duties. If Defendant fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties.

9. The Special Master shall give due consideration to the Government's efforts and the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses.

10. The Special Master shall have the power to: (a) obtain such further order(s) from the Court that he deems prudent or necessary to effectuate the payment of Defendant's restitution obligations; and (b) make a motion or application to the Court regarding instruction or clarification in connection with his powers in this matter.

11. All income tax reporting and payments, whether for periods prior to or during the terms of this Order, shall remain the obligation of Defendant. The Special Master shall not be required to report any income generated by the Primary Restitution Assets (including interest earned), or to pay any income taxes due thereon, nor shall the Special Master bear liability for the

failure of Defendant to report said income to taxing authorities or pay the taxes associated with such income.

12. The Special Master has the power to employ a law firm, including his own, and/or other professionals in this matter as reasonably necessary to accomplish the purposes of this Order without further application to the Court.

13. The Special Master will be acting solely in his capacity as Special Master, and the Special Master, the Financial Advisor, and any other professionals retained by the Special Master shall have no personal liability for claims against Defendant, individually or collectively. With respect to any insurance coverage, the Special Master, and other parties with insurable interests, should be named as additional insureds on the policies for the period that the Special Master shall be appointed. No person may pursue any claim against the Special Master, the Financial Advisor, or any other professionals retained by the Special Master for any action or omission taken or made in connection with the Special Master's powers or duties under this Order without first seeking leave of the Court. Neither the Special Master, the Financial Advisor, nor any other professionals retained by the Special Master in connection with this matter shall be liable to any person for any action or omission taken or made in good faith.

14. The Special Master shall prepare quarterly interim statements (each, an "Interim Statement") that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties, as well as those of any other professionals the Special Master deems appropriate. The Interim Statements should also reflect the fees and expenses of Defendant's counsel if such fees and expenses have been provided to the Special Master. Such Interim Statements should be submitted to the Court for its approval and confirmation, in the form of

either a noticed interim request for fees or a Special Master's final account and report. Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court, including, to the extent authorized by otherwise applicable law, from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets.

15. The parties and/or the Special Master shall be authorized to make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing.

16. None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders.

**SO ORDERED**.

Signed: January 23, 2025

Max O. Cogburn Jr.
United States District Judge

# EXHIBIT D

Greg E. Lindberg's Response to Consent Motion for Instruction Regarding Proposed Damovo Transaction, Causey v. Southland National Insurance Corp., No. 19-CVS-008664-910 (N.C. Super. Ct. Wake Cty., filed Aug. 19, 2026), with all exhibits

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19CVS008664-910

MIKE CAUSEY, COMMISSIONER OF INSURANCE OF NORTH CAROLINA,

Petitioner,

v.

SOUTHLAND NATIONAL INSURANCE CORPORATION, SOUTHLAND NATIONAL REINSURANCE CORPORATION, BANKERS LIFE INSURANCE COMPANY, COLORADO BANKERS LIFE INSURANCE COMPANY, North Carolina Domiciled Insurance Companies,

Respondents.

**GREG E. LINDBERG'S RESPONSE TO CONSENT MOTION FOR INSTRUCTION REGARDING PROPOSED DAMOVO TRANSACTION**

Greg E. Lindberg ("Mr. Lindberg"), an interested party, the counterparty to the June 27, 2019 Memorandum of Understanding (the "MOU") referenced in the Motion, and the defendant in the related federal criminal proceeding, *United States v. Lindberg*, No. 3:23-CR-48-MOC (W.D.N.C.), respectfully submits this Response, pro se, to the Consent Motion for Instruction Regarding Proposed Damovo Transaction filed on August 17, 2026 (the "Motion"). For the reasons set forth below, the Court should decline to authorize the transaction described in the Motion on the terms presented and should instead enter the instructions requested herein.

## INTRODUCTION

The Motion asks this Court to bless a framework under which the Damovo Group—a group of Specified Affiliated Companies that has been designated a Primary Restitution Asset in the federal criminal proceedings against Mr. Lindberg, *see* Order Granting Motion for Appointment of Special Master, *United States v. Lindberg*, No. 3:23-CR-48, D.E. 56 (W.D.N.C. Jan. 23, 2025)—would be sold in a transaction that, by the purchaser's own account, generates *no sale proceeds at all*. Mot. ¶ 6 & n.4. Under the contemplated transaction, the only value extracted from this multinational enterprise consists of approximately $17.5 million in so-called "consent fees"—approximately $13 million to the Joint Provisional Liquidators of the Bermuda insurers, approximately $4.5 million to the New Holding Company ("NHC"), and ten dollars ($10.00) to the Respondent insurance estates. Mot. ¶¶ 8–9.

There is a materially better alternative on the table. On July 31, 2026, Twelve Seas Investment Company III ("Twelve Seas"), a special purpose acquisition company listed on the NASDAQ under ticker "TWLV" and holding approximately $175 million in trust capital, delivered a written indication of interest proposing a business combination with Damovo at an enterprise value of **$400 million**, to be paid through a combination of cash in trust, additional funds raised through a PIPE, and newly issued SPAC shares. A true and correct copy of the Twelve Seas letter is attached hereto as Exhibit 1. Upon information and belief, the value offered by Twelve Seas is materially higher than the value that would be realized under the transaction NHC is presently contemplating.

Mr. Lindberg therefore respectfully requests that the Court (i) instruct NHC to engage promptly and in good faith with Twelve Seas regarding its indication of interest; (ii) require that all proceeds of any Damovo transaction, however denominated, be placed in the escrow of the United States District Court for the Western District of North Carolina (the "Federal Court"); and (iii) order that no Damovo transaction be finally approved or closed unless and until the Federal Court issues an order approving the transaction and all of its terms.

## BACKGROUND

1. The Damovo Group is a multinational technology services company providing communications, cybersecurity, and related services to the defense, healthcare, insurance, retail, and other industries, operating through subsidiaries across Europe, the United Kingdom, the United States, and Costa Rica. Mot. ¶ 4 & n.2; Ex. 1. The Damovo Group entities are Specified Affiliated Companies under the MOU, and the Damovo Group has been designated a Primary Restitution Asset in the federal criminal proceedings against Mr. Lindberg. Mot. ¶ 10.

2. Under the MOU, NHC must act "consistent with the protection of the best interests of the Policyholders and in accordance with North Carolina law." Mot. ¶ 3. Although "[t]he Damovo Group should have been contributed to NHC in September 2019," it instead "has continued to operate outside of NHC's direct management and control," Mot. ¶¶ 4–5, and is under the direct control of Trustee Hugh S. Wilson pursuant to a June 17, 2021 Trust Agreement approved by the Review Panel in *Southland National Ins. Corp. v. Lindberg*, No. 19-CVS-13093-910 (N.C. Super. Ct.).

Mot. ¶ 5 n.3; Mot. Ex. A (Irrevocable Trust Instrument dated June 17, 2021 among Damovo Financial Services LLC, Robert Gaddy, and Hugh S. Wilson). That characterization — that the Damovo Group has "continued to operate outside of NHC's direct management and control" — is the movants' own, and Mr. Lindberg does not accept it. The Damovo Group does not, and cannot, operate outside the federal restitution process. It is a designated Primary Restitution Asset in United States v. Lindberg, No. 3:23-CR-48-MOC, and that is not a matter of characterization: the Federal Court has already entered an order transferring all of Mr. Lindberg's rights and interests in the Primary Restitution Assets into "the exclusive possession and control of the special master." Order Appointing Special Master, United States v. Lindberg, No. 3:23-CR-48, D.E. 56 ¶ 9 (W.D.N.C.). The very Trust the movants invoke confirms the point rather than defeats it. The "Irrevocable Trust Instrument Relating to a Change of Control Trust for the Damovo Group" was created for a single purpose — to remove Mr. Lindberg from control of the Damovo Group during the pendency of his federal criminal case. It defines the triggering "Adverse Proceeding" as "the appeal and final resolution of the jury verdict in the trial of Greg Lindberg in the Western District of North Carolina," and it endures only until that conviction is reversed or "a final and binding court order" brings it to an end. Mot. Ex. A (Trust Instrument), Recital A & cl. 1.1, 3.1(a), (e). That Adverse Proceeding is ongoing — the district court's judgment of conviction is on appeal to the United States Court of Appeals for the Fourth Circuit — so the Trust remains in force by its own terms until that appeal is finally resolved, and the Damovo Group remains within the federal

restitution structure throughout. A trust that exists solely because of, and only for the duration of, the federal restitution proceeding is an instrument of that proceeding, not something operating apart from it. The Trust yields to court order by its own terms — it terminates upon "a final and binding court order," id. cl. 3.1(e) — and the federal restitution orders are precisely such orders: the Federal Court has already ordered all of Mr. Lindberg's rights and interests in the Primary Restitution Assets into the Special Master's exclusive possession and control, and a final order of restitution will follow. Nor does the Trust cut the Damovo Group loose from that process: no sale (a "Disposition") may be made "without the prior written consent of the Settlor," and the Trustee and the Damovo Group must "co-operate with the Settlor in respect of … a transaction involving the sale of all of the equity of the Damovo Group." Id. cl. 5.2(a), (c), 5.3. The movants themselves concede as much, acknowledging that the Damovo transaction "must be treated going forward under federal restitution law by the Federal Court." Mot. ¶ 7 n.5. A designated Primary Restitution Asset — whose owner's rights and interests are held by the Special Master under a federal order, and which is held in a trust that exists only for the federal case — is not operating "outside" the restitution structure. It is squarely within it, and it may not be disposed of except consistent with the federal restitution process and subject to the Federal Court's control.

3. The Motion discloses that a third-party offer to purchase the Damovo Group is presently pending, Mot. ¶ 6, and that the proposed purchaser has represented that the Damovo Group companies "are burdened with debt that exceed[s] the fair market

value of the companies," such that the transaction would produce no sale proceeds in the traditional sense. Mot. ¶ 6 n.4. Respondents candidly acknowledge that they "do not know the underlying economics of the deal." *Id.* The only value identified in the Motion consists of consent fees: approximately $13 million to the JPLs, approximately $4.5 million to NHC, and $10.00 to the Respondents—an offer by which Respondents themselves report they "were shocked." Mot. ¶¶ 8–9. Respondents further understand that the JPLs' consent fee "is in reality a settlement of their adversary proceeding" pending in the United States Bankruptcy Court for the Southern District of New York, Mot. ¶ 8 n.6, and that "NHC has not yet provided its final consent to the proposed transaction." Mot. ¶ 8 n.7.

4. By contrast, the Twelve Seas indication of interest proposes a business combination at a $400 million enterprise value, funded by approximately $175 million in NASDAQ trust capital together with PIPE financing and newly issued shares, and reflects Twelve Seas' assessment—based on its review of Damovo materials and its own independent research—that Damovo represents a very attractive merger candidate for Twelve Seas, citing its diversified customer base, broad geographic presence, and fast-growing artificial intelligence initiatives. Ex. 1.

5. Respondents themselves recognize that the disposition of the Damovo Group "must be treated going forward under federal restitution law by the Federal Court," Mot. ¶ 7 n.5, and the stated purpose of the Motion is "to preserve the status quo until such a ruling can be made by the Federal Court." Mot. at 2. Mr. Lindberg agrees with that premise—but the escrow of consent fees alone, while the underlying

asset itself is sold off for no proceeds, does not preserve the status quo. It liquidates the status quo and escrows the crumbs.

6. In their prayer for relief, Respondents ask this Court to enter an order (1) instructing that the Liquidator and Rehabilitator, acting through the SDRs, may provide consents associated with the Damovo Group transaction only if Respondents, NHC, and the JPLs agree to place all consent fees into escrow "that would be delivered to the federal Special Master for a subsequent determination by the Federal Court overseeing the criminal case against Greg Lindberg of how they should be treated under a Final Order of Restitution"; (2) instructing that "the content of any Consents and the terms of the escrow are within the discretion of the SDRs as to Respondents"; and (3) "[a]ffirming and approving in all respects the conduct of the Liquidator, Rehabilitator, his employees, agents, the SDRs and counsel in connection with this Motion." Mot. at 8 (Prayer ¶¶ 1–3). Respondents state that their escrow request is intended "to prevent any unlawful double recovery by the JPLs" and to permit "the restitution assets to be monetized properly." Mot. ¶ 18 n.8. The Petitioner consents to the relief requested in the Motion. Mot. ¶ 19.

## ARGUMENT

### I. NHC SHOULD BE INSTRUCTED TO ENGAGE WITH TWELVE SEAS, WHOSE OFFER IS, UPON INFORMATION AND BELIEF, MATERIALLY HIGHER THAN THE PRESENTLY CONTEMPLATED TRANSACTION

This Court possesses broad supervisory authority over the rehabilitation and liquidation estates and their dealings, including the authority Respondents themselves invoke under N.C. Gen. Stat. §§ 58-30-20(a)(11), 58-30-120(b), and 58-30-

85(b) to instruct the parties concerning the proposed Damovo transaction. That authority should be exercised to ensure that the Damovo Group—one of the most significant remaining Specified Affiliated Companies—is not disposed of without a genuine effort to obtain fair value.

The comparison presented by the record is stark. The transaction described in the Motion would yield zero sale proceeds and approximately $17.5 million in consent fees, of which the Respondent estates—the entities whose policyholders the entire structure exists to protect—would receive ten dollars. Mot. ¶¶ 6–9 & n.4. The Twelve Seas indication of interest proposes a transaction at a $400 million enterprise value, backed by approximately $175 million in cash already held in trust by a NASDAQ-listed acquirer. Ex. 1. Upon information and belief, the price and total consideration reflected in the Twelve Seas proposal are materially higher than the value that would be realized by any stakeholder—policyholders, the insurance estates, the Bermuda liquidation estates, or the federal restitution process—under the transaction NHC is presently contemplating.

NHC is bound to act "consistent with the protection of the best interests of the Policyholders." Mot. ¶ 3. No fiduciary acting in the best interests of policyholders could decline even to engage with a credible, financed, written indication of interest at a $400 million enterprise value in favor of a transaction that admittedly produces no sale proceeds. Mr. Lindberg does not ask the Court to compel NHC to accept the Twelve Seas proposal or any particular transaction. He asks only that the Court instruct NHC to engage promptly and in good faith with Twelve Seas—to respond to

the indication of interest, to facilitate customary due diligence, and to negotiate in good faith toward definitive documentation—before any competing transaction that extracts materially less value is permitted to proceed. Because "NHC has not yet provided its final consent to the proposed transaction," Mot. ¶ 8 n.7, no rights have vested and there is still time for a genuine market check. And because the Damovo Group presently operates under the direct control of Trustee Hugh S. Wilson rather than NHC, Mot. ¶ 5 & n.3, the instruction should also direct NHC to take all steps within its authority—including communicating the Twelve Seas indication of interest to the Trustee and cooperating with the Trustee—to facilitate full and good-faith consideration of the Twelve Seas proposal. A market check of this kind is the minimum that prudent estate administration requires before an asset of this magnitude is sold.

Moreover, NHC could not lawfully provide that consent in any event without the vote now held by the Special Master. Under Article II, Section 3.i of the MOU, and provided that no Loan is in default, "the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director" — a consent right now held by the Special Master — so NHC cannot approve or consent to any sale of the Damovo Group, an NHC subsidiary under the MOU, without that affirmative vote. And because that AAI Director's consent is now held by the Special Master — an officer appointed by, and answerable to, the Federal Court, whose authority to liquidate or approve the sale of any estate asset is expressly conditioned on the Court's approval — the Special Master cannot

cast that affirmative vote, or otherwise consent to any sale of the Damovo Group, without first seeking and obtaining the approval of the United States District Court for the Western District of North Carolina. Were the Special Master to cast that vote, or NHC to approve or consent to any sale of the Damovo Group, without first obtaining the Federal Court's approval, the action would violate the Order Appointing Special Master and the Federal Court's control over the Primary Restitution Assets, and would violate Mr. Lindberg's rights in the pending federal criminal proceeding, including his rights concerning the causation, valuation, offset, and credit determinations that bear upon his sentence.

## II. ALL TRANSACTION PROCEEDS, HOWEVER DENOMINATED, SHOULD BE PLACED IN THE ESCROW OF THE FEDERAL COURT

The Damovo Group is a designated Primary Restitution Asset in *United States v. Lindberg*, and restitution proceedings—including proceedings before the court-appointed Special Master directed toward a Final Order of Restitution—remain pending before the Federal Court. Mot. ¶ 10. Respondents concede that the Damovo transaction "must be treated going forward under federal restitution law by the Federal Court." Mot. ¶ 7 n.5.[1]

[1]Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), the disposition of Primary Restitution Assets bears directly upon Mr. Lindberg's sentence and upon the causation, offset, and credit determinations that remain to be made, de novo, by the Federal Court. Mr. Lindberg expressly reserves, and does not waive, all rights, defenses, objections, and constitutional challenges concerning restitution, including as to causation, offsets, credits, the identification of any victim, and the amount of any loss, and nothing in this Response shall be construed as a waiver of any such position in any forum.

Mr. Lindberg agrees with the escrow principle embodied in the Motion, but the Motion's proposed escrow is underinclusive. It would escrow only the amounts the transaction parties have chosen to label "consent fees," while the entirety of the Damovo Group—the Primary Restitution Asset itself—passes out of the estate structure. As Respondents acknowledge, "the consent fees represent value available from the Damovo Group SACs that the parties to the transaction have labeled consent fees." Mot. ¶ 6 n.4. Labels chosen by transaction parties cannot determine the reach of the federal restitution process. If any Damovo transaction proceeds, then *all* value flowing from it—sale proceeds, consent fees, settlement payments, fee payments, debt repayments to affiliates, or consideration in any other form—should be deposited into the escrow (registry) of the Federal Court itself, to be held pending that court's determination of its treatment under any Final Order of Restitution. The Motion instead proposes an escrow "that would be delivered to the federal Special Master." Mot. at 8 (Prayer ¶ 1). Escrow with the Federal Court itself, rather than delivery to the Special Master or retention by any transaction party, ensures that the funds are secured under the direct control of the tribunal that all parties agree must ultimately determine their disposition.

The Motion's own disclosures confirm why comprehensive Federal Court escrow is necessary. Respondents report that the JPLs' approximately $13 million consent fee "is in reality a settlement of their adversary proceeding" pending in the Bankruptcy Court for the Southern District of New York. Mot. ¶ 8 n.6. In other words, value extracted from a designated Primary Restitution Asset would be redirected to

settle separate litigation for the benefit of a single creditor constituency—precisely the kind of allocation that Respondents themselves warn may constitute "unlawful double recovery by the JPLs." Mot. ¶ 18 n.8. Whether any such payment is permissible, and how every dollar of Damovo value must be allocated as against restitution, are questions committed to the Federal Court. Until the Federal Court answers them, every dollar should sit in that court's escrow—not merely the sliver the transaction parties have labeled "consent fees."

## III. NO DAMOVO TRANSACTION SHOULD BE FINALLY APPROVED OR CLOSED UNTIL THE FEDERAL COURT ISSUES AN ORDER APPROVING THE TRANSACTION AND ALL OF ITS TERMS

The Motion's own stated purpose is "to preserve the status quo until such a ruling can be made by the Federal Court." Mot. at 2. That purpose can be achieved only if the transaction itself—not merely a subset of its cash flows—awaits federal approval. Once the Damovo Group is sold, the status quo cannot be restored: the asset is gone, the corporate structure is dismantled, and any later determination by the Federal Court that the transaction undervalued a Primary Restitution Asset will come too late to remedy. The federal record already reflects the consequences of disposing of a Primary Restitution Asset before valuation disputes are resolved: the Beckett asset was sold for approximately $134 million against a valuation of approximately $1 billion reflected in the federal record. *See United States v. Lindberg*, No. 3:23-CR-48, Doc. 256 (W.D.N.C.). That experience should not be repeated with Damovo.

Accordingly, principles of comity and orderly administration—and the parties' shared recognition that federal restitution law governs—counsel a simple condition: no Damovo transaction should receive final approval from this Court, and no closing should occur, unless and until the Federal Court in *United States v. Lindberg*, No. 3:23-CR-48-MOC, issues an order approving the transaction and all of its terms, including the identity of the purchaser, the total consideration, the allocation of that consideration, and the escrow arrangements described above. This condition costs the estates nothing: if the contemplated transaction is fair, it will withstand federal review; if it is not, federal review is precisely what the restitution statutes and the victims they protect require.

## IV. THE COURT SHOULD DECLINE TO COMMIT THE ESCROW TERMS TO THE SDRS' DISCRETION OR TO GRANT BLANKET APPROVAL OF CONDUCT

Two features of the Motion's prayer warrant denial regardless of the Court's disposition of the remainder. First, the Motion asks the Court to instruct that "the content of any Consents and the terms of the escrow are within the discretion of the SDRs as to Respondents." Mot. at 8 (Prayer ¶ 2). An escrow whose terms rest in the discretion of one interested party is not a safeguard; it is a formality. If the purpose of the escrow is to preserve value for a determination by the Federal Court, then the terms of that escrow—the depository, the conditions of release, and the prohibition on any disbursement absent Federal Court order—should be fixed by court order, not left to the discretion of the SDRs or any other transaction participant.

Second, the Motion asks the Court to enter an order "[a]ffirming and approving in all respects the conduct of the Liquidator, Rehabilitator, his employees, agents, the SDRs and counsel in connection with this Motion." Mot. at 8 (Prayer ¶ 3). No factual record supports—and the Motion does not even attempt to develop—a basis for a blanket, prospective judicial affirmation of unspecified conduct. Such an exculpatory provision is unnecessary to the escrow relief the Motion nominally seeks, and it should not be granted, particularly where the underlying transaction disposes of a Primary Restitution Asset for no sale proceeds and remains subject to review by the Federal Court.

## CONCLUSION

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court enter an order: (1) instructing NHC to engage promptly and in good faith with Twelve Seas Investment Company III regarding its July 31, 2026 indication of interest to acquire the Damovo Group at a $400 million enterprise value—including responding to the indication of interest, facilitating customary due diligence, negotiating in good faith toward definitive transaction documentation, and taking all steps within NHC's authority, including with respect to Trustee Hugh S. Wilson, to facilitate full consideration of the Twelve Seas proposal; (2) directing that all proceeds of any Damovo transaction, however denominated—including sale proceeds, consent fees, settlement payments, and consideration in any other form—be placed in the escrow of the United States District Court for the Western District of North Carolina pending that court's determination of their treatment under any Final Order of Restitution;

(3) providing that no Damovo transaction shall be finally approved by this Court, and no closing shall occur, unless and until the United States District Court for the Western District of North Carolina issues an order approving the transaction and all of its terms; (4) denying Paragraphs 2 and 3 of the Motion's prayer for relief, and granting the Motion otherwise only to the extent consistent with the foregoing; and (5) granting such other and further relief as the Court deems just and proper.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Greg E. Lindberg*

Greg E. Lindberg
P.O. Box 159
Thonotosassa, FL 33592

*Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I filed the foregoing with the Clerk of Court and served a copy upon all counsel of record, by electronic filing through the eCourts electronic filing system (which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case) or, as to any party not so registered, by depositing a copy in the United States Mail, first-class postage prepaid, addressed to counsel of record.

Dated: August 19, 2026

*/s/ Greg E. Lindberg*
Greg E. Lindberg
*Pro Se*

# EXHIBIT 1

TWELVE SEAS

July 31, 2026

Mr. Greg Lindberg
Global Growth Holdings
P.O. Box 159
Thonotosassa, FL 33592

**RE: Indication of Interest in Business Combination with Damovo**

Dear Mr. Lindberg,

On behalf of Twelve Seas Investment Company III (the "Company"), a special purpose acquisition company listed on the NASDAQ ("TWLV") and currently holding approximately $175 million in trust capital, I am pleased to submit this letter outlining our interest in pursuing a potential business combination with Damovo, a multinational technology services company that provides communications, cybersecurity and other service to defense, healthcare, insurance, retail and other industries ("Damovo").

Based on our review of the materials previously provided to us about Damovo, and based on our independent research, we believe that Damovo represents a very attractive merger candidates for Twelve Seas. We are especially impressed by Damovo's diversified customer base, its broad geographic presence, and its fast-growing artificial intelligence initiatives.

We would be looking to structure a transaction with an enterprise value of Damovo of $400 million, which would be paid through a combination of our cash in trust, additional funds raised (PIPE) and newly issued shares of our SPAC.

Please accept this letter as a formal indication of our interest in commencing discussions regarding a Twele Seas – Damovo merger. Any potential transaction would, of course, be subject to customary conditions, including the completion of satisfactory due diligence, necessary regulatory reviews and audits, and the execution of definitive transaction documentation.

We look forward to working closely with you and your team on this endeavor in the near future.

Sincerely,

Dimitri Elkin
CEO
Twelve Seas Investment Company III

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S SECOND MOTION TO SET ASIDE THE SPECIAL MASTER'S REPORT AND THE RESTITUTION ORDERS (DOCS. 161, 245, 245-1)**

Defendant Greg E. Lindberg respectfully moves the Court to set aside, in their entirety, the Preliminary Order of Restitution (Doc. 161), the Special Master's Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1). This is Defendant's second motion to set aside the Special Master's report. Its legal grounds are those set forth in Defendant's previously filed Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (the "Motion to Disqualify") (Doc. 269), which Defendant adopts here without change. Its additional ground is factual and present: the same officer who produced the report has been shopping the estate's companies "for the debt" — proposing to accept roughly $100 million for Damovo — when a contemporaneous, arm's-length expression of interest values Damovo at $400 to $450 million. This motion is further supported by the accompanying Declaration of Greg E. Lindberg. In support, Mr. Lindberg states:

## I. The legal grounds are those set forth in the Motion to Disqualify, which Defendant adopts without change.

1. The legal basis for setting aside the Special Master's report and the restitution orders is set forth in full in Defendant's previously filed Motion to Disqualify (Doc. 269). Defendant adopts and incorporates by reference the legal arguments and authorities of that motion, without change, as though fully set forth herein. As established there, the Second Supplement (Doc. 245) and the proposed Final Order of Restitution (Doc. 245-1) are the work product of an officer who unites in himself the receiver's custody, liquidation, and fee interest and the Article III function of quantifying each victim's loss and fashioning the restitution order — an officer subject to disqualification; the report of such an officer may not be adopted, is not cured by a later de novo determination under 18 U.S.C. § 3664(d)(6), and must be suppressed; and the Preliminary Order of Restitution (Doc. 161), the Second Supplement, and the proposed Final Order must be set aside. Defendant does not repeat those authorities here; he adopts them in full and relies on them as the legal basis for this motion. This motion supplies an additional, factual ground that independently requires the same relief.

## II. The Special Master has been shopping Damovo "for the debt" — roughly $100 million — while a present, arm's-length offer values it at $400 to $450 million.

2. The Special Master has been shopping the estate's operating companies "for the debt." As to Damovo, he has represented, through Defendant's former counsel, that he intends to accept roughly $100 million — the approximate amount of Damovo's outstanding debt. Decl. ¶¶ 3–4. But Damovo is worth far more than the

debt recorded against it. On July 31, 2026, Twelve Seas Investment Company III (NASDAQ: TWLV), a publicly traded acquisition company, delivered a signed, arm's-length expression of interest to combine with Damovo at a $400 million enterprise value, with an anticipated, negotiated price of up to approximately $450 million achievable at arm's length. Decl. ¶¶ 2–3. That is an offer in the market today — from a real, independent counterparty — for roughly four times what the Special Master proposes to accept.

3. An arm's-length expression of interest of this kind is not a projection or an advocate's estimate; it is present market evidence that the enterprise value of these companies remains. A willing, independent buyer is offering $400 to $450 million for the same Damovo the Special Master would surrender for roughly $100 million. The report's premise — that a company is worth only the debt recorded against it — is refuted by the market itself, in real time, as to an asset still within the estate. A report and restitution figure built on that refuted premise cannot stand.

## III. Debt is not a stand-alone measure of value; the same pattern recurs in every company the Special Master sold "for the debt."

4. The Damovo offer exposes the analytic error at the core of the report. A company's enterprise value is determined by its assets, its earnings, and its cash flows — not by the amount of debt it happens to carry. Decl. ¶¶ 10–11. Debt is a claim to be satisfied out of enterprise value, not a subtraction from it, and virtually every substantial operating company carries debt and uses it deliberately as an instrument of growth. *Id.* The debt a company carries is therefore not a variable that stands alone; it must be weighed together with the many other factors that determine value

— the enterprise's earnings, cash flows, growth prospects, and the arm's-length prices independent buyers will actually pay. Treating the debt figure in isolation, as though it were the company's worth, is not a valuation at all.

5.The Damovo offer is not an isolated data point; it confirms a pattern already documented in the other companies the Special Master sold "for the debt." Beckett Collectibles, appraised at approximately $1 billion, was sold for approximately $134 million; and Clanwilliam, valued at approximately $880 million in the signed Quadro purchase agreement [Doc. 235 ¶ 32; Doc. 174 ¶ 117; Ex. I3], was sold for approximately $450 million. Decl. ¶ 4. In each case the enterprise value far exceeded the debt, and in each case selling the company "for the debt" destroyed hundreds of millions of dollars in value the Special Master was charged with preserving. Damovo is exemplary of that same value destruction: applying the identical "sell it for the debt" premise, the Special Master stands to destroy roughly $300 to $350 million of Damovo's value — the difference between the approximately $100 million he proposes to accept and the $400 to $450 million the market offers today — just as value was destroyed in Beckett, Clanwilliam, and the other companies already sold. The difference is only one of timing: as to Damovo, the market's proof of the true value is before the Court now, before the loss is locked in, rather than after. A report built on the premise that these companies are worth only their debt therefore systematically understates their value and overstates the loss.

6. The report compounds the error by treating as loss amounts that are covered or already satisfied. The American policyholders have been paid in full —

more than $157 million distributed to over 43,000 policyholders. Decl. ¶ 1. The approximately $208 million the report alleges remains owing to Northstar, OMNIA, and PBIHL is covered by the Damovo transaction described above. Decl. ¶¶ 2–3. And the approximately $339 million the report alleges remains owing to ULICO has been satisfied by ULICO's acceptance of AAPC preferred equity with a par value of $352,906,240 — the very figure the Special Master lists in his own table. Decl. ¶ 5; see Doc. 245 at 6 (Issue 3). A restitution figure that values these companies at their debt and disregards these mandatory offsets and credits, 18 U.S.C. § 3664(j)(2), overstates the loss; the report cannot be adopted, and the orders resting on it must be set aside.

## IV. The report cannot contain the complete accounting the MVRA requires: the parties holding the loss and valuation data refused to produce it and disputed the Special Master's authority to compel it, and Defendant has been denied the subpoenas that would supply it.

7. The report cannot be the complete and accurate accounting the MVRA requires, because the Special Master never obtained — and, by the express position of the parties who hold it, could not compel — the information a restitution accounting demands. The Special Master circulated a term sheet defining the scope of his rights and responsibilities, which he intended to use as the basis for a motion seeking a "Clarification Order" from this Court. See Ex. ___ (Term Sheet — Scope of the Special Master's Rights and Responsibilities). That process collapsed. The institutional parties that hold the books, records, valuations, and loss data — the North Carolina insurance companies (the "NCICs") and NHC Holdings, LLC — refused to consent and disputed the Special Master's authority, and the Court's authority, over the

assets and the information at issue. They took the position that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." Ex. ___. The term sheet itself expressly contemplated that these parties might "refuse to furnish to the Special Master any documents and information in their possession reasonably requested by the Special Master, whether relating to loss calculations, asset valuations, or otherwise." *Id.* That is precisely what occurred: despite the efforts of Defendant's counsel and of Paladin Management, no agreement was reached and the information was never produced.

8. The consequence is dispositive, and it does not depend on resolving whether the Special Master controls these records. Defendant contends he does — the Special Master having stepped into Defendant's shoes as record owner through the assignment of Defendant's interests, the AAPC voting trust, and his designees on the NHC board, and having refused to compel production, as the Motion to Disqualify (Doc. 269) establishes — while the Special Master contends he does not (Docs. 266, 268). Either way, the accounting cannot be completed on this record: on the Special Master's own account the books, records, and valuations the MVRA requires are held by third parties beyond the reach of this Court, the Special Master, and the Government alike, and the asset-holding parties refused to produce them. An accounting assembled without the very books, records, and valuations that the asset-holding parties refused to produce cannot satisfy the MVRA's command that the

Court determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on a complete record. And Defendant's own effort to obtain that same information through compulsory process — his Motion for Issuance of Rule 17(c) Subpoenas (Doc. 248) — has been opposed and remains undecided. To deny Defendant the subpoenas that would complete the record while adopting a Final Report the Special Master himself could not complete would stand the MVRA's accounting requirement on its head, fixing a restitution exceeding $1.6 billion on an admittedly incomplete accounting — assembled from information that no participant in this proceeding, the Special Master included, has ever seen in full. Because a complete accounting is a statutory predicate to any final restitution order, and because that accounting cannot be made until the necessary process issues, the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) must be set aside. Because that accounting cannot be assembled on this record, the Court cannot satisfy 18 U.S.C. § 3664(f)(1)(A) in any event and is powerless to adopt the Report or to fix restitution upon it.

## V. Neither the Government nor the Special Master has produced evidence of any loss.

9. The record also refutes the causation the restitution orders assume. Neither the Government nor the Special Master has produced evidence of any loss to the protected victims caused by Mr. Lindberg. To the contrary, the records filed in support of Defendant's Motion for a Determination That No Restitution Is Owed, and the accompanying Consolidated Statement of Facts (Docs. 234, 235), show that he contributed approximately $1 billion of his own capital to the businesses as a net

addition to their surplus — a first-loss position that would be exhausted before any protected policyholder or creditor bore a dollar of loss — and that, when control passed, independent firms valued the companies and found the affiliated loans well secured. That a company carries debt is not evidence of loss: debt is the ordinary engine of corporate growth that every company uses, and at a loan-to-value ratio of roughly 40 to 50 percent it is conservatively secured and reflects the retention of value, not its loss. Causation is an element the Government must prove by a preponderance of the evidence, 18 U.S.C. § 3664(e); on this record it is unproven. A report that fixes a loss the Government has not proven cannot support the restitution orders, and they must be set aside.

**VI. Relief.**

WHEREFORE, Mr. Lindberg respectfully requests that the Court:

(1) set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) in their entirety;

(2) order that the Special Master's report, recommendations, and other work product not be adopted, relied upon, or otherwise disseminated in any manner, consistent with the authorities adopted from the Motion to Disqualify;

(3) order the Special Master to render a full and verified accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined — including the Beckett sale, and including every sale, offer, or expression of interest that came before him

but that he did not approve, did not pursue, or did not take (such as the Twelve Seas expression of interest for Damovo), with the price and terms offered and his reasons for declining — and of all proceeds and all fees paid from the estate, together with credit for all amounts already paid or satisfied (including the policyholder distributions and the ULICO preferred-equity satisfaction described in the Declaration), as required to fix restitution under 18 U.S.C. § 3664(f)(1)(A), (e), (j)(2), (k), (n), and (d)(6);

(4) direct that the § 3664(e) loss and causation determination be made by the Court itself, on the Government's own proof and on motion practice, with a written response from the Government to the pending motions and a right of reply for Mr. Lindberg; and

(5) grant such other and further relief as is just.

Dated: August 6, 2026.

Respectfully submitted,

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com
*Counsel for Greg E. Lindberg*[1]

[1] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted last week on two motions to disqualify and to set aside the report; the Government disagrees with and opposes the relief requested, as does the Special Master.

s/ Kenneth N. Barnes
Kenneth N. Barnes

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 6, 2026.

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Counsel for Greg E. Lindberg

# EXHIBIT 3

**Nos. 26-4309(L) and 26-4310**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GREG E. LINDBERG,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of North Carolina
Nos. 3:23-cr-48-MOC and 5:19-cr-22-MOC
The Honorable Max O. Cogburn, Jr., District Judge

# DEFENDANT-APPELLANT'S AMENDED EMERGENCY MOTION TO STAY THE IMMEDIATE-PAYMENT DIRECTIVE OF THE RESTITUTION ORDER AND TO RESTRAIN DISSIPATION OF RESTITUTION ASSETS PENDING APPEAL

**EMERGENCY STATUS (Local Rule 27(e)): Action is respectfully requested at the Court's earliest opportunity, and before the district court accepts, adopts, or acts upon the special master's final restitution report — filed July 23, 2026, ahead of even its announced date and within hours after counsel gave Rule 27(e) notice of these filings. The final restitution report has asked the Court to adopt a 1.6 Billion Dollar restitution without hearing which could happen as early as July 28th when the notice and comment period laid out in the preliminary restitution order expires, with at least six motions filed by the Defendant unanswered on merits including a Motion to Dismiss restitution. Asset sales are proceeding now; the grounds are set out in the Introduction and the accompanying Motion to Expedite. Counsel for the United States was notified of these filings on July 23, 2026, and stated that the government opposes each of them. (Ex. G)**

# TABLE OF CONTENTS

This Motion Is Properly Presented to This Court. .... 16
BACKGROUND .... 20
ARGUMENT .... 32
I. This Court May Stay the Restitution Directive Pending Appeal .... 32
II. The Traditional Stay Factors Favor a Stay. .... 33
CONCLUSION .... 51
CERTIFICATE OF COMPLIANCE .... 53
CERTIFICATE OF SERVICE .... 54

EXHIBITS:

**Exhibit A**: Doc. No. 172: Defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No.161); (II) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (III) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; and (IV) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect

**Exhibit B**: Doc. No. 190: Defendant's Emergency Motion To Stay All Asset Sales And Asset-Sale Processes Pending Entry Of A Final Restitution Order And De Novo Article III Determination, And Consolidated Objections To The Preliminary Order Of Restitution (Doc. 161), The Scope Of The Special Master Reference, And The Special Master's Statement (Doc. 159), With Incorporated Memorandum Of Law

**Exhibit C**: Doc. No. 201: Defendant's Emergency Motion To Enforce The Plea Agreement And The Order Appointing The Special Master, To Preserve His Due-Process And Counsel-Access Rights In The Pending Restitution Proceedings, And To Require That The Government Be Represented By Conflict-Free Counsel filed 15 June 2026.

**Exhibit D**: Doc. No. 202: Defendant's Emergency Motion To Enforce The Plea Agreement And The Order Appointing The Special Master, To Preserve His Due-Process And Counsel-Access Rights In The Pending Restitution Proceedings, And To Require That The Government Be Represented By Conflict-Free Counsel filed 16 June 2026.

**Exhibit E**: Doc. Nos. 234–235: Defendant's Motion For A Determination That No Restitution Is Owed, Or In The Alternative For Exclusion And Offset Of Losses Not Proximately Caused By The Offense Of Conviction, With Incorporated Memorandum Of Law, with supporting declaration and Exhibits A–W.

**Exhibit F**: Doc. No. 248: Defendant's Motion for Issuance of Rule 17(c) Subpoenas Duces Tecum.

**Exhibit G**: Email correspondence dates July 23, 2026.

**Exhibit H:** Doc. No. 256: Notice of Correction re Beckett Collectibles Valuation

# TABLE OF AUTHORITIES

Cases

*Apprendi v. New Jersey*,
530 U.S. 466, 490 (2000) ........ 28

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833, 850–51 (1986) ........ 36

*Ellingburg v. United States*,
607 U.S. 163, 166 (2026) ........ 19, 28, 35, 36

*Hilton v. Braunskill*,
481 U.S. 770, 776 (1987) ........ 30

*Hughey v. United States*,
495 U.S. 411, 413 (1990) ........ 18, 31

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162, 170 (2016) ........ 6

*Nken v. Holder*,
556 U.S. 418, 434 (2009) ........ 30

*Paroline v. United States*,
572 U.S. 434, 444–45 (2014) ........ 18, 31

*Robers v. United States*,
572 U.S. 639 (2014) ........ 18, 33

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) ........ 28

*Stern v. Marshall*,
564 U.S. 462, 484 (2011) ........ 36

*United States v. Boccagna*,
450 F.3d 107, 115 (2d Cir. 2006) ........ 35

*United States v. Crawford*,
169 F.3d 590, 592–93 (9th Cir. 1999) ........ 41

United States v. Johnson,
48 F.3d 806, 808–09 (4th Cir. 1995) ........ 36, 40

*United States v. Karam*,
201 F.3d 320, 329 (4th Cir. 2000) ........ 39

*United States v. Ritchie*,
858 F.3d 201, 211 (4th Cir. 2017) ........ 39

*United States v. Springer*,
715 F.3d 535, 540–42 (4th Cir. 2013) ........ 6

*United States v. Steele*,
897 F.3d 606, 613–14 (4th Cir. 2018), ........ 41

United States v. Stein,
846 F.3d 1135 (11th Cir. 2017) ........ 28

*United States v. Ziadeh*,
104 F. App'x 869, 874 (4th Cir. 2004) ........ 41

Statutes

18 U.S.C. § 3556 ........ 30
18 U.S.C. § 3572(g) ........ 6, 31
18 U.S.C. § 3663A(a)(2) ........ 32
18 U.S.C. § 3663A(c)(3)(B) ........ 29
18 U.S.C. § 3664(d)(5) ........ 7, 21, 45
18 U.S.C. § 3664(d)(6) ........ 7, 17, 18, 20, 24, 34, 36, 39, 47, 51
18 U.S.C. § 3664(e) ........ 29
18 U.S.C. § 3664(f)(1)(A) ........ 30
18 U.S.C. § 3664(f)(2) ........ 19
18 U.S.C. § 3664(j)(2) ........ 18, 19, 34

Rules

Fed. R. App. P. 8 ........ 6, 30
Fed. R. App. P. 8(a) ........ 6, 13, 31
Fed. R. Crim. P. 38(e) ........ 6, 31
Fed. R. Crim. P. 38(e)(1) ........ 30

Loc. R. 8 .......... 6
Loc. R. 26.1 .......... 17

**Pursuant to** Federal Rule of Appellate Procedure 8, Federal Rule of Criminal Procedure 38(e), and Fourth Circuit Local Rule 8, Defendant-Appellant Greg E. Lindberg respectfully moves this Court to stay, pending appeal, the directive in the district court's Preliminary Order of Restitution that restitution be paid immediately — together with any materially identical immediate-payment directive in any subsequent or final restitution order — and, as a term of that stay, to restrain the sale or other dissipation of the restitution assets, including assets held in any trust and any disposition by way of forfeiture. This is deliberately a modest request. The Court's authority arises from the pending appeals, Fed. R. App. P. 8(a); Fed. R. Crim. P. 38(e); 18 U.S.C. § 3572(g); and the stay requested need not outlast the need: Appellant proposes that it remain in place pending appeal, subject to dissolution or modification upon the district court's determination of causation, offsets, and credits by a preponderance of the evidence made after adjudication of the pending motions (Docs. 172, 190, 201, 202, 234, 248), or upon disposition of the consolidated appeals. The relief is needed now, not later: the immediate-payment directive is already operative and the sales are already underway. And the relief must reach forward, because any final restitution order will carry the same immediately-payable language — a stay confined to the preliminary order would expire at the very moment the identical directive re-enters through the final order, requiring a second emergency motion to prevent the same

harm. That is the paradigm of a wrong "capable of repetition, yet evading review": the directive is "too short to be fully litigated prior to cessation," and there is "a reasonable expectation that the same complaining party [will] be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016); see *United States v. Springer*, 715 F.3d 535, 540–42 (4th Cir. 2013). The stay should therefore extend to the immediate-payment directive in any successor order, without prejudice to any party's right to seek modification upon entry of a final order. And the motion is ripe precisely because of the Preliminary Order's own terms: by making $1.655 billion "due and payable immediately," the order created a presently operative directive — one the government treats as operative enough to justify liquidating assets now, and which is therefore operative enough to be stayed now. Because the directive is already operative, the need for relief is immediate, not prospective: enforcement is not something that will begin if this motion is denied — it is occurring as the motion is read. Appellant therefore respectfully requests that the Court enter an administrative stay upon receipt of this motion — before Monday July 27, 2026, if practicable — while it considers the motion in full.

On July 28, 2026 the sixty-day notice period on the preliminary restitution report expires. The final restitution report now asks that the report be adopted without a hearing. (Doc. 245.) On July 29, 2026, the court may adopt the order if it

follows the recommendation in the report with six pending motions with no response from the government on merits. On July 24, 2026, the district court, sua sponte, ordered that the defendant be produced from the custody of the Bureau of Prisons for a hearing before the court no later than August 7, 2026. (Doc. 250.) The order does not state the hearing's subject, but the directive to produce the defendant in person signals a substantive proceeding — likely the final restitution hearing — at which the court could enter the proposed Final Order (Doc. 245-1) and fix the restitution amount by adoption before the six pending motions are decided. Given the August 7 date, the government is unlikely to respond on the merits to any of the pending motions absent an order directing the district court to require its response and to allow the defendant to respond to all of them before any restitution hearing. The motion is narrow. It does not ask this Court to disturb the determination of causation, offsets, and the final amount of restitution; those determinations should proceed in the district court under 18 U.S.C. § 3664(d)(5), subject to that court's de novo determination under § 3664(d)(6). The motion asks only that the assets from which any restitution would be paid still exist when those determinations are made and this court does not lose jurisdiction over the assets before the appeal.

The record makes the pattern concrete. The rules were short-circuited once, and — absent a forward-reaching stay — the same maneuver can recur with the successor restitution order, the next asset sale, or the next contested filing:

| Date / Time | Event |
|---|---|
| Wed., July 22 4:48 p.m. | Special Master's counsel circulates the draft Final Supplement, proposed Final Order, and sealed appendix; states the filing is due "by Friday." |
| Wed., July 22 (evening) | Defense asks the Government and Special Master to consent to an extension consistent with the joint bifurcation order. **The Special Master sets a deadline of end of day, July 23 for the parties' positions.** |
| Thu., July 23 9:01 a.m. | Defense serves a Rule 27(e) notice of the emergency filings on the Government. |
| Thu., July 23 9:07 a.m. | Defense advises that the Rule 17(c) subpoena motion (Doc. 248) will be filed that day; asks the Government to state its position by 11:00 a.m. |
| Thu., July 23 9:11 a.m. | Government: "The government objects." |
| Thu., July 23 10:45 a.m. | Special Master: "the special master objects." |
| Thu., July 23 10:57 a.m. | Special Master files the Second Supplement (Doc. 245), proposed Final Order (Doc. 245-1), and sealed appendix (Doc. 245-2) — **five hours before his own end-of-day deadline for the defense position, and a day before his announced Friday filing date.** |
| Thu., July 23 11:12 a.m. | Government's appellate counsel asks whether the filing has "mooted" the pending mandamus. |
| Thu., July 23 11:30 a.m. | Government "opposes each" of the emergency filings. |
| **Thu., July 23 end of day** | **Deadline the Special Master set for the Defendant's position** — while Appellant is in Bureau of Prisons custody and cannot review the documents or meet newly appeared counsel until the following Tuesday. |
| **Fri., July 24** | **The Special Master's originally announced filing date** — though the Preliminary Order's governing period actually ran to July 28. |

| | |
|---|---|
| **Tue., July 28** | **60 - day Notice period provided in Preliminary Restitution order expires** — and the final restitution report may be adopted without hearing if the reports recommendation is adopted with six pending motions including a dispositive motion on causation with detailed documentation. |

The restitution assets are disappearing now. One company is already gone: Beckett — transferred to the special master's control through an Assignment of Interests — has already been sold for approximately $134 million (a price, not a concession of value which when transferred was over $800 Million), without the district court's approval, without any accounting to this day, and without a dollar of proceeds credited against the restitution obligation. More are on the block: Damovo and ARM are being marketed for sale, as the Special Master reported on the parties' weekly call, and on or about July 1, 2026, the Government indicated, on the parties' weekly call, that the assets held by NewHoldCo LLC, a North Carolina limited liability company ("NewHoldCo") — the entity that holds a substantial portion of the Primary Restitution Assets (AAPC is held separately) — would likewise be dissipated. And AAPC, the most valuable single asset in the structure, is being listed at a value below its demonstrated worth — a write-down that would trigger forfeiture consequences under the plea agreement (Doc. 160, ¶ 1) and permit immediate liquidation of the estate, short-circuiting the restitution process before any amount is lawfully determined and before this Court can act.

The special master has also administered the distribution of $23,520,710 in asset-sale proceeds to a recipient that, by his own determination, is not a victim of the offenses of conviction.

The pattern is not isolated. Each principal asset has been, or is proposed to be, sold at a fraction of its independent value on the same rationale — that maturing debt compels an immediate sale rather than a refinancing or rollover:

| Asset | Independent Value | Sale / Proposed Sale | Stated Rationale & Process |
|---|---|---|---|
| **Beckett** (one of only two collectible-card valuation companies) | Over $800 million (value when transferred) (Doc. 256) and (Doc. 579) | ≈ $134 million | Sold with **no motion, notice, or court order** — leaving Defendant no opportunity to object; no accounting; no proceeds credited to restitution. Acquired by its only competitor for a fraction of value — creating a near-monopoly. The Special Master's Third Status Report states that because of "the extensive debt encumbering Beckett and the rest of the Collectivus portfolio," the sale "did not yield proceeds that can be distributed as restitution payments." (Doc. 94, at 6–7; accord Sent. Mem. (Doc. 507), at 13.) |
| **Clanwilliam** | $880 million (Q1 2024 Quadro Acquisition Corp. agreement; 22.14x EBITDA) | Gross ≈ $450 million (Doc. 174); net proceeds est. $338 million, reduced to $318 million after a $20 million Irish-tax escrow (Doc. 66, at 7 & n.5) — ≈ $474 million in value destroyed | Rehabilitator blocked the higher-value Quadro deal, then forced the sale. The order recites "loan obligations set to mature in October … that, absent a sale, could result in debt collection litigation," and that delay "risks the Purchaser walking away." (Doc. 66 ¶ 25; Doc. 174 ¶¶ 117–118, § XIX(c).) |

| | | | |
|---|---|---|---|
| **AAPC** (proposed sale; appendix filed under seal) | $2.7–$3.0 billion — and durable: an AI-resistant business, as AI-driven medical billing invites False Claims Act exposure, so human billers remain indispensable. | Sealed appendix values AAPC at a small fraction of its demonstrated worth (Doc. 245-2 (sealed), at 2) | The same rationale as Clanwilliam and Beckett — the disposition divorced from the valuation at which the asset was delivered to the Special Master. |

Without a stay, this pattern will persist: each remaining asset — Damovo, ARM, NewHoldCo, and AAPC — is exposed to the same debt-and-timing rationale that has already produced sales at a fraction of value, and, as with Beckett, may be sold without a court order and thus beyond Defendant's power to object.

Only this Court can preserve the status quo. Defendant-Appellant moved twice in the district court to stay the immediate-payment directive and to halt the asset sales; both motions are fully briefed on his part and remain undecided, and the special master has sought to defer his own response until after the final restitution recommendation issues — that is, until after the sales are complete. Appellant does not oppose reasonable conditions to secure the eventual obligation

and respectfully requests an administrative stay pending the Court's ruling on this motion. The request is time-critical by the calendar the participants themselves have set: on July 22, 2026, the special master's counsel stated in writing that he will file the final supplement and a proposed final order of restitution — with the appendix under seal — on Friday, July 24, 2026, days before the July 28 end of the governing period, with asset sales underway in the same window. Appellant therefore respectfully requests administrative relief before that date and will accept any interim conditions the Court deems appropriate. A motion to expedite accompanies this motion.

**This Motion Is Properly Presented to This Court.**

A stay motion may be made in the first instance to this Court where, "a motion having been made, the district court denied the motion or failed to afford the relief requested." Fed. R. App. P. 8(a)(2)(A)(ii). That predicate is squarely satisfied; on every ground this motion presents. Within fourteen days of the entry of the Preliminary Order of Restitution, Appellant moved in the district court to stay enforcement of the immediate-payment directive. (Ex. A, Doc. 172.) Appellant then filed an emergency motion to stay all asset sales and asset-sale processes. (Ex. B, Doc. 190.) Both motions are fully briefed on Appellant's part. The district court has ruled on neither. And the stay motions do not stand alone: on July 14, 2026, Appellant also moved in the district court to dismiss the $1.655

billion restitution figure itself, on the ground that no causation has been — or can be — established for the claimed losses and that mandatory offsets extinguish any properly calculated obligation. (Ex. E, Docs. 234, 235.)[1] That dispositive motion

[1] The motion to dismiss (Doc. 234, at 9–10) summarizes its grounds as follows: First, no loss on the affiliated investments was reasonably foreseeable to Mr. Lindberg at the time those investments were originated. The investments were made under a written, board-approved risk-management framework; they were personally guaranteed by Mr. Lindberg himself; they were backed by approximately one billion dollars of zero-coupon bonds purchased to protect principal; the regulator himself praised Mr. Lindberg's handling of regulatory questions in the relevant period; and the change in law that disfavored affiliated investments was not enacted until 2019, after origination. Furthermore, Houlihan Lokey, one of the largest valuation companies in the country, provided contemporaneous analysis that concluded that the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, and KPMG provided contemporaneous analysis showing that there was over $1 billion of equity supporting the loans. (Exs. E2 and E3 KPMG Valuations and HL (Houlihan Lokey, Jan. 18, 2018) & E (KPMG, Aug. 24, 2018).) As the sole owner of the insurance companies and of the operating companies that received the loans, Mr. Lindberg would have seen his entire $1 billion investment in his insurance companies and his entire investment in his non-insurance operating companies wiped out if there were a loss on the affiliated loans. Any single one of the foregoing facts is sufficient to establish that there was no reasonably foreseeable loss to Mr. Lindberg when he oversaw the origination of the affiliated loans. Combined, these facts provide overwhelming evidence that no reasonable person could have expected that all of the safeguards Mr. Lindberg put in place (personal guarantees, a $1 billion equity cushion, conservative 50% loan-to-value loans, a robust risk-management plan, and $1 billion of bonds as insurance) would fail amid the regulatory and prosecutorial onslaught that Mr. Lindberg and his businesses have endured over the last 7 years. Someone who reasonably expects a loss on a loan does not personally guarantee every penny of that loan, underwrite it conservatively at 50% loan-to-value, purchase insurance against any loss,

implement a robust risk-management program for underwriting such loans, invest $1 billion of his own capital as equity to support that loan, and receive strong praise from his regulator on how he was handling regulatory issues related to such loans. On the contrary, these are the actions of someone who reasonably expected zero loss and put his entire net worth on the line because he expected no loss. Under MVRA any loss must be reasonably foreseeable to a defendant to form the basis for a restitution order, and here the opposite is the case.

Second, and independently, any loss that later materialized was caused not by Mr. Lindberg's conduct but by a chain of intervening acts by independent third parties—the Government, the court-appointed Rehabilitator, and the court-appointed Special Master—each occurring after Mr. Lindberg ceded control in October 2018, and some continuing to the present: the Government's interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban transactions; the coerced ten-year hold imposed by the June 2019 MOU; the fire-sale of the zero-coupon bond portfolio that had secured the affiliated-loan principal; and the Special Master's continuing disposition of estate assets—before any final restitution determination, in the case of the Beckett transaction without court approval or accounting, and while the Special Master's own compensation is paid from the very assets he sells. Those intervening causes broke, and continue to break, the chain between Mr. Lindberg's conduct and any loss. Under MVRA any loss must be closely related and proximately caused by the defendant's conduct. The foregoing string of events shows exactly the opposite: any losses occurred after Mr. Lindberg gave up control of his insurers in October of 2018 and were caused by the independent decisions of third parties beyond Mr. Lindberg's control.

Third, this Court has characterized the "real loss" in this case as "risk." Restitution under the Mandatory Victims Restitution Act ("MVRA") is measured by, and capped at, a victim's actual loss. Risk is not actual loss—particularly where the policyholders the statute is designed to protect have been made whole and confirmed paid in full. Moreover, the "risk" the Court identified was not unlawful: the affiliated investments were lawful when made, were approved by the regulator, and were within prevailing industry practice, and a later change in law does not

likewise awaits decision. The United States has filed no merits response to any of them; instead, it sought and obtained an extension of time as to the stay motions (Doc. 205; text-only order of June 22, 2026). The special master filed only an initial response (Doc. 217) and moved for an extension keyed not to any fixed date but to the completion of his own restitution recommendation — due on or before July 25, 2026 — so that the motions seeking to halt the asset sales would be fully answered only after the restitution figure is finalized and the sales have proceeded. (Doc. 218.) Appellant opposed that extension. (Doc. 219) On this record, the district court has "failed to afford the relief requested," and the posture below affords no prospect of timely relief: the relief sought is the preservation of assets, and the assets are being sold while the motions await decision. Pursuant to Local Rule 8, the six motions are attached to this motion as Exhibits A through F, and —

---

retroactively render that risk-taking criminal. Lawful risk cannot be the predicate for a penal, loss-measured restitution award.

Mr. Lindberg does not seek to disturb his Plea Agreement. He agreed, in Paragraph 10(a), to pay restitution for harm "caused by the defendant's criminal conduct." He stands by that agreement. But that agreement reaches only harm his conduct caused; by its own terms it does not reach losses inflicted years later by an intervening actor, and it does not convert "risk" into a compensable, realized loss. The proximate-cause limitation that the Supreme Court and the Fourth Circuit enforce is the very limitation Paragraph 10(a) imposes by the words "caused by the defendant's criminal conduct." (Doc. 234 at 11-12).

so that this motion may remain confined to the stay factors — each is summarized briefly in the margin rather than reargued here.[2]

As required by Local Rule 8, copies of both stay motions, the Preliminary Order of Restitution, and the relevant portions of the record are attached. *See* Fed. R. App. P. 26.1; Loc. R. 26.1.

## BACKGROUND

1. On January 23, 2025, the district court appointed a special master in connection with the restitution proceedings. (Doc. 56.) On May 26, 2026, the district court sentenced Appellant, and on May 28, 2026, entered a Preliminary Order of Restitution in the amount of approximately $1.655 billion, directing that

[2] Exhibit A — Doc. 172: motion to stay enforcement of the Preliminary Order's immediate-payment directive, filed within fourteen days of its entry. Exhibit B — Doc. 190: emergency motion to stay all asset sales, with consolidated objections, including the Article III and § 3664(d)(6) challenge to the special-master reference and the challenge to the special master's authority and neutrality. Exhibit C — Doc. 201: emergency motion to enforce the plea agreement, with supporting affidavit, addressing government counsel's demand that a protected filing be removed from the docket on pain of a declared breach. Exhibit D — Doc. 202: [conform description to Doc. 202 as filed]. Exhibit E — Docs. 234–235: motion to dismiss the $1.655 billion restitution figure, with supporting declaration and Exhibits A–W, on the grounds that no loss was reasonably foreseeable at origination (see note 3, supra), that intervening events after October 2018 severed any causal chain, and that mandatory offsets and credits of approximately $2.9 billion extinguish any properly calculated obligation (see note 1, supra).

restitution be paid immediately. (Doc. 161.) Appellant's appeals are pending before this Court as Nos. 26-4309 and 26-4310.

2. The final amount of restitution is not settled — and is contested at its foundation. No court has adjudicated whether, or to what extent, the claimed losses were directly and proximately caused by the offenses of conviction, as the Mandatory Victims Restitution Act requires. Appellant's pending motions present those causation issues, together with offsets and credits of approximately $2.9 billion that — if credited as the statute requires, see 18 U.S.C. § 3664(j)(2) — would reduce the net restitution obligation to zero. On July 14, 2026, Appellant filed a motion to dismiss the $1.655 billion restitution figure on causation and offset grounds, with supporting exhibits, followed by a supporting declaration. (Docs. 234, 235.) Those determinations remain for the district court in the first instance, subject to its de novo determination under 18 U.S.C. § 3664(d)(6).

Those credits are itemized and record-sourced in Appellant's Response and Objection to the Special Master's Report:

| **Documented Credit / Transfer (Doc. 132, Part II)** | **Amount** | **Record Source** |
|---|---|---|
| AAPC preferred equity transferred to ULICO (Dec. 2022) | $352.9 million | Doc. 132 at 13 |
| Capital contributions to SNIC | $27.8 million | Doc. 132 at 15 |
| Cash payments to Pre-Designated Restitution Parties | $79.6 million | Doc. 132 at 16 |
| Cash payment to CBL (Beckett refinance amendment) | $3 million | Doc. 132 at 19 |

| | | |
|---|---|---|
| Additional proceeds, sale of the Clanwilliam Group | $20 million | Doc. 132 at 19 |
| Real estate contributed to ULICO | $13.6 million | Doc. 132 at 20 |
| Sale proceeds of certain zero-coupon bonds | $243.4 million | Doc. 132 at 20 |
| **Total documented transfer credits** | **≈ $740.3 million** | **Doc. 132 at 11** |

3. The motion to dismiss presents five principal grounds. *First*, causation has never been adjudicated: the claimed losses were produced by the independent, intervening acts of the state Rehabilitator — including the rejection of the Ares (November 2018) and Oaktree (February 2019) transactions, either of which would have monetized the affiliated-investment portfolio at face value and paid policyholders in full by mid-2019, together with pre-maturity bond sales and the extraction of professional fees — acts that no plea admission reaches and that break the chain of proximate causation the MVRA requires. See *Hughey v. United States*, 495 U.S. 411, 413 (1990); *Robers v. United States*, 572 U.S. 639 (2014); *Paroline v. United States*, 572 U.S. 434, 444–45 (2014). *Second*, the Preliminary Order is facially noncompliant with the MVRA: it exceeds the special master's own recommendation by $30 million (and now exceeds his final recommendation, since revised downward to $1,616,000,000, by $39 million), contains no itemization of victims' losses, no causation findings, and no findings under 18 U.S.C. § 3664(f)(2), yet was made due, payable, and enforceable immediately while acknowledged reductions remain unquantified. *Third*, the amount is subject to mandatory offsets under 18 U.S.C. § 3664(j)(2) of approximately $2.9 billion —

including more than $1.2 billion in cash payments, asset transfers, and debt elimination already provided — yielding, on Appellant's figures, a net overpayment of approximately $1.2 billion. *Fourth*, the policyholders were paid in full in December 2025, fulfilling the MVRA's compensatory purpose. *Fifth*, because restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), its amount may be fixed only by the district court's de novo determination under § 3664(d)(6) — not by a special master's process the court has never reviewed.

4. The persons the underlying insurance proceedings exist to protect have been paid. On or about December 22, 2025, the policyholders of the insurance companies at the center of this case received distributions described in the estates' own notices as "the full amount of your claim in the liquidation" and "the final payment in settlement of any liability relative to your contract." Appellant's timing in seeking interim relief reflects that fact: he sought no stay of any kind while policyholder payments were being completed, precisely so that policyholders would be paid without delay or disruption. Only after those payments were complete — and the liquidation of assets nonetheless continued, without accounting and without credit — did Appellant move to stay the immediate-payment directive and the asset sales.

USCA4 Appeal: 26-4309 Doc: 27-1 Filed: 07/29/2026 Pg: 24 of 54 Total Pages:(24 of 54)

5. Within fourteen days of the Preliminary Order, Appellant moved to stay enforcement of the immediate-payment directive. (Doc. 172.) Appellant separately filed an emergency motion to stay all asset sales and asset-sale processes. (Doc. 190.) Both motions are fully briefed on Appellant's part and remain undecided.

6. The proceedings below offer no prospect of timely relief. The United States, rather than respond to the stay motions on the merits, sought and obtained an extension of time keyed to the resolution of prior defense counsel's motions to withdraw — an event that has no bearing on the government's duty to respond under § 3664(e). (Doc. 205; text-only order of June 22, 2026.) The special master filed only an initial response (Doc. 217) and moved for an extension whose endpoint floats with the completion of his own final restitution recommendation, due on or before July 25, 2026 — approximately the same window in which, under 18 U.S.C. § 3664(d)(5), the final determination of the victims' losses must be made. (Doc. 218.) The practical effect of that sequencing is that the motions seeking to halt the asset sales would be answered, if at all, only after the restitution figure is finalized and the sales have proceeded. Appellant opposed both extensions on precisely that ground. (Docs. 211, 219, 220.)

7. The dissipation of restitution assets is not prospective; it has begun. Beckett — an operating company within Appellant's holdings — was transferred to the special master's control through an Assignment of Interests effective

February 13, 2025, after the special master's appointment. It has since been sold to a third party. The special master neither sought nor obtained the district court's approval for that sale, and the sale left no trace on the district court's docket — no motion, no notice, no order; Appellant's counsel learned of it only orally, in or about December 2025. (Doc. 190-4 ¶ 5; Statement of Facts ¶ 11.) To this day the special master has provided no accounting of it, and no proceeds — and no part of the approximately $134 million in value transferred to his control — have been credited against the restitution obligation.

8. The special master has also administered the distribution of $23,520,710 in proceeds from the sale of Clanwilliam Group — a primary restitution asset — to Vista, a party that, by the special master's own determination, is not a victim of the offenses of conviction: his report concluded that the related claimant "fall[s] short" of the victim definition because it had not "pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments," (Doc. 106-3, at 23), and the district court adopted that determination in the Preliminary Order of Restitution (Doc. 161) and Judgment (Doc. 162). Indeed, in the very filing proposing the distribution, the special master acknowledged he was unsure Vista was due restitution at all. (Doc. 66, ¶ 26 n.8.) Restitution-asset proceeds have thus been paid out to a recipient the restitution process itself has determined is not entitled to restitution. Appellant has moved to recoup that

distribution and credit it against the restitution obligation. (Doc. 238) The recipient's related cell has since moved under the Crime Victims' Rights Act to overturn its exclusion (Docs. 221, 222) — and the special master, the very officer whose victim determination that motion attacks, has taken a position only within his own final report, recommending denial. That posture reflects a structural conflict: he cannot defend his own determination that the claimant is not a victim without confronting his own administration of a $23,520,710 distribution to its affiliate on account of the same investments.

9. The dissipation is about to become total. On or about July 16, 2026, the special master indicated, on the parties' weekly call, that the assets held by NewHoldCo — which holds a substantial portion of the Primary Restitution Assets — would likewise be dissipated, even when there was final restitution amount set by the court de novo.

10. This course of conduct is systematic, not episodic. Under the Order Appointing Special Master, the special master exercises control over the restitution assets. (Doc. 56.) The appointing order itself conditions liquidation — twice — on "Court approval." (Doc. 56, at 6.) Notwithstanding that condition, that control, and 18 U.S.C. § 3664(d)(6)'s confinement of a special master to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court," the special master neither sought nor obtained the district

court's approval for the Beckett sale, has provided no accounting of it or of any other disposition, and has identified no intention to seek approval before the dissipation of the assets held by NewHoldCo. And the administration has failed in both directions: where approval was not sought, a $134 million asset under the special master's control was sold without judicial authorization and without any record of the proceeds; where approval was obtained — the Clanwilliam proceeds — $23,520,710 flowed to a recipient the special master himself has since determined is not a victim. (Doc. 106-3, at 23.) Assets subject to a restitution order are being dissipated by a court-appointed officer, without the court's de novo determination of anything.

11. The process is accelerating even as these motions await answer — and it is proceeding out of order. As disclosed in Appellant's motion for leave to issue subpoenas and the correspondence appended to it (Doc. 248), the sale process now extends beyond NewHoldCo: ARM — an asset valued at approximately $[300] million — and Damovo are being marketed for sale, as reflected in the Rule 17(c) subpoena motion filed contemporaneously (Doc. 248). And AAPC — among the most valuable assets in the structure, with a current valuation of 18-to-20-times forecasted 2026 EBITDA of $150 million, i.e., approximately $2.7 to $3.0 billion, on the Houlihan Lokey analysis attached to the motion to dismiss (Doc. 234) is simultaneously being devalued: positioned for disposition at a fire-sale valuation,

or for a write-down of its valuation, either of which would trigger forfeiture consequences under the plea agreement (Doc. 160, ¶ 1) before any restitution amount has been lawfully determined. The stated justification — that AAPC's debt is maturing and may drive the timeline — repeats the Clanwilliam playbook step for step: there too, a maturity-and-timing narrative was deployed to justify a rushed disposition after the arm's-length transaction had been blocked, and an asset that commanded $880 million at 22.14-times EBITDA under the Quadro agreement was sold for a fraction of that figure. But maturing debt on a performing business is a refinancing event, not a forced-sale event — debt of this kind is routinely rolled over — and the record shows that when refinancing would have preserved value, the administration itself blocked it, as with the UKAT refinancing by BC Partners. The contrast is stark. The same administration that liquidates operating companies piecemeal — at the private-equity discounts the record already documents run some 63% below public-acquirer valuations — is writing down the very asset whose value demonstrates the estate's sufficiency to satisfy any award. Dispositions are proceeding before the determination that is their statutory predicate, outside any sequencing the appointing order contemplates, and without accounting at any step. Meanwhile, the pattern below has hardened: the United States has filed no merits response to either stay motion, obtaining instead an extension of time (Doc. 205); the special master has deferred his full response until

after his final recommendation issues (Docs. 217, 218); and he addressed the Crime Victims' Rights Act motion attacking his own victim determination only within his own final report, recommending its denial rather than responding as an adversary (Docs. 221, 222). And as set forth in Defendant's emergency motion and supporting affidavit already of record below, government counsel demanded that defense counsel remove a protected filing from the public docket, stating that a failure to do so would be treated as a breach of the plea agreement — conduct Defendant has asked the district court to address, in a motion that likewise remains unanswered. (Doc. 201; Aff., Doc. 201-1, ¶¶ 5–6.) A restitution determination cannot lawfully proceed to finality — and asset dispositions cannot lawfully proceed at all — while the dispositive motion to dismiss, the stay motions, and the pending challenge to the special master's own authority and neutrality (Doc. 190) remain unanswered.

12. On July 22, 2026, the posture below hardened into a written record. The special master's counsel circulated a draft final supplement, a proposed final order of restitution, and an appendix to be filed under seal in its entirety, announcing that he would file by Friday, July 24 — although the governing period runs to July 29 — for the stated reason that he is "out of the office" and would "log in remotely." He demanded the defense position within one day, while Appellant sits in custody unable to review the documents and counsel who appeared that same day cannot

meet him until the following Tuesday. It is from that same custody that the court has now ordered the Defendant produced for the August 7 hearing (Doc. 250), compelling him to face a substantive proceeding while imprisoned and without a fair opportunity to review the record, and while in transit through a BOP system where he will not have access to counsel en route before the hearing. Counsel will attempt to meet the Defendant on July 25, 2026, given the change in circumstances. Counsel invoked the joint bifurcation and requested an extension on the record; the special master's counsel answered that he would file notwithstanding; and the government, asked directly for its position on the record, objected to any extension. (Ex. G (July 22, 2026 email chains).) That refusal to engage inverts the statute. Causation is the threshold determination of any restitution analysis: the government bears the burden of proving, by at least a preponderance of the evidence, that the claimed losses were directly and proximately caused by the offense conduct, 18 U.S.C. § 3664(e), including that intervening events did not sever the causal chain.[3] See *United States v. Stein*, 846 F.3d 1135, 1155–56 (11th Cir. 2017) (vacating a restitution award where the losses resulted from intervening, post-offense events not shown to have been reasonably

[3] Appellant preserves the contention that because MVRA restitution is criminal punishment, *Ellingburg*, 607 U.S. at 166, the facts fixing its amount must be found by a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343 (2012). The showing here prevails under any standard.

foreseeable to the defendant). Answering the defendant's causation challenge is not a raid on the victims' recovery; it is the adjudication the statute makes the precondition of any recovery. And the MVRA itself supplies the answer for the case in which the government deems that adjudication too burdensome: for property offenses, where "determining complex issues of fact related to the cause or amount of the victim's losses" would unduly burden the process, the statute directs that mandatory restitution not be imposed at all. 18 U.S.C. § 3663A(c)(3)(B). Cost is a statutory ground for declining restitution; it is nowhere a license to impose — still less to collect — restitution without the determination. The government's refusal is likewise irreconcilable with the accuracy the statute commands: restitution must issue "in the full amount of each victim's losses as determined by the court," 18 U.S.C. § 3664(f)(1)(A) — a determination that presupposes causation, not a figure finalized because answering the challenge to it was deemed too costly. Meanwhile, Appellant has been compelled to seek the underlying records themselves by Rule 17(c) subpoena requests directed to the Rehabilitator and the administration, filed contemporaneously in the district court (Doc. 248), because in the nearly eight years since he relinquished control they have never been produced to him. Appellant's evidence — that no loss was reasonably foreseeable when the affiliated investments were originated, and that

intervening events after October 2018 severed any causal chain — is presented in the motion to dismiss (Docs. 234, 235) and stands undisputed.

13. Once those assets are sold, they cannot be recovered. Their disposition would liquidate the very res at issue before the amount, causation, offsets, and the special master's authority to direct such sales have been adjudicated by any court.

## ARGUMENT

### I. This Court May Stay the Restitution Directive Pending Appeal.

Federal Rule of Criminal Procedure 38(e)(1) provides that, "[i]f the defendant appeals, the district court, or the court of appeals under Federal Rule of Appellate Procedure 8, may stay — on any terms considered appropriate — any sentence providing for restitution under 18 U.S.C. § 3556." The rule vests this Court with express authority to stay the restitution directive on any terms it considers appropriate, and Rule 8 supplies the vehicle. That "any terms" authority permits the Court to condition the stay on preservation of the restitution assets, including by restraining their sale or dissipation pending the restitution determination. Rule 8 independently authorizes "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C); see also 18 U.S.C. § 3572(g) (restraint on transferring or dissipating assets where a monetary penalty is stayed); Fed. R. Crim. P. 38(e)(2) (orders to ensure compliance, including registry deposit or bond).

## II. The Traditional Stay Factors Favor a Stay.

The familiar four factors govern: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first two factors are the most critical. *Id.* at 434–35.

**Likelihood of success.** The restitution figure this motion asks the Court not to let be irreversibly collected is contested at its legal foundation, in two independent respects. Appellant need not prove the ultimate loss number to prevail on appeal; it is enough that the process fixing a $1.616 billion criminal figure is unlawful — a determination made by a non-Article III officer, before the § 3664(d)(6) de novo determination, on the summary premise that there are "no contested material factual issues … that require an evidentiary hearing" (Doc. 245-1, at 9). On that structural question Appellant is likely to succeed.

*First*, no court has adjudicated causation. The MVRA authorizes restitution only for losses to victims "directly and proximately harmed" by the offense of conviction. 18 U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411, 413 (1990) (restitution is authorized "only for the loss caused by the specific conduct

that is the basis of the offense of conviction"). The Fourth Circuit has already articulated the governing standard in this very case: harm must be "closely related to the conduct inherent to the offense" rather than merely tangentially linked. (Doc. 203, at 4–5 (amended opinion in No. 26-1749).) Proximate cause under the restitution statutes is likewise explicated in terms of foreseeability and excludes losses attributable to independent intervening causes. See *Paroline v. United States*, 572 U.S. 434, 444–45 (2014); *United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021) (government must prove, by a preponderance, that the harm was foreseeable to the defendant in committing the offense). Here, the only foreseeability figure to which Appellant ever agreed is the Plea Agreement's stipulation that the loss known to or reasonably foreseeable by him exceeded $550,000,000 — a Guidelines stipulation the agreement itself distinguishes from restitution. (Plea Agreement (Doc. 40) ¶ 8(a).) The $1.655 billion Preliminary Order is occupied by losses Appellant contends were caused by independent intervening acts of the state Rehabilitator — blocked sale transactions, pre-maturity bond sales, and the extraction of fees — that no plea admission reaches and no court has adjudicated. The district court's own observation at sentencing was that "the real loss there was risk." (Sent. Tr. at 47:21-22.) Indeed, the court explained that "[t]he fact that all of it wasn't lost … only means that the loss was overstated." (Sent. Tr. at 47:18–21.) Appellant's motion to dismiss the $1.655

billion restitution figure (Doc. 234) presents this causation challenge in full (see note 3, supra): there was no proximate causation to begin with, because the losses claimed were neither known to nor reasonably foreseeable by Appellant at the time the investments were originated, and were produced by intervening acts of others. The motion develops the point in two steps. As a matter of the plea agreement's text, the restitution provision reaches persons "directly or indirectly harmed by [Appellant's] criminal conduct" (Plea Agreement (Doc. 40) ¶ 10(a)); its phrase "regardless of the resulting loss amount" addresses quantum, not causation, and neither dispenses — nor could dispense — with the MVRA's requirement that the loss be caused by the offense conduct. Paragraph 10(a) of the plea agreement itself provides for restitution only for harm "caused by the defendant's criminal conduct." (Doc. 40 ¶ 10(a); Doc. 234 at 11.) And as a matter of causation doctrine, the intervening acts here are of a different order than the victim-choice scenarios that mark proximate cause's outer limits: the Rehabilitator did not merely hold collateral while its value declined, cf. *Robers*, 572 U.S. at 645–46; he refused face-value cash transactions — Ares in November 2018 and Oaktree in February 2019, either of which would have monetized the portfolio in full and paid every policyholder by mid-2019 — sold bonds before maturity, and extracted professional fees from the very estates said to have suffered the loss. Each was an independent, discretionary act of a third party; none was admitted in the plea; none

has been adjudicated by any court. (Doc. 234 at 9–16.) Whether plea admissions can, as a matter of law, establish proximate causation for the full $1.655 billion is a question of legal sufficiency committed to the district court's de novo determination, 18 U.S.C. § 3664(d)(6) — a determination that has not occurred.

*Second*, the amount is subject to offsets the statute makes mandatory. Any restitution award "shall be reduced" by amounts later recovered for the same loss. 18 U.S.C. § 3664(j)(2). Appellant's pending filings document offsets and credits of approximately $2.9 billion against the $1.655 billion figure[4] — including more

[4] The offsets and credits are itemized in Defendant's Response and Objection to the Special Master's Report (Doc. 132) and the reconciliation exhibits thereto, and include, among others:

| **Offset / Credit** | **Amount** |
|---|---:|
| Starting-balance correction to the Special Master's report | $188,000,000 |
| NCIC enterprise value at the October 2018 transfer of control | $478,000,000 |
| Clanwilliam sale distributions ($172,171,598 NCICs; $80,993,997 ULICO; $23,520,710 Vista) | $276,686,305 |
| AAPC preferred equity (current par value) | $358,000,000 |
| AAPC preferred dividend payoffs | $38,000,000 |
| Beckett sale proceeds, uncredited (price, not conceded value) | $134,000,000 |
| Agera Energy credit | $102,000,000 |
| ECL credit | $118,000,000 |
| Holding-company debt elimination | $50,000,000 |
| UKAT refinancing loss (blocked BC Partners refinancing) | $39,000,000 |
| SNIC escrow | $28,000,000 |
| Non-IALA assets | $59,000,000 |
| Clanwilliam fire-sale loss relative to the Quadro valuation | $474,000,000 |

than $1.2 billion in cash payments, asset transfers, and debt elimination already provided, and, concretely, the approximately $134 million in Beckett value transferred to the special master's control by Assignment of Interests, no part of which has been credited. The statute's command presupposes an accounting. Restitution exists to compensate — to restore victims to their position before the loss, see *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) — and awards must be reduced by amounts recovered precisely so that no victim obtains a windfall. *Robers*, 572 U.S. at 644. An obligation that "shall be reduced" by recoveries cannot be lawfully administered without a running account of what has been recovered, from whom, and for whose benefit — yet the officer administering this one has provided no accounting of anything. On Appellant's figures, he has already overpaid any properly calculated obligation. The net figure, once causation and offsets are properly adjudicated, may be a fraction of the Preliminary Order — or zero. A restitution directive whose amount could move by that magnitude cannot support immediate, irreversible collection.

*Third*, the process generating the figure itself is contested. A special master may be referred restitution issues only "for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue

| | |
|---|---|
| Real-estate sale proceeds retained without credit | $25,000,000 |

by the court." 18 U.S.C. § 3664(d)(6). Here, the special master is proceeding to a final restitution recommendation — and to the liquidation of the assets themselves — without the district court's de novo determination of causation or the pending offset motions, and Appellant has challenged that exercise of authority on Article III grounds. Because restitution under the MVRA "is plainly criminal punishment," *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), fixing its amount is a judicial function that § 3664(d)(6) reserves to the court. The stay motions below develop the point with controlling authority: § 3664(e) commands that any dispute as to the amount "shall be resolved by the court," an allocation the Fourth Circuit enforces strictly, *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995); the judicial power may be exercised only by Article III courts, *Stern v. Marshall*, 564 U.S. 462, 484 (2011); and consent cannot cure a structural defect in the allocation of that power, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986). (Doc. 190, at 13–17.) Appellant's motions attached herewith show docketing statement challenges, among other things, whether the restitution determination is procedurally and substantively proper where final restitution adjustments were reserved to a post-sentencing special-master proceeding that remains pending — and the Article III, sequencing, and the like, *supra*. The departure from the advisory role is not abstract: the special master exercises control over the restitution assets under the appointing order (Doc. 56),

yet has disposed of them — beginning with the approximately $134 million Beckett transaction — without seeking the district court's approval for that sale and without providing any accounting; and he has administered a $23,520,710 distribution of restitution-asset proceeds to a recipient he himself has since determined is not a victim (Doc. 106-3, at 23), a determination now under attack in a Crime Victims' Rights Act motion (Docs. 221, 222) to which he — the officer charged with victim identification — has now taken a position only within his own final report. An officer limited by statute to proposing findings for the court's de novo determination is instead liquidating and distributing the estate on his own authority and is conflicted from defending even his own recommendations. Appellant is likely to show that a restitution amount fixed through that process cannot stand — and, at a minimum, that the amount will be materially reduced once causation and offsets are properly adjudicated.

Nor is the adversarial, criminal character of these proceedings merely Appellant's characterization — the government has declined to dispute it. Appellant's motion concerning access to counsel and case records for the restitution proceedings — a motion premised expressly on the propositions that the restitution determination is part of the criminal sentence, constitutes criminal punishment under *Ellingburg*, and is a stage of the criminal case at which due process and counsel rights attach — was filed on the district court's public docket,

not ex parte, with notice to the United States and responses due by July 1, 2026, and drew no opposition. (Doc. 225, at 2, 6.) Having declined below to dispute that the restitution determination is adversarial criminal punishment to which due process attaches, the government cannot now countenance the liquidation of the res before any adversarial adjudication of causation, offsets, or amount has occurred. Due process in a criminal punishment proceeding means, at a minimum, that the punishment is fixed before it is executed.

And the Article III sequencing violation, once executed, is not fixable. De novo review under § 3664(d)(6) can revisit a recommendation; it cannot unsell Beckett, recall the $23,520,710 distributed to a non-victim, restore the fees already consumed, or reconstruct the value destroyed in a fire sale. Each disposition converts a correctable legal error into a permanent fact. That irreversibility is the reason this motion is necessary: because the violations already executed cannot be remedied retroactively, the only remedy that still exists is prospective — a stay of further sales pending appeal, so that the sequence the Constitution and the statute require (adjudication first, execution second) is preserved for what remains of the estate. A stay is not one available remedy among several; for the assets not yet sold, it is the only one. And the next execution is already in motion: a disposition of AAPC on the Clanwilliam model — at the documented 63 percent private-acquirer discount from its $2.7-to-$3.0 billion valuation — would erase on the

order of $1.7 billion or more in a single transaction, a sum exceeding the entire Preliminary Order, and would moot the adjudication this motion exists to preserve. Without a stay now, the questions presented below and in the consolidated appeals will be answered by a sale rather than by a court.

Fourth, the proposed order would resolve all of this with no hearing at all. It asks the district court to find, "viewing the facts in a light most favorable to Defendant," that there are "no contested material factual issues … that require an evidentiary hearing." (Doc. 245-1, at 9.) The order presses for entry with no hearing at all, moreover, while the very motions contesting the award remain unanswered by the Government on the docket — asking the court to deny them by adoption rather than adjudication. That is a civil summary-judgment standard imported into criminal restitution, and it collides with the statute: § 3664(e) commits any dispute "as to the proper amount or type of restitution" to resolution "by the court by the preponderance of the evidence," and § 3664(d)(6) requires the court's de novo determination — neither of which a paper finding of "no genuine issue" can supply. The burden is the Government's. *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017); 18 U.S.C. § 3664(e). On the parties' weekly call with the Special Master, the Government stated that responding on the merits to the causation arguments would take money from the victims, and that the Special Master — not the Government — must respond: an open refusal to carry that

burden, and an improper reliance on the neutral's recommendation as though it were the Government's proof. Yet the Government has filed no merits response to any pending motion, and Appellant — who bears the burden on offsets, *United States v. Karam*, 201 F.3d 320, 329 (4th Cir. 2000) — has been denied the very records needed to carry it. A defendant cannot be put to a burden at a hearing that never occurs, on documents he is not permitted to obtain; and a special master's report is not the Government's opposition — only the court may resolve a dispute as to the proper amount of restitution. *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995). That the recommended figure fell from $1.655 billion to $1,616,000,000 once the defense's objections were tested confirms the dispute is real, not illusory. The order resolves everything by adoption — it adopts the master's findings "as the Court's own" (Doc. 245-1, at 5), finds "Defendant has failed to rebut" the recommendations (Doc. 245-1, at 8), and, upon entry, makes restitution "due and payable immediately" and enforceable as a judgment, with an abstract available on request (Doc. 245-1, at 12): judgment-grade collection against a res already being liquidated.

Nor is the answer to convene a hearing now. Appellant does not resist a hearing — § 3664(e) entitles him to one — but any hearing is premature until the Government files merits responses to all six pending motions (and any additional motions subsequently filed) and the district court resolves the challenge to the

special master's authority and neutrality (Doc. 190). A hearing staged on a conflicted officer's report, before the adversary that bears the burden has stated its position, would ratify the report rather than test it, and would resolve nothing the statute commits to the court on an adversarial record. Counsel said as much when the Preliminary Order was entered: it was "obviously subject to the objections of numerous parties and further hearings with the Court." (Sent. Tr. at 66:20–22.) The district court's own bifurcation order says the same: it anticipated that "the restitution issues in this case may require a lengthy hearing or hearings," and ordered that "the Court will schedule one or more hearings (if necessary) to finalize restitution." (Doc. 108, at 2, 4.)

The Government's contrary authority does not carry the day. Section 3664 does not make an evidentiary hearing mandatory in every case, *United States v. Ziadeh*, 104 F. App'x 869, 874 (4th Cir. 2004); but *Ziadeh* upheld a denial only where the defendant offered a "bald assertion," *id.* at 875 — the opposite of the specific, material disputes developed in the motion to dismiss here. Nor is the burden the Government's to escape: it "never shifted" as to the amount of loss, *United States v. Steele*, 897 F.3d 606, 613–14 (4th Cir. 2018), and even the allocation of the offset burden is contested — the Ninth Circuit commits it to the court's "as justice requires" determination "in its entirety." *United States v. Crawford*, 169 F.3d 590, 592–93 (9th Cir. 1999).

**Irreparable injury.** The injury here is not hypothetical, prospective, or monetary in the ordinary sense. It is the ongoing, irreversible liquidation of the res. One operating company — transferred to the special master's control by Assignment of Interests — has already been sold for approximately $134 million, without court approval and without credit. $23,520,710 in sale proceeds has already been distributed to a recipient the special master himself has determined is not a victim. (Doc. 106-3, at 23.) And on or about July 1, 2026, the special master indicated, on the parties' weekly call, that the assets held by NewHoldCo — a substantial portion of the Primary Restitution Assets — would likewise be dissipated, before any final restitution amount is determined. The harm is compounded by the absence of any accounting: because the special master has accounted for none of the dispositions, neither Appellant nor any court can even measure the dissipation as it occurs — what has been sold, for how much, or where the proceeds have gone. And the acceleration now disclosed compounds it further: a fire-sale disposition or write-down of AAPC would not merely diminish the res — it would trigger forfeiture consequences under the plea agreement (Doc. 160, ¶ 1), converting an unadjudicated restitution figure into a completed taking that no subsequent ruling could undo. Nor is sale the only mode of destruction. Since taking control in October 2024, the administration has shut down operating Specified Affiliated Companies outright — including the Riversource group,

companies with millions of dollars in revenue and decades of operating history — notwithstanding the stipulation in the Clanwilliam sale order that the de minimis companies hold no value for the restitution process. A stay of sales alone cannot prevent shutdowns — which is why the observer and accounting terms requested below are necessary complements to the stay. The information asymmetry is equally complete: the records of the estate's own realized losses have been in the exclusive control of the Rehabilitator and the administration since Appellant relinquished control in October 2018; Appellant, incarcerated, has never possessed them. Only an accounting can produce them. Once sold, those assets cannot be restored; funds disbursed are, as a practical matter, unrecoverable if the amount is later reduced or the process by which it was set is invalidated. No later ruling in Appellant's favor — in the district court or in this Court — could undo those sales. And because the district court has not acted on either stay motion, and the special master has sought to defer his response until after the final report triggering a final order and sales are complete, only a stay from this Court, entered now, can preserve the status quo.

Nor does the pendency of Appellant's merits motions below counsel delay of the issuance of the requested stay. Those motions seek different relief — the adjudication of causation, offsets, and the amount — that this motion expressly leaves to the district court. What the district court has twice been asked for, and has

not provided, is interim preservation of the assets. The pendency of the motion to dismiss is itself a reason for the stay, not against it: that motion is dispositive — if granted, it eliminates the restitution obligation entirely — and a stay is the only means of ensuring that the res is not liquidated before it is decided. Enforcement should not outrun adjudication. The pendency of the merits motions thus confirms, rather than undermines, the need for a stay: they demonstrate that the amount remains fundamentally contested while the res that would satisfy it is being liquidated.

The same logic supports staying the issuance of the final restitution recommendation itself. The restitution phase exists as a separate, deferred proceeding by design: the district court bifurcated sentencing from the restitution determination and deferred the amount under 18 U.S.C. § 3664(d)(5) — a structure adopted with the parties' agreement — precisely so that the amount would be fixed through orderly adjudication rather than at the sentencing hearing. (Doc. 107). That structure was not an accident of scheduling: before sentencing, the parties jointly moved to bifurcate sentencing from the restitution determination (Doc. 107, granted, Doc. 108), and the court proceeded on precisely the structure the parties jointly proposed — imposing sentence on May 26, 2026, entering the Preliminary Order two days later, and deferring the final restitution determination under 18 U.S.C. § 3664(d)(5). Having jointly proposed that architecture and received the

completed sentence it contemplated, the government cannot now collapse the adjudicative phase that was its other half. The sentence the government received was itself a downward variance the court granted "due to the extraordinary cooperation of Mr. Lindberg." (Sent. Tr. at 62:6–8.) [107, Defendant Greg E. Lindberg and the United States' Joint Motion to Bifurcate Sentencing Hearing, filed April 3, 2026 at 5-6. The current schedule inverts that structure. The special master's final recommendation is due July 25, 2026 — before the district court has resolved the dispositive motion to dismiss (Docs. 234, 235), the stay motions (Docs. 172, 190), or the challenge to the special master's own authority and neutrality (Doc. 190), and before the special master even responds to those motions (Docs. 217, 218). A final figure produced on that sequence would be fixed by a non-Article III officer in advance of every Article III determination the statute reserves to the court. And no urgency justifies the rush: the sequencing defect already exists, and it cannot be cured by accelerating the report — while the harms of acceleration — liquidation, forfeiture triggers, and unreviewable distributions — are the subject of this motion. Completing motions practice first costs nothing; rushing the report costs everything this motion seeks to preserve. The Court should hold the process to the bifurcated structure the district court itself adopted. The report has now issued: the special master filed it on July 23, 2026 — ahead of even his announced Friday date, and before the end-of-day time by which his counsel

had stated, in writing, that he would await Mr. Lindberg's comments. (Ex. G (email of the special master's counsel).) The report was filed within hours after counsel provided Rule 27(e) notice of the present filings to the government's appellate counsel — notice given at 9:01 a.m.; filing confirmed by the government's appellate counsel at 11:12 a.m. (Ex. G (email timestamps).) Nothing in this motion is mooted: the report is a recommendation without legal force until the district court acts on it, 18 U.S.C. § 3664(d)(6), and the harms this motion addresses — the asset sales and the immediate-payment directive — remain fully subject to the relief requested.

**No substantial injury to others.** A stay of the immediate-payment directive does not impair any victim's ultimate recovery. The obligation remains in place, and the eventual award is already secured by approximately $6 billion in collateral value under the court's control — Appellant's assets, held under the special master's administration pursuant to the appointing order — the Specified Affiliated Companies through NewHoldCo, and AAPC separately. (Doc. 56.) Because the amount is itself still being determined, immediate collection is premature, not delayed. Nor can Appellant's timing be held against him: he forbore from seeking any stay while policyholder payments were being completed, and moved within fourteen days of the Preliminary Order once it issued. Victims are harmed, not helped, by distributions that may have to be clawed back — or that

flow, as $23,520,710 already has, to a recipient the restitution process itself has determined is not a victim.

**Public interest.** The public interest lies in restitution that is accurately and lawfully determined, not rapidly collected and later unwound — and the compensatory urgency that might otherwise weigh against a stay is absent here. The policyholders whom the underlying insurance proceedings exist to protect have been paid in full. As set forth in the sworn Statement of Facts of record below, approximately 43,000 individual policyholders received distributions in December 2025 totaling approximately $157 million — payments described in the estates' own notices as "the full amount of your claim in the liquidation" and as "the final payment in settlement of any liability relative to your contract" — and the special master himself filed a Notice of Distribution confirming those payments on December 23, 2025. (Statement of Facts (Doc. 190-4) ¶¶ 13; Ex. B7.) Appellant's own conduct honored that priority — he sought no stay while those payments were being completed, precisely so that policyholders would be paid without delay. With the policyholders paid, continued liquidation of the estate serves no one so directly as the administration itself: the professional fees of the administrators, advisors, and liquidators have already consumed approximately $175 million.

**III. The Court's Existing Control of Appellant's Assets Provides Complete Security.**

No bond or further security is required, because Appellant has already provided it. Pursuant to his plea commitments, Appellant transferred the majority of his assets to the control of the court: through the Assignment of Interests effective February 13, 2025 and related instruments, interests in more than 300 companies — including the operating companies held by NewHoldCo, comprising approximately $6 billion in collateral value — were placed under the special master's administration pursuant to the appointing order. (Doc. 56.) The value of that collateral is demonstrated, not asserted. Applying the 22.14-times EBITDA multiple established by the arm's-length Quadro transaction to forecasted 2026 EBITDA of approximately $300 million yields a value exceeding $6 billion for the remaining operating companies; and the Quadro transaction itself — which covered only a subset of the assets and did not include AAPC — was valued at $3.4 billion. (Docs. 132, Exhibit 1- Part 2.) On either measure, the collateral under the court's control is worth several billion dollars if it is preserved and sold at arm's length — several multiples of the $1.655 billion Preliminary Order, and well in excess of any potential restitution determination, which on Appellant's showing of causation and offsets is zero. That value, however, is not a static cushion: it exists only so long as the assets are not liquidated at a fraction of their worth, and

the stay is what preserves it. Absent a stay, the fire-sale dispositions documented above convert billions in security into a fraction of the award — the very irreparable harm this motion seeks to prevent. No asset can leave the estate except through the court's own officer, and a stay restraining dissipation preserves — rather than diminishes — the fund from which any award would be paid. A defendant who has already delivered the res into the court's hands has provided greater security than any bond could; what remains is only to ensure that the res is still there when the amount is finally and lawfully fixed.

## CONCLUSION

Appellant respectfully requests that the Court (1) enter an administrative stay of the immediate-payment directive pending disposition of this motion; (2) stay, pending appeal, the directive that restitution be paid immediately, together with any materially identical immediate-payment directive in any subsequent or final restitution order; and (3) as a term of that stay, restrain the sale or other dissipation of all assets subject to the restitution order — including the assets held by NewHoldCo, assets held in trust, and any dissipation by way of forfeiture — until the district court has determined causation, the pending offset motions, and the final amount of restitution, on such conditions securing the obligation as the Court deems appropriate; and (4) direct that the special master account for all dispositions to date; that a representative of Appellant be permitted to sit on the

boards of all Primary Restitution Assets and Specified Affiliated Companies to prevent their wind-down, closure, or dissolution pending the district court's determination of causation, the pending offset motions, and the final amount of restitution; and that any asset the district court finds is being mismanaged be returned to Appellant's ownership and control. (Court approval for any disposition is not separately requested only because the appointing order already requires it. (Doc. 56, at 6.)) The determination of causation, offsets, and the final amount of restitution should proceed in the district court, subject to that court's de novo determination under 18 U.S.C. § 3664(d)(6).

Respectfully submitted,

/s/ Vivek Ramachandran
Vivek Ramachandran
DHAMMA LAW PLLC
418 Broadway, Suite N
Albany, NY 12207
(202) 860 - 4084
vramachandran@dhammalaw.com
*Counsel for Defendant-Appellant,*
*Greg E. Lindberg*

# CERTIFICATE OF COMPLIANCE

This motion does not comply with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 11, 213 words. Accordingly, Appellant is filing concurrently herewith a Motion For Leave To File Emergency Motion In Excess of The Type-Volume Limitation.

It complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) – (6) because it has been prepared in a proportionally spaced typeface using a word-processing system in 14-point Times New Roman.

/s/ Vivek Ramachandran
Vivek Ramachandran

## CERTIFICATE OF SERVICE

I certify that on July 29, 2026, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will serve all counsel of record as follows:

Anthony Joseph Enright, Assistant U. S. Attorney
Email: usancw.appeals@usdoj.gov
Office of The United States Attorney
Western District of North Carolina
Suite 1650
227 West Trade Street
Charlotte, NC 28202

Jeremy Raymond Sanders
Email: jeremy.sanders@usdoj.gov
U.S. Department of Justice
Criminal Division
1400 New York Avenue, NW
Washington, DC 20005

*Counsel for Plaintiff-Appellee,* United States of America

/s/ Vivek Ramachandran
Vivek Ramachandran

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>GREG E. LINDBERG,<br>*Defendant*. | No. 5:19-CR-22-MOC<br>No. 3:23-CR-48-MOC |

**DEFENDANT GREG E. LINDBERG'S EMERGENCY MOTION (I) TO STAY ALL FURTHER ASSET SALES AND ASSET-SALE PROCESSES AND TO STAY ENFORCEMENT OF THE PRELIMINARY ORDER OF RESTITUTION (DOC. NO. 161); (II) TO CORRECT AND AMEND THE PRELIMINARY ORDER OF RESTITUTION TO CONFORM TO THE MANDATORY VICTIMS RESTITUTION ACT; (III) TO RETURN THE PRIMARY RESTITUTION ASSETS TO DEFENDANT'S CONTROL ON THE GROUND THAT RESTITUTION HAS BEEN FULLY PAID AND OVERPAID; AND (IV) IN THE ALTERNATIVE, TO RETURN THE DE MINIMIS SACS IDENTIFIED IN THE CLANWILLIAM SALE ORDER TO DEFENDANT'S CONTROL WITH IMMEDIATE EFFECT**

Defendant Greg E. Lindberg, by and through undersigned counsel, respectfully moves this Court, pursuant to its inherent supervisory authority over the Special Master and the proceedings on its docket, the Mandatory Victims Restitution Act (the "MVRA"), 18 U.S.C. §§ 3663A–3664, Federal Rule of Civil Procedure 53 (as applied by analogy to the Court's supervision of court-appointed officers in this criminal proceeding), and the All Writs Act, 28 U.S.C. § 1651(a), for an Order: **(i)** staying all further sales of Mr. Lindberg's assets, and all further asset-sale processes, that have been initiated, are being conducted, or are contemplated as a means of generating proceeds to satisfy any preliminary or final order of restitution in this case, and staying enforcement of the Preliminary Order of Restitution entered on May 28, 2026 (Doc. No. 161) (the "Preliminary Restitution Order"), including the issuance or recording of any abstract of judgment, pending the Court's adjudication of Defendant Greg E. Lindberg's Response and Objection to

Special Master's Report and Recommendations Regarding Restitution (the "Response"); **(ii)** correcting and amending the Preliminary Restitution Order to conform to the MVRA, including by striking the unexplained $30,000,000 by which the Order exceeds the figure the Special Master recommended, by itemizing and applying the $2.89 billion mandatory offsets and credits documented in the Response, by excluding any pre-judgment interest, and by deferring enforceability until those corrections are made, as set forth in Paragraph 6 below; **(iii)** directing that the Primary Restitution Assets, as defined in the Order Appointing Special Master (Doc. No. 56) (the "Special Master Order"), be returned to Mr. Lindberg's full ownership and control, because restitution under the MVRA has been fully paid and, indeed, overpaid by approximately $1.244 billion measured against the Court's own entered figure; and (iv) in the alternative, directing that the eight de minimis Specified Affiliated Companies expressly identified in the Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies (Doc. No. 66) (the "Clanwilliam Sale Order") as having no further material value to NHC Holdings, LLC ("NHC") — namely, SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited (collectively, the "De Minimis SACs") — be returned to Mr. Lindberg's full ownership and control with immediate effect.

In support of this Motion, Mr. Lindberg states as follows:

1. On May 4, 2026, Mr. Lindberg filed his Response objecting to the Special Master's Report and Recommendations Regarding Restitution (ECF No. 106) (the "Restitution Report"), and to the Special Master's preliminary proposed restitution figure of **$1,625,000,000**. On May 28, 2026 — without first adjudicating that Response — the Court entered the Preliminary Restitution Order (Doc. No. 161), ordering restitution in the total amount of $1,655,000,000, which is $30,000,000 more than the Special Master recommended. The Preliminary Restitution Order

declares that the restitution is "due and payable immediately," provides that it "shall be enforceable as a judgment of the United States," and authorizes the Clerk, at the request of any payee or the Special Master, to issue an abstract of judgment that becomes a lien on Mr. Lindberg's property. Doc. No. 161 at 3–5. This Motion is addressed to that Order.

2. The Response demonstrates, on the basis of contemporaneous documentary evidence and verified statements of fact, that the Special Master's proposed figure is overinflated by **at least $2.899 billion** in required offsets, reductions, and credits, with the result that — when the MVRA is correctly applied — Mr. Lindberg's net restitution obligation is **zero**, and Mr. Lindberg has **overpaid by approximately $1.274 billion** the maximum sum the Special Master proposed.

3. The documented categories of mandatory offsets and reductions identified in the Response and the supporting Statement of Facts (filed May 4, 2026) and Supplemental Statement of Facts filed herewith total **$2,899,418,383**, against a maximum proposed restitution figure of $1,625,000,000 — a documented **net overpayment** of approximately **$1,274,418,383**. Measured against the Court's own entered figure of $1,655,000,000, those same documented offsets exceed the Preliminary Restitution Order by approximately $1,244,418,383, so that net restitution remains zero and the documented overpayment is approximately $1.244 billion even on the Court's own numbers.

4. The contrast between Mr. Lindberg's twenty-year track record of value creation and the Rehabilitator's six-plus years of documented value destruction is dispositive and is directly relevant to the relief sought here. The factual record before this Court establishes the following on the basis of contemporaneous, third-party documentary evidence:

a) **Mr. Lindberg's twenty-year track record of value creation.** Mr. Lindberg built the Specified Affiliated Companies (the "SACs") from nothing over more than two decades. Through that work, he generated nearly $1 billion of his own personal capital, which he invested into the North Carolina Insurance Companies (the "NCICs") as a net contributor to those companies' surplus. SOF ¶ 5. Under his management between 2019 and 2024, the SACs grew from approximately $1.5 billion in aggregate value to approximately $3.4 billion — an increase of approximately $1.9 billion in enterprise value over a five-year period — corroborated by the arm's-length, signed Q1 2024 purchase agreement with Quadro Acquisition Corp. One (NASDAQ: QRDO) at a 22.14x EBITDA multiple consistent with public-market comparables. Lindberg's companies collectively generated EBITDA in excess of $300 million in 2024. The public-company EBITDA multiples used in the Quadro pricing have not declined; the comparable five-company average has in fact increased from 22.14x in Q1 2024 to approximately 24.37x as of November 2025, further confirming that the Quadro valuation was conservative, not inflated.

b) **The Rehabilitator destroyed the $454 million NCIC baseline.** By contrast, under the management of Mike Dinius as Special Deputy Rehabilitator, the NCICs were ultimately liquidated, destroying the $454 million baseline value that the NCICs' own management — operating under the Rehabilitator's supervision — had established as of November 5, 2018, eighteen days after Mr. Lindberg transferred operational control. SOF ¶¶ 55–62 & Ex. J.

c) **More than $165 million in fees extracted from the NCIC rehabilitation estates.** Over the past seven years, the Rehabilitator and his consultants have charged the NCIC rehabilitation estates more than $165 million in fees. Those fees continue today at the rate of approximately $2.5 million per month — a draining of the very estates the Rehabilitator was supposed to be preserving for the benefit of policyholders. SOF ¶ 58(a)–(d).

d) **$137 million in investment losses on portfolio decisions unrelated to Mr. Lindberg.** Independent of any conduct of Mr. Lindberg, the Rehabilitator and his agents incurred approximately $137 million in losses on corporate bond and other investment decisions that were made by the Rehabilitator's team after Mr. Lindberg transferred control. These losses occurred on the Rehabilitator's portfolio, on the Rehabilitator's watch, and have no causal connection to Mr. Lindberg whatever. SOF ¶ 58(b).

e) **Multiple billion-dollar-plus monetization transactions blocked or sabotaged.** The Rehabilitator blocked, refused, or sabotaged at least four separate monetization transactions, each of which would have fully paid the NCIC policyholders and creditors: (i) the November 22, 2018 Ares Management Letter of Intent, covering 100% of GBIG (including the NCICs and the affiliated-loan portfolio); (ii) the February 8, 2019 Oaktree Capital Management $1.0 billion Global Solution; (iii) the 2023 Montshire/Alban offer; and (iv) the Q1 2024 Quadro Acquisition Corp. One transaction valuing the SAC group at approximately $3.4 billion. Each of these was a free, deliberate, and informed choice of the victim's representative, made

after Mr. Lindberg transferred control. SOF ¶¶ 9, 16, 58, 75, 76; Supp. SOF ¶¶ 4–29.

f) **Suing prospective buyers to prevent monetization.** In at least one instance, the Rehabilitator and his agents went so far as to file litigation against a prospective arm's-length buyer that had submitted an offer to purchase the NCICs — a transaction that would have produced cash to pay the policyholders in full. That litigation succeeded in driving the buyer away. The Rehabilitator's entities did not merely fail to sell to a willing arm's-length buyer; they affirmatively used the courts to prevent the sale. This is the very definition of a victim's "choice to hold collateral rather than to reduce it to cash within a reasonable time" under *Robers v. United States*, 572 U.S. 639, 647 (2014) (Sotomayor, J., concurring).

g) **Below-market fire-sale of Clanwilliam.** On the Rehabilitator's watch in September 2025, the Clanwilliam Group was sold to TA Associates for approximately $450 million — approximately $474 million below the $880 million signed Quadro purchase-agreement valuation negotiated by Mr. Lindberg less than eighteen months earlier. SOF ¶ 75 & Exs. G3, I3, I4. Public-company comparables establish that Clanwilliam's value did not decline; if anything, the comparable EBITDA multiples appreciated over that interval. The undervaluation is a direct consequence of selling a public-company-quality asset to a private-equity buyer at a discount, after the Rehabilitator blocked the higher public-market Quadro transaction.

h) **Pre-maturity sale of $1.006 billion in protective bank zero-coupon bonds.** Rather than holding to maturity the $1,006,239,867 face-value bank-issued zero-

coupon bonds backing the Principal Protected Notes — instruments whose entire purpose was to protect the affiliated-loan principal from any credit-related downside — the Rehabilitator unilaterally sold those instruments for approximately $394 million, crystallizing a $611.6 million loss on assets that, by their structure, were contractually guaranteed to pay par. SOF ¶¶ 48–54.

5. The Preliminary Restitution Order declares the full $1,655,000,000 "due and payable immediately" and enforceable as a judgment, and the Special Master and/or the Government are presently conducting, or are about to conduct, additional asset-sale processes intended to generate proceeds to satisfy that figure. Allowing those sales and that enforcement to proceed before the Court corrects the Order and resolves the Response would (i) cause the irreversible liquidation of Mr. Lindberg's assets to pay a restitution obligation that, on the documentary record, does not exist as a matter of law; (ii) compound an already documented overpayment of approximately $1.244 billion; (iii) create the very type of windfall to the Pre-Designated Restitution Parties that the MVRA expressly forbids, *see United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017); (iv) transfer further assets from the proven value-creator (Mr. Lindberg) to a control structure (NHC, operating under the Rehabilitator's supervision) with a documented six-year track record of value destruction; (v) inflict the further, separate, and continuing irreparable harm of degrading the going-concern value of the Specified Affiliated Companies, all of which are now being managed on a short-term, for-sale basis rather than for sustained operation — a management posture that, by its nature and irrespective of the merits of any underlying sale, depresses enterprise value, defers needed investment, disrupts customer and counter-party relationships, accelerates senior-management attrition, and has already produced one documented $474 million below-market sale (the September 2025 Clanwilliam transaction,

Doc. No. 66 & SOF ¶ 75); (vi) cause the irretrievable disbursement of further sale proceeds to the Pre-Designated Restitution Parties, from whom — once funds have been paid out under an MVRA order — the statute provides Mr. Lindberg with *no* mechanism to recover the funds even if the restitution figure is later corrected downward, *see* 18 U.S.C. § 3664(j)(2) (statutory remedy is offset against future payments, not clawback from the payee); and (vii) compel further asset sales when, on the documentary record, no further sales are necessary, because the entire gap between Mr. Lindberg's documented offset position ($2,899,418,383) and the Court's entered figure ($1,655,000,000) consists exclusively of credits attributable to prior sales and other transactions that have *already occurred* — so that, on Mr. Lindberg's documented numbers, the proceeds of any further sales would be owed to Mr. Lindberg, not to the Pre-Designated Restitution Parties, and the present sale program is liquidating Mr. Lindberg's property to fund a recovery that has, by approximately $1.244 billion, already been completed; and (viii) ratify and extend the precedent already set by the recent Beckett sale, which was effectuated *without the prior court approval* that Paragraph 6(e) of the Order Appointing Special Master expressly requires (Doc. No. 56, ¶ 6(e) (the Special Master "shall seek Court approval to liquidate … any available assets for the benefit of victims")) — itself a violation of this Court's express supervisory architecture and a concrete demonstration that, absent the requested stay, further sales of Mr. Lindberg's property will continue to be consummated in derogation of the Court's order, without any opportunity for the Court or Mr. Lindberg to evaluate them *ex ante* and without any avenue, once consummated, to undo them.

This Motion asks only that asset sales be stayed long enough — until the Court's § 3664 restitution determination fixes the amount actually owed if any — to prevent the irreparable, below-value losses that premature liquidation would inflict. Those forced-sale losses would

reduce, not increase, the funds available to victims. Preserving value until the § 3664 determination serves the same make-whole purpose the plea agreement and the MVRA share, and is consistent with Mr. Lindberg's commitment to marshal assets toward full restitution.

The balance of equities weighs decisively in favor of a brief stay. On one side of the ledger is a concrete, irreparable harm: assets sold below value cannot be recovered, and every dollar lost to a premature, forced sale is a dollar that will never reach the victims this restitution is meant to make whole. On the other side is only delay — a stay lasting no longer than the Court's § 3664 determination, after which any restitution properly owed can be satisfied from assets preserved at their full value. A short stay that protects the estate's value imposes no cognizable hardship on the victims, whose interest lies in maximizing recovery, not in hastening sales that diminish it.

The conduct relevant to the equities is the post-2024 cooperation the sentencing court credited as "extraordinary" — the assignment of interests in more than 300 companies, the dismissal of litigation that impeded asset sales, the waiver of a $40 million tax escrow, and more than $1 billion in restitution already realized. That record reflects an effort to marshal value for victims, not to frustrate it.

Finally, the public interest favors a stay. The public has no interest in compelling sales that destroy value and reduce the funds available to victims, and a substantial interest in ensuring that restitution is fixed accurately under § 3664 before irreversible dispositions are made.

6. The Preliminary Restitution Order should be corrected and amended now, before it is enforced, because it does not conform to the MVRA in at least the following respects — each of which remains subject to correction notwithstanding the Order's "final judgment" status, 18 U.S.C. § 3664(o), and Federal Rule of Criminal Procedure 36, and each of which this Court must determine de novo, 18 U.S.C. § 3664(d)(6): (i) the Order's total of $1,655,000,000 exceeds, by

$30,000,000, the $1,625,000,000 the Special Master recommended, with no explanation for the increase, even though the Government and the Special Master bear the burden of proving the amount of each victim's loss by a preponderance of the evidence, 18 U.S.C. § 3664(e); (ii) the Order recites that its figures "already account for monetary recoveries realized by the payees prior to the entry of this Order" (Doc. No. 161 at 4), but it itemizes no such recoveries and does not apply the $2,899,418,383 in mandatory offsets and credits documented in the Response, as the statute requires, 18 U.S.C. §§ 3663A(b)(1)(B)(ii), 3664(j)(2); *Robers v. United States*, 572 U.S. 639 (2014); (iii) the Order reduces only PBLA's $416,000,000 award, and only by the speculative "ultimate value" ULICO may later receive (Doc. No. 161 at 3), even though — as documented in the Response — the AAPC preferred equity was already transferred to ULICO in December 2022 with dollar-for-dollar credit for the current $357 million par value, so that the offset is presently fixed and due "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and even though the Order applies no parallel offset for the cash and property returned to the other payees; (iv) the Order reserves four separate categories of further reductions — prior recoveries on "non-IALA assets," prior recoveries on "zero coupon bonds," the payments itemized at page 22 of Doc. No. 132, and transfers to "SFL" and "SASL" — for investigation after sentencing (Doc. No. 161 at 5), yet simultaneously declares the un-reduced gross figure "due and payable immediately" and enforceable as a judgment now, guaranteeing the over-recovery the MVRA forbids, *Ritchie*, 858 F.3d at 216; (v) the Order makes no finding tying any payee's award to the loss directly and proximately caused by the offense of conviction (Counts One and Thirteen), as *Hughey v. United States*, 495 U.S. 411 (1990), and *United States v. Blake*, 81 F.3d 498 (4th Cir. 1996), require; (vi) to the extent the figures embed pre-judgment interest, the MVRA does not authorize it; (vii) the Order is captioned "preliminary" precisely because it "precedes sentencing" (Doc. No. 161 at 1

n.1), yet it imposes restitution as "due and payable immediately" and (viii) the Order declares the full amount immediately due without the findings on the manner and schedule of payment that the MVRA requires, 18 U.S.C. § 3664(f)(2). Each defect independently requires correction; together they require that enforcement be stayed until the Order is conformed to the statute.

7. The Preliminary Restitution Order, and the Government's and the Special Master's underlying position, also contravene the express intent of Congress as stated in the MVRA's legislative history. The Senate Judiciary Committee declared that restitution exists to "restore the victim to his or her prior state of well-being," S. Rep. No. 104-179, at 13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 926 — not to confer the approximately $1.244 billion windfall the uncorrected Order would produce. The Committee confined mandatory restitution to losses "directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted," *id.* at 19, 1996 U.S.C.C.A.N. at 932 — not the losses the Rehabilitator's own post-transfer discretionary decisions caused. The Committee clarified that the anti-double-recovery rule of 18 U.S.C. § 3664(j)(2) exists "to ensure that the victim is not compensated twice for the same loss," *id.* at 21, 1996 U.S.C.C.A.N. at 934 — yet the uncorrected Order would compensate the Pre-Designated Restitution Parties a second time for assets and cash they have already received and, in many instances, still hold. The Committee instructed that "highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that losses that are "speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution," *id.* at 19, 1996 U.S.C.C.A.N. at 932 — yet the Order resolves precisely such issues. And the Committee recognized that "the sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information," *id.* at 20, 1996 U.S.C.C.A.N. at 933 — a right the uncorrected Order violates by resting on a figure that ignores $2,899,418,383 in documented offsets and credits. These departures from Congress's express intent independently support the relief requested. Nor did the plea agreement waive the causal requirement that limits the Special Master's determination. The agreement commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct," Plea Agreement ¶ 10(a) (Doc. 40) — language the Government drafted, which must be construed against it. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). Paragraph 10(a)

reaches only losses "harmed by [his] criminal conduct," and "regardless of the resulting loss amount" goes to quantum, not causation. The losses produced by the Rehabilitator's independent, discretionary decisions were caused neither directly nor indirectly by Mr. Lindberg, *see Hughey v. United States*, 495 U.S. 411, 420 (1990); *Robers v. United States*, 572 U.S. 639, 645 (2014), and, together with the documented offsets, leave no additional restitution owing. The Government's own sentencing memorandum confirms the causal disconnect: it concedes that North Carolina did not restrict affiliate investment by statute until 2019 — after the charged conduct — and relies on a source describing the prior regime as an "investment loophole." Gov't Sentencing Mem. at 22–23 & n.12 (Doc. 508).

8. Because the MVRA limits restitution to losses directly and proximately caused by the offense of conviction, 18 U.S.C. § 3663A(a)(2); because the MVRA mandates that restitution be reduced by the value of any property returned, 18 U.S.C. § 3663A(b)(1)(B)(ii); because the MVRA prohibits any recovery in excess of the victim's actual loss, *Ritchie*, 858 F.3d at 216; and because — under *Ellingburg v. United States*, 607 U.S. ___, slip op. at 1–2 (Jan. 20, 2026) — restitution under the MVRA constitutes **criminal punishment** subject to the constitutional limits applicable to criminal punishment, the continued retention and management of the Primary Restitution Assets by the Special Master and/or NHC is unauthorized by law now that restitution has been fully paid by Lindberg.

9. In the alternative, this Court should order the immediate return of the De Minimis SACs to Mr. Lindberg. The Clanwilliam Sale Order itself — to which the United States, the Special Master, NHC, and Mr. Lindberg are all parties — expressly identifies eight SACs that NHC, in its own assessment, may "ha[ve] no further material value to NHC and NHC does not otherwise intend to sell" (Doc. No. 66, ¶ 20(h)). And as set forth in Paragraph 4 above, the only party with a demonstrated track record of building enterprise value across the Lindberg-related companies is Mr. Lindberg himself. Returning the De Minimis SACs to his control is the only

outcome that, on the present record, is rational, equitable, and consistent with the MVRA's requirement that the apparatus of criminal punishment serve a victim-compensatory purpose. *See Ritchie*, 858 F.3d at 216.

10. This Motion is supported by the accompanying Memorandum of Law, by the previously filed Response and supporting documentation, by the Statement of Facts filed on May 4, 2026, and by the Supplemental Statement of Facts filed contemporaneously herewith.

**WHEREFORE**, Defendant Greg E. Lindberg respectfully requests that this Court enter an Order:

a) **Staying**, immediately and until further order of this Court, all further sales of Mr. Lindberg's assets and all further asset-sale processes initiated, conducted, or contemplated for the purpose of generating proceeds to satisfy any preliminary or final order of restitution in this case, and staying enforcement of the Preliminary Restitution Order (Doc. No. 161), including the issuance or recording of any abstract of judgment, pending further order of this Court;

b) **Directing** the Special Master to suspend any pending asset-sale activities and to refrain from initiating any new asset-sale activities until further order of this Court;

c) **Directing** that any proceeds presently held in escrow or in the constructive possession of the Special Master, the Government, or any other person acting on behalf of the Pre-Designated Restitution Parties be preserved and not disbursed pending further order of this Court;

d) **Correcting and amending** the Preliminary Restitution Order (Doc. No. 161), pursuant to the Court's retained authority, the Order's own provision for amendment, 18 U.S.C. § 3664(o), and Federal Rule of Criminal Procedure 36, to (i) strike the

unexplained $30,000,000 by which the Order exceeds the Special Master's recommendation; (ii) itemize and apply the $2,899,418,383 in mandatory offsets and credits documented in the Response; (iii) recognize the credit for the current par value of the ULICO/AAPC preferred-equity as presently due, and apply the credit for all other cash and property returned to the payees; (iv) exclude any pre-judgment interest; (v) make findings tying each payee's award to the loss directly and proximately caused by the offense of conviction, or set that issue for determination; and (vi) provide that the Order is not enforceable, and that no abstract of judgment shall issue, until those corrections are made and until sentencing;

e) **Adjudicating** that, on the voluminous contemporaneous documentary record before the Court, restitution under the MVRA has been fully satisfied and, indeed, overpaid by approximately $1.244 billion, and **ordering** the return of the Primary Restitution Assets, as defined in the Special Master Order, to Mr. Lindberg's ownership and control;

f) **In the alternative**, and at a minimum, **ordering** the immediate return to Mr. Lindberg's full ownership and control of the De Minimis SACs identified in the Clanwilliam Sale Order at Paragraph 20(h) — namely, SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited;

g) **Setting** an expedited hearing on the Response and on this Motion; and

h) **Granting** such other and further relief as the Court deems just and proper.

**[SIGNATURE PAGE FOLLOWS.]**

Dated: June 9, 2026.

Respectfully submitted,

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of June 2026, I caused a true and correct copy of the foregoing Defendant Greg E. Lindberg's defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No. 161); (Ii) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (Iii) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; And (Iv) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect, together with the supporting Memorandum of Law, to be filed with the Clerk of the Court for the United States District Court for the Western District of North Carolina using the Court's electronic filing system, which will serve notice on all counsel of record.

/s/ /s/ Kenneth Barnes________________
Kenneth Barnes

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | No. 5:19-cr-22-MOC<br>No. 3:23-cr-00048-MOC<br>**EXPEDITED CONSIDERATION REQUESTED** |

**DEFENDANT'S EMERGENCY MOTION TO STAY ALL ASSET SALES AND ASSET-SALE PROCESSES PENDING ENTRY OF A FINAL RESTITUTION ORDER AND DE NOVO ARTICLE III DETERMINATION, AND CONSOLIDATED OBJECTIONS TO THE PRELIMINARY ORDER OF RESTITUTION (DOC. 161), THE SCOPE OF THE SPECIAL MASTER REFERENCE, AND THE SPECIAL MASTER'S STATEMENT (DOC. 159), WITH INCORPORATED MEMORANDUM OF LAW**

Defendant Greg E. Lindberg respectfully moves this Court, on an emergency basis, for an order staying all sales and dispositions of assets, and all asset-sale processes (including without limitation marketing, solicitation of bids, negotiation of letters of intent or purchase agreements, and closings), conducted by or at the direction of the Special Master or any person acting in concert with him, pending (1) this Court's entry of a final order of restitution after a de novo determination of all disputed restitution issues, and (2) this Court's adjudication, upon motion and after an opportunity to be heard, of any specific request to approve any specific sale. This filing is made within the time allowed for objections to the Preliminary Order of Restitution [Doc. 161], and every ground stated herein is asserted both in support of the requested stay and as an objection to the Preliminary Order of Restitution, to the scope and implementation of the Special Master reference, and to the Special Master's Statement Concerning Defendant's Cooperation [Doc. No. 159]. Defendant's previously filed motion to stay [Docs. 172-188] are incorporated by reference, and the grounds stated in that motion are likewise asserted as objections to the Preliminary Order of Restitution. Pursuant to LCrR 47.1, the supporting memorandum is incorporated below;

Defendant's Supplemental Statement of Facts (Addendum), cited herein as the "Statement of Facts," is attached hereto; and a proposed order is submitted herewith.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ 4
INTRODUCTION ........ 7
FACTUAL AND PROCEDURAL BACKGROUND ........ 8
LEGAL STANDARD ........ 12
ARGUMENT ........ 13
I. Section 3664(d)(6) Authorizes a Special Master to Recommend—Not to Sell. ........ 13
II. The Restitution Determination Is a Nondelegable Article III Judicial Function. ........ 14
III. Defendant's Consent Cannot Supply What the Statute and Article III Withhold. ........ 15
IV. The New Waiver Confirms the Defect: An Attempt to Manufacture the Missing Consent, Sought by a Conflicted Officer Under Sentencing Pressure. ........ 18
V. The Special Master Is Disqualified From Recommending or Adjudicative Functions: He Demanded, as "Cooperation," a Release Running to Himself, While His Professionals Are Compensated From the Assets He Liquidates. ........ 20
VI. The Special Master's May 22 Statement (Doc. 159) Tainted the Sentencing and, Unless Stricken, Will Taint the Final Restitution Determination. ........ 23
VII. The Becket Sale Proceeded Without the Court Approval That Both the Statute and This Court's Own Order Require. ........ 28
VIII. Sales Before a Final Restitution Determination Invert the Statutory Sequence and Inflict Irreparable, Unquantifiable Prejudice. ........ 29
IX. On De Novo Review, the Court Must Find the Facts Itself—by a Preponderance at Minimum, and, After Ellingburg, Beyond a Reasonable Doubt. ........ 31
X. Every Stay Factor Is Satisfied ........ 33
CONSOLIDATED OBJECTIONS ........ 34
CONCLUSION AND RELIEF REQUESTED ........ 37
CONSULTATION STATEMENT ........ 39
CERTIFICATE OF SERVICE ........ 39

## TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey*,
530 U.S. 466 (2000), .......... 31, 35

*Blackledge v. Perry*,
417 U.S. 21, 28 (1974) .......... 26

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833, 850–51 (1986) .......... 14

*Ellingburg v. United States*,
607 U.S. 163, 166 (2026) .......... 31, 35

*Ex parte Peterson*,
253 U.S. 300, 312 (1920) .......... 13

*Gomez v. United States*,
490 U.S. 858, 864 (1989) .......... 12

*In re Murchison*,
349 U.S. 133, 136 (1955) .......... 19

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694, 702 (1982). .......... 14

*La Buy v. Howes Leather Co.*,
352 U.S. 249, 256 (1957) .......... 13

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847, 858–60 (1988) .......... 20

*Nken v. Holder*,
556 U.S. 418, 434 (2009). .......... 11

*North Carolina v. Pearce*,
395 U.S. 711, 725 (1969),
*limited on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989) .......... 26

*Peretz v. United States*,
501 U.S. 923 (1991) .......... 15, 16

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) .......... 31, 35

*Stern v. Marshall*,
564 U.S. 462, 484 (2011) ........ 13

*Townsend v. Burke*,
*334 U.S. 736 (1948)* ........ 23, 24, 25

*Tumey v. Ohio*,
273 U.S. 510, 523 (1927) ........ 20

*United States v. Coppenger*,
775 F.3d 799, 805 (6th Cir. 2015)) ........ 25

*United States v. Johnson*,
48 F.3d 806, 808–09 (4th Cir. 1995) ........ 13

*United States v. Miclaus*,
No. 23-3146, slip op. at 14–15 (6th Cir. May 29, 2026) ........ 25

*United States v. Raddatz,*
447 U.S. 667, 681 (1980) ........ 15

*Wellness International Network, Ltd. v. Sharif*,
575 U.S. 665 (2015) ........ 15

**Statutes**

18 U.S.C. § 3613(c). ........ 16
18 U.S.C. § 3613(f) ........ 16
18 U.S.C. § 3663(a)(3) ........ 14
18 U.S.C. § 3664 ........ passim
18 U.S.C. § 3664(a) ........ 25
18 U.S.C. § 3664(b) ........ 25
18 U.S.C. § 3664(d)(5) ........ 16, 28, 32, 35
18 U.S.C. § 3664(d)(6) ........ passim
18 U.S.C. § 3664(e) ........ passim
18 U.S.C. § 3664(j)(2) ........ 24, 28, 29, 34
18 U.S.C. § 3664(o) ........ 16, 28, 29
28 U.S.C. § 2001 ........ 28
28 U.S.C. § 455(a) ........ 21
28 U.S.C. § 455 ........ 19, 34

**Other Authorities**

Due Process Clause ........ 19, 34
S. Rep. No. 104-179 ........ passim
S. Rep. No. 104-179 (1995) (committee substitute § 105),
reprinted in 1996 U.S.C.C.A.N. 924 ........ 12
S. Rep. No. 104-179, at 19 ........ 31

**Rules**

Fed. R. Civ. P. 53(a)(2) ........................................................................................................ 19, 34

## INTRODUCTION

Congress has spoken with precision about what a special master may do in a federal criminal restitution proceeding, and it is not this. The only express authority for a special master in this setting is 18 U.S.C. § 3664(d)(6), and its text is narrow: the court "may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master *for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court*." A special master may propose; only the Court may decide; and nothing in the statute empowers a master to liquidate a defendant's assets—least of all before any final restitution determination exists.

This Court's own Order Appointing Special Master enforces the same design. It directs the Special Master to "identify all assets available for liquidation . . . for the benefit of the victims," to "select an appropriate method and timetable and *seek Court approval* to liquidate . . . any available assets," and to "oversee and help accomplish the liquidation *with Court approval*." Doc. No. 56, at 6 (emphases added). Court approval is not an ornament in that order; it is the mechanism by which § 3664(d)(6)'s de novo guarantee operates.

The process on the ground has departed from that design in three escalating respects. *First*, the Becket asset was sold without any order of this Court—indeed, without any trace on this Court's docket: no motion, no notice, no order. Defendant's counsel learned of the sale only orally, in a weekly meeting with the Special Master's team in or about December 2025. [Statement of Facts ¶ 11.] *Second*, even the Clanwilliam transaction—to which Defendant consented at the urging of the Special Master and the United States, while expressly preserving his valuation objections—proceeded and its $318 million in estimated proceeds were distributed without a final restitution order and without any final determination of the restitution number. Doc. No. 66, ¶¶ 18, 21(b). The Special Master himself conceded the point: "[i]n an ideal set of circumstances, the

Special Master would have completed his restitution victim analyses—and made recommendations to the Court concerning the same—before seeking Court approval of (i) a restitution asset sale or (ii) how funds from such a sale would be disbursed to victims." Doc. No. 66, ¶ 24. *Third*, Defendant's pending submissions document offsets of approximately $2.9 billion against the $1.655 billion preliminary figure [Doc. 161], which, if credited on de novo review, yield *zero* net restitution. Every asset sold before that determination is an irreversible penalty imposed before the penalty has been adjudicated. The reference as implemented exceeds § 3664(d)(6), displaces this Court's nondelegable Article III duty to resolve restitution disputes "by the court by the preponderance of the evidence," 18 U.S.C. § 3664(e), and deprives Defendant of the de novo determination the statute guarantees. A stay of all further sales and sale processes—with any future disposition requiring a specific, contested motion and this Court's own findings—is the minimum relief necessary to restore the statutory and constitutional order of operations.

## FACTUAL AND PROCEDURAL BACKGROUND

1. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. Doc. No. 40. In it, Defendant agreed "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks *as ordered by the Court*." Doc. No. 40, ¶ 9 (emphasis added). Defendant consented, in other words, to a court-supervised process—not to dispositions of his assets unmediated by orders of this Court.

2. On January 23, 2025, the Court entered its Order Appointing Special Master, naming Joseph W. Grier, III, pursuant to 18 U.S.C. § 3664(d)(6). Doc. No. 56. That order directs the Special Master to "identify all assets available for liquidation . . . for the benefit of the victims"; to "select an appropriate method and timetable and seek Court approval to liquidate . . . any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation

with Court approval." Doc. No. 56, at 6. The order further provides that none of the Special Master's authority is intended to authorize the violation of any other federal or state court orders. Doc. No. 56, at 10, ¶ 16.

3. On July 3, 2025, the Special Master filed a Consent Motion for an order approving the disposition of the net proceeds—estimated at $318,000,000—from the sale of the Clanwilliam Group of Companies, a transaction conducted under the supervision of the Wake County Superior Court and restrained by that court's injunction and its March 14, 2023 Clanwilliam order. Doc. No. 66, ¶¶ 10–18. Defendant consented to that disposition at the urging of the Special Master and the United States, to avoid the loss of the transaction—while expressly preserving, by agreement with the United States, his right to contest the true value of Clanwilliam for restitution-offset purposes. Defendant's preserved position, communicated in writing to the Special Master's counsel, is that Clanwilliam was sold at approximately $450 million against a market value of approximately $800 million—roughly $350 million below the value of the asset when contributed to NHC in October 2024. [Ex. S2, Lindberg–Martinez Correspondence (Aug. 14, 2025).]

4. The Clanwilliam Consent Motion is candid about its own irregularity. The Special Master acknowledged that "[i]n an ideal set of circumstances," his "restitution victim analyses" and "recommendations to the Court concerning the same" would have been completed "before seeking Court approval of (i) a restitution asset sale or (ii) how funds from such a sale would be disbursed to victims," and that the distribution "almost certainly will deviate in some degree from the general victim restitution apportionment later approved by the Court." Doc. No. 66, ¶ 24. The motion disbursed $23,520,710 to Vista even though "the Special Master is unsure whether the Special Master will recommend that the Court treat Vista as a victim in this proceeding." Doc. No. 66, ¶ 26 n.8. And it asked that distributions be credited against "Defendant's ultimate restitution

obligations *as determined by a future order of restitution* entered by the Court"—a concession that no such order existed. Doc. No. 66, ¶ 21(b) (emphasis added). The Special Master's assurance that he "anticipates collecting enough funds in the future to equalize distributions" (Doc. No. 66, ¶ 26) only underscores the problem: equalization depends on liquidating still more assets before the obligation those liquidations are meant to satisfy has been adjudicated.

5. On May 14, 2026—twelve days before sentencing—the Special Master presented Defendant with a "Consent, Waiver, and Acknowledgement" bearing an effective date of May 15, 2026 (the "New Waiver"). [Ex. W.] Its recitals assert that the Special Master "has full discretion to liquidate the Primary Restitution Assets, including determination of the timing of sale(s) and the price at which Primary Restitution Assets are sold, subject to only the approval of the Court," and characterize Defendant's execution of the instrument as "cooperation" the Special Master "deems . . . necessary" under the appointment order. Its operative clauses would waive Defendant's "right to object to any sale, the manner of the sale, the timing of the sale, and the price at which the Primary Restitution Assets are sold"; confine Defendant to a single "timely objection" in the approval proceeding; and release—and covenant not to sue—a beneficiary class that expressly includes "the Special Master" himself, together with purchasers, financing sources, and insurers. [Ex. W.] On May 22, 2026—four days before sentencing—the Special Master filed a Statement Concerning Defendant's Cooperation, itemizing Defendant's non-execution of waivers among its "clarifications" to Defendant's cooperation showing and announcing that the Special Master "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. Defendant has not executed the New Waiver. The conflict of interest embedded in this sequence is addressed in Part V, infra.

6. The New Waiver episode was not isolated; it fit a pattern of promises made to induce Defendant's cooperation and never honored, while adverse material moved promptly. After Defendant produced emails documenting the Zero Coupon Bond sales, the Special Master promised to correct the restitution analysis to credit those sales—a correction that was supposed to be made even before Defendant's objections were due. No correction was ever filed or made, before sentencing or since. [Statement of Facts ¶¶ 4–5; Doc. No. 173 Ex. M.] Other sale credits promised to Defendant—including the ECL credits—likewise never materialized before sentencing. [Statement of Facts ¶ 6.] And Defendant waived a $40,000,000 court-approved tax escrow in the Clanwilliam transaction on the condition—never fulfilled—that the de minimis companies be transferred to him on an unrestricted basis; the Clanwilliam order instead gave the Special Master the option to assume those companies, Doc. No. 66, ¶ 20(h), at least one of which has since been shut down. [Ex. S2.] The asymmetry is one-way: commitments that would reduce the restitution figure or benefit Defendant were promised and never delivered, while the statement adverse to Defendant was filed four days before sentencing.

7. The Special Master has not disclosed how the proceeds of completed dispositions have been used or applied. No accounting of the proceeds of the Becket sale has been provided to Defendant, and Defendant does not know whether other sales or dispositions have occurred, because none has been disclosed. [Statement of Facts ¶ 3.] A court-appointed fiduciary administering a defendant's assets for restitution owes the Court and the parties a complete accounting of every disposition and of the application of every dollar of proceeds; none has been made.

8. On May 26, 2026, the Court sentenced Defendant. On May 28, 2026, the Court entered a Preliminary Order of Restitution in the amount of $1.655 billion. [Doc. 161.] By its own terms,

the order is preliminary; no final order of restitution has been entered; and Defendant's objections and consolidated offset submissions—documenting recoveries, transfers, and payments to the recipient insurance company estates totaling approximately $2.9 billion, including the preserved Clanwilliam valuation differential—remain pending before the Court. [Doc. 161.]

9. Notwithstanding the absence of any final restitution determination, and notwithstanding Doc. No. 56's express requirement of Court approval, the Becket asset was sold—and there is no evidence of that sale anywhere on the record of this Court. No motion seeking approval of a Becket sale, no notice of such a sale, and no order authorizing one appears on the docket. Defendant's counsel learned that Becket had been sold only orally, in one of the weekly meetings with the Special Master's team described in Doc. No. 159, ¶ 1. [Statement of Facts ¶ 11.] On information and belief, additional sale processes are underway or imminent. Absent a stay, assets will continue to pass irretrievably to third parties before the Court has determined whether any restitution is owed at all.

## LEGAL STANDARD

This Court has inherent authority to control its own orders of reference and the conduct of its own appointees, and to stay proceedings ancillary to its judgments. In evaluating a stay, courts weigh the familiar four factors: (1) the movant's likelihood of success on the merits; (2) irreparable injury absent a stay; (3) injury to other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## ARGUMENT

### I. Section 3664(d)(6) Authorizes a Special Master to Recommend—Not to Sell.

The Mandatory Victims Restitution Act supplies the sole express authority for a special master in a criminal restitution proceeding, and it confines the office to a single function: "The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). Three textual limits follow. The master's output is "proposed" findings and "recommendations"—advice, not action. The subject matter is issues arising in connection with a "proposed" order of restitution—the statute presumes the master's work precedes and informs the Court's final order, not that the master enforces an order that does not yet exist. And every recommendation is "subject to a de novo determination of the issue by the court"—a guarantee that is meaningless if the recommended (or unrecommended) disposition has already been consummated and the asset is gone.

Selling assets is none of these things. A sale is not a proposed finding; it is an executed, largely irreversible disposition. When delegation statutes touching the judicial power are at issue, they are construed strictly, precisely to avoid the constitutional questions that broad readings would raise. *Gomez v. United States*, 490 U.S. 858, 864 (1989). Section 3664(d)(6) cannot be stretched from "may recommend" into "may liquidate."

The legislative history confirms that the design was deliberate. The reference provision appeared in the Judiciary Committee's bill in precisely the form Congress enacted—a master limited to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. The Committee described the procedures it was enacting as "a streamlined process for the determination of . . . the amount of restitution," explained that "the

need for finality and certainty in the sentencing process dictates that this determination be made quickly," and insisted that "restitution must be considered a part of the criminal sentence." S. Rep. No. 104-179, at 20. Congress designed a prompt, court-centered determination followed by enforcement of the resulting judgment. A multi-year liquidation program that sells first, distributes second, and determines—if ever—last is not an administration of the statute; it is its inversion.

## II. The Restitution Determination Is a Nondelegable Article III Judicial Function.

The judicial power of the United States is vested in Article III courts and may be exercised only by them. U.S. Const. art. III, § 1; *Stern v. Marshall*, 564 U.S. 462, 484 (2011). Congress wrote that principle directly into the MVRA: "Any dispute as to the proper amount or type of restitution shall be resolved *by the court* by the preponderance of the evidence." 18 U.S.C. § 3664(e). The Fourth Circuit enforces this allocation strictly. In *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995), the court held that the determination of restitution—there, merely the amounts and timing of payments—is a core judicial function that cannot be delegated even to a probation officer, an arm of the court itself. If a court may not delegate the scheduling of restitution payments, it surely may not delegate the liquidation of the assets from which restitution would be paid before the restitution obligation has even been fixed.

The Supreme Court's special-master jurisprudence is as follows: masters exist "to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause," and "not to displace the court." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (quoting *Ex parte Peterson*, 253 U.S. 300, 312 (1920)). In *La Buy*, references that handed the master the parties' basic issues were condemned as "little less than an abdication of the judicial function," and the Supreme Court approved the extraordinary remedy of mandamus to vacate them. *Id.* at 256–57. A reference under which the master does not merely hear disputed restitution issues but

disposes of the defendant's property—without court approval and without any final restitution determination—goes further than anything *La Buy* condemned. Defendant raises this respectfully and in the first instance here, where it belongs: this Court retains full authority to confine its reference to the boundaries Congress set.

## III. Defendant's Consent Cannot Supply What the Statute and Article III Withhold.

The anticipated response—that Defendant "agreed" to the Special Master in his plea agreement, Doc. No. 40, ¶ 9, and consented to the Clanwilliam disposition, Doc. No. 66—fails for three independent reasons. Consent operates within settled limits, and each one forecloses reliance on it here.

*First*, consent cannot enlarge a statute. Parties may no more amend § 3664(d)(6) by stipulation than they may confer subject-matter jurisdiction by agreement. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Indeed, *Schor* makes the analogy explicit: where structural limits are implicated, "the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986). Where Congress intends party consent to expand restitution authority, it says so expressly: 18 U.S.C. § 3663(a)(3) permits restitution "to the extent agreed to by the parties in a plea agreement." That provision proves the rule. Consent enlarges the *scope* of restitution only because a statute authorizes it; no provision of the MVRA or any other statute authorizes parties to transfer the adjudicative or liquidation function itself from the court to a master.

*Second*, Article III's structural guarantee is not the parties to waive. *Schor* holds that the right to an Article III adjudicator is "personal" and "subject to waiver," 478 U.S. at 848, but that

"notions of consent and waiver cannot be dispositive" where Article III's structural limitations are at issue, "because the limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 851. *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), permitted bankruptcy judges to adjudicate *Stern* claims on the parties' knowing and voluntary consent *precisely because* bankruptcy judges act under the appointment, removal, and review authority of Article III courts—the structural safeguards remained intact. *Peretz v. United States*, 501 U.S. 923 (1991), is to the same effect in the criminal context: "no such structural protections are implicated" by consent to a magistrate judge's supervision of felony voir dire, the Court explained, because magistrates "are appointed and subject to removal by Article III judges" and "the entire process takes place under the district court's total control and jurisdiction." *Id.* at 937 (quoting *United States v. Raddatz,* 447 U.S. 667, 681 (1980)). The teaching of these cases is uniform: consent legitimizes a *supervised* adjunct; it cannot legitimize an adjunct who has slipped the court's supervision. A special master who disposes of assets without court approval is not the supervised actor *Wellness* and *Peretz* describe—he is the unsupervised exercise of judicial power that *Schor* holds no party can authorize. This Court's own order conditioned the reference the same way, appointing a master to resolve restitution issues "under the Court's supervision and guidance." Doc. No. 56, at 3, ¶ 7.

*Third*, consent is measured by its terms, and every instrument of Defendant's consent presupposes court orders. The plea agreement consents to a special master performing tasks "*as ordered by the Court*." Doc. No. 40, ¶ 9. The appointment order conditions liquidation—twice—on "Court approval." Doc. No. 56, at 6. The Clanwilliam consent was transaction-specific, given by motion on notice, with valuation objections expressly preserved. Doc. No. 66. *Wellness* requires that consent be knowing and voluntary as to the adjudication actually conducted; a blanket,

prospective consent to unspecified future sales *without* court orders cannot be extracted from documents whose every operative clause presupposes them. Defendant consented to a master who recommends and who liquidates only with Court approval. He did not—and could not—consent to dispositions unmediated by orders of this Court. The consent documents are not a defense to the Becket sale; they are evidence that it was never authorized.

The point runs deeper than the scope of consent because the deviation here is structural. Congress prescribed an order of operations, and this Court's appointment order faithfully reproduced it. Under the MVRA, the court determines the victims' losses, § 3664(d)(5); resolves every dispute itself, by a preponderance, § 3664(e); may take a master's proposed findings, but only subject to a de novo determination, § 3664(d)(6); enters a restitution order that then becomes a final judgment, § 3664(o); and only then do the civil enforcement mechanisms attach, upon entry of judgment, § 3613(c), (f). Doc. No. 56 mirrors that architecture: identify the assets; "seek Court approval to liquidate"; accomplish liquidation "with Court approval." Doc. No. 56, at 6. In both designs, Article III adjudication comes first, execution comes second, and every act of the adjunct passes through the court. That sequencing is not a stylistic preference; it is the constitutional condition on which the use of a non-Article III adjunct rests. *Wellness* and *Peretz* sustained adjuncts precisely because "the entire process takes place under the district court's total control and jurisdiction"—appointment, supervision, review, and the final word all belonging to the Article III judge. *Peretz*, 501 U.S. at 937.

As implemented, the process inverted that sequence at every step: assets were liquidated before any final restitution determination existed; proceeds were distributed under a formula the Special Master concedes "almost certainly will deviate" from the apportionment this Court will later adopt, Doc. No. 66, ¶ 24; the Becket sale occurred off the record entirely; and the corrective

inputs promised to the Court's process—the Zero Coupon Bond credits, the ECL credits, the other promised credits—never arrived. What remains is execution without adjudication: criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), carried into effect by a private appointee operating outside the supervision that is the constitutional precondition for his existence. That is not a defect in Defendant's personal right to an Article III adjudicator, which *Schor* holds waivable, 478 U.S. at 848; it is a defect in the structural allocation of the judicial power, which *Schor* holds no party can waive: "the parties cannot by consent cure the constitutional difficulty," because the limitations "serve institutional interests that the parties cannot be expected to protect." *Id.* at 850–51. Under *Wellness*, supervision is what makes the adjunct constitutional; the record shows the supervision did not occur; the conclusion follows. A structural violation of this kind persists no matter what Defendant signed, said, or consented to, and it requires correction by the Court whether or not any party asks for it.

## IV. The New Waiver Confirms the Defect: An Attempt to Manufacture the Missing Consent, Sought by a Conflicted Officer Under Sentencing Pressure.

The New Waiver is the program reduced to writing. Its recitals declare that the Special Master "has full discretion to liquidate the Primary Restitution Assets, including determination of the timing of sale(s) and the price . . . , subject to only the approval of the Court." [Ex. W.] That is not what this Court ordered, and it is not what Congress authorized. Doc. No. 56 directs the Special Master to identify assets and to "seek Court approval to liquidate" them, accomplishing any liquidation "with Court approval," Doc. No. 56, at 6; and § 3664(d)(6) confines the office to proposed findings and recommendations subject to de novo determination by the Court. An instrument reciting "full discretion" over timing and price—with Court approval reduced to a backstop and the defendant's objection rights waived in advance—is an attempt to obtain by private contract the authority that the statute and the appointment order withhold. As shown in Part

III, *supra*, consent cannot supply that authority. The New Waiver is the proof that the Special Master understands this: one does not seek a waiver of rights one believes do not exist. And the demand sought more protection than this Court chose to give. The appointment order already shields the Special Master in calibrated, court-controlled terms: "No person may pursue any claim against the Special Master . . . without first seeking leave of the Court," and he bears no liability "for any action or omission taken or made in good faith." Doc. No. 56, at 9, ¶ 13. The New Waiver would replace that protection—a leave-of-court gate and a good-faith condition, both of which keep the Court in control—with an absolute personal release and covenant not to sue, with no leave requirement and no good-faith limitation, enforceable against Defendant by specific performance without bond. An officer does not demand a broader release than the Court conferred unless he wants protection the Court's own order withholds.

Nor could consent extracted in these circumstances ever satisfy *Wellness*'s requirement that waiver of Article III rights be knowing and voluntary. The chronology speaks for itself. The New Waiver was presented on May 14, 2026, twelve days before sentencing. On May 22, 2026—four days before sentencing—the Special Master filed a public statement to the sentencing court itemizing Defendant's non-execution of waivers among the "clarifications" to Defendant's cooperation showing and announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. A waiver of statutory and constitutional objection rights, demanded as "cooperation" by the very officer reporting on the defendant's cooperation to the judge about to sentence him, is the antithesis of a voluntary relinquishment. It is leverage. And the leverage was applied by an officer with a disqualifying stake in the outcome: the New Waiver's beneficiary clause runs expressly to "the Special Master" himself—releasing him, personally, from suit—while his professionals are compensated from the

very assets whose accelerated, unopposed liquidation the waiver is designed to "streamline." Doc. No. 56, at 9–10; Doc. No. 66, ¶ 20(d)(i) ($14,112,426 administrative reserve). The recitals themselves brand the absence of Defendant's waiver as something that "will impair the value" of the assets—recasting rights Congress conferred as obstacles to be cleared. The Special Master's own filing concedes the pattern, acknowledging that at least one of his demands on Defendant came "[a]lthough arguably exceeding the scope of the Special Master's authority." Doc. No. 159, ¶ 3. These circumstances are detailed in Part V, infra, under 28 U.S.C. § 455, the Due Process Clause, and Fed. R. Civ. P. 53(a)(2) (by analogy). For present purposes, they confirm why a stay is necessary: the sale program is being driven by an officer whose interests favor speed and foreclosure of objections, in tension with the adjudication-first sequence the statute commands.

## V. The Special Master Is Disqualified From Recommending or Adjudicative Functions: He Demanded, as "Cooperation," a Release Running to Himself, While His Professionals Are Compensated From the Assets He Liquidates.

"[N]o man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). That command of due process was announced in criminal cases and applies of its own force here, binding every officer who exercises adjudicative power, whatever the label of the proceeding. This Court's own appointment order then supplies the standard in terms: the office exists, by the Court's express finding, because "an experienced, neutral, and disinterested person should be appointed to assist the Court," resolving restitution issues "under the Court's supervision and guidance." Doc. No. 56, at 3, ¶ 7. Neutrality and disinterest are not imported into this case from the civil rules; they are the express conditions of the appointment itself. As for the codified benchmark: no Federal Rule of Criminal Procedure addresses special masters, and § 3664(d)(6) is silent on their qualifications, so courts look to the lone federal rule on the subject, under which a master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification

of a judge under 28 U.S.C. § 455." Fed. R. Civ. P. 53(a)(2) (governing civil masters and supplying the benchmark by analogy). An adjunct exercising quasi-judicial functions in a criminal sentencing cannot be held to a lesser standard of impartiality than a master appointed in a civil case; if anything, the standard is more exacting where liberty and criminal punishment are at stake. Section 455(a) requires disqualification "in any proceeding in which [the officer's] impartiality might reasonably be questioned"; § 455(b)(4) where the officer has "a financial interest in the subject matter in controversy." The standard is objective and protects "public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858–60 (1988). Due process supplies the constitutional floor: an adjudicator may not have "a direct, personal, substantial pecuniary interest" in the outcome. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).

The record now establishes the disqualifying configuration. The New Waiver is a private contract under which Defendant would release, and covenant never to sue, "the Special Master" by name—presented not as a counterparty's request but as "cooperation" the Special Master "deems . . . necessary" under the appointment order, and enforceable against Defendant by specific performance without bond. [Ex. W.] The Special Master's professionals are compensated from the assets he administers, Doc. No. 56, at 9–10, including the $14,112,426 Clanwilliam administrative reserve, Doc. No. 66, ¶ 20(d)(i), and the New Waiver's recitals declare that Defendant's signature "would enhance value and help streamline the sale" of those assets while its absence "will impair the value." [Ex. W.] He is simultaneously (1) the recommending adjudicator of Defendant's restitution offsets as author of the restitution report, Doc. No. 106; *see* Doc. No. 159, ¶ 2(k); (2) the administrator of a fee-generating liquidation program; (3) the counterparty and personal beneficiary of a demanded release; and (4) a sentencing commentator who filed a point-by-point response to Defendant's sentencing memorandum. Doc. No. 159. Each role might be tolerable

alone; together, no reasonable observer could view them as compatible with impartiality toward a defendant who has declined to sign the waiver, whose objections slow the sales, and whose civil litigation the Special Master demanded—by his own admission "[a]lthough arguably exceeding the scope of the Special Master's authority"—be dismissed. Doc. No. 159, ¶ 3. In fairness, Doc. No. 159 also records genuine cooperation—fifteen months of weekly meetings, "voluminous data," counsel "freely available," *id.* ¶ 1—and this objection does not depend on any finding of subjective bad faith. The problem is structural, and § 455(a)'s objective standard exists for precisely this situation. Defendant accordingly objects to the Special Master's continued exercise of any recommending or adjudicative function concerning restitution, and requests that those functions be performed by a neutral successor appointed under § 3664(d)(6), or by the Court itself.

The pattern of unfulfilled inducements confirms the conflict is operative, not theoretical. Cooperation was repeatedly purchased with promises—the unrestricted transfer of the de minimis companies in exchange for Defendant's waiver of the $40 million Clanwilliam tax escrow [Ex. S2]; the promised correction of the restitution analysis to credit the Zero Coupon Bond sales once Defendant produced the documenting emails; other promised sale credits, including the ECL credits [Statement of Facts ¶¶ 4–7]—and none was honored. An officer whose practice is to extract concessions with commitments he does not keep, while reporting the concessor's "cooperation" deficits to the sentencing court, is not an officer whose impartiality a reasonable observer could credit. 28 U.S.C. § 455(a).

The Special Master's restitution report completes the picture. In the same filing in which he rejected the bulk of Defendant's asserted offsets—offsets the report itself acknowledges "total at least $1.6 billion," Doc. No. 106, at 22—the Special Master expressly "reserve[d] the right to advise the Court concerning Defendant's cooperation during the sentencing hearing." Doc. No.

106, at 33. The leverage deployed on May 22 was announced on April 3, in the very document adjudicating Defendant's credits. And the proposed order the Special Master drafted provides that Defendant "shall not receive a credit" against restitution for the Court-approved administrative expenses paid from his assets. Doc. No. 106-1, at 4. The structure this creates should be stated plainly: every dollar paid to the Special Master's professionals comes from Defendant's assets, reduces the restitution obligation not at all, and enlarges the administration whose pace and friction those same professionals' control. An officer occupying that position cannot also be the officer who grades the debtor's cooperation and adjudicates his credits.

## VI. The Special Master's May 22 Statement (Doc. 159) Tainted the Sentencing and, Unless Stricken, Will Taint the Final Restitution Determination.

Due process guarantees a sentencing untainted by materially compromised information or improper influence. A sentence resting on assumptions that are "materially untrue" denies due process, *Townsend v. Burke*, 334 U.S. 736, 741 (1948), as does one "founded at least in part upon misinformation of constitutional magnitude," *United States v. Tucker*, 404 U.S. 443, 447 (1972). Sentencing is a critical stage to which the full measure of due process applies. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Four days before sentencing, the Court's own quasi-judicial adjunct filed a statement systematically recharacterizing Defendant's cooperation—while his demand for a self-benefiting waiver was pending against Defendant, and while expressly linking the two by announcing his expectation that Defendant would execute the New Waiver "before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. Such a statement does not reach the sentencing judge as one more adversarial submission to be discounted; it arrives bearing the imprimatur of the Court's own officer. A cooperation assessment shaped—consciously or not—by the assessor's pending personal demand on the person being assessed is materially compromised information of the kind *Townsend* and *Tucker* place outside the sentencing process.

Defendant objects that the May 26, 2026 sentencing was fundamentally affected by the submission and consideration of Doc. No. 159; the remedy as to the sentence lies with the Fourth Circuit on Defendant's pending appeal. The remedy as to *this* proceeding lies here and now: because the final restitution determination—itself criminal punishment, *Ellingburg*, *supra*—remains to be made on a record that includes Doc. No. 159 and the conflicted officer's restitution report, the Court should strike Doc. No. 159 or accord it no weight in any further proceeding, and should ensure that the de novo determination of Defendant's offsets proceeds on the recommendation of a neutral officer or on the Court's own review.

The taint was compounded by what the sentencing record did *not* contain. The Special Master had promised—before Defendant's objections were even due—to correct the restitution analysis to credit the Zero Coupon Bond sales Defendant had documented by email, and to credit other sales to Defendant, including the ECL credits. None of those corrections was ever filed. [Statement of Facts ¶¶ 4–6.] The Court therefore sentenced Defendant on an uncorrected, inflated restitution picture, accompanied by the Special Master's adverse cooperation statement—the corrective filings promised to Defendant absent, the filing adverse to Defendant present and four days fresh. And on information and belief, the statements presented at sentencing were obtained and prepared before the Clanwilliam proceeds were distributed and before the other payments and recoveries documented in Defendant's offset submissions had been received—so the Court heard descriptions of loss and harm unadjusted for the hundreds of millions of dollars the recipient insurance companies had already received. [Statement of Facts ¶ 14.] Under the framework governing the Special Master's determination, restitution distributions are made to or through the recipient insurance companies' estates—not to individual policyholders directly. [Statement of Facts ¶ 15.] That is not Defendant's characterization; it is the Special Master's: his report

recommends "directing restitution payments through the insurance companies themselves rather than directly to the individual policyholders." Doc. No. 106, App. 2; see Doc. No. 66, ¶ 20. The skew, at every point, ran in one direction. Due process does not tolerate a sentencing record curated in one direction by a conflicted officer. *Townsend*, 334 U.S. at 741; *Tucker*, 404 U.S. at 447. Congress said the same when it wrote this statute: in the Committee's words, "[t]he sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 20–21. That is precisely the interest the May 22 statement, the promised-and-undelivered corrections, and the pre-distribution statements compromised.

The due process violation can be stated with precision: Defendant was sentenced on restitution calculations that were incomplete and that had not been produced in compliance with the statutory order of operations. *Incomplete*, because the figure before the Court at sentencing omitted credits the Special Master had promised to apply—the documented Zero Coupon Bond sales, the ECL credits, and the other sales to be credited to Defendant [Statement of Facts ¶¶ 4–6]—and omitted the reductions that 18 U.S.C. § 3664(j)(2) makes mandatory and that this Court's own appointment order directed: "Restitution amounts should be reduced by any amount victims have recovered for the same losses." Doc. No. 56, at 6 n.2. *Noncompliant*, because the statute commits every disputed restitution issue to resolution "by the court," 18 U.S.C. § 3664(e), upon proposed findings "subject to a de novo determination," § 3664(d)(6)—and no such determination had occurred. The $1.655 billion figure that framed the § 3553(a) analysis was the unadjudicated recommendation of a conflicted adjunct, unadjusted for the approximately $2.9 billion in documented offsets then pending and unadjusted for the mandatory § 3664(j)(2) credits. A sentence imposed in the shadow of a restitution number that the governing statute required to be

reduced—but that never was—rests on the "invalid premises or inaccurate information" the Committee identified, S. Rep. No. 104-179, at 20–21, and on "misinformation of constitutional magnitude." *Tucker*, 404 U.S. at 447; *see Townsend*, 334 U.S. at 741. The courts of appeals enforce the statutory order of operations strictly: two weeks ago, the Sixth Circuit vacated a restitution award—on plain-error review, no objection having been made below—because the defendant "was not privy to the underlying calculations relied on by the government and the district court," and sentencing a defendant on undisclosed restitution information is "fundamentally at odds with the adversarial scheme" the rules establish. *United States v. Miclaus*, No. 23-3146, slip op. at 14–15 (6th Cir. May 29, 2026) (quoting *United States v. Coppenger*, 775 F.3d 799, 805 (6th Cir. 2015)); *see* 18 U.S.C. § 3664(a)–(b) (requiring "a complete accounting of the losses to each victim," disclosed to the defendant). Defendant's position is stronger still: he objects expressly, and within the objection period. Defendant objects on this ground for the record and for appellate review; the remedy as to the sentence lies with the Fourth Circuit. In this Court, the violation requires at minimum that no further consequence—no sale, no distribution, and no final order of restitution—be built upon the uncorrected, unadjudicated figure.

The off-record Becket sale magnified the distortion. Because the sale appears nowhere on the docket—and because Defendant's counsel learned of it only orally, in a weekly meeting, with sentencing approaching—the matter was not brought before the Court prior to sentencing. The structure of the process explains why. To raise the irregularity, Defendant would have had to accuse the Court's own appointee of an unauthorized disposition on the eve of sentencing—while that same appointee held the pen on the cooperation statement he would file four days before the hearing, and while his demand for a self-benefiting waiver was pending against Defendant. Objection carried a price, and the price was the cooperation narrative before the sentencing judge.

A sale process run ahead of the final restitution determination, administered by the officer who grades the defendant's cooperation, thus operated as a practical gag on the very objections the statute invites: it suppressed, at the moment of maximum consequence, the irregularities this motion now places on the record. And the consequences of that suppression fell entirely on Defendant: the Court imposed sentence on a record that included the Special Master's adverse cooperation statement and excluded the fact that an off-record, unauthorized disposition of restitution assets had already occurred, and excluded the promised and undelivered credits. A sentencing shaped by what a conflicted officer chose to file, and by what the off-record character of his administration kept from the Court, is precisely the disproportion this motion asks the Court to prevent from recurring at the final restitution determination.

Due process condemns that structure directly. A defendant may not be made to pay a penalty for the exercise of his procedural rights, because "the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right," and due process therefore requires that a defendant "be freed of apprehension of such a retaliatory motivation." *Blackledge v. Perry*, 417 U.S. 21, 28 (1974) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), *limited on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). The rule does not demand proof of intent: it "was not grounded upon the proposition that actual retaliatory motivation must inevitably exist." *Blackledge*, 417 U.S. at 28. Here the deterrent was built into the sequence itself: by selling first and adjudicating later, and by uniting in one officer the roles of seller, release counterparty, and cooperation evaluator, the process ensured that a defendant who corrected the record before sentencing would do so at the cost of his cooperation assessment. Congress identified one due process interest above all at sentencing—the right not to be sentenced on invalid premises or inaccurate information, S. Rep. No. 104-179, at 20–21, *supra*—and a process that penalizes the

correction of invalid premises before sentencing defeats that interest at its root: the premises remain uncorrected precisely because correcting them is punished. That is not a gag order in form, but it operated as one in fact, and the sentencing on uncorrected premises that resulted is the very violation the statute's framers sought to foreclose.

## VII. The Becket Sale Proceeded Without the Court Approval That Both the Statute and This Court's Own Order Require.

The Becket transaction appears nowhere on the record of this Court: no motion seeking its approval, no notice of the sale, and no order authorizing it. Defendant's counsel learned that Becket had been sold only orally, in one of the weekly meetings described in Doc. No. 159, ¶ 1, in or about December 2025—and in the months since, no motion, notice, or order concerning Becket has appeared on the docket. [Statement of Facts ¶ 11.] An asset sale that leaves no trace on the docket of the Article III court supervising it is not a procedural foot-fault; it is proof that this process derailed from its constitutional moorings long ago. The docket is the constitutional record of a federal criminal proceeding, and dispositions of a defendant's property conducted entirely off that record are irreconcilable with due process, with § 3664(d)(6), and with the appointment order itself, which conditions liquidation—twice—on "Court approval." Doc. No. 56, at 6. Whatever authority the Special Master possesses is derived entirely from this Court's appointment and orders; an act undertaken without the court approval those orders require is an act undertaken without authority. The defect is not procedural housekeeping. Court approval of each disposition is the mechanism by which § 3664(d)(6)'s de novo guarantee operates: absent a motion, an opportunity for objection, and an order, the Court never makes the determination the statute reserves to it—and the contrast with Clanwilliam, where the Special Master did seek approval by motion (Doc. No. 66), shows that the Special Master knows precisely how the process is supposed to work. Where judicial sales of realty are concerned, Congress has separately prescribed

mandatory procedures—public sale, appraisal, and related safeguards—whose omission independently invalidates a sale. 28 U.S.C. § 2001. Defendant respectfully requests that the Court direct the Special Master to file a complete accounting of the Becket transaction and all other completed, pending, or contemplated dispositions, identifying the order of this Court claimed as authority for each.

Compounding the defect, the Special Master has never disclosed how the Becket proceeds were applied—whether to restitution, to administrative expenses, to the Special Master's professionals, or otherwise—nor whether other sales or dispositions have occurred beyond those of record. [Statement of Facts ¶ 3.] On the present record, the Court and Defendant are alike in the dark as to what has been sold and where the money went. The accounting requested below is therefore not ancillary relief; it is the predicate for assessing the lawfulness of what has already occurred, for crediting Defendant under 18 U.S.C. § 3664(j)(2) for amounts actually applied to the recipient insurance companies, and for the de novo determination still to come.

## VIII. Sales Before a Final Restitution Determination Invert the Statutory Sequence and Inflict Irreparable, Unquantifiable Prejudice.

The MVRA's architecture is sequential: the court determines the victims' losses, § 3664(d)(5); resolves all disputes itself by a preponderance, § 3664(e); enters a restitution order that then constitutes a final judgment, § 3664(o); and only then do the enforcement mechanisms attach. Those mechanisms are, by Congress's own designation, civil in character: 18 U.S.C. § 3613 is titled "Civil remedies for satisfaction of an unpaid fine"; it reaches restitution orders through § 3613(f); and the lien it creates "arises on the entry of judgment." § 3613(c). Congress thus prescribed post-judgment civil process—a lien and execution against an entered judgment—as the means of collecting restitution; it nowhere authorized pre-judgment liquidation of a defendant's assets by a court adjunct inside the criminal case. That the collection machinery is civil does not

make the punishment civil, *Ellingburg*, *supra*, but it does fix when collection begins: after judgment, through the remedies Congress specified. *See Dolan v. United States*, 560 U.S. 605, 607–08 (2010) (describing the statute's timetable for converting sentencing into a final restitution determination). Liquidating assets first and determining the obligation later reverses every step of that sequence. It is enforcement of a judgment that does not exist.

Nor is any of this inconsistent with Defendant's plea agreement. Defendant agreed to pay full restitution and to the immediate enforceability of monetary penalties under 18 U.S.C. § 3613. Doc. No. 40, ¶¶ 10(a), 10(d). Consent to immediate enforcement of a judgment is not consent to execution before judgment: § 3613 is a civil-remedies statute whose lien "arises on the entry of judgment," § 3613(c), so its enforcement presupposes the restitution order that § 3664(o) describes, and the amount that order may impose is full restitution less the credits § 3664(j) mandates—a computation the statute reserves to the Court. The Committee was explicit that the purpose of § 3664(j)(2) "is to ensure that the victim is not compensated twice for the same loss." S. Rep. No. 104-179, at 21. This Court's appointment order says the same: "Restitution amounts should be reduced by any amount victims have recovered for the same losses," and Defendant "has reserved all rights with regard to any arguments regarding calculating loss amount." Doc. No. 56, at 6 n.2 (citing 18 U.S.C. § 3664(j)(2)). Defendant's offset submissions enforce the plea agreement's design; they do not resist it.

The prejudice is not hypothetical; the record already quantifies it. Defendant's pending offset submissions total approximately $2.9 billion against a preliminary figure of $1.655 billion. If the Court's de novo determination credits those offsets in whole or substantial part, the final restitution obligation is zero or near it—and yet the assets will be gone, sold into the hands of third parties (including potential bona fide purchasers) from whom recovery may be legally or

practically impossible. Clanwilliam is the proof of concept. By the Special Master's own account, its $318 million in proceeds were distributed under a formula that "almost certainly will deviate" from the apportionment this Court later approves, Doc. No. 66, ¶ 24, including $23,520,710 to an entity the Special Master cannot yet say is a victim at all, *id.* ¶ 26 n.8. And Defendant's preserved valuation position is that the asset itself was sold approximately $350 million below its market value—value that, once the sale closed, no de novo determination can restore. [Ex. S2.] Defendant does not seek to unwind Clanwilliam; he consented to that disposition to preserve the transaction at the parties' request. But Clanwilliam demonstrates with arithmetic precision what each further "out of order" sale will do: fix losses, misallocate proceeds, and moot the de novo review Congress guaranteed—while the Special Master's proposed cure, "collecting enough funds in the future to equalize distributions," Doc. No. 66, ¶ 26, requires liquidating still more assets before the underlying obligation is adjudicated. Forced-sale dynamics compound the harm. Harm of that character—unrecoverable property, mootness of pending objections, evasion of de novo review—is the definition of irreparable.

## IX. On De Novo Review, the Court Must Find the Facts Itself—by a Preponderance at Minimum, and, After Ellingburg, Beyond a Reasonable Doubt.

Section 3664(e) fixes the statutory floor: every disputed restitution issue must be resolved "by the court by the preponderance of the evidence." Two consequences follow for any proposed sale. First, the finding must be the Court's own—a de novo determination on the record, not a ratification of the Special Master's conclusions. Second, the Government and the Special Master bear the burden of demonstrating, by at least a preponderance, the facts that would justify each specific disposition—including that a final restitution obligation will exist and will exceed the offsets of record.

The Constitution now requires more. In *Ellingburg* a unanimous Supreme Court held that restitution under the MVRA is "plainly criminal punishment." That holding arose under the Ex Post Facto Clause, but its premise—that MVRA restitution is a criminal penalty imposed at sentencing—activates the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that facts increasing a criminal penalty must be proved beyond a reasonable doubt, and of *Southern Union Co. v. United States*, 567 U.S. 343, 346–49 (2012), which applied *Apprendi* to criminal monetary penalties. Defendant acknowledges that *Ellingburg* did not itself decide the burden-of-proof question and presents the argument squarely: because restitution is criminal punishment, the facts establishing the amount of that punishment—here, a contested $1.655 billion—must be found beyond a reasonable doubt. At an absolute minimum, no asset may be sold unless and until this Court itself, de novo, finds by a preponderance of the evidence that the sale is justified by a restitution obligation that survives the documented offsets. No sale to date has been supported by findings under either standard.

The Committee likewise insisted that the mandatory scheme not become a vehicle for resolving "highly complex issues related to the cause or amount of a victim's loss," that "speculative" losses be excluded, and that even restitution arising from a plea agreement be "supported by fact" and "ordered by the court." S. Rep. No. 104-179, at 19. A contested $1.655 billion figure—built on disputed valuations and met by approximately $2.9 billion in documented offsets—demands more judicial process, not less.

The Special Master's own restitution report (Doc. No. 106) proves the point with arithmetic. On the report's own figures, the principal-only measure of loss—"Unpaid Principal," net of the recoveries the Special Master credited—is $1.362 billion; the $1.625 billion the report recommends is reached only by adding approximately $263 million of "time value of money"

interest at a rate the Special Master selected, over Defendant's express objection to any interest component. Doc. No. 106, at 21–22. The Preliminary Order then entered a figure of $1.655 billion—$30 million above even the Special Master's recommendation, without explanation on the record. [Doc. 161] An interest enhancement of more than a quarter-billion dollars, computed by a court adjunct at a rate of his choosing and imposed without the Court's own findings, cannot stand: restitution is criminal punishment, *Ellingburg*, *supra*, and the facts that fix its amount must be found by the Court—on Defendant's submission, beyond a reasonable doubt under *Apprendi* and *Southern Union*. And the report's rejection of offsets is, in places, expressly provisional: the Special Master concedes that the credit for the preferred-equity interest Defendant transferred to ULICO—against which ULICO agreed to reduce its civil judgment by at least $218 million—"should occur if and when the preferred equity position is liquidated into cash," Doc. No. 106, at 23, a concession that the recommended figure overstates the obligation by amounts the Special Master himself expects to credit. Meanwhile, of the Clanwilliam proceeds, the $14,112,426 administrative reserve and the $23,520,710 paid to Vista—an entity the Special Master "is unsure" is due restitution at all—generated no credit to Defendant. Doc. No. 66, ¶¶ 20(d), 26 n.8.

**X. Every Stay Factor Is Satisfied.**

*Likelihood of success*. The textual argument under § 3664(d)(6) is straightforward; the Article III argument is controlled by *Johnson* and *Stern*; and the sequencing argument follows from the face of §§ 3664(d)(5), (e), and (o). *Irreparable harm*. Assets sold to third parties before any final restitution determination cannot be recovered; the de novo review Congress guaranteed will have been rendered illusory. By the Special Master's own estimate, the Primary Restitution Assets are worth $1.162 to $1.878 billion, with a midpoint of $1.454 billion—below the preliminary figure—so every dollar of value sacrificed in a rushed or unsupervised sale directly

enlarges the unpaid balance for which Defendant remains liable. Doc. No. 106, at 30. *Harm to others*. A stay preserves the status quo; the assets remain available to satisfy whatever final restitution order the Court enters, and no restitution recipient is prejudiced by the Court deciding the obligation before liquidating the security for it. *Public interest.* The public interest lies in sentences—including criminal monetary penalties, *Ellingburg*, *supra*—being imposed by Article III judges under the procedures Congress enacted, not by court adjuncts acting beyond their statutory writ. *Nken*, 556 U.S. at 434.

## CONSOLIDATED OBJECTIONS

Within the time allowed for objections to the Preliminary Order of Restitution [Doc. 161], Defendant objects as follows, in addition to and independent of the stay relief requested. These objections are presented within the restitution-determination process that 18 U.S.C. § 3664 commits to this Court—not in any appeal or post-conviction action—and nothing herein contests Defendant's agreement to pay full restitution as determined according to law: (i) the Special Master reference, as implemented, exceeds the sole statutory authority for it, 18 U.S.C. § 3664(d)(6), which permits proposed findings and recommendations subject to de novo determination by the Court—not the execution of asset sales; (ii) the determination of restitution is a nondelegable Article III judicial function, U.S. Const. art. III, § 1; 18 U.S.C. § 3664(e), and its delegation here violates the separation of powers; (iii) no consent by Defendant—in the plea agreement, the Clanwilliam consent motion, or otherwise—did or could enlarge § 3664(d)(6), waive Article III's structural guarantee, or authorize dispositions without court approval, and the inversion of the statutory order of operations as implemented—execution of criminal punishment before and without Article III adjudication, by an adjunct operating outside the Court's supervision—is a structural constitutional violation that no consent could waive; (iv) the Special Master labors under

disqualifying conflicts of interest under the standards of 28 U.S.C. § 455, the Due Process Clause, and Fed. R. Civ. P. 53(a)(2) (by analogy), and his reports and recommendations, including the restitution report (Doc. No. 106) and the Statement Concerning Defendant's Cooperation (Doc. No. 159), are the product of that conflict; (v) the submission and consideration of Doc. No. 159, filed four days before sentencing while the Special Master's demand for a self-benefiting waiver was pending, fundamentally compromised the May 26, 2026 sentencing in violation of due process, as did the presentation of statements obtained, on information and belief, before restitution distributions—including the Clanwilliam proceeds—had been received by the recipient insurance company estates to or through which, under the framework governing the Special Master's determination, restitution distributions are made, and as did the imposition of sentence on restitution calculations that were incomplete—omitting the promised Zero Coupon Bond, ECL, and other credits and the mandatory reductions of 18 U.S.C. § 3664(j)(2)—and that had not been subjected to the determination "by the court" that §§ 3664(e) and (d)(6) command, and as did the structure of the pre-determination sale process, under which objection to these irregularities before sentencing carried the price of an adverse cooperation assessment by the officer administering the sales and so operated as a practical restraint on Defendant's ability to bring them before the Court; (vi) the Becket sale—of which there is no evidence on the record of this Court: no motion, no notice, and no order, and of which Defendant's counsel learned only orally in a weekly meeting—was conducted without the court approval required by Doc. No. 56 and § 3664(d)(6) and was ultra vires, and the off-record character of that disposition is itself evidence that the reference departed from constitutional and statutory requirements long before sentencing; (vii) all sales and distributions conducted before entry of a final restitution order—including the disposition of the Clanwilliam proceeds under a formula the Special Master concedes "almost certainly will deviate"

from the apportionment later approved, Doc. No. 66, ¶ 24—invert the sequence commanded by §§ 3664(d)(5), (e), and (o) and are objected to as premature and prejudicial; (viii) any disputed restitution issue must be resolved by this Court de novo, on the Court's own findings, by at least a preponderance of the evidence under § 3664(e), and—because restitution is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 166 (2026)—beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Southern Union Co. v. United States*, 567 U.S. 343 (2012); (ix) the $1.655 billion preliminary figure is unsupported and is exceeded by documented offsets of approximately $2.9 billion—including the preserved Clanwilliam valuation differential of approximately $350 million [Ex. S2]—such that the final restitution obligation is zero, with substantial overpayment; further, the figure includes approximately $263 million of non-contractual interest selected by the Special Master over Defendant's objection, exceeds by $30 million even the $1.625 billion the Special Master recommended (Doc. No. 106, at 4) without record explanation, omits the ULICO preferred-equity credit of at least $218 million that the Special Master concedes "should occur" (Doc. No. 106, at 23), and gives Defendant no credit for the $14,112,426 Clanwilliam administrative reserve or the $23,520,710 distributed to Vista (Doc. No. 66, ¶¶ 20(d), 26 n.8); and (x) the preliminary restitution figure rests on an analysis the Special Master promised—before objections were due—to correct, including credits for the documented Zero Coupon Bond sales, the ECL credits, and other sales credited to Defendant, and those promised corrections were never made, before sentencing or since, such that the figure is inflated by the amount of every promised and undelivered credit, each of which must be applied on de novo review; and (xi) the Special Master has not disclosed or accounted for the use of proceeds from completed dispositions, including the Becket sale, and other dispositions may have occurred that remain undisclosed; Defendant objects to any restitution determination, credit allocation, or

further disposition made without a complete accounting of all dispositions, of the application of all proceeds, and of all administrative fees and expenses paid or accrued to any person or firm from administered assets or sale proceeds; and (xii) Defendant objects to the entry of any final order of restitution, and to the approval of any further asset disposition, except upon the procedures and findings set forth above. Defendant's substantive offset submissions, and Defendant's previously filed motion to stay [Docs. 172-188], are incorporated by reference, and the grounds stated in each are asserted as objections to the Preliminary Order of Restitution.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an order: (1) staying, effective immediately, all sales and dispositions of assets and all asset-sale processes conducted by or at the direction of the Special Master or any person acting in concert with him, pending entry of a final order of restitution following the Court's de novo determination of all disputed issues; (2) providing that no asset may be marketed, contracted, or sold absent a specific prior order of this Court entered on motion, with notice and an opportunity to be heard, supported by the Court's own findings under 18 U.S.C. § 3664(e) (and, as preserved above, beyond a reasonable doubt under Ellingburg, Apprendi, and Southern Union); (3) striking, or directing that no weight be accorded in any further proceeding to, the Special Master's Statement Concerning Defendant's Cooperation (Doc. No. 159); (4) disqualifying the Special Master from any recommending or adjudicative function concerning the determination of restitution, with those functions performed by a neutral successor appointed under 18 U.S.C. § 3664(d)(6) or by the Court; (5) directing the Special Master to file, within fourteen (14) days, a complete accounting of all completed, pending, and contemplated asset dispositions, including the Becket and Clanwilliam transactions, identifying the authority claimed for each and the application of all proceeds

therefrom—including the proceeds of the Becket sale and of any disposition not yet of record; (6) directing that there be filed with the Court, within fourteen (14) days, a full and itemized accounting of administrative fees and expenses, identifying each person and firm that has received or accrued fees or expenses from administered assets or sale proceeds—including the Special Master, his counsel, his financial advisors, and any other professional or party—together with the amount received or accrued by each, the dates and sources of each payment, and the order of this Court authorizing each payment; (7) granting such other and further relief as the Court deems just. Given the ongoing and imminent nature of the sale processes, Defendant respectfully requests expedited briefing and consideration.

Respectfully submitted, this 11th day of June, 2026.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

## CONSULTATION STATEMENT

Pursuant to the Court's motions practice, the undersigned states that [counsel for Defendant conferred with counsel for the United States on ___, 2026, regarding the relief requested herein; the United States' position is ___ / describe timely attempts to confer].

/s/ Kenneth Barnes________
Kenneth Barnes

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2026, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

/s/ Kenneth Barnes________
Kenneth Barnes

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| United States of America,<br>v.<br>Greg E. Lindberg, *et al.*,<br>*Defendants*. | No. 5:19-cr-22 |

| | |
|---|---|
| United States of America,<br>v.<br>Greg E. Lindberg,<br>*Defendant*. | No. 3:23-cr-48 |

**DEFENDANT'S EMERGENCY MOTION TO ENFORCE THE PLEA AGREEMENT AND THE ORDER APPOINTING THE SPECIAL MASTER, TO PRESERVE HIS DUE-PROCESS AND COUNSEL-ACCESS RIGHTS IN THE PENDING RESTITUTION PROCEEDINGS, AND TO REQUIRE THAT THE GOVERNMENT BE REPRESENTED BY CONFLICT-FREE COUNSEL**

# TABLE OF CONTENTS

Table of Contents .......... 2
Table of Authorities .......... 3
Introduction and Request for Expedited Consideration .......... 5
Statement of Facts .......... 5
Argument .......... 6
I. The Government May Not Treat Protected Advocacy as a Breach of the Plea Agreement; Doing So Is Prosecutorial Vindictiveness. .......... 6
II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced. .......... 7
III. Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records. 8
IV. Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights. .......... 11
V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions. .......... 12
VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government. .......... 12
Conclusion and Relief Requested .......... 13
Certification Regarding Use of Artificial Intelligence .......... 16
Certificate of Service .......... 17

# TABLE OF AUTHORITIES

**Cases**

*Berger v. United States,*
295 U.S. 78 (1935)....12, 13

*Blackledge v. Perry,*
417 U.S. 21 (1974)....6

*Bounds v. Smith,*
430 U.S. 817 (1977)....11

*Ellingburg v. United States,*
607 U.S. ___ (2026)....8

*In re McNulty,*
597 F.3d 344 (6th Cir. 2010)....10

*In re Zetteler,*
No. 26-1749 (4th Cir. June 13, 2026)....10

*Lewis v. Casey,*
518 U.S. 343 (1996)....11

*Mathews v. Eldridge,*
424 U.S. 319 (1976)....9

*North Carolina v. Pearce,*
395 U.S. 711 (1969)....6

*Robers v. United States,*
572 U.S. 639 (2014)....10

*Santobello v. New York,*
404 U.S. 257 (1971)....7

*United States v. Goodwin,*
457 U.S. 368 (1982)....7

**Constitutional Provisions**

U.S. Const. amend. V....9
U.S. Const. amend. VI....9

**Statutes**

18 U.S.C. § 3663A....5, 9
18 U.S.C. § 3663A(a)(2)....10
18 U.S.C. § 3664....9

18 U.S.C. § 3664(e) ....................7
18 U.S.C. § 3664(j)(2) ....................9
28 U.S.C. § 530B ....................12

**Rules**

N.C. R. Prof'l Conduct r. 3.7 ....................12
N.C. R. Prof'l Conduct r. 3.8 ....................12
N.C. R. Prof'l Conduct r. 8.4 ....................12

## INTRODUCTION AND REQUEST FOR EXPEDITED CONSIDERATION

Defendant Greg E. Lindberg respectfully moves this Court on an emergency basis for relief necessary to preserve his constitutional and statutory rights while the restitution phase of this case remains open. The supporting facts are set out in the accompanying *Declaration of Greg E. Lindberg* ("Lindberg Decl."), filed herewith. This motion is grounded on the plea agreement entered in this case, the Order appointing the Special Master, the Fifth and Sixth Amendments to the United States Constitution, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A and 3664, and this Court's inherent and statutory authority.

Expedited consideration is warranted. The final restitution hearing has not been scheduled, yet Defendant faces imminent designation and transfer by the Bureau of Prisons ("BOP") to a facility at which he has no access to a computer, the internet, spreadsheets, or the financial records he needs to litigate the disputed offsets, and only limited access to counsel. Once such a transfer occurs, the harm to Defendant's ability to be heard on a restitution figure exceeding one and one-half billion dollars—against which he asserts offsets approaching $2.9 billion—cannot meaningfully be undone. (Lindberg Decl. ¶¶ 2, 10–15.)

## STATEMENT OF FACTS

Consistent with the requirement of Local Criminal Rule 47.1, the operative facts are established by the accompanying affidavit and are summarized here only for the Court's convenience. Defendant rests the factual basis of this motion exclusively on the Lindberg Decl. and not on any extrinsic correspondence.

At sentencing on May 26, 2026, this Court expressly rejected the Government's position—advanced by Assistant United States Attorney Daniel Ryan—that Defendant be housed at the Pike County Detention Center ("PCDC") for 90 days only, until the final restitution hearing. (Lindberg Decl. ¶ 3.) Notwithstanding that ruling, within a day of sentencing Defendant was moved to the Pike County Detention Center (PCDC) for approximately one day and then transferred again. (Id. ¶ 4.)

After Defendant, through counsel, filed his first emergency motion to stay all asset sales—a filing that raised prosecutorial vindictiveness, including the reuse at sentencing of victim statements collected roughly two and one-half years earlier, before restitution had been paid, presented as though current by Department of Justice Trial Attorney Lyndie Freeman—Ms. Freeman contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement. (Id. ¶¶ 5–6.)

Most recently, on June 12, 2026, the Government, through AUSA Ryan, communicated that it is reconsidering whether it will continue to support Defendant's request to delay reporting to BOP—a request the Government had previously premised on Defendant's cooperation with the Special Master. The reporting-delay question is presently before United States Magistrate Judge Keesler, and the Government's proposed wording both shortens the period to 90 days and walks back the understanding reflected at the sentencing hearing. (Lindberg Decl. ¶¶ 7–8.)

Defendant's prior counsel at Katten Muchin Rosenman LLP was informed by the Special Master, at or about the time the requested waiver (ECF No. 537) was refused, that its fees would not be paid until after year-end. To continue representing Defendant through the end of the year, that firm would have had to advance an estimated $2 to $2.5 million in unpaid credit. (Id. ¶ 9.) Defendant's access to counsel and to the tools of self-representation is now materially impaired: he is held in a single cell with no access to any computer, the internet, or spreadsheet software, and his contact with counsel is largely confined to in-person visits and video calls on which complex restitution positions cannot adequately be developed. (Id. ¶¶ 10–11.)

## ARGUMENT

### I. The Government May Not Treat Protected Advocacy as a Breach of the Plea Agreement; Doing So Is Prosecutorial Vindictiveness.

A defendant has the right to seek relief from the courts and to pursue an appeal without governmental retaliation, and due process forbids vindictiveness against a defendant for having exercised those rights. *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969); *Blackledge v. Perry*,

417 U.S. 21, 27–28 (1974). That prohibition on actual vindictiveness applies with full force after trial-level proceedings are complete, where retaliation for the exercise of post-conviction rights is of special concern. *United States v. Goodwin*, 457 U.S. 368, 372–84 (1982). Defendant does not rest on any presumption of vindictiveness; the sequence here establishes actual retaliation.

Here, the sequence speaks for itself. Defendant filed an emergency motion that placed on the public record his contention that the prosecution had acted vindictively including by recycling stale, pre-payment victim statements at sentencing as if they were current. The named prosecutor whose conduct the motion challenged, Trial Attorney Lyndie Freeman, then demanded that the motion be stricken from the docket and threatened a breach of the plea agreement if it was not. (Lindberg Decl. ¶¶ 5–6.) That is not a neutral enforcement of the plea; it is the use of the breach mechanism to suppress a protected filing that was adverse to the very lawyer making the threat. The timing—an adverse demand made directly in response to a protected, post-conviction filing implicating the prosecutor personally—establishes actual prosecutorial vindictiveness—and, at the very least, the "realistic likelihood of vindictiveness" the Constitution forbids.

The Government compounded the problem on June 12, 2026, when it signaled that it may withdraw support for Defendant's reporting-delay request in apparent response to Defendant's recent exercise of his rights—a request the Government had previously supported and had tied to Defendant's cooperation with the Special Master. (Id. ¶¶ 7–8.) Conditioning a custodial accommodation on a defendant's agreement to abandon protected advocacy, or penalizing him for declining to do so, is an unconstitutional condition that cannot stand.

## II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced.

A plea agreement is enforced according to its terms because a defendant's waiver of his most fundamental rights rests upon the Government's promises. When a guilty plea rests in any significant degree on a promise of the prosecution, that promise "must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). The obligation runs to the entire prosecution team; the staff

of a prosecutor's office bears the burden of "letting the left hand know what the right hand is doing." *Id.* at 262.

Defendant's plea agreement and the Order appointing the Special Master contemplate that Defendant will participate in, and cooperate with, the orderly marshaling and accounting of assets—participation that is impossible without access to counsel, to a computer and the internet, and to the financial records underlying the disputed offsets. (Lindberg Decl. ¶¶ 9–12, 15.) The Government cannot demand cooperation under the agreement while simultaneously engineering conditions that make cooperation and defense impossible, and it cannot recast Defendant's insistence on a full accounting before assets are liquidated as a "breach." The promises that induced the plea must be honored, and the access necessary to perform under the agreement must be preserved.

Critically, the access Defendant invokes is not a discretionary courtesy or a bargaining chip. The access provisions of the plea agreement exist to protect Defendant's constitutional rights—to the assistance of counsel, to due process, and to access the courts—as the restitution phase proceeds; they are not a quid pro quo for Defendant's cooperation with an out-of-order, premature liquidation of assets, and the Government may not treat them as one. Conditioning Defendant's access to counsel, computers, the internet, and records on his cooperation with asset sales, or withdrawing that access because he has exercised protected rights, converts a constitutional guarantee into leverage and invokes the very violations described throughout this motion. The concern is heightened now that Defendant is represented by new counsel, who must absorb a voluminous and technical restitution record—making timely, meaningful, and daily access all the more essential, not less.

## III. Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records.

Restitution under the MVRA is criminal punishment. *Ellingburg v. United States*, 607 U.S. ___, No. 24-482 (Jan. 20, 2026). Because the restitution Defendant faces is punishment—here, a

preliminary figure exceeding $1.655 billion (Doc. 161)—the full protections of due process attach to the proceedings that fix it. The MVRA itself guarantees procedural participation: it requires the court to resolve disputes and places defined burdens on the parties. 18 U.S.C. § 3664; see also 18 U.S.C. § 3663A. The statute also forbids double recovery: a victim's losses must be reduced by amounts later recovered, 18 U.S.C. § 3664(j)(2)—the precise issue Defendant seeks to litigate through his offsets and his request for a full accounting before any further liquidation.

The process due is measured by weighing the private interest at stake, the risk of erroneous deprivation under the current procedures and the value of additional safeguards, and the Government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). At its core, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 333. Every factor favors Defendant. The private interest—liberty and more than a billion dollars in punishment—is enormous. The risk of error is acute: the offsets turn on technical financial questions (for example, the treatment of approximately $1 billion in AAA-rated zero-coupon bonds and whether losses were caused by a forced sale rather than by Defendant's conduct) that cannot be presented without computers, the internet, records, spreadsheets, and counsel who can absorb them. (Lindberg Decl. ¶¶ 11–12, 15.) The Government has no legitimate interest in a restitution figure inflated by the denial of these basic tools. U.S. Const. amend. V.

The burden of proof makes access indispensable. Under the MVRA, the Government bears the burden of proving the amount of the victims' loss, but the burden of demonstrating entitlement to the offsets and credits a defendant asserts rests on the defendant. 18 U.S.C. § 3664(e). It is therefore Defendant who must marshal the records and analysis establishing, among other things, that the losses were caused by a forced sale rather than by the offense of conviction, and that amounts have been or will be recovered that must reduce any restitution. Denying Defendant the counsel, the computer, the internet, and the financial records needed to carry that statutory burden does not lighten it—it ensures that it cannot be met, and that the resulting restitution figure will be inflated by default rather than fixed on the merits.

These offsets are not collateral; they go to the heart of proximate causation, which the MVRA makes essential. Restitution reaches only those losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Supreme Court has confirmed that restitution must be reduced by the amount a victim actually realizes upon selling property, and that a defendant is not the proximate cause of a decline in value that flows from the victim's own decision whether and when to dispose of assets. *Robers v. United States*, 572 U.S. 639 (2014). A restitution figure measured in the billions—here, the approximately $1.6 billion stated in the Preliminary Order—can sound, at first, as though every dollar reflects loss the Defendant proximately caused. It does not. Whether the losses were instead caused by a fire-sale liquidation of AAA-rated, gold-equivalent securities that should have been held to maturity, or by the blocking of value-preserving transactions such as the proposed Ares sale, is precisely the causation inquiry the statute requires—an inquiry into who sold the assets, on what terms, and with what intention. (Lindberg Decl. ¶¶ 11–12.) The Government's demands—that Defendant's filing be pulled from the docket, and that he be designated and transferred to a Federal Prison Camp (FPC) in violation of this Court's own ruling at sentencing—operate to strip Defendant of the ability to develop and present this causation and offset evidence at the very moment the record is being made.

Nor is the danger of uncounted, unauthorized liquidation hypothetical. Motions described the sale of the Beckett affiliate, valued at approximately $133 million, without court approval. (Lindberg Decl. ¶ 12.) Assets of that magnitude cannot be sold out from under the restitution determination without a full accounting; that is precisely why no further sale or liquidation should occur before restitution is finally determined.

This is not an abstract point; the same causation screen has already been applied in this very case. In denying a crime victim's mandamus petition arising directly out of the Preliminary Order of Restitution, the Fourth Circuit reaffirmed that restitution reaches only harm "directly and proximately" caused by the offense, and that a claimed loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (unpublished) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th

Cir. 2010)). The panel sustained the exclusion of a claimant precisely because its losses were not closely tied to the conduct inherent in Defendant's offense. Because that decision was entered in this very case, it is the law of the case and governs the restitution determination here; and the causation screen it applied cuts both ways: the causation screen that kept losses out of the restitution figure must equally keep out losses charged against Defendant that flowed not from the offense of conviction but from the rehabilitator's fire-sale of gold-equivalent securities and the blocking of value-preserving sales. Offsets and causation are therefore not "collateral" to the restitution inquiry; under the law governing this case, they define it, and Defendant must be given the access necessary to litigate them.

## IV. Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights.

The right to the assistance of counsel extends through sentencing, of which restitution is a part. U.S. Const. amend. VI. Independently, the constitutional right of access to the courts guarantees a person held in custody a reasonable opportunity to prepare and present nonfrivolous legal claims, and to obtain relief he must show actual injury—that the challenged conditions have hindered his efforts to pursue such a claim. *Lewis v. Casey*, 518 U.S. 343, 350–51 (1996); see also *Bounds v. Smith*, 430 U.S. 817 (1977) (recognizing the right of meaningful access to the courts), as limited by *Lewis*, 518 U.S. at 350–55.

Defendant readily makes that showing. He is litigating live, plainly nonfrivolous matters—objections to a multi-billion-dollar restitution recommendation, offsets approaching $2.9 billion, and a pending appeal—yet he is confined where he cannot touch a computer, cannot access the internet, cannot use the spreadsheets these issues demand, and cannot meet with counsel except in person or by video calls unsuited to complex financial analysis. (Lindberg Decl. ¶¶ 10–12, 15.) These restrictions are not incidental; they directly impede Defendant's ability to be heard on the very questions now before the Court, and a transfer to BOP designation would deepen that injury. The conditions necessary to cure it—meaningful counsel access and the ability to review records electronically—should be ordered now.

## V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions.

A federal prosecutor represents a sovereign whose interest "is not that it shall win a case, but that justice shall be done;" the prosecutor may strike hard blows but "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Federal prosecutors are bound by the rules of professional conduct of the State in which they practice. 28 U.S.C. § 530B (the McDade Amendment). North Carolina's Rules of Professional Conduct accordingly govern the prosecutors here, including the special responsibilities of a prosecutor and the prohibition on conduct that is prejudicial to the administration of justice. N.C. R. Prof'l Conduct r. 3.8; N.C. R. Prof'l Conduct r. 8.4.

Measured against those standards, the conduct described in the declaration is deeply troubling. Demanding that opposing counsel strike a protected filing from the public docket—and threatening a breach of the plea agreement to coerce that result—uses the prosecutor's unique leverage not to do justice but to suppress advocacy adverse to the prosecutor personally. Presenting years-old victim statements gathered before restitution was paid as though they were current and then leveraging custodial accommodations to discourage Defendant from contesting the restitution accounting, compound the concern. AUSA Daniel Ryan and Trial Attorney Lyndie Freeman are the officers responsible for this course of conduct, which the Court should not condone.

## VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government.

The prosecutors who engaged in the conduct described above can no longer fairly serve as the Government's advocates, because they are now necessary witnesses to the very facts the Court must evaluate. The demand that Defendant's emergency motion be removed from the docket, the threat to treat that filing as a breach of the plea agreement, and the presentation at sentencing of years-old victim statements are events known firsthand to AUSA Daniel Ryan and Trial Attorney Lyndie Freeman. A lawyer who is likely to be a necessary witness shall not act as advocate in the proceeding. N.C. R. Prof'l Conduct r. 3.7; see 28 U.S.C. § 530B. The advocate-witness conflict is

squarely presented here, and it cannot be cured by the same attorneys continuing to litigate the propriety of their own conduct.

These prosecutors also have a personal stake that conflicts with the Government's overriding duty to see that justice is done. The filing they sought to suppress accused Ms. Freeman personally of vindictiveness; their response was to threaten Defendant rather than to address the accusation through the orderly processes of the Court. A prosecutor who reacts to a protected, personally adverse filing by wielding the plea's breach mechanism is no longer the disinterested representative of the sovereign the law requires. *See Berger v. United States*, 295 U.S. at 88. That personal interest is itself a disqualifying conflict.

Accordingly, and pursuant to the Court's supervisory authority to protect the integrity of the proceedings before it, the prosecutors who engaged in the conduct described herein—including AUSA Daniel Ryan and Trial Attorney Lyndie Freeman—should be replaced with conflict-free counsel for the United States: attorneys who were not personally involved in, and are not witnesses to, that conduct, and who can fairly discharge the Government's duty to do justice in the restitution proceedings.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order:

(a) Directing that Defendant not be designated or transferred to Bureau of Prisons custody until the final restitution hearing in this case has been completed; or, in the alternative, directing that Defendant be held only at a facility that affords him adequate access to a computer, the internet, spreadsheet software, his financial records, and reasonable daily access to his counsel;

(b) Finding that meaningful daily access to counsel, to a computer, the internet, and spreadsheet software, and to the relevant financial records is necessary for Defendant to receive due process and to participate as the MVRA contemplates in the determination of restitution, offsets, and credits;

(c) Enforcing the access-related provisions of the plea agreement and the Order appointing the Special Master, and stating expressly that Defendant is entitled to reasonable daily access to counsel and to computer and internet resources sufficient to prepare his restitution submissions;

(d) Directing that the practice of moving Defendant to facilities at which he has no computer or internet access—and which thereby impair his ability to defend his restitution offsets—be discontinued immediately;

(e) Directing that no further sale or liquidation of Defendant's assets occur prior to the Court's final restitution determination, so that the offsets and credits at issue may be adjudicated before any further disposition of assets; acknowledging that Defendant's access—to counsel, to a computer and the internet and his records, and to a reasonable place and date of confinement during the restitution phase—rests on his constitutional rights to counsel, to due process, and to access the courts, and is not contingent on his cooperation with any asset-sale or liquidation process; and expressly directing that counsel for the United States, including the Assistant United States Attorney, shall not use Defendant's access (or his reporting date or place of confinement) as a lever to obtain his cooperation or to discourage his exercise of those rights;

(f) Directing that the prosecutors who engaged in the conduct described in this motion—including Assistant United States Attorney Daniel Ryan and Trial Attorney Lyndie Freeman—be replaced with conflict-free counsel for the United States who were not personally involved in, and are not witnesses to, that conduct; and

(g) Granting such other and further relief as the Court deems just and proper.

Respectfully submitted, this 15th day of June, 2026.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

## CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 6 /15/26

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| United States of America,<br>v.<br>Greg E. Lindberg, *et al.*,<br>*Defendants*. | No. 5:19-cr-22 |

| | |
|---|---|
| United States of America,<br>v.<br>Greg E. Lindberg,<br>*Defendant*. | No. 3:23-cr-48 |

**DEFENDANT'S EMERGENCY MOTION TO ENFORCE THE PLEA AGREEMENT AND THE ORDER APPOINTING THE SPECIAL MASTER, TO PRESERVE HIS DUE-PROCESS AND COUNSEL-ACCESS RIGHTS IN THE PENDING RESTITUTION PROCEEDINGS, AND TO REQUIRE THAT THE GOVERNMENT BE REPRESENTED BY CONFLICT-FREE COUNSEL**

# TABLE OF CONTENTS


Table of Contents ........ 2

Table of Authorities ........ 3

Introduction and Request for Expedited Consideration ........ 5

Statement of Facts ........ 5

Argument ........ 6

I. The Government May Not Treat Protected Advocacy as a Breach of the Plea Agreement; Doing So Is Prosecutorial Vindictiveness. ........ 6

II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced. ........ 7

III. Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records. 8

IV. Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights. ........ 11

V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions. ........ 12

VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government. ........ 12

Conclusion and Relief Requested ........ 13

Certification Regarding Use of Artificial Intelligence ........ 16

Certificate of Service ........ 17

# TABLE OF AUTHORITIES

**Cases**

*Berger v. United States,*
295 U.S. 78 (1935)....................12, 13

*Blackledge v. Perry,*
417 U.S. 21 (1974)....................6

*Bounds v. Smith,*
430 U.S. 817 (1977)....................11

*Ellingburg v. United States,*
607 U.S. ___ (2026)....................8

*In re McNulty,*
597 F.3d 344 (6th Cir. 2010)....................10

*In re Zetteler,*
No. 26-1749 (4th Cir. June 13, 2026)....................10

*Lewis v. Casey,*
518 U.S. 343 (1996)....................11

*Mathews v. Eldridge,*
424 U.S. 319 (1976)....................9

*North Carolina v. Pearce,*
395 U.S. 711 (1969)....................6

*Robers v. United States,*
572 U.S. 639 (2014)....................10

*Santobello v. New York,*
404 U.S. 257 (1971)....................7

*United States v. Goodwin,*
457 U.S. 368 (1982)....................7

**Constitutional Provisions**

U.S. Const. amend. V....................9
U.S. Const. amend. VI....................9

**Statutes**

18 U.S.C. § 3663A....................5, 9
18 U.S.C. § 3663A(a)(2)....................10
18 U.S.C. § 3664....................9

18 U.S.C. § 3664(e) .....7
18 U.S.C. § 3664(j)(2) .....9
28 U.S.C. § 530B .....12

**Rules**

N.C. R. Prof'l Conduct r. 3.7 .....12
N.C. R. Prof'l Conduct r. 3.8 .....12
N.C. R. Prof'l Conduct r. 8.4 .....12

## INTRODUCTION AND REQUEST FOR EXPEDITED CONSIDERATION

Defendant Greg E. Lindberg respectfully moves this Court on an emergency basis for relief necessary to preserve his constitutional and statutory rights while the restitution phase of this case remains open. The supporting facts are set out in the accompanying *Declaration of Greg E. Lindberg* ("Lindberg Decl."), filed herewith. This motion is grounded on the plea agreement entered in this case, the Order appointing the Special Master, the Fifth and Sixth Amendments to the United States Constitution, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A and 3664, and this Court's inherent and statutory authority.

Expedited consideration is warranted. The final restitution hearing has not been scheduled, yet Defendant faces imminent designation and transfer by the Bureau of Prisons ("BOP") to a facility at which he has no access to a computer, the internet, spreadsheets, or the financial records he needs to litigate the disputed offsets, and only limited access to counsel. Once such a transfer occurs, the harm to Defendant's ability to be heard on a restitution figure exceeding one and one-half billion dollars—against which he asserts offsets approaching $2.9 billion—cannot meaningfully be undone. (Lindberg Decl. ¶¶ 2, 10–15.)

## STATEMENT OF FACTS

Consistent with the requirement of Local Criminal Rule 47.1, the operative facts are established by the accompanying affidavit and are summarized here only for the Court's convenience. Defendant rests the factual basis of this motion exclusively on the Lindberg Decl. and not on any extrinsic correspondence.

At sentencing on May 26, 2026, this Court expressly rejected the Government's position—advanced by Assistant United States Attorney Daniel Ryan—that Defendant be housed at the Pike County Detention Center ("PCDC") for 90 days only, until the final restitution hearing. (Lindberg Decl. ¶ 3.) Notwithstanding that ruling, within a day of sentencing Defendant was moved to the Pike County Detention Center (PCDC) for approximately one day and then transferred again. (Id. ¶ 4.)

After Defendant, through counsel, filed his first emergency motion to stay all asset sales—a filing that raised prosecutorial vindictiveness, including the reuse at sentencing of victim statements collected roughly two and one-half years earlier, before restitution had been paid, presented as though current by Department of Justice Trial Attorney Lyndie Freeman—Ms. Freeman contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement. (Id. ¶¶ 5–6.)

Most recently, on June 12, 2026, the Government, through AUSA Ryan, communicated that it is reconsidering whether it will continue to support Defendant's request to delay reporting to BOP—a request the Government had previously premised on Defendant's cooperation with the Special Master. The reporting-delay question is presently before United States Magistrate Judge Keesler, and the Government's proposed wording both shortens the period to 90 days and walks back the understanding reflected at the sentencing hearing. (Lindberg Decl. ¶¶ 7–8.)

Defendant's prior counsel at Katten Muchin Rosenman LLP was informed by the Special Master, at or about the time the requested waiver (ECF No. 537) was refused, that its fees would not be paid until after year-end. To continue representing Defendant through the end of the year, that firm would have had to advance an estimated $2 to $2.5 million in unpaid credit. (Id. ¶ 9.) Defendant's access to counsel and to the tools of self-representation is now materially impaired: he is held in a single cell with no access to any computer, the internet, or spreadsheet software, and his contact with counsel is largely confined to in-person visits and video calls on which complex restitution positions cannot adequately be developed. (Id. ¶¶ 10–11.)

## ARGUMENT

### I. The Government May Not Treat Protected Advocacy as a Breach of the Plea Agreement; Doing So Is Prosecutorial Vindictiveness.

A defendant has the right to seek relief from the courts and to pursue an appeal without governmental retaliation, and due process forbids vindictiveness against a defendant for having exercised those rights. *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969); *Blackledge v. Perry*,

417 U.S. 21, 27–28 (1974). That prohibition on actual vindictiveness applies with full force after trial-level proceedings are complete, where retaliation for the exercise of post-conviction rights is of special concern. *United States v. Goodwin*, 457 U.S. 368, 372–84 (1982). Defendant does not rest on any presumption of vindictiveness; the sequence here establishes actual retaliation.

Here, the sequence speaks for itself. Defendant filed an emergency motion that placed on the public record his contention that the prosecution had acted vindictively including by recycling stale, pre-payment victim statements at sentencing as if they were current. The named prosecutor whose conduct the motion challenged, Trial Attorney Lyndie Freeman, then demanded that the motion be stricken from the docket and threatened a breach of the plea agreement if it was not. (Lindberg Decl. ¶¶ 5–6.) That is not a neutral enforcement of the plea; it is the use of the breach mechanism to suppress a protected filing that was adverse to the very lawyer making the threat. The timing—an adverse demand made directly in response to a protected, post-conviction filing implicating the prosecutor personally—establishes actual prosecutorial vindictiveness—and, at the very least, the "realistic likelihood of vindictiveness" the Constitution forbids.

The Government compounded the problem on June 12, 2026, when it signaled that it may withdraw support for Defendant's reporting-delay request in apparent response to Defendant's recent exercise of his rights—a request the Government had previously supported and had tied to Defendant's cooperation with the Special Master. (Id. ¶¶ 7–8.) Conditioning a custodial accommodation on a defendant's agreement to abandon protected advocacy, or penalizing him for declining to do so, is an unconstitutional condition that cannot stand.

## II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced.

A plea agreement is enforced according to its terms because a defendant's waiver of his most fundamental rights rests upon the Government's promises. When a guilty plea rests in any significant degree on a promise of the prosecution, that promise "must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). The obligation runs to the entire prosecution team; the staff

of a prosecutor's office bears the burden of "letting the left hand know what the right hand is doing." *Id.* at 262.

Defendant's plea agreement and the Order appointing the Special Master contemplate that Defendant will participate in, and cooperate with, the orderly marshaling and accounting of assets—participation that is impossible without access to counsel, to a computer and the internet, and to the financial records underlying the disputed offsets. (Lindberg Decl. ¶¶ 9–12, 15.) The Government cannot demand cooperation under the agreement while simultaneously engineering conditions that make cooperation and defense impossible, and it cannot recast Defendant's insistence on a full accounting before assets are liquidated as a "breach." The promises that induced the plea must be honored, and the access necessary to perform under the agreement must be preserved.

Critically, the access Defendant invokes is not a discretionary courtesy or a bargaining chip. The access provisions of the plea agreement exist to protect Defendant's constitutional rights—to the assistance of counsel, to due process, and to access the courts—as the restitution phase proceeds; they are not a quid pro quo for Defendant's cooperation with an out-of-order, premature liquidation of assets, and the Government may not treat them as one. Conditioning Defendant's access to counsel, computers, the internet, and records on his cooperation with asset sales, or withdrawing that access because he has exercised protected rights, converts a constitutional guarantee into leverage and invokes the very violations described throughout this motion. The concern is heightened now that Defendant is represented by new counsel, who must absorb a voluminous and technical restitution record—making timely, meaningful, and daily access all the more essential, not less.

## III. Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records.

Restitution under the MVRA is criminal punishment. *Ellingburg v. United States*, 607 U.S. ___, No. 24-482 (Jan. 20, 2026). Because the restitution Defendant faces is punishment—here, a

preliminary figure exceeding $1.655 billion (Doc. 161)—the full protections of due process attach to the proceedings that fix it. The MVRA itself guarantees procedural participation: it requires the court to resolve disputes and places defined burdens on the parties. 18 U.S.C. § 3664; see also 18 U.S.C. § 3663A. The statute also forbids double recovery: a victim's losses must be reduced by amounts later recovered, 18 U.S.C. § 3664(j)(2)—the precise issue Defendant seeks to litigate through his offsets and his request for a full accounting before any further liquidation.

The process due is measured by weighing the private interest at stake, the risk of erroneous deprivation under the current procedures and the value of additional safeguards, and the Government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). At its core, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 333. Every factor favors Defendant. The private interest—liberty and more than a billion dollars in punishment—is enormous. The risk of error is acute: the offsets turn on technical financial questions (for example, the treatment of approximately $1 billion in AAA-rated zero-coupon bonds and whether losses were caused by a forced sale rather than by Defendant's conduct) that cannot be presented without computers, the internet, records, spreadsheets, and counsel who can absorb them. (Lindberg Decl. ¶¶ 11–12, 15.) The Government has no legitimate interest in a restitution figure inflated by the denial of these basic tools. U.S. Const. amend. V.

The burden of proof makes access indispensable. Under the MVRA, the Government bears the burden of proving the amount of the victims' loss, but the burden of demonstrating entitlement to the offsets and credits a defendant asserts rests on the defendant. 18 U.S.C. § 3664(e). It is therefore Defendant who must marshal the records and analysis establishing, among other things, that the losses were caused by a forced sale rather than by the offense of conviction, and that amounts have been or will be recovered that must reduce any restitution. Denying Defendant the counsel, the computer, the internet, and the financial records needed to carry that statutory burden does not lighten it—it ensures that it cannot be met, and that the resulting restitution figure will be inflated by default rather than fixed on the merits.

These offsets are not collateral; they go to the heart of proximate causation, which the MVRA makes essential. Restitution reaches only those losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Supreme Court has confirmed that restitution must be reduced by the amount a victim actually realizes upon selling property, and that a defendant is not the proximate cause of a decline in value that flows from the victim's own decision whether and when to dispose of assets. *Robers v. United States*, 572 U.S. 639 (2014). A restitution figure measured in the billions—here, the approximately $1.6 billion stated in the Preliminary Order—can sound, at first, as though every dollar reflects loss the Defendant proximately caused. It does not. Whether the losses were instead caused by a fire-sale liquidation of AAA-rated, gold-equivalent securities that should have been held to maturity, or by the blocking of value-preserving transactions such as the proposed Ares sale, is precisely the causation inquiry the statute requires—an inquiry into who sold the assets, on what terms, and with what intention. (Lindberg Decl. ¶¶ 11–12.) The Government's demands—that Defendant's filing be pulled from the docket, and that he be designated and transferred to a Federal Prison Camp (FPC) in violation of this Court's own ruling at sentencing—operate to strip Defendant of the ability to develop and present this causation and offset evidence at the very moment the record is being made.

Nor is the danger of uncounted, unauthorized liquidation hypothetical. Motions described the sale of the Beckett affiliate, valued at approximately $133 million, without court approval. (Lindberg Decl. ¶ 12.) Assets of that magnitude cannot be sold out from under the restitution determination without a full accounting; that is precisely why no further sale or liquidation should occur before restitution is finally determined.

This is not an abstract point; the same causation screen has already been applied in this very case. In denying a crime victim's mandamus petition arising directly out of the Preliminary Order of Restitution, the Fourth Circuit reaffirmed that restitution reaches only harm "directly and proximately" caused by the offense, and that a claimed loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (unpublished) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th

Cir. 2010)). The panel sustained the exclusion of a claimant precisely because its losses were not closely tied to the conduct inherent in Defendant's offense. Because that decision was entered in this very case, it is the law of the case and governs the restitution determination here; and the causation screen it applied cuts both ways: the causation screen that kept losses out of the restitution figure must equally keep out losses charged against Defendant that flowed not from the offense of conviction but from the rehabilitator's fire-sale of gold-equivalent securities and the blocking of value-preserving sales. Offsets and causation are therefore not "collateral" to the restitution inquiry; under the law governing this case, they define it, and Defendant must be given the access necessary to litigate them.

## IV. Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights.

The right to the assistance of counsel extends through sentencing, of which restitution is a part. U.S. Const. amend. VI. Independently, the constitutional right of access to the courts guarantees a person held in custody a reasonable opportunity to prepare and present nonfrivolous legal claims, and to obtain relief he must show actual injury—that the challenged conditions have hindered his efforts to pursue such a claim. *Lewis v. Casey*, 518 U.S. 343, 350–51 (1996); see also *Bounds v. Smith*, 430 U.S. 817 (1977) (recognizing the right of meaningful access to the courts), as limited by *Lewis*, 518 U.S. at 350–55.

Defendant readily makes that showing. He is litigating live, plainly nonfrivolous matters—objections to a multi-billion-dollar restitution recommendation, offsets approaching $2.9 billion, and a pending appeal—yet he is confined where he cannot touch a computer, cannot access the internet, cannot use the spreadsheets these issues demand, and cannot meet with counsel except in person or by video calls unsuited to complex financial analysis. (Lindberg Decl. ¶¶ 10–12, 15.) These restrictions are not incidental; they directly impede Defendant's ability to be heard on the very questions now before the Court, and a transfer to BOP designation would deepen that injury. The conditions necessary to cure it—meaningful counsel access and the ability to review records electronically—should be ordered now.

## V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions.

A federal prosecutor represents a sovereign whose interest "is not that it shall win a case, but that justice shall be done;" the prosecutor may strike hard blows but "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Federal prosecutors are bound by the rules of professional conduct of the State in which they practice. 28 U.S.C. § 530B (the McDade Amendment). North Carolina's Rules of Professional Conduct accordingly govern the prosecutors here, including the special responsibilities of a prosecutor and the prohibition on conduct that is prejudicial to the administration of justice. N.C. R. Prof'l Conduct r. 3.8; N.C. R. Prof'l Conduct r. 8.4.

Measured against those standards, the conduct described in the declaration is deeply troubling. Demanding that opposing counsel strike a protected filing from the public docket—and threatening a breach of the plea agreement to coerce that result—uses the prosecutor's unique leverage not to do justice but to suppress advocacy adverse to the prosecutor personally. Presenting years-old victim statements gathered before restitution was paid as though they were current and then leveraging custodial accommodations to discourage Defendant from contesting the restitution accounting, compound the concern. AUSA Daniel Ryan and Trial Attorney Lyndie Freeman are the officers responsible for this course of conduct, which the Court should not condone.

## VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government.

The prosecutors who engaged in the conduct described above can no longer fairly serve as the Government's advocates, because they are now necessary witnesses to the very facts the Court must evaluate. The demand that Defendant's emergency motion be removed from the docket, the threat to treat that filing as a breach of the plea agreement, and the presentation at sentencing of years-old victim statements are events known firsthand to AUSA Daniel Ryan and Trial Attorney Lyndie Freeman. A lawyer who is likely to be a necessary witness shall not act as advocate in the proceeding. N.C. R. Prof'l Conduct r. 3.7; see 28 U.S.C. § 530B. The advocate-witness conflict is

squarely presented here, and it cannot be cured by the same attorneys continuing to litigate the propriety of their own conduct.

These prosecutors also have a personal stake that conflicts with the Government's overriding duty to see that justice is done. The filing they sought to suppress accused Ms. Freeman personally of vindictiveness; their response was to threaten Defendant rather than to address the accusation through the orderly processes of the Court. A prosecutor who reacts to a protected, personally adverse filing by wielding the plea's breach mechanism is no longer the disinterested representative of the sovereign the law requires. *See Berger v. United States*, 295 U.S. at 88. That personal interest is itself a disqualifying conflict.

Accordingly, and pursuant to the Court's supervisory authority to protect the integrity of the proceedings before it, the prosecutors who engaged in the conduct described herein—including AUSA Daniel Ryan and Trial Attorney Lyndie Freeman—should be replaced with conflict-free counsel for the United States: attorneys who were not personally involved in, and are not witnesses to, that conduct, and who can fairly discharge the Government's duty to do justice in the restitution proceedings.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order:

(a) Directing that Defendant not be designated or transferred to Bureau of Prisons custody until the final restitution hearing in this case has been completed; or, in the alternative, directing that Defendant be held only at a facility that affords him adequate access to a computer, the internet, spreadsheet software, his financial records, and reasonable daily access to his counsel;

(b) Finding that meaningful daily access to counsel, to a computer, the internet, and spreadsheet software, and to the relevant financial records is necessary for Defendant to receive due process and to participate as the MVRA contemplates in the determination of restitution, offsets, and credits;

(c) Enforcing the access-related provisions of the plea agreement and the Order appointing the Special Master, and stating expressly that Defendant is entitled to reasonable daily access to counsel and to computer and internet resources sufficient to prepare his restitution submissions;

(d) Directing that the practice of moving Defendant to facilities at which he has no computer or internet access—and which thereby impair his ability to defend his restitution offsets—be discontinued immediately;

(e) Directing that no further sale or liquidation of Defendant's assets occur prior to the Court's final restitution determination, so that the offsets and credits at issue may be adjudicated before any further disposition of assets; acknowledging that Defendant's access—to counsel, to a computer and the internet and his records, and to a reasonable place and date of confinement during the restitution phase—rests on his constitutional rights to counsel, to due process, and to access the courts, and is not contingent on his cooperation with any asset-sale or liquidation process; and expressly directing that counsel for the United States, including the Assistant United States Attorney, shall not use Defendant's access (or his reporting date or place of confinement) as a lever to obtain his cooperation or to discourage his exercise of those rights;

(f) Directing that the prosecutors who engaged in the conduct described in this motion—including Assistant United States Attorney Daniel Ryan and Trial Attorney Lyndie Freeman—be replaced with conflict-free counsel for the United States who were not personally involved in, and are not witnesses to, that conduct; and

(g) Granting such other and further relief as the Court deems just and proper.

Respectfully submitted, this 15th day of June, 2026.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

## CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 6 /15/26

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S MOTION FOR A DETERMINATION THAT NO RESTITUTION IS OWED, OR IN THE ALTERNATIVE FOR EXCLUSION AND OFFSET OF LOSSES NOT PROXIMATELY CAUSED BY THE OFFENSE OF CONVICTION, WITH INCORPORATED MEMORANDUM OF LAW

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ v

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 4

A. The Affiliated-loan Program Operated Under a Written Risk management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the Rehabilitator ........ 4

B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal ........ 5

C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance ........ 6

D. The 2018 KPMG and Houlihan Lokey valuations confirmed the loans were well secured ........ 7

E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business ........ 8

F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees ........ 10

G. A series of intervening acts destroyed value after October 2018 ........ 10

H. The Plea Agreement and Factual Basis ........ 11

I. The Special Master's recommendation and the Preliminary Order ........ 13

J. The Special Master has continued to dispose of estate assets during the restitution proceeding ........ 13

ARGUMENT ........ 14

I. Restitution is Limited to Actual Losses Proximately Caused by the Offense—a Limitation the Plea Agreement Preserves. ........ 14

A. *In re Zetteler* is the law of this case and fixes the governing proximate-cause standard ........ 16

II. No Loss Was Reasonably Foreseeable at Origination (Proximate Cause: Foreseeability) ........ 18

III. The Offense Conduct Procured No Official Or Agency Action, And So Did Not Cause The Loss (Proximate Cause: No Agency Action) ........ 21

IV. Intervening Superseding Causes Broke the Chain of Causation (Proximate Cause: Intervening Cause) ........ 24

A. The Government's interference with the Ares sale (November 2018) ........ 26

B. The Rehabilitator's refusal of the Oaktree transaction (February 2019) ........ 27

C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU) ........ 27

D. The Rehabilitator's pre-maturity fire-sale of the principal-protection bonds ........ 28

E. The Rehabilitator's refusal of the Montshire/Alban offer (2023) and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025). ........ 30

F. The Special Master's continuing asset dispositions (2026) ........ 30

V. "Risk" Is Not Actual Loss, And Restitution Is Capped At Actual Loss ........ 31

VI. The Government and the Special Master Did Not Carry the Section 3664(e) Burden ........ 35

VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction ........ 37

VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation ........ 38

IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor ........ 39

CONCLUSION AND RELIEF REQUESTED ........ 39

ARTIFICIAL INTELLIGENCE CERTIFICATION ........ 41

CERTIFICATE OF SERVICE ........ 42

## TABLE OF AUTHORITIES

CASES | Page No.

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) .......... 18, 33

*Arizona v. California*,
460 U.S. 605 (1983) .......... 17

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 37

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 22

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 18, 32, 33, 39

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*,
343 F.3d 189 (2d Cir. 2003) .......... 20

*Hughey v. United States*,
495 U.S. 411 (1990) .......... 14, 16, 32

*In re McNulty*,
597 F.3d 344 (6th Cir. 2010) .......... 17

*In re Zetteler*,
No. 26-1749 (4th Cir. June 13, 2026) .......... 16, 17, 31

*Irizarry v. United States*,
553 U.S. 708 (2008) .......... 15, 28

*Lagos v. United States*,
584 U.S. 577 (2018) .......... 15

*McCutcheon v. FEC*,
572 U.S. 185 (2014) .......... 22

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... 21

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*,
No. 24-621, 2026 WL 1868932 (U.S. June 30, 2026) ........................................ 22

*Paroline v. United States*,
572 U.S. 434 (2014) ........................................ 14, 31

*Robers v. United States*,
572 U.S. 639 (2014) ........................................ 14, 29, 31, 33, 34, 38

*Snyder v. United States*,
603 U.S. 1 (2024) ........................................ 21

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) ........................................ 18, 33

*United States v. Alalade*,
204 F.3d 536 (4th Cir. 2000) ........................................ 38

*United States v. Blake*,
81 F.3d 498 (4th Cir. 1996) ........................................ 15, 18

*United States v. Boccagna*,
450 F.3d 107 (2d Cir. 2006) ........................................ 34, 38

*United States v. Broughton-Jones*,
71 F.3d 1143 (4th Cir. 1995) ........................................ 15, 25

*United States v. Coats*,
487 B.R. 648 (E.D.N.C. 2013) ........................................ 34

*United States v. Davenport*,
445 F.3d 366 (4th Cir. 2006) ........................................ 15, 28

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) ........................................ 16

*United States v. Fike*,
140 F.4th 351 (6th Cir. 2025) ........................................ 34

*United States v. Freeman*,
741 F.3d 426 (4th Cir. 2014) ........................................ 15, 25

*United States v. Gallant*,
537 F.3d 1202 (10th Cir. 2008) ........................................ 36

*United States v. Gibbens*,
25 F.3d 28 (1st Cir. 1994) ........ 26

*United States v. Goodrich*,
12 F.4th 219 (2d Cir. 2021) ........ 25

*United States v. Harvey*,
532 F.3d 326 (4th Cir. 2008) ........ 32

*United States v. Harvey*,
791 F.2d 294, 300 (4th Cir. 1986) ........ 15

*United States v. Henoud*,
81 F.3d 484 (4th Cir. 1996) ........ 18

*United States v. Hoyle*,
33 F.3d 415 (4th Cir. 1994) ........ 34

*United States v. Jesenik*,
702 F. Supp. 3d 1024 (D. Or. 2023) ........ 35

*United States v. Jordan*,
509 F.3d 191 (4th Cir. 2007) ........ 15, 16

*United States v. Karam*,
201 F.3d 320 (4th Cir. 2000) ........ 18, 35

*United States v. Lindberg*,
39 F.4th 151 (4th Cir. 2022) ........ 21

*United States v. Llamas*,
599 F.3d 381 (4th Cir. 2010) ........ 16

*United States v. Newsome*,
322 F.3d 328 (4th Cir. 2003) ........ 16

*United States v. Ocasio*,
750 F.3d 399 (4th Cir. 2014) ........ 25

*United States v. Qurashi*,
634 F.3d 699 (2d Cir. 2011) ........ 34

*United States v. Ritchie*,
858 F.3d 201 (4th Cir. 2017) ........ 26

*United States v. Shephard*,
892 F.3d 666 (4th Cir. 2018) ........ 18

*United States v. Smerling*,
No. 21-cr-317, 2022 WL 1806300 (S.D.N.Y. June 1, 2022) ........ 35

*United States v. Squirrel*,
588 F.3d 207 (4th Cir. 2009) ........ 25, 31

*United States v. Steele*,
897 F.3d 606 (4th Cir. 2018) ........ 32, 36, 38

*United States v. Stein*,
846 F.3d 1135 (11th Cir. 2017) ........ 25, 31

*United States v. Stone*,
866 F.3d 219 (4th Cir. 2017) ........ 34

*United States v. Tyler*,
767 F.2d 1350 (9th Cir. 1985) ........ 25, 39

<u>FEDERAL STATUTES</u> <u>Page No.</u>

18 U.S.C. § 3663A(a)(2) ........ 14, 17

18 U.S.C. § 3663A(b)(1)(B) ........ 33, 34, 38, 39

18 U.S.C. § 3663A(c)(3)(B) ........ 36

18 U.S.C. § 3664(e) ........ 4, 18, 35, 37, 39

18 U.S.C. § 3664(f)(1)(A) ........ 14, 31

<u>OTHER AUTHORITIES</u> <u>Page No.</u>

S. Rep. No. 104-179 (1995), reprinted in 1996 U.S.C.C.A.N. 924 ........ 15, 24, 25, 36, 38

## PRELIMINARY STATEMENT

Defendant Greg E. Lindberg respectfully submits this motion for a determination that no restitution is owed, or in the alternative for the exclusion and offset of losses not proximately caused by the offense of conviction which results in an overpayment of $2.89 billion. The Preliminary Order of Restitution fixes Mr. Lindberg's restitution at $1,655,000,000.[1] That figure cannot stand, for three independent reasons, any one of which is sufficient.

*First*, no loss on the affiliated investments was reasonably foreseeable to Mr. Lindberg at the time those investments were originated. The investments were made under a written, board-approved risk-management framework; they were personally guaranteed by Mr. Lindberg himself; they were backed by approximately one billion dollars of zero-coupon bonds purchased to protect principal; the regulator praised Mr. Lindberg's handling of regulatory questions in the relevant period; and the change in law that disfavored affiliated investments was not enacted until 2019, after origination. Beyond that, Houlihan Lokey, one of the largest valuation companies in the country, provided contemporaneous analysis concluding that the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, and KPMG provided contemporaneous analysis showing that there was over $1 billion of equity supporting the loans (Exs. E2 and E3 KPMG Valuations and HL (Houlihan Lokey, Jan. 18, 2018) & E (KPMG, Aug. 24, 2018)). As the sole owner of

[1] The Court has yet to determine, *de novo*, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

the insurance companies and of the operating companies that received the loans, Mr. Lindberg would have seen his entire $1 billion investment in his insurance companies and his entire investment in his non-insurance operating companies wiped out if there were a loss on the affiliated loans. Any one of the foregoing facts suffices to establish that there was no reasonably foreseeable loss to Mr. Lindberg when he oversaw the origination of the affiliated loans. No reasonable person, viewing these facts together, could have expected the safeguards Mr. Lindberg put in place to fail all at once amid the regulatory and prosecutorial onslaught that Mr. Lindberg and his businesses have endured over the last seven years. Someone who reasonably expects a loss on an investment does not personally guarantee every penny of that investment, underwrite it conservatively at 50% loan-to-value, purchase insurance against any loss, implement a robust risk-management program, invest $1 billion of his own capital as equity to support that investment and receive strong praise from his regulator on how he was handling regulatory issues. Under the Mandatory Victims Restitution Act ("MVRA") any loss must be reasonably foreseeable to form the basis for restitution. That was not the case here.

*Second*, and independently, any loss that later materialized was caused not by Mr. Lindberg's conduct but by a chain of intervening acts by independent third parties—the Government, the court-appointed Rehabilitator, and the Special Master—each occurring after Mr. Lindberg ceded control in October 2018, and some continuing to the present: the Government's interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban

transactions; the coerced ten-year hold imposed by the June 2019 MOU; the fire-sale of the zero-coupon bond portfolio that had secured the affiliated-loan principal; and the Special Master's continuing disposition of estate assets—before any final restitution determination, in the case of the Beckett transaction without court approval or accounting, and while the Special Master's own compensation is paid from the same assets he sells. Those intervening causes break the chain between Mr. Lindberg's conduct and any loss. Under the MVRA, any loss must be closely related to and proximately caused by the defendant's conduct. The foregoing string of events shows the opposite: the losses occurred after Mr. Lindberg ceded control in October 2018 and were caused by independent decisions of third parties beyond his control.

*Third*, this Court has characterized the "real loss" in this case as "risk." Restitution under the MVRA is measured by, and capped at, a victim's *actual* loss. Risk is not actual loss—particularly where the policyholders the statute is designed to protect have been made whole and confirmed paid in full. Moreover, the "risk" the Court identified was not unlawful: the affiliated investments were lawful when made, were approved by the regulator, and were within prevailing industry practice. Lawful risk cannot be the predicate for a penal, loss-measured restitution award.

Mr. Lindberg accepts responsibility for his offense and does not seek to disturb his Plea Agreement. He agreed, in Paragraph 10(a), to pay restitution for harm "caused by the defendant's criminal conduct." Doc. 40. He stands by that agreement. But that agreement reaches only harm his conduct *caused*; by its own terms it does not reach losses inflicted years later by an intervening actor, and it does not convert

"risk" into a compensable, realized loss. The proximate-cause limitation that the Supreme Court and the Fourth Circuit enforce is the very limitation Paragraph 10(a) imposes by the words "caused by the defendant's criminal conduct." *Id.*

Mr. Lindberg respectfully requests a determination, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by Mr. Lindberg, and that net restitution is zero. In the alternative, he requests that the Court exclude the intervening-cause losses identified in Part IV and credit the offsets identified in Part VIII, which independently reduce any obligation to zero.

## STATEMENT OF FACTS

### A. The affiliated-loan program operated under a written risk-management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the rehabilitator.

Mr. Lindberg's North Carolina insurers operated under a Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017 (Ex. C), and continuously updated (see Ex. E5 for the April 14, 2018 revision). The Policy required, among other controls: senior-secured first-lien positions on "all assets and cash flows of the borrower"; a minimum credit rating of "B-" or equivalent from an SEC-approved NRSRO for every loan; a weighted-average portfolio rating of "BB" or higher with portfolio leverage under four times; third-party arm's-length pricing opinions; perfection certificates; quarterly risk-based-capital calculations; and annual cash-flow testing "to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements" (Ex. C, Phases 1–3). The Policy recited a "zero default track record" over twenty-five years and committed Mr. Lindberg's affiliates

to "prepay any underperforming loan using reserve capital" (*Id.*). This is not the architecture of a person who anticipates loss.

In fact, prior to the transfer of control of Mr. Lindberg's insurance companies to the Rehabilitator in October 2018, there were no defaults on the affiliate loans. A reasonable person does not expect losses on an investment program that, while he controlled it, had experienced no defaults—let alone any losses.

**B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal.**

Mr. Lindberg invested roughly one billion dollars of his own capital into the insurance group and took no dividends from the insurers (See Ex. A11). Independent analysis by Berkeley Research Group ("BRG") also confirms capital contributions exceeding $377 million and no dividends to Mr. Lindberg (Ex. D). He personally guaranteed the affiliates' obligations to the insurers totaling approximately $2.39 billion under the March 11, 2019, Amended and Restated Backstop Agreement, without any regulatory requirement to do so. (Ex. B8) And in May 2018 he directed the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds—held inside Principal Protected Notes—as dollar-for-dollar principal-loss insurance that, if held to maturity, would have repaid the affiliated-loan principal in full. (Supp. Statement of Facts ¶¶ 27–34 (Doc. 174) & Exs. H2, I2, and I5) A person who reasonably foresees loss does not invest $1 billion of his own capital, guarantee billions in additional obligations, forgo all dividends, and purchase par-payable principal protection against the very loss he supposedly foresees.

### C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance.

The North Carolina Department of Insurance ("NCDOI") approved the affiliate-investment concentration at issue. As early as a September 2014 presentation (see Ex. A) and confirmed in the NCDOI's April 11, 2016 annual-statement Review Letter from Senior Financial Analyst Jessica Price, CPA, CFE, the NCDOI recited and agreed to the negotiated regulatory arrangement, including the approximately forty-percent ceiling on affiliated investments (NCDOI Review Letter / Ex. A12). That concentration remains within prevailing industry practice: U.S. life and annuity insurers reported approximately $413 billion in affiliated investments in 2025—roughly twice the 2020 figure (See Ex. B24). Affiliate investments have become standard practice for many of the largest names in the insurance business, including Blackstone, Brookfield, and KKR. Data published by Apollo illustrates that some large life insurers have up to 35 to 43 percent of their assets in affiliated investments, like the 40 percent limit that Mr. Lindberg proposed to the NCDOI in 2014 (See Ex. B5). That many large life insurers have since adopted an affiliate-investment strategy shows that the strategy Mr. Lindberg proposed was neither novel nor particularly controversial; it was an effective way to manage insurance-company assets in a rising-interest-rate environment. (See Ex. B5)

The statutory limitation on affiliated investments was not enacted until 2019—after the investments were originated. See Doc. 152. On March 9, 2018, Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state

regulators today" (Ex. B6). The same message reflects that Mr. Lindberg was then working to "engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans" (*id.*)—actively working to reduce the affiliated-loan portfolio through third-party capital. In short, Mr. Lindberg was continuously responding to regulatory demands related to affiliated investments. This is not the behavior of someone who reasonably foresees a loss on these investments.

### D. The 2018 KPMG and Houlihan Lokey valuations confirmed the loans were well secured.

In 2018, two of the nation's largest and most widely trusted valuation firms—KPMG and Houlihan Lokey—analyzed Mr. Lindberg's assets. Both concluded that the asset values securing the affiliated loans exceeded the balances due on those loans by over $1 billion, and that the loans were conservatively underwritten at approximately fifty-percent loan-to-value (Exs. E2 and E3 (KPMG, Aug. 24, 2018) & HL (Houlihan Lokey, Jan. 18, 2018)). Two well-known and well-trusted authorities concluded that no loss was reasonably foreseeable on these loans in 2018 because they were backed by asset values significantly in excess of the loan amounts. Mr. Lindberg expended approximately $1.8 million on this valuation work, which spans over 380 pages (See Exs. E2 and E3). Given the nationally recognized reputations of KPMG and Houlihan Lokey, it was entirely reasonable for Mr. Lindberg to rely on their work concluding that no loss was foreseeable.

The timing is significant. KPMG completed its valuation work in August 2018, shortly before Mr. Lindberg ceded control of the insurers to the Rehabilitator in October 2018. At all times before that change of control, trusted national authorities

concluded that no loss was reasonably foreseeable on the affiliated loans. At all times after the change of control, the decision to hold the loans for ten years—rather than execute any of the transactions Mr. Lindberg proposed that would have repaid them in full—was the Rehabilitator's, not Mr. Lindberg's.

Two of these contemporaneous work products are submitted herewith and are described by their own terms: the Houlihan Lokey report dated January 18, 2018 (Ex. E3), which documents each affiliated investment held by Mr. Lindberg's insurers, including enterprise-value-coverage and loan-to-value analysis; and the KPMG valuations (Ex. E2). Each report's stated scope and assumptions appear on its face.

KPMG's August 24, 2018 valuations confirm this point. KPMG separately valued the twenty-one Eli Global operating companies—the borrowers whose enterprise value secured the affiliated loans—at an aggregate business-enterprise value of approximately $2.45 billion, including Global Health Technology Group at $1.2 billion and American Academy Holdings at $900 million, in addition to approximately $1.08 billion of insurance-entity equity value (Ex. E2).

### E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business.

The genesis of the entire case against Mr. Lindberg predates Commissioner Mike Causey's inauguration as North Carolina Insurance Commissioner. In December 2016—weeks before taking office—Causey identified Mr. Lindberg, a major financial supporter of Causey's electoral opponent Wayne Goodwin, as a political problem and "significant impediment" to be eliminated. Witness statements

establish that Causey plotted to "dismantle" Mr. Lindberg's insurance operations even before assuming any official authority (See Exs. A3, A3.1, A4).

According to one witness, Causey stated that he "was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election" and that Causey "saw Lindberg as a significant impediment to winning the [upcoming 2020] election against Goodwin." The same witness stated that "Causey said that he had a person in mind" to help him eliminate Lindberg as a political threat, noting that "she had been at the DOI a long time" and "she already didn't like Lindberg and would know how to go about dealing with [Lindberg's] companies and dismantling them" (*Id*.).

A second witness corroborated these statements: "Causey explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won. Causey said that because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him" (See Exs. A3, A3.1, A4).

This all casts doubt on the legitimacy of the subsequent rehabilitation proceedings. Moreover, because the affiliated investments had already received NCDOI approval, the severity of these regulatory actions was entirely unforeseeable.

### F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees.

In October 2018, control of the North Carolina insurers passed to the court-supervised Rehabilitator. Every event material to the claimed loss occurred after that date and was within the control of the Rehabilitator and the Government, rather than Mr. Lindberg. The record reflects that over $165 million in fees have been paid from the insurance-company estates to the Rehabilitator and others since June 2019. This includes an estimated $25 million in compensation to the Rehabilitator, an estimated $30 million paid to the Williams Mullen law firm, and ongoing monthly fees of approximately $2.5 million to the Rehabilitator and various advisors (See Ex. M).

### G. A series of intervening acts destroyed value after October 2018.

*The Blocked Ares Sale.* On November 22, 2018, just weeks after becoming aware of the federal investigation and before he was charged with any offense, Mr. Lindberg signed an exclusive letter of intent to sell his North Carolina insurers to Ares Management for approximately $450 million, a transaction that would have preserved policyholder benefits without interruption (Ex. G). Eli Global's Chief Financial Officer, Christa Miller, contemporaneously memorialized—in a January 6, 2019 email to the company's general counsel, Peter Nordberg—that, following Ares's meeting with the Department of Justice, Ares stated it had been advised by an undisclosed "third party constituent… to avoid any ongoing connection to Eli Global," refused to identify the source, and abandoned the term under which it would have retained affiliated loans through an SPV (Ex. A15 (Miller email, Jan. 6, 2019)).

*The Rejected Oaktree Transaction (February 2019).* The Rehabilitator rejected a proposed transaction with Oaktree that would have created an approximately $1 billion special-purpose vehicle to purchase all the affiliated loans from the insurers. The transaction, if consummated, would have paid the loans off in full.

*The Coerced Ten-year Hold (June 2019).* Under threat of liquidation (see Ex. D5), the Rehabilitator required Mr. Lindberg to agree to a Memorandum of Understanding obligating a ten-year hold of the affiliated loans. This converted a position that could be exited into a forced long-term hold and foreclosed the very transactions that would have repaid the loans (*see* Ex. A14).

*The Bond Fire-sale.* The Rehabilitator sold the zero-coupon bond portfolio before maturity for approximately $394 million, rather than holding it to the contractual par value of $1,006,239,867, thereby crystallizing a loss of approximately $611.6 million and destroying the principal protection that would have repaid the affiliated loans in full at maturity (*see* Exs. H, H2, I2, and I5).

*Litigation Against Willing Counterparties (Montshire/Alban, 2023) and the Rejected Quadro Transaction (2024).* Rather than transacting with counterparties to avert losses, the Rehabilitator litigated against them, and later rejected the Quadro transaction—both of which would have protected policyholders (See Exs. O and O2).

**H. The Plea Agreement and Factual Basis.**

In the Factual Basis, the parties agreed that Mr. Lindberg's conduct involved "circular, non-economic transactions" and materially false statements "regarding these transactions," and that his "conduct caused substantial financial hardship"

such that "certain of [his] insurance companies were placed in rehabilitation." Doc. 42 at ¶¶ 5–6. Mr. Lindberg does not dispute those facts. The Factual Basis does not, however, admit any loss *amount*, does not admit that the $1.655 billion figure was foreseeable, and does not attribute to Mr. Lindberg the Rehabilitator's later conduct.

In the Plea Agreement, the parties jointly stipulated, for Guidelines purposes *only*, that "[t]he amount of loss that was known to or reasonably foreseeable by the defendant exceeded $550,000,000," while expressly providing that "'loss' under U.S.S.G. § 2B1.1 may be different from, greater, or lesser than restitution." Doc. 40 at ¶ 8(a). This does not relate to restitution. In Paragraph 10(a), Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed **by the defendant's criminal conduct**." *Id.* The Plea Agreement fixes no restitution amount, and the Plea Agreement provides no admission by Mr. Lindberg of any reasonably foreseeable loss for restitution purposes. This remains a *de novo* determination for the Court on causation and reasonably foreseeable loss for restitution purposes and the Court has already said that the "real loss was risk"[2].

[2] The government in its Sentencing Memo explicitly acknowledges that the laws in North Carolina on affiliated investments did not change until 2019—after the relevant conduct in this case and after the affiliated investments were originated. Therefore, there is no basis for restitution based on risk. Doc. 152. The MVRA requires actual loss and does not pay restitution for "risk."

### I. The Special Master's recommendation and the Preliminary Order.

The Special Master recommended restitution of approximately $1.625 billion. On the report's own figures, the principal-only measure of loss—unpaid principal, net of credited recoveries—is approximately $1.362 billion; the recommendation reaches $1.625 billion only by adding approximately $263 million of "time value of money" interest, computed at a rate the Special Master selected over Mr. Lindberg's objection. The Preliminary Order of Restitution then entered $1,655,000,000—approximately $30 million above even the Special Master's recommendation—without explanation on the record. Doc. 161 at 3. No accounting accompanied the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25).

### J. The Special Master has continued to dispose of estate assets during the restitution proceeding.

Value-destroying conduct by third parties did not end in 2019; it has continued into this proceeding. The Special Master has disposed of estate assets before any final restitution determination. The Special Master owes a fiduciary duty to the court, the Insurance Companies, and Mr. Lindberg to seek court approval as soon as he learns of a sale. The Special Master's sale of estate assets relating to a restitution asset—whether by misfeasance, malfeasance, or non-feasance—without court approval violates the MVRA and constitutional limits on the Special Master's powers. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25). The Special Master's

compensation, and that of his professionals, is paid from the same administered assets he sells, creating a structural incentive to sell. And the Special Master has sought from Mr. Lindberg a waiver of claims relating to these dispositions. Doc. 159. A fiduciary does not seek a release for conduct that creates no exposure; the request itself confirms that the dispositions generate a diminution in value independent of Mr. Lindberg's conduct. These dispositions—conducted before a final determination, in part without court approval, and under a financial conflict—also raise serious constitutional concerns that Mr. Lindberg addresses in separate filings.

## ARGUMENT

### I. Restitution is Limited to Actual Losses Proximately Caused by the Offense—A Limitation the Plea Agreement Preserves.

The MVRA authorizes restitution only for "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and only for "the loss caused by the specific conduct that is the basis of the offense." *Hughey v. United States*, 495 U.S. 411, 413 (1990). The statute defines a victim as one "directly and proximately harmed," 18 U.S.C. § 3663A(a)(2), importing a proximate-cause requirement that asks, "whether the harm alleged has a sufficiently close connection to the conduct." *Robers v. United States*, 572 U.S. 639, 645 (2014) (citations omitted). Proximate cause is "often explicated in terms of foreseeability" and forecloses liability for losses "caused in only a remote sense." *Paroline v. United States*, 572 U.S. 434, 445, 449 (2014). The legislative history confirms this limit in Congress's own words: mandatory restitution provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct

under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932. In this Circuit, a person is a "victim" only if the harm results from "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is itself an element of that offense, *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008); a "factual connection" between the offense and a loss "is legally irrelevant" where the specific conduct underlying the conviction did not cause the loss, *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995); and conduct that "may have exacerbated" a harm but "did not cause it" cannot support restitution, *United States v. Freeman*, 741 F.3d 426, 438 (4th Cir. 2014). The MVRA is read to its terms, not expanded to serve its remedial aims. *Lagos v. United States*, 584 U.S. 577, 582–85 (2018).

These limits are not displaced by Paragraph 10(a) of the Plea Agreement. It commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct." Doc. 40 at ¶ 10(a). The Plea Agreement explicitly states that restitution under 18 U.S.C. § 3556 "may be different from, greater, or lesser than" the loss under U.S.S.G. § 2B1.1. *Id.* Therefore, restitution under 18 U.S.C. § 3556 can be zero or in fact overpaid.

The Government drafted that language, and any ambiguity in it must be resolved against the Government and in favor of Mr. Lindberg. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *United States v. Jordan*, 509 F.3d 191,

195–96 (4th Cir. 2007). Two features of ¶ 10(a)'s own text are dispositive here. It reaches only persons "harmed by the defendant's criminal conduct"—an express causal predicate. And "regardless of the resulting loss amount" speaks to quantum, confirming the figure is not tied to the § 2B1.1 loss calculation—but rather to causation. *Id*. Read as its terms require, ¶ 10(a) does not abandon the requirement, central to *Hughey* and to the MVRA alike, that the loss be caused by the conduct. That reading mirrors the statute's own design: under the MVRA, "unlike sentencing, the broader concept of 'relevant conduct' does not expand 'the offense of conviction.'" *United States v. Elbaz*, 52 F.4th 593, 610 (4th Cir. 2022) (quoting *United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010)); *accord United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003). Paragraph 10(a) expands the conduct covered by contract; it does not repeal the causation limit its own words impose.

Proximate cause has two components, and the claimed loss fails both: the loss was not reasonably foreseeable at origination (Part II), and intervening causes severed any connection between Mr. Lindberg's conduct and the loss (Part IV). Separately, "risk" is not a compensable actual loss (Part V); the Government has not carried its burden (Part VI); and offsets extinguish any obligation (Part VIII).

### A. *In re Zetteler* is the law of this case and fixes the governing proximate-cause standard.

The controlling causation standard is not borrowed from other litigation; the Fourth Circuit announced and applied it in this very docket. In denying the Crime Victims' Rights Act mandamus petition brought by the Conservatrix insolvency practitioners, the Fourth Circuit held that a person is a compensable victim only

where "directly and proximately harmed," and that the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked"; it sustained the exclusion of that petitioner precisely because it failed to tie its asserted harm to Mr. Lindberg's "criminal activities." *In re Zetteler*, No. 26-1749, WL 1724731 at *2 (4th Cir. June 13, 2026) (per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)). Because that determination was made by the court of appeals *in this case*, it is the law of the case: "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). This Court is bound to apply, in the restitution phase, the same proximate-cause standard the Fourth Circuit applied in this case. That the disposition is unpublished bears only on its weight as precedent in *unrelated* cases, *see* 4th Cir. R. 32.1; it does not diminish—and cannot displace—its force as the law of this case. And the standard is materially identical under the MVRA and the CVRA, which define "victim" in the same terms. *Compare* 18 U.S.C. § 3663A(a)(2), *with id.* § 3771(e)(2)(A).

The consequence is direct and symmetrical. The same "closely related" test that the Fourth Circuit applied in this case to *exclude* a claimant whose harm was not closely tied to the offense must, applied evenhandedly, *exclude* the losses—developed in Parts III and IV below—that were caused not by Mr. Lindberg but by the Government, the Rehabilitator, and the Special Master. That is not merely a persuasive authority; it is the rule of decision the Fourth Circuit has already established in this case, and it is the organizing theory of this motion.

## II. No Loss Was Reasonably Foreseeable at Origination (Proximate Cause: Foreseeability).

The Government bears the burden of proving, by a preponderance, that the claimed loss was a reasonably foreseeable result of Mr. Lindberg's conduct.[3] 18 U.S.C. § 3664(e). It cannot. In the Fourth Circuit, restitution reaches a loss only where the loss is a "direct result" of the defendant's conduct or is "closely related to the scheme." *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996) (citations omitted); accord *United States v. Karam*, 201 F.3d 320, 325 (4th Cir. 2000). *See also United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996) (a person is a victim only where the harmful act is "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is an element of the offense). Foreseeability is measured as of the time the defendant acted—by what he knew or reasonably should have known then. *Cf. United States v. Shephard*, 892 F.3d 666, 672–73 (4th Cir. 2018) (assessing foreseeability of harm from the defendant's vantage point at the time of the conduct). The Factual Basis admits no loss amount and no foreseeability of the $1.655 billion figure; the only foreseeability figure Mr. Lindberg ever stipulated is the

---

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163, 166 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

">$550,000,000" Guidelines figure, which the Plea Agreement expressly decouples from restitution. Doc. 40 at ¶ 8(a). The contemporaneous record affirmatively negates foreseeability of loss:

- Mr. Lindberg's insurers operated under a written Risk Mitigation Policy requiring first-lien senior-secured positions, minimum NRSRO ratings, portfolio leverage caps, arm's-length pricing opinions, and annual cash-flow testing to confirm assets were adequate to service liabilities. (Ex. C.)
- He guaranteed roughly $2.39 billion of the affiliates' obligations under the March 11, 2019 Backstop Agreement (Ex. B8), invested roughly $1 billion of his own capital with no dividends (Ex. A11), and directed the purchase of $1,006,239,867 in par value of bank zero-coupon bonds to insure the affiliated-loan principal dollar-for-dollar (Supp. Statement of Facts ¶¶ 27–34).
- The regulator approved the affiliate concentration—confirmed in the NCDOI's April 11, 2016 Review Letter (Ex. A12)—and, in the relevant period, praised Mr. Lindberg's regulatory performance in writing (Ex. B6). Affiliate concentrations of this magnitude remain ordinary: U.S. life and annuity insurers reported roughly $413 billion in affiliated investments in 2025, about twice the 2020 level. (See Exs. B5 and B24)
- The legal limitation on affiliated investments was enacted only in 2019—after origination. Doc. 152. A loss produced by a later change in law is not a foreseeable consequence of the origination.

Persuasive authority confirms the point: foreseeability is measured by what the defendant could anticipate when he acted, and the economic harm "ultimately suffered" must be a foreseeable consequence of the conduct. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003), *disapproved of by Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435 (S.D.N.Y. 2007). Where, as here, nationally recognized advisors were engaged to analyze and document the positions, and the regulator itself approved the concentration and praised the conduct, the Government cannot show that loss was reasonably foreseeable. As set out in the Statement of Facts § D, both KPMG and Houlihan Lokey concluded in 2018 that the asset values securing the affiliated loans exceeded the loan balances by over $1 billion, at approximately fifty-percent loan-to-value (See Exs. E2 and E3, KPMG & Houlihan Lokey Valuations).

*By way of illustration:* imagine you build your house on high ground, buy flood insurance, and have three engineers certify that it is safe and dry. Then a stranger bulldozes your levee and deliberately floods the house. The law requires payment only for losses a person could reasonably see coming when he acted—and a person who guarantees the loans himself, invests a billion dollars of his own money, buys a billion dollars of bonds as insurance, and hires the top firms in the country to check the numbers is not a person who foresaw a loss.

The Motion should be granted for this reason alone. The record forecloses any showing that loss was reasonably foreseeable. A loss that no reasonable person saw coming cannot support restitution under the MVRA.

## III. The Offense Conduct Procured No Official Or Agency Action, And So Did Not Cause The Loss (Proximate Cause: No Agency Action).

The Fourth Circuit's decision in this case draws the line that decides causation—the line between the entity and its agent. In vacating the original convictions, the court held that the "business" that 18 U.S.C. § 666 protects "is not the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act." *United States v. Lindberg*, 39 F.4th 151, 174 (4th Cir. 2022) (emphasis in original). That distinction is dispositive. The conduct of conviction concerned a staff reassignment—which deputy commissioner would be assigned to review Mr. Lindberg's companies. A reassignment of staff is an act of the agent, not of the entity: it is not an act of the North Carolina Department of Insurance, whose business is the external regulation of insurers, and there is no evidence that the Department took any regulatory action—no examination, no order, no change in enforcement—as a result of the conduct. (Ex. W.)

The Supreme Court's definition of an "official act" confirms the point. An official act must involve "a formal exercise of governmental power" that is "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," and must be more than "[s]etting up a meeting, talking to another official, or organizing an event[.]" *McDonnell v. United States*, 579 U.S. 550, 574 (2016). The reassignment of a deputy is none of these. The Court's most recent construction of the bribery statute confirms the trend: § 666 reaches only a bribe to influence an official act. *Snyder v. United States*, 603 U.S. 1, 19 (2024).

The causation consequence follows directly. The offense procured no action by the entity. The $1.655 billion loss, by contrast, could arise only from action by the entity and its court-appointed successors—the Department's October 2018 supervision, the 2019 rehabilitation, and the Rehabilitator's and Special Master's later decisions (Part IV). Conduct that set no Department action in motion cannot be the proximate cause of a loss that only the Department's (and its appointees') actions could produce, and no such loss was foreseeable from it. This goes to causation, not guilt: taking the conviction as given, the offense still procured no exercise of the entity's regulatory power.

The Court's own view of the offenses is consistent. At sentencing, the Court explained that it had "always viewed this once, with the two cases together, because they were really part of the same thing." (Sentencing Tr. 47 (May 26, 2026); Ex. ST.) The constitutional character of the conduct confirms the point: the payments were campaign contributions—made through an independent-expenditure committee and the North Carolina Republican Party (Ex. W, at 8)—which the First Amendment protects, see *Citizens United v. FEC*, 558 U.S. 310 (2010); *McCutcheon v. FEC*, 572 U.S. 185 (2014), and which the Supreme Court reaffirmed in 2026 may be reached only as "contributions in exchange for official action," *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, No. 24-621, 2026 WL 1868932, at *8 (U.S. June 30, 2026). A contribution that bought no official act procured no governmental action, and a loss flowing from governmental action the contribution never procured was not a foreseeable consequence of it.

The trial record confirms that Mr. Lindberg never sought any action from the entity. Even while secretly recorded, he asked only for fair, rigorous regulation: he said he was "happy to be well regulated" and "just [did not] want to be subject to personal vendettas," and that all he sought was "an even playing field." (Ex. W (quoting GEL Exh. 164, at 36:3–5; GEL Exh. 195, at 19:4–11).) He asked the Commissioner to assign a competent, unbiased regulator—Debra Walker—precisely because she was tough and fair: "Debbie will do a competent job, and a very rigorous job, but she doesn't have a built in bias against us … She's going to be tough and fair, that's all we need." (Ex. W (quoting GEL Exh. 189, at 18:14–17).) The second trial produced no evidence that Mr. Lindberg ever asked the North Carolina Department of Insurance—the entity—to take any action whatsoever.

The regulator Mr. Lindberg suggested confirmed the point. Testifying for the Government, Ms. Walker stated that there was no "side deal" with Mr. Lindberg or his companies, that no one ever approached her about anything inappropriate, and that there was "no type of guaranteed financial benefit … from her looking over the files instead of Jacquelyn Obusek." (Ex. W (Day 6 Rough Tr. 28:16–22; id. 25:7–9).) The Government conceded in closing that there was "no evidence" that Ms. Walker "was corrupt or had some sort of side deal" with the Defendants. (Ex. W (Day 7 Rough Tr. 19:10–11 (Gov't Closing)).) A request for a regulator who will do no favors is not the purchase of an official act.

That the diminution in value was set in motion by a political vendetta only confirms that no such loss was foreseeable. The record reflects that Commissioner

Causey targeted Mr. Lindberg's insurance group for "dismantling" before he took office, and that the long-serving Department employee he "had in mind" to accomplish it was the very deputy—Jacquelyn Obusek—whose apparent bias led Mr. Lindberg to seek her replacement, and whom Causey later promoted. (Ex. A3 (Loftin Aff.); Ex. A4 (Thompson Interview); Ex. K2 (Closing Demonstratives).) A loss on affiliated investments was not a reasonably foreseeable consequence of asking that a biased deputy be replaced with a tough, fair regulator who testified she would give Mr. Lindberg no favor. A Commissioner's determination to dismantle the business of his electoral opponent's largest supporter is a rare, one-time event that no reasonable person originating an affiliated-investment program could have anticipated.

## IV. Intervening Superseding Causes Broke the Chain of Causation (Proximate Cause: Intervening Cause).

Even if some losses were assumed, the chain of proximate causation was severed by independent intervening acts that occurred after October 2018 and that Mr. Lindberg neither caused nor could have foreseen. Congress made the point explicit: "A loss caused in part by intervening circumstances cannot be said to have been directly and proximately caused by the offense of conviction, unless the intervening cause is related to or a foreseeable consequence of that offense," and restitution should not lie where the conduct "is too far removed, either factually or temporally, from the loss." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. A sentencing court accordingly "should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant," and a restitution order entered without findings on the

effect and foreseeability of such events must be vacated. *United States v. Stein*, 846 F.3d 1135, 1154–56 (11th Cir. 2017). The Ninth Circuit's decision in *United States v. Tyler* is directly on point: a defendant convicted of timber theft could not be ordered to pay the amount the timber "declined in value" after it was returned, because "[a]ny reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not from [the defendant's] criminal acts." 767 F.2d 1350, 1352 (9th Cir. 1985). So too here: control of the insurers returned to the Rehabilitator in October 2018, and any later diminution stems from the Rehabilitator's decisions—not from Mr. Lindberg's offense. *Stein*, 846 F.3d at 1154–56. The Fourth Circuit enforces the same limit, vacating restitution where the loss is fixed by events outside the scope of the offense conduct. *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009) (restitution "is to be based upon the loss directly and proximately caused by the defendant's offense conduct" (citing S. Rep. No. 104-179, at 19)); *see also United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021). Critically, each intervening act below also falls outside Paragraph 10(a), because none is harm "caused by the defendant's criminal conduct." Doc. 40. The Fourth Circuit polices the same line: a "factual connection" between offense and loss "is legally irrelevant" absent causation by the conviction conduct, *Broughton-Jones*, 71 F.3d at 1149; conduct that "may have exacerbated" a harm but "did not cause it" supports no restitution, *Freeman*, 741 F.3d at 438; and losses from an "uncharged" scheme cannot be recovered, because "it would … be inappropriate to penalize [the defendant] as though he was also convicted of that offense." *United States v. Ocasio*, 750 F.3d 399, 412–13 (4th Cir. 2014). Nor does

*United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017), aid the Government: *Ritchie* faulted a defendant who "presented no evidence" of a superseding cause; Mr. Lindberg carries that burden with contemporaneous record evidence of affirmative, unilateral acts of value destruction—not a victim's mere delay in a falling market.

*By way of illustration:* think of a relay race. Mr. Lindberg ran the first leg and handed the baton to the Rehabilitator in October 2018. Everything that went wrong happened on the Rehabilitator's leg of the race—not Mr. Lindberg's.

**A. The Government's interference with the Ares sale (November 2018).**

Mr. Lindberg signed an exclusive LOI to sell the insurers to Ares for approximately $450 million, preserving policyholder benefits. (Ex. B.) Following Ares's contact with the Department of Justice, Ares cited undisclosed third-party advice to "avoid any ongoing connection to Eli Global" and abandoned a key favorable term. (Ex. A15.) The intervening cause here is not merely a counterparty's commercial change of heart; it is governmental interference with a signed, value-preserving transaction—an act of the Government itself, separate from and additional to the Rehabilitator's later conduct. Such interference was not a foreseeable consequence of underwriting an affiliated loan, and the loss it produced is not harm "caused by the defendant's criminal conduct." *Cf. United States v. Gibbens*, 25 F.3d 28, 29, 36 (1st Cir. 1994) (the "sovereign is not entitled to restitution" for a loss the Government itself "provoke[d]"; a loss set in motion by the Government's own conduct is not the kind of harm the restitution statutes compensate).

**B. The Rehabilitator's refusal of the Oaktree transaction (February 2019).**

Within weeks of the Ares termination, Mr. Lindberg personally directed the negotiation of an independent, arm's-length transaction with Oaktree Capital Management, L.P.—one of the world's largest credit-focused asset managers. The February 2019 Oaktree "Global Solution Presentation" proposed an approximately $1.0 billion Oaktree investment into a holding-company special-purpose vehicle that would have acquired the affiliated-loan positions held by the insurers and 100% of the GBIG equity, removing the affiliated loans from the insurers' balance sheets at face value. (Supp. Statement of Facts ¶ 72 & see Exs. C and C2) Had the Rehabilitator permitted the transaction to close, every NCIC policyholder would have been paid in full by approximately June 2019. The Rehabilitator discretionarily elected not to proceed. That second refusal—of a second sophisticated buyer pricing the same portfolio at face value within four months of the first—is the proximate cause of the loss of the Oaktree alternative; it is not Mr. Lindberg's conduct.

**C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU).**

Having refused both face-value exits, the Rehabilitator then foreclosed any future exit. The Memorandum of Understanding was first proposed on or about May 9, 2019; Mr. Lindberg met with the Rehabilitator in Durham, North Carolina in late May or early June 2019; and on June 27, 2019, the Rehabilitator presented the MOU on a take-it-or-leave-it basis under **express written threat of immediate liquidation of all four NCICs**. (Supp. Statement of Facts ¶ 34, 56-57 and see Ex.

D5.) The MOU affirmatively locked the affiliated loans in place for a **ten-year term**, converting a marketable portfolio—one that two buyers had just offered to purchase at par—into a forced decade-long hold. The Rehabilitator's counsel characterized the tactic as a "hammer and nail" used to extract representations and warranties under the same liquidation threat. *Id. at* ¶ 34 and see also Wake County MOU Trial Tr. (Vol. 5, p. 1012:11–12) *("Mr. Lindberg, you're the nail. I'm the hammer")*. The election to hold the loans for ten years rather than monetize them was the Rehabilitator's, and it is that election—not the origination years earlier—that drove any subsequent diminution in recoverable value. *See Davenport*, 445 F.3d at 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008) *(Davenport's* restitution holding is intact).

*By way of illustration:* two buyers were ready to pay full price. The Rehabilitator, holding the threat of shutting the companies down, forced Mr. Lindberg to promise to keep the loans locked in a drawer for ten years instead of selling them. You cannot lock someone's car in a garage for ten years, refuse to let him sell it, and then bill him for the rust.

### D. The Rehabilitator's pre-maturity fire-sale of the principal-protection bonds (2019).

In May 2018, Mr. Lindberg had directed the insurers to purchase $1,006,239,867 in par value of investment-grade zero-coupon bonds—held inside Principal Protected Notes for the sole purpose of insuring the affiliate-loan principal dollar-for-dollar. (Supp. Statement of Facts ¶¶ 27–34 and see Exs. H, H2, and I2) After taking control, the Rehabilitator made the unilateral decision to **sell those**

**bonds before maturity for approximately $394 million**—less than forty cents on the dollar of guaranteed par—**crystallizing a loss of approximately $611.6 million** on the very instruments whose only function was to prevent loss. *Id.* at ¶¶ 38–39. He did so without the advance approval of the Wake County Superior Court that N.C. Gen. Stat. § 58-30-85 and the June 27, 2019 Consent Order of Rehabilitation required for material asset dispositions. *Id.* at ¶ 45. And he ignored at least three loss-free alternatives—holding the bonds to maturity, using them to credit-enhance a sale, or borrowing against them. *Id.* at ¶ 40.

This is the paradigm of a superseding cause. The Supreme Court has held that a victim's own independent decision regarding collateral can break the chain of proximate causation, *Robers v. United States*, 572 U.S. 639, 647–48 (Sotomayor, J., concurring); where a passive decision to hold collateral too long can break the chain, a fiduciary's *affirmative* decision to liquidate a held-to-maturity, par-payable principal-protection instrument before maturity—forgoing $611.6 million of contractually mandated value—breaks it *a fortiori*. The crystallized loss is "attributable to the victim's independent decisions" and cannot be charged to Mr. Lindberg. *Id.* at 648; *accord United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985) (loss from holding asset "during a period of declining prices" is not caused by the offense). *Id.* at 648. Mr. Lindberg bought a billion-dollar insurance policy—bonds guaranteed to repay the loans in full if you simply waited for them to mature, like a savings bond you cash at the end. The Rehabilitator tore up that policy early and sold

it for forty cents on the dollar, throwing away $611 million. That loss does not belong to the person who bought the insurance policy to protect against the loss.

**E. The Rehabilitator's refusal of the Montshire/Alban offer (2023) and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025).**

The pattern continued. In 2023, Mr. Lindberg negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the insurers—a transaction that, like Ares and Oaktree, would have paid every policyholder in full. The Rehabilitator not only rejected the offer; he filed litigation against Mr. Alban. (Supp. Statement of Facts ¶ 117 and Exs. O and O2.) Then, in the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion—and Clanwilliam alone at $880 million. (Supp. Statement of Facts ¶ 118; and see Exs. G2, I3, I4.) The Rehabilitator blocked the Quadro transaction over Mr. Lindberg's repeated objections, and then, in September 2025, forced a below-market fire-sale of Clanwilliam to TA Associates for $450 million—a destruction of approximately $474 million in value attributable entirely to the Rehabilitator's discretionary decision to block Quadro. *Id.*

**F. The Special Master's continuing asset dispositions (2026).**

The chain of intervening causation extends into the present proceeding. Since his appointment, the Special Master has disposed of estate assets before any final restitution determination. With respect to the Beckett transaction, the sale occurred without court approval, and the record does not reflect an accounting of proceeds. At

the same time, the Special Master's compensation is derived from the assets administered, and he has sought a waiver of liability for actions taken in that role (See Ex. B25 and see Doc. No. 159).

These actions were undertaken independently by the Special Master. To the extent the claimed loss reflects value attributable to the disposition of these assets, that reduction cannot be attributed to Mr. Lindberg.

Applying *Robers*, *Paroline*, *Stein*, and *Squirrel*, the losses produced by these intervening acts are "more aptly described as mere fortuity" than as harm proximately caused by Mr. Lindberg, and they are not harm "caused by the defendant's criminal conduct" within Paragraph 10(a). Doc. 40. As Part I.A establishes, the "closely related" proximate-cause test the Fourth Circuit applied in this case is the law of the case, *In re Zetteler*, *supra*; the same test that excluded a claimant whose harm was not closely tied to the offense excludes the Government-, Rehabilitator-, and Special Master-caused losses here. Because the conduct by these third parties has continued into the present proceeding, the chain of causation remains broken as of this determination: the Government cannot establish proximate causation between Mr. Lindberg's conduct and the claimed loss *even now*. At least for this reason, the Motion should be granted.

## V. "Risk" Is Not Actual Loss, And Restitution Is Capped at Actual Loss.

This Court has characterized the "real loss" in this case as "risk." (See Sentencing Transcript) That characterization is dispositive. Restitution is owed only "in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), measured by

realized actual loss, *Hughey*, 495 U.S. at 413. Risk of loss is not actual loss; a victim who has suffered no realized loss has no "loss" to compensate. Although the Supreme Court has held that MVRA restitution is criminal punishment, the Fourth Circuit enforces both halves of that rule: restitution "must be based on actual loss," not intended loss, *United States v. Harvey*, 532 F.3d 326, 340–41 (4th Cir. 2008), and the MVRA "makes clear that the defendant is expected from the outset to repay all of the actual losses that he caused, but no more," *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018) (citations omitted) (arising from this District). *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), it remains a *loss-measured* sanction—not a free-standing fine—and it may not be imposed in an amount untethered from a realized actual loss. The point is concrete: even though the Special Master has determined that in this case the policyholders are not victims (and only the insurance companies are the victims), they have been "made completely whole" and "confirmed paid in full" (Ex. D7 and Docket 100). Where the protected victims are whole (indeed overpaid by $1.2 billion per Mr. Lindberg's filings) and the Court's premise is "risk," the actual loss attributable to Mr. Lindberg is zero.

*By way of illustration:* there is a difference between the chance of getting hurt and actually getting hurt. Driving a car always carries a risk of an accident, but the law does not require payment for a crash that never happened. The Court said the "real loss was risk"—and the policyholders were paid every penny. A defendant cannot be ordered to repay money that was never actually lost.

To the extent the figure rests on an interest enhancement, that enhancement compounds the error. Restitution is now criminal punishment, *Ellingburg*, *supra*; the facts that fix a penal amount must be found by the Court, and—on Mr. Lindberg's submission—beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), and *Southern Union Co. v. United States*, 567 U.S. 343, 350 (2012). A quarter-billion-dollar interest component selected by a court adjunct, over objection and without the Court's own findings, and in violation of the DOJ's own policy forbidding interest awards in restitution, cannot satisfy even the preponderance standard, let alone a higher one.[4] The Motion should be granted for this reason alone.

---

[4] The Special Master recommends that "some interest component" should be applied to the Affiliate Investment balances "to account for the time value of money." Doc. 106 at 3-4. Based on a 2.19% interest rate (representing the 30-Day U.S. Treasury rate as of June 27, 2019, through March 31, 2026), the Special Master proposes adding an additional $263 million in restitution for "post-IALA interest." App'x 3 at 8. This is legal error.

As a threshold matter, the MVRA does not expressly include interest among the compensable forms of financial loss recoverable through restitution. And more specifically, DOJ policy recognizes this fact; it expressly excludes interest as a "financial loss," clarifying that it is "not eligible for restitution." Therefore, any interest should be excluded from any restitution calculation.

An award of interest is also contrary to the plain language of the MVRA. As explained above, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers*, 572 U.S. at 640. And it provides two ways for a sentencing court to accomplish that: by ordering a defendant to either "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A) or, "if return of the property . . . is impossible, impracticable, or inadequate," to pay an amount equal to "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence" less the value of any part of the property that is returned. *Id.* § 3663A(b)(1)(B).

Notably, there is no provision under the first option—subsection (b)(1)(A)—for a court to add interest when the defendant can return the property at issue. Where, as here, the "property" at issue is cash, the only option for the Court is to order Mr. Lindberg to "return the property to the owner" under subsection (b)(1)(A). As the

Supreme Court taught in *Robers,* if "the 'property that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property . . . returned' must also be the money." 572 U.S. at 643 (alterations in original). And "money being fungible," the return of any cash equivalent to the amount the victim lost satisfies the statute. *Id.* In contrast, where a defendant takes something other than cash and cannot return that specific piece of property (e.g., a necklace) because it would be impossible, impracticable, or inadequate to do so, then the Court must determine the "value of the property" on the date of the loss or at the time of sentencing under subsection (b)(1)(B).

The property that the Pre-Designated Restitution Parties lost is cash—the money taken out of the companies via Affiliate Investments. And an order directing Mr. Lindberg to return that "property"—the amount of cash taken—fully satisfies the MVRA. 18 U.S.C. § 3663A(b)(1)(A). Accordingly, under a straightforward application of the MVRA, any award of interest is inappropriate.

To be sure, a handful of other circuit courts have allowed prejudgment interest to be included in a restitution order. *See, e.g.*, *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011); *United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). But these cases were wrongly decided, and none is binding on this Court. Both the Second Circuit in *Qurashi* and the Sixth Circuit in *Fike* incorrectly assumed that the amount of restitution in the case was governed by subsection (b)(1)(B). *See Fike*, 140 F.4th at 356 (citing 18 U.S.C. § 3663A(b)(1)(B) for the proposition that "a victim's losses may change in value between the date of the loss and the date of sentencing"); *Qurashi*, 634 F.3d at 703 (similar). But as explained above, a court may apply subsection (b)(1)(B) only where a defendant returns *substitute* property because it is impossible, impracticable, or inadequate to return the property that was taken; that subsection has no application where, as here and in both *Fike* and *Qurashi*, a victim lost cash that a defendant can return.

Nor has the Fourth Circuit held that prejudgment interest may be awarded under the MVRA. Although the Special Master claims the Fourth Circuit authorized interest on restitution in *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994), *see* App'x 3, at 10, *Hoyle* was decided prior to the enactment of the MVRA and focuses on the unremarkable proposition that the determination of loss for sentencing and restitution are separate inquiries. It therefore does not speak directly to when interest qualifies as a compensatory form of damages under the MVRA. *See Hoyle,* 33 F.3d at 420.

At bottom, the Special Master's proposal cannot be squared with the law. Restitution is not concerned with a victim's "disappointed expectations" but only with his actual loss. *United States v. Boccagna*, 450 F.3d 107, 109 (2d Cir. 2006); *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). Thus, restitution is not meant to "guarantee the benefit of any bargain." *Id.* And it "cannot include consequential damages." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013).

The Court has identified the real loss as risk, the victims have been confirmed paid in full, and restitution measured by actual loss is therefore zero.

## VI. The Government and the Special Master Did Not Carry the Section 3664(e) Burden.

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and the "burden of demonstrating the amount of the loss… shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The restitution order must rest on findings adequate for review. *Karam*, 201 F.3d at 325. Courts "abuse their discretion by granting the defendant a 'bailout' or by

---

Here, interest is not part of the Pre-Designated Restitution Parties' actual loss. Instead, it constitutes recompense for the benefit of the parties' bargain—the time value of money while the insurance companies provided loans covering the Affiliated Investments. Accordingly, any interest would exceed the restitution statutorily allowed by the MVRA.

Courts applying these principles have excluded interest from restitution awards or at least reduced the amount of the award to avoid giving the victims more than they are statutorily eligible to receive. In *United States v. Jesenik*, the court explained that **"accrued but unpaid interest" on an investment does not constitute part of a victim's actual losses**. 702 F. Supp. 3d 1024, 1039 (D. Or. 2023). Similarly, in *United States v. Smerling*, the defendant and government agreed that a restitution award based on fraudulently obtained loans should not include interest based on the loan agreement's post-default rate, because "including such interest in the restitution order would inappropriately award [the victim] its expectation under the loan agreement, not merely compensate it for its loss." No. 21-cr-317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).

In this case, including only the principal amount of the Affiliate Investments serves the purposes of restitution. It redresses the actual loss caused by Mr. Lindberg's conduct but avoids imposing undue punishment on him and exceeding the bounds of what the MVRA authorizes.

For these reasons, neither the MVRA nor the principles of restitution support adding any interest to the restitution award. Accordingly, the amount of restitution ordered should be further reduced by at least $263 million.

allowing the victim to obtain a 'windfall.'" *Steele*, 897 F.3d at 611. Here, the Preliminary Order entered $1.655 billion—$30 million above the Special Master's own recommendation—without explanation; the recommendation itself reaches $1.625 billion only by adding approximately $263 million of interest at a rate the Special Master chose; and no accounting supports the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting of proceeds. (See Ex. B25) A record in that condition cannot support a $1.655 billion finding by a preponderance. *See* 18 U.S.C. § 3663A(c)(3)(B) (restitution need not be ordered where complex causation issues would unduly burden the sentencing process).

The Committee designed exactly this safeguard. Any special master submits only "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), *reprinted in* 1996 U.S.C.C.A.N. 924. And Congress authorized courts to decline restitution altogether where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). Here, where causation and offsets are genuinely complex and disputed, that burden falls on the Government, not on Mr. Lindberg. *See also United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008) (citations omitted) (loss calculation for restitution may "present[] complex factual issues" warranting an evidentiary hearing).

## VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction.

The causation inquiry turns in significant part on why the Ares sale—which would have paid every policyholder in full—collapsed. The contemporaneous record reflects that, following Ares's meeting with the Department of Justice, Ares was advised by an undisclosed party to avoid any ongoing connection to Eli Global and abandoned the transaction's key term (Ex. A15). That gives Mr. Lindberg a good-faith basis to believe a governmental actor communicated with Ares concerning the transaction. If the Government possesses evidence of such communications and has not disclosed it, that evidence is favorable and material to the causation issue now before the Court—it would show that an intervening act of the Government, not Mr. Lindberg's conduct, caused the loss of the Ares transaction—and due process requires its disclosure. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Mr. Lindberg therefore requests that the Court order the Government to disclose any communications between any federal or state governmental actor and Ares, or its advisors, concerning the proposed acquisition of the insurers or any ongoing relationship with Eli Global. Where the Government bears the burden of proving causation by a preponderance under 18 U.S.C. § 3664(e), basic fairness requires that Mr. Lindberg have access to the evidence bearing on whether the Government itself caused the very loss it now seeks to charge to him.

## VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation.

Should the Court find any portion of the loss proximately caused by Mr. Lindberg's conduct, the MVRA requires that restitution be reduced by the value of property returned to the victims and by amounts the victims have received or will receive. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *see Robers*, 572 U.S. at 645; *United States v. Boccagna*, 450 F.3d 107, 118 (2d Cir. 2006); *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000). The Committee was equally explicit that restitution may not exceed a victim's actual loss or yield a windfall: the offset provisions ensure that "the victim is not compensated twice for the same loss." S. Rep. No. 104-179, at 20 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 933. *Accord Steele*, 897 F.3d at 611 (no victim "windfall"). Applied, the credits below yield net restitution of zero and a substantial overpayment, as the chart illustrates:

| **Description** | **Amount** | **Body §** |
|---|---|---|
| **Special Master's Proposed Restitution Figure** | **$1,655,000,000** | — |
| **Improper Additions to Affiliate Investment Balances** | | **I.** |
| Pre-Judgment Interest | ($263,000,000) | I.A |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) | I.B |
| **Additional Credits** | | **II.** |
| AAPC Preferred Equity Par Value as of May 26, 2026 | ($352,906,240) | II.A |
| SNIC Payments | ($27,823,425) | II.B |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master | ($79,655,289) | II.C |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) | II.D |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) | II.E |
| ULICO Sale of Contributed Real Estate | ($13,596,013) | II.F |
| Bermuda ICs' Proceeds from Sale of Affiliated Assets | ($9,800,076) | II.F |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,000,000) | II.G |
| Value of NCICs as of October 2018 | ($454,000,000) | Exh. A |

| **Losses Not Proximately Caused by Mr. Lindberg** | | **III.** |
|---|---|---|
| Loss on Agera | ($129,000,000) | III. |
| ECL Losses | ($22,288,826) | Exh. A |
| Loss on UKAT | ($39,000,000) | Exh. A |
| Insurance-Holdco Debt Portion | ($14,897,805) | Exh. A |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) | Exh. A |
| Loss on Early Zero-Coupon Bond Sales | ($611,600,000) | Exh. A |
| **TOTAL MINIMUM OFFSETS AND REDUCTIONS** | **($2,899,418,383)** | |
| **NET RESTITUTION OWED** | **$0** | |

## IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor.

The Plea Agreement fixes no restitution amount and stipulates only a ">$550M" Guidelines figure expressly decoupled from restitution. Because restitution is now criminal punishment, *Ellingburg*, *supra*, and because Paragraph 10(a)'s reach is bounded by causation, any genuine ambiguity over whether third-party-caused losses are "caused by the defendant's criminal conduct" must be resolved in Mr. Lindberg's favor under the rule of lenity.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction; (2) in the alternative, excluding from restitution the intervening-cause losses identified in Part IV; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) directing a complete accounting of all asset dispositions and of all fees and expenses paid from administered assets, including the Beckett proceeds; (5) ordering the Government to disclose any governmental communications with Ares or

its advisors regarding the proposed transaction or any ongoing relationship with Eli Global; (6) fixing net restitution at zero; and (7) granting such other and further relief as is just. Given the pendency of related proceedings, Mr. Lindberg respectfully requests expedited consideration.

Dated: July 14, 2026

Respectfully submitted,

*<u>/s/ Kenneth N. Barnes</u>*

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order *In Re: Use of Artificial Intelligence* entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices.

Dated: July 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**CONSOLIDATED STATEMENT OF FACTS IN SUPPORT OF DEFENDANT'S MOTION REGARDING RESTITUTION CAUSATION**

## INTRODUCTION

Defendant Greg E. Lindberg respectfully submits this Statement of Facts in support of his motion regarding restitution. The facts set forth below are established by the exhibits filed herewith and cited in the text; the exhibits are identified in the accompanying Schedule of Exhibits.

### A. The Affiliated-loan Program Operated Under a Written Risk-Management Framework and Experienced Zero Defaults Prior to Mr. Lindberg's Transfer of Control to the Rehabilitator.

1. Mr. Lindberg's North Carolina insurers operated under a written Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017. The Policy provided that "the majority of loans are senior secured investments where the insurer lender as a first claim on all assets and cash flows of the borrower"; that "All loans have a

minimum credit rating of 'B-' or equivalent from a SEC approved NRSRO"; that "the portfolio has weighted average credit score of 'BB' or higher and leverage ratio of less than 4x"; and that "All loans receive a third party arms' length pricing opinion." (Ex. B21 (Risk Mitigation Policy on Affiliated Loans, rev. Feb. 20, 2017).)

2. The Policy recited a track record of no defaults, stating that "SNH's affiliates have provided additional capital as needed to pay down any underperforming loans over the last 25 years, producing a zero default track record on these investments," and it committed the affiliates to "[p]repay any underperforming loan using reserve capital from SNH's non-insurance affiliates." (Ex. B21.)

3. The April 14, 2018 successor Policy also required "Cash flow testing needs of the portfolio to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements." (Ex. C (Risk Mitigation Policy).)

**B. Mr. Lindberg Committed Approximately $1 Billion of His Own Capital, Guaranteed the Loans, and Purchased $1 Billion of Bonds to Protect Principal.**

4. Mr. Lindberg's documented total investment in the insurance group from 2014 to 2018 was "$963 million," as summarized with source documentation by entity — including Colorado Bankers Life ($71 million, plus $193 million of additional capital), Southland National Insurance Corporation ($48 million), Pavonia Life ($45 million net of its sale), the investment into Agera and replacement of Agera assets ($187 million), and management, overhead, and legal costs ($83 million and $72

million, respectively). (Ex. A11 (Lindberg Total Investment in the Insurance Group), Part I.)

5. Independent analysis by Berkeley Research Group ("BRG") separately states that "capital contributions, consisting of cash infusions, foregone dividends and certain non-cash transactions, amount to at least $377 million," and that BRG did not "uncover payment of any dividends to Mr. Lindberg, GBIG or any Lindberg-affiliated companies." (Ex. D (BRG letter).)

6. Mr. Lindberg executed an "AMENDED & RESTATED BACKSTOP AGREEMENT … dated as of March 11, 2019," personally guaranteeing scheduled payments on the affiliated obligations. (Ex. B22 (Amended & Restated Backstop Agreement, Mar. 11, 2019), at 1.)

7. In 2018 the insurers held a portfolio of zero-coupon and related bonds with an aggregate notional (par) value of $1,006,239,867, acquired for an aggregate purchase price of $359,714,888.58. (Ex. H2 (Principal Value of Zero-Coupon Bonds), at 1.) The bonds were issued by a diversified group of financial institutions, including CIBC, Citigroup, TVA, Nomura, Wells Fargo, Natixis, Barclays, RBC, Bank of Montreal, UBS, and JPMorgan. (Id.)

### C. The Regulator Approved the Affiliate Concentration and Praised Mr. Lindberg's Regulatory Performance.

8. The affiliate-investment strategy was presented to the North Carolina Department of Insurance ("NCDOI") as early as a September 17, 2014 presentation, which represented that "Controlled investments will be personally guaranteed by Eli Global owner, Greg Lindberg – this puts in a backstop for any potential failed deals,"

and would "Serve as backstop for any bad investments beyond historical zero percent default rate." (Ex. A22 (NCDOI Presentation on Affiliate Investments, Sept. 17, 2014).)

9. The 2014 presentation described "Strong risk management from (a) zero historical default rate on controlled deals … and (C) full guarantee backstop from owner on all controlled deals." (Ex. A22.)

10. The parties negotiated a percentage ceiling on affiliated investments. In the NCDOI's Review Letter 1 (dated April 11, 2016), the Department found that, at December 31, 2015, the company had "50% of total admitted assets invested in affiliates" and "directed [the company] to refrain from investing further in affiliates and to provide a plan outlining how it will return to compliance with the 40% agreed upon limit." The company's April 19, 2016 written response to Senior Financial Analyst Jessica Price, CPA, CFE, stated that "we interpreted the 40% limit to apply to affiliated sub-investment grade investments, not to affiliated investments in total," and undertook to bring "total affiliate investments (not including affiliated insurance investments) … below 40% of total assets." (Ex. A12 (SNIC Response to NCDOI Review Letter 1, Apr. 19, 2016), at 1–2.)

11. Affiliated-investment concentrations of this general character are widespread in the life-insurance industry. A May 26, 2026 Wall Street Journal report is titled "For Wall Street's Private Investments, In-House Insurers Are the Go-To Buyer," and states that "[r]egulators are trying to keep up with insurers' $413 billion in 'affiliated investments,'" observing that "[i]nsurance companies are increasingly

investing policyholders' money in private credit sold by parent firms or affiliated parties." (Ex. B24 (Wall St. J., May 26, 2026).)

12. On March 9, 2018, Insurance Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state regulators today." The same message requested "[d]etails and status of plans to engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans." (Ex. B6 (Causey email, Mar. 9, 2018), at 1.)

**D. The 2018 KPMG and Houlihan Lokey Valuations Confirmed the Loans Were Well Secured.**

13. KPMG, in accordance with an engagement letter "dated May 21, 2018," completed a valuation "to determine the fair value of a 100.0 percent interest in the equity of certain insurance entities (the 'Subject Companies' …) owned by Global Bankers Insurance Group … on marketable, controlling interest basis as of December 31, 2017." The report is dated August 24, 2018. (Ex. E (KPMG, Final Valuation of Eli Global Insurance Entities, Aug. 24, 2018) and Ex. E2.)

14. KPMG's stated "Fair Value of Equity" conclusions were: Colorado Bankers Life Insurance Company, $380,500,000; Bankers Life Insurance Company, $57,500,000; Southland National Insurance Corporation, $29,000,000; Southland National Reinsurance Corporation, $46,500,000; Pavonia Life Insurance Company of Michigan, $120,000,000; Private Bankers Life and Annuity Co., Ltd., $283,500,000; Omnia Ltd., $7,000,000; Conservatrix N.V., €74,000,000; Standard Re (Malta) Limited, €4,000,000; GB Life Luxembourg S.A., €32,700,000; Bankers Reinsurance Company Ltd., $12,400,000; and PB Investment Holdings Ltd., $8,300,000. (Ex. E.)

In the aggregate, these conclusions total on the order of one billion dollars — described in Mr. Lindberg's investment summary as "aggregate fair value of the insurance entities of approximately $1.08 billion." (Ex. A11 (Lindberg Total Investment in the Insurance Group), Part II, S-5.)

15. KPMG completed this work in August 2018, less than sixty days before control of the insurers passed to State administrative supervision on October 18, 2018 (see § F below), making it contemporaneous evidence of the value of the companies at the time regulatory control was imposed. (Ex. A11, Part II, S-5, S-10 and Ex. E2.)

16. Houlihan Lokey Financial Advisors, Inc. separately prepared a "written Report containing certain financial analyses and documentation pertaining to investments … controlled by Eli Global," held by Colorado Bankers Life and Southland National "as of December 15, 2017," dated January 18, 2018. The Report presents, for each position, "[e]nterprise value ranges and associated enterprise value coverage and loan-to-value calculations." (Ex. E3 HL (Houlihan Lokey, Summary of Certain Investments Held by Colorado Bankers Life and Southland National, Jan. 18, 2018), at 3, 5.)

17. The Houlihan Lokey Report repeatedly concludes that the enterprise value of the borrowers fully covered the loans. Representative of its position-level findings, it states: "Our assessment of enterprise value implied full coverage through the Term Loan, with a loan-to-value range through the security of 38.7% to 43.4%," and elsewhere "implied full coverage through the aggregate subordinate debt with a net loan-to-value of 42.8% to 47.3%." Loan-to-value results vary by position across

the portfolio, but the Report's consistent conclusion is "full coverage" of the secured loans. (Ex. E3.)

18. A summary of the KPMG August 24, 2018 valuations, compiling KPMG's per-entity conclusions as of the December 31, 2017 valuation date, reflects fair values of equity for the insurance entities totaling approximately $1.08 billion, and separately values the twenty-one Eli Global operating companies — the borrowers whose assets and enterprise value secured the affiliated loans — at an aggregate business-enterprise value of approximately $2.45 billion. (Ex. E2 (KPMG Valuations Summary), Overview.)

19. KPMG's concluded enterprise values for the principal operating-company borrowers included Global Health Technology Group, LLC at $1,200,000,000; American Academy Holdings (AAPC) at $900,000,000; Practice Insight, LLC at $146,000,000; and Claris Vision, LLC at $51,500,000, among others. These contemporaneous valuations of the borrowers confirm that the asset values securing the affiliated loans substantially exceeded the loan balances. (Ex. E2.)

**E. Before Taking Office, the Commissioner Planned to "Dismantle" Mr. Lindberg's Business.**

20. The affidavit of Roland M. Loftin, Jr. states that, in mid-2016, "Mike Causey told Cartret that he was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election," and "saw Lindberg as a significant impediment to winning the election against Goodwin." (Ex. A3 (Affidavit of Roland M. Loftin, Jr.).)

21. The Loftin affidavit further states that Causey "said that he had a person in mind who had already helped him a lot and she had been at DOI a long time," and that "she already didn't like Lindberg and would know how to go about dealing with the companies and dismantling them." (Ex. A3.)

22. In a recorded interview, Lyne Thompson stated that Causey "explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won," and that "because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him." (Ex. A4 (Interview of Lyne Thompson, Mar. 28, 2024), at 2–3.)

23. Thompson further stated that Causey "already knew that the biggest problem he was going to have if Goodwin ran again against him in four years was this multimillionaire funding Wayne's campaign." (Ex. A4, at 3.)

### F. Mr. Lindberg Ceded Control to the Rehabilitator in October 2018, and the Rehabilitator Proceeded to Pay Himself and Others Over $165 Million in Fees.

24. On October 18, 2018, the North Carolina insurers were placed under a "CONSENT ORDER FOR ADMINISTRATIVE SUPERVISION." The order recites that "[t]he Companies have consented to administrative supervision" and were "placed under administrative supervision for a period of 120 days from the date of execution of this Consent Order," subject to extension in the Commissioner's discretion. (Ex. F2 (Southland Confidential Administrative Supervision Consent Order, Oct. 18, 2018).)

25. Since June 2019, the fees and expenses paid out by the Rehabilitator/Receiver total $165,749,392, of which an estimated $30,000,000 was paid to Williams Mullen and an estimated $25,000,000 to Noble Consulting/Mike Dinius, with current estimated monthly fees of $2,744,743. (Ex. M (Expenses + Losses of NCICs), at 1.)

**G. A Series of Intervening Acts Destroyed Value After October 2018.**

26. The blocked Ares transaction. On November 22, 2018, Ares submitted a letter of intent that was "non-binding (other than in respect of Section 12 (Exclusivity …))," proposing an "Upfront Purchase Price" of "$400 million" under Option A and "$420 million" under Option B. (Ex. G (Ares Project Triangle Proposal, Nov. 22, 2018).)

27. Eli Global's Chief Financial Officer, Christa Miller, memorialized in a January 6, 2019 email that, when Ares was asked whether it was withdrawing the SPV term under which it would retain affiliated loans, "they said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close," and "refused to say" who had given that advice. Ms. Miller wrote that "it seems very likely from their comments on both occasions that they have been heavily influenced by a third party with power." (Ex. A15 (Miller email, Jan. 6, 2019), at 1.)

28. The rejected Oaktree transaction. In or about February 2019, an Oaktree "Global Solution" presentation proposed that "IG will fund a [$1.0B] investment into an SPV Holding Company" that would acquire the affiliated-loan

positions and the GBIG equity. (Ex. C2 -- Oaktree (Oaktree Global Solution Presentation), at 1.)

29. The June 27, 2019 liquidation demand and MOU. On June 27, 2019, Mike Dinius wrote to Mr. Lindberg: "If you do not sign the consent, we will contact the guaranty associations and move directly to liquidation. You know what that means." He added that, "[i]f this is not signed, the P&I deferral ends immediately … That means the ELI companies will be in default on millions of loan and interest payments. We will then take all legal action that is necessary." (Ex. D5 (Dinius email, June 27, 2019), at 1.)

30. The Memorandum of Understanding "is made and entered into as of this 27th day" of June 2019 and recites the intent to "protect the best interests of the policyholders" and to "increase the long-term equity value." The accompanying Interim Loan Amendment fixed the loans on a decade-long term: it provides that "the maturity date of each Senior Loan shall be December 31, 2029," with junior and other loan maturities set to 2029 as well, and it refers to the "(10)-year anniversary of the Amendment Effective Date." (Ex. A14 (Memorandum of Understanding and Interim Loan Amendment, June 27, 2019).)

31. The bonds sold before maturity. A summary schedule states, under the heading "Zero Coupon Loss by Dinius Decision to Sell Early," a figure of $611,660,960, and reflects "Total Proceeds" of $394,578,906 from the sale of the bond portfolio that carried an aggregate par value of $1,006,239,867. (Ex. I2 (Summary of Loss on Zero Coupon Bond Sales), at 1.)

32. The Quadro transaction (2024). A January 24, 2024 investor presentation for a Quadro business combination states a "Proforma enterprise value" of $3,153 million (approximately $3.2 billion) for the combined companies. (Ex. I3 (GG-Quadro Investor Presentation, Jan. 24, 2024).)

33. The Universal Financial Holdings offer (2022). On November 17, 2022, Universal Financial Holdings LLC submitted an "indication of interest … to acquire 100% of the membership interest of GBIG Holdings," including its insurance subsidiaries Bankers Life, Colorado Bankers Life, and Southland National, stating that upon completion of diligence it "will immediately sign a binding purchase agreement." (Ex. O2 (Universal Financial Holdings Indication of Interest, Nov. 17, 2022), at 1.)

## H. Forced Private-market Sales Understate Value Relative to Public-Market Benchmarks.

34. Independent academic research submitted with the exhibits finds that private acquirers systematically pay less than public acquirers: "for most premium measures private operating companies pay less than public firms," and "target shareholder premiums are 63.3% higher if an offer is by a public firm rather than by a private equity firm." (Ex. R (Bargeron et al., Why Do Private Acquirers Pay So Little Compared to Public Acquirers?).) This bears on the measurement of any claimed loss: the values realized through the Rehabilitator's forced private dispositions are not a reliable measure of the companies' value, particularly as against the public-market benchmark reflected in the 2024 Quadro presentation (§ G above).

Dated: July 15, 2026

Respectfully submitted,

*<u>/s/ Kenneth N. Barnes</u>*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br>Judge Max O. Cogburn, Jr.<br><br>EXPEDITED CONSIDERATION REQUESTED |

# DEFENDANT'S MOTION FOR ISSUANCE OF SUBPOENAS DUCES TECUM TO MICHAEL DINIUS, TO THE SPECIAL MASTER AND NHC HOLDINGS, LLC ("NEWHOLDCO"), TO PALADIN MANAGEMENT, TO THE NCICS FOR THE COMMUNICATIONS OF COMMISSIONER MICHAEL CAUSEY, TO THE BERMUDA INSURANCE COMPANIES THROUGH THEIR JOINT PROVISIONAL LIQUIDATORS, AND TO WES CAMDEN, LAUREN FUSSELL, AND THEIR FIRM, PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17, WITH INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 3

ARGUMENT ........ 6

I. Legal Standard. ........ 6

II. The *Nixon* Factors Are Satisfied. ........ 7

III. The MVRA Itself Requires Production of These Records, and Requires Time to Cure Deficiencies Before the Hearing. ........ 9

CONCLUSION AND RELIEF REQUESTED ........ 11

CONSULTATION STATEMENT ........ 13

ARTIFICIAL INTELLIGENCE CERTIFICATION ........ 14

CERTIFICATE OF SERVICE ........ 15

# TABLE OF AUTHORITIES

***Cases***

*Apprendi v. New Jersey* ........ 7 n.1

530 U.S. 466 (2000)

*Ellingburg v. United States* ........ 6 n.1

607 U.S. 163, 146 S. Ct. 564 (2026)

*Khouj v. Darui* ........ 10

248 F.R.D. 729 (D.D.C. 2008)

*Robers v. United States* ........ 7

572 U.S. 639 (2014)

*Southern Union Co. v. United States* ........ 7 n.1

567 U.S. 343 (2012)

*United States v. Bendawald* ........ 6

No. 24-cr-146, 2025 WL 711725 (D. Idaho 2025)

*United States v. DNRB, Inc.* ........ 6

257 F. Supp. 3d 1033 (W.D. Mo. 2017)

*United States v. Karam* ........ 2, 10

201 F.3d 320 (4th Cir. 2000)

*United States v. Krane* ........ 6

625 F.3d 568 (9th Cir. 2010)

*United States v. Nixon* ........ 2, 6, 7, 8, 9, 11

418 U.S. 683 (1974)

*United States v. Ritchie* ........ 10

858 F.3d 201 (4th Cir. 2017)

***Statutes***

18 U.S.C. § 3663A(b)(1)(B)(ii) ........ 9

18 U.S.C. § 3664(d)(6) ........ 2, 7

18 U.S.C. § 3664(e) ........ 2, 6, 9, 10

18 U.S.C. § 3664(j)(2) ........ 7, 9–10

***Rules***

Fed. R. Crim. P. 17 ........ passim

Fed. R. Evid. 803(6) ........ 8

## INTRODUCTION

Defendant Greg E. Lindberg moves, pursuant to Federal Rule of Criminal Procedure 17, for issuance of (i) a subpoena duces tecum to Michael Dinius, Special Deputy Rehabilitator of the North Carolina insurance companies (Colorado Bankers Life Insurance Company, Bankers Life Insurance Company, Southland National Insurance Corporation, and Southland National Reinsurance Corporation (the "NCICs")) and a principal of Noble Consulting Services, Inc., commanding production of the documents identified in Exhibit A hereto; (ii) a subpoena duces tecum to Joseph W. Grier, III, as Special Master, and to NHC Holdings, LLC ("NewHoldCo"), as custodians of the records of the companies Defendant surrendered to the Special Master's administration, commanding production of the documents identified in Exhibit B hereto; (iii) a subpoena duces tecum to Paladin Management Group, the Special Master's court-approved financial advisor, commanding production of the documents identified in Exhibit C hereto; (iv) a subpoena duces tecum to the NCICs, through the Rehabilitator as their custodian of records, commanding production of the documents identified in Exhibit D hereto; (v) a subpoena duces tecum to the Bermuda insurance companies identified in the Restitution Report (including PB Life and Annuity Co., Ltd. and Northstar Financial Services (Bermuda) Ltd.), through their Joint Provisional Liquidators as custodians of records, commanding production of the documents identified in Exhibit E hereto; (vi) a subpoena duces tecum to Wes Camden, Lauren Fussell, and their law firm, as counsel to the NCICs, commanding production of the documents identified in Exhibit F hereto; each in advance of the evidentiary hearing on the disputed restitution issues, pursuant to Rule 17(c)(1).

Compulsory process is necessary because Defendant does not have these records; the subpoenaed parties do. Control of the relevant companies and their books and records passed out of Defendant's hands twice: first in 2019, when, under the Memorandum of Understanding executed June 27, 2019 and the ensuing rehabilitation, the Rehabilitator's team under Mr. Dinius took over the companies and their records; and again under the Appointment Order (Doc. No. 56), when Defendant turned the companies over to the Special Master's administration, where they are now held by or through NewHoldCo. Defendant retained neither the companies nor their records. The documents that answer the open offset and causation questions sit in the files of Mr. Dinius, of the Special Master and NewHoldCo, and of Paladin. No witness is more central to the questions this Court must decide *de novo* under 18 U.S.C. § 3664(d)(6) than Mr. Dinius, who personally directed the estates' administration. The documents sought are specific, admissible, and relevant under *United States v. Nixon*, 418 U.S. 683, 700 (1974), and the Court must resolve the disputed offset and causation questions by a preponderance of the evidence under 18 U.S.C. § 3664(e). Because the MVRA places on Defendant the burden of proving the offsets and credits the statute mandates, *United States v. Karam*, 201 F.3d 320, 327 (4th Cir. 2000), while the records that carry that burden sit exclusively with the subpoenaed custodians, Defendant requests that production be ordered at such time as the Court directs, sufficiently in advance of the evidentiary hearing—so that he can review the productions, seek additional information, and, if

necessary, move to compel or enforce compliance before the hearing, rather than discover deficiencies when it is too late to cure them.

**FACTUAL BACKGROUND**

1. Michael Dinius is a principal of Noble Consulting Services, Inc. and has served as Special Deputy Rehabilitator of the NCICs under the North Carolina Commissioner of Insurance, as Rehabilitator, since 2019. In that capacity he has directed the management, investment decisions, monetization decisions, and professional-fee administration of the NCIC estates. (See Suppl. Stmt. of Facts, Doc. No. 174, ¶¶ 78–79; Original Stmt. of Facts ¶ 13, filed as Ex. 1 to Doc. No. 132.)

2. The disputed restitution issues before this Court are framed by Defendant's Response and Objection to the Special Master's Report (Doc. No. 132), the supporting Statements of Facts, and Defendant's pending motions (Doc. Nos. 172, 190, 201, 202). They include: whether losses claimed by the payees were directly and proximately caused by the offenses of conviction or instead by the intervening, discretionary decisions of the estates' management; and the amount of the mandatory offsets and credits for value returned to or realized by the payees.

3. The record already before the Court identifies Mr. Dinius's personal involvement in the principal disputed transactions. Under his management, the NCICs were liquidated notwithstanding the $454 million baseline value established by the companies' own management as of November 5, 2018. The Rehabilitator refused or blocked at least four monetization transactions—the November 22, 2018 Ares Management letter of intent; the February 8, 2019 Oaktree Capital Management $1.0 billion proposal; the 2023 Montshire/Alban offer; and the Q1 2024

Quadro Acquisition Corp. One transaction—and in at least one instance litigation was filed against a prospective arm's-length buyer. More than $165 million in fees have been charged to the estates, at a current rate of approximately $2.5 million per month, and approximately $137 million in investment losses were incurred on portfolio decisions made after Defendant transferred control. See Doc. No. 132 & Statements of Facts, Doc. No. 190-4.

4. On the day the rehabilitation order was entered, Mr. Dinius wrote to Defendant from his Noble Consulting account, in connection with the Memorandum of Understanding executed June 27, 2019: "we will contact the guaranty associations and move directly to liquidation. You know what that means." (Original Stmt. of Facts ¶ 58(a) & Ex. D5, filed as Ex. 1 to Doc. No. 132; Suppl. Stmt. of Facts ¶¶ 80–81 & ¶ 96(c), Doc. No. 174 at 41, 49.)

5. Contemporaneous correspondence ties Mr. Dinius personally to the transactions underlying the disputed offsets. A September 12, 2019 e-mail records that Barclays' pricing on the zero-coupon instruments was "provided . . . through Dinius"—instruments the Rehabilitator later sold before maturity for approximately $394 million, crystallizing a loss of approximately $611.6 million against their $1,006,239,867 face value. August 22, 2019 e-mails record that the parties "heard back [from] Mike Dinius" concerning Academy Financial/Vista Life's ownership of and dealings in the AAPC preferred equity—the same instrument whose December 2022 transfer to ULICO underlies a disputed dollar-for-dollar offset. And May 2019

correspondence from Mr. Dinius's Noble Consulting account reflects his role as liaison with the Pennsylvania regulators concerning the affiliated entities.

6. Defendant does not possess the records at issue. Under the June 27, 2019 MOU and the ensuing rehabilitation, custody and control of the relevant companies and their books and records passed to the Rehabilitator's team under Mr. Dinius. (Suppl. Stmt. of Facts, Doc.No. 174, ¶¶ 78, 80–81; see also Original Stmt. of Facts ¶ 13, filed as Ex. 1 to Doc. No. 132.) Under the Appointment Order (Doc. No. 56), Defendant surrendered the remaining companies to the Special Master's administration, and they are now held by or through NewHoldCo, together with their books and records. The interest-bearing loan analysis ("ILA" or "IALA") and its workpapers—including the starting balances, the classification of the zero-coupon instruments, and the treatment of the April 2022 AAPC refinance—were prepared and are maintained by Paladin Management, the Special Master's financial advisor.

7. Mr. Lindberg anticipates that the government will seek to set an evidentiary hearing in the relatively near future. In connection with that, Mr. Lindberg requests that the Court take these subpoenas into account when setting a hearing date, and that they be issued promptly once that date is selected.

## ARGUMENT

### I. Legal Standard

Rule 17(a) entitles a party to a subpoena commanding a witness's attendance and testimony. Rule 17(c)(1) authorizes a subpoena to "order the witness to produce any books, papers, documents, data, or other objects the subpoena designates," and provides that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence," and that upon production "the court may permit the parties and their attorneys to inspect all or part of them." To obtain pre-hearing production, the moving party must clear three hurdles: "(1) relevancy; (2) admissibility; (3) specificity," and the application must be made in good faith and not as a "general 'fishing expedition.'" *Nixon*, 418 U.S. at 700. The *Nixon* factors apply at sentencing-stage proceedings, *United States v. Krane*, 625 F.3d 568, 574 (9th Cir. 2010) (court "must apply the Supreme Court's *Nixon* factors in the specific context of sentencing"); *accord United States v. DNRB, Inc.*, 257 F. Supp. 3d 1033, 1038–39 (W.D. Mo. 2017), and early return dates are the rule's design. *See United States v. Bendawald*, No. 24-cr-146, 2025 WL 711725, at *3 (D. Idaho 2025) ("Almost by its nature, every Rule 17(c) subpoena requests an early return"). Because the restitution disputes are for this Court to resolve by a preponderance of the evidence, 18 U.S.C. § 3664(e),[1] subject to a *de novo* determination of every referred

---

[1] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Motion without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see *Ellingburg v. United States*, 607 U.S. 163, 165 (2026), Defendant contends that the Sixth

issue, 18 U.S.C. § 3664(d)(6), the Rule 17 mechanism is the appropriate vehicle for compelling the third-party evidence those determinations require.

## II. The *Nixon* Factors Are Satisfied

*Relevancy*. Every category in Exhibit A is tied to a disputed causation or offset question already framed on the docket. Causation: the MVRA limits restitution to losses directly and proximately caused by the offense of conviction, and the intervening, discretionary decisions of the estates' manager—the refusals of the Ares, Oaktree, Montshire, and Quadro transactions; the litigation against a prospective buyer; the pre-maturity sale of the protective zero-coupon instruments; the below-market Clanwilliam disposition—are the core of Defendant's causation defense. *See generally Robers v. United States*, 572 U.S. 639, 648-49 (2014); Doc. Nos. 132, 190. Mr. Dinius made or directed those decisions. Offsets: the value realized by or returned to the payees—the zero-coupon sale proceeds, the AAPC preferred equity transferred to ULICO, the Clanwilliam proceeds, and the fees and investment losses charged to the estates—must be credited under 18 U.S.C. § 3664(j)(2), and the documents that quantify those items are in the Rehabilitator's files. The necessity of compulsory process is confirmed by the Special Master's own position: his counsel's draft

---

Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

supplement asserts that the "precise dollar figures" and IALA classification of the zero-coupon offset remain open questions—questions answerable only from the estates' records, which Mr. Dinius controls.

*Admissibility*. The categories seek business records of the rehabilitation estates and of Noble Consulting kept in the ordinary course, Fed. R. Evid. 803(6); contemporaneous correspondence of the payees' representative bearing on the estates' valuation and monetization decisions.

*Specificity*. The Exhibits identify categories of admissible evidence with reasonable specificity. For example, Exhibit A identifies discrete, dated transactions—the November 22, 2018 Ares letter of intent; the February 8, 2019 Oaktree proposal; the June 27, 2019 MOU; the zero-coupon bond sales; the December 2022 AAPC/ULICO transfer; the September 2025 Clanwilliam sale; the Beckett disposition—together with defined categories of valuation, fee, and accounting records, each bounded to the period October 1, 2018 to the present. (Ex. A at 2-5). The transactions are known, the record already documents Mr. Dinius's personal role in them, and what remains is the underlying paper.

*Good faith*. The subpoena is sought for the evidentiary hearing this Court must conduct on disputes the statute reserves to it—not for general discovery. Pre-hearing production is necessary because the volume and age of the records make review on the day of the hearing impracticable, and "the failure to obtain such inspection may tend unreasonably to delay" the proceeding. *Nixon*, 418 U.S. at 699. Defendant does not have access to the records. He surrendered the companies and their records in

2019 under the MOU and again under the Appointment Order, and a subpoena is the ordinary and proper mechanism for obtaining records from the officers and advisors who now hold them—including a court-appointed officer, whose records of a criminal restitution administration are not his own but the Court's. Finally, as to privilege: communications between any subpoenaed custodian and the Government are not privileged, and any claim of privilege as to other materials should be presented by written log, not by blanket withholding. "[T]he failure to obtain such inspection may tend unreasonably to delay" the proceeding. *Nixon*, 418 U.S. at 699.

## III. The MVRA Itself Requires Production of These Records, and Requires Time to Cure Deficiencies Before the Hearing.

The MVRA does not merely permit this production; its architecture requires it. The statute commands that restitution be reduced by "the value . . . of any part of the property that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and that any amount the victim later recovers for the same loss be credited, 18 U.S.C. § 3664(j)(2). It directs that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and it allocates the burdens: the Government bears the burden of demonstrating the victim's loss, and "the burden of demonstrating such other matters as the court deems appropriate" rests "upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). In this Circuit, the defendant bears the burden of proving that an offset or reduction applies, *United Karam*, 201 F.3d at 327, and of showing that a victim "delayed unreasonably in selling property (or otherwise neglected it)." *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017). The Compulsory Process Clause reaches materials obtained by

Rule 17(c) subpoena. See *Khouj v. Darui*, 248 F.R.D. 729, 732 (D.D.C. 2008). The statute therefore assigns Defendant a burden of proof on the very questions—the zero-coupon proceeds and their IALA classification, the AAPC-refinance payments, the cash repayments, the use of the hundreds of millions in interest and principal repayments the estates received—whose proof lives entirely in the files of the subpoenaed custodians. A statutory scheme that assigns a party the burden of proof necessarily entitles that party to process adequate to obtain the evidence that carries it; otherwise the preponderance standard of § 3664(e) and the mandatory credits of § 3664(j)(2) become rights without remedies. These documents should be produced for these reasons: without them, the *de novo* determination that § 3664(d)(6) reserves to this Court would proceed on a record only one side is permitted to see.

The same statutory design dictates the timing. Defendant does not ask the Court to fix any particular interval; he asks only that the return date leave a meaningful runway to cure deficiencies before the hearing, because: (i) the productions span five custodians, seven-plus years, and hundreds of millions of dollars of transactions, and meaningful review of that volume cannot be compressed into days; (ii) review will generate follow-up—additional requests, clarifications, and targeted supplementation—that must itself be served and answered before the hearing; (iii) if any custodian produces deficiently, asserts unfounded privilege, or withholds, Defendant must have time to test the privilege logs and move to compel or to enforce the subpoena under Rule 17(g) while relief is still meaningful; and (iv) *Nixon* itself grounds pre-hearing production in the concern that late inspection "may

tend unreasonably to delay" the proceeding, 418 U.S. at 699—a concern that cuts entirely in favor of early production here, because an adequate runway protects the hearing date rather than threatening it. A return date that leaves no time to cure deficiencies is, in practice, no compulsory process at all. By way of illustration only: given the number of custodians and the seven-year period the records span, a runway on the order of 120 to 180 days would accommodate that cure process; Defendant defers to the Court on the precise interval.

**CONCLUSION AND RELIEF REQUESTED**

WHEREFORE, Defendant respectfully requests that the Court enter an Order:

(a) Authorizing issuance of, and directing the Clerk to issue, subpoenas duces tecum to (i) Michael Dinius in the form of Exhibit A; (ii) Joseph W. Grier, III, as Special Master, and NHC Holdings, LLC, in the form of Exhibit B; (iii) Paladin Management Group in the form of Exhibit C; (iv) the NCICs, through the Rehabilitator as custodian of records, in the form of Exhibit D; (v) the Bermuda insurance companies, through their Joint Provisional Liquidators, in the form of Exhibit E; and (vi) Wes Camden, Lauren Fussell, and their firm, in the form of Exhibit F—each commanding production of the designated documents to the Clerk of Court (or, at the Court's election, to counsel for all parties) at such time as the Court directs, sufficiently in advance of the evidentiary hearing on the disputed restitution issues to permit Defendant to review the productions, seek additional information through any follow-up requests, and, if necessary, move to compel or enforce compliance

under Rule 17(g) before the hearing, with leave for the parties and their attorneys to inspect the productions pursuant to Rule 17(c)(1);

(b) Providing that any assertion of privilege or protection be made by written log served on all parties within seven (7) days of service of the subpoena; and

(c) Granting such other and further relief as the Court deems just and proper.

Dated: July 22, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

**CONSULTATION STATEMENT**

Pursuant to the Court's motions practice and LCrR 47.1, the undersigned states that counsel for Defendant conferred with counsel for the United States and counsel for the Special Master on July 23, 2026, regarding the relief requested herein. The United States opposes the relief requested and the Special Master's opposes the relief requested.

Dated: July 23, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 23, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 23, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | **Case No. 3:23-CR-48-MOC**<br>*(Charlotte Division)*<br><br>**Case No. 5:19-CR-22-MOC**<br>*(Statesville Division)*<br><br>Judge Max O. Cogburn, Jr. |

**NOTICE OF CORRECTION REGARDING THE VALUATION OF BECKETT COLLECTIBLES, LLC**

Defendant Greg E. Lindberg respectfully submits this Notice of Correction to correct the record in the above-captioned proceedings regarding the value of Beckett Collectibles, LLC ("Beckett"). This Notice corrects only the record as reflected on the docket and is submitted promptly upon counsel and Mr. Lindberg obtaining access to the underlying valuation materials.

## I. BACKGROUND

In prior filings made by Defendant on the docket in these proceedings—including the response to the Special Master's request for additional time—a *New York Times* article discussing the sale of Beckett was attached, and the filing used the sales figure for Beckett then available to counsel. That sales figure—approximately $134 million—was communicated by the Special Master during a call and did not originate with Defendant. A sales figure is not the same as a valuation: as the independent materials set forth below establish, Beckett's value was approximately $1 billion, and in all events greater than $800 million. The record is corrected accordingly.

This correction was precipitated by Mr. Lindberg's movement through the Federal Bureau of Prisons ("BOP") transit system following his designation, during which

counsel had very limited—if any—access to Mr. Lindberg at the time these filings were made. Because Mr. Lindberg could not be meaningfully consulted, and in order to timely place a response on file, the filing relied on the sales figure then available to counsel and attached the *New York Times* article discussing the Beckett sale rather than the underlying valuation materials. Mr. Lindberg and counsel now have access to the underlying valuation and transaction materials, each of which is attached hereto and independently corroborates the others.

## II. THE CORRECTED VALUATION

The contemporaneous, independent, and arm's-length market evidence establishes the following with respect to Beckett's value:

A. **Independent appraisal (Cabrillo Advisors).** An independent business valuation prepared by Cabrillo Advisors, Inc., with a valuation date of January 31, 2022, concluded that the enterprise value of Beckett was **$1,003,924,000**—approximately $1 billion. (Ex. A.)

B. **Blackstone Indication of Interest.** In an indication of interest and related counter dated April 5, 2022, Beckett was valued at a total enterprise valuation of **$1.05 billion**, with the accompanying analysis noting an implied enterprise value of approximately $1.001 billion, "just under Cabrillo's calculated EV of $1.004bn." (Ex. B.)

C. **CCG + Beckett term sheet.** The CCG + Beckett proposal and term sheet dated April 14–16, 2022 reflected a Beckett equity value of **$800 million to $900 million** (on a debt-free, cash-free basis), and projected "Beckett Proceeds by 2022E" of approximately $941 million to $1.065 billion. (Ex. C.)

D. **Best-and-final counter.** Contemporaneous transaction correspondence reflects a best-and-final counter at a Beckett valuation of **$1.1 billion** (structured as

$250 million cash at closing and $325 million within 30 days, among other terms). (Ex. D.)

Each of these sources—an independent appraisal, an institutional buyer's indication of interest, the parties' term sheet, and the best-and-final counter—independently establishes that Beckett's value was approximately $1 billion, and in every case greater than $800 million. The approximately $134 million sales figure previously available to counsel is not the same as this independent valuation; to the extent it was used in any prior filing to describe Beckett's value, the record is corrected.

## III. SCOPE OF THIS CORRECTION

Defendant corrects the record as to Defendant's own filings on the docket in these proceedings—specifically the two filings identified below, and any other filing made by Defendant that used the sales figure then available to counsel to describe the value of Beckett. In each such filing by Defendant, any use of that sales figure to describe Beckett's value is superseded and corrected by the valuation evidence set forth above and in the attached exhibits, which reflect a value of approximately $1 billion, and in all events greater than $800 million. This Notice corrects only Defendant's own filings and does not purport to correct any filing made by any other party.

**A. Response to the Special Master's Motion for Extension of Time (Doc. 220).** Defendant's Response in Opposition to the Special Master's Motion for Extension of Time, filed June 22, 2026, attached as Exhibit A a *New York Times* article discussing the sale of Beckett and stated that Beckett "was sold to Collectors in December 2025 with no motion, no notice, no order, and no accounting of the proceeds." That filing stated no value for Beckett and did not use the approximately $134 million figure; it is identified here for completeness and requires no correction as to Beckett's

value, which the attached exhibits establish was approximately $1 billion, and in all events greater than $800 million.

**B. Motion for a Determination That No Restitution Is Owed (Doc. 234).** Defendant's Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction, filed July 14, 2026, states that "[t]he Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds." The approximately $134 million figure in that statement refers to the sales figure the Special Master reported Beckett was sold for and is not Beckett's valuation. The record is corrected to reflect that Beckett's value was approximately $1 billion, and in all events greater than $800 million, as shown in the attached exhibits—a valuation distinct from, and substantially above, the reported sale price of approximately $134 million. This correction is limited to Beckett's value and does not alter any other statement in that filing, including that the disposition was effected without court approval or an accounting of proceeds.

This Notice is limited to correcting the record as reflected on the docket. To the extent any filing references the Special Master's sale of Beckett for approximately $134 million, that figure is accurate as a description of the reported sale; the correction made herein is limited to Beckett's value, which was approximately $1 billion, and in all events greater than $800 million.

## IV. SUMMARY OF SUPPORTING VALUATION EVIDENCE

| Source (Exhibit) | Beckett Value | Document Date | Exhibit |
|---|---|---|---|
| Cabrillo Advisors, Inc., Business Valuation (Ex. A) | $1,003,924,000 | Valuation date Jan. 31, 2022; prepared Apr. 7, 2022 | Ex. A |
| Blackstone Indication of Interest / Beckett Counter (Ex. B) | $1.05 billion TEV | Apr. 5, 2022 | Ex. B |
| CCG + Beckett Blackstone Proposal / Term Sheet (Ex. C) | $800–$900 million equity value; proceeds to $1.065 billion by 2022E | Apr. 14–16, 2022 | Ex. C |
| Correspondence re CCG \| Beckett Term Sheet (best-and-final counter) (Ex. D) | $1.1 billion valuation | Apr. 18, 2022 | Ex. D |

## V. EXHIBITS

Exhibit A — Business Valuation of Certain Entities for Global Growth Holdings Inc., prepared by Cabrillo Advisors, Inc. (valuation date Jan. 31, 2022; prepared Apr. 7, 2022).

Exhibit B — Blackstone Indication of Interest – Beckett Counter (Apr. 5, 2022).

Exhibit C — CCG + Beckett Blackstone Proposal / Term Sheet (Apr. 14–16, 2022).

Exhibit D — Correspondence re CCG | Beckett Term Sheet, reflecting best-and-final counter (Apr. 18, 2022).

Dated: July 27, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
(202) 860-4084
vramachandran@dhammalaw.com
*Pro Hac Vice Pending*

*Counsel for Defendant Greg E. Lindberg*

## CERTIFICATE OF CONSULTATION

Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States on July 27, 2026, regarding the relief requested herein.

The United States' does not have a position.

The Special Master also has no objection to this filing.

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 27, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 27, 2026

*<u>/s/ Kenneth Barnes</u>*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

# EXHIBIT E

Letter from Greg E. Lindberg to Michael Martinez, copying Paladin Management Group, dated March 6, 2026

March 6, 2026

To: Michael Martinez
From: Greg Lindberg
CC: Paladin Management Group
RE: Potential acquiror of Damovo

Michael,

We have been approached by the controlling shareholder of this SPAC:

https://twelveseasspac.com/

They raised $172 million and they are looking for assets like Damovo. They mentioned perhaps a valuation of $500 million or so (27 times EBITDA) for Damovo based on the limited financial information we have.

Can you instruct Damovo to engage with this SPAC so a full LOI can be prepared? I assume an offer anywhere near $500 million for Damovo would be attractive to all stakeholders.

Thank you

GREG

# EXHIBIT F

Declaration of Greg E. Lindberg pursuant to 28 U.S.C. § 1746 (executed August 25, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________________
(To be supplied by the court)

GREG E. LINDBERG,
Plaintiff,
v.
HUGH STEVEN WILSON, CHRIS NICKERSON,
UK ATLANTA HOLDINGS LLC, et al.,
Defendants.

**DECLARATION OF GREG E. LINDBERG**
**(28 U.S.C. § 1746)**

I, Greg E. Lindberg, declare as follows:

1. I am the Plaintiff in this action. I am over the age of eighteen and competent to make this Declaration. Except where I state that a matter is based upon information and belief, the facts set forth below are within my personal knowledge, and if called as a witness I could and would testify competently to them.

2. I am the defendant in United States v. Lindberg, No. 3:23-CR-48-MOC (W.D.N.C.). On January 23, 2025, that court entered an Order Appointing Special Master, which appointed Joseph Grier as Special Master and Scott Avila of Paladin Management as his Financial Advisor. The Damovo Group entities are Specified Affiliated Companies under the June 27, 2019 Memorandum of Understanding referenced in that Order, and the Damovo Group is a Primary Restitution Asset in that proceeding.

3. I am the person who owes the restitution obligation that the Primary Restitution Assets, including the Damovo Group, exist to satisfy. It is my understanding that value realized

on the disposition of those assets and paid to the victims is credited against that obligation, and that value not realized is not credited, leaving me personally liable for the difference.

**A. The March 2026 Twelve Seas Approach and Referral**

4. In or about early 2026, I was approached by the controlling shareholder of Twelve Seas Investment Company III ("Twelve Seas"), a special purpose acquisition company listed on the NASDAQ under the ticker symbol "TWLV." Twelve Seas had raised approximately $172 million and was seeking to acquire assets of the kind represented by the Damovo Group.

5. Twelve Seas mentioned a possible valuation of approximately $500 million for the Damovo Group — approximately twenty-seven times EBITDA — based on the limited financial information then available to it. I understood that figure to be preliminary and indicative rather than a firm offer, because Twelve Seas had not been given access to the Damovo Group's financial information.

6. On March 6, 2026, I prepared a written letter addressed to Michael Martinez, copying Paladin Management Group, captioned "Potential acquiror of Damovo." In that letter I identified Twelve Seas and its website, stated that it had raised $172 million and was looking for assets like Damovo, stated that it had mentioned a possible valuation of approximately $500 million for Damovo, and asked Martinez to instruct Damovo to engage with the SPAC so that a full letter of intent could be prepared. I wrote that I assumed an offer anywhere near $500 million for Damovo would be attractive to all stakeholders. A true and correct copy of that letter is attached as Exhibit E.

7. Paladin Management Group is the firm whose principal, Scott Avila, was appointed Financial Advisor to the Special Master under the Order Appointing Special Master. I

copied Paladin so that the Special Master's own financial advisor would have direct notice of the opportunity.

8. It is my understanding, based on my dealings in this matter, that Michael Martinez has functioned as a principal decision-maker with respect to the administration of these assets.

9. I instructed my then-counsel at Katten Muchin Rosenman LLP — Ryan J. Meyer and Brandon N. McCarthy — to transmit that letter. Later the same day, Mr. Meyer confirmed to me in writing that the letter had been sent, and advised that he had also copied Don Harer because Mr. Harer is a member of the board of the New Holding Company. In the course of that exchange, Mr. Meyer asked me whether a point person and contact information could be provided to the recipients.

10. I did not seek to negotiate with Twelve Seas myself. I referred the opportunity so that those administering the asset could pursue it on behalf of the restitution estate. What I asked for was simple and is stated on the face of the letter: that Damovo be instructed to engage so that a full letter of intent could be prepared.

11. Upon information and belief, no one thereafter contacted Twelve Seas, instructed the Damovo Group to engage with Twelve Seas, or commenced any diligence process with Twelve Seas in response to that letter. My belief is based on the following: I received no report from Mr. Martinez, from Paladin Management, from the Special Master, from counsel, or from any other person that any such contact had been made; no diligence process involving Twelve Seas was ever commenced to my knowledge; and, as set forth below, when Twelve Seas

ultimately submitted a written proposal nearly five months later, it did so by contacting me directly rather than through any process being run by those administering the asset.

### B. The July 2026 Indication of Interest

12. On August 1, 2026, Dimitri Elkin, the Chief Executive Officer of Twelve Seas, sent me a written indication of interest concerning the Damovo Group, dated on or about July 31, 2026. He addressed it to me directly, copying Richard McDonald, and asked how best to proceed. A true and correct copy of that letter is attached as Exhibit A.

13. The letter proposes a business combination with the Damovo Group at an enterprise value of $400 million. I understand it to be a non-binding indication of interest, subject to diligence and definitive documentation.

14. Twelve Seas approached me directly. To my knowledge, no one administering the Damovo Group or the restitution estate solicited that proposal, notwithstanding the referral I had directed nearly five months earlier.

15. The valuation associated with Twelve Seas declined by approximately $100 million between March 2026 and July 2026 — from the approximately $500 million indicated in March to the $400 million proposed in writing in July — across the period during which, upon information and belief, no contact with Twelve Seas was made and no diligence was permitted.

### C. The Payments to Chris Nickerson

16. Chris Nickerson is the Chief Executive Officer of the Damovo Group.

17. Upon information and belief, Mr. Nickerson is set to receive several million dollars in payments characterized as "transfer of control payments" if the Damovo Group is sold.

18. My belief as to the preceding paragraph is based on the following: the Damovo Group has failed to respond to a written indication of interest at a $400 million enterprise value from a NASDAQ-listed acquirer, a course of conduct I cannot explain on ordinary commercial terms; the transaction being pursued instead is one that, by the proposed purchaser's own account, generates no sale proceeds; that transaction is nonetheless structured to generate substantial payments to persons whose consent is required to close it; and Mr. Nickerson, as Chief Executive Officer, controls the flow of information to prospective purchasers and would have been the person to respond to Twelve Seas.

19. I do not have access to the Damovo Group's books, records, board materials, or transaction documents. I am incarcerated and have been excluded from the management and records of the Damovo Group. The terms, amount, and documentation of any payment to Mr. Nickerson are within the knowledge and control of the Defendants and are not available to me.

**D. Harm**

20. If the Damovo Group is transferred to a third-party acquirer, I do not believe the enterprise could be recovered or repurchased. It is a specific operating business with particular customers, contracts, and personnel, and once it is integrated into an acquirer's operations I do not believe any court could restore it.

21. I believe the Twelve Seas opportunity will be extinguished entirely if the Damovo Group is transferred to another acquirer.

22. Upon information and belief, no order has been sought from or entered by the United States District Court for the Western District of North Carolina approving the transaction presently being pursued.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 25th, 2026, at FCI Atlanta.

Greg E. Lindberg
Plaintiff, pro se
P.O. Box 159
Thonotosassa, FL 33592
919-308-9686
[redacted]
geLindberg@gmail.com
BOP Inmate # 34-828-058