Lindberg v. Wilson, et al., Civil Action No. 1:26-cv-03939-GPG (D. Colo.)
Plaintiff's Motion for Reconsideration of the Order of September 21, 2026 (Doc. 13)

# EXHIBIT 1

Order Appointing Special Master

United States v. Lindberg, No. 3:23-cr-48, Doc. 56 (W.D.N.C. Jan. 23, 2025)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3-23-cr-48-MOC**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| GREG E. LINDBERG | ) |

**ORDER APPOINTING SPECIAL MASTER**

**THIS MATTER IS BEFORE THE COURT** on the Joint Motion for Appointment of Special Master, filed by the United States and Defendant Greg E. Lindberg on December 5, 2024. (Doc. No. 54). The motion is **GRANTED**.

**THE COURT HEREBY FINDS AS FOLLOWS:**

1. On February 23, 2023, in a thirteen-count Bill of Indictment, Defendant was charged with conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. (Id. at ¶ 185).

2. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." (Doc. No. 40). In paragraph 10(a) of the plea agreement, Defendant also agreed "to pay full restitution" to all victims of the conduct charged in the Bill of Indictment, including the following

insurance companies and their impacted policyholders: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. (Id.).

3. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, victims are accorded specific rights, and the Act confirms that victims have "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

4. To fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i).

5. In this case, complicated issues are likely to arise in determining an appropriate restitution order because, among other reasons: (a) there are several insurance company victims that collectively have thousands of wronged policyholders; (b) the amount of restitution owed is substantial; (c) several of the insurance company victims are in liquidation proceedings; (d) some of the victims have received, or may before sentencing receive, various amounts of repayment of their outstanding debts; (d) priority of payment, if applicable, amongst victims has yet to be determined; (e) certain property or assets may have joint or overlapping ownership and/or may be subject to various third party claims; (f) certain victims may have civil judgments for money damages against Defendant and his entities; and (g) Defendant's business assets from which restitution will likely be paid are not readily convertible into cash.

6. Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid.

7. It would be unduly burdensome for the Government, the Probation Office, the Clerk of Court, and the investigative agencies to attempt this process. As a result, an experienced, neutral, and disinterested person should be appointed to assist the Court. Section 3664 authorizes courts to "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). It would conserve the resources of this Court and others if a special master is appointed to resolve victim and restitution issues in this case under the Court's supervision and guidance.

8. The parties recommend that the Court appoint Joseph Grier of Grier Wright Martinez PA as the special master pursuant to 18 U.S.C. § 3664(d)(6). The parties further recommend that the Court appoint Scott Avila of Paladin Management as the special master's financial advisor to assist the special master in the performance of all tasks related to this Order. Mr. Grier and Mr. Avila have submitted declarations outlining their qualifications and standard rates. Mr. Grier and Mr. Avila are well-qualified to serve in these roles, and the Court finds that their standard rates appear reasonable.

9. To assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth

Holdings, LLC's rights and interests, whether held directly or indirectly, in the following assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic or controlling interest (collectively referred to as the "Primary Restitution Assets"):

a. AAPC Holdings, LLC and any related entities or trusts; and

b. New Hold Co. ("NHC") and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding and any related entities or trusts that include Specified Affiliated Companies.[1]

10. Defendant has agreed to cooperate with the special master in carrying out the duties and responsibilities of the special master and to take all necessary steps identified by the special master to assist the special master in carrying out his/her duties pursuant to this Order. Defendant has also agreed to refrain from taking and/or cease taking any actions identified by the special master as interfering with the special master carrying out his/her duties.

11. Courts have approved of appointing special masters and have given them responsibilities similar to those being requested in the instant case. See, e.g., United States v. Vaughan, No. 3:01CR11, 2008 U.S. Dist. LEXIS 98817, at *1 (W.D.N.C. Dec. 3, 2008) (Thornburg, J.) (special master appointed in case with losses totaling $33 million involving complicated, offshore, and/or inadequately documented financial transactions to assist in noticing potential victims, setting percentages for their losses, and ultimately distributing $3 million to more than 500 victims); United States v. Olivares, No. 3:13-CR-335, 2014 U.S. Dist. LEXIS 76743, at *2 (W.D.N.C. June 5, 2014) (Cogburn, J.) (special master, who was receiver in parallel civil case

[1] See Exhibit A to the Memorandum of Law in Support of the Joint Motion for Appointment of Special Master (Doc. No. 55-1).

brought by U.S. Securities and Exchange Commission, appointed in $850 million Ponzi scheme with 900,000 potential victims in over 150 countries). Here, the requested relief is administratively reasonable; will further the interests of justice as to victim rights; will promote cooperative efforts between the parties, the Court, and others involved or interested; and will increase efficiency in the collection and timely distribution of restitution. Accordingly, for the aforementioned reasons, a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims.

**IT IS THEREFORE ORDERED** that the Joint Motion For Appointment of Special Master is **GRANTED**.

**IT IS FURTHER ORDERED** that:

1. Joseph Grier of Grier Wright Martinez PA (the "Special Master") is appointed as Special Master pursuant to 18 U.S.C. § 3664(d)(6).

2. Scott Avila of Paladin Management (the "Financial Advisor") is appointed as the Special Master's Financial Advisor. The Financial Advisor shall assist the Special Master in the performance of all tasks related to this Order. In so assisting the special master, the financial advisor shall be allowed to utilize such other personnel at Paladin Management as reasonably necessary for the performance of his duties as Financial Advisor, and Paladin Management and such personnel should also be granted the rights and protections of "Financial Advisor" under terms of this Order.

3. The Special Master is hereby empowered to perform the following necessary tasks:

a. verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses;[2]

b. identify all assets available for liquidation and/or repatriation for the benefit of the victims, including any such assets held by GBIG Capital, LLC, GBIG Holdings, Inc., PBX Holdings, LLC, PBX Bermuda Holdings, Ltd., BMX Holdings, LLC., BMX Bermuda Holdings, Ltd. and any of their subsidiaries, and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets;

c. select an appropriate method and timetable and seek Court approval to liquidate and/or repatriate any available assets for the benefit of the victims;

d. oversee and help accomplish the liquidation with Court approval and/or repatriation of any available assets for the benefit of the victims;

e. clear title to all assets for transfer to bona-fide buyers;

f. fashion a proposed restitution order;

g. apportion any available funds among the victims in accordance with the Court's restitution order and, if necessary, propose an apportionment methodology to be applied to future restitution payments received;

h. receive and distribute restitution payments to victims in accordance with the Court's restitution order;

---

[2] Defendant has reserved all rights with regard to any arguments regarding calculating loss amount. See U.S.S.G. § 2B1.1Note 3(E)(formerly 2F1.1); see also U.S. v. Lane, 323 F.3d 568, 585-89 (7th Cir. 2003); United States v. Monk, No. 2:20-CR-22-WKW, 2020 WL 5219534 at **8–9 (M.D. Ala. Sept. 1, 2020). Restitution amounts should be reduced by any amount victims have recovered for the same losses. See 18 U.S.C. § 3664(j)(2).

i. cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims, such cooperation and coordination to include seeking modifications, if necessary, of any existing restraining orders and/or injunctions;

j. retain a law firm, including his own, and/or other professionals to assist the Special Master in carrying out his duties;

k. provide periodic reports to the Court about the status of Defendant's restitution obligations; and

l. pay Defendant's outstanding and future legal fees if such fees and expenses have been approved by the Court.

4. Defendant shall take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the Primary Restitution Assets.

5. The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the Special Master deems it helpful in fulfilling his duties under this Order.

6. In accomplishing the tasks enumerated above, the Special Master shall attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets.

7. If the Special Master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Defendant's restitution obligations, he shall not seek to liquidate additional assets owned, controlled, and/or associated with Defendant and/or his entities or in

which Defendant and/or his entities have an economic interest (the "Secondary Restitution Assets") until and unless he determines, and so notifies the Court, that the Primary Restitution Assets are not likely to be sufficient to fully satisfy Defendant's restitution obligations.

8. Defendant shall cooperate with the Special Master in carrying out the duties and responsibilities of the Special Master and take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order. Defendant shall also refrain from taking and/or cease taking any actions identified by the Special Master as interfering with the Special Master carrying out his/her duties. If Defendant fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties.

9. The Special Master shall give due consideration to the Government's efforts and the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses.

10. The Special Master shall have the power to: (a) obtain such further order(s) from the Court that he deems prudent or necessary to effectuate the payment of Defendant's restitution obligations; and (b) make a motion or application to the Court regarding instruction or clarification in connection with his powers in this matter.

11. All income tax reporting and payments, whether for periods prior to or during the terms of this Order, shall remain the obligation of Defendant. The Special Master shall not be required to report any income generated by the Primary Restitution Assets (including interest earned), or to pay any income taxes due thereon, nor shall the Special Master bear liability for the

failure of Defendant to report said income to taxing authorities or pay the taxes associated with such income.

12. The Special Master has the power to employ a law firm, including his own, and/or other professionals in this matter as reasonably necessary to accomplish the purposes of this Order without further application to the Court.

13. The Special Master will be acting solely in his capacity as Special Master, and the Special Master, the Financial Advisor, and any other professionals retained by the Special Master shall have no personal liability for claims against Defendant, individually or collectively. With respect to any insurance coverage, the Special Master, and other parties with insurable interests, should be named as additional insureds on the policies for the period that the Special Master shall be appointed. No person may pursue any claim against the Special Master, the Financial Advisor, or any other professionals retained by the Special Master for any action or omission taken or made in connection with the Special Master's powers or duties under this Order without first seeking leave of the Court. Neither the Special Master, the Financial Advisor, nor any other professionals retained by the Special Master in connection with this matter shall be liable to any person for any action or omission taken or made in good faith.

14. The Special Master shall prepare quarterly interim statements (each, an "Interim Statement") that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties, as well as those of any other professionals the Special Master deems appropriate. The Interim Statements should also reflect the fees and expenses of Defendant's counsel if such fees and expenses have been provided to the Special Master. Such Interim Statements should be submitted to the Court for its approval and confirmation, in the form of

either a noticed interim request for fees or a Special Master's final account and report. Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court, including, to the extent authorized by otherwise applicable law, from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets.

15. The parties and/or the Special Master shall be authorized to make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing.

16. None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders.

**SO ORDERED**.

Signed: January 23, 2025

Max O. Cogburn Jr
United States District Judge

# EXHIBIT 2

Special Master's Response to Defendant's Motion to Disqualify and Remove the Special Master

No. 3:23-cr-48, Doc. 288 (W.D.N.C. Aug. 7, 2026)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**SPECIAL MASTER'S RESPONSE TO DEFENDANT'S MOTION TO DECLARE THE SPECIAL MASTER REFERENCE UNCONSTITUTIONAL, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDER**

NOW COMES Joseph W. Grier, III, the Court-appointed special master (the "Special Master") in this proceeding, through counsel, hereby presents this response (this "Response") to the *Defendant's Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Docs. 161, 245, 245-1)* (the "Motion")[1] and respectfully represents as follows:

**INTRODUCTION**

Once again, Defendant's attempts to disqualify the Special Master fail when the doctrines he cites are applied to the actual facts and circumstances of this case.[2] Defendant seeks to relitigate issues previously resolved in this case by: omitting or grossly distorting facts concerning the liquidation of certain assets—a liquidation process largely outside of the Special Master's control;

---

[1] Doc. No. 269.

[2] The same is true for Defendant's prior motion seeking the same or similar relief on the same or similar grounds, *Defendant's Emergency Motion to Stay All Asset Sales and Asset Sale Processes Pending Entry of a Final Restitution Order and De Novo Article III Determination, and Consolidated Objections to the Preliminary Order of Restitution (Doc. 161), the Scope of the Special Master Reference, and the Special Master's Statement (Doc. 159), with Incorporated Memorandum of Law* (Doc. No. 190), which is explained in the Special Master's response thereto (Doc. No. 268) (the "Response to Prior Disqualification Motion"). Capitalized terms not otherwise defined herein shall have the meanings prescribed in the Special Master's Response to Prior Disqualification Motion.

distorting facts on the value of assets liquidated; and grossly mischaracterizing or ignoring the role of his prior counsel—his court authorized representative—in collaborating with the Special Master on all facets of this case (while simultaneously reaping the benefit of a reduced sentence obtained by such prior counsel). The primary purpose of this Response is to clarify the record in response to the various false or misleading factual contentions appearing in the Motion.

While the Special Master believes that the Motion's legal arguments—primarily concerning the alleged unconstitutionality of, and Defendant's inability to consent to, the Appointment Order—lack merit, no further response to the Motion's legal arguments appears necessary considering that Defendant previously submitted a brief[3] supporting the special master process in this case and any such response, if necessary, falls within the Government's purview.

## FACTUAL AND PROCEDURAL BACKGROUND

Many of the facts alleged in the Motion are undermined by the facts presented in the Special Master's Response to Prior Disqualification Motion and the *Affidavit of Michael L. Martinez* filed in support thereof.[4] Some of those facts about the history of this case, along with others implicated by the Motion, are summarized immediately below.

- Defendant agreed "to pay full restitution" to the victims of the conduct charged in the indictment, including but not limited to, certain insurance companies and their impacted policyholders.[5]
- On December 5, 2024, the Government and Defendant brought a joint motion to appoint the Special Master in accordance with 18 U.S.C. § 3664(d)(6).[6]
- In that motion, Defendant (with the Government joining) argues and otherwise represents to the Court that the Special Master is "experienced, neutral, and disinterested"[7] and that it is appropriate under the law to appoint the Special Master to perform the functions described in the proposed appointment order.
- On January 23, 2025, the Court entered the Appointment Order in the form

3 Doc. No. 55.
4 Doc. No. 268-1.
5 Doc. No. 40.
6 Doc. No. 54.
7 *See* Doc. No. 54, at 3 [¶¶ 7–8].

proposed by Defendant with minimal or no revisions.[8]

- The Appointment Order empowers the special master to: (a) verify and quantify losses; (b) identify assets available for liquidation; (c) select an appropriate method and timetable and seek Court approval to liquidate available assets; (d) oversee and help accomplish the liquidation with Court approval; (e) clear title to all assets for transfer to bona-fide buyers; (f) fashion a proposed restitution order; (g) apportion any available funds among the victims in accordance with the Court's restitution order; (h) receive and distribute restitution payments to victims in accordance with the Court's restitution order; (i) cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims; (j) retain a law firm; (k) provide periodic reports to the Court; and (l) pay Defendant's outstanding and future legal fees approved by the Court.[9]
- The Appointment Order mandates that Defendant put the Special Master in immediate possession and control of Defendant's interests in the "Primary Restitution Assets."[10]
- In addition to ordering the Special Master to "cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims," the Appointment Order directs the Special Master to "give due consideration" to "the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant" and "[n]one of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders."[11]
- The Appointment Order provides that the Special Master's professionals (and Defendant's counsel) would be paid Court approved fees and expenses from assets administered by the Special Master.[12]
- Again, Defendant recommended and requested that the Court enter the form of the Appointment Order that was ultimately entered by the Court, to which the Court made minimal or no revisions. Defendant did not appeal, seek reconsideration of, or otherwise object to the Appointment Order.
- Defendant's brief in support of the motion seeking the appointment of a special master attaches as Exhibit A that certain *Memorandum of Understanding* (the "MOU") whereby Defendant agreed to convey various "Specified Affiliated Companies" (also known as "SACs") to NHC Holdings, LLC ("NHC").[13]
- The MOU charges NHC with administering the SACs in a manner that protects the interests of the policyholders of Defendant's insurance company victims.[14]
- When Defendant balked at transferring control over the SACs to NHC, the North

[8] Doc. No. 56.
[9] Doc. No. 56, at 6–7 [¶ 3].
[10] Doc. No. 56, at 7 [¶ 4].
[11] Doc. No. 56, at 8, 10 [¶¶ 9, 16].
[12] Doc. No. 56, at 9–10 [¶ 14].
[13] Doc. No. 55-1.
[14] Doc. No. 55-1, at 6 [Article II.3.ii].

Carolina Insurance Companies sued Defendant in Wake County, North Carolina Superior Court to compel him to do so; Defendant was then ordered to do so; and eventually Defendant conveyed the SACs to NHC, which occurred prior to entry of the Appointment Order.

- The MOU states that "***provided that there is no default under any Loan***, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one" NHC director appointed by (effectively) Defendant.[15]

- On information and belief, at the time the Appointment Order was entered (and since) *all* of the "Loans" within the meaning of the MOU[16] were in default (and remain in default). At a minimum, the U.S. District Court for the Eastern District of North Carolina has held that at least some of the "Loans" within the meaning of the MOU (and the companion Interim Amendment to Loan Agreements ("IALA")) have been in default.[17]

- Thus, the only control rights in NHC or the SACs that Defendant held at the time of the Appointment Order's entry was the right to appoint two (2) directors to NHC's 7-director board.[18] Therefore, the only rights the Special Master could have acquired in the SACs from Defendant through the assignment agreement mandated by the Appointment Order was the right to appoint two of NHC's seven directors.[19]

- When the Appointment Order was entered, the Wake County Superior Court had previously approved the sale of certain Specified Affiliated Companies, referred to as the Clanwilliam Group of Companies ("CWG"). However, the CWG sale had never been consummated.

- With Defendant's consent, the Special Master moved the Court to approve the Special Master's receipt and distribution of certain funds to be generated from the sale of CWG.[20]

- The Court granted the Special Master's motion for authority to receive and disburse the CWG sale proceeds.[21]

- However, because NHC (and not the Special Master) controlled CWG, the Court never approved or authorized the CWG sale itself. Rather, the Court merely provided that "[i]n the event the [CWG] Proceeds are disbursed to the Special Master" then the Special Master shall dispose of those proceeds in accordance with

---

[15] Doc. No. 55-1, at 5 [Article II.3.i] (emphasis added).

[16] The "Loans" referred to by the MOU essentially equate to the "Affiliate Investments" that Defendant caused the insurance companies to make in Defendant's companies. The Special Master has based his calculations and proposed restitution amounts in this case on the principal amounts owed on these "Loans" or "Affiliate Investments."

[17] *See Colorado Bankers Life Ins. Co.* et al. *v. Academy Financial Assets, LLC*, Case No. 5:20-CV-474-D, Order, Doc. No. 115 (E.D.N.C. Aug. 19, 2024).

[18] *See* Doc. No. 55-1, at 5 [Article II.3.i].

[19] To date, the Special Master has only appointed one such director.

[20] Doc. No. 66.

[21] Doc. No. 68.

the CWG order.[22]

- Likewise, when NHC agreed to sell Beckett Collectibles, NHC was free to do so without the Special Master's consent. When NHC informed the Special Master that a potential sale of Beckett Collectibles might transpire on a rapid timeline, the Special Master disclosed as much on weekly calls with Defendant's counsel in November and December of 2025.[23]

- The Special Master did not sign any bill of sale, assignment agreement, or any other transactional documents in connection with the Beckett Sale, nor was the Special Master involved in finding a potential purchaser for Beckett Collectibles or negotiating any deal terms with such potential purchaser.[24]

- The only connection the Special Master had to the Beckett Sale was, after reviewing a fairness opinion prepared by a third-party expert, the Special Master's NHC board designee voted in favor of NHC approving the transaction and the Special Master signed a letter (after the fact)—addressed to the Special Master's NHC board designee[25]—confirming that the Special Master would not oppose the Beckett Sale.[26]

- The NHC board would have approved the Beckett Sale by a vote of 5-1 (had the Special Master's board designee voted against the transaction) or by a vote of 5-0 (had he abstained).

- On or around December 15, 2025, the Special Master was informed by NHC that the Beckett Sale was consummated, and the Special Master informed Defendant's counsel of the Beckett Sale soon after the closing.[27]

- Within days of learning of the Beckett Sale closing, the Special Master filed a report with the Court disclosing the transaction as follows:

  > "[A] group of Specified Affiliated Companies[] (known as "Beckett") was sold by its parent portfolio group (known as "Collectivus")—to a third-party purchaser for value in an arms'-length transaction. Upon information and belief, a fairness opinion analyzing the transaction prepared by JPMorgan Chase Bank was provided to the NHC board, which voted to approve the transaction. The purchaser of Beckett did not require or otherwise request that the Special Master approve the sale of Beckett. Because of the extensive debt encumbering Beckett and the rest of the Collectivus portfolio of companies, the sale did not yield proceeds that can be distributed as restitution payments. However, the sale significantly reduced the debt associated with Collectivus and thus will make the future sale(s) of

---

[22] Doc. No. 68, at 4 [¶ A].

[23] *See* Doc. No. 268-1, at 1.

[24] Doc. No. 268-1, at 2 [¶ 10].

[25] Until the existence of the letter was publicly disclosed last week in the *Affidavit of Michael L. Martinez* (Doc. No. 168-1), the undersigned is unsure if anyone besides the Special Master and Paladin was aware that the letter existed as it was addressed only to the Special Master's NHC board designee.

[26] Doc. No. 268-1, at 2 [¶ 10].

[27] Doc. No. 268-1, at 2 [¶¶ 5, 7].

companies within the Collectivus portfolio more likely to yield more value to apply toward restitution."[28]

- In response, Defendant's counsel immediately requested that the Special Master provide further clarity on the Beckett Sale deal terms. The Special Master's counsel passed this request along to NHC, which provided further clarity around the transaction to the Special Master after the Motion was filed.
- On December 19, 2025, Defendant's counsel sent the Special Master's counsel an email (i) demanding that the Special Master file a motion seeking clarification from the Court on whether NHC's sales of SACs needed to be approved by this Court pursuant to the Appointment Order and (ii) indicating that, if the Special Master refused, then Defendant would be filing such a motion. Later that day, the Special Master's counsel communicated the Special Master's refusal to file such a clarification motion but stated that the Special Master might consent to the clarification request if made by Defendant. Defendant never filed such a clarification motion.
- As described by Defendant in more detail in *Defendant Greg E. Lindberg's Sentencing Memorandum* ("Defendant's Sentencing Memo"),[29] Defendant, the Special Master, and the Government worked together over a period of several months to resolve, at least as among themselves, as many of the questions concerning restitution in this case as possible, engaging in discussions at least weekly and sometimes more frequently.
- Defendant's counsel requested that, in the Special Master's original restitution report, the Special Master include a list of the restitution issues that Defendant and the Special Master did not agree on. Absent from that list are the various "causal" arguments recently advanced by Defendant or any other arguments that Defendant had already paid back all of his victims.[30]
- Between the Special Master's appointment in late January 2025 and the filing of the Special Master's restitution report and recommendations in early April 2026, at no point in the many discussions between the Special Master's counsel and Defendant's counsel did Defendant's counsel ever advocate:
  - the position that no restitution should be owed by Defendant;
  - the position that the CWG sale and/or the Beckett Sale caused the entire special master process established through the Appointment Order to be unconstitutional or otherwise objectionable; or
  - that the "New Waiver"[31] constituted self-dealing by the Special Master or

[28] Doc. No. 94, at 6–7.
[29] Doc. No. 145.
[30] *See* Doc. No. 106, at 22–25.
[31] The facts and circumstances of the New Waiver are more thoroughly outlined in the Response to Prior Disqualification Motion (Doc. No. 268, at 7–10). After the Special Master asked Defendant to execute the "New Waiver," Defendant's counsel consistently expressed the expectation that Defendant would execute the waiver as soon as Defendant's counsel had the opportunity to discuss it with Defendant. This sentiment was expressed to the Special Master's counsel as late as in the courtroom immediately prior to the May 26, 2026 sentencing hearing. Until

otherwise impugned the Special Master's independence.

- Defendant's Sentencing Memo describes, *inter alia*:
    - Defendant's "unprecedented restitution efforts";
    - Defendant's "substantial cooperation with the Special Master";
    - Defendant's willingness to immediately convey the Primary Restitution Assets to the Special Master;
    - Defendant's cooperation with the CWG compromise that resulted in the Special Master paying more than $157,000,000 to individual policyholders harmed by Defendant's activities;
    - Defendant's efforts to work with the Special Master "to address numerous tax issues"; and
    - Defendant's efforts, "along with the hard work of the Special Master and his financial advisor, hav[ing] resulted in **the total restitution paid in this case being among the largest amounts of restitution ever recovered in the United States**."[32]
- During the May 26, 2026 sentencing hearing, Defendant, seeking a reduced sentence, stated as follows through counsel, *inter alia*:
    - Defendant recognizes "the excellent work of the Special Master and of its financial advisor in this case. They listened to all sides, they're experienced, and then they make their own *independent* judgments about what should occur. And if there are dustups, which there were, *they work to resolve those and have resolved those*";
    - "[w]e engaged in weekly meetings, hour-long meetings, with the US Attorney's Office, with the Special Master, with Paladin, in order to effectuate these asset sales, the payment of restitution, and *the future payment of restitution*";
    - "we, as defense counsel, engaged cooperatively with the Government, the Special Master, Paladin, the Special Master's advisor, to cooperatively work together to resolve issues for two reasons: one, *to get assets sold* to benefit policyholders, and, second, to narrow the issues for this Court";
    - whereas Defendant was previously "fighting on every front, and I think this Court saw that in the first trial. But that has changed, and it has led to *a very productive relationship with the Special Master* and for the victims";
    - "[i]t has been *a very, very productive process, probably the first productive process* relating to this whole global issue of -- the issues between Mr. Lindberg and various insurance companies";

---

Defendant filed motions in this case after the sentencing hearing expressing an unwillingness to sign the New Waiver, the Special Master was unaware that Defendant had any issue with it, other than a question regarding potential adverse tax consequences.

[32] Doc. No. 145, at 1–4 (emphasis in original).

- "*the first productive process has been the Special Master's involvement in terms of the asset sales*";
- just as defendants "should get credit for their evidentiary cooperation, [the Defendant] should get credit for his cooperation relating to restitution"; and
- "there has been substantial restitution, in fact, paid and *will be paid*" and "we've seen the billions of dollars of restitution that has been already paid and *will be paid*."[33]

- After Defendant received a reduced custodial sentence during the May 26, 2026 sentencing hearing, Defendant alleged, for the first time, that the same special master restitution process that Defendant relied upon to obtain such a reduced sentence was unconstitutional or otherwise objectionable.

The trust agreement for "The Beckett Collectibles Trust" referenced frequently in the Motion[34] was, on information and belief, terminated prior to the Beckett Sale as a result of a 2024 refinancing of a loan and replaced with the corporate ownership structure described in the Response to Prior Disqualification Motion.[35] To the extent said trust agreement is relevant, the approval right therein referenced by the Motion[36] ran to the grantor Entrust Global Group, LLC—a SAC under NHC's control—and not to Defendant.[37]

The Motion also compares the Beckett Sale price with various valuations, arguing that Beckett Holdings sold Beckett Collectibles for a fraction of its value.[38] Without commenting on whether the valuations referenced by the Motion are currently stale or otherwise inaccurate, the comparison is simply not "apples to apples." The "Beckett Sale" discussed in the Motion involved a sale by Beckett Holdings of its equity interests in CBCS Operations, LLC, Beckett Collectibles, and certain subsidiaries of Beckett Collectibles.[39] On information and belief, all of the valuations included in the Motion take into account and include the values of various subsidiaries and other

---

33 The emphasis appearing above was added by the undersigned to a transcript of the May 26, 2026 sentencing hearing provided to the Special Master by the Government.
34 Doc. No. 269, at 12.
35 *See* Doc. No. 268, at 3–6.
36 Doc. No. 269, at 12.
37 Doc. No. 260-1, at 9–10.
38 Doc. No. 269, at 12–13.
39 Doc. No. 268-1, at 2 [¶ 6].

affiliates of Beckett Collectibles currently within NHC's "Collectivus" portfolio group that were excluded from the Beckett Sale. On information and belief, the companies included in the Beckett Sale represented a small portion of the total amount of current annual revenues of the "Collectivus" portfolio group. Collectivus, LLC remains an NHC asset with significant value today.

As to the remaining Primary Restitution Asset besides NHC and its subsidiary SACs, the Motion itself attaches as Exhibit A that certain voting trust agreement—entered into prior to the Appointment Order—that generally divests Defendant from any control over the corresponding asset.[40] Notwithstanding the foregoing, for certain extraordinary transactions (*e.g.*, restructurings, refinancings, or sales), Defendant (and now the Special Master[41]) has the power to vote to approve those transactions.[42]

## ARGUMENT

### The Special Master is Not a Receiver

Although the Appointment Order vests the Special Master with certain powers often granted to equity receivers, that does not mean that the Special Master is operating as a receiver, at least not with respect to the SACs. Most notably, two critical features of any receivership are (1) placing the exclusive possession and control over the asset with the receiver and (2) enjoining all others from interfering with the receiver's possession and control. The Appointment Order appears carefully crafted to *avoid* putting the Special Master in full and exclusive control of the Primary Restitution Assets, including the SACs. Not only is there no injunction preventing others from disposing of the Primary Restitution Assets through foreclosure, sale, restructuring, or otherwise, the Appointment Order mandates that the Special Master tread lightly by not disrupting

---

[40] Doc. No. 269-2.

[41] The Special Master acquired this power through the assignment agreement mandated by the Appointment Order.

[42] Doc. No. 269-2, at 6–7 [¶ 3(b)].

or interfering with what other courts and receivers might be doing to dispose of the Primary Restitution Assets. When it comes to NHC/SACs, all the Special Master can do is appoint two (2) members to NHC's board of directors. When it comes to the remaining Primary Restitution Asset, all the Special Master can do under the voting trust agreement is appoint one (1) director and vote to approve any major transactions.[43]

No Adjudicative Function was Assigned to the Special Master

The Motion casts the Special Master as an "adjudicator" supervising a tribunal where two adverse parties present evidence, make legal argument, and then the Special Master enters proposed findings of fact and conclusions of law on a final basis subject to *de novo* review, akin to the functions that an arbitrator, magistrate judge, or bankruptcy judge might perform in certain settings. That is not the function the Appointment Order imposed on the Special Master, nor is it the function the Special Master set out to perform. The Appointment Order instructs the Special Master to "verify and quantify," "identify," and ultimately "fashion a *proposed* restitution order."[44] The Special Master is functioning like an examiner, not as an "adjudicator."

Indeed, the Special Master has conducted an independent investigation into the legal and factual circumstances pertaining to restitution issues in this case, outside of the rules of evidence or criminal procedure. From the outset, the Special Master has had *ex parte* communications with various interested parties (including more with Defendant than any other interested party), has gained and reviewed private information not subject to public disclosure, and has otherwise taken into account documents and information that exist outside of the formal record. The Special Master is not taking evidence and rendering decisions. The Special Master is *investigating* the

---

43 With respect to this particular Primary Restitution Asset (for which the Special Master has a vote that could block any transaction ultimately disposing of the asset), the Special Master intends to seek Court approval prior to voting on such a transaction.

44 Doc. No. 56, at 6 (emphasis added).

complex transactions implicated by this case and *reporting* to the Court what amounts might be owed to the victims as restitution based on that investigation, subject to interested parties objecting and submitting their own recommendations to the Court on restitution amounts, which they—including Defendant—have done.[45] The Court, and only the Court, is performing the adjudicatory function of evaluating all of those competing positions and issuing a dispositive ruling deciding the disputes.

<u>The "Fee Interest" is Not Disqualifying</u>

The Motion argues that "[a]n officer paid from the estate he liquidates cannot be the neutral officer who quantifies the victims' losses."[46] If the Special Master, and not the Court, hypothetically served as the ultimate adjudicator of restitution in this case, Defendant might have a point. Again, however, the Special Master is reporting to the Court, subject to the input of interested parties and subject to the Court adjudicating the competing interests of the victims and Defendant; therefore, the Court, and not the Special Master, is the adjudicator here.

Otherwise, the fact that the Special Master is paid from assets that come under his control is not troublesome. Federal equity receivers (most commonly) and bankruptcy trustees (always) get paid from the assets they administer while also evaluating claims and making recommendations to the supervising court concerning the allowable amounts and priorities of those claims. Here, the Court approved a process whereby the Special Master is currently paid from an administrative expense reserve established using funds generated by NHC's sale of CWG. Defendant—who agreed that the Special Master would be paid in this fashion—cites no authority in the Motion for the proposition that a "fee interest" is disqualifying independent of the question of whether the

---

[45] Defendant has been the most active and willing participant in the Special Master's non-adjudicatory process since immediately following entry of the Appointment Order, at least until immediately following his receipt of a reduced custodial sentence.

[46] Doc. No. 269, at 5.

Court delegated full adjudicatory power to the Special Master. It is worth noting that Defendant's professionals have been paid pursuant to the exact same process.

Defendant Consented to the Special Master Process

To the extent a relevant factual question exists concerning whether Defendant consented to the process established by the Appointment Order, the record in this case speaks for itself. Defendant filed the motion seeking the Special Master's appointment and proposed the form of the Appointment Order. Defendant then actively engaged in the Special Master's investigation and formulation of the Special Master's report and proposed restitution order. In addition to other suggested edits to the Special Master's report and proposed restitution order, Defendant's counsel specifically requested that the Special Master itemize in the report those few issues on which the Special Master and Defendant did not agree, which request the Special Master obliged. At that time, Defendant's counsel had not raised any of Defendant's more recent arguments that, effectively, contend that no restitution is owed in this case; certainly, Defendant had not raised any concerns about the process itself. Defendant celebrated this cooperation with the Special Master repeatedly, including in both his written sentencing memorandum and his oral representations to the Court at the sentencing hearing. Defendant cooperated with the Special Master's efforts to broker a solution that would allow the CWG sale to proceed, including by consenting to the CWG motion and order filed in this Court. Again, Defendant celebrated this cooperation repeatedly, including in both his written sentencing memorandum and his oral representations to the Court at the sentencing hearing. Defendant's counsel and the Special Master's professionals have filed several rounds of fee applications to be paid out of the proceeds from CWG's sale without any objection by Defendant.

To the extent the defect in the process arises from the Beckett Sale, Defendant learned of the Beckett Sale, at the very latest, when the Special Master described it publicly in a status report filed on December 18, 2025. Defendant did not raise any issue with the Beckett Sale with the Court,[47] including any argument that the lack of Court approval thereof was grounds for the Special Master's disqualification and removal. Rather, Defendant allowed the Special Master's team to continue to work (with weekly cooperation from Defendant and his counsel), allowed the Special Master to draft a comprehensive restitution report and supplement, responded formally to the report without raising any concern with the propriety of the process, and repeatedly celebrated the success of the very same process in the sentencing context. So, even if Defendant's lack of knowledge of the Beckett Sale somehow undermined his prior consent to the process, Defendant's conduct uniformly consenting to the process *after* Defendant was aware of the Beckett Sale solidified his affirmative assent to the Special Master continuing to perform the functions set forth in the Appointment Order.

Defendant's actions and inactions in this case reflect overwhelming and consistent indications of Defendant's consent to the process established by the Appointment Order, even one that involves NHC liquidating SACs without approval from this Court.

Court Approval of the Beckett Sale was not Required

To the extent the question of whether the Court should have approved the Beckett Sale is critical to evaluating the relief requested through the Motion, the Special Master maintains that Court approval was not required. When Defendant assigned his interests in NHC and its subsidiary SACs to the Special Master, Defendant could not assign any greater rights in those entities than

[47] Defendant never raised the disqualification/removal theory with the Special Master, either. Defendant's counsel expressed disagreement with the Special Master's interpretation of the Appointment Order concerning whether or not this Court must approve NHC's sales of SACs, but, even after the Special Master refused to file a clarification motion, Defendant never did so and the Special Master assumed Defendant dropped the issue.

what Defendant had at that time. With respect to the SACs, Defendant had no direct interests whatsoever and certainly no rights to control a sale process or otherwise approve or veto any sales. With respect to NHC, Defendant holds an ownership interest with no control rights, other than the right to appoint two designees to NHC's seven-member board of directors.[48]

The Motion points to a certain trust agreement for "The Beckett Collectibles Trust" as governing Beckett Collectibles and/or Beckett Holdings. The corresponding trust was, on information and belief, terminated prior to the Beckett Sale as a result of a 2024 refinancing of a loan and replaced with the corporate ownership structure described in the Response to Prior Disqualification Motion. Thus, the provisions of the trust agreement are not determinative of the arguments advanced in the Motion. To the extent the provisions of the trust agreement are at all relevant, the Motion mischaracterizes those provisions. Namely, the Motion avers that certain transactions involving Beckett Collectibles must have been approved by the Special Master, standing in Defendant's shoes. This is inaccurate. Although the trust agreement contains an approval right along the lines the Motion describes, the approval right is reserved for the grantor of the trust, Entrust Global Group, LLC—not Defendant. Entrust Global Group, LLC, in turn, is a SAC under the total control of NHC and not under the control of Defendant or the Special Master.

Although the Appointment Order empowers the Special Master to "seek Court approval to liquidate" assets, the Appointment Order also directs the Special Master to avoid duplicating efforts and to otherwise cooperate with others liquidating the Primary Restitution Assets, such as NHC.[49] The Special Master was not involved in the Beckett Sale. The Special Master's NHC

---

48 NHC's board currently has six (6) members because the Special Master has only filled one of the two seats that Defendant held the right to fill.

49 The Appointment Order also empowers the Special Master, upon notice to the Court, to seek and liquidate, as "Secondary Restitution Assets," other assets owned, controlled, and/or associated with Defendant and/or his entities in the event the Special Master determines that the Primary Restitution Assets are not likely to be sufficient to fully satisfy the Defendant's restitution obligations. In that instance, the Special Master himself would be actively seeking to himself sell and liquidate assets of Defendant, which would require Court approval.

board designee voted with all of the other NHC directors to approve the Beckett Sale.[50] The purchaser of Beckett Collectibles from Beckett Holdings did not seek the Special Master's consent and did not seek approval from this Court. Defendant had no approval rights over such a transaction prior to the Appointment Order, and no language in the Appointment Order could have effectively expanded Defendant's rights in the hands of the Special Master concerning the same assets.

Essentially, Defendant reads the Appointment Order as a broad injunction preventing any party with any rights in the SACs from taking any dispositive actions against the SACs without this Court, in this criminal case, first approving such actions upon a motion by the Special Master. Not only is this not a fair interpretation of the Appointment Order, but also the Appointment Order, interpreted in this fashion, would be tantamount to a worldwide injunction entered with no advance notice to the parties affected thereby. To the contrary, the most the Appointment Order could have directly dealt with was Defendant's interests in the Primary Restitution Assets. Defendant had no ability to stop NHC from liquidating the SACs prior to the Appointment Order, and neither does the Special Master.[51]

<u>The Valuations Referenced in the Motion are not Instructive</u>

The Motion criticizes the Beckett Sale for generating nearly $900,000,000.00 less than what the assets sold were worth.[52] However, the "Beckett Sale" discussed in the Motion involved a sale by Beckett Holdings of its equity interests in CBCS Operations, LLC, Beckett Collectibles, and certain subsidiaries of Beckett Collectibles.[53] On information and belief, all of the valuations

---

50 The Special Master's NHC board designee voted in favor of the Beckett Sale after reviewing both an independent third-party's fairness opinion and a letter from the Special Master indicating that the Special Master would not oppose the transaction.

51 The Appointment Order also addresses the Special Master's ability to seize and sell other assets of Defendant as "Secondary Restitution Assets."

52 Doc. No. 269, at 12–15.

53 Doc. No. 268-1, at 2 [¶ 6].

included in the Motion take into account and include the values of various subsidiaries and other affiliates of Beckett Collectibles currently within NHC's "Collectivus" portfolio group that were excluded from the Beckett Sale. On information and belief, the companies actually included in the Beckett Sale represented a small portion of the total amount of current annual revenues of the "Collectivus" portfolio group. Collectivus, LLC remains an NHC asset with significant value today.

As itemized further below: the proceeds from the Beckett Sale went primarily toward partial satisfaction of legitimate secured debt, with the remainder used for seller-side transaction expenses and a customary holdback; and none of the funds went to NHC, NHC's management, or victims in this case. Thus, none of the Beckett Sale proceeds could be classified as payments toward restitution nor could the Beckett Sale proceeds otherwise directly impact the restitution analysis.

<u>The Objection was Not Only Recently Discoverable</u>

The Motion attempts to excuse Defendant's failure to timely raise the argument that the Beckett Sale eviscerated the entire special master process by positing that the issue was "only recently discoverable" during the last week of July, 2026.[54] Although Defendant knew of the Beckett Sale no later than December 18, 2025, the Motion asserts that this issue only became discoverable when Defendant's counsel came into possession of the aforementioned trust documentation for "The Beckett Collectibles Trust."[55] It is worth observing that Defendant signed the corresponding trust documentation,[56] so it was discoverable by Defendant between late December 2025 and late July 2026. More importantly, this contention in the Motion is itself a

54 Doc. No. 269, at 15–16 (". . . recent discoveries from this week . . .").
55 Doc. No. 269, at 15.
56 Doc. No. 260-1, at 24.

direct admission that, but for these trust documents governing the equity in the SACs that were sold, no Court approval was required. But, as stated above, these trust documents are stale and no longer apply. The MOU governs, and because Affiliate Investments are in default, the Special Master cannot prevent any sales of SACs by NHC. If Defendant wanted to argue otherwise, he needed to raise the issue within a reasonable amount of time after learning of the Beckett Sale on or before December 18, 2025. Instead, Defendant waited to try to use the Beckett Sale to unwind the entire restitution process until after the Special Master filed his restitution report and supplements thereto and until the eve of the Court rendering a final restitution order.

<u>There was No Inversion of Sequence, Only of Defendant's Positions</u>

The Motion complains of NHC liquidating CWG and Beckett Collectibles prior to a determination of Defendant's restitution liability.[57] The fundamental flaw in this analysis is that it wrongfully assumes that no third parties have rights in the Primary Restitution Assets outside of the restitution process. The opposite is true. Not only is Defendant in breach of countless agreements with dozens of parties, many of whom have obtained judgments against Defendant (such that any and all of his assets remain ripe for seizure), but also Defendant agreed to convey—and, after balking, was then ordered to convey—the SACs to NHC. The Court has not enjoined parties from executing on their judgments against Defendant's assets and has not enjoined NHC from selling the SACs; the Court is supervising neither the judgment execution process nor NHC's sale of any SACs. Indeed, the process of others, including victims in this case, disposing of or otherwise extracting value from the SACs to satisfy their claims against Defendant began well before the initiation of this restitution process. The sales of CWG and Beckett Collectibles would

[57] Doc. No. 269, at 18–19.

have happened even if this criminal case never existed and would have paid down the claims of his creditors even if they were never called victims.

There was no inversion of process, but Defendant has inverted his perspective on restitution. Defendant did not oppose the CWG sale proceeds coming to the Special Master for distribution: to the likely victims as partial payments on obligations owed to the likely victims, some of which would count as restitution offsets; and to the Special Master to satisfy expenses incurred in administering the process established by the Appointment Order. Prior to the Special Master filing the initial restitution report, Defendant had consistently taken the position that some restitution was owed—the question was "how much." Both in his sentencing memorandum and during the sentencing hearing, Defendant indicated that more restitution payments would be made in the future. Contemporaneously with sentencing, Defendant flipped his position on restitution. Whereas Defendant had agreed to a special master process that would streamline the Court's efforts to establish Defendant's restitution obligations, Defendant inverted his position around the time of sentencing to argue for a process whereby the Government must prove to a jury beyond a reasonable doubt each penny Defendant owes in restitution (*i.e.*, a process with no or little room for a special master).

<u>No Need to Delay Restitution Pending More Information on the Beckett Sale</u>

The Motion argues that the MVRA requires a full accounting of the Beckett Sale before entry of a final restitution order.[58] As part of preparing this Response, the Special Master obtained an accounting of the economics of the Beckett Sale, which provides as follows:

- although the sale price remains confidential, more than eighty percent (80%) of the Beckett Sale proceeds were used to pay down senior secured debt and related fees owed to a non-affiliated lender;
- the remainder was used toward seller-side transaction expenses and a holdback; and

58 Doc. No. 269, at 19–20.

- no portion of the funds went to NHC, NHC's management, or any of the persons due restitution in this case.

There is no need to delay the Court's final restitution determination on an account of this item. The foregoing accounting tells the Court everything the Court needs to know about the Beckett Sale for restitution purposes: it generated no money for victims and, therefore, should not reduce Defendant's restitution liability.

## CONCLUSION

This Response is not intended as a comprehensive response to the litany of arguments and positions advocated by Defendant in the Motion. Although it may not be appropriate for the Special Master to justify the process through which the Special Master was appointed, it is appropriate for the Special Master to clarify the factual record in the face of the various false or misleading factual contentions appearing in the Motion. In addition to any legal and procedural infirmities, as its factual foundation is thoroughly flawed (not to mention the relief requested being illogical, inequitable, and otherwise inappropriate), the Motion must be denied.

WHEREFORE, the Special Master prays that the Court deny the Motion and grant such further relief as is just and proper.

Respectfully submitted this 7th day of August, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com
*Attorneys for Joseph W. Grier, III, Special Master*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Special Master's Response to Defendant's Motion to Declare the Special Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order* were served on those parties who have requested electronic service in this case through the CM/ECF system.

Respectfully submitted this 7th day of August, 2026.

*/s/ Michael L. Martinez*

Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202

# EXHIBIT 3

Order

No. 3:23-cr-48, Doc. 330 (W.D.N.C. signed Aug. 28, 2026; filed Aug. 31, 2026)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**5:19-cr-22-MOC**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | **ORDER** |

**THIS MATTER** is before the Court on Defendant's two separate motions: Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order. (No. 5:19cr22, Doc. Nos. 584, 588; No. 3:23cr48, Doc. Nos. 269, 278). The Government has filed a brief in opposition. (No. 5:19cr22, Doc. No. 610; No. 3:23cr48, Doc. No. 288). This matter is ripe for disposition.

## I. BACKGROUND

The parties are familiar with the facts and background of this case and the related action in 3:23cr48. Therefore, the Court does not restate the entire procedural background. Relevant to the pending motion, on November 5, 2024, Defendant signed a plea agreement in which he agreed, among other things, to pay:

> full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct. This includes Defendant's crime of conviction, all 'relevant conduct," as defined by U.S.S.G. as defined by U.S.S.G. § 1B1.3, and all conduct pertaining to any dismissed counts or uncharged conduct, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. Among other things, Defendant agrees to pay full restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company.

(Case No. 3:23-cr-48, Doc. No. 40 ¶ 10(a) (emphasis added)).

Defendant also signed a Factual Basis under penalty of perjury along with his guilty plea. (Id., Doc. No. 42). Defendant specifically admitted in the Factual Basis that:

> [t]o carry out the conspiracies, Defendant and others engaged in circular, non-economic transactions among Defendant's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions. [And that his] conduct caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of Defendant's insurance companies were placed in rehabilitation and PBLA was placed into liquidation.

(Id. ¶¶ 5–6) (emphasis added).

On June 17, 2025, the U.S. Probation Office submitted its final presentence report, which, among other things, set forth the offense conduct relating to Defendant's crimes. (Id., Doc. No. 63 ¶¶ 22–110). At his sentencing hearing, Defendant agreed that the Court could use the offense conduct set forth in the presentence report for sentencing and indicated he had no objections to its contents. (Id., Doc. No. 234-52 at 6–8). The offense conduct set forth in the presentence report included the following facts, among others:

- In total, the co-conspirators caused Defendant's insurance companies, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in other Defendant companies. The vast majority of these obligations remain unpaid. (Id., Doc. No. 63 ¶ 103(f)).

- Although the exact amount of restitution owed to the victim insurance companies and victim policyholders is currently unknown, it likely exceeds $2 billion. (Id., Doc. No. 63 ¶ 110).

On December 5, 2024, the parties submitted a Joint Motion for Appointment of Special Master and a proposed order. (Id., Doc. No. 54). Defendant had agreed to do this as part of his

plea agreement. (Id., Doc. No. 40 ¶ 9) (stating that "defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution…. Within thirty days after filing of this Plea Agreement, the parties agree to submit a joint motion for the appointment of a special master….").

The parties began working on a draft of the Joint Motion weeks before Defendant signed his plea agreement. Defendant's counsel submitted an initial draft of the motion to the Government on October 18, 2024. (Id., Doc. No. 308-1 at 2: Ex. A). Defendant originally proposed that Scott Avila of the Paladin Group serve as Special Master. (Id. at 1). The Government wanted a lawyer to serve as Special Master, preferably one with experience practicing in this district. Ultimately, the parties compromised and jointly recommended that Joseph Grier of the Charlotte-based law firm Grier Wright Martinez, PA serve as Special Master, and that Scott Avila serve as the Special Master's financial advisor. (Id., Doc. No. 54 ¶ 8). The Joint Motion represented to the Court, among other things, that:

- "[T]he amount of restitution **owed is substantial**." (Doc. No. 54 ¶ 5(b)).
- "Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to **maximize the amount of restitution** that is recovered and **paid**." (Doc. No. 54 ¶ 6) (emphasis added).

The Court granted the Joint Motion and issued an order in the form jointly proposed by the parties. Defendant did not object to the Court's order. ("Special Master Order," Doc. No. 56 ¶¶ 5(b), 6). The Special Master Order contemplated that the Special Master would be paid consistently with his hourly rates, which had been previously submitted for the Court's review. (Id. ¶ 8). Other provisions of the Special Master Order included:

- Noting Defendant's agreement "to take all necessary and reasonable steps in his power to secure in the exclusive possession

and control of the special master … **all of Defendant's** … rights and interests, whether held directly or indirectly, in … the 'Primary Restitution Assets'" (Doc. No. 56 ¶ 9) (emphasis added).

- Empowering Special Master to "fashion a proposed restitution order" (Doc. No. 56 ¶ 3(f)); and "propose an apportionment methodology to be applied to future restitution payments received" (Doc. No. 56 ¶ 3(g)).

- "The Special Master shall prepare quarterly interim statements … that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties...." and that "Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court…." (Doc. No. 56 ¶ 14).

- "None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders." (Doc. No. 56 ¶ 16).

## II. DISCUSSION

In Defendant's pending motion, he argues that the Special Master's Order of Restitution is unconstitutional. For the following reasons, Defendant's argument fails.

### A. Defendant's Claim that the Due Process Clause of the Fourteenth Amendment Prohibits a Special Master from also Acting as a Receiver

18 U.S.C. § 3664(d)(6) expressly provides that the "[c]ourt may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Defendant argues that the Special Master process is unconstitutional as applied in this case because the Special Master Order purportedly grants the

Special Master receiver duties in addition to those arising in connection with a proposed order of restitution.

Defendant's argument is without merit. Defendant has not cited to a single case holding that a Special Master appointed under Section 3664(d)(6) fails constitutional muster. Indeed, federal courts, including this Court, routinely employ Special Masters to carry out similar duties to those authorized by the Special Master Order here. See, e.g., United States v. Burks, Case 3:14-cr-208, Doc. No. 14 (W.D.N.C. Nov. 20, 2014); United States v. Guastella, No. 98CR1325(SAS), 2009 WL 1619902, at *n.7 (S.D.N.Y. Jun. 4, 2009); Cf. United States v. Takata Corp., No. 16-cr-20810, Doc. No. 40 (E.D. Mich. Jul. 31, 2017).

As the Government notes, in Burks, Adams, and Hitt, the Special Masters were appointed specifically as both Special Master and receiver and had all the duties attendant to each role. See Burks, Doc. No. 14 (same individual appointed as Special Master under Section 3664(d)(6) and as receiver under Section 1956(b)(4)); Adams, Doc. No. 24 (same individual appointed as Special Master under Section 3664(d)(6) and receiver in related civil action brought by SEC); Hitt, Doc. Nos. 61 & 71 (same individual appointed as Special Master under Section 3664(d)(6) and receiver in related civil action brought by SEC). The mere combination of multiple roles in one person does not violate due process. Indeed, the Supreme Court has repeatedly acknowledged this. See, e.g., Richardson v. Perales, 402 U.S. 389, 410 (1971) (holding that due process not violated by social security examiner acting as both investigator and adjudicator); Withrow v. Larkin, 421 U.S. 35, 58 (1975) (holding that due process not violated by medical board acting as investigator, adjudicator, and sentencer).

Even if combining the roles of receiver and Special Master raises potential constitutional issues, the Special Master Order here did not make the Special Master a general receiver over the

Primary Restitution Assets in this case. Rather, the Special Master Order carefully limits the Special Master's authority to securing control of "all of Defendant's … rights and interests, whether held directly or indirectly, in … the 'Primary Restitution Assets.'" (No. 3:23cr48, Doc. No. 56 ¶ 9). With respect to New Hold Co. ("NHC") and the Specified Affiliated Companies, including Beckett, Defendant had already lost control over those assets through the June 27, 2019, Memorandum of Understanding ("MOU") and the orders issued by the North Carolina Wake County Superior Court in related litigation.[1] Thus, rather than acting as a general receiver over those assets, the Special Master only took control over whatever remaining interest, if any, Defendant had in those assets.[2]

---

[1] See, e.g., Southland Nat'l Ins. Corp. v. Lindberg, 19 CVS 013093, Judgment and Order entered May 17, 2022, ¶ 47 ("The core of the [MOU] agreement is that the affiliated debt would be adjusted and restructured to facilitate repayment and that Lindberg would relinquish control of the SAC's by making them subsidiaries of a new company, New Holding Company ("NHC"), which would be managed by an independent board, comprised of sophisticated and qualified individuals charged with a duty to protect the best interest of Plaintiffs' policyholders.") and ¶ 108 ("If SAC's are transferred to NHC, NHC will be able to take various actions with respect to the SACs under its control, including selling the SAC ….") (Doc. No. 610-2, Gov't Ex. B).

[2] Defendant incorrectly claims that because he transferred his "equity interest" in NHC to the Special Master, the Special Master had the ability to control NHC and, thus, the sale of, among other things, Beckett. (See, e.g., No. 3:23cr48, Doc. No. 269 at 12, 15, 16; Doc. No. 292 at 4). The record belies this claim. Defendant could, and did, transfer only what he had rights over. The MOU and the resulting Wake County litigation limited the rights attendant to his equity interest in NHC. The Special Master explained this in his response to Lindberg's motion to disqualify him. (See id. Doc. No. 288 at 13–14) ("With respect to the SACs, Defendant had no direct interests whatsoever and certainly no rights to control a sale process or otherwise approve or veto any sales. With respect to NHC, Defendant holds an ownership interest with no control rights, other than the right to appoint two designees to NHC's seven-member board of directors."). Defendant also claims that the sale of Beckett required the "affirmative consent of an AAI Director [e.g., the board member appointed by the Special Master]." (Id., Doc. No. 292 at 12). The record does not support this claim. Indeed, as the MOU makes clear, this was only the case "[p]rovided that there is no default under any Loan," (Id., Doc. No. 55-1 at 5), and, here, several of the loans were in default. As the Eastern District of North Carolina found in granting summary judgment against Defendant for breaching the IALA by failing to pay required interest payments on the loans, Defendant "materially underpaid at least one month's interest for some loans [under the IALA] and even more for the loans that defendants unilaterally asserted accrued

Defendant's own exhibits confirm that reality. For example, he admits that (i) in June 2019, he signed the MOU thus "establishing the process to transfer the … SACs"; and (ii) in October 2024, he transferred the SACs to the rehabilitator appointed in the Wake County litigation. (No. 5:19cr22, Doc. No. 584-1 at 3–4). And the "Term Sheet" that was circulated after the Court entered the Special Master Order states: "The Special Master has no role with respect to NHC or the SACs, because GEL [Defendant] has no property rights in these companies. Paragraph 16 in the Special Master Order was meant to clarify this. But even without that paragraph, the Special Master has no rights to property other than those the defendant holds…. The Special Master has no role in NHC's plan to manage or sell the SACs." (Id. at 8, 11). If Defendant disagreed with this position, he never asked this Court to find otherwise, and he cannot complain about it now.

Finally, rather than citing any controlling legal support for his claim that the duties of the Special Master here are unconstitutional, Defendant relies on various civil cases for the incorrect proposition that allowing the Special Master to be paid from the Primary Restitution Assets creates a structural conflict that violates his due process rights. Defendant primarily bases his argument on United States v. O'Connor, 291 F.2d 520 (2d Cir. 1961). In that case, the district court appointed a receiver to enforce a federal tax lien and also appointed the same individual as Special Master under Rule 53(b). Id. at 523, 528. Ultimately, the O'Connor Court held that the district court should not have appointed a Special Master because it saw "no exceptional condition that would justify reference to a master when the Tax Court is available." 291 F.2d at 528. The Court then stated, in dicta, that the district court should not have appointed the same

zero interest." Colorado Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC, No. 5:20-cv-474, 2024 WL 3875781, at *8 (E.D.N.C. Aug. 19, 2024).

person to act as both receiver and Special Master due to that person's financial interest in his role as receiver, e.g., in order to be paid as a receiver, he would need to determine as Special Master that there was a tax due and owing and thus the lien was valid. Id. at 526 (citing Turney v. Ohio, 273 U.S. 510, 522 (1927)).

The receiver's financial interest in O'Connor does not support a finding here that the Special Master has a financial conflict in this matter or, if he did have one, that it would rise to a constitutional due process violation. As the Supreme Court has repeatedly made clear in Turney and its progeny, a defendant's due process rights are implicated only when a judicial officer "has a direct, personal, substantial pecuniary interest in reaching a conclusion." 273 U.S. at 523. Here, Defendant proffers no credible "direct," "personal," or "substantial" pecuniary interest that the Special Master has here that would create a conflict. Rather, he makes the unsupported claim that the more the Special Master administers, "the larger the fund from which he is paid." (No. 3:23-cr-48, Doc. No. 292 at 21). Even if true, this is irrelevant. As Defendant agreed, the costs and hourly fees of the Special Master (along with Defendant's defense counsel) were to be paid, upon Court approval, out of "the assets administered by the Special Master … or as otherwise directed by the Court." (Id., Doc. No. 56 ¶ 14) (emphasis added). Those fees were not contingency fees, nor did they depend on whether any particular asset was sold or, if so, for how much. Indeed, the Order would allow the Special Master to be compensated "as otherwise directed by the Court" even if the Special Master recommended to the Court that Defendant owed no restitution. The Order further also allows the Court to direct that the Special Master be paid from sources other than the assets he administers. Defendant has simply not shown that the Special Master's arrangement here for payment amounts to a conflict of interest. Cf. United States v. Konrad, 730 F.3d 343, 352 n.12 (3rd Cir. 2013) ("Defendant's contention the Master

had a conflict of interest because she was compensated from the recommended reimbursement is unfounded. The Master was paid the standard hourly rate, and not a percentage of the sum she calculated."). Moreover, the Special Master received no compensation from the Beckett sale that Defendant cites as purported proof of the Special Master's unconstitutional conflict, which further undercuts his claims.[3] (No. 3:23cr48, Doc. No. 288 at 16).

Additionally, per the Special Master Order, the Special Master (as well as Defendant's defense counsel) submitted itemized fee petitions for the Court's approval. (See, e.g., No. 3:23cr48, Doc. Nos. 75, 81, 95, 97, 148, 154, 263, 264). Defendant has not objected to any of them, even those submitted after the Beckett sale.[4]

**B. Defendant's Claim that His Conduct Did Not Proximately Cause the Victim Companies' Injuries**

Defendant also contends that he did not cause the losses that led to the restitution amounts. Defendant admitted under penalty of perjury, however, that his criminal conduct "caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders." (Case No. 3:23cr48, Doc. No. 42 ¶ 6). He further represented to the Court in the parties' joint motion for a Special Master that "the amount of restitution owed is

[3] The Government further argues that Defendant's claims about the Beckett sale are also based on incorrect factual assertions about the sale process and, among other things, Beckett's value.

[4] The Government notes that in the Special Master's Third Status Report filed on December 18, 2025, the Special Master disclosed that one group of Specified Affiliated Companies known as "Beckett" was "sold by its parent portfolio group … to a third-party purchaser for value in an arms'-length transaction…." (No. 3:23cr48, Doc. No. 94 at 6). Beckett's purchaser did not require or otherwise request that the Special Master approve the sale of Beckett. Because of the extensive debt encumbering Beckett and the rest of the Collectivus portfolio of companies, the sale did not yield proceeds that can be distributed as restitution payments. The Government asserts that this sale significantly reduced the debt associated with Collectivus and thus will make the future sale(s) of companies within the Collectivus portfolio more likely to yield more value to apply toward restitution. (Id. at 6–7).

substantial" and that "[s]ome of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid." (Case No. 3:23cr48, Doc. No. 54 ¶¶ 5(b) & 6). Defendant has submitted several Declarations to support his recent filings in his attempt to undo these admissions, and he uses these purported "facts" to support his claims that he was not the "proximate cause" of the victims' losses. (See, e.g., Doc. No. 300 at 8–9). Rather, he now claims that the victim's losses were caused by "intervening decisions" of those placed in control over the insurance companies after the companies were placed into rehabilitation and liquidation proceedings. (See, e.g., id. at 9).

The Court wholly rejects Defendant's attempt to revise the events here that led to the victims' losses, and he may not now to try to get around his statements and admissions under penalty of perjury that he caused Defendants' losses. Moreover, even if some of the losses did not materialize until after Defendant lost control of the insurance companies, Defendant's assertions misconstrue the meaning of proximate cause. Defendant admitted, and the evidence shows, that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments. Indeed, the presentence investigation report, to which Defendant did not object, found that Defendant "caused Defendant's insurance companies, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in other Defendant companies. The vast majority of these obligations remain unpaid." (See, e.g., No. 3:23cr48, Doc. No. 63 ¶ 103(f)).

As the Government notes, in focusing on what happened after he fraudulently took the insurance companies' money, Defendant misconstrues the proximate cause inquiry. In any event, as noted, Defendant agreed to pay restitution for losses above and beyond those he directly and proximately caused. Per the plea agreement, Defendant explicitly agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." (Id., Doc. No. 40 ¶ 10(a) (emphasis added). Indirect harm, by definition, is more expansive than proximately caused harm, and a defendant is free to obligate himself, as Defendant has, to pay restitution above and beyond that called for by statute. Section 3663A(a)(3) provides that the "court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." Moreover, significantly, Section 3663A defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). Thus, a defendant can agree in the plea agreement to pay restitution to persons other than those "directly and proximately" harmed by his conduct. Defendant explicitly agreed to this in exchange for concessions by the United States and as a basis for his successful petition for leniency.

Defendant also has raised several objections to the Special Master's estimation of the value of assets available to satisfy restitution contained in the Special Master's Final Report. As the Government notes, the Court need not resolve those objections before entering a Final Restitution Order because the Special Master only "provided [them] for informational purposes, specifically to help the Court gauge how the Special Master's recommended restitution award compares to the value of the assets that have been designated as Primary Restitution Assets." (No. 3:23cr48, Doc. No. 245 at 36). Because they have not yet been monetized and used to actually pay restitution to victims, their value is not relevant to determining the losses suffered

by victims at this point. In sum, the Court rejects Defendant's attempt to challenge the restitution arguments by arguing that he did not proximately cause Defendants' injuries.

## III. CONCLUSION

The Court finds that sufficient factual evidence in the record submitted by the parties supporting the requested restitution award. The Court has conducted a de novo of the Special Master's recommendations and has evaluated Defendant's filings regarding restitution alongside all filings made by others seeking restitution. The Court will issue a separate order addressing the specific objections to the restitution amounts. The Court does intend to adopt the Special Masters' report, with a few modifications in light of the parties' arguments at the hearing held on August 10, 2026, and based on the parties' pleadings.

## ORDER

For the reasons stated herein, it is **THEREFORE ORDERED** that

(1) Defendant's two separate motions: Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order, (Doc. Nos. 584, 588), are **DENIED** to the extent that Defendant asks the court to declare the Special Master reference as unconstitutional as applied, and to the extent seeks to have the Special Master removed and restitution cancelled.

(2) The corresponding motions are filed as Docket Numbers 269 and 278 in Defendant's related Case No. 3:23cr48. The Clerk is respectfully instructed to file this Order in that case and to terminate these corresponding motions.

(3) To the extent that Defendant challenges the amounts of restitution, the Court will enter a separate final Order on the amount of restitution owed in this matter.

Signed: August 28, 2026

Max O. Cogburn Jr.
United States District Judge

# EXHIBIT 4

Special Master's Response to Defendant's Motion to Stay Disposition of Damovo

No. 3:23-cr-48, Doc. 334 (W.D.N.C. Aug. 31, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**SPECIAL MASTER'S RESPONSE TO DEFENDANT'S**
**MOTION TO STAY DISPOSITION OF DAMOVO**

NOW COMES Joseph W. Grier, III, the Court-appointed special master (the "Special Master") in this proceeding, through counsel, who hereby presents this response (this "Response") to the *Defendant's Notice Concerning the Damovo Primary Restitution Asset and Motion to Stay its Disposition* (the "Motion")[1] and respectfully represents as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

Through the Motion, Defendant requests that the Court:

> (a) direct the Special Master to inform the Court, forthwith, of the status and terms of any pending or completed disposition of the Damovo asset; and (b) stay any sale, transfer, or other disposition of the Damovo asset pending this Court's review and approval under its appointing order (Doc. 56) and 18 U.S.C. § 3664.[2]

The Motion attaches as Exhibit 1[3] a pleading Defendant filed—in the Wake County Superior Court action concerning the MOU[4]—through which Defendant asks the Wake County Superior Court to (i) instruct NHC to engage with a third party allegedly interested in purchasing certain SACs (*i.e.*,

---

1 Doc. No. 320.
2 Doc. No. 320, at 2–3.
3 Doc. No. 320-1.
4 Capitalized terms not otherwise defined in this Response shall have the meanings prescribed thereto in the Special Master's response to a motion by Defendant seeking to remove the Special Master (Doc. No. 288) ("Response to Removal Motion").

those known as the Damovo Group of Companies ("Damovo")), (ii) require that all proceeds from a transaction involving Damovo "be placed in the escrow" of this Court (W.D.N.C.), and (iii) order that no transaction involving Damovo be closed unless and until this Court (W.D.N.C.) "issues an order approving the transaction and all of its terms."[5]

On information and belief, Damovo—unlike other SACs that were transferred by Defendant to NHC in October of 2024—does not reside directly within NHC's ownership chain; rather, in 2021, Damovo was transferred to a trust governed by English law in order to isolate Damovo from the control of Defendant and to permit Damovo to maintain existing deposit accounts and loan facilities. On information and belief, the transfer of Damovo to the trust was approved by a then-empaneled "Review Panel" established by the Wake County Superior Court in connection with the MOU litigation.[6] The consideration for the transfer by the settlor entity (also a SAC under NHC's control) was a promissory note payable by the owner-trust to the settlor-SAC. In other words, NHC does not own Damovo, but rather owns an entity that is a creditor owed money by Damovo's owner-trust.

While the Special Master is aware of a proposed disposition of Damovo (the "Potential Damovo Transaction"), neither the Special Master nor NHC is conducting or otherwise responsible for the Potential Damovo Transaction. Rather, the Potential Damovo Transaction is to be conducted through the enforcement of rights by Damovo's secured lenders, rights that arose upon Damovo's default under the corresponding loan documents. On information and belief, the aforementioned Review Panel also approved Damovo's entry into the financing relationship with these secured lenders, including the specific provisions of the corresponding loan documents.

---

5 Doc. No. 320-1, at 3.

6 *See Southland Nat'l Ins. Corp., et al. v. Greg E. Lindberg, et al.*, No. 19CVS013093-910, Amended Order Amending Temporary Restraining Order (Wake County, NC Super. Ct. Apr. 2, 2020).

Neither Defendant nor NHC nor the Special Master has any input into the secured lenders' enforcement process.

Neither Damovo's secured lenders nor the potential acquiror of Damovo seeks the consent of the Special Master—or the approval of this Court—to close the Potential Damovo Transaction. Without accepting that it is legally required to do so, the potential acquiror of Damovo has sought consents to the transaction and/or releases of any possible claims from the Bermuda Insurance Companies (victims due restitution), the North Carolina Insurance Companies (victims due restitution), and NHC (the entity designated by the MOU to receive and supervise the SACs for the benefit of victims due restitution, including the SAC owed money by the trust owning Damovo). In consideration for such consents/releases, the prospective acquiror has proposed to pay certain sums to those parties.

Based on the Special Master's evaluation of the Potential Damovo Transaction (especially considering that persons due restitution in this Case are currently slated to (i) receive funds in exchange for releases that would reduce Defendant's outstanding restitution obligations and (ii) consent to the transaction before it closes), the Special Master does not intend to interfere with, or otherwise oppose, the transaction.

## ARGUMENT

As previously explained to the Court in the Response to Removal Motion,[7] the Special Master does not control the liquidation of the SACs; NHC controls the SACs as set forth in the MOU. The MOU provides that, because one or more "Loans" (including, but not limited to, Affiliate Investments) are in default, Defendant (and now the Special Master standing in

[7] *See* Doc. No. 288, at 3–5, 9–10, 13–15, 16–17.

Defendant's shoes) has no veto right to prevent dispositions of SACs by NHC.[8] Rather, by simple majority vote, NHC's board can approve, or not approve, any and all dispositions of SACs.

The Potential Damovo Transaction is multiple steps removed from even that process. First and foremost, the Potential Damovo Transaction is being conducted through the third-party secured lenders' enforcement of rights under the governing loan documents and otherwise applicable English law. Second, NHC does not own or control Damovo; rather, all NHC controls is a SAC that is owed money by Damovo's owner-trust. In other words, the only way funds would flow to NHC from Damovo (outside of the consent/release construct mentioned above) would be if Damovo's secured lenders (and all other creditors) were satisfied in full through a disposition of Damovo; the Potential Damovo Transaction will not satisfy Damovo's creditors in full or generate sufficient funds to make distributions to Damovo's owner-trust (or the SAC that is owed money by Damovo's owner-trust).

Perhaps more importantly for purposes of resolving the Motion, the parties that Defendant seeks to enjoin through the Motion are not before the Court, and, under any circumstances, the Court's jurisdiction to enter such an injunction is, at best, dubious. Damovo is not a party to this proceeding; the potential purchaser of Damovo is not a party to this proceeding; Damovo's secured lenders are not parties to this proceeding. Even NHC—to the extent relevant for purposes of the Motion—is not a party to this proceeding. Defendant asks this Court to enjoin all of those strangers to this proceeding from entering into private transactions. The Court lacks this power under the present posture of Defendant's request.

8 *See* Doc. No. 55-1, at 5 [Article II.3.i].

## Conclusion

The Motion first asks the Court to direct the Special Master to provide more information concerning a possible disposition of Damovo; this Response accomplishes that objective[9] and, thus, moots that request for relief. The Motion's second request for relief seeking an injunction is wholly unsupported by any factual circumstances that could warrant such extraordinary relief and, in any event, this Court lacks authority over those involved with the Potential Damovo Transaction. At a minimum, those third parties that the Motion seeks to enjoin must be formally noticed concerning the Motion and otherwise properly brought before this Court prior to being enjoined. Should the Court be inclined to enter any relief concerning the Potential Damovo Transaction, the Special Master respectfully requests that such relief be limited to directing the conduct of the Special Master.

WHEREFORE, the Special Master prays that the Court deny the Motion and grant such further relief as is just and proper.

Respectfully submitted this 31st day of August, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for Joseph W. Grier, III, Special Master*

[9] By providing additional information to the Court concerning the potential transaction involving Damovo in response to Defendant's Motion, the Special Master is not waiving—and is hereby explicitly preserving—any and all arguments against providing such information concerning SACs upon similar future demands by Defendant.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that copies of the foregoing *Special Master's Response to Defendant's Motion to Stay Disposition of Damovo* were served on those parties who have requested electronic service in this case through the CM/ECF system.

Respectfully submitted this 31st day of August, 2026.

*/s/ Michael L. Martinez*

Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202

# EXHIBIT 5

United States' Response in Opposition to Defendant's Motion to Stay

No. 3:23-cr-48, Doc. 335 (W.D.N.C. Aug. 31, 2026)

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>GREG E. LINDBERG,<br>*Defendant*. | No. 5:19-CR-22-MOC<br>No. 3:23-CR-48-MOC |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY**

The United States of America respectfully submits that the Court should decline to issue the extraordinary stay requested by Defendant, which is essentially seeking an injunction against a third party's disposition of the Damovo Group ("Motion to Stay," Doc. 320) because Defendant's request is premised on inaccurate facts and would impermissibly interfere with the rights of various non-parties in this matter and ongoing litigation in state court. To the extent the Court is inclined to issue a stay, the United States respectfully submits that: (i) it should be limited to staying the actions of the Special Master and his designated board member with respect to any disposition of the Damovo Group, not the overbroad relief requested by Defendant, and (ii) that any such stay be temporary and expire once the Court enters a final restitution order.

**ARGUMENT**

Defendant's Motion to Stay asks this Court to frustrate the rights of various third parties, including those involved in ongoing civil litigation being handled in the Superior Court of Wake County, North Carolina, and it reaches far beyond the parties and remaining issues currently before this Court. Essentially, Defendant is seeking an

injunction from this Court stopping the sale of a Specified Affiliated Company – Damovo Group, which is under the control of New Holding Company ("NHC") or some other trust (both independent entities that are not parties to this matter), to a third party (also a non-party). According to Defendant's filings, the bulk of the proceeds of the contemplated sale would be used to pay off Damovo's debt owed to other non-insurance company lenders (also non- parties). Defendant provides no justification for such an extraordinary request except for his own self-serving claims about the purported unfair terms of the proposed sale.[1]

The Special Master in this case is not the party controlling and selling Damovo.[2] As the Court is aware, Defendant lost control of the Damovo Group and NHC through the June 27, 2019, Memorandum of Understanding ("MOU") and the orders issued by the North Carolina Wake County Superior Court in related litigation (the "Wake County MOU Action"). (Doc. 330 at 6 and n.1). Yet, Defendant's Motion to Stay is premised on the false assertion that the Special Master now controls NHC and the Specified Affiliated Companies like Damovo Group because Defendant transferred his interests in those entities to the Special Master. But, Defendant could not and did not transfer what he did not have, which was such control. Rather, with respect to control, Defendant only transferred his ability to appoint two of seven directors to NHC's board of directors. (*Id.* at n.2).

---

[1] For example, Defendant's claims about the nature of the proposed transaction focus on the potential selling price of Damovo Group without any discussion of how much third-party debt Damovo Group has.

[2] It appears that Defendant is also wrong about whether NHC even controls the Damovo Group or its sale, which is yet another reason for the Court to decline to grant the requested stay.

Defendant's company admitted this in a related civil action in federal district court in the Eastern District of North Carolina, representing to that court that:

> NHC was established under the terms of the MOU to benefit the policyholders of Plaintiffs SNIC, BLIC, and CBLIC (collectively, the "Insurance Policyholders") who experienced financial harm due to Lindberg. The governance structure of NHC, as outlined in the MOU, stipulates that a Board of Directors will oversee the operations of NHC. As a result of the Contribution, the Defendant is now held under the governance of the NHC Board of Directors, whose primary duty is to act in the best interests of the Insurance Policyholders. The involvement of the Special Deputy Rehabilitators of CBLIC and BLIC (the "Special Deputy Rehabilitators") and Special Deputy Liquidators of SNIC (the "Special Deputy Liquidators") on the NHC Board of Directors requires careful coordination and consultation to ensure that all actions taken align with the overarching objectives of the MOU and that no conflicts of interest arise.

*Colorado Bankers Life Ins. Co., et al. v. Academy Financial Assets, LLC*, Case 5:20-cv-474, Doc. 118 ¶¶ 11-13 (E.D.N.C. Feb. 4, 2025).

The Special Master has appointed one director to NHC's board. The Special Master has not exercised his ability to appoint the second director so that seat remains vacant. (Doc. 308-3 ¶20). Thus, the NHC board is comprised of three appointees from the North Carolina Insurance Companies, two independent directors, and the Special Master's designated director. (*Id.*)

Notwithstanding these facts, Defendant claims that the Special Master nevertheless controls asset sales by NHC because of language in the MOU requiring one of Defendant's appointed directors to approve any NHC sale of Specified Affiliated Companies "provided there is no default under any Loan." (*See* Doc. 316 at 16, quoting MOU Art. II, § 3.i). Defendant's claim fails because, among other reasons, the court in

*Colorado Bankers Life Ins. Co., et al. v. Academy Financial Assets, LLC* has found loans to be in default. Case 5:20-cv-474, Doc. 115 at 17 (E.D.N.C. Aug. 19, 2024) (granting summary judgment for the North Carolina Insurance Companies in collection actions involving affiliate loans because Defendant's company "materially underpaid at least one month's interest for some loans [under the IALA] and even more for the loans that defendants unilaterally asserted accrued zero interest.").

This would seem to be the end of the matter, but Defendant now raises yet another argument, proposing a novel interpretation of the MOU's language to suggest that "no default under any Loan" does not really mean what it says. While the merits of this claim seem facially dubious, the proper forum for making that determination is not here. Rather, the Wake County Superior Court, where Defendant is simultaneously attempting to stop the proposed sale of the Damovo Group (*see* Doc. 320-1),[3] already has the issue before it in connection with previous litigation. Indeed, Defendant is attempting to raise the exact same arguments about the Special Master's purported control over NHC to the Wake County Court. (*Id.* at 9 ("NHC cannot approve or consent to any sale of the Damovo Group … without that affirmative vote" of the Special Master's director)). As such, a stay is not needed here because the Wake County Court will either reject Defendant's argument, in which case it will be clear the Special Master does not control NHC or the sale of Damovo Group, or it will agree with Defendant, in which case the Special Master

[3] This filing is styled as Defendant's "Response to Consent Motion for Instruction Regarding Proposed Damovo Transaction," which was filed in Wake County Superior Court action 19CVS008664-910 on August 19, 2026.

may need to come back to this Court to seek approval for a sale (to the extent that NHC is actually the party selling Damovo Group as Defendant claims). Either way, this Court need not enter the requested stay at this point, which would unnecessarily interfere with the state proceedings and likely lead to a conflict with a future state court order.

If the Court is inclined to issue a stay, it should be limited to staying the actions of the Special Master and his designated board member with respect to any disposition of the Damovo Group and not the general injunction requested by Defendant. Granting the broad relief requested by Defendant would unnecessarily interfere with the proceedings in the Wake County Superior Court and may violate principles of federal abstention. *See, e.g. Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013).[4] Moreover, it could lead to diminution of value of the Damovo Group asset if there were unnecessary delay in lifting the stay if/when the Wake County Court approves the sale. Finally, any stay issued by this Court should be of limited duration and should not last beyond the Court's entry of a final restitution order.

---

[4] In *Sprint*, the Supreme Court reaffirmed its previous holdings that there are "certain instances in which the prospect of undue interference with state proceedings counsels against federal relief[,]" including when there are "'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" 571 U.S. at 72 (citing *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367-368 (1989)).

## CONCLUSION

This Court should deny Defendant's request for a stay because it is not supported by the facts and, in any event, is not necessary. If the Court is inclined to issue a stay, it should be narrowly tailored and limited to the actions of the Special Master and his designee.

RESPECTFULLY SUBMITTED, this 31st day of August, 2026.

DALLAS J.E. KAPLAN
ATTORNEY FOR THE UNITED STATES[5]

*/s/ Daniel Ryan*

Daniel Ryan
Dana Washington
Assistant United States Attorneys
United States Attorney's Office
Western District of North Carolina

227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-3222
daniel.ryan@usdoj.gov

LORINDA I. LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*/s/ Lyndie M. Freeman*

Lyndie M. Freeman
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue
Washington, DC 20005
Telephone: 202-616-5315
lyndie.freeman@usdoj.gov

[5] Acting under authority conferred by 28 U.S.C. § 515.

# EXHIBIT 6

Defendant's Response to the Special Master's Opposition to Defendant's Motion to Stay Disposition of the Damovo Asset

No. 3:23-cr-48, Doc. 339 (W.D.N.C. Sept. 7, 2026)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S RESPONSE TO THE SPECIAL MASTER'S OPPOSITION TO DEFENDANT'S MOTION TO STAY DISPOSITION OF THE DAMOVO ASSET**

Defendant Greg E. Lindberg respectfully submits this Response to the Special Master's Opposition (Doc. No. 334) to his Motion to Stay Disposition of the Damovo Asset (Doc. No. 320). For the reasons set forth below, the Special Master's opposition should be rejected and the Motion granted.

## INTRODUCTION

The Special Master's opposition rests on the same premise as the Government's. He says that "the Special Master does not control the liquidation of the SACs," that "NHC controls the SACs as set forth in the MOU," and that "because one or more 'Loans' (including, but not limited to, Affiliate Investments) are in default, Defendant (and now the Special Master standing in Defendant's shoes) has no veto right to prevent dispositions of SACs by NHC." Doc. No. 334 at 3–4. From there he reasons that NHC's board "can approve … any and all dispositions of SACs" by "simple majority vote," *id.* at 4, and that the Court cannot reach the transaction because the entities involved are "not before the Court," *id.* at 4.

Every step of that reasoning depends on the same clause the Government invokes—Article II, Section 3.i's proviso that the Defendant-appointed director's consent to any sale falls away only upon a "default under any Loan." Doc. No. 55-1 at 5. And that premise is wrong for the reasons set out below: the "Loan" and the "default" the proviso requires are creatures of Article III of the MOU, which was adjudicated an unenforceable "agreement to agree," severed, and never implemented. The "Article III Loans" and their "Default and Remedy Terms" never came into existence, so no "default under any Loan" can exist, and the consent right was never stripped. It passed intact to the Special Master when he acquired AAI's rights in NHC. Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17.

That last point exposes the central contradiction in the Special Master's position. He cannot at once hold the very consent right the MOU makes a precondition to any sale and disclaim any "control" over whether the sale proceeds. And his remaining submissions—an unsworn account, offered "on information and belief," that NHC does not really own Damovo, and that third-party lenders are foreclosing—do not defeat the Motion. They are reasons to require the transaction and its true structure to be placed on the record before a Primary Restitution Asset is irreversibly disposed of, which is what the Motion asks.

## ARGUMENT

### I. The Special Master's opposition, like the Government's, depends on the MOU proviso conditioning the loss of the consent right on a "default under any Loan."

Under Article II, Section 3.i, although the NHC Board otherwise acts by majority vote, "[n]otwithstanding the foregoing, provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5 (MOU Art. II, § 3.i). The AAI directors' consent is thus the rule for any sale of a Specified Affiliated Company; the single exception is a "default under any Loan." The Special Master's entire theory—that "by simple majority vote, NHC's board can approve … any and all dispositions of SACs," Doc. No. 334 at 4—holds only if that exception is satisfied. It is not.

### II. The "Loan" and the "default" the proviso requires are creatures of Article III of the MOU, which was adjudicated unenforceable, severed, and never implemented.

#### A. "Loans" is a defined term, and the MOU reserved the operative default regime to Article III.

The MOU's recitals frame the transaction as including "the immediate partial amendment of … the interest rate and repayment terms of the Loans (the 'Interim Loan Amendment')" and "the global restructuring and modification of all Loans, including assignment of the Loans to such new holding company (the 'Global Loan Amendments')." Doc. No. 55-1 (MOU Recital O). The affiliated "Loans" were to be carried in two stages—a stopgap Interim Loan Amendment at signing (Article I) and a permanent Global Loan Amendments restructuring (Article III), under which "all

Loans, as amended by the Interim Loan Amendment, shall be assumed by and assigned to NHC as borrower and further amended." Doc. No. 55-1 (MOU Art. III, § 1). And Article III alone was to define a "default": "all Loans will be subject to events of default and remedies for events of default set forth on Attachment B attached hereto (the 'Default and Remedy Terms')." *Id.* (MOU Art. III, § 1(g)). The restructured Loans and the events that could ever constitute a "default under any Loan" were both to be created by Article III.

**B. In the litigation over this MOU, the courts held Article III an unenforceable "agreement to agree," severed it, and confirmed it was never implemented.**

In *Southland National Insurance Corp. v. Lindberg*, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), the North Carolina insurance companies—whose policyholders are the restitution victims and whose designees control the NHC Board on which the Special Master now sits—sued Defendant over this MOU. The court held: "Article III of the MOU is an unenforceable agreement to agree." Amended Judgment and Order (May 26, 2022) ¶ 129 (Ex. A). "The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article III may be enforced." *Id.* ¶ 131. It found that "[t]he loan amendment process set forth in Article III of the MOU had not yet been completed," *id.* ¶ 98(ix), then severed Article III and enforced the remainder against Defendant, *id.* ¶¶ 132–36. The North Carolina Court of Appeals affirmed, agreeing that "the other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete [Article III]," and that "the amendments and restructuring outlined in Article III were

to take place after the SACs were transferred to the NHC"—"in the future." *Southland Nat'l Ins. Corp. v. Lindberg*, 289 N.C. App. 378 (2023) (Opinion of the Court), *disc. rev. improvidently allowed*, No. 173PA23 (N.C. Oct. 17, 2025).

**C. It follows that the "Article III Loans" and their "Default and Remedy Terms" never came into existence.**

The restructured "Loans" the proviso speaks of—those "as they were to be amended and restructured under Article III," Doc. No. 316 at 17, and assumed by NHC as borrower—were never brought into being; the Global Loan Amendments were never implemented. And the "Default and Remedy Terms" that alone define what an "event of default" is were never adopted, so there is no agreed measure by which any "default under any Loan" could be declared. As Defendant's sworn account states, "the default provisions that would trigger a loss of the … veto right were never implemented," and "no default under Article III has ever been asserted." Def. Ex. 1, Tab A ¶¶ 8, 14–18 (Affidavit of Greg E. Lindberg); Doc. No. 316 at 16–18.

**III. Step by step, the veto-stripping condition never applied and cannot apply.**

The Special Master's theory can be tested against the MOU's own logic, and it fails at every step:

1. The consent right is the rule: no NHC subsidiary may be sold without the affirmative consent of at least one AAI (Defendant-appointed) director. Doc. No. 55-1 at 5.
2. The single exception is a "default under any Loan," which alone lets the board sell by simple majority. *Id.*

3. The "Loan" and the "default" that exception requires are defined by Article III—the restructured Loans assumed by NHC and the "events of default … set forth on Attachment B … (the 'Default and Remedy Terms')." Doc. No. 55-1 (MOU Art. III, § 1(g); Recital O).

4. Article III was adjudicated unenforceable, severed, and never implemented. *Southland*, No. 19-CVS-013093, Amended Judgment and Order ¶¶ 129–36 (Ex. A); *aff'd*, 289 N.C. App. 378 (2023), *disc. rev. improvidently allowed*, No. 173PA23 (N.C. Oct. 17, 2025).

5. Therefore the restructured Loans and the Default and Remedy Terms never came into existence. Def. Ex. 1, Tab A ¶¶ 8, 14–18; Doc. No. 316 at 16–18.

6. Therefore no "default under any Loan" can exist, the exception is never satisfied, and the consent right never falls away. On this instrument the veto is incapable of being stripped, because the only mechanism the parties provided for stripping it was never created.

## IV. The "Affiliate Investments" and pre-MOU defaults the Special Master invokes cannot supply a "default under any Loan."

The Special Master says that "Loans (including, but not limited to, Affiliate Investments)" are in default. Doc. No. 334 at 3. That does not supply the default the proviso requires, for three independent reasons. First, the MOU wiped the slate clean of pre-existing defaults at its inception: the Interim Loan Amendment, executed the same day, "waive[d] any and all claims for any Events of Default" predating it. Def. Ex. 1, Tab A ¶ 9; Doc. No. 316 at 17. Second, the only post-Effective-Date "events of default" the MOU recognizes are those Article III's Default and Remedy Terms were

to establish, and those were never adopted; a default under the old, superseded, pre-MOU covenants or the affiliate investments is not a "default under any Loan" as the governing documents define one. Third, to read "any Loan" to reach those superseded covenants would, as Defendant attests, render "the veto provision … meaningless," because the insurance companies could "simply declare defaults under the old, pre-MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11; Doc. No. 316 at 17. The Special Master, who holds his position by virtue of the MOU structure the insurance companies enforced, is bound by the terms of the instrument as adjudicated, not as reimagined; he cannot claim the benefit of a severed, never-implemented Article III to manufacture the default his "no veto right" argument requires. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

## V. The Special Master cannot disclaim "control" of a disposition his own inherited consent gates—and, as the Court's officer, may not furnish that consent outside the Court's review.

The Special Master's disclaimer of control cannot be reconciled with the consent right he holds. When no qualifying default exists, Article II, Section 3.i forbids the NHC Board to approve the sale of any NHC subsidiary "without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5. That AAI consent right "passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC." Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17. The Special Master is therefore not a bystander to dispositions of the SACs; he holds the one consent the MOU makes a precondition to any sale. He exercised exactly that power once before, on

Defendant's account, when he furnished his consent—including a letter of non-objection to the buyer—for the Beckett disposition. *Id.*

Against that backdrop, the Special Master's representation that he "does not intend to interfere with, or otherwise oppose, the transaction," Doc. No. 334 at 4, is not neutrality; from the holder of the gating consent right, non-opposition operates as the very consent that lets the sale proceed. And the reason he gives—that "persons due restitution … are currently slated to (i) receive funds in exchange for releases that would reduce Defendant's outstanding restitution obligations and (ii) consent to the transaction before it closes," *id.* at 3—confirms that the Court's own officer is prepared to facilitate an irreversible disposition of a restitution asset, on terms he has evaluated, without submitting those terms to the Court. That is precisely what the appointing order and 18 U.S.C. § 3664 commit to the Court, not to the officer acting alone. Whether the surviving consent right should be exercised for or against this transaction is a decision for the Court to review; it is not one the Special Master may make unilaterally and then characterize as no control at all.

## VI. The Special Master's account of Damovo's ownership does not remove it from the MOU's consent structure or this Court's control, and the narrow relief the Motion seeks runs to the Court's own officer, not to strangers.

The Special Master represents—"on information and belief," and without a supporting declaration—that NHC "does not own or control Damovo," that Damovo was moved in 2021 "to a trust governed by English law," and that NHC owns only "a SAC that is owed money by Damovo's owner-trust." Doc. No. 334 at 2–3. Even taken at face value, that does not remove Damovo from the MOU's consent structure or

from this Court's restitution process. Damovo is a Specified Affiliated Company and, as Defendant has explained to the Wake County Superior Court, "an NHC subsidiary under the MOU." Doc. No. 320-1 at 9. The June 17, 2021 trust does not cut Damovo loose: by its own terms, no sale (a "Disposition") may be made "without the prior written consent of the Settlor," the Trustee and the Damovo Group must cooperate with the Settlor on any sale of the Damovo equity, and the trust "exists only for the federal case." Doc. No. 320-1 at 4–5. And the Special Master holds Defendant's rights and interests in the Primary Restitution Assets under this Court's order. The disposition of Damovo therefore cannot proceed except consistent with the federal restitution process and subject to this Court's control—which is what the Motion seeks. To the extent the Special Master's account is offered to suggest the Court is powerless here, it is beside the point: whoever holds the pen on the transaction's mechanics, a Primary Restitution Asset may not be disposed of below value and without this Court's review.

The Special Master's own submission, moreover, shows that NHC and the victims are participants in, not strangers to, the transaction: the prospective acquiror "has sought consents … and/or releases" from the North Carolina and Bermuda insurance companies and from NHC, and "has proposed to pay certain sums to those parties" in exchange. Doc. No. 334 at 2–3. A disposition structured around purchased releases from the restitution victims and from NHC, and gated by the consent right the Special Master now holds, is not a private matter among strangers; it directly reduces the value available to satisfy restitution and to size the forfeiture keyed to it.

Finally, the Special Master's objection that "the parties [Defendant] seeks to enjoin … are not before the Court," Doc. No. 334 at 4, misstates the relief. The Motion's relief runs to the Special Master—this Court's own appointee—and his NHC-board designee, and to preservation of an asset and its proceeds; it need not enjoin Damovo, its purchaser, or its lenders to be effective. Directing the Court's own officer to refrain from consenting to, or facilitating, the disposition, and to bring its terms before the Court, is squarely within the Court's authority over its appointee and the res of its restitution proceeding. To the extent any broader relief implicates non-parties, the Court can tailor its order to the Special Master and his designee without reaching strangers at all.

## VII. The Special Master and the Government are circumventing the appointing order to sell a Primary Restitution Asset for a fraction of its value—forgoing restitution the order commands the Special Master to maximize.

The order that appointed the Special Master prescribes how a Primary Restitution Asset may be liquidated, and it binds the Special Master directly. It directs him to "identify all assets available for liquidation … and … determine a reasonable estimated value for those assets"; to "select an appropriate method and timetable and seek Court approval to liquidate … any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation with Court approval." Doc. No. 56 ¶ 3(b)–(d). It rests on the Court's finding that "it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid," *id.* ¶ 6, and directs the Special Master to "attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets," *id.* Any

change to the scope of the Primary Restitution Assets "shall be heard upon notice and hearing." *Id.* ¶ 15.

The contemplated Damovo disposition satisfies none of these requirements. There is no reasonable estimated value on the record; there is no Court-approved method or timetable; there is no Court approval of the liquidation; and there has been no notice and hearing. The Special Master's own account is that the asset is to be sold through a third-party lender foreclosure, with the acquiror paying only "certain sums" to NHC and the insurance companies for releases, Doc. No. 334 at 2–3—a sale at a fraction of the asset's worth, the bulk of whose proceeds, on the Government's account, "would be used to pay off Damovo's debt owed to other non-insurance company lenders," Doc. No. 335 at 2.

The value forgone is substantial and concrete. Damovo is a going concern "independently worth between $400 million and $500 million," Doc. No. 316 at 68, and a credible, financed alternative is already on the table: on July 31, 2026, Twelve Seas Investment Company III delivered a written indication of interest to acquire Damovo at a $400 million enterprise value, backed by approximately $175 million held in trust by a NASDAQ-listed acquirer. Doc. No. 320-1 at 2–3 & Ex. 1; Declaration of Greg E. Lindberg ¶ 12 (filed herewith). The contemplated transaction, by contrast, yields no sale proceeds at all—only about $17.5 million in "consent fees," of which the North Carolina insurance estates would receive ten dollars. Doc. No. 320-1 at 2, 5. The Special Master cannot simultaneously be the officer the Court charged with maximizing restitution recovery and a bystander to the disposal of the estate's most

valuable asset for a sliver of consent fees while a financed $400 million offer sits unanswered. Defendant's position in both courts is the same: he has asked the Wake County Superior Court to instruct NHC to engage the Twelve Seas offer, to place all proceeds of any Damovo transaction in this Court's escrow, and to bar any closing until this Court approves the transaction and all of its terms. Doc. No. 320-1 at 9–12.

That is the circumvention the Motion is aimed at. Accomplishing the sale through the secured lenders' foreclosure—rather than the Special Master's selecting a method and timetable and seeking this Court's approval of the price, as Doc. No. 56 ¶ 3(c)–(d) requires—is an attempt to do off the Court's docket, and without the Court's approval or the Defendant's participation, exactly what the appointing order permits only "with Court approval" and only in service of maximizing restitution. The Special Master's posture that he is a mere bystander, Doc. No. 334 at 3–4, and the Government's that the matter belongs in Wake County, Doc. No. 335 at 4, are two routes to the same end: disposing of a Primary Restitution Asset for a fraction of its value without the Court review the order requires. The Court should not permit its own appointing order to be bypassed in that way.

## VIII. The constitutional and statutory challenge to disposing of Damovo before any restitution order is preserved for appeal, and the Court's prior ruling does not authorize this sale.

The stay the Motion seeks is not a new request. Defendant has already asked the Court to stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and to set aside the special-master reference, on constitutional and statutory grounds—principally that the estate is being liquidated before any

restitution order exists, so that, in the words of his motion, "execution has preceded adjudication" in violation of the Mandatory Victims Restitution Act's mandatory sequence and of due process. Doc. No. 269 §§ VII–VIII & Prayer ¶ 3; *see* Doc. No. 316 at 67–68, 83. He identified the Damovo disposition as a live example: a Primary Restitution Asset being sold, through a pending state-court motion, "for no more than the debt against it," before any restitution order and without this Court's approval. Doc. No. 316 at 68, 83. The Special Master is the officer effecting that out-of-sequence liquidation.

The Government never answered that Damovo-based challenge. As Defendant has shown, "the issues [the Government] has left unanswered—including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state-court sale … stand unopposed." Doc. No. 316 at 68. This District's rules make that omission consequential: the Government "must file a response to any dispositive motion within fourteen (14) days of service," and "[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice." LCrR 47.1(d)(1), (3); *see* Doc. No. 316 at 7.

The Special Master's Opposition does not cure that omission either. It answers only the MOU-consent mechanics of the present Motion; it does not answer the constitutional and MVRA-sequencing challenge to disposing of a Primary Restitution Asset before any restitution order.

The Court, however, has ruled otherwise on the broader challenge: it denied Defendant's motion to declare the special-master reference unconstitutional as

applied and to set aside the reference, and stated its intent to adopt the Special Master's report, with a few modifications, while reserving a separate final order on the amount of restitution. Doc. No. 330. Because the Court ruled otherwise, Defendant respectfully disagrees and expressly preserves the constitutional and MVRA-sequencing challenge—including as applied to the Damovo disposition, and including the failure of the Government and the Special Master to answer it—for review by the United States Court of Appeals for the Fourth Circuit, and does not waive any part of it. Nothing in that ruling authorizes the specific disposition now contemplated: Doc. No. 330 did not approve the sale of Damovo, make the findings 18 U.S.C. § 3664 requires, or authorize an out-of-sequence, below-value liquidation of a Primary Restitution Asset without Court review, and the Special Master should not be permitted to complete that liquidation while the challenge is pending on appeal.

**IX. The equities require a stay.**

The Damovo asset is a designated Primary Restitution Asset, and its disposition would be irreversible and would reduce, dollar for dollar, the value available to satisfy the restitution the Court is about to fix and to size the forfeiture keyed to it. A brief stay preserving the status quo until the transaction is presented to the Court imposes no cognizable harm on anyone with a legitimate claim to the asset, while its absence risks the permanent, uncompensable loss of restitution value—on a premise the parties' own prior litigation has already rejected, and on an ownership account that, in any event, does not remove Damovo from this Court's control. At a minimum, the Court should direct the Special Master and his NHC-

board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

### X. The Court should hold an evidentiary hearing to resolve the disputed factual issues before any disposition of the Damovo asset.

The Motion turns on disputed questions of fact that should be resolved on an evidentiary record, not on the competing papers alone. Defendant respectfully requests that, before any disposition of the Damovo asset, the Court hold an evidentiary hearing and resolve through that hearing the factual issues material to the Motion—including whether any "default under any Loan" exists within the meaning of the MOU, and the value and terms of the contemplated disposition. Those facts are contested and material to the relief the Motion seeks, and they should be resolved before any irreversible sale of a Primary Restitution Asset.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court reject the Special Master's opposition and grant the Motion, staying any sale, transfer, or other disposition of the Damovo asset until its terms are presented to and reviewed by the Court under its appointing order and 18 U.S.C. § 3664, and preserving any proceeds of a disposition pending that review. In the alternative, the Court should direct the Special Master and his NHC-board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

Dated: September 7, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 7, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

# EXHIBIT 7

Affidavit of Michael L. Martinez (Counsel for the Special Master)

No. 3:23-cr-48, Doc. 343 (W.D.N.C. Sept. 10, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

GREG E. LINDBERG,

Defendant.

Case No. 3:23-CR-48-MOC

**AFFIDAVIT OF MICHAEL L. MARTINEZ**

Michael L. Martinez, being duly sworn, deposes and says:

1. I am a member of the law firm of Grier Wright Martinez, PA, 521 E Morehead Street, Suite 440, Charlotte, North Carolina 28202.

2. I serve as counsel for the Court-appointed Special Master, Joseph W. Grier, III (the "Special Master") in the above-referenced case, who was appointed pursuant to the *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Appointment Order").

3. The Special Master, other attorneys at this firm, and I have experience quantifying, and making recommendations to courts concerning, restitution claims in fraud cases while serving as and/or representing a federal equity receiver, a state court receiver, a bankruptcy trustee, and/or a special master in a criminal case.

4. I believe the Special Master was considered for appointment in the above-captioned case (this "Case") based on the foregoing experience.

5. Based on initial meetings with Defendant's counsel and the government prior to entry of the Appointment Order, I understood the primary responsibility of the Special Master, upon appointment, to be to investigate the facts and circumstances of Defendant's dealings with

various insurance companies, to determine how much, if anything, each insurance company (or its policyholders) might be owed under restitution theories, and to prepare a report recommending to the Court the appropriate amount of restitution due each person seeking restitution, the priority or sequencing of restitution payments to each person potentially due restitution, and related issues.

6. In addition to the foregoing responsibilities, I interpret the Appointment Order to also instruct the Special Master to perform other tasks, including facilitating liquidations of "Primary Restitution Assets," taking immediate possession and control of certain of Defendant's assets to preserve such assets, seeking Court approval of any liquidations of Defendant's assets—whether "Primary" or "Secondary"—*by the Special Master*, and to cooperate with receivers and other third parties previously charged with marshalling certain of Defendant's assets in connection with ancillary civil litigation matters and related settlements.

7. The Appointment Order also designates Scott Avila and his firm, Paladin Management Group ("Paladin"), as the Special Master's financial advisors in this Case. On information and belief, while the government recommended that the Special Master be appointed in this Case, Defendant's counsel preferred that Scott Avila or Paladin be named special master, and, as a compromise, the government and Defendant agreed to the construct appearing in the Appointment Order (local attorney named to the office of special master, with Defendant's preferred financial analysts approved as the special master's financial advisors).

8. Immediately upon entry of the Appointment Order, (a) Defendant's counsel engaged in one-on-one communications with the Special Master that excluded the government and (b) Defendant's counsel encouraged the Special Master team to, as part of the Special Master's investigation, communicate one-on-one—outside the presence of either Defendant's counsel or the government—with various third parties, including potential victims, court-appointed

receivers/rehabilitators/liquidators, potential purchasers of assets, and management and counsel for various companies owned directly or indirectly by Defendant.

9. I continue to communicate about this Case outside the presence of both the government and Defendant's counsel with third parties on a daily (or near daily) basis as part of assisting the Special Master in fulfilling his responsibilities under the Appointment Order.

10. Without having tallied each and every phone call, email, video conference, or the amount of time spent on each, my impression is that the Special Master and Paladin had more one-on-one communications with Defendant's counsel than any other person or group involved in this Case, including the government.

11. In my opinion, it would be impossible for the Special Master to perform the duties and functions set out in the Appointment Order if the Special Master were required to communicate only in the presence of Defendant (or Defendant's counsel) and/or the government. Indeed, the Special Master team has conducted voluminous interviews and other meetings with various interested third parties, including victims, receivers, officers and directors of Primary Restitution Assets, lenders and other creditors, regulators, and representatives of state guaranty associations, all or most of which meetings were critical to completing the work assigned through the Appointment Order. I believe the flexibility to accomplish the various tasks required by the Appointment Order outside of a formal adjudicative hearing-type setting is one of the many reasons why a special master was necessary in this Case.

12. Prior to Defendant's sentencing hearing, I do not recall Defendant or his counsel ever articulating a concern to me concerning how the Special Master was fulfilling his duties under the Appointment Order, with the exception of the Special Master's conduct (or lack thereof) in relation to the disposition of Beckett Collectibles, LLC.

13. Continuously from the Appointment Order through Defendant's sentencing, the Special Master, Defendant's counsel, and the government worked collaboratively on resolving and narrowing as many restitution-related issues as possible, including by participating in weekly video conferences, with very few weeks missed over the course of approximately 16 months.

14. Defendant himself submitted various memoranda addressed to me or the Special Master concerning either his assets, his potential restitution liability, or both, some of which were helpful to our efforts and all of which I considered earnestly.

15. Until a time (*i.e.*, Spring of 2026) substantially contemporaneous with the Special Master submitting his initial report and recommendations regarding restitution in this Case (together, with the supplements thereto subsequently filed, the "Report"), Defendant's counsel advanced only certain of Defendant's current offset theories and did not emphasize (or advance at all) some of Defendant's more ambitious theories, which effectively translate into Defendant not owing any restitution at all.

16. Prior to that time, the restitution-related arguments made by Defendant's counsel to me were always focused on determining how much restitution Defendant owed (after factoring in offsets), not on whether any restitution was owed at all.

17. A substantial portion of the materials that the Special Master relied upon in reaching the conclusions appearing in the Report originated with Defendant and were provided to the Special Master's team by Defendant's counsel.

18. Defendant's counsel and Paladin had numerous meetings, both in-person and via video conference, during which various documents and information concerning restitution were freely exchanged between the Special Master and Defendant. From my perspective, Paladin (who, again, was recommended for this job by the lawyers at Katten Muchin Rosenman LLP) appeared

to be very responsive to requests for meetings and information from Defendant's counsel at all points in time prior to sentencing, and their relationship otherwise appeared fluid and constructive. Certainly, I heard nothing to undermine these impressions from Defendant's counsel.

19. On information and belief, one such meeting occurred in-person at Katten Muchin Rosenman LLP's offices in Dallas, Texas in late January 2026, shortly after the Court ordered the Special Master to file the Report by March 20, 2026. Coming out of that meeting, while Defendant's counsel owed some additional documents to Paladin, I understood, based on emails following up on that meeting that were shared with me, that the Special Master, at that time, owed no outstanding documents or information to Defendant relating to restitution issues.

20. Stated differently, in the weeks leading up to the filing of the Report, I thought that Paladin had provided documents and information satisfactory to Defendant's counsel to enable Defendant to understand and meaningfully contest the findings and conclusions appearing in the Report. While I was aware that Defendant wanted us to produce additional materials in our possession relating to valuations of assets to be liquidated in the future, I do not recall open document requests relating to restitution in the weeks leading up to filing the Report. Of particular note, Paladin presented a slide deck during many of the weekly meetings in which Paladin itemized (i) unresolved/open restitution issues that required further investigation, (ii) resolved/agreed-upon restitution issues, and (iii) restitution issues for which the parties would not likely agree upon. The slide deck was updated weekly (or nearly weekly) and ultimately served as an outline and reference material for the Report. I do not recall, especially near the time of filing the Report, Defendant's counsel noting unresolved objections to how the slide deck categorized the various restitution issues or to the slide deck omitting offset requests or to the slide deck noting something as resolved

when Defendant's counsel sought further documents, information, or investigation on that point; any issues that were raised by Defendant's counsel were addressed by Paladin.

21. Over the course of my many telephone calls and video conferences with Defendant's counsel, we worked to narrow many of the restitution questions raised by the facts and circumstances of this Case. Of prime importance, the Special Master team, the government, and Defendant's counsel agreed that Defendant's base restitution responsibility (*i.e.*, before factoring in credits or offsets) would be established using unpaid loan balances agreed to by Defendant and the North Carolina insurance company victims in connection with that certain *Interim Amendment to Loan Agreement* ("IALA"), rolled forward.

22. Much of the documents and information that enabled the Special Master team to understand IALA balances originated with Defendant's counsel, and where critical data considered by the Special Master came from the North Carolina insurance company victims or some other source, that information was ultimately shared with Defendant's counsel, albeit sometimes not in the form, or as quickly as, Defendant might have preferred, but certainly with sufficient detail, and with enough time, for Defendant to make meaningful use of the data.

23. I was encouraged by both Defendant's counsel and the government to include in the initial Report all areas of the restitution analysis where the Special Master did not reach consensus with Defendant. Indeed, those nine (9) areas were flagged and discussed in the Report: eight (8) asserted offsets (discussed on pages 23–25 of Doc. No. 106 in this Case); and the question of whether to incorporate an interest component (discussed on pages 3–4, 20–22 of Doc. No. 106 in this Case). Thus, at the time of filing the Report, I believed Defendant consented to the Special Master's methodology and calculation of Defendant's primary restitution responsibility based on the IALA.

24. Admittedly, the Special Master did not provide to Defendant's counsel each and every document received by the Special Master that Defendant's counsel asked to review, primarily due to a desire to preserve the free-flow of information to the Special Master, privacy concerns, and a desire to maximize the recoveries for victims from Defendant's assets. That said, my recollection is that most (if not all) of the documents we ultimately did not provide to Defendant's counsel pertained to the current state of the "Primary Restitution Assets" that may, in the future, be liquidated to compensate victims and did not pertain to restitution issues.

25. Notwithstanding, over the course of the various meetings and other communications between Paladin and Defendant's counsel, Paladin provided Defendant's counsel enough documents and information to understand the Special Master's restitution-related conclusions to the satisfaction of Defendant's counsel, or so I was led to believe by Paladin and Defendant's counsel (including by the absence of Defendant's counsel objecting to representations in Paladin's slide decks during weekly video conferences).

26. At the time the initial Report was filed, I did not believe Defendant's counsel was waiting on the Special Master to provide Defendant with any documents or information critical to the restitution analysis. Rather, I understood that, through various communications between Paladin and Defendant's counsel and otherwise, Defendant's counsel generally had everything they needed from the Special Master to understand and, where Defendant deemed appropriate, oppose the Report.

27. Notably, in January, the Court ordered the Special Master to file the Report in March. Despite weekly meetings following that order (during which the Special Master's proposed figures were discussed in some detail), Defendant's counsel served no formal discovery requests between January and March and did not move to compel the Special Master or

government to provide any additional documents or information before the Special Master filed the Report in March.

28. After Defendant's counsel reviewed the filed version of the Special Master's Report, Defendant's counsel and the Special Master team continued to have conversations concerning restitution items, primarily Defendant's offset requests. To the best of my knowledge and recollection, all requests for documents and information conveyed at that time were satisfied prior to Defendant terminating his relationship with the Katten Muchin Rosenman LLP and Wyatt & Blake, LLP law firms, although Paladin was waiting for additional information from Defendant's counsel concerning Defendant's asserted offset based on the "zero-coupon bonds."

29. Neither the Special Master, other attorneys at this firm, nor I have any appreciable experience serving as an arbiter, magistrate judge, adjudicator, or prosecutor.

30. At no point in time did I believe the Special Master was serving a prosecutorial or an adjudicatory function in this Case. Rather, I understood the Special Master's role to be to investigate and to report/recommend, while also preserving certain assets and facilitating recoveries for persons due restitution.

31. In the *Affidavit of Greg E. Lindberg* (Doc. No. 332-1) (the "Lindberg Affidavit") filed in connection with *Defendant's Motion to Compel the Special Master to Produce the Data Underlying the Restitution Figure and his Ex Parte Communications, and to Set Aside his Report and Final Supplement* (Doc. No. 332), Defendant avers under oath that Defendant's counsel sent something referred to as a "Restitution Calculation letter" to the Special Master and Paladin, "setting out the calculation and the credits and offsets the defense contended were owed" on September 16, 2025. I have conducted a reasonably diligent search of this firm's records and identified no such correspondence received from Defendant's counsel in or around September of

2025. I also asked Paladin to conduct such a search and no responsive document was provided to me. Notwithstanding, and although Defendant's description of what he is referring to here is vague, on March 17, 2026 (*i.e.*, six months later than indicated, and on the eve of the Special Master filing the initial Report[1]), Defendant's counsel transmitted to the Special Master a memorandum exceeding fifty (50) pages that could fit this description.

32. The Lindberg Affidavit avers under oath that—on November 22–23, 2025—Defendant's counsel "wrote again on causation and offsets," seeking a credit based on the purported value of certain victims. I have conducted a reasonably diligent search of this firm's records and identified no such correspondence received from Defendant's counsel in or around November of 2025. I also asked Paladin to conduct such a search and no responsive document was provided to me. However, on December 10, 2025, Defendant's counsel transmitted a letter addressed to me from Defendant dated November 22, 2025 (a date matching the description in the Lindberg Affidavit), requesting that the Special Master use more than $470,000 of the administrative expense reserve funded with the Clanwilliam sale proceeds to pay for Defendant's personal assistants, who were apparently at that time visiting Defendant at the Gaston County jail on a daily basis, and another $240,000 for Defendant's bookkeeper. This correspondence did not discuss the alleged equity value of the North Carolina insurance company victims or "causation and offsets" more generally, as alleged in the Lindberg Affidavit.

33. The Lindberg Affidavit avers under oath that in December of 2025, Defendant's counsel "served written information requests on the Special Master's counsel [seeking] the specific data and methodology behind the figure; on December 18, 2025 the Special Master deferred them and did not respond." Although, in December of 2025, Defendant had asked for more information

[1] Per the January Court order, the Report was due on March 20, 2026, and, after obtaining an extension of time, the Special Master filed the Report on April 3, 2026.

on the specific data and methodology underlying the Special Master's calculations (which request was temporarily deferred by me on December 18, 2025 as the Lindberg Affidavit indicates), as stated above, these information requests—to the extent related to restitution—were resolved by Paladin during the early part of 2026.

34. The Lindberg Affidavit avers under oath that the Special Master relied on information from third parties "without any disclosure from the Special Master as to how or why those adjustments, made from ex parte communications, were arrived at, and without access to the underlying data for me or my counsel." This statement is not accurate.

35. The Lindberg Affidavit avers under oath that "each category of information the defense has requested[] is ex parte information that was never provided to my former counsel . . . or to me." This statement is not accurate.

36. The Lindberg Affidavit avers under oath that any information collected by the Special Master from third parties "was never produced to my counsel or to me." This statement is not accurate.

37. Further affiant sayeth not.

This is the 10th day of September, 2026.

Michael L. Martinez

Sworn to and subscribed before me
this 10th day of September, 2026.

Notary Public

Print Name: Jacinda T. MerChant

My commission expires: 01/07/2030

Jacinda T. MerChant
My Commission Expires
NOTARY
PUBLIC
January 7, 2030
MECKLENBURG COUNTY, NC

# EXHIBIT 8

United States' Response in Opposition to Defendant's Motion to Compel

No. 3:23-cr-48, Doc. 341 (W.D.N.C. Sept. 8, 2026)

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant*. | No. 5:19-CR-22-MOC<br><br>No. 3:23-CR-48-MOC |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL**

The United States respectfully submits that the Court should deny Defendant's untimely, unjustified, and unreasonable request to compel the production of forty-seven different categories of materials from the United States and his most recent request to set aside the Special Master's Report. ("Motion," Doc. 331).

The Special Master process was proper and supported by the law and, until he was sentenced, fully involved Defendant and his counsel. Nevertheless, Defendant now makes false and misleading assertions about a lack of access to information regarding the restitution process and about purportedly improper direct "ex parte" communications during the Special Master process. However, the record, including sworn statements of Defendant's previous counsel, reflects that Defendant and his previous counsel participated in and benefited from such direct communications with the Special Master and the Financial Advisor, including communications on many of the topics about which he now claims he lacks information. Moreover, there is nothing improper about the Special Master's direct contacts with the parties, victims, or other interested third parties, which were authorized by the Court and the law. In any event, Defendant's strategic

decision to wait nearly 20 months to raise his complaints with the Special Master process so that he could appear cooperative at his sentencing forecloses his ability to complain now that he does not like the result. As such, the Court should deny his Motion.

**ARGUMENT**

**I. The Court Should Deny Defendant's Overly Broad Requests for Materials from the United States**

Defendant's Motion is premised on two false factual assertions, the brazenness of which are demonstrated by numerous sworn declarations (including by his previous counsel) and other filings already on the docket in this case. First, he falsely claims that neither the United States nor the Special Master have provided him with any of the materials underpinning the proposed restitution amounts. Second, he asserts that the Special Master's purportedly impermissible "ex parte" communications with the parties, victims, and other third parties, which he claims to have only recently discovered, render the Special Master process unconstitutional. Defendant provides a sworn affidavit in support of these assertions, attesting that, among other things:

> The information … would simply appear as final values, without any disclosure from the Special Master as to how or why those adjustments, made from ex parte communications, were arrived at, and without access to the underlying data for me or my counsel. My former counsel asked for that data and were invariably denied access to it. These reports and values were provided ex parte to the Special Master, in violation of my rights, and neither I nor my counsel could ever test them…"

(*See, e.g.,* Doc. 331-1 at ¶ 4). As set forth below, the record lays bare the inaccuracy of these claims. Moreover, even if Defendant's claims were true, he is still not entitled to the relief he seeks because he waited too long to assert them in the hopes of gaining a strategic

advantage at his sentencing and, thus, he has waived them. *Cf. Kolon Indus. Inc. v. E.I. Dupont de Nemours & Co.*, 748 F.3d 160, 168-169 (4th Cir. 2014) ("Here—just as with a § 455(a) recusal, for example—the requirement of timeliness 'prohibits knowing concealment of an ethical issue for strategic purposes,'" and "'is vital ... to prevent waste and delay.'") (quoting *United States v. York,* 888 F.2d 1050, 1055 (5th Cir.1989) & *United Stats v. Owens,* 902 F.2d 1154, 1156 (4th Cir. 1990)).

The timeline of events and filings leading to the appointment of the Special Master are set forth in numerous filings, including in the United States' opposition to Defendant's initial request for subpoenas (Doc. 261), and are incorporated here as appropriate. Suffice to say that over the course of more than five months, the parties engaged in substantial negotiation over the terms of Defendant's plea agreement and the terms of the proposed order appointing a special master that culminated in the Court granting the parties' joint request to appoint a special master and entering the Special Master Order on January 23, 2025. (Doc. 56). The Special Master Order tasked the Special Master and his Financial Advisor with several responsibilities, including fashioning a proposed restitution order. It also directed the Special Master to "regularly update the Parties" and "**consult with the Parties** to the extent the Special Master deems it helpful in fulfilling his duties under this Order." (*Id.* at ¶ 5) (emphasis added). Moreover, it directed the Special Master to submit quarterly statements "to the Court for its approval and confirmation." (*Id.* at ¶ 14).

Shortly after the Court appointed the Special Master and the Financial Advisor, they got to work to carry out their duties. This was reflected in the Special Master's very

first status report, filed with the Court on July 2, 2025, under the heading "Communications with Stakeholders":

> Upon appointment, the Special Master (including the Special Master's attorneys at Grier Wright Martinez, PA ("Grier Law") and Financial Advisor (partners and staff from Paladin Management Group ("Paladin")) conducted several introductory video conferences, telephone conversations, and in-person meetings with various stakeholders in the restitution process, including, without limitation: John N. Johnston of Deloitte Ltd., a court-appointed liquidator for the Bermuda Insurance Companies …; Various officers of ULICO …; Wes J. Camden and Caitlin M. Poe of Williams Mullen P.C., counsel for the North Carolina Insurance Companies; … Mohsin (Mo) Meghji, Matthew Manning, and William Gallagher of M3 Advisory Partners, LP, providers of outside professional advisory services to NHC Holdings, LLC …; **Ryan J. Meyer and Brandon N. McCarthy of Katten Muchin Rosenman LLP and James F. Wyatt, III of Wyatt & Blake, LLP, Defendant's criminal defense counsel; Daniel Ryan, Benjamin Bain-Creed, Taylor Stout, and Julia Park with the U.S. Attorney's Office for the Western District of North Carolina and Lyndie Freeman with the U.S. Department of Justice;** John Hulbert, in-house corporate counsel for AAPC Holdings, LLC ("AAPC") ….

(Doc. 65 at 2-3) (emphasis added).

The report also noted that, "[t]he Special Master has held recurring conferences with many of these stakeholders. Similarly, the Special Master conducts weekly video conferences, jointly, with the prosecution team and Defendant's defense team in this Case." (*Id.* at 4). In addition, the report explained the reason for these direct communications: "the Special Master's initial goal from these communications was to gather information about Defendant's various victims and assets. These communications

also served (i) to keep all constituencies well-apprised of the Special Master's efforts and (ii) to identify concerns and friction points among the various stakeholders." (*Id.*).[1]

Contemporaneously with the filing of his first status report, the Special Master also filed an application for the payment of fees and expenses supported by detailed billing records. The very first entries on the Special Master's billing records reflect direct communications between the Special Master and Defendant's counsel on November 26, 2024 (before the Special Master was even appointed). (Doc. 69 at 10). There are similar entries in December reflecting direct communications between the Special Master and the United States and with victims and other third parties. (*Id.* at 11-12). The billing records reflect that these types of direct communications continued after the Special Master was appointed as he and the Financial Advisor got up to speed on the case, including direct communications with Defendant personally:

| | |
|---|---|
| 02/10/2025 | "Review memoranda prepared by Greg Lindberg re various asset liquidation and claims resolution concepts" |
| 02/20/2025 | "Review letter and memo from G. Lindberg re suggestions. Review memo from Katten on federal preemption" |
| 04/10/2025 | "Review memorandum from BDR re communications from Greg Lindberg" |

(*See, e.g. id.* at 19, 27, 55).

[1] It is noteworthy that the report also disclosed (with no objection or clarification from Defendant) that, "[p]ursuant to the corporate governance documents of NHC, the Special Master has the right to appoint minority board seats to the NHC board of directors **but otherwise has minimal or no power to direct NHC to liquidate assets for the benefit of victims**." (*Id.* at 10) (emphasis added).

The Financial Advisor's billing records reflect similar direct communications:

| | |
|---|---|
| 02/6/2025 | "Call with G Lindberg and Katten regarding introductory" |
| 02/8/2025 | "Call with G Lindberg regarding assets and other issues" |
| 02/10/2025 | "Review of email from G Lindberg regarding tax reserve on Clanwilliam transaction;" |
| 3/8/2025 | "prepare for and participate in G Lindberg interview" |
| 4/2/2025 | "Call with G. Lindberg regarding thoughts on Primary Restitution Asset" |
| 6/6/2025 | "Call with [Katten] regarding G Lindberg email" |

(*See, e.g. id.* at 82, 85, 86, 105, 122, 137).

Contrary to Defendant's current claims, the billing records also make clear that the Special Master and the Financial Advisor were also providing Defendant and his counsel with information about their work and the data behind it, including their valuation work.

| | |
|---|---|
| 2/13/2025 | "Call with R Meyer (Katten) regarding update" |
| 3/13/2025 | "Call with Katten regarding valuations and NC insurance companies" |
| 3/25/2025 | "Call with Katten team regarding NC position" |
| 4/1/2025 | "Call with Katten regarding term sheet, and options" |
| 4/3/2025 | "Draft comments to G Lindberg regarding Primary Restitution Asset proposal" |
| 5/1/2025 | "Call Katten regarding Clanwilliam proposal" |
| 6/4/2025 | "Review and respond to emails from G Lindberg" |
| 6/20/2025 | "Review and QC informational deck for G Lindberg and Special Master" |

(*See, e.g. id.* at 87, 109, 118, 122, 123, 130, 137, 138).

Not surprisingly given the activity reflected in the billing records, in the first motion for approval of fees filed by Defendant's previous counsel, counsel explained its "constant communication with the special master and all parties involved" and "discussions with interested third parties." (Doc. 74 at 5). While the billing records submitted by Defendant's previous counsel are harder to decipher given their redactions, they nonetheless clearly evidence the receipt of information related to the Special Master's restitution work directly from the Special Master, the Financial Advisors, the United States, victims, and other third parties:

| | |
|---|---|
| 10 Feb 25 | "follow up meeting with special master M. Martinez and S. Avila …; attention to outstanding issues identified by special master team…; follow up on items identified by special master team" |
| 19 Feb 25 | "attention to restitution figures requested by court; …review data and begin collection and analysis of same in order to answer question for court and provide underlying justification data for special master" |
| 13 Mar 25 | "meet with D. Harer [from Financial Advisor] regarding valuation background and process" |
| 18 Mar 25 | "attention to recent documentation regarding AAPC" |
| 19 Mar 25 | "identify issues raised and identified by the Paladin team … Prepare for and meet with Paladin team regarding status of asset and restitution issues" |
| 25 Mar 25 | "review document received from Special Master team in response to their request to NC then NC response to same" |
| 25 Mar 25 | "review and analyze North Carolia responses to M. Martinez clarification order term sheet" |
| 28 Mar 25 | "Review and analyze financials and credit documents at request of special master to identify credit facilities available and used" |
| 31 Mar 25 | "Review and analyze repayment data and summarize same for Special Master and Financial Advisor team" |
| 02 Apr 25 | "Review and analyze AAPC term sheet" |

| | |
|---|---|
| 03 Apr 25 | "prepare for and meet with S. Avila regarding status of restitution calculations and asset monetization" |
| 08 Apr 25 | "Prepare for and meet with Financial Advisor regarding potential restitution strategies…" |
| 10 Apr 25 | "review Paladin term sheet 4-10 received from Scott Avila" |
| 15 Apr 25 | "attention to correspondence from Williams Mullen W. Camden on behalf of North Carolina insurance companies … follow up with special master financial advisor as to same" |
| 23 Apr 25 | "Review and analyze additional material provided by AAPCs counsel related to parent advance" |
| 28 Apr 25 | "Review and analyze correspondence from M. Martinez related to Vista" |
| 25 Apr 25 | "Working on issues related to disposition of assets in order to pay restitution to victims … follow up with counsel for companies at issue, including counsel for Bermuda companies" |
| 01 May 25 | "review provisions related to restitution identified by counsel for AAPC … review board deck provided regarding status of AAPC's financial health, including projections and cash on hand … follow up with client regarding [REDACTED]" |
| 09 May 25 | "Work on issues related to restitution credit with R. Meyer and Special Master team" |
| 09 Jun 25 | "confer with D. Harer [from Financial Advisor] regarding any background CWG [Clanwilliams Group] material collected or prepared by FA team … review and analyze produced documents" |
| 10 Jun 25 | "review NHC board discussion materials regarding Clan Williams sale" |
| 18 Jun 25 | "review and analyze most recent financials from NCICs … confer with D. Harer [from Financial Advisor] regarding same to confirm understanding of same" |
| 27 Jun 25 | "Review and analyze draft Special Master Report" |

(*See, e.g.*, Doc. 75-1 at 79, 105-110, 115, 116, 118, 120, 123, 124, 128, 129, 133, 146, 147, 151, 153).[2]

The Special Master's subsequent status reports and fee applications contain numerous additional examples, as do the subsequent motions for payment of fees by Defendant's counsel. Without belaboring the point, below are some of the many additional examples from those records that prove the falsity of Defendant's current claims:

- "In an effort to understand the nature and extent of losses resulting from Defendant's activities identified in the indictment, Paladin continued to: (i) review extensive documentation provided by alleged victims and other sources of documents and information; (ii) interview representatives of different potential victim constituencies; and (iii) conduct its own calculations and analyses to vet alleged loss amounts. During the Reporting Period, Paladin has prepared conceptional strategies for characterizing victims and calculating restitution loss estimates, which were circulated for discussion purposes only to the Defendant's counsel and the U.S. Attorney's office, seeking their review and comment. Those discussions remain ongoing." (Special Master's Second Status Report (Doc. 80) at 7-8).

- "Katten has also had numerous other meetings and communications with the Special Master and Paladin in order to facilitate Mr. Lindberg's cooperation with the Special Master." (Katten Memo in Support of Third Fee Motion (Doc. 97-1) at 4).

- "Working to meet Mr. Lindberg's obligations relating to restitution has required a significant amount of legal work by Katten, including strategizing with Mr. Lindberg and separately with the Special Master and Paladin regarding the maximization of the value of the Primary Restitution Assets, advocating for Mr. Lindberg's positions based on its analysis and research, determining restitution amounts, including potential offsets and credits, classifying and prioritizing victims, and reviewing numerous lengthy documents and agreements to untie a complex web of entities to

[2] The Court granted all of the initial requests for payment of fees by the Special Master, the Financial Advisor, as well as Defendant's counsel without objection. (*See* Docs. 89, 90, 91).

ensure victims are maximally compensated." (*Id.* at 5).

- 06 Oct 25 "follow up with Paladin regarding their conversations with M3 and NHC" (Katten Declaration (Doc. 97-2) at 11).

- 28 Oct 25 "Multiple meetings with S. Avila regarding initial restitution calculations and sales process" (*Id.* at 13).

- 31 Oct 25 "Confer with Paladin regarding restitution calculation items" (*Id.* at 14).

- 05 Nov 25 "prepare for and meet with Paladin team regarding restitution calculations, including potential offsets" (*Id.* at 17).

- 07 Nov 25 "Attention to recent information supplied by Special Master regarding JPL position, contested issues, and required legal work for restitution path forward … attention to multiple documents received from D. Ryan at the Department of Justice" (*Id.* at 18).

- 10 Nov 25 "Review and analyze supplemental information provided by D. Ryan related to Agera … confer with D. Harer (from Financial Advisor) regarding draft restitution analysis" (*Id.* at 18).

- 13 Nov 25 "Attention to documents received from Department of Justice … review documents received from [REDACTED] … attention to information regarding average received from Special Master team" (*Id.* at 19).

- "Among other tasks, my firm has been involved in weekly meetings with the Special Master, USAO and Paladin, and analyzing numerous complicated issues relating to restitution. Numerous other meetings and communications with the Special Master and his financial representative have also occurred." (Wyatt & Blake's Memo in Support of Third Motion for Fees (Doc. 98) at 3).

- "The Special Master and Paladin engaged in extensive discussions with the alleged victims, Defendant's counsel, the U.S. Attorney's office, and other interested parties about the nature and extent of the losses, various potential offsetting credits due to the Defendant for property previously returned to the victims, and issues relating to the priority of restitution payments." (Special Master's Fourth Status Report (Doc. 147) at 3).

- "During the Reporting Period, the Special Master continued to have weekly video conferences with the Defendant's counsel and the Assistant U.S. Attorneys handling this matter. Similarly, the Special Master's team has maintained open and frequent communications with representatives of the

Primary Restitution Assets, the likely victim constituencies, and other interested parties impacted by Defendant's conduct." (*Id.* at 4).

- 18 Dec 25 "Multiple correspondence and meetings with Special Master regarding Beckett sale, including timing, scope, and use of proceeds … update client regarding [REDACTED] (Declaration in Support of Katten's Fourth Motion for Fees (Doc. 154-2) at 8).

- 04 Mar 26 "prepare for and meet with Paladin regarding restitution offsets, credits, and amounts not appropriate for restitution" (*Id.* at 34).

- "Katten has also had numerous other meetings and communications with the Special Master and Paladin in order to facilitate Mr. Lindberg's cooperation with the Special Master. Finally, Katten had numerous meetings with Paladin personnel to review and inform the Special Master's conclusions …. These voluminous meetings and communications have helped to narrow the restitution issues in this case and to facilitate the Special Master's Restitution Report and the Special Master's Supplemental Report." (Katten Memo in Support of Fifth Fee Motion (Doc. 337) at 7).

- "Since Mr. Lindberg's plea, my team and I have been working diligently with the Special Master and the Department of Justice every week since the plea. The unilateral goal is to fulfill Mr. Lindberg's obligations under the Plea Agreement and the Order Appointing Special Master, in order to maximize the restitution available to the victims …. (Declaration in Support of Katten's Fifth Fee Motion (Doc. 336-1) at 2).

- 26 May 26 "Confer with D. Harer [from Financial Advisor] regarding asset sales" (336-2 at 22).

Notwithstanding all of these references (and countless others) in the record to direct communications between and among the Special Master, the Financial Advisor, Defendant's counsel, Defendant, the United States, victims, and other third parties, Defendant's Motion states that "[c]urrent counsel first learned of the ex parte character of this proceeding **only with the past several days—on or about August 27, 2026…."** (Doc. 331 at 5) (emphasis added). That claim is hard to square with counsel's concession that he has been involved in this case since the Defendant's sentencing hearing in May

and has been diligently filing hundreds of pages of briefing on numerous matters regarding restitution.

Equally incredible is Defendant's claim that, "[f]rom the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused." (*Id.* at 6). There is no evidence to support this claim other than Defendant's self-serving affidavit, which is controverted by the examples above,[3] and by the fact that Defendant's prior counsel did not raise a single objection with the Court about its access to materials despite numerous opportunities to do so, including at Defendant's sentencing when it allowed the Court to enter the Preliminary Order of Restitution.

It was not until Defendant retained his third set of counsel (who never showed any interest in working collaboratively with the Special Master or the United States) that the claims of lack of information started. As the emails attached to Defendant's Motion demonstrate, however, his current counsel has never made any genuine attempts to identify what information Defendant already received or could access. Rather, current

[3] *See, e.g.*, "Multiple correspondence and meetings with Special Master regarding Beckett sale, including timing, scope, and use of proceeds;" "prepare for and meet with Paladin regarding restitution offsets, credits, and amounts not appropriate for restitution" (Doc. 154-2 at 8, 34); "Attention to recent information supplied by Special Master regarding JPL position, contested issues, and required legal work for restitution path forward … attention to multiple documents received from D. Ryan at the Department of Justice;" "Attention to documents received from Department of Justice … review documents received from [REDACTED] … attention to information regarding average received from Special Master team" (Doc. 97-1) at 18.

counsel repeatedly demanded that the Special Master and the United States reproduce "all" information regarding restitution and asset valuation.

Particularly telling, are two different email threads sent by Defendant's counsel. In the first, dated August 17, 2026, counsel demands from the Special Master "all financial reports and all board reports for all primary restitution assets, specified affiliated companies for the last four year and all letter of intents and offers to purchase received." (Doc. 331-2 at 61). Notwithstanding that this information has nothing to do with the calculation of restitution, the Special Master agreed to produce such documents "under a confidentiality order limiting the public disclosure of proprietary information." (*Id.* at 57). Rather than work with the Special Master towards a mutually agreeable production protocol, Defendant's counsel demanded that the Special Master file all of that data (potentially thousands of pages) on the docket. (*Id.* at 54) ("You have a duty place this information on the docket."). And, when the Special Master, and then the United States, refused, Defendant filed his Motion.[4]

[4] In his emails, and in the Motion, Defendant's counsel makes baseless claims about Defendant's prison sentence being tied to the proposed restitution amount and the Special Master's valuation estimates. For instance, he claims that "the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term" and "the same figures drove the § 2B1.1 enhancement and the sentence." (Doc. 331 at 4, 12). Putting aside that loss under the guidelines is completely different than restitution, these claims are fanciful and are flatly contradicted by, among other things, Defendant's plea agreement, in which he agreed that he caused losses that "exceeded $550,000,000" that resulted in a 30-level increase to his base offense level under § 2B1.1. (Doc. 40 at 2). Whether the loss was $550,000,001 or more than $1.6 billion, the loss table set a ceiling for offense levels that had been met, to which the parties and the Court agreed. Moreover, the United States acknowledged in the plea agreement and at the sentencing hearing that the guideline losses overstated the harm in this case and that a sentence below the applicable guideline range was appropriate. (*Id.* at 3).

In the second email sent on August 25, 2026, which was not attached to the Motion but which is attached here as Exhibit A, Defendant's counsel expanded his demand, asking the United States "to give data that underlies the restitution and sentencing." (Exhibit A at 6). The United States responded later than afternoon by asking: "What 'data' are you referencing that you believe is in the government's possession that has not been turned over to you or your predecessor counsel?" Rather than answer the inquiry so that the United States could facilitate getting Defendant relevant information he may not have had, Defendant's counsel responded with a version of the dozens of overbroad requests contained in his Motion spanning more than three pages, which sought all of "the data and methodology underlying the restitution, sentencing, and forfeiture figures." (Exhibit A at 2-6). The next morning, the United States again offered to work with Defendant's counsel to get him any material information he may not have had, stating:

> [Y]ou did not answer my question. What materials regarding restitution did Mr. Lindberg's prior counsel not receive from the Government, the Special Master, Paladin, or any other source? The government does not have any obligation to reproduce materials already in Defendant's possession. … We are happy to provide Mr. Lindberg with any materials he is entitled to, but we do not agree with your suggestion that he has not already received materials underpinning the restitution amount."

(331-2 at 30-31).

Defendant's counsel again refused to identify any material that he claimed was missing, instead replying incredibly that, "I spoke to Greg Lindberg a few minutes ago. He has never received any of this information from the special master or anyone else. Prior counsel also have not had any success getting this information from the special

master. They are copied here." (*Id.* at 29) Tellingly, Defendant's prior counsel then responded indicating that, "[w]e are happy to run another search for anything. Just let us know the specific items to look for." (*Id.* at 28). But rather than take prior counsel up on that offer (which he should have done before claiming that Defendant never had any of this information), Defendant's counsel incorrectly explained to Defendant's prior counsel (presumably based upon information told to him by Defendant) how Defendant's prior counsel never received any of this information. (*Id.*) ("Per my understanding the special master never gave us any information on the data and the spreadsheets behind the 1.6 Billion in restitution…Greg does not have them and would have had them if you had access to them."). This response, premised on false information directly contradicted by numerous filings on the Court's docket that were readily available to Defendant's counsel, demonstrates the insincerity of Defendant's claims.[5] If Defendant was genuinely interested in identifying any materials relevant to the calculation of the restitution amount that had not already been provided to him, he would have engaged in a discussion about what information he already had rather than simply pretending that he had never been provided anything.

The record does not demonstrate that Defendant is lacking any material information that is relevant to the calculation of the proposed restitution order. To the contrary, the record is replete with examples of Defendant and his counsel being continually advised by the Special Master, the Financial Advisor, and the United States

[5] Defendant's claim in his Motion that "former counsel and current counsel searched and found none of [the requested information]," fails for the same reasons. (Doc. 331 at 5).

of matters impacting the restitution calculation. Moreover, even if there were material information that Defendant has not been provided, Defendant has waived his claims to such information by allowing the Preliminary Order of restitution to be entered without specifically objecting to a lack of information and refusing to identify what materials he does not believe he was previously provided. Regarding the Special Master's valuation estimates, which are not relevant to the calculation of restitution, Defendant's Motion should be denied because he will not agree to the entry of a reasonable protective order to safeguard the confidential nature of the proprietary information he seeks, but instead demands that all of this information be placed on the docket.

## II. The Court Should Deny Defendant's Latest Request to Set Aside the Special Master's Work

Similarly deficient is Defendant's latest request to set aside the Special Master's work as unconstitutional based upon the purported secret "ex parte" communications the Special Master and the Financial Advisor had with the United States and with victims and other interested third parties. As set forth above, these direct communications were anything but secret, and they were authorized by the Court's Order appointing the Special Master. (*See* Doc. 56 at ¶ 5) ("directing the Special Master to "**consult with the Parties** to the extent the Special Master deems it helpful in fulfilling his duties under this Order.") (emphasis added). Defendant's Motion fails to acknowledge this language in the appointment order or the fact that the parties repeatedly relied upon it to allow for direct communications. Rather, Defendant now claims that "the order authorized no such [direct] contact" (doc. 331 at 12) and that he just learned of the direct communications, in

which he himself participated, in August 2026. The Court should not condone Defendant's attempts to rewrite history.

Defendant cites no authority for his proposition that a Special Master appointed under 18 U.S.C. § 3664(d)(6) cannot engage in direct communications with the parties, victims, or other third parties. The lack of authority for his position is telling, though not unsurprising. Indeed, Defendant concedes that special masters appointed under Rule 53 of the Federal Rules of Civil Procedure ("Rule 53") may "communicate ex parte when the appointing order so provides." (Doc. 331 at 12). Yet, unlike the Special Master here, whose work is "subject to de novo determination of the issue by the court" under § 3664, special masters appointed under Rule 53 can make findings of fact with limited or no judicial review. *See* Fed. R. Civ. P. 53(f)(3)-(5). Moreover, Rule 53 allows special masters in civil matters to exercise much more authority than those appointed under § 3664 to assist only with restitution. For instance, Rule 53 allows special masters to conduct hearings, exercise the court's power to compel, take and record evidence, and to impose sanctions, among other things. *See* Fed. R. Civ. P. 53(c). In other words, even Defendant's own authorities permit ex parte communications in circumstances wherein special masters wield significantly more power than the special master here.

The Supreme Court cases cited by Defendant in support of his argument have nothing to do with ex parte communications, restitution in general, or with special masters appointed under § 3664. Indeed, because Defendant did not provide any page references in his citations, it is difficult to discern why he cited these cases. Regardless, the cases do make clear that due process is satisfied where, as here, Defendant has "the

opportunity to be heard" (*Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quotation omitted))[6] by a "disinterested tribunal" (*Marshall v. Jerrico, Inc.*, 446 U.S. 238, (1980))[7].

Defendant cites one out-of-circuit case that does involve a special master and ex parte communications but has nothing to do with restitution and, in any event, still does not support his argument. *In re: Brooks* was a civil contempt matter addressing whether the District Court Judge should be recused based upon ex parte communications he had with the special masters who had been appointed in separate underlying litigation to which petitioners were not parties. *See In re: Brooks*, 383 F.3d 1036, 1040 (D.C. Cir. 2004) (Petitioners on writ of mandamus, who were "non-parties" to the underlying litigation, "argued that although the communications between the Court and the special masters were not improper in the context of the underlying litigation, they were inconsistent with participation in the contempt proceedings ….") (quotations omitted). The D.C. Circuit held that the Judge need not be recused and no discovery was warranted notwithstanding petitioners' claim that they were "completely in the dark about what transpired" during the ex parte communications with the Judge. *Id.* at 1043-44. While the Court did find that the special master from the underlying litigation should not have been involved in the subsequent contempt proceedings, and thus his reports could not be used in them, that finding was based upon the danger that the special master would use the

[6] In *Goldberg*, the Court held that welfare recipients were entitled to a minimal preliminary hearing prior to termination of benefits. 397 U.S. at 266-67.

[7] In *Jerrico*, the Court held that due process was not offended by the involvement of an assistant regional manager of the Employment Standards Administration in the imposition of civil penalties for violations of the Fair Labor Standards Act, in part, because his determination was subject to "a *de novo* review of all factual and legal issues." 446 U.S. at 245.

ex parte information gleaned in the underlying litigation against non-parties to that litigation in the subsequent contempt proceedings. *Id.* at 1046. The facts of *In re: Brooks* are simply not relevant here, where Defendant and his counsel have participated in direct communications with the Special Master and the Financial Advisor and have been heavily involved in the overall process.[8]

Indeed, the nature of the direct contacts the Special Master and the Financial Advisor had here are more analogous to those routinely had by the United States Probation Office in criminal cases during the preparation of the presentence report. Rule 32 of the Federal Rules of Criminal Procedure ("Rule 32") expressly allows for probation officers to have ex parte communications with the parties and with victims. *See United States v. Nelson-Rodriguez*, 319 F.3d 12, 62 (1st Cir. 2003) ("Rule 32(b) is literally read as permitting ex parte communications initiated by either party both *before* and *after* this fourteen-day period" between the draft and final report); *Roccisano v. United States*, 936 F. Supp. 96, 103 (S.D.N.Y. 1996) ("First, [defendant] provides no authority for the proposition that *ex parte* communications between the Government and the Probation Office are improper. In fact, in this Court's experience, such contacts are appropriate and regular…"), *affirmed in summary order* 152 F.3d 920, 1998 WL 382600 (Table) (2d Cir. 1998).[9]

---

[8] Defendant also cites *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996), which is inapposite. In *Edgar*, which had nothing to do with restitution or a special master, the District Court Judge had substantive ex parte communications with a panel of three experts that "had become partisans" against the defendant the Illinois' mental health system. 93 F.3d at 260. Notably, the Court affirmed its prior precedent that a party that delays raising purported improper ex parte communications can waive the issue. *Id.* at 258.

[9] *Cf. United States v. Washington*, 146 F.3d 219, 223 (4th Cir. 1998) (no constitutional issue with probation officer conducting independent investigation into facts of defendant's criminal activity).

In fact, the probation officer is empowered to have direct communications with victims and the United States about restitution matters. For example, Rule 32(d)(2) requires that the "presentence report must also contain … information that assesses any financial … impact on any victim" and "information sufficient for a restitution order." In addition, 18 U.S.C. § 3664(d)(1) provides that, "[u]pon request of the probation officer… the attorney for the Government, **after consulting, to the extent practicable, with all identified victims**, shall promptly provide the probation officer with a listing of the amounts subject to restitution." (emphasis added).[10]

Similarly, 18 U.S.C. § 3664(d)(2)(A) directs the probation officer to contact the victims about, among other things, "the amounts subject to restitution" and "the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution." Thus, it is common practice for the United States and/or the United States Probation Office to contact all potential victims of a defendant's criminal conduct and solicit victim impact information. Such information is then incorporated into the presentence report.

This process is no different than what the Special Master and Financial Advisor have done here pursuant to the Court's Order. And, because Defendant has had an opportunity to review and object to the report and recommendations of the Special Master, just like Defendant had the opportunity to review the presentence report, and the

[10] Similarly, the Crime Victims' Rights Act ("CVRA") specifically affords victims the "right to confer with the attorney for the Government in the case," including about their "right to full and timely restitution as provided by law." 18 U.S.C. § 3771(a)(5) & (6). It would be nonsensical if a defendant or defendant's counsel were allowed to participate in such conferences.

Court will review the Special Master's recommendations de novo, the Special Master practice employed here comports with due process.

**CONCLUSION**

Defendant fully participated in the Special Master process for nearly 20 months and then extolled his cooperation with that process at his sentencing to receive leniency. Now that he has been sentenced, he, for the first time, claims that the process kept material information from him and violated his constitutional rights. His claims are not supported by the facts or the law, and the Court should deny his requested relief. The Special Master acted properly within the bounds of his role, and Defendant has refused to identify documents or information to which he is entitled that anyone has failed to provide.

RESPECTFULLY SUBMITTED, this 8th day of September, 2026.

DALLAS J.E. KAPLAN
ATTORNEY FOR THE UNITED STATES[11]

*/s/ Daniel Ryan*
Daniel Ryan
Dana Washington
Assistant United States Attorneys
United States Attorney's Office
Western District of North Carolina

227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-3222
daniel.ryan@usdoj.gov

LORINDA I. LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*/s/ Lyndie M. Freeman*
Lyndie M. Freeman
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue
Washington, DC 20005
Telephone: 202-616-5315
lyndie.freeman@usdoj.gov

[11] Acting under authority conferred by 28 U.S.C. § 515.

# EXHIBIT 9

Defendant's Motions to Compel (Docs. 331, 332) and E-mail Correspondence (Doc. 331-2)

No. 3:23-cr-48 (W.D.N.C. Aug. 31, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S MOTION TO COMPEL THE GOVERNMENT TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE IT ADOPTED AND ITS EX PARTE COMMUNICATIONS WITH THE SPECIAL MASTER, AND TO SET ASIDE THE SPECIAL MASTER'S REPORT AND FINAL SUPPLEMENT

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, *Brady v. Maryland* and its progeny, and the Due Process Clause, for an order (1) compelling the Government to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and

proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and-confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete

record of the defense's demands and the refusals that met them. Counsel would be remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

## I. The Government adopted each and every position of the Special Master, made his figures its own, and—as the prosecutor bearing the burden of proof—must produce the data that supports them.

The Government did not merely receive the Special Master's work; it adopted it wholesale and made it the basis of the punishment it seeks. In its Omnibus Response, the Government asks the Court to "adopt the reasoning and recommendations set forth in the Special Master's" Final Report and to enter a final order of restitution "similar to that proposed by the Special Master." Doc. 279. In its Consolidated Position, the Government states that it "concurs with the arguments and conclusions contained in the Special Master's filings" and asks the Court to enter a restitution order "substantially similar to that proposed by the Special Master." Doc. 308. The Government has embraced each and every one of the Special Master's positions—the loss build, the valuations, and the disallowed offsets and credits—as its own. Having done so, the Government owns those figures, and with them the obligation to produce and support the data beneath them.

Even in the proceeding before the Special Master, the Government remained the prosecutor. A special master under 18 U.S.C. § 3664(d)(6) is an adjunct who makes proposed findings and recommendations, subject to the Court's de novo determination; he does not carry the Government's burden, and his involvement did not relieve the Government of the prosecutor's obligations. The burden of proving

each victim's loss by a preponderance is, and throughout has been, the Government's, 18 U.S.C. § 3664(e); so is the duty to render "a complete accounting of the losses to each victim," id. § 3664(a); and so are the prosecutor's disclosure duties under Brady and Giglio. A prosecutor's interest "is not that it shall win a case, but that justice shall be done"; he "may strike hard blows," but "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Government could not shed its burden, or its disclosure obligations, by routing the development of the loss and valuation figures through the Special Master; those obligations followed it into that forum and bind it now. Having adopted the figures the master produced, the Government must produce and support the data on which they rest, or those figures fail for want of proof.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served a written, itemized demand for the data. The Government first said the Defendant

already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

Nor was any of this waived by the passage of time. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026—and learned it as a direct result of the Government's own emails. When the Government represented that the data had all been provided to former counsel, current counsel investigated that representation; asking former counsel and searching the files revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master—from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others—on which the loss and

valuation figures were built. The Government's representation, offered to deflect the demand, is what exposed the unconstitutional, one-sided character of the proceeding to current counsel. A challenge raised within days of learning the facts that give rise to it is timely and is preserved.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August 15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality

agreement," the Government's "reserving [its] position," and the Special Master's one-word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may

be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from

them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

## II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing

order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies—told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that—information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever being disclosed to the

Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

## III. In a criminal proceeding no ex parte communication with the adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," *Edgar*, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected

with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. § 3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the decisionmaker saw and that the defendant was never permitted to examine, test, or rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures,

constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

**IV. It makes no difference whether the Special Master is treated as a neutral or as an arm of the prosecution.**

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, *Kyles v. Whitley*, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment. Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

**V. The ex parte communications are Brady and Giglio material the Defendant is entitled to receive.**

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, *Cone v. Bell*, 556 U.S. 449 (2009); restitution is punishment,

*Ellingburg*. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, *Kyles*, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. *See* Ex. A; Affidavit of Greg E. Lindberg.

## VI. The manner of the liquidations was hidden, and the new report's lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity—were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18

U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why—whether the decline is attributable to the offense or to the Special Master's own post-transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post-transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The Government, having adopted the figures, must introduce those facts or the figures fail for want of proof; the data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's

property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, *Honeycutt v. United States*, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

## VII. The forty-seven categories of data underlying the figures the Government adopted, which it must produce or support.

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests

within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.
2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.
3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.
4. The low/middle/high figures filed under seal in July 2026, and all data behind them.
5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.
6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.
7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.
9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.
10. The repayment data and loan-balance base data used as the starting point.
11. All LoanIQ screenshots, exports, and outputs.
12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.
13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.
14. The ULICO reconciliation.
15. The iteration history of the loss memoranda (approximately $2.9 billion to approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.
17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.
18. The terms of the agreed Clanwilliam offset and the valuation data applying it.
19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.
20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero-

coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).

21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.

22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.

24. All NHC board books.

25. All board minutes, financial reports, and financial presentations for the companies.

26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians

concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

## VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

## IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; *Timbs v. Indiana*, 586 U.S. 146 (2019); *United States v. Bajakajian*, 524 U.S. 321 (1998). The Court cannot gauge either danger, and

the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Government (1) to produce to the Defendant, and to support with the underlying data, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the

record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009); *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications, and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603

919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

# EXHIBIT A

Email Correspondence — "Draft Final Supplement to Restitution Report" Thread
(the complete chain, August 2026)

United States v. Lindberg, No. 3:23-CR-48-MOC (W.D.N.C.)

**Contents (top-level emails; each carries the full quoted chain beneath it)**


1. Aug 17, 2026 04:57 PM — Michael Martinez
2. Aug 28, 2026 03:30 PM — vramachandran@dhammalaw.com
3. Aug 29, 2026 07:50 AM — Vramachandran
4. Aug 29, 2026 03:48 PM — vramachandran@dhammalaw.com
5. Aug 30, 2026 04:55 PM — vramachandran@dhammalaw.com

**Date:** Mon, 17 Aug 2026 16:57:24 +0000

**From:** Michael Martinez <mmartinez@grierlaw.com>

**To:** "vramachandran@dhammalaw.com" <vramachandran@dhammalaw.com>, "Ryan, Daniel (USANCW)" <Daniel.Ryan@usdoj.gov>

**Cc:** "barnesatty@aol.com" <barnesatty@aol.com>, "Freeman, Lyndie (CRM)" <Lyndie.Freeman@usdoj.gov>, "Bain-Creed, Benjamin (USANCW)" <Benjamin.Bain-Creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Sanders, Jeremy (CRM)" <Jeremy.Sanders@usdoj.gov>, "Washington, Dana (USANCW)" <Dana.Washington@usdoj.gov>

**Subject:** RE: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

No.

Michael L. Martinez

Grier Wright Martinez PA

521 E. Morehead St., Ste. 440, Charlotte, NC 28202

(704) 332-0209 (direct dial)

www.grierlaw.com

mmartinez@grierlaw.com

-----Original Message-----

From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>

Sent: Monday, August 17, 2026 12:28 PM

To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>; Michael Martinez <mmartinez@grierlaw.com>

Cc: barnesatty@aol.com; Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW) <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier <jgrier@grierlaw.com>; Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>; Washington, Dana (USANCW) <Dana.Washington@usdoj.gov>

Subject: Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

Caution: This message is from an external sender.

Martinez,

Are you going to place the requested data under seal on the court records to avoid the motion? We would rather fight on the designation than delay proceedings. Thank you.

In any case, in March 2026 you offered to place it on the record under seal. I am not sure why you cannot do the same now. None of this requires a confidentiality agreement.

Sincerely,

Vivek

On 2026-08-17 11:49, vramachandran@dhammalaw.com wrote:

> Dan,

>

> We need the data. We are asking for the data to avoid the motion.

>

> Sincerely,

> Vivek

>

> On 2026-08-17 11:48, Ryan, Daniel (USANCW) wrote:

>> Vivek,

>>

>> We appreciate your advocacy for your client, but we do not litigate

>> via email. If you file a motion with the court with your requested

>> relief, we will respond accordingly. To the extent we understand your

>> emails, we object to your conclusions, accusations, and requested

>> relief. That said, with respect to your requests for valuation
>> information, you can represent to the Court that we are reserving our
>> position until we see your motion.
>>
>> Regards,
>>
>> Dan
>>
>> From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>
>> Sent: Monday, August 17, 2026 11:37 AM
>> To: Michael Martinez <mmartinez@grierlaw.com>
>> Cc: barnesatty@aol.com; Ryan, Daniel (USANCW)
>> <Daniel.Ryan@usdoj.gov>; Freeman, Lyndie (CRM)
>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>> (USANCW) <Benjamin.Bain-Creed@usdoj.gov>; Meyer, Ryan J.
>> <ryan.meyer@katten.com>; Joe Grier <jgrier@grierlaw.com>; Sanders,
>> Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>
>> Subject: [EXTERNAL] Re: Draft Final Supplement to Restitution Report
>>
>> Dan and Michael,
>>
>> (1) Do you have the financial reports data we asked for below? Did
>> you use it in your report?
>>
>> We are looking for all financial reports and all board reports for
>> all primary restitution assets, specified affiliated companies for

>> the last four years and all letter of intents and offers to purchase
>> received. It is going to take us a month to analyze all this data.
>>
>> (2) Specifically the mid low high you filed with the court in July
>> 2026 is going to trigger a forfeiture worth millions of dollars. So
>> you need to let the defendant see this data on the court docket and
>> this needs to be on the docket so that this can be appealed.
>>
>> (3) Do you have the data you used to arrive at the valuation of all
>> assets you quoted in the sealed report in July 2026?
>>
>> (4) Do you have the data you said you will share with the court under
>> seal on March 2026?
>>
>> (5) Where is the updated data from March 2026 for the same where you
>> said that because AAPC is now valued less it needs to be downgraded?
>>
>> You are going to place all of the above on the record today under
>> seal.
>>
>> Without this the sentencing is going to be based on a blackbox and
>> attorney arguments.
>>
>> Dan, the government may not stand silent in all this. This is a
>> criminal proceeding where you sent someone to prison for 12 years
>> based on data he cannot see and will not be allowed to see? And

>> restitution worth billions of dollars based on data he cannot see and
>> you will not place on the record under seal?
>>
>> Sorry, I am having trouble with scruples. I am flummoxed that anyone
>> thinks this is ok in a criminal proceeding and if we ask for it as a
>> criminal defendant we are delaying the proceedings.
>>
>> Thank you.
>>
>> Sincerely,
>> Vivek
>>
>> On 2026-08-17 11:08, vramachandran@dhammalaw.com wrote:
>>
>>> Michael,
>>>
>>> Let me get this straight you are evaluating the assets with a range
>>> that you put on the record to trigger forfeiture but will not share
>>> that information with the defendant?
>>>
>>> You are going to share the valuation you said you have on all the
>>> assets from March 26, 2026 report. Either that was a lie or you have
>>> that data. You are going to place this on the record today under
>>> seal which we will contest.
>>>
>>> Dan, you are going to sentence someone based on data he cannot even

>>> see. You need to get this on the docket today please. And this is
>>> not for lack of asking as was represented to the court. You
>>> represented to the court when you had questionable authority to
>>> prevent product as the government and you want a sentence on an
>>> incomplete record. You need to explain this to the court.
>>>
>>> We want this on the record today under seal. You forced the deadline
>>> you need to give us the data now on the court records under seal if
>>> it needs to be.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-17 10:35, vramachandran@dhammalaw.com wrote:
>>>
>>> Michael,
>>>
>>> Let me get this straight you are evaluating the assets with a range
>>> that you put on the record to forfiture but will not share that
>>> information with the defendant?
>>>
>>> You are going to share the valuation you said you have on all the
>>> assets from March 26, 2026 report. Either that was a lie or you have
>>> that data. You are going to place this on the record today under
>>> seal which we will contest.
>>>

>>> Dan, you are going to sentence someone based on data he cannot even
>>> see. You need to get this on the docket today please. And this is
>>> not for lack of asking as was represented to the court. You
>>> represented to the court when you had questionable authority to
>>> prevent product as the government and you want a sentence on an
>>> incomplete record. You need to explain this to the court.
>>>
>>> We want this on the record today under seal. You forced the deadline
>>> you need to give us the data now on the court records under seal if
>>> it needs to be.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-17 10:24, vramachandran@dhammalaw.com wrote:
>>>
>>> Dan,
>>>
>>> Also as suggested, we have raised concerns about the relevance to
>>> some of this data to an independent criminal investigation.
>>> The government needs to act and get this data on file. Thank you.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-17 10:19, vramachandran@dhammalaw.com wrote:

>>>
>>> Dan,
>>>
>>> As a prosecutor you should be aware that this is not just about Greg
>>> Lindberg. This data belongs to the victims and should be known to
>>> the general public. Sentencing without disclosing all of this
>>> information on the record is illegal. Unconstitutional. You need to
>>> let the Special Master know that he needs to file everything under
>>> seal if he so wants to.
>>>
>>> This is a criminal proceeding. You have a duty to place this
>>> information on the docket. This is exceptional. You delay the
>>> proceedings and then blame it on the defendant. Then seek a
>>> confidentiality agreement. You have the burden of proof. Are you
>>> going to meet it or not?
>>>
>>> I would like an answer by 12.00 P.M.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> Michael,
>>>
>>> This is a criminal case. Whatever you want to produce you need to
>>> produce now. I need to get this to my client so that we can defend
>>> on August 24th which you are forcing on the defendant.

>>>
>>> The data is subject to the court's sealing procedures. You are not
>>> going to condition this data on anything other than the court's own
>>> processes.
>>>
>>> Any failure to produce the data means you are unwilling to establish
>>> these on the record as required under the MVRA. That is a failure to
>>> prosecute by the government.
>>>
>>> Please file on the record the methodology and the data we requested
>>> underseal by August 17, 2026 noon. We will contest the sealing with
>>> the court if necessary.
>>>
>>> This is not a civil proceeding.
>>>
>>> Sincerely,
>>> viek
>>>
>>> On 2026-08-17 10:13, Michael Martinez wrote:
>>>
>>> Vivek:
>>>
>>> The Special Master disagrees with your legal analyses and
>>> conclusions below.
>>>
>>> That said, the Special Master would not be opposed in concept to

>>> producing (on a reasonable timeline) documents in our possession
>>> under a confidentiality agreement and protective order limiting the
>>> public disclosure of proprietary information. If your client is
>>> amenable to preserving the confidentiality of sensitive proprietary
>>> information, then I can draft a confidentiality agreement and
>>> protective order for your review and edit. If your client is not
>>> amenable to preserving the confidentiality of sensitive proprietary
>>> information, then a court order compelling us to produce these
>>> materials with no restrictions on subsequent disclosure will be
>>> required.
>>>
>>> Without limiting the foregoing, our proposed methodology for
>>> unrealized offsets/credits is that your client will receive a credit
>>> against his restitution obligation as the assets are monetized
>>> rather than him receiving a credit now based on our estimation of
>>> what the Primary Restitution Assets might fetch for victims. The
>>> purpose of the estimation was to satisfy the mandate in the special
>>> master order that the special master identify assets “and to the
>>> extent those assets are not readily convertible to cash, determine a
>>> reasonable estimated value for those assets.” In other words,
>>> evaluating our estimation of what the Primary Restitution Assets
>>> might generate for victims in the future is not an integral
>>> component of the Court’s restitution determination, and those
>>> estimated figures do not appear anywhere in the proposed restitution
>>> order.
>>>

>>> Michael L. Martinez

>>> Grier Wright Martinez PA

>>> 521 E. Morehead St., Ste. 440, Charlotte, NC 28202

>>> (704) 332-0209 (direct dial)

>>> www.grierlaw.com [1] [1 [2]]

>>> mmartinez@grierlaw.com

>>>

>>> -----Original Message-----

>>> From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>

>>> Sent: Monday, August 17, 2026 6:03 AM

>>> To: Michael Martinez <mmartinez@grierlaw.com>

>>> Cc: barnesatty@aol.com; Daniel Ryan (Daniel.Ryan@usdoj.gov)

>>> <daniel.ryan@usdoj.gov>; Freeman, Lyndie (CRM)

>>> <lyndie.freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW)

>>> <benjamin.bain-creed@usdoj.gov>; Meyer, Ryan J.

>>> <ryan.meyer@katten.com>; Joe Grier <jgrier@grierlaw.com>; Jeremy

>>> Sanders <jeremy.sanders@usdoj.gov>

>>> Subject: Re: Draft Final Supplement to Restitution Report

>>>

>>> Caution: This message is from an external sender.

>>>

>>> Michael and Dan,

>>>

>>> I do want to remind you that unlike a bankruptcy proceeding, these

>>> companies are not just worth debt. They have revenues in the

>>> millions, so your methodology of evaluation has to be disclosed to

>>> the defendant on the record.

>>>

>>> We are looking for all financial reports and all board reports for

>>> all primary restitution assets, specified affiliated companies for

>>> the last four years and all letter of intents and offers to purchase

>>> received. It is going to take us a month to analyze all this data.

>>> Without this the sentencing is going to be based on a blackbox and

>>> attorney arguments.

>>> This does not meet the MVRA accounting requirement. Please get us

>>> this information by noon August 17, 2026.

>>>

>>> A fiduciary duty applies to the Special Master/Receiver.

>>>

>>> If you cannot establish your burden of proof, the government has a

>>> duty to let the court know that you cannot do it. Failure to do that

>>> to win is striking a foul blow.

>>>

>>> Katten has asked for this in the past. We do not have this

>>> information.

>>>

>>> Thank you.

>>>

>>> Sincerely,

>>> Vivek

>>>

>>> On 2026-08-15 14:59, vramachandran@dhammalaw.com wrote:

>>>

>>> Michael and Dan,

>>>

>>> (I) In your March 2026 report, you stated that publicly disclosing

>>> too much detail regarding the Primary Restitution Assets and the

>>> Special Master's value determinations concerning the same would

>>> negatively impact liquidation efforts and could, in itself,

>>

>> decrease

>>

>>>> the value of the Primary Restitution Assets, and that the Special

>>>> Master therefore erred on the side of caution by including in the

>>>> report a single range encompassing all Primary Restitution Assets

>>

>> lumped together.

>>

>>>> Please provide all of the data you stated you would provide to the

>>>> Court in that March 2026 report, together with any other documents

>>>> the Special Master intends to rely on for the valuations in this

>>>> proceeding. Please do so by noon on August 17, 2026. To the extent

>>>> you have any additional information these have to be established on

>>

>>>> the record under § 3664(f)(1)(A) by placing them on the record.

>>>>

>>>> Under the MVRA that material belongs with the defendant: the burden

>>

>>>> of demonstrating the amount of loss is on the Government, 18 U.S.C.

>>

>> §

>>

>>>> 3664(e); the statute requires "a complete accounting of the losses

>>

>> to

>>

>>>> each victim," id. § 3664(a); and restitution must be set "in the

>>

>> full

>>

>>>> amount of each victim's losses as determined by the court," id. §

>>>> 3664(f)(1)(A). A single lumped range, with its particulars

>>

>> withheld,

>>

>>>> cannot satisfy those provisions or permit the de novo

>>>> determination

>>

>>>> the Court is required to make. Id. § 3664(d)(6).

>>>>

>>>> (II) We will also file a motion on to unseal the Appendix to the

>>>> final report. Other than attorney argument, there is nothing in

>>

>> that

>>

>>>> Appendix, and we will file our own argument saying so -- both to

>>>> highlight this issue and to preserve the record for the Fourth

>>>> Circuit. Neither the defendant's right to contest the loss amount

>>

>> nor

>>

>>>> the Court's de novo review under § 3664(d)(6) can be exercised

>>>> against a figure whose basis is kept under seal. See § 3664(e).

>>>>

>>>> (III) We are going to file a motion for reconsideration of the

>>

>> denial

>>

>>>> of the subpoenas -- not because we expect the Court to change its

>>>> mind, but to make sure the record is clear on three points. First,

>>>> under the MVRA the burden of proof lies with the Government, not

>>

>> the

>>

>>>> defendant. § 3664(e). Second, to the extent the valuations of the

>>>> companies rest with the Special Master, they must be provided to

>>

>> the

>>

>>>> defendant under the accounting provisions of the MVRA. §§

>>

>> 3664(a),

>>

>>>> (f)(1)(A). Third, restitution under the MVRA must be accurate; if

>>

>> it

>>

>>>> cannot be made accurate, or if the issues are too complex, the

>>>> Court's option is to decline restitution rather than order an

>>>> inaccurate amount. § 3663A(c)(3)(B). To the extent you again

>>>> press

>>

>>>> the August 24 deadline, we preserve this issue for the Fourth

>>>> Circuit: the deferred determination is expressly contemplated by

>>>> §

>>

>>>> 3664(d)(5), and that ninety-day date is directory, not a license

>>

>> for an inaccurate award.

>>

>>>> See Dolan v. United States, 560 U.S. 605 (2010) (a court that

>>

>> misses

>>

>>>> the § 3664(d)(5) deadline retains authority to order restitution,

>>>> because the deadline is meant to protect victims, not to create a

>>>> windfall for defendants). Where loss is not yet ascertainable, the

>>>> MVRA's remedy is to develop the record -- or to decline

>>>> restitution

>>

>>>> under § 3663A(c)(3)(B) -- not to adopt a guess.

>>>>

>>>> (IV) We will additionally file a motion on the AAPC valuation and

>>

>> on

>>

>>>> Ares causation, tied to the subpoena request, to highlight the

>>>> live

>>

>>>> issues that remain pending and that the Government and the Special

>>>> Master are resisting. Causation and amount are the Government's to

>>>> prove by a preponderance of the evidence, § 3664(e), and the

>>>> value

>>

>> of

>>

>>>> the property must be established on the record under §

>>

>> 3664(f)(1)(A).

>>

>>> Attorney arguments about AI and AAPC do not establish value of the

>>> property on the record.

>>>

>>> We are happy to state that you are opposed to these motions.

>>>

>>> Sincerely,

>>> Vivek

>>>

>>> On 2026-07-22 16:48, Michael Martinez wrote:

>>>

>>> Please find attached our current draft of a final supplement to

>>

>> the

>>

>>> restitution report in the 3:23-CR-48 case. Also attached is a

>>> proposed final order of restitution and appendix to the supplement

>>

>>> discussing the primary restitution assets.

>>>

>>> Here is what we said about the other parties positions on this

>>> supplement: "The Special Master has conferred with both the

>>> government and the Defendant's counsel in relation to this

>>> Supplement.

>>> Although the government does not oppose the positions articulated

>>

>> by

>>

>>> the Special Master through this Supplement, the Defendant opposes

>>> the majority of the Special Master's recommendations appearing in

>>> this Supplement." If I have not accurately stated your client's

>>> position on our supplement, please let me know by the end of the

>>

>> day

>>

>>> tomorrow.

>>> We have to file this by Friday.

>>>

>>> Thank you.

>>>

>>> Michael L. Martinez

>>>

>>> Grier Wright Martinez, PA

>>>

>>> 521 E. Morehead St., Ste. 440

>>>

>>> Charlotte, NC 28202

>>>

>>> 704/332.0209 (direct)

>>>

>>> 704/332.0215 (fax)

>>>

>>> mmartinez@grierlaw.com

>>>

>>> Disclaimer

>>>

>>> This e-mail may contain confidential and attorney-client

>>

>> privileged

>>

>>> material for the sole use of the intended recipient. Do not accept

>>

>>> wiring instructions from us by email. If you are not the

>>

>> recipient,

>>

>>> you are hereby notified that any disclosure, copying, distribution

>>

>>> or taking action in relation of the contents of this information

>>

>> is

>>

>>> strictly prohibited and may be unlawful, please contact the sender

>>

>>> and delete this e-mail.

>>>

>>> This email has been scanned for viruses and malware, and may have

>>> been automatically archived by Mimecast Ltd, an innovator in

>>> Software as a Service (SaaS) for business. Providing a safer and

>>> more useful place for your human generated data. Specializing in;

>>> Security, archiving and compliance. To find out more Click Here [1

>>

>>> [1 [3]]].

>>>

>>> Links:

>>> ------

>>> [1] http://www.mimecast.com/products/ [4]

>>>

>>> Links:

>>> ------

>>> [1] http://www.mimecast.com/products/ [5]

>>

>> Disclaimer

>>

>> This e-mail may contain confidential and attorney-client privileged

>> material for the sole use of the intended recipient. Do not accept

>> wiring instructions from us by email. If you are not the recipient,

>> you are hereby notified that any disclosure, copying, distribution or

>> taking action in relation of the contents of this information is

>> strictly prohibited and may be unlawful, please contact the sender and

>> delete this e-mail.

>>

>> This email has been scanned for viruses and malware, and may have been

>> automatically archived by Mimecast Ltd, an innovator in Software as a

>> Service (SaaS) for business. Providing a safer and more useful place

>> for your human generated data. Specializing in; Security, archiving

>> and compliance. To find out more Click Here [2 [6]].

>>

>> Links:

>> ------

>> [1] http://www.grierlaw.com [7]

>> [2] http://www.mimecast.com/products/ [8]

>>

>> Links:

>> ------

>> [1]

>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F

>> [2]

>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [3]

>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [4]

>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [5]

>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [6]

>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [7]

>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F

>> [8]

>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

Disclaimer

This e-mail may contain confidential and attorney-client privileged material for the sole use of the intended recipient. Do not accept wiring instructions from us by email. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful, please contact the sender and delete this e-mail.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd, an innovator in Software as a Service (SaaS) for business. Providing a safer and more useful place for your human generated data. Specializing in; Security, archiving and compliance. To find out more visit the Mimecast website.

**Date:** Fri, 28 Aug 2026 15:30:24 -0400

**From:** vramachandran@dhammalaw.com

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Dan,

Once again following up on the ex parte communications. We need an answer. I also sent you the categories we want via a separate email.

Silence is not an option. We have done everything we can to get you specificity.

Sincerely,
Vivek

On 2026-08-28 13:29, vramachandran@dhammalaw.com wrote:
> Dan,
>
> Following up once again on ex parte communications with the special
> master and his representatives (including but not limited to Paladin.)
> The government should let us know when we can see this Brady/Gigilo
> material. We need a response because the judgement may issue anytime
> and we don't want to go an file a motion to reconsider. Want to get
> this resolved through emails instead of another motion. We need to
> prepare for a 4th circuit appeal and cannot be blocked at every turn on
> everything from the government.
>
> As I understand the entire NHC communications were ex parte to the
> special master and Defendant has not had any access to that information
> and emails. All of these goto the $1.6 Billion base itself. Please
> provide this material to the Defendant. Since you adopted all of these
> wholesale you must have the underlying data.
>
> Similarly, the entire communication from Mike Dinius was ex parte to
> the special master. Defendant has not had any access to any of that
> information and emails. All of these goto the $1.6 Billion base itself.
> Please provide this material to the Defendant. Since you adopted all of
> these wholesale you must have the underlying data.
>

```
> Thank you.
>
> Sincerely,
> Vivek
>
>
> On 2026-08-28 11:35, vramachandran@dhammalaw.com wrote:
>> Dan,
>>
>> Your silence over the past three days on this ex parte issue is
>> disconcerting. How extensive was your ex parte contact with the
>> special master and his representatives (including paladin)? What was
>> discussed? Defense needs to know and have this Brady/Gigilo material.
>>
>> You had a trial two days ago. We can understand that. It's now 11.30
>> and we wanted a response by 9.30 A.M. today. Thank you.
>>
>>
>> Sincerely,
>> Vivek
>>
>>
>>
>> On 2026-08-28 10:01, vramachandran@dhammalaw.com wrote:
>>> Dan,
>>>
>>> We asked about ex parte communications two or three days ago. You
>>> have not responded yet. Please do so now.
>>>
>>> Thank you.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-28 08:17, vramachandran@dhammalaw.com wrote:
>>>> Dan,
>>>>
>>>> For clarity, ex-parte communications are targeted for Brady/Gigilo
>>>> material targets everything that was send or received by the
>>>> government from/to the special master, his counsel or his
>>>> representatives (including but not limited to Paladin.) Any
>>>> communications between the government and any officers of the
>>>> entities (Preliminary Restitution Assets and Specified Affiliated
>>>> Companies) including but not limited to CEOs and trustees of the
>>>> organizations. For example, your communication with NHC officer
>>>> Meiji(?) to produce the affidavit you did in one of the only
>>>> responses to our motions you filed with the court.
>>>>
>>>> We are also trying to preserve evidence in what is a scrambled egg
>>>> with a special master/receiver. This applies not just to Greg
>>>> Lindberg. It applies to the victims as well. You have a
>>>> constitutional duty to get this done right.
```

>>>>
>>>> Please respond by 9.30 A.M. so that we know you are going to meet
>>>> your constitutional obligations.
>>>>
>>>> Sincerely,
>>>> Vivek
>>>>
>>>> On 2026-08-28 07:39, vramachandran@dhammalaw.com wrote:
>>>>> Dan,
>>>>>
>>>>> We want all ex parte communication between the government and the
>>>>> special master or his counsel. Let's start there. As you know
>>>>> communicating with a judge ex parte is not constitutional. It's a
>>>>> due process issue. It's Brady/Gigilo material which defense is
>>>>> entitled to have. All of it. Please respond by 9.30 AM so that we
>>>>> know that you are working on this production.
>>>>>
>>>>> We will send a discrete list of other items we want from the
>>>>> government as well. We will place all of these on the record in a
>>>>> motion to compel just as a protective measure. We will of course
>>>>> remove this from the docket if you provide us the information. We
>>>>> have no choice but to do this.
>>>>>
>>>>> I have had an extensive look at the contemporaneous record and the
>>>>> government in many instances made promises it never kept. For
>>>>> example, it agreed with Greg Lindberg that ClanWilliams should have
>>>>> a value of $800 million and Greg could argue for the $400 in
>>>>> credits. The government during a call suggested the same NCICS
>>>>> offset would be favorably treated and Greg would get the offsets.
>>>>>
>>>>> Let me just say, I had issues with my scruples again.
>>>>>
>>>>> Sincerely,
>>>>> Vivek
>>>>>
>>>>> On 2026-08-27 10:03, Vramachandran wrote:
>>>>>> Dan,
>>>>>>
>>>>>> Added you to the one place where the special master reached out to
>>>>>> us.
>>>>>> We have now regularized the one ex parte communication initiated
>>>>>> by
>>>>>> the master.
>>>>>>
>>>>>> Thank you.
>>>>>>
>>>>>> Sincerely,
>>>>>> Vivek
>>>>>>
>>>>>>> On Aug 26, 2026 at 12:39 PM, <Vramachandran> wrote:
>>>>>>>
>>>>>>> Brandon,

>>>>>>>
>>>>>>> Per my understanding the special master never gave us any
>>>>>>> information on
>>>>>>> the data and the spreadsheets behind the 1.6 Billion in
>>>>>>> restitution.
>>>>>>> Nor
>>>>>>> the methodology behind that value. Greg does not have them and
>>>>>>> would
>>>>>>>
>>>>>>> have had them if you had access to them.
>>>>>>>
>>>>>>> Additionally, none of the calculations, methodology spreadsheets
>>>>>>> and
>>>>>>>
>>>>>>> data behind the offsets and credits are disclosed.
>>>>>>>
>>>>>>> The valuations of the primary restitution assets and specified
>>>>>>> affiliated companies and assets and the methodology was ever
>>>>>>> disclosed.
>>>>>>> One was made in March 2026 and filed with the court in April
>>>>>>> 2026.
>>>>>>>
>>>>>>> This valuation of assets was updated and not disclosed to the
>>>>>>> defendant
>>>>>>> in the second supplement. None of which has ever been produced
>>>>>>> with
>>>>>>> the
>>>>>>> defendant. Only a range was disclosed in the second supplement.
>>>>>>>
>>>>>>> None of this is available with the defendant. We just asked the
>>>>>>> government to provide this information. We have already formally
>>>>>>> requested the government with a list and expect the government to
>>>>>>> step
>>>>>>> in provide all the results. This is an independent request to the
>>>>>>> government and they should provide it.
>>>>>>>
>>>>>>> Sincerely,
>>>>>>> Vivek
>>>>>>>
>>>>>>> On 2026-08-26 12:27, McCarthy, Brandon N. wrote:
>>>>>>>> Just seeing this back and forth. I am not sure what specific
>>>>>>>> items
>>>>>>> are
>>>>>>>> needed. We are happy to run another search for anything. Just
>>>>>>>> let
>>>>>>> us
>>>>>>>> know the specific items to look for.
>>>>>>>> Thanks
>>>>>>>>
>>>>>>>> Brandon N. McCarthy
>>>>>>>> Partner
>>>>>>>> Katten

>>>>>>>> Katten Muchin Rosenman LLP
>>>>>>>> 2121 North Pearl Street, Suite 1100 | Dallas, TX 75201-2591
>>>>>>>> direct +1.214.765.3680
>>>>>>>> brandon.mccarthy@katten.com | katten.com
>>>>>>>> Bio | vCard
>>>>>>>>
>>>>>>>> -----Original Message-----
>>>>>>>> From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>
>>>>>>>> Sent: Wednesday, August 26, 2026 9:37 AM
>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>> Cc: Barnesatty <barnesatty@aol.com>; Freeman, Lyndie (FRD)
>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW)
>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>> Sanders, Jeremy (FRD) <Jeremy.Sanders@usdoj.gov>; Washington,
>>>>>>>> Dana
>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael Martinez
>>>>>>>> <mmartinez@grierlaw.com>; Meyer, Ryan J.
>>>>>>>> <ryan.meyer@katten.com>;
>>>>>>>> McCarthy, Brandon N. <brandon.mccarthy@katten.com>
>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>> Restitution
>>>>>>>> Report
>>>>>>>>
>>>>>>>> EXTERNAL EMAIL \u2013 EXERCISE CAUTION
>>>>>>>>
>>>>>>>> Dan,
>>>>>>>>
>>>>>>>> And yes, I spoke to Greg Lindberg a few minutes ago. He has
>>>>>>>> never
>>>>>>>> received any of this information from the special master or
>>>>>>>> anyone
>>>>>>>> else.
>>>>>>>> Prior counsel also have not had any success getting this
>>>>>>> information
>>>>>>>> from the special master. They are copied here.
>>>>>>>>
>>>>>>>> You (the government) have the burden of proof. Also all of this
>>>>>>>> is
>>>>>>>> Brady/Giglio information.
>>>>>>>>
>>>>>>>> We don't have it and have not had it. We want this information.
>>>>>>>>
>>>>>>>> Sincerely,
>>>>>>>> Vivek
>>>>>>>>
>>>>>>>> On 2026-08-26 09:33, vramachandran@dhammalaw.com wrote:
>>>>>>>>> I have not had any ex parte communication with the special
>>>>>>>>> master
>>>>>>>> other
>>>>>>>>> than an AAPC tax return.
>>>>>>>>> I would like to know what communication the government had.

>>>>>>>>> And your data request is to you the government. Do not bring in
>>>>>>> the
>>>>>>>>> Special Master or anyone else into this.
>>>>>>>>> Either you have it or you don't have it. State plainly whether
>>>>>>> you
>>>>>>>> have
>>>>>>>>> the data or not in the other email.
>>>>>>>>>
>>>>>>>>> Sincerely,
>>>>>>>>> vivek
>>>>>>>>>
>>>>>>>>> On 2026-08-26 09:29, vramachandran@dhammalaw.com wrote:
>>>>>>>>>> Dan,
>>>>>>>>>>
>>>>>>>>>> The government was asked via a separate email for the data to
>>>>>>>>>> be
>>>>>>>>>> produced.
>>>>>>>>>> You can respond there. We asked the government to produce what
>>>>>>> it
>>>>>>>> has
>>>>>>>>>> in that email thread.
>>>>>>>>>> It is directed to the government. I am not playing ask the
>>>>>>> special
>>>>>>>>>> master again.
>>>>>>>>>> We want the basis for your adoption of the report wholesale
>>>>>>>>>> and
>>>>>>>> using
>>>>>>>>>> that during sentencing.
>>>>>>>>>> Your response to the government's request should be on that
>>>>>>> thread.
>>>>>>>>>>
>>>>>>>>>> Sincerely,
>>>>>>>>>> Vivek
>>>>>>>>>>
>>>>>>>>>> On 2026-08-26 09:27, Ryan, Daniel (USANCW) wrote:
>>>>>>>>>>> Vivek,
>>>>>>>>>>>
>>>>>>>>>>> We once again disagree with your claims about the facts and
>>>>>>>>>>> the
>>>>>>>> law.
>>>>>>>>>>> Moreover, you did not answer my question. What materials
>>>>>>> regarding
>>>>>>>>>>> restitution did Mr. Lindberg's prior counsel not receive from
>>>>>>> the
>>>>>>>>>>> Government, the Special Master, Paladin, or any other source?
>>>>>>> The
>>>>>>>>>>> government does not have any obligation to reproduce
>>>>>>>>>>> materials
>>>>>>>>>>> already in Defendant's possession. Is it your position that
>>>>>>>>>>> Mr.
>>>>>>>>>>> Lindberg's counsel did not receive any information or
>>>>>>>>>>> materials

>>>>>>>> from
>>>>>>>>>>> the Special Master and/or Paladin during its ex parte
>>>>>>>> communications
>>>>>>>>>>> with them or the government in discovery relating to
>>>>>>> restitution?
>>>>>>>> If
>>>>>>>>>>> so, please provide support for that claim.
>>>>>>>>>>>
>>>>>>>>>>> We are happy to provide Mr. Lindberg with any materials he is
>>>>>>>>>>> entitled to, but we do not agree with your suggestion that he
>>>>>>> has
>>>>>>>> not
>>>>>>>>>>> already received materials underpinning the restitution
>>>>>>>>>>> amount.
>>>>>>>>>>>
>>>>>>>>>>> Also, I will be at a trial that starts this morning, so I
>>>>>>>>>>> will
>>>>>>> not
>>>>>>>> be
>>>>>>>>>>> able to respond to any further emails today.
>>>>>>>>>>>
>>>>>>>>>>> Dan
>>>>>>>>>>>
>>>>>>>>>>>
>>>>>>>>>>> -----Original Message-----
>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>> Sent: Wednesday, August 26, 2026 7:43 AM
>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>>>>> Cc: Barnesatty <barnesatty@aol.com>; Freeman, Lyndie (FRD)
>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW)
>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>> Sanders, Jeremy (FRD) <Jeremy.Sanders@usdoj.gov>; Washington,
>>>>>>> Dana
>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael Martinez
>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>> Restitution
>>>>>>>>>>> Report
>>>>>>>>>>>
>>>>>>>>>>> Dan,
>>>>>>>>>>>
>>>>>>>>>>> We will be placing objections on file today. We will also
>>>>>>>>>>> place
>>>>>>> a
>>>>>>>>>>> motion
>>>>>>>>>>> to compel against the government and special master if I
>>>>>>>>>>> don't
>>>>>>>> hear
>>>>>>>>>>> back
>>>>>>>>>>> from the government on the documents we asked for.

>>>>>>>>>>>
>>>>>>>>>>> Clearly, the government knows how to share the information it
>>>>>>> has.
>>>>>>>>>>> And
>>>>>>>>>>> it should to avoid troubling the court.
>>>>>>>>>>>
>>>>>>>>>>> Sincerely,
>>>>>>>>>>> Vivek
>>>>>>>>>>>
>>>>>>>>>>> On 2026-08-25 14:38, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>> Please respond before 3.30 P.M. We will be seeking active
>>>>>>>>>>>> intervention
>>>>>>>>>>>> from both the 4th circuit and the district court on the
>>>>>>>> government's
>>>>>>>>>>>> obligation to share data it has.
>>>>>>>>>>>>
>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>> Vivek
>>>>>>>>>>>>
>>>>>>>>>>>> On 2026-08-25 14:28, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>>> Dan and Jeremy,
>>>>>>>>>>>>>
>>>>>>>>>>>>> We once again request the government to give the data that
>>>>>>>>>>>>> underlies
>>>>>>>>>>>>> the restitution and sentencing. Restitution is part and
>>>>>>> parcel
>>>>>>>> of
>>>>>>>>>>>>> the
>>>>>>>>>>>>> criminal sentence. It's a Brady/Giglio violation to deny
>>>>>>> access
>>>>>>>> to
>>>>>>>>>>>>> the
>>>>>>>>>>>>> data and the methodology on which sentencing is based.
>>>>>>>>>>>>>
>>>>>>>>>>>>> Additionally, your second omnibus position is against DOJ
>>>>>>> policy
>>>>>>>> on
>>>>>>>>>>>>> interest rate.
>>>>>>>>>>>>>
>>>>>>>>>>>>> The prosecution has the duty to provide the data we
>>>>>>>>>>>>> requested
>>>>>>>> from
>>>>>>>>>>>>> the
>>>>>>>>>>>>> special master.
>>>>>>>>>>>>>
>>>>>>>>>>>>> There is an appeal filed to preserve Greg Lindberg's rights
>>>>>>>> after
>>>>>>>>>>>>> sentencing and after preliminary order on restitution. That
>>>>>>> does
>>>>>>>>>>>>> not
>>>>>>>>>>>>> excuse non-production of the data. Dan it's the
>>>>>>>>>>>>> government's

>>>>>>>>>>>>> responsibility to get the data and share the data similar
>>>>>>>>>>>>> to
>>>>>>> how
>>>>>>>>>>>>> the
>>>>>>>>>>>>> Ares 302's were shared.
>>>>>>>>>>>>>
>>>>>>>>>>>>> At the end of the day, it's the United States Vs. Greg
>>>>>>> Lindberg.
>>>>>>>>>>>>> It's
>>>>>>>>>>>>> your burden of proof irrespective of your position on what
>>>>>>> the
>>>>>>>> data
>>>>>>>>>>>>> relates to. It's the underlying data on restitution and the
>>>>>>> data
>>>>>>>>>>>>> that
>>>>>>>>>>>>> you used for sentencing and preliminary restitution and an
>>>>>>> order
>>>>>>>> on
>>>>>>>>>>>>> restitution the government wants and a forfeitutre the
>>>>>>>> government
>>>>>>>>>>>>> will
>>>>>>>>>>>>> seek to enforce.
>>>>>>>>>>>>> And sentencing is as yet incomplete and we are asking for
>>>>>>>>>>>>> the
>>>>>>>> data.
>>>>>>>>>>>>>
>>>>>>>>>>>>> It's the prosecution to obtain the data.
>>>>>>>>>>>>>
>>>>>>>>>>>>> On our part, even when we don't agree with a designation,
>>>>>>>>>>>>> we
>>>>>>>> have
>>>>>>>>>>>>> gone
>>>>>>>>>>>>> the extra mile to file everything under seal pending
>>>>>>>> determination
>>>>>>>>>>>>> by
>>>>>>>>>>>>> the court. Not getting us the data under these
>>>>>>>>>>>>> circumstances
>>>>>>>> does
>>>>>>>>>>>>> not
>>>>>>>>>>>>> comport with your obligations.
>>>>>>>>>>>>>
>>>>>>>>>>>>> You have the ability to share the data with the defendant
>>>>>>>>>>>>> and
>>>>>>>> have
>>>>>>>>>>>>> done so on victims statements which are far more sensitive
>>>>>>> than
>>>>>>>> the
>>>>>>>>>>>>> statements of companies Greg Lindberg turned over to you.
>>>>>>>>>>>>>
>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>
>>>>>>>>>>>>> Sincerely,

>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>
>>>>>>>>>>>>> On 2026-08-23 21:11, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>>>> Jermey,
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> We may file this with the 4th again as an interim stay.
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Dan and Martinez,
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Given that the court has not been informed of a sale on
>>>>>>>>>>>>>> the
>>>>>>>> Damovo
>>>>>>>>>>>>>> sale and both of you have not responded to the motion
>>>>>>> relating
>>>>>>>> to
>>>>>>>>>>>>>> Damovo which is now being sold for debt with an offer for
>>>>>>> the
>>>>>>>> $400
>>>>>>>>>>>>>> million to 450 million. We are filing a motion for stay.
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> On 2026-08-18 11:07, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>>>>> Thank you, Dan. We will file a motion to reconsider
>>>>>>> shortly.
>>>>>>>> We
>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>> to preserve our objections at this point.
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> Sent with Spark [18]
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> On Aug 18, 2026 at 11:03\u202fAM -0400, Ryan, Daniel
(USANCW)
>>>>>>>>>>>>>>> <Daniel.Ryan@usdoj.gov>, wrote:
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Vivek,
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> I disagree with your recitation of the facts and law,
>>>>>>>>>>>>>>>> but,
>>>>>>> as
>>>>>>>> I
>>>>>>>>>>>>>>>> indicated yesterday, the Government has no objection to
>>>>>>> you
>>>>>>>>>>>>>>>> getting

>>>>>>>>>>>>>>>> access to the type of information you are requesting
>>>>>>>>>>>>>>>> from
>>>>>>> the
>>>>>>>>>>>>>>>> Special Master subject to his ability to provide it to
>>>>>>> you.
>>>>>>>> The
>>>>>>>>>>>>>>>> Government believes that the information you are seeking
>>>>>>>> would,
>>>>>>>>>>>>>>>> at
>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>> minimum, qualify as \u201csensitive materials\u201d under
the
>>>>>>>> Court\u2019s
>>>>>>>>>>>>>>>> Standard Criminal Discovery Order that the Defendant may
>>>>>>> not
>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>> copies of, and they may rise to the level of
>>>>>>> \u201cattorney\u2019s
>>>>>>>> eyes
>>>>>>>>>>>>>>>> only.\u201d I would encourage you to work with the
Special
>>>>>>>> Master to
>>>>>>>>>>>>>>>> see if you can agree to a mechanism for you to obtain
>>>>>>> access
>>>>>>>> to
>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>> materials you seek.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Dan
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> From: Vramachandran <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 5:55 PM
>>>>>>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>>>>>>>>>> Cc: Barnesatty <barnesatty@aol.com>; Freeman, Lyndie
>>>>>>>>>>>>>>>> (CRM)
>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>>>>>>>>>>> (USANCW)
>>>>>>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>>>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>> Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>;
>>>>>>> Washington,
>>>>>>>>>>>>>>>> Dana
>>>>>>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael Martinez
>>>>>>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Corrected. Sent was hit before the draft was complete.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>> Defense wants a complete record for the appeal. The
>>>>>>>>>>>>>>>> basis
>>>>>>> for
>>>>>>>>>>>>>>>> both
>>>>>>>>>>>>>>>> the sentence term and the restitution number is based on
>>>>>>> the
>>>>>>>>>>>>>>>> methodology of calculating the value of the restitution
>>>>>>>> assets
>>>>>>>>>>>>>>>> i.e.
>>>>>>>>>>>>>>>> companies.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Similar to when law enforcement uses a sting ray device
>>>>>>> they
>>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>> disclose the specification of the stingray device and
>>>>>>>>>>>>>>>> how
>>>>>>> the
>>>>>>>>>>>>>>>> data
>>>>>>>>>>>>>>>> on a particular suspect was collected.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Similarly over here when you allege that multiple
>>>>>>> restitution
>>>>>>>>>>>>>>>> assets
>>>>>>>>>>>>>>>> are worth a lump sum value you need to disclose what
>>>>>>>>>>>>>>>> each
>>>>>>>>>>>>>>>> company
>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>> worth and how that valuation was arrived at. Finally you
>>>>>>> need
>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>> show how each credit and offset is calculated and the
>>>>>>>> detailed
>>>>>>>>>>>>>>>> method. All of these under MVRA are the government
>>>>>>>>>>>>>>>> burden
>>>>>>> to
>>>>>>>>>>>>>>>> establish. Without this there cannot be a final
>>>>>>> restitution
>>>>>>>>>>>>>>>> order.
>>>>>>>>>>>>>>>> Here the restitution order triggers a forfeiture if the
>>>>>>> value
>>>>>>>> of
>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>> companies is less than the restitution ordered. So the
>>>>>>> harm
>>>>>>>> is
>>>>>>>>>>>>>>>> immediate to Greg Lindberg. In addition whatever
>>>>>>> methodology
>>>>>>>>>>>>>>>> including numbers from the insurance companies and
>>>>>>>>>>>>>>>> losses
>>>>>>>> that
>>>>>>>>>>>>>>>> went

>>>>>>>>>>>>>>>> into the calculations should also be on the record.
>>>>>>>>>>>>>>>> Again
>>>>>>> the
>>>>>>>>>>>>>>>> governments proof on the record.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Once again defendants interest over here is to
>>>>>>>>>>>>>>>> adversarily
>>>>>>>> test
>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>> information for which defendant has to see this
>>>>>>> information
>>>>>>>> and
>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>> time with this information.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> On multiple instances Katten has tried to obtain this
>>>>>>>>>>>>>>>> information
>>>>>>>>>>>>>>>> unsuccessfully. If we need to go to the 4 th circuit and
>>>>>>> come
>>>>>>>>>>>>>>>> back
>>>>>>>>>>>>>>>> on remand to get this information in two years we will.
>>>>>>>>>>>>>>>> We
>>>>>>>> will
>>>>>>>>>>>>>>>> seek
>>>>>>>>>>>>>>>> a bond from the 4th because government failed in
>>>>>>>>>>>>>>>> providing
>>>>>>>> the
>>>>>>>>>>>>>>>> factual basis for the numbers.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> It will be easier for all parties including Greg
>>>>>>>>>>>>>>>> Lindberg
>>>>>>> and
>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>> victims, if this information is placed on the record
>>>>>>>>>>>>>>>> right
>>>>>>>> now.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Given that we are willing to use the governments
>>>>>>> protective
>>>>>>>>>>>>>>>> order
>>>>>>>>>>>>>>>> there is no basis to deny access to the information we
>>>>>>>>>>>>>>>> requested.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:38 PM, <Vramachandran> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> There is already a standing protective order in place
>>>>>>>>>>>>>>>>> in
>>>>>>> the

```
>>>>>>>>>>>>>>>>> criminal
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> case that governs all of the government's discovery in
>>>>>>> this
>>>>>>>>>>>>>>>>> case,
>>>>>>>>>>>>>>>>> so I'm
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> now sure where there needs to be a new protective order
>>>>>>> for
>>>>>>>>>>>>>>>>> this.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> Please use that order.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> On 2026-08-17 13:20, Vramachandran wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Martinez,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Please provide the information we asked for and what\
u2019s
>>>>>>> in
>>>>>>>> your
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> subpoena. Just blocking access with a no is just an
>>>>>>> illegal
>>>>>>>>>>>>>>>>> sentence.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> This is not a civil proceeding. Delaying access is
>>>>>>>> prejudicial
>>>>>>>>>>>>>>>>> to Greg
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Lindberg.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:11 PM, <Vramachandran> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
```

>>>>>>>>>>>>>>>>>>> Of course if there is business confidential
>>>>>>>>>>>>>>>>>>> information
>>>>>>> we
>>>>>>>>>>>>>>>>> won\u2019t
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> contest it. It\u2019s Greg Lindberg\u2019s companies.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> The AAPC report is mere attorney arguments without
>>>>>>>>>>>>>>>>>>> any
>>>>>>>> data.
>>>>>>>>>>>>>>>>> That
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> kind of a report being sealed serves no one.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:06 PM, <Vramachandran> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> The court can order a protective order and the
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>> Master
>>>>>>>>>>>>>>>>> can
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> request one after filing it under seal. We will
>>>>>>>>>>>>>>>>>>> contest
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> protective order request.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sent with Spark [1]

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:04\u202fPM -0400, Ryan, Daniel
>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Daniel.Ryan@usdoj.gov>, wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> While we do not believe the requested information is
>>>>>>>> relevant
>>>>>>>>>>>>>>>>> to the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Court's determination of a final restitution order,
>>>>>>>>>>>>>>>>>>> we
>>>>>>>> have
>>>>>>>>>>>>>>>>>>> no
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> objection to you getting relevant data from the
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>>>>>>>>>>>>> Master.
>>>>>>>>>>>>>>>>> That
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> said, we agree a protective order, not just filing it
>>>>>>>> under
>>>>>>>>>>>>>>>>> seal, is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> appropriate here at least with respect to the most
>>>>>>>> sensitive
>>>>>>>>>>>>>>>>> types
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> of business data.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Dan
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> From: Vramachandran <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 1:01 PM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Cc: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>;
>>>>>>>> Barnesatty
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <barnesatty@aol.com>; Freeman, Lyndie (CRM)

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>>>>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>;
>>>>>>>> Washington,
>>>>>>>>>>>>>>>>> Dana
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael
>>>>>>>>>>>>>>>>>>> Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Are you opposed to an expedited motion being placed
>>>>>>>>>>>>>>>>>>> on
>>>>>>> the
>>>>>>>>>>>>>>>>> record?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> We have no interest in delaying proceedings and want
>>>>>>> this
>>>>>>>>>>>>>>>>>>> data
>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the record now.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 12:57 PM, <Michael Martinez>

>>>>>>>>>>>>>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> No.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Michael L. Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Grier Wright Martinez PA
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> 521 E. Morehead St., Ste. 440, Charlotte, NC 28202
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> (704) 332-0209 (direct dial)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=27d1ab0d-429dc25f-27d68fe8-74fe4867716e-08c48172a4f75ca0&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>> [1] [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> mmartinez@grierlaw.com
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> -----Original Message-----
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 12:28 PM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>;
>>>>>>> Michael
>>>>>>>>>>>>>>>>> Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Cc: barnesatty@aol.com; Freeman, Lyndie (CRM)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>>>>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>;
>>>>>>>> Washington,

>>>>>>>>>>>>>>>>> Dana
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Caution: This message is from an external sender.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Martinez,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Are you going to place the requested data under seal
>>>>>>>>>>>>>>>>>>> on
>>>>>>>> the
>>>>>>>>>>>>>>>>> court
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> records to avoid the motion? We would rather fight on
>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> designation than delay proceedings. Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> In any case, in March 2026 you offered to place it on
>>>>>>> the
>>>>>>>>>>>>>>>>> record
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> under seal. I am not sure why you cannot do the same
>>>>>>> now.
>>>>>>>>>>>>>>>>>>> None
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> this requires a confidentiality agreement.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On 2026-08-17 11:49, vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>>>> wrote:

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> We need the data. We are asking for the data to
>>>>>>>>>>>>>>>>>>>> avoid
>>>>>>> the
>>>>>>>>>>>>>>>>> motion.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> On 2026-08-17 11:48, Ryan, Daniel (USANCW) wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Vivek,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> We appreciate your advocacy for your client, but we
>>>>>>> do
>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> litigate
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> via email. If you file a motion with the court with
>>>>>>> your
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> requested
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> relief, we will respond accordingly. To the extent
>>>>>>>>>>>>>>>>>>>>> we
>>>>>>>>>>>>>>>>> understand
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> your
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> emails, we object to your conclusions, accusations,
>>>>>>> and
>>>>>>>>>>>>>>>>> requested
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> relief. That said, with respect to your requests
>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>> valuation
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> information, you can represent to the Court that we
>>>>>>> are
>>>>>>>>>>>>>>>>> reserving

```
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> our
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> position until we see your motion.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Regards,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Dan
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 11:37 AM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> To: Michael Martinez <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Cc: barnesatty@aol.com; Ryan, Daniel (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> <Daniel.Ryan@usdoj.gov>; Freeman, Lyndie (CRM)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (USANCW) <Benjamin.Bain-Creed@usdoj.gov>; Meyer,
>>>>>>>>>>>>>>>>>>>>> Ryan
>>>>>>> J.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> <ryan.meyer@katten.com>; Joe Grier
>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sanders,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Subject: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Dan and Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (1) Do you have the financial reports data we asked
>>>>>>> for
```

>>>>>>>>>>>>>>>>> below?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Did
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you use it in your report?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> We are looking for all financial reports and all
>>>>>>> board
>>>>>>>>>>>>>>>>> reports
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> all primary restitution assets, specified
>>>>>>>>>>>>>>>>>>>>> affiliated
>>>>>>>>>>>>>>>>> companies
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the last four years and all letter of intents and
>>>>>>> offers
>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> purchase
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> received. It is going to take us a month to analyze
>>>>>>> all
>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> data.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (2) Specifically the mid low high you filed with
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>> court
>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> July
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> 2026 is going to trigger a forfeiture worth
>>>>>>>>>>>>>>>>>>>>> millions
>>>>>>> of
>>>>>>>>>>>>>>>>> dollars.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> So
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you need to let the defendant see this data on the
>>>>>>> court
>>>>>>>>>>>>>>>>> docket
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> this needs to be on the docket so that this can be
>>>>>>>>>>>>>>>>>>>>> appealed.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (3) Do you have the data you used to arrive at the
>>>>>>>>>>>>>>>>>>>>> valuation
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> all
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> assets you quoted in the sealed report in July
>>>>>>>>>>>>>>>>>>>>> 2026?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (4) Do you have the data you said you will share
>>>>>>>>>>>>>>>>>>>>> with
>>>>>>>> the
>>>>>>>>>>>>>>>>> court
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> seal on March 2026?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (5) Where is the updated data from March 2026 for
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>> same
>>>>>>>>>>>>>>>>> where
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> said that because AAPC is now valued less it needs
>>>>>>>>>>>>>>>>>>>>> to
>>>>>>> be
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> downgraded?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> You are going to place all of the above on the
>>>>>>>>>>>>>>>>>>>>> record
>>>>>>>> today
>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> seal.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Without this the sentencing is going to be based on
>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>> blackbox
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> attorney arguments.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Dan, the government may not stand silent in all
>>>>>>>>>>>>>>>>>>>>> this.
>>>>>>>> This
>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>> a [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> criminal proceeding where you sent someone to
>>>>>>>>>>>>>>>>>>>>> prison
>>>>>>> for
>>>>>>>> 12
>>>>>>>>>>>>>>>>> years [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> based on data he cannot see and will not be allowed
>>>>>>> to
>>>>>>>> see?
>>>>>>>>>>>>>>>>> And [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [2]>>> restitution worth billions of dollars based on
>>>>>>> data
>>>>>>>> he
>>>>>>>>>>>>>>>>> cannot see
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you will not place on the record under seal?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Sorry, I am having trouble with scruples. I am
>>>>>>> flummoxed
>>>>>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> anyone
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> thinks this is ok in a criminal proceeding and if
>>>>>>>>>>>>>>>>>>>>> we
>>>>>>> ask
>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>> it
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> as a

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> criminal defendant we are delaying the proceedings.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 11:08, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Let me get this straight you are evaluating the
>>>>>>> assets
>>>>>>>>>>>>>>>>>>>>>> with
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> range
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that you put on the record to trigger forfeiture
>>>>>>>>>>>>>>>>>>>>>> but
>>>>>>>> will
>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> share
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that information with the defendant?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> You are going to share the valuation you said you
>>>>>>> have
>>>>>>>> on
>>>>>>>>>>>>>>>>> all
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> assets from March 26, 2026 report. Either that was
>>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>> lie

>>>>>>>>>>>>>>>>>>>>>> or
>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that data. You are going to place this on the
>>>>>>>>>>>>>>>>>>>>>> record
>>>>>>>> today
>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> seal which we will contest.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan, you are going to sentence someone based on
>>>>>>>>>>>>>>>>>>>>>> data
>>>>>>> he
>>>>>>>>>>>>>>>>> cannot
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> even
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> see. You need to get this on the docket today
>>>>>>> please.
>>>>>>>> And
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> not for lack of asking as was represented to the
>>>>>>> court.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> represented to the court when you had questionable
>>>>>>>>>>>>>>>>>>>>>> authority
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> prevent product as the government and you want a
>>>>>>>> sentence
>>>>>>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>> an
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> incomplete record. You need to explain this to the
>>>>>>>> court.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We want this on the record today under seal. You
>>>>>>> forced
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> deadline
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> you need to give us the data now on the court
>>>>>>> records
>>>>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>> seal
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> if
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> it needs to be.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:35, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Let me get this straight you are evaluating the
>>>>>>> assets
>>>>>>>>>>>>>>>>>>>>>> with
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> range
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that you put on the record to forfiture but will
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>> share
>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information with the defendant?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> You are going to share the valuation you said you
>>>>>>> have
>>>>>>>> on
>>>>>>>>>>>>>>>>> all
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> assets from March 26, 2026 report. Either that was
>>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>> lie

>>>>>>>>>>>>>>>>>>>>>> or
>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that data. You are going to place this on the
>>>>>>>>>>>>>>>>>>>>>> record
>>>>>>>> today
>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> seal which we will contest.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan, you are going to sentence someone based on
>>>>>>>>>>>>>>>>>>>>>> data
>>>>>>> he
>>>>>>>>>>>>>>>>> cannot
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> even
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> see. You need to get this on the docket today
>>>>>>> please.
>>>>>>>> And
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> not for lack of asking as was represented to the
>>>>>>> court.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> represented to the court when you had questionable
>>>>>>>>>>>>>>>>>>>>>> authority
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> prevent product as the government and you want a
>>>>>>>> sentence
>>>>>>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>> an
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> incomplete record. You need to explain this to the
>>>>>>>> court.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We want this on the record today under seal. You
>>>>>>> forced
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> deadline
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> you need to give us the data now on the court
>>>>>>> records
>>>>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>> seal
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> if
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> it needs to be.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:24, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Also as suggested, we have raised concerns about
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>> relevance
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> some of this data to an independent criminal
>>>>>>>>>>>>>>>>>>>>>> investigation.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> The government needs to act and get this data on
>>>>>>> file.
>>>>>>>>>>>>>>>>>>>>>> Thank
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:19, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> As a prosecutor you should be aware that this is
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>> just
>>>>>>>>>>>>>>>>> about
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Greg
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Lindberg. This data belongs to the victims and
>>>>>>> should
>>>>>>>> be
>>>>>>>>>>>>>>>>> known
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the general public. Sentencing without disclosing
>>>>>>> all
>>>>>>>> of
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information on the record is illegal.
>>>>>>> Unconstitutional.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> let the Special Master know that he needs to file
>>>>>>>>>>>>>>>>>>>>>> everything
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> seal if he so wants to.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This is a criminal proceeding. You have a duty to
>>>>>>> place
>>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information on the docket. This is exceptional.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>> delay
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> proceedings and then blame it on the defendant.
>>>>>>>>>>>>>>>>>>>>>> Then

>>>>>>>> seek
>>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> confidentiality agreement. You have the burden of
>>>>>>>> proof.
>>>>>>>>>>>>>>>>>>>>>> Are
>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> going to meet it or not?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> I would like an answer by 12.00 P.M.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This is a criminal case. Whatever you want to
>>>>>>> produce
>>>>>>>> you
>>>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> produce now. I need to get this to my client so
>>>>>>>>>>>>>>>>>>>>>> that
>>>>>>> we
>>>>>>>>>>>>>>>>>>>>>> can
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> defend
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> on August 24th which you are forcing on the
>>>>>>> defendant.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> The data is subject to the court's sealing
>>>>>>> procedures.
>>>>>>>> You
>>>>>>>>>>>>>>>>> are
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> going to condition this data on anything other
>>>>>>>>>>>>>>>>>>>>>> than
>>>>>>> the
>>>>>>>>>>>>>>>>> court's
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> own
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> processes.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Any failure to produce the data means you are
>>>>>>> unwilling
>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> establish
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> these on the record as required under the MVRA.
>>>>>>>>>>>>>>>>>>>>>> That
>>>>>>> is
>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> failure to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> prosecute by the government.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Please file on the record the methodology and the
>>>>>>> data
>>>>>>>> we
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> requested
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> underseal by August 17, 2026 noon. We will contest
>>>>>>> the
>>>>>>>>>>>>>>>>> sealing
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> with
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the court if necessary.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This is not a civil proceeding.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> viek
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:13, Michael Martinez wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> The Special Master disagrees with your legal
>>>>>>> analyses
>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> conclusions below.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> That said, the Special Master would not be opposed
>>>>>>> in
>>>>>>>>>>>>>>>>> concept to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> producing (on a reasonable timeline) documents in
>>>>>>> our
>>>>>>>>>>>>>>>>> possession
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> under a confidentiality agreement and protective
>>>>>>> order
>>>>>>>>>>>>>>>>> limiting
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> public disclosure of proprietary information. If
>>>>>>> your
>>>>>>>>>>>>>>>>>>>>>> client
>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> amenable to preserving the confidentiality of
>>>>>>> sensitive
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> proprietary
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information, then I can draft a confidentiality
>>>>>>>> agreement
>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> protective order for your review and edit. If your
>>>>>>>> client
>>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> amenable to preserving the confidentiality of

>>>>>>> sensitive
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> proprietary
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information, then a court order compelling us to
>>>>>>>> produce
>>>>>>>>>>>>>>>>> these
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> materials with no restrictions on subsequent
>>>>>>> disclosure
>>>>>>>>>>>>>>>>>>>>>> will
>>>>>>>>>>>>>>>>> be
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> required.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Without limiting the foregoing, our proposed
>>>>>>>> methodology
>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> unrealized offsets/credits is that your client
>>>>>>>>>>>>>>>>>>>>>> will
>>>>>>>>>>>>>>>>>>>>>> receive
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> credit
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> against his restitution obligation as the assets
>>>>>>>>>>>>>>>>>>>>>> are
>>>>>>>>>>>>>>>>> monetized
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> rather than him receiving a credit now based on
>>>>>>>>>>>>>>>>>>>>>> our
>>>>>>>>>>>>>>>>> estimation
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> what the Primary Restitution Assets might fetch
>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>>>>>> victims.
>>>>>>>>>>>>>>>>> The
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> purpose of the estimation was to satisfy the
>>>>>>>>>>>>>>>>>>>>>> mandate
>>>>>>> in
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> special
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> master order that the special master identify
>>>>>>>>>>>>>>>>>>>>>> assets

>>>>>>>> \u201cand
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> extent those assets are not readily convertible to
>>>>>>>> cash,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> determine a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> reasonable estimated value for those assets.\u201d
In
>>>>>>>> other
>>>>>>>>>>>>>>>>> words,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> evaluating our estimation of what the Primary
>>>>>>>> Restitution
>>>>>>>>>>>>>>>>> Assets
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> might generate for victims in the future is not an
>>>>>>>>>>>>>>>>>>>>>> integral
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> component of the Court\u2019s restitution
>>>>>>> determination,
>>>>>>>> and
>>>>>>>>>>>>>>>>> those
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> estimated figures do not appear anywhere in the
>>>>>>>> proposed
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> order.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael L. Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Grier Wright Martinez PA
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 521 E. Morehead St., Ste. 440, Charlotte, NC 28202
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> (704) 332-0209 (direct dial)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=d7e8bd0a-b2a4d458-d7ef99ef-74fe4867716e-429552d0fc93fb87&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [2]
>>>>>>>>>>>>>>>>>>>>>> [1] [3] [1] [1 [2]]

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> mmartinez@grierlaw.com
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> -----Original Message-----
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 6:03 AM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> To: Michael Martinez <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Cc: barnesatty@aol.com; Daniel Ryan
>>>>>>>>>>>>>>>>>>>>>> (Daniel.Ryan@usdoj.gov)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <daniel.ryan@usdoj.gov>; Freeman, Lyndie (CRM)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <lyndie.freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <benjamin.bain-creed@usdoj.gov>; Meyer, Ryan J.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <ryan.meyer@katten.com>; Joe Grier
>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>> Jeremy
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sanders <jeremy.sanders@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Subject: Re: Draft Final Supplement to Restitution
>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Caution: This message is from an external sender.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael and Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> I do want to remind you that unlike a bankruptcy
>>>>>>>>>>>>>>>>>>>>>> proceeding,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> these
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> companies are not just worth debt. They have
>>>>>>> revenues
>>>>>>>> in
>>>>>>>>>>>>>>>>>>>>>> the

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> millions, so your methodology of evaluation has to
>>>>>>> be
>>>>>>>>>>>>>>>>> disclosed
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the defendant on the record.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We are looking for all financial reports and all
>>>>>>> board
>>>>>>>>>>>>>>>>> reports
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> all primary restitution assets, specified
>>>>>>>>>>>>>>>>>>>>>> affiliated
>>>>>>>>>>>>>>>>> companies
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the last four years and all letter of intents and
>>>>>>>> offers
>>>>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> purchase
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> received. It is going to take us a month to
>>>>>>>>>>>>>>>>>>>>>> analyze
>>>>>>> all
>>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> data.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Without this the sentencing is going to be based
>>>>>>>>>>>>>>>>>>>>>> on
>>>>>>> a
>>>>>>>>>>>>>>>>> blackbox
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> attorney arguments.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This does not meet the MVRA accounting
>>>>>>>>>>>>>>>>>>>>>> requirement.
>>>>>>>> Please
>>>>>>>>>>>>>>>>> get
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> us
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> this information by noon August 17, 2026.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> A fiduciary duty applies to the Special
>>>>>>>> Master/Receiver.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> If you cannot establish your burden of proof, the
>>>>>>>>>>>>>>>>>>>>>> government
>>>>>>>>>>>>>>>>> has
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> duty to let the court know that you cannot do it.
>>>>>>>> Failure
>>>>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>> do
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> to win is striking a foul blow.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Katten has asked for this in the past. We do not
>>>>>>> have
>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-15 14:59, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael and Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> (I) In your March 2026 report, you stated that
>>>>>>> publicly
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> disclosing
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> too much detail regarding the Primary Restitution
>>>>>>>> Assets
>>>>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Special Master's value determinations concerning
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>> same
>>>>>>>>>>>>>>>>> would
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> negatively impact liquidation efforts and could,
>>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>>>>>> itself,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> decrease
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the value of the Primary Restitution Assets, and
>>>>>>> that
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Master therefore erred on the side of caution by
>>>>>>>>>>>>>>>>>>>>>>> including
>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> report a single range encompassing all Primary
>>>>>>>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Assets
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> lumped together.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Please provide all of the data you stated you
>>>>>>>>>>>>>>>>>>>>>>> would
>>>>>>>>>>>>>>>>>>>>>>> provide

>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Court in that March 2026 report, together with
>>>>>>>>>>>>>>>>>>>>>>> any
>>>>>>>> other
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> documents
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the Special Master intends to rely on for the
>>>>>>>> valuations
>>>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> proceeding. Please do so by noon on August 17,
>>>>>>> 2026.
>>>>>>>> To
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> extent
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> you have any additional information these have to
>>>>>>> be
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> established on
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the record under � 3664(f)(1)(A) by placing them
>>>>>>> on
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> record.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Under the MVRA that material belongs with the
>>>>>>>> defendant:
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> burden
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> of demonstrating the amount of loss is on the
>>>>>>>> Government,
>>>>>>>>>>>>>>>>> 18
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> U.S.C.
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> 3664(e); the statute requires "a complete
>>>>>>> accounting
>>>>>>>> of
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> losses
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> each victim," id. � 3664(a); and restitution must
>>>>>>> be
>>>>>>>> set
>>>>>>>>>>>>>>>>> "in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> full
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> amount of each victim's losses as determined by
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>>>>>>> court,"
>>>>>>>>>>>>>>>>> id.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> 3664(f)(1)(A). A single lumped range, with its
>>>>>>>>>>>>>>>>>>>>>>> particulars
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> withheld,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> cannot satisfy those provisions or permit the de
>>>>>>> novo
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> determination

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the Court is required to make. Id. � 3664(d)(6).
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (II) We will also file a motion on to unseal the
>>>>>>>> Appendix
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> final report. Other than attorney argument, there
>>>>>>> is
>>>>>>>>>>>>>>>>> nothing in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Appendix, and we will file our own argument
>>>>>>>>>>>>>>>>>>>>>>> saying
>>>>>>> so
>>>>>>>> --
>>>>>>>>>>>>>>>>> both
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> highlight this issue and to preserve the record
>>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>> the
>>>>>>>>>>>>>>>>> Fourth
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Circuit. Neither the defendant's right to contest
>>>>>>> the
>>>>>>>>>>>>>>>>>>>>>>> loss
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> amount
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> nor
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the Court's de novo review under � 3664(d)(6) can
>>>>>>> be
>>>>>>>>>>>>>>>>> exercised
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>> against a figure whose basis is kept under seal.
>>>>>>> See
>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> 3664(e).
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (III) We are going to file a motion for
>>>>>>>> reconsideration
>>>>>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> denial
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> of the subpoenas -- not because we expect the
>>>>>>>>>>>>>>>>>>>>>>> Court
>>>>>>> to
>>>>>>>>>>>>>>>>> change
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> its
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> mind, but to make sure the record is clear on
>>>>>>>>>>>>>>>>>>>>>>> three
>>>>>>>>>>>>>>>>>>>>>>> points.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> First,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> under the MVRA the burden of proof lies with the
>>>>>>>>>>>>>>>>> Government,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> defendant. � 3664(e). Second, to the extent the
>>>>>>>>>>>>>>>>>>>>>>> valuations
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> companies rest with the Special Master, they must
>>>>>>> be
>>>>>>>>>>>>>>>>> provided

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> defendant under the accounting provisions of the
>>>>>>> MVRA.
>>>>>>>> ��
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> 3664(a),
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (f)(1)(A). Third, restitution under the MVRA must
>>>>>>> be
>>>>>>>>>>>>>>>>> accurate;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> if
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> it
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> cannot be made accurate, or if the issues are too
>>>>>>>>>>>>>>>>>>>>>>> complex,
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Court's option is to decline restitution rather
>>>>>>> than
>>>>>>>>>>>>>>>>>>>>>>> order
>>>>>>>>>>>>>>>>> an
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> inaccurate amount. � 3663A(c)(3)(B). To the
>>>>>>>>>>>>>>>>>>>>>>> extent
>>>>>>>> you
>>>>>>>>>>>>>>>>> again
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> press
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the August 24 deadline, we preserve this issue
>>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>> the

>>>>>>>>>>>>>>>>> Fourth
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Circuit: the deferred determination is expressly
>>>>>>>>>>>>>>>>> contemplated
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> by
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> 3664(d)(5), and that ninety-day date is
>>>>>>>>>>>>>>>>>>>>>>> directory,
>>>>>>> not
>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> license
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> for an inaccurate award.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> See Dolan v. United States, 560 U.S. 605 (2010)
>>>>>>>>>>>>>>>>>>>>>>> (a
>>>>>>>> court
>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> misses
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the � 3664(d)(5) deadline retains authority to
>>>>>>> order
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> restitution,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> because the deadline is meant to protect victims,
>>>>>>> not
>>>>>>>> to
>>>>>>>>>>>>>>>>> create
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> windfall for defendants). Where loss is not yet
>>>>>>>>>>>>>>>>> ascertainable,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>> MVRA's remedy is to develop the record -- or to
>>>>>>>> decline
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> under � 3663A(c)(3)(B) -- not to adopt a guess.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (IV) We will additionally file a motion on the
>>>>>>>>>>>>>>>>>>>>>>> AAPC
>>>>>>>>>>>>>>>>> valuation
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Ares causation, tied to the subpoena request, to
>>>>>>>>>>>>>>>>>>>>>>> highlight
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> live
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> issues that remain pending and that the
>>>>>>>>>>>>>>>>>>>>>>> Government
>>>>>>> and
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Master are resisting. Causation and amount are
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>> Government's
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> prove by a preponderance of the evidence, �
>>>>>>> 3664(e),
>>>>>>>> and
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> value
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the property must be established on the record
>>>>>>> under
>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> 3664(f)(1)(A).
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Attorney arguments about AI and AAPC do not
>>>>>>> establish
>>>>>>>>>>>>>>>>>>>>>> value
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> property on the record.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We are happy to state that you are opposed to
>>>>>>>>>>>>>>>>>>>>>> these
>>>>>>>>>>>>>>>>>>>>>> motions.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-07-22 16:48, Michael Martinez wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Please find attached our current draft of a final
>>>>>>>>>>>>>>>>>>>>>> supplement
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> restitution report in the 3:23-CR-48 case. Also
>>>>>>>> attached
>>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> proposed final order of restitution and appendix
>>>>>>>>>>>>>>>>>>>>>> to
>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> supplement
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> discussing the primary restitution assets.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Here is what we said about the other parties
>>>>>>> positions
>>>>>>>> on
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> supplement: "The Special Master has conferred with
>>>>>>> both
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> government and the Defendant's counsel in relation
>>>>>>> to
>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Supplement.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Although the government does not oppose the
>>>>>>> positions
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> articulated
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> by
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the Special Master through this Supplement, the
>>>>>>>> Defendant
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> opposes
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the majority of the Special Master's
>>>>>>>>>>>>>>>>>>>>>> recommendations
>>>>>>>>>>>>>>>>> appearing
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> this Supplement." If I have not accurately stated
>>>>>>> your
>>>>>>>>>>>>>>>>> client's
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> position on our supplement, please let me know by
>>>>>>> the
>>>>>>>> end
>>>>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> day
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> tomorrow.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We have to file this by Friday.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael L. Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Grier Wright Martinez, PA
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 521 E. Morehead St., Ste. 440
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Charlotte, NC 28202
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 704/332.0209 (direct)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 704/332.0215 (fax)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> mmartinez@grierlaw.com
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Disclaimer
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This e-mail may contain confidential and
>>>>>>>> attorney-client
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> privileged
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> material for the sole use of the intended
>>>>>>>>>>>>>>>>>>>>>> recipient.
>>>>>>> Do
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> accept
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> wiring instructions from us by email. If you are
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> recipient,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> you are hereby notified that any disclosure,
>>>>>>> copying,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> distribution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> or taking action in relation of the contents of
>>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>> information
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> strictly prohibited and may be unlawful, please
>>>>>>> contact
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> sender
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> and delete this e-mail.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This email has been scanned for viruses and
>>>>>>>>>>>>>>>>>>>>>> malware,
>>>>>>>> and
>>>>>>>>>>>>>>>>>>>>>> may
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> been automatically archived by Mimecast Ltd, an
>>>>>>>> innovator
>>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Software as a Service (SaaS) for business.
>>>>>>>>>>>>>>>>>>>>>> Providing
>>>>>>> a
>>>>>>>>>>>>>>>>>>>>>> safer
>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> more useful place for your human generated data.
>>>>>>>>>>>>>>>>> Specializing
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> in;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Security, archiving and compliance. To find out
>>>>>>>>>>>>>>>>>>>>>> more
>>>>>>>> Click
>>>>>>>>>>>>>>>>> Here
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [1
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> [1 [3]]].
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b4a86c6f-d1e4053d-b4af488a-74fe4867716e-51e0532dcd107cc3&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [3]
>>>>>>>>>>>>>>>>>>>>>> [4] [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=686a9d19-0d26f44b-686db9fc-74fe4867716e-a368940ed31d1681&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [4]
>>>>>>>>>>>>>>>>>>>>>> [5] [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Disclaimer
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> This e-mail may contain confidential and
>>>>>>> attorney-client
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> privileged
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> material for the sole use of the intended
>>>>>>>>>>>>>>>>>>>>> recipient.
>>>>>>> Do
>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> accept
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> wiring instructions from us by email. If you are
>>>>>>>>>>>>>>>>>>>>> not
>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> recipient,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you are hereby notified that any disclosure,
>>>>>>>>>>>>>>>>>>>>> copying,

```
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> distribution or
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> taking action in relation of the contents of this
>>>>>>>>>>>>>>>>>>>>> information
>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> strictly prohibited and may be unlawful, please
>>>>>>> contact
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> sender and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> delete this e-mail.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> This email has been scanned for viruses and
>>>>>>>>>>>>>>>>>>>>> malware,
>>>>>>> and
>>>>>>>>>>>>>>>>>>>>> may
>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> been
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> automatically archived by Mimecast Ltd, an
>>>>>>>>>>>>>>>>>>>>> innovator
>>>>>>> in
>>>>>>>>>>>>>>>>> Software
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> as a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Service (SaaS) for business. Providing a safer and
>>>>>>> more
>>>>>>>>>>>>>>>>> useful
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> place
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> for your human generated data. Specializing in;
>>>>>>>> Security,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> archiving
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> and compliance. To find out more Click Here [2
>>>>>>>>>>>>>>>>>>>>> [6]].
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
```

>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1256fbba-771a92e8-1251df5f-74fe4867716e-5a41341f986a8499&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [5]
>>>>>>>>>>>>>>>>>>>>> [6] [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b875bf00-dd39d652-b8729be5-74fe4867716e-a15d6b5aa53271f9&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [6]
>>>>>>>>>>>>>>>>>>>>> [7] [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [7]
>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [8]
>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>

>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [13]
>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [14]
>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Disclaimer
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> This e-mail may contain confidential and
>>>>>>> attorney-client
>>>>>>>>>>>>>>>>> privileged
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> material for the sole use of the intended recipient.
>>>>>>>>>>>>>>>>>>> Do
>>>>>>>> not
>>>>>>>>>>>>>>>>> accept
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> wiring instructions from us by email. If you are not
>>>>>>> the
>>>>>>>>>>>>>>>>> recipient,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> you are hereby notified that any disclosure, copying,
>>>>>>>>>>>>>>>>> distribution
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> or taking action in relation of the contents of this
>>>>>>>>>>>>>>>>> information is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> strictly prohibited and may be unlawful, please
>>>>>>>>>>>>>>>>>>> contact
>>>>>>>> the
>>>>>>>>>>>>>>>>> sender
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and delete this e-mail.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> This email has been scanned for viruses and malware,
>>>>>>> and
>>>>>>>> may
>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> been automatically archived by Mimecast Ltd, an
>>>>>>> innovator
>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Software as a Service (SaaS) for business. Providing
>>>>>>>>>>>>>>>>>>> a
>>>>>>>> safer
>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> more useful place for your human generated data.
>>>>>>>> Specializing
>>>>>>>>>>>>>>>>> in;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Security, archiving and compliance. To find out more
>>>>>>> Click
>>>>>>>>>>>>>>>>>>> Here
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [16].
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [1] https://sparkmailapp.com/source?from=signature
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

```
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=255d2cc9-439869f7-255a082c-
c400add0b6f2-ef3d6ebaede0607b&q=1&e=a6705d1f-d38d-426b-88ff-
6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [15]
>>>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=58de74e3-3e1b31dd-58d95006-
c400add0b6f2-c480a08ec262503a&q=1&e=a6705d1f-d38d-426b-88ff-
6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [16]
>>>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b21c0063-d4d9455d-b21b2486-
c400add0b6f2-a89226c8521b3cfb&q=1&e=a6705d1f-d38d-426b-88ff-
6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [17]
>>>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=cc6968bb-aaac2d85-cc6e4c5e-
c400add0b6f2-2e8d6cc528df355f&q=1&e=a6705d1f-d38d-426b-88ff-
6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [18]
>>>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>>>
```

>>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=a22959de-c4ec1ce0-a22e7d3b-c400add0b6f2-90df1e1e64bd4ff1&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [19]
>>>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=9f3909c3-f9fc4cfd-9f3e2d26-c400add0b6f2-50b7993eed216485&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [20]
>>>>>>>>>>>>>>>>> [16]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [7]
>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>

>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [8]
>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [13]
>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [14]
>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [16]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1c82a97f-7a47ec41-1c858d9a-c400add0b6f2-92ca2cca7ec81edf&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [21]
>>>>>>>>>>>>>>>>> [17]
>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=5698ca81-33d4a3d3-569fee64-74fe4867716e-28d93030ca2e1c11&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [22]
>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2137e668-447b8f27-2130c28d-74fe4868cd43-1f354b13c23ee39e&q=1&e=acab17db-132a-430a-a710-caa9d1ae50c8&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [23]
>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [7]
>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [8]
>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>>>>>>>> [7]

>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [13]
>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [14]
>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=255d2cc9-439869f7-255a082c-c400add0b6f2-ef3d6ebaede0607b&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [15]
>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=58de74e3-3e1b31dd-58d95006-c400add0b6f2-c480a08ec262503a&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [16]
>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>

>>>>>> https://protect2.fireeye.com/v1/url?k=b21c0063-d4d9455d-b21b2486-c400add0b6f2-a89226c8521b3cfb&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [17]
>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=cc6968bb-aaac2d85-cc6e4c5e-c400add0b6f2-2e8d6cc528df355f&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [18]
>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=a22959de-c4ec1ce0-a22e7d3b-c400add0b6f2-90df1e1e64bd4ff1&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [19]
>>>>>>>>>>>>>>> [16]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=9f3909c3-f9fc4cfd-9f3e2d26-c400add0b6f2-50b7993eed216485&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [20]
>>>>>>>>>>>>>>> [17]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1c82a97f-7a47ec41-1c858d9a-c400add0b6f2-92ca2cca7ec81edf&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [21]
>>>>>>>>>>>>>>> [18] https://sparkmailapp.com/source?from=signature
>>>>>>>>
>>>>>>>> ============================================================
>>>>>>>> CONFIDENTIALITY NOTICE:
>>>>>>>> This electronic mail message and any attached files contain
>>>>>>>> information intended for the exclusive
>>>>>>>> use of the individual or entity to whom it is addressed and may
>>>>>>>> contain information that is
>>>>>>>> proprietary, privileged, confidential and/or exempt from
>>>>>>> disclosure
>>>>>>>> under applicable law. If you
>>>>>>>> are not the intended recipient, you are hereby notified that any
>>>>>>>> viewing, copying, disclosure or
>>>>>>>> distribution of this information may be subject to legal
>>>>>>> restriction
>>>>>>>> or sanction. Please notify

>>>>>>>> the sender, by electronic mail or telephone, of any unintended
>>>>>>>> recipients and delete the original
>>>>>>>> message without making any copies.
>>>>>>>> ============================================================
>>>>>>>> NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited
>>>>>>>> liability partnership that has
>>>>>>>> elected to be governed by the Illinois Uniform Partnership Act
>>>>>>> (1997).
>>>>>>>>
>>>>>>>> ============================================================
>>>>>>>>
>>>>>>>>
>>>>>>>> Links:
>>>>>>>> ------
>>>>>>>> [1]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=27d1ab0d-429dc25f-27d68fe8-74fe4867716e-08c48172a4f75ca0&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [2]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=d7e8bd0a-b2a4d458-d7ef99ef-74fe4867716e-429552d0fc93fb87&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [3]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b4a86c6f-d1e4053d-b4af488a-74fe4867716e-51e0532dcd107cc3&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [4]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=686a9d19-0d26f44b-686db9fc-74fe4867716e-a368940ed31d1681&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [5]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1256fbba-771a92e8-1251df5f-74fe4867716e-5a41341f986a8499&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [6]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b875bf00-dd39d652-b8729be5-74fe4867716e-a15d6b5aa53271f9&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [7]
>>>>>>>>

>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [8]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [13]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [14]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [15]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=255d2cc9-439869f7-255a082c-c400add0b6f2-ef3d6ebaede0607b&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F

>>>>>>>> [16]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=58de74e3-3e1b31dd-58d95006-c400add0b6f2-c480a08ec262503a&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [17]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b21c0063-d4d9455d-b21b2486-c400add0b6f2-a89226c8521b3cfb&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [18]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=cc6968bb-aaac2d85-cc6e4c5e-c400add0b6f2-2e8d6cc528df355f&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [19]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=a22959de-c4ec1ce0-a22e7d3b-c400add0b6f2-90df1e1e64bd4ff1&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [20]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=9f3909c3-f9fc4cfd-9f3e2d26-c400add0b6f2-50b7993eed216485&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [21]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1c82a97f-7a47ec41-1c858d9a-c400add0b6f2-92ca2cca7ec81edf&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [22]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=5698ca81-33d4a3d3-569fee64-74fe4867716e-28d93030ca2e1c11&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [23]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2137e668-447b8f27-2130c28d-74fe4868cd43-1f354b13c23ee39e&q=1&e=acab17db-132a-430a-a710-caa9d1ae50c8&u=http%3A%2F%2Fwww.grierlaw.com%2F

**Date:** Sat, 29 Aug 2026 07:50:50 -0400

**From:** Vramachandran <vramachandran@dhammalaw.com>

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Dan and Jermey,

The government ( believe Dan Ryan) chose the special master. The government (Dan Ryan via edits) made him a receiver ( illegally and unconstitutionally with no basis in MVRA and the constitution)over the objections of the defendant with threats of filing with or without Lindberg.

Then tried to claim in a filing that Greg Lindberg wanted a receiver/special master. He did not. The government made the special master a part of the plea agreement. Then the government made the special master a receiver using characterizations in your email that had no basis in facts. Greg Lindberg wanted to retain control so that any dissipation was at fair market value. Then the government in a filing claimed Greg Lindberg wanted the special master as a receiver at the district court just two weeks ago. To claim consent that never existed to an illegal taking under the constitution and illegal appointment. With that filing the government breached the provisions of Hunter and other cases once again. I can’t recall how many other times this has happened.The government can hit hard but cannot play foul.

The government needs to give us all the ex parte communication.   This filing from two weeks   ago is an independent reason why we need that information.

You own the constitutional crisis. The defense is trying to document things so that the defendant Greg Lindberg does not end up with multiple punishments in the form of restitution again and again stemming from the mistakes of the government.

And part of that includes all ex parte communication to the special master and the other named entities in the list from the government being logged right now before it is dissipated.

On multiple punishments.   Already Beckett plus Damovo is 1.5 Billion in losses.

Government taking a position that is contrary to DOJ policy in pre-restitution order interest is another few million dollars. In all that's one punishment even assuming the faulty figures which have never been verified because Defendant does not have the numbers. The email from Dan disclaims having the numbers yesterday in some part.

The second punishment was ClanWilliams was sold and the government (Dan Ryan) orally with Katten copied on this email on a weekly call/ phone call claimed it would allow Greg Lindbeg to argue for offsets at a price of $800 million. Similar promises by government (Dan Ryan) made on a phone call with Katten that NCICs loans would be offsets.

For all of the reasons above Defendant should have access to all ex parte communications the government had with the special master, Paladin, M3, NCICs, Mike Dinius, Wes Camden and the Mullin law firm. To preserve evidence that will be dissipated. Preservation so multiple criminal punishments can stop.

When this issue goes to the 4th circuit or the district court.

Jermey,

I have advised you multiple times about conflict. Here is a live example.

The government has been told via you that there are severe issues that cannot be ignored needing an internal government ethics review. The government just does not care to self-correct.

Defendant and his counsel have tried multiple times to bring awareness to this issue without success and need to get this on the record. After repeated failure.

Sincerely,

Vivek

>
> On Aug 29, 2026 at 3:31 AM, <Vramachandran (mailto:vramachandran@dhammalaw.com)> wrote:
>
>
>
>
>
> Dan,
>
>
>
> I will follow up every day until I get this from the government. Please give us all of the government's ex parte communications with the special master, Wes Camden, Williams Mullin, playing, NHC, NCICs and M3.
>
>
>
> Greg Lindberg has nothing to hide. We are happy to provide all data we shared with the special master. We did indeed share information. We never got back anything from any other party.
>
>

>
> Prosecutor all Brady/Gigilo info should be shared.
>
>
>
> Once again we don’t live in the USSR. We don’t have secret courts. We don’t send people to prison using confidential data that defense cannot get under the discovery order.
>
>
>
> Please follow MVRA and the constitution.
>
>
>
> Sincerely,
>
> Vivek
>
>
>
>
>
>
>
>
>
>
> >
> > On Aug 28, 2026 at 4:40 PM, <Vramachandran (mailto:vramachandran@dhammalaw.com)> wrote:
> >
> >
> >
> >
> > Dan
> >
> > Let me know when you are going to produce all the ex parte communications?
> >
> > You responded to the other email so let me know when you will product the ex parte emails?
> >
> > Sincerely,
> > Vivek
> >
> > Sent with Spark (https://sparkmailapp.com/source?from=signature)
> > On Aug 28, 2026 at 4:40 PM -0400, vramachandran@dhammalaw.com, wrote:
> >
> > >
> > >
> > > Dan

> > >
> > > Let me know when you are going to produce all the ex parte communications?
> > >
> > > You responded to the other email so let me know when you will product the ex parte emails?
> > >
> > > Sincerely,
> > > Vivek

**Date:** Sat, 29 Aug 2026 15:48:41 -0400

**From:** vramachandran@dhammalaw.com

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Dan and Jermey,

I will talk to Greg Lindberg tomorrow. We will go through our messages and produce everything that was ever sent to the Special Master and Paladin. We do NOT have anything to hide. We will have our paralegal go through the messages and create a production set.

We expect the government to give us all of the message you ever send ex parte. In any case, we will file a motion to compel forthwith. It's not appropriate for a tribunal to be making decisions based on ex parte submissions. And in the case of the government in a criminal proceeding, that is fatal.

Thank you.

Sincerely,
Vivek

On 2026-08-29 07:50, Vramachandran wrote:
> Dan and Jermey,
>
> The government ( believe Dan Ryan) chose the special master. The
> government (Dan Ryan via edits) made him a receiver ( illegally and
> unconstitutionally with no basis in MVRA and the constitution)over the
> objections of the defendant with threats of filing with or without
> Lindberg.
>
> Then tried to claim in a filing that Greg Lindberg wanted a
> receiver/special master. He did not. The government made the special
> master a part of the plea agreement. Then the government made the
> special master a receiver using characterizations in your email that
> had no basis in facts. Greg Lindberg wanted to retain control so that
> any dissipation was at fair market value. Then the government in a
> filing claimed Greg Lindberg wanted the special master as a receiver
> at the district court just two weeks ago. To claim consent that never
> existed to an illegal taking under the constitution and illegal

> appointment. With that filing the government breached the provisions
> of Hunter and other cases once again. I can\u2019t recall how many other
> times this has happened.The government can hit hard but cannot play
> foul.
>
> The government needs to give us all the ex parte communication. This
> filing from two weeks ago is an independent reason why we need that
> information.
>
> You own the constitutional crisis. The defense is trying to document
> things so that the defendant Greg Lindberg does not end up with
> multiple punishments in the form of restitution again and again
> stemming from the mistakes of the government.
>
> And part of that includes all ex parte communication to the special
> master and the other named entities in the list from the government
> being logged right now before it is dissipated.
>
> On multiple punishments. Already Beckett plus Damovo is 1.5 Billion in
> losses.
>
> Government taking a position that is contrary to DOJ policy in
> pre-restitution order interest is another few million dollars. In all
> that\u2019s one punishment even assuming the faulty figures which have
> never been verified because Defendant does not have the numbers. The
> email from Dan disclaims having the numbers yesterday in some part.
>
> The second punishment was ClanWilliams was sold and the government
> (Dan Ryan) orally with Katten copied on this email on a weekly call/
> phone call claimed it would allow Greg Lindbeg to argue for offsets at
> a price of $800 million. Similar promises by government (Dan Ryan)
> made on a phone call with Katten that NCICs loans would be offsets.
>
> For all of the reasons above Defendant should have access to all ex
> parte communications the government had with the special master,
> Paladin, M3, NCICs, Mike Dinius, Wes Camden and the Mullin law firm.
> To preserve evidence that will be dissipated. Preservation so multiple
> criminal punishments can stop.
>
> When this issue goes to the 4th circuit or the district court.
>
> Jermey,
>
> I have advised you multiple times about conflict. Here is a live
> example.
>
> The government has been told via you that there are severe issues that
> cannot be ignored needing an internal government ethics review. The
> government just does not care to self-correct.
>
> Defendant and his counsel have tried multiple times to bring awareness
> to this issue without success and need to get this on the record.

> After repeated failure.
>
> Sincerely,
> Vivek
>
>> On Aug 29, 2026 at 3:31 AM, <Vramachandran> wrote:
>>
>> Dan,
>>
>> I will follow up every day until I get this from the government.
>> Please give us all of the government\u2019s ex parte communications
>> with the special master, Wes Camden, Williams Mullin, playing, NHC,
>> NCICs and M3.
>>
>> Greg Lindberg has nothing to hide. We are happy to provide all data
>> we shared with the special master. We did indeed share information.
>> We never got back anything from any other party.
>>
>> Prosecutor all Brady/Gigilo info should be shared.
>>
>> Once again we don\u2019t live in the USSR. We don\u2019t have secret
>> courts. We don\u2019t send people to prison using confidential data
>> that defense cannot get under the discovery order.
>>
>> Please follow MVRA and the constitution.
>>
>> Sincerely,
>> Vivek
>>
>> On Aug 28, 2026 at 4:40 PM, <Vramachandran> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>>
>> Sent with Spark [1]
>> On Aug 28, 2026 at 4:40\u202fPM -0400, vramachandran@dhammalaw.com,
>> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will

```
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>
>
> Links:
> ------
> [1] https://sparkmailapp.com/source?from=signature
```

**Date:** Sun, 30 Aug 2026 16:55:47 -0400

**From:** vramachandran@dhammalaw.com

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Jermey,

The reason it should goto up the chain in the DOJ. What was the government representative at the distirct court an in front of the tribunal doing in light of extensive ex-parte communications from M3, NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike Dinius which directly affect the $1.6 Billion restitution?

Why did the government not goto the Judge and let the Judge know about the ex parte communication that was the norm here from everyone. I am still flummoxed having realized the entire proceeding was fundamentally flawed at such a basic level in a criminal proceeding? I was here looking at the constitution and everything else. Judge Rader chief judge of the Federal Circuit had to resign after just one ex-parte contact for something innocuous. Here the contact seems to be so extensive, with no access to any of that data available to the Defendant that I don't know what to make of this.

Why did the government think it was ok to engage in it's own ex parte communications for months on end with a tribunal in a criminal proceedings?

You need to get someone else to look into this so that the government can at least do the right thing moving forward.

Sincerely,
Vivek

On 2026-08-30 16:39, vramachandran@dhammalaw.com wrote:
> Jermey,
>
> This should goto ODAG.
>
> Sincerely,
> Vivek
>

> Dan and Jermey,
>
> Additionally, counsel is unsure what the position of the government
> is:
>
> There are numerous submissions that were entirely ex parte from M3,
> NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike Dinius which
> directly affect the $1.6 Billion restitution or forfiture that were
> never provided to Defendant. Moreover, since these were provided to
> the forum ex parte.
>
> It's like the government which is the party with the burden of proof
> is asking us to ask a tribunal for information that it used to arrive
> at a decision. Since the submissions themselves were ex parte, none of
> this was ever properly before the tribunal. Finally, even if it was
> before a the tribunal, Defendant has never had the ability to test the
> data because it was never shared with the defendant. As already
> provided former counsel and current counsel have looked for all the
> requests and shown when each request was made.
>
> To the extent, government is adopting the results of this ex parte
> data from M3, NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike
> Dinius which directly affect the $1.6 Billion restitution or
> forfeiture, it's the government's burden to give us this information.
> Asking us to go ask a tribunal is a weird position under the law for
> the government in an MVRA dispute. Unless you claim the special master
> is a paid prosecutor.
>
> The government has to disclose all ex parte communication with the
> special master M3, NHC, NCICs, Wes Camden, Willams Mullen law firm
> and/or Mike Dinius. It's independently fatal.
>
> Finally, the Defendant is in a position where it has to petition the
> Judge Cogburn here to give us information from someone in the shoes of
> Magistrate Keesler, because the submissions were made ex parte to
> Magistrate Keesler. This is just not constitutional in a criminal
> proceeding. I don't see how the government gets around ex parte data
> from M3, NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike Dinius
> which directly affect the $1.6 Billion restitution or forfeiture, it's
> the government's burden. For example, NCICs numbers on losses drove
> the restitution 1.6 billion. Similarly, Mike Dinius's numbers drove
> the 1.6 Billion restitution calculations themselves. Each of the 54
> identified categories is related to 1.6 Billion in restitution itself
> or the forfiture.
>
> On the straw man argument the government (Dan Ryan) threw up to
> mislead the court and the 4th circuit:
>
> I spoke to Greg Lindberg today:
> (i) Greg Lindberg has made a handful of submissions to the financial
> advisor to the special master (all of the memos had a cc to the
> special master from his email. All were addressed to the tribunal

> (e.g., with a cc to the special master) and all of which are for
> release to everyone and to the general public. He did not mark Dan
> Ryan or any other government attorney because he was represented by
> counsel and was not sure he could copy the government attorney on
> these submissions.
>   (ii) Greg Lindberg has no issues with submissions to the tribunal
> (special master and his advisors) being given to the government and it
> was always his intention that all of these be available publicly and
> to the government.
>   (iii) Current counsel will forward every email that was sent to the
> tribunal (special master or his advisor) from Greg Lindberg's email to
> the government because none of these were submitted in secret and were
> for wider distribution. There are a handful. All of these were on
> information and belief of Greg Lindberg made available to the
> government at the time through the tribunal and have since been used
> by the government and tribunal in their analysis. In some instances,
> Dan Ryan remarked that Greg Lindberg has given more data than the
> NCICs have while claiming to be a victim.
>   (iv) Everything else referenced in the chronology, were based on
> weekly calls and follow ups for data from those weekly calls that is
> still the government's responsibility to produce. None of these are ex
> parte.
>    (v) Other than these here is no non-privileged emails that Greg
> Lindberg has of any ex parte submissions.
>    (vi) To the extent government claims something else is ex parte,
> current counsel are happy to go look at them but our research over the
> last two days did not turn up anything that Greg Lindberg has other
> than the handful of emails.
>
> Sincerely,
> Vivek
>
> On 2026-08-29 15:48, vramachandran@dhammalaw.com wrote:
>
>> Dan and Jermey,
>>
>> I will talk to Greg Lindberg tomorrow. We will go through our
>> messages and produce everything that was ever sent to the Special
>> Master and Paladin. We do NOT have anything to hide. We will have
>> our paralegal go through the messages and create a production set.
>>
>> We expect the government to give us all of the message you ever send
>> ex parte. In any case, we will file a motion to compel forthwith.
>> It's not appropriate for a tribunal to be making decisions based on
>> ex parte submissions. And in the case of the government in a
>> criminal proceeding, that is fatal.
>>
>> Thank you.
>>
>> Sincerely,
>> Vivek
>>

>> On 2026-08-29 07:50, Vramachandran wrote: Dan and Jermey,
>>
>> The government ( believe Dan Ryan) chose the special master. The
>> government (Dan Ryan via edits) made him a receiver ( illegally and
>> unconstitutionally with no basis in MVRA and the constitution)over
>> the
>> objections of the defendant with threats of filing with or without
>> Lindberg.
>>
>> Then tried to claim in a filing that Greg Lindberg wanted a
>> receiver/special master. He did not. The government made the special
>> master a part of the plea agreement. Then the government made the
>> special master a receiver using characterizations in your email that
>> had no basis in facts. Greg Lindberg wanted to retain control so
>> that
>> any dissipation was at fair market value. Then the government in a
>> filing claimed Greg Lindberg wanted the special master as a receiver
>> at the district court just two weeks ago. To claim consent that
>> never
>> existed to an illegal taking under the constitution and illegal
>> appointment. With that filing the government breached the provisions
>> of Hunter and other cases once again. I can't recall how many other
>> times this has happened.The government can hit hard but cannot play
>> foul.
>>
>> The government needs to give us all the ex parte communication. This
>> filing from two weeks ago is an independent reason why we need that
>> information.
>>
>> You own the constitutional crisis. The defense is trying to document
>> things so that the defendant Greg Lindberg does not end up with
>> multiple punishments in the form of restitution again and again
>> stemming from the mistakes of the government.
>>
>> And part of that includes all ex parte communication to the special
>> master and the other named entities in the list from the government
>> being logged right now before it is dissipated.
>>
>> On multiple punishments. Already Beckett plus Damovo is 1.5 Billion
>> in
>> losses.
>>
>> Government taking a position that is contrary to DOJ policy in
>> pre-restitution order interest is another few million dollars. In
>> all
>> that's one punishment even assuming the faulty figures which have
>> never been verified because Defendant does not have the numbers. The
>> email from Dan disclaims having the numbers yesterday in some part.
>>
>> The second punishment was ClanWilliams was sold and the government
>> (Dan Ryan) orally with Katten copied on this email on a weekly call/
>> phone call claimed it would allow Greg Lindbeg to argue for offsets

>> at
>> a price of $800 million. Similar promises by government (Dan Ryan)
>> made on a phone call with Katten that NCICs loans would be offsets.
>>
>> For all of the reasons above Defendant should have access to all ex
>> parte communications the government had with the special master,
>> Paladin, M3, NCICs, Mike Dinius, Wes Camden and the Mullin law firm.
>> To preserve evidence that will be dissipated. Preservation so
>> multiple
>> criminal punishments can stop.
>>
>> When this issue goes to the 4th circuit or the district court.
>>
>> Jermey,
>>
>> I have advised you multiple times about conflict. Here is a live
>> example.
>>
>> The government has been told via you that there are severe issues
>> that
>> cannot be ignored needing an internal government ethics review. The
>> government just does not care to self-correct.
>>
>> Defendant and his counsel have tried multiple times to bring
>> awareness
>> to this issue without success and need to get this on the record.
>> After repeated failure.
>>
>> Sincerely,
>> Vivek
>>
>> On Aug 29, 2026 at 3:31 AM, <Vramachandran> wrote:
>>
>> Dan,
>>
>> I will follow up every day until I get this from the government.
>> Please give us all of the government's ex parte communications
>> with the special master, Wes Camden, Williams Mullin, playing, NHC,
>> NCICs and M3.
>>
>> Greg Lindberg has nothing to hide. We are happy to provide all data
>> we shared with the special master. We did indeed share information.
>> We never got back anything from any other party.
>>
>> Prosecutor all Brady/Gigilo info should be shared.
>>
>> Once again we don't live in the USSR. We don't have secret
>> courts. We don't send people to prison using confidential data
>> that defense cannot get under the discovery order.
>>
>> Please follow MVRA and the constitution.
>>

```
>> Sincerely,
>> Vivek
>>
>> On Aug 28, 2026 at 4:40 PM, <Vramachandran> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>>
>> Sent with Spark [1 [1]]
>> On Aug 28, 2026 at 4:40\u202fPM -0400, vramachandran@dhammalaw.com,
>> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>>
>> Links:
>> ------
>> [1] https://sparkmailapp.com/source?from=signature
>
>
> Links:
> ------
> [1] https://sparkmailapp.com/source?from=signature
```

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION TO COMPEL THE SPECIAL MASTER TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE AND HIS EX PARTECOMMUNICATIONS, AND TO SET ASIDE HIS REPORT AND FINAL SUPPLEMENT**

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, *Brady v. Maryland* and its progeny, and the Due Process Clause, for an order (1) compelling the Special Master to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those

assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and-confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete record of the defense's demands and the refusals that met them. Counsel would be

remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

At the outset, the Defendant recognizes that a motion to compel a special master to disclose the information before him is unusual—because, in the ordinary course, it should never be necessary. When data is placed before a master, it is shared with the parties: the Government and the Defendant alike. The master's record is the parties' record; that is a basic incident of the reference authorized by the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and of due process, and it is why a party rarely has to move to compel the very officer deciding its case to reveal what he relied upon. In this proceeding, that never happened. The data underlying the loss and valuation figures was placed before the Special Master ex parte and was never shared with the Defendant—not at the time, and not since.

The Government sought to obscure this by trading on a change in defense counsel. When the Defendant's current counsel demanded the data, the Government represented that it had all been provided to the Defendant's former counsel, Katten Muchin Rosenman. Current counsel then did exactly what that representation invited: they asked former counsel. Former counsel searched and—far from confirming the Government's account—helped current counsel identify, item by item, the materials that had never been turned over to the Defendant at all. The Government's premise thus collapsed: the records confirm that the data current counsel seeks was never produced to former counsel either. Confronted with that, the Government did not produce the data. It shifted ground, asserting instead that it had

met its discovery obligations—an assertion it advanced knowing that its effort to blame former counsel had backfired, and that former counsel had helped current counsel pinpoint the very data the Special Master and the Government never produced.

The timing confirms that nothing has been waived. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026. It was the Government's own emails, representing that the data had all been provided to former counsel, that prompted current counsel to run the point to ground; and it was that inquiry—asking former counsel and searching the files—that revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master: from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others, on which the loss and valuation figures were built. The unconstitutional, one-sided character of the proceeding thus became known to current counsel only days ago, as a direct consequence of the Government's own representation. A challenge asserted within days of learning the facts that give rise to it is timely; the ex parte and due process issues are preserved, not forfeited.

## I. The Special Master and the custodians subject to his authority hold the data; as the Court's own appointee he must produce it, and the Court has full supervisory authority to compel him.

The loss and valuation figures rest on data the Special Master and his financial advisor, Paladin Management Group, developed and hold, together with the

interested custodians subject to his authority—NHC Holdings, LLC, the North Carolina insurance companies, M3, and Michael Dinius. The Defendant does not have that data; the Court has only figures filed under seal, with no underlying data; and the Government has disclaimed possession of it. The Special Master and those custodians are the sole remaining source. The Special Master is the Court's own appointee under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the Court retains inherent supervisory authority over its own officer to direct him to produce the data, methodology, valuations, offsets, credits, and communications underlying the figures he recommended, and to place them on the Court's record. He has stated that he would produce "documents in [his] possession" only "under a confidentiality agreement," or upon "a court order compelling" production. Ex. A (Martinez email, Aug. 17, 2026). The Court should now enter that order.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served

a written, itemized demand for the data. The Government first said the Defendant already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the

defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August 15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality agreement," the Government's "reserving [its] position," and the Special Master's one-word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The

Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its

burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

## II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has

not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies—told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the

proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that—information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever being disclosed to the Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested

third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

## III. In a criminal proceeding no ex parte communication with the adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production

cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," *Edgar*, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. § 3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the

decisionmaker saw and that the defendant was never permitted to examine, test, or rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures, constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

## IV. It makes no difference whether the Special Master is treated as a neutral or as an arm of the prosecution.

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, *Kyles v. Whitley*, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment.

Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

## V. The ex parte communications are Brady and Giglio material the Defendant is entitled to receive.

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, *Cone v. Bell*, 556 U.S. 449 (2009); restitution is punishment, *Ellingburg*. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, *Kyles*, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. *See* Ex. A; Affidavit of Greg E. Lindberg.

## VI. The manner of the liquidations was hidden, and the new report's lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets

available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity—were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why—whether the decline is attributable to the offense or to the Special Master's own post-transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post-transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or

eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, *Honeycutt v. United States*, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value

dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

## VII. The forty-seven categories of data the Special Master must produce.

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.
2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.
3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.

4. The low/middle/high figures filed under seal in July 2026, and all data behind them.
5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.
6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.
7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.
9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.
10. The repayment data and loan-balance base data used as the starting point.
11. All LoanIQ screenshots, exports, and outputs.
12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.
13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.
14. The ULICO reconciliation.
15. The iteration history of the loss memoranda (approximately $2.9 billion to approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.

17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.

18. The terms of the agreed Clanwilliam offset and the valuation data applying it.

19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.

20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero-coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).

21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.

22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.

24. All NHC board books.

25. All board minutes, financial reports, and financial presentations for the companies.

26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

## VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

## IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own

conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; *Timbs v. Indiana*, 586 U.S. 146 (2019); *United States v. Bajakajian*, 524 U.S. 321 (1998). The Court cannot gauge either danger, and the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Special Master (1) to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those

assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009); *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications, and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

# EXHIBIT 10

Defendant's Motion for Reconsideration of the Order of August 31, 2026 (Doc. 330), and Notice of Preserved and Unanswered Issues

No. 3:23-cr-48, Doc. 347 (W.D.N.C. Sept. 14, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION FOR RECONSIDERATION OF THE ORDER OF AUGUST 31, 2026 (DOC. 330), AND NOTICE OF PRESERVED AND UNANSWERED ISSUES**

Defendant Greg E. Lindberg respectfully moves the Court to reconsider its Order signed August 28, 2026 and entered August 31, 2026 (Doc. 330) (the "Order"), which denied his Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269) and his Second Motion to Set Aside (Doc. 278). Reconsideration is warranted because the Order works a manifest injustice: it denies relief on factual premises that the record does not support and that, in several instances, the record affirmatively contradicts, and it does so without addressing the filing in which those premises were answered. For the reasons set forth below, the Motion should be granted and the matter set for hearing.[1]

[1] Defendant's Motion for a Determination That No Restitution Is Owed (Doc. 234) remains pending and is not re-argued here; the merits of causation, offsets, and credits are addressed there, in the Reply supporting it (Doc. 300), and in Defendant's Response to the Government's Consolidated Position (Doc. 316). This Motion is directed to the Order and to the record on which it rests. The

## INTRODUCTION

The Order rests on a series of statements about the record that the record does not support. It treats a stipulation offered at sentencing to establish the factual basis for the plea, and to permit application of the Guidelines, as an admission of the Presentence Report's restitution narrative—when the Presentence Report itself said the restitution amount was "currently unknown," when Defendant had filed written objections to the Presentence Report (Doc. 62) and a thirty-two-page objection to the restitution numbers (Doc. 132), and when counsel reserved every restitution objection on the record minutes later. It states that Defendant "admitted, and the evidence shows," that he "fraudulently caused [the insurers] to swap cash and high-quality, liquid investments with his own illiquid affiliated investments," Doc. 330, at 10—an admission that appears nowhere in the Factual Basis the Order itself quotes, and a finding for which the Order cites no evidence. It describes the Special-Master reference as Defendant's proposal, on the strength of the Government's exhibit alone, without mentioning the sworn declaration and the Government's own e-mails and redlines establishing that the prosecutor drafted the operative order and rejected nearly every change Defendant proposed. And it recites that "[t]he Government has filed a brief in opposition," Doc. 330, at 1, citing the Special Master's response (Doc. 288) and the Government's Consolidated Position (Doc. 308)—while never citing Defendant's eighty-five-page Response to that Consolidated Position (Doc. 316), filed

Order was entered in No. 5:19-CR-22 and docketed in this case at the Court's direction, Doc. 330, at 12; this Motion is filed in both cases.

five days before the Order was signed, which answers each argument the Order adopts.

These are not peripheral errors. Each is a premise on which the Order's denial of relief depends, and each concerns what Defendant did or did not admit and contest. A sentence and a restitution award "founded at least in part upon misinformation of constitutional magnitude" cannot stand, *United States v. Tucker*, 404 U.S. 443, 447 (1972), and a court may not pronounce judgment on "assumptions . . . which were materially untrue." *Townsend v. Burke*, 334 U.S. 736, 741 (1948). Defendant says this plainly because the record compels it: to preserve a sentence and a restitution figure that rest on a tainted process, the Order resorts to statements about the facts of the case, and about what Defendant admitted, that this Court's own docket does not support.

Part I identifies each unsupported statement and sets the record against it. Part II sets out the answers the Order does not consider—Defendant's Response to the Government's Consolidated Position (Doc. 316) and the portions of his Reply (Doc. 292) the Order does not reach. Part III incorporates the Addendum of preserved issues and explains why, after three declined opportunities, the Government and the Special Master may not now be given a fourth.

## LEGAL STANDARD

The Order is interlocutory. It states that the Court "will issue a separate order addressing the specific objections to the restitution amounts" and "will enter a separate final Order on the amount of restitution owed." Doc. 330, at 12. No final

order of restitution has been entered, and the Court had already determined that restitution would be finalized "after any necessary hearings on such issues." Doc. 108 ¶ 15. "[A] district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). Reconsideration is warranted where, among other grounds, "the prior decision was clearly erroneous and would work manifest injustice." *Id.* at 515 (quoting *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)). The Supreme Court has long recognized "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors" in criminal cases. *United States v. Dieter*, 429 U.S. 6, 8 (1976) (per curiam).[2]

The ground for reconsideration here is manifest injustice: the Order denies constitutional and statutory relief on factual premises the record does not support. Where a sentencing court relies on a disputed matter, it "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(B). In restitution proceedings, "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with "[t]he burden of demonstrating the amount of the loss sustained by a victim . . . on the attorney for the Government." 18 U.S.C. § 3664(e). A denial of relief that proceeds as if there were

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

no dispute—when the docket shows the dispute was raised, briefed, and reserved—cannot be reconciled with either rule.

## I. THE ORDER RESTS ON STATEMENTS ABOUT THE RECORD THAT THE RECORD DOES NOT SUPPORT

### A. The Order converts a sentencing-hearing stipulation to the factual basis and the Guidelines into a withdrawal of every restitution objection (Doc. 330, at 2, 10).

The Order states that "[a]t his sentencing hearing, Defendant agreed that the Court could use the offense conduct set forth in the presentence report for sentencing and indicated he had no objections to its contents," Doc. 330, at 2 (citing Doc. 234-52, at 6–8), and later relies on "the presentence investigation report, to which Defendant did not object," as having "found" the facts on which the restitution award rests. *Id.* at 10. The transcript shows what was actually said, and it does not bear the weight the Order places on it.

The Court asked: "Does the defense agree that the Court may use the offense conduct set forth in the presentence report to form the factual basis for this?" Counsel answered "Yes, Your Honor," and the Court, "[b]ased upon that stipulation," found "a factual basis for the entry of the plea of guilty." Sentencing Tr. 6:2–12 (May 26, 2026) (Doc. 234-52). Asked whether there were "any objections to the presentence report *today*," counsel answered "None at this time, Your Honor," and the Court stated that it would "adopt the information contained in the presentence report for the purpose of applying the guidelines." *Id.* at 7:4–12. That is the whole of the exchange. The stipulation was to the factual basis for the plea; the adoption was "for the purpose of applying the guidelines." Neither was a stipulation to any loss amount, to any

restitution figure, or to the Presentence Report's narrative as proof of proximately caused loss under 18 U.S.C. § 3664(e). The only admission Defendant made is the Factual Basis, Doc. 42, and the colloquy did not enlarge it. Counsel's agreement that the Court could use the Report's offense conduct "to form the factual basis" was an agreement about the source the Court could consult under Rule 11(b)(3) for a plea already entered on the written Factual Basis; it was confined by its terms to the offense-conduct section, and the adoption of the Report that followed was confined by its terms to "the purpose of applying the guidelines." Neither was an admission of loss, of causation, or of restitution, and neither could have been, because the Report itself said restitution was unknown. And even the offense conduct, taken as written, does not contain the sentence the Order attributes to it. Part I.D, *infra*. The Presentence Report itself, as the Order quotes it, stated that "the exact amount of restitution owed . . . is currently unknown." Doc. 330, at 2 (quoting PSR ¶ 110).

Counsel withdrew nothing at the hearing. The Court's question was confined to objections "today," and the answer was confined to "this time." Sentencing Tr. 7:4–6. That is a statement about timing, not a relinquishment, and the Court's response matched it: the report was adopted "for the purpose of applying the guidelines," *id.* at 7:10–12, not for the purpose of fixing restitution. The word "withdraw" does not appear anywhere in the transcript with respect to the Presentence Report in this case. A waiver is "the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). An answer limited by its own terms to "this time," given by the same

lawyer who, later in the same hearing, announced on the record that the restitution order was "obviously subject to the objections of numerous parties and further hearings with the Court," Sentencing Tr. 66:20–22, is the opposite of an intentional relinquishment. The Order reads "[n]one at this time" as if counsel had said "none," and then reads "none" as if counsel had said "withdrawn." The transcript supports neither step.[3]

Every other participant in the hearing understood the point the same way, and said so on the record. The Government asked the Court to enter the preliminary order of restitution "understanding that, within the next 90 days, people are going to want to be heard about aspects of that." Sentencing Tr. 66:10–12. Defense counsel answered that the order was "obviously subject to the objections of numerous parties and further hearings with the Court." *Id.* at 66:20–22. And the Court entered it on exactly that footing: "certainly there may be some additional litigation over that, but the Fourth Circuit wants us to order forfeiture, even when there's a contest about the amounts to later be determined," *id.* at 66:23–67:2, ordering the amount "at this time, understanding that there may be some dispute." *Id.* at 67:16–17. The Government, the defense, and the Court thus each placed on the record, within two pages of transcript, that the restitution amounts were contested and would be "later . . . determined." An order entered on the express understanding that "there's a contest about the amounts" cannot, three months later, be recast as a finding that the

[3] The flat answers "No, Your Honor" that follow, Sentencing Tr. 7:24–8:1, 8:24–25, concern the presentence report and the Guidelines range in the public-corruption case, No. 5:19-CR-22, *see id.* at 7:20–8:12, not the restitution narrative in this case. The Order's citation to "Doc. No. 234-52 at 6–8" spans both exchanges without distinguishing them.

amounts were conceded—still less on the strength of an answer given earlier in the same hearing that was limited to "this time."[4]

Nor was the Presentence Report unobjected-to. The draft report issued March 6, 2025, with objections due March 20, 2025. Doc. 57. Defendant twice moved, unopposed, for additional time to object, and the Court granted both motions. Docs. 58, 59, 60, 61. On May 21, 2025, Defendant filed his Objections to the Presentence Investigation Report, the written objection the Order does not mention. Doc. 62. Defendant does not dispute that the Guidelines loss figure was fixed by the plea: the parties jointly recommended the thirty-level enhancement, Doc. 40 ¶ 8(a), and the objections said so. Doc. 62, at 2. But the same plea provision stated that Guidelines "loss" "may be different from, greater, or lesser than restitution," Doc. 40 ¶ 8(a), and the objections drew exactly that line. They told the Court that the sentencing issues had first been argued "at a time when the government believed there to be a 'billion dollar' loss. We now know there is no such loss," Doc. 62, at 2; that the enhancement "based on the 'foreseeable' loss amount of $550,000,000 substantially overstates the seriousness of the offense," *id.*; that there was no "permanent deprivation of over a half billion dollars in assets," but a delay in payment backed by Defendant's personal guarantee of every affiliated loan and by assigned assets "well in excess of the amount required for any restitution obligation," *id.* at 2–4; and that "the loss amount [was] overstated in this case," *id.* at 5. And on restitution they objected outright: because

[4] The Court also gave notice at the same hearing "that this case may involve other defendants who may be held jointly and severally liable for payments of all or part of the restitution ordered." Sentencing Tr. 67:21–24. The allocation of any loss among the co-conspirators charged in this and related proceedings, 18 U.S.C. § 3664(h), is another matter the hearing left open.

the Report left the restitution amount "currently unknown" pending the Special Master's work, Defendant objected to the Report being finalized before the Special Master's findings and asked that he "be given a renewed opportunity to object to the total restitution calculated in the final PSR as well as be given an opportunity to present credits." *Id.* at 7–8. The Probation Office's answer to that objection is in the final Report's Addendum, and it is the opposite of a finding: the Government "bears the burden of presenting any restitution requests to the Court prior to, at sentencing, or post sentencing depending on the Court's order." Doc. 63, at 55 (Addendum, Objection Three); *see id.* ¶ 112. No such opportunity was ever afforded: the final Report deferred restitution to the Special Master's findings, the Court bifurcated it, Doc. 108, and the restitution hearing never took place. Part I.J, *infra.*[5]

On May 4, 2026, he filed a thirty-two-page Response and Objection to the Special Master's Report—objecting that the restitution figure is "overinflated," that interest must be excluded, that the principal balances must be reduced, that at least $740 million in additional credits are mandatory, that restitution must be limited to losses proximately caused, and that the Sixth Amendment requires a jury—and showing that "if the Court were to sustain all of Mr. Lindberg's objections, the

[5] The delay in payment that the objections described was itself precipitated by intervening causes, not by the offense. Weeks after Defendant learned of the investigation, he signed an exclusive letter of intent to sell the North Carolina insurers to Ares Management for approximately $450 million, a transaction Ares abandoned after a meeting with the Department of Justice; the Rehabilitator then rejected the Oaktree transaction that would have paid the affiliated loans off in full, imposed a ten-year hold on those loans, sold the zero-coupon bond portfolio before maturity at roughly thirty-nine cents on the dollar, litigated against the Montshire/Alban purchasers rather than transact with them, and rejected the Quadro transaction. Doc. 234, at 10–11, 24–31; Doc. 316, at 40–41, 50–52; *see* Part I.D, *infra* (setting out that record); Part II.H, *infra*. Each of those events came after control had passed from Defendant, and each is documented by contemporaneous exhibits the Government has never addressed.

restitution owed is zero." Doc. 132, at 3, 7–25. On May 14, 2026, his Sentencing Memorandum preserved the objection that "the loss amount in the Presentence Report substantially overstates the seriousness of the offense," and relied on Doc. 132 for the proposition that "full restitution has already been paid." Doc. 145, at 16, 28–29. The only withdrawal of Presentence Report objections anywhere in the record is the written one in that memorandum, and by its terms it withdrew only objections "other than those mentioned above and briefed in this Memorandum." *Id.* at 29. The overstatement of loss was the first of the grounds "mentioned above," and it was kept. The restitution objections in Doc. 132 were not objections to the Presentence Report at all; they were objections to the Special Master's Report, they were never withdrawn, and the memorandum relied on them. A written withdrawal that carves out the loss ground cannot be read as a withdrawal of it, and it cannot withdraw restitution objections it never addressed. What the plea and the sentencing resolved was the Guidelines figure. What they did not resolve—what every document in the sequence expressly deferred—was restitution: its amount, its causation, and the credits against it.

The Rules draw the same line the parties drew. A sentencing court "may accept any undisputed portion of the presentence report as a finding of fact," but "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(A), (B). The restitution portions of the report were objected to and reserved in writing before the hearing (Doc. 62, at 7–8; Docs. 132, 145), the loss figure was disputed as

overstated (Doc. 62, at 2–5; Doc. 145, at 28–29), both were reserved orally at the hearing (Sentencing Tr. 66:20–22), acknowledged by the Government and the Court to be contested (Tr. 66:10–12, 66:23–67:2, 67:16–17), and set for later determination by the Court's own bifurcation order (Doc. 108). They were never "undisputed," and a report's recital of a disputed figure is not a finding under Rule 32(i)(3)(A). The Order's statement that the report "found" the restitution facts, Doc. 330, at 10, is therefore reliance on a finding that was never made. And because "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with the burden "on the attorney for the Government," 18 U.S.C. § 3664(e), a stipulation given "for the purpose of applying the guidelines" cannot discharge a burden the statute places on the Government at a hearing that has not been held.

The Factual Basis, the only document in which Defendant admitted facts under penalty of perjury, reserved exactly this. It provides that "[t]he parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis," and that the defendant "may submit . . . a response to the 'Statement of Relevant Conduct.'" Doc. 42, at 1. The Order quotes the Factual Basis, Doc. 330, at 2, but not that reservation.[6]

[6] Before sentencing, the parties jointly represented that "[t]he restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims," that they "may require a lengthy hearing or hearings," and that sentencing should proceed "before any necessary hearings to finalize restitution." Doc. 107 ¶¶ 8, 12. The Court adopted those findings and ordered that "[f]ollowing the sentencing hearing, the Court will schedule one or more hearings (if necessary) to finalize restitution." Doc. 108 ¶¶ 8, 12, 15 & at 4. A figure the parties jointly told the Court would require "a lengthy hearing or hearings" to resolve was not agreed at the sentencing hearing that preceded them.

### B. The Order treats the Presentence Report's restitution estimate as a finding (Doc. 330, at 2, 10).

The Order recites as "facts" that the co-conspirators "caused Defendant's insurance companies . . . to invest more than $2 billion in loans and other securities," that "[t]he vast majority of these obligations remain unpaid," and that restitution "likely exceeds $2 billion." Doc. 330, at 2, 10 (quoting PSR ¶¶ 103(f), 110). Those passages are the Government's Statement of Relevant Conduct as adopted by the Probation Office; the approximately $2 billion figure was the Government's opening position, not a determination of this Court. The Special Master's own recommendation came in at approximately $1.655 billion, Doc. 106; Doc. 161; Defendant's objections place the figure at zero, Doc. 132, at 3. Nor was the figure accepted at sentencing by anyone. Defendant's Sentencing Memorandum argued that "[t]he Fraud Guidelines Drastically Overstate the Seriousness of the Offense" and that "the loss amount in the Presentence Report substantially overstates the seriousness of the offense." Doc. 145, at 28–29. At the hearing, counsel pressed the same point as a ground for variance—"the overstatement of loss. When 90 percent of the relevant assets go into other assets . . . then the guideline figure for loss overstates the loss"—Sentencing Tr. 18:24–19:6; the Government conceded it—"we agree that the loss overstates, which is why we offered the 15-year cap," *id.* at 37:4–7; and the Court so found: "the loss was overstated . . . because the real loss there was risk. It all could have been lost, but it wasn't all lost." *Id.* at 47:20–23. A figure the defense disputed, the Government conceded was overstated, and the Court found overstated is not a fact the Court "found" to be the loss. Nor did the figure ever receive the credit

the Guidelines themselves require for collateral. Under the commentary to § 2B1.1, "[l]oss shall be reduced by" the credits it lists, and "[i]n a case involving collateral pledged or otherwise provided by the defendant," the credit is "the amount the victim has recovered at the time of sentencing from disposition of that collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *see United States v. Rice*, 551 F. App'x 656, 664–65 (4th Cir. 2014) (per curiam) (unpublished) (quoting the note); *United States v. Camp*, 566 F. App'x 226, 229 (4th Cir. 2014) (per curiam) (unpublished) (same). The affiliated loans here were collateralized: by the zero-coupon principal-protected bond portfolio, with a contractual par value of $1,006,239,867, that the Rehabilitator sold before maturity for approximately $394 million, and by the special-purpose-vehicle and trust structures the Department reviewed. Doc. 234, at 11; Doc. 295; Doc. 316, at 49. The Presentence Report's loss figure credited neither the amount recovered from disposition of that collateral nor the fair market value of the collateral still held; it applied the thirty-level enhancement to the gross figure, PSR ¶¶ 107, 128, and the Court never ruled on the credit. Counsel raised the value returned and held at sentencing: Defendant came before the Court "with a billion dollars of restitution that's been paid, with another close to a billion dollars on the Department of Insurance books that can be used to pay the guaranty associations," Sentencing Tr. 18:11–14, and "should be credited substantially for his efforts in paying restitution," *id.* at 52:1–6; the Government agreed that the North Carolina policyholders "by and large at this point in time have

been repaid," *id.* at 34:5–8. The Sentencing Memorandum set out "well over $500 million in payments credited by the Special Master and an additional $2.889 billion in payments, transfers, and credits," and showed that, with the offsets and credits, "full restitution has already been paid." Doc. 145, at 14–16 (relying on Doc. 132). Defendant's agreement to recommend a Guidelines loss finding above $550 million, Doc. 40 ¶ 8(a), was made on the express understanding that Guidelines "loss" "may be different from, greater, or lesser than restitution," *id.*, and it is the restitution figure, not the Guidelines threshold, that the Order fixed. A loss figure that was never reduced for the collateral, with the credits reserved in writing, Doc. 62, at 7–8; Doc. 132; Doc. 145, at 29, and at the hearing, and never ruled on, cannot be the "found" loss on which restitution is fixed. That a balance "remain[s] unpaid" is a statement of status, not of cause: the balances remain unpaid because the transactions that would have retired them were blocked after Defendant ceded control, Doc. 316, at 40–41, 50–52; Doc. 234, at 6–11—a matter the Order does not address. Nor are the policyholders unpaid. The Special Master's own status report for May and June 2026 records that, under the Clanwilliam Order, he "issued 43,793 checks to the NCICs' Policyholders with Uncovered Claims in the aggregate amount of $157,989,655"—the full amount calculated as due to every North Carolina policyholder whose claim was not covered by a guaranty association—of which approximately 96% by amount had cleared by June 30, and that he "paid the remainder of the North Carolina Insurance Companies' share of the Clanwilliam proceeds directly to the NCICs." Doc. 262, at 1–2, 6. The Government told the Court at sentencing that the North Carolina

policyholders "by and large at this point in time have been repaid, and that debt now sits with the state guaranty associations." Sentencing Tr. 34:5–8. The policyholders with covered claims have been paid by the guaranty associations; the policyholders with uncovered claims have been paid by the Special Master; the insurers themselves received the balance. The policyholders the Order invokes have been paid. And the "$2 billion" narrative omits the other side of the ledger, which is sworn and unrebutted. Defendant's sworn statement of facts documents, entity by entity and with source documentation, a total investment of $963 million of his own capital in the insurance group from 2014 to 2018, and no dividends taken from the insurers, Doc. 235 ¶ 4 & Ex. A11; Berkeley Research Group's independent analysis confirms "capital contributions, consisting of cash infusions, foregone dividends and certain non-cash transactions, amount[ing] to at least $377 million" and no dividends to Defendant or any affiliate, *id.* ¶ 5 & Ex. D; KPMG's August 2018 work put the aggregate fair value of the insurance entities at approximately $1.08 billion less than sixty days before control passed to state supervision, *id.* ¶¶ 14–15 & Exs. A11, E2; Defendant personally guaranteed the affiliates' obligations to the insurers—approximately $2.39 billion—under the March 11, 2019 Amended and Restated Backstop Agreement, with no regulatory requirement to do so, *id.* ¶ 6 & Ex. B22; Doc. 234, at 5; and in 2018 the insurers held, at his direction, zero-coupon bonds with a par value of $1,006,239,867 inside principal-protected notes, as dollar-for-dollar principal insurance that, held to maturity, would have repaid the affiliated-loan principal in full, Doc. 235 ¶ 7 & Ex. H2; Doc. 234, at 5; Doc. 316, at 41, 55; Doc. 300,

at 25. That capital was a first-loss cushion "that would be exhausted before any protected policyholder or creditor bore a dollar." Doc. 316, at 41. A person who foresees the loss the Order attributes to him does not invest a billion dollars of his own money ahead of it, guarantee billions more, and buy a billion dollars of principal protection. Those facts are also irreconcilable with the loss the Order attributes to the offense: an insurance group independently valued at approximately $1.08 billion sixty days before control passed to the State, with a billion dollars of the defendant's own capital standing first in line for any loss and a billion dollars of principal protection behind the affiliated loans, was not carrying a $1.655 billion loss when the defendant's control ended. Whatever value was lost thereafter was lost under the control of others, in the events Part I.D describes. The Order mentions none of this. Under Rule 32(i)(3)(B) the Court was required either to rule on those disputes or to determine that a ruling was unnecessary; under § 3664(e) the Government bore the burden of proving each disputed amount. Neither has occurred.

**1. Preservation for the Fourth Circuit only: the disputed loss figure and the term of imprisonment.**

What follows is stated expressly and solely for preservation. The term of imprisonment and the manner in which the disputed loss figure fixed it are the subject of Defendant's pending appeal to the Fourth Circuit, Nos. 26-4309 and 26-4310; the issue is preserved for that appeal; and it is not open for argument by the Government in this Court, nor presented for decision here. It is recorded only so that the connection between the restitution figure the Order treats as "found" and the sentence under review is on the record of this motion.

The consequence reaches the sentence itself. On the loss figure the Government adopted, the Presentence Report added a thirty-level enhancement for a loss exceeding $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P), producing a Guidelines range the Court described as "actually about 540 months." Sentencing Tr. 55:23–24; PSR ¶¶ 107, 128, 178; Doc. 152, at 8, 10–11. The Court then imposed sixty months on Count One and "84 months to run consecutive to the 60 months, to produce a sentence of 144 months." Sentencing Tr. 61–62; Doc. 162. It did so notwithstanding its own earlier assurance, after the May 2024 retrial, that it viewed the financial and public-corruption cases as "overarching cases," "all [] part of the same parcel," and that "[i]t's not one where the Court is going to go and try to be stacking stuff," Trial Tr. 1032:19–24 (May 15, 2024) (No. 5:19-cr-22, Doc. 450), quoted in Doc. 145, at 6, 17—an assurance on which the Sentencing Memorandum expressly relied—and over counsel's objection at the hearing that the Government, "through a concurrent structure, asks this Court to stack sentences" and "to double the original sentence." Sentencing Tr. 18:19–21. The same disputed numbers thus fixed both the term of imprisonment and the restitution figure. The term of imprisonment, and the consecutive structure that produced it, are before the Fourth Circuit, Nos. 26-4309 and 26-4310 (Doc. 192). Defendant does not ask this Court to revisit either here; these facts are stated for the record and for preservation only. The point for present purposes is that the Order treats as "found" a figure whose validity is under review

in the court of appeals, and that the restitution determination cannot rest on it as settled.[7]

### C. The Order's account of the origin of the Special-Master reference rests on the Government's exhibit alone and omits the sworn record (Doc. 330, at 3).

The Order states that "Defendant's counsel submitted an initial draft of the motion to the Government on October 18, 2024," that "Defendant originally proposed that Scott Avila of the Paladin Group serve as Special Master," that "the parties compromised," that the Court "issued an order in the form jointly proposed by the parties," and that "Defendant did not object." Doc. 330, at 3 (citing Doc. 308-1). Every one of those statements is drawn from the Government's exhibit to its Consolidated Position. None of them engages the sworn declaration and the Government's own e-mails and redlines that Defendant placed in the record in response. Lindberg Plea & Appointment Decl. ¶¶ 3–4, 8–10 (Doc. 316-1, Tab B); Def. Ex. 2, Tabs B, D, E (Doc. 316-2); *see* Doc. 316, at 23–25, 31–32; Doc. 292, at 15–16.

That record shows the following. The special-master clause of the plea agreement was inserted by the Government's prosecutor; the plea's tracked changes attribute the insertion to Assistant United States Attorney Daniel Ryan. Doc. 316, at

---

[7] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

31. The Government recruited the officer, asking defense counsel to "consider this Charlotte-based firm for the role as special master." *Id.* at 25 (citing Def. Ex. 2, Tab D). When the defense proposed language that would have cabined the officer's authority, Mr. Ryan refused, insisting that Defendant was "supposed to be giving up 'exclusive possession and control' of these assets to the government's satisfaction in order to get the benefit of the plea agreement," that the Government "will not agree to any such efforts," and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims." *Id.* (quoting Dec. 18, 2024 e-mail of AUSA Daniel Ryan, Def. Ex. 2, Tab E). The Government rejected nearly all of the changes proposed on Defendant's behalf—including his request that the order impose a fiduciary duty to all stakeholders—"took control of the draft, and produced the operative order itself," and made clear it would file "competing memos and proposed orders" if the defense did not agree. *Id.* at 25; Doc. 292, at 15–16. The provision that converted a § 3664(d)(6) fact-finder into a receiver—the authority to "assume Defendant's and/or Global Growth's authority . . . to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors"—appears in the Government's red-lined edits, not the defense's. Doc. 316, at 32. Defendant did not see the final draft before it was filed. Lindberg Plea & Appointment Decl. ¶ 10.

An order the prosecution drafted, over the defense's objection, and filed on its own schedule is the Government's work product, not Defendant's consent. The

Order's contrary account is not a finding on conflicting evidence; it is an adoption of one side's exhibit without mention of the other side's sworn response.

**D. The Order states that Defendant "admitted, and the evidence shows," that he "fraudulently caused" the insurers "to swap cash and high-quality, liquid investments with his own illiquid affiliated investments" and thereby "proximately caused" their losses (Doc. 330, at 10–11). No such admission exists, no evidence is cited, and the intervening causes of record are never addressed.**

The Order's central finding on causation is this: "Defendant admitted, and the evidence shows, that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments." Doc. 330, at 10; *see id.* at 11 ("after he fraudulently took the insurance companies' money"). Defendant pleaded guilty to two conspiracy counts—Count One, conspiracy under 18 U.S.C. § 371 to commit offenses under 18 U.S.C. §§ 1033 and 1343 and 15 U.S.C. §§ 80b-6 and 80b-17, and Count Thirteen, money-laundering conspiracy under 18 U.S.C. § 1956(h)—each of which incorporates the same paragraphs 1 through 186 of the Indictment, Doc. 1 ¶¶ 187–188, 201–202, and he admitted, under penalty of perjury, the facts in the Factual Basis, which the Order quotes in full: that "Defendant and others engaged in circular, non-economic transactions among Defendant's web of entities using insurance company funds," that materially misleading statements were made "regarding these transactions," and that his "conduct caused substantial financial hardship." Doc. 330, at 2 (quoting Doc. 42 ¶¶ 5–6). That is the admission. The sentencing colloquy did not add to it, Part I.A, *supra*,

and even the Report's offense conduct, which counsel agreed the Court could consult for the Rule 11 factual basis, does not contain the sentence the Order attributes to it. **What must be highlighted is what that admission does not contain.** It contains no admission of any loss amount; no admission that any identified victim's loss—still less the $1.655 billion the Special Master recommends—was proximately caused by the conduct admitted; no admission that any loss was foreseeable when the affiliated loans were made; and no admission that the later, regulator-reviewed disaffiliation restructurings were themselves fraudulent. An admission of "hardship" is not an admission of the amount of each victim's loss or of its cause, Doc. 316, at 41–47, and a stipulation to the factual basis for a guilty plea is not a finding under 18 U.S.C. § 3664(e) that particular losses were caused by the offense. The Factual Basis itself reserved the right to contest every fact outside it. Doc. 42, at 1.

The specific proposition the Order attributes to the plea—that Defendant caused the insurers "to swap cash and high-quality, liquid investments with his own illiquid affiliated investments"—appears in no document Defendant signed, stipulated to, or pleaded to. The Factual Basis—the statement of facts Defendant stipulated to as the basis for his plea, Doc. 40 ¶ 12—contains none of the words "swap," "cash," "high-quality," "liquid," or "illiquid." Doc. 42. The Indictment, to which Defendant pleaded guilty "as alleged," *id.* at 1, uses the word "swap" in two paragraphs, and both describe something else: co-conspirators, "with his approval, caused the FinCos to 'swap' various assets among themselves and other Affiliated Companies in an effort to improve the ratings from HR Ratings for some FinCos at

the expense of others." Doc. 1 ¶¶ 157–158. Those were exchanges of assets among the finance companies to affect a rating, not an exchange of the insurers' cash and liquid securities for affiliated paper.[8]

And the one Presentence Report paragraph the Order cites for the point, ¶ 103(f), says that the co-conspirators caused the insurers "to invest more than $2 billion in loans and other securities in other [Defendant] companies." Doc. 330, at 10. It does not say "swap," "cash," "high-quality," "liquid," or "illiquid" either. The sentence at page 10 is the Order's, not Defendant's.

The sentence has a source, and the source is not the record. It is the Government's Consolidated Position. There, at page 20, the Government argued: "[H]is assertions misconstrue the meaning of proximate cause. LINDBERG proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high quality, liquid investments with his opaque, illiquid affiliated investments. As set forth in the offense conduct of the PSR, to which LINDBERG did not object, LINDBERG 'caused LINDBERG's insurance companies . . . to invest more than $2 billion in loans and other securities in other LINDBERG companies. The vast majority of these obligations remain unpaid.' (See, e.g., Doc. 63 ¶ 103(f)). LINDBERG wants the Court to focus on what happened after he fraudulently took the insurance companies' money, but that misconstrues the proximate cause inquiry." Doc. 308, at 20. The Order, at pages 10

[8] Such exchanges of assets among affiliated finance companies to improve or maintain the ratings of their obligations were standard practice in the insurance industry during the low-interest-rate regime of the period.

and 11, reads: "Defendant's assertions misconstrue the meaning of proximate cause. Defendant admitted, and the evidence shows, that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments. Indeed, the presentence investigation report, to which Defendant did not object, found that Defendant 'caused Defendant's insurance companies . . . to invest more than $2 billion in loans and other securities in other Defendant companies. The vast majority of these obligations remain unpaid.' (See, e.g., No. 3:23cr48, Doc. No. 63 ¶ 103(f))," and, a sentence later: "As the Government notes, in focusing on what happened after he fraudulently took the insurance companies' money, Defendant misconstrues the proximate cause inquiry." Doc. 330, at 10–11. The Order's account of the sentencing hearing at page 2 is likewise the Consolidated Position's account at page 10, reproduced word for word, down to the citation. *Compare* Doc. 308, at 10, *with* Doc. 330, at 2. Three things changed in the transfer. The prosecutor's argument that Defendant "proximately caused" a swap became "Defendant admitted, and the evidence shows." The prosecutor's "[a]s set forth in the offense conduct of the PSR" became the Report "found." And the word "opaque" was dropped. Nothing was added: no citation to any admission, no citation to any evidence, because the brief being copied contained neither. The Government itself never claimed that Defendant admitted a swap; it argued a swap, and the only record it cited for it was ¶ 103(f), which says "invest." The "admission" on which the Order's causation ruling rests is therefore the prosecutor's characterization,

relabeled. The Supreme Court has "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record," *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *cf. Chicopee Mfg. Corp. v. Kendall Co.*, 288 F.2d 719, 724–25 (4th Cir. 1961) ("there is no authority in the federal courts that countenances the preparation of the opinion by the attorney for either side"), and this is the case those cautions describe: a conclusory statement, lifted from the prevailing party's brief, that cites no record because there is none, and that has been upgraded in the copying from argument to admission.

What the record does contain on the subject of liquidity is narrower and different, and the Order's sentence is built by running three distinct things together. The first is the affiliated-investment strategy itself: the insurers invested reserves in loans to affiliated companies, PSR ¶ 103(f)—the disclosed strategy the North Carolina Department of Insurance reviewed and conducted under the approximately forty-percent ceiling the Department set in its April 11, 2016 review letter, Doc. 316, at 49; Doc. 234, at 3, 6; Doc. 174, at 9, 12–13. Investing insurance reserves in affiliated loans is an investment decision, not a "swap," and it is not the conduct Defendant admitted was fraudulent; the admitted fraud was the circular transactions and the misstatements "regarding these transactions." Doc. 42 ¶ 5. The second is the ULICO repurchase agreements: approximately $162 million of 90-day instruments, funded from the ULICO 2017 Trust and collateralized by affiliated investments, that were reported to ULICO as "cash equivalents" and were structured so that they "gave them

the appearance to ULICO of being safer, more liquid investments than they actually were." Doc. 1 ¶¶ 108, 116, 127–128, 140, 159; PSR ¶ 103(d). That is a statement about how one instrument appeared to one counterparty—how two sets of repurchase agreements were classified and reported—not an allegation that the insurers' portfolios consisted of "high-quality, liquid investments" that Defendant swapped out. It concerns a fraction of the figure; any loss to the ULICO trust must be proven, claimant by claimant, like every other, 18 U.S.C. § 3664(e); and ¶ 103(d) is not the paragraph the Order cites. The Order generalizes it to ten insurers and $1.655 billion.[9]

The third is what regulators found afterward: the Rector Report's warning that the volume of affiliated lending posed a risk to "the financial condition and liquidity of the Companies," Doc. 1 ¶ 131, and the Department's 2019 rehabilitation petition citing deteriorated "long-term liquidity of the investment portfolios," *id.* ¶ 182. Those are findings about concentration risk in a strategy the regulator had reviewed and capped; they are not admissions by Defendant, and risk is not loss. Doc. 234, at 3. None of the three says that the insurers held "high-quality, liquid investments" that Defendant fraudulently exchanged for illiquid paper. The Order's sentence takes the ULICO repo allegation, attaches it to the entire affiliated-loan portfolio, and calls the combination an admission.

[9] The strategy behind the ULICO reinsurance—reinsuring a ceding insurer's long-duration liabilities and investing the ceded reserves in higher-yielding affiliated and privately originated assets, including through repurchase agreements—was standard practice in the insurance industry during the low-interest-rate regime of the period.

Defendant contested that characterization in writing before sentencing. His objections to the Report told the Court that "there is no evidence that Mr. Lindberg ever meant to permanently deprive his companies' policyholders of their rightful benefits," that "[t]his case is about a serious liquidity issue, as opposed to a permanent deprivation issue," and that the policyholders "will ultimately be paid in full." Doc. 62, at 2–4. The objections acknowledged that "[s]ubstantial amounts of money were invested in illiquid assets" and that "many policyholders suffered due to the delay in payments," *id.* at 4; what they denied was loss. That is the distinction the Order erases, and it is the distinction the statute draws. The Mandatory Victims Restitution Act compensates actual loss—a defendant may not be made to "pay back more money than he stole," *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017) (quoting *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017))—and an illiquid asset is not a lost one. The affiliated loans the insurers held were personally guaranteed by Defendant, approximately $2.39 billion of them under the March 11, 2019 Amended and Restated Backstop Agreement, and were backed from May 2018 by $1,006,239,867 in par value of investment-grade bank zero-coupon bonds purchased as dollar-for-dollar principal protection that, held to maturity, would have repaid the affiliated-loan principal in full. Doc. 234, at 5 (citing Doc. 174 ¶¶ 27–34 & Exs. B8, H2, I2, I5). Nor did the affiliated loans' time to recover create a liquidity problem at the insurers. The insurers held cash. Their own quarterly statutory asset pages, filed with the Department, show that "from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form

of third-party bonds." Doc. 281, at 23, 55 & Part XV.E (citing Doc. 289, Ex. 1(a)–(e)); Doc. 300, at 31–32; Doc. 316, at 61 (the early bond sale "was unnecessary given cash reserves sufficient to pay any obligations") (citing Doc. 295 ¶¶ 5–7 & Ex. G). An insurer with more than a billion dollars of cash and third-party bonds on hand had no need to sell the affiliated loans at a discount and no need to sell the principal-protecting bonds before maturity; it could hold both to recovery. The affiliated loans' time to recover was not the cause of any loss, and it was not a liquidity concern for the insurers. An asset that cannot be sold today, but that is guaranteed and principal-protected at par, is not a $1.655 billion loss; it is a delay in payment, which is what the objections said. What converted that delay into the loss the Special Master now counts were decisions made after control had passed—the Rehabilitator's rejection of a $1 billion payoff of the very loans at issue, its ten-year hold on them, its sale of the principal-protecting bonds at roughly thirty-nine cents on the dollar, its refusal to transact with the Montshire/Alban and Quadro purchasers, and the Department of Justice meeting after which Ares abandoned its $450 million purchase of the insurers—each set out below, and none of them the offense. Doc. 234, at 10–11, 24–31; Doc. 316, at 40–41, 50–52. A contested description of the offense as a delay in payment, offered to show that there was no loss, is the opposite of an admission that liquid portfolios were swapped for illiquid paper.

The sentence at page 10 is therefore not a quotation or a paraphrase of anything Defendant admitted. It is a characterization that appears for the first time in the Order, attributed to an admission that does not exist and to evidence that is

not cited, and it does the Order's causal work: it is the only bridge between the conduct admitted and the $1.655 billion the Order treats as its consequence. A restitution finding that rests on a sentence the defendant never said, in a document he never signed, supported by a paragraph that does not contain it, is the "materially untrue" foundation that *Tucker* and *Townsend* forbid. *See* Part I.K, *infra.*[10]

The Order cites no evidence for its statement that "the evidence shows" the causal link. It cites the Presentence Report, Doc. 330, at 10—which is the Government's Statement of Relevant Conduct, adopted at sentencing "for the purpose of applying the guidelines," Sentencing Tr. 7:10–12, and which itself declared the restitution amount "currently unknown" (Part I.B, *supra*)—and nothing else. The Government has offered no independent proof of loss or causation in this proceeding; it "concurs with . . . the Special Master's filings and sees no reason to duplicate them here," Doc. 279, at 2, and its Consolidated Position offers a chart of conclusions and an affidavit whose five load-bearing averments are sworn only "to the best of [the affiant's] knowledge, information and belief." Doc. 316, at 13–14 (citing Doc. 308, Ex. C ¶¶ 5, 8, 13, 21, 22; *Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998)).

And the record affirmatively contradicts the characterization of the later transfers as a fraudulent "swap." The transfers the Special Master isolates were the required mechanics of the disaffiliation structures the North Carolina Department of

[10] Nothing in this Part asks the Court to revisit the plea. Defendant admitted the circular transactions and the misstatements "regarding these transactions." Doc. 42 ¶ 5. The point is narrower and dispositive: the Order's description of *what* was swapped, *for what*, and *with what consequence* is not among the admitted facts, and it is the description on which the Order's causation conclusion depends.

Insurance reviewed—"the two-class special-purpose vehicles, the irrevocable trust, the finance companies, and the principal-protection notes." Doc. 316, at 49. "The Department negotiated and confirmed that framework—setting the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, receiving the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j), and reviewing the successor finance-company and principal-protection-note structures before they were used." *Id.* (citing Doc. 234, at 6; Doc. 300, at 29–31 & Exs. DS-1 through DS-21). "The apparent circularity is the signature of that mandated sequence, not evidence that value left the estate," and moving the same assets "into a successively better-collateralized, regulator-reviewed structure increased credit quality and added collateral; it did not create a new loss." *Id.* at 49–50. Those restructurings post-dated the origination of the affiliated loans. The Order does not mention the disaffiliation record, the Department's review letter, the statutory disclaimers, or the principal-protection bonds. The Government never answered that record; its Consolidated Position relies on the phrase "circular, non-economic transactions" and declines to address the disaffiliation exhibits issue by issue. Doc. 316, at 48, 51. On the factual question the Order purports to resolve—what the transactions the Special Master counts as loss actually were—the only evidence in the record is Defendant's, and it stands unrebutted. A plea admission to "circular, non-economic transactions" is not an admission that every later, regulator-reviewed restructuring was a fraudulent swap that caused $1.655 billion in loss, and the Order

may not supply by characterization what the Government did not prove and Defendant did not admit.

Nor does the disaffiliation record support the theory that the vehicles were devices for evading the Department's limits. The Government has described the special-purpose vehicles and finance companies as structures used "to evade the concentration limits and the limits on affiliated investments," Doc. 152, at 15; *see* Doc. 1 ¶¶ 139–140. Defendant admitted misstatements "regarding these transactions," Doc. 42 ¶ 5. He admitted nothing about the value of the assets in them, and the Government has never proven any. The restitution question is what the assets were, not how a filing described them, and on that question the record is one way: the structures themselves were laid before the regulator, reviewed by it, and operated within a ceiling it set. The eleven disclaimers of affiliation were filed with the Department because N.C. Gen. Stat. § 58-19-25(j) required them, together with a legal opinion identifying the vehicles, Doc. 300, at 30, 35 (citing Exs. DS-5, DS-7); the structures were laid before the Department and revised in response to its comments, and the successor finance-company and principal-protection-note structures were reviewed before they were used, *id.* at 30, 35 (citing Exs. DS-9, DS-15, DS-16, DS-19); the Department confirmed the approximately forty-percent ceiling in its April 11, 2016 review letter, Doc. 234, at 6 (Ex. A12); the Department described the loans, in its own words, as "100% held by the Insurers," Doc. 300, at 25 (citing Ex. DS-1); and the Department expressly permitted the May 2018 purchase of the principal-protection bonds, Doc. 174 ¶ 36. Every affiliated loan carried a rating from an SEC-

approved NRSRO and an arm's-length pricing opinion; Egan-Jones rated the finance-company and special-purpose-vehicle loan pools to an investment-grade profile; DBRS rated and approved the principal-protection notes; and KPMG and Houlihan Lokey valued the twenty-one borrowers at approximately $2.45 billion in enterprise value, with the loans underwritten at roughly fifty-percent loan-to-value. Doc. 300, at 23–25 (citing Exs. DS-4, DS-16, DS-17, DS-19, DS-20). A filing made with the regulator under a statute that requires it is not an evasion of that regulator, and a structure revised to the regulator's comments is not hidden from it. Whatever was misstated, the vehicles were known to the Department, the loans were carried on the insurers' books as the Department confirmed, and the assets inside the structures were real, rated, and collateralized. That is the question restitution asks—what the assets were worth and what became of them—and the Government has never engaged the exhibits that answer it. Doc. 316, at 48, 51.

The affiliate-investment strategy itself was lawful when it was carried out, regulator-reviewed, and within industry practice. Doc. 234, at 3, 6; Doc. 174, at 9, 12–13. A restitution theory that treats every affiliated investment as a fraudulent swap of liquid assets for illiquid paper, and counts its full principal as loss, rests on a premise the record does not support.

The Order's treatment of the losses that arose after Defendant lost control is two sentences. It describes Defendant's showing as an "attempt to revise the events here that led to the victims' losses," and adds that "even if some of the losses did not materialize until after Defendant lost control of the insurance companies,

Defendant's assertions misconstrue the meaning of proximate cause." Doc. 330, at 10. Neither sentence identifies an event. The Order cites, for the whole subject, two pages of the reply brief supporting Defendant's pending Motion for a Determination That No Restitution Is Owed, *id.* (citing Doc. 300, at 8–9); it never cites the motion itself, Doc. 234, whose Part IV is devoted to exactly this question and whose exhibits document it. The record the Order does not engage is this. On November 22, 2018—weeks after Defendant learned of the investigation and before any charge—he signed an exclusive letter of intent to sell the North Carolina insurers to Ares Management for approximately $450 million; Ares abandoned the transaction after a meeting with the Department of Justice, stating that an undisclosed "third party constituent" had advised it "to avoid any ongoing connection to Eli Global." Doc. 234, at 10 (citing Exs. G, A15). In February 2019 the Rehabilitator rejected a proposed Oaktree transaction, an approximately $1 billion special-purpose vehicle that would have purchased all of the affiliated loans from the insurers and "paid the loans off in full." *Id.* at 11. In June 2019, under threat of liquidation, the Rehabilitator required a Memorandum of Understanding imposing a ten-year hold on the affiliated loans, foreclosing the transactions that would have repaid them. *Id.* The Rehabilitator then sold the zero-coupon bond portfolio before maturity for approximately $394 million against a contractual par value of $1,006,239,867, "crystallizing a loss of approximately $611.6 million and destroying the principal protection that would have repaid the affiliated loans in full at maturity." *Id.* In 2023 the Rehabilitator litigated against the Montshire/Alban purchasers rather than transact with them, and in 2024 rejected

the Quadro transaction. *Id.*; *see id.* at 24–31 (Part IV); Doc. 316, at 40–41, 50–52. And in 2025 the Special Master disposed of Beckett Collectibles: his own controlled entity supplied the Grantor approval that terminated the Beckett Trust, his board designee voted to approve the sale, and the Special Master furnished the buyer a letter stating that he would not object—facts the Government's own affiant admits, Doc. 308, Ex. C ¶¶ 9, 19–21, and the Special Master, who concedes that the sale closed without the Court approval his Appointment Order required, Doc. 288, at 15; Doc. 56, at 6–7, does not deny. Producing that letter of non-objection is not standing apart from the sale; it is the Special Master acting. Doc. 316, at 12, 17, 20; *see* Part I.F, *infra.* Each of those acts was taken by someone other than Defendant, after control had passed, and each is documented by contemporaneous exhibits the Government has never addressed.

*Robers* holds that ordinary market fluctuation does not break the causal chain, but it holds so precisely because market fluctuation is unlike the events that do: an offender is not "responsible for everything that reduces the amount of money a victim receives," and events unlike market fluctuation—the Court's examples were a natural disaster, a donation of the collateral, or "its sale to a friend for a nominal sum"—"could break the causal chain." *Robers v. United States*, 572 U.S. 639, 646 (2014). A victim's own "independent decisions" about whether to hold or sell are of that kind. *Id.* at 648–49 (Sotomayor, J., concurring). A rehabilitator's decision to reject a $1 billion payoff of the very loans at issue, to sell principal-protecting collateral at roughly thirty-nine cents on the dollar, and to sue willing purchasers

rather than sell to them is not a market fluctuation. Whether those decisions broke the chain is a question on which the Government bears the burden, 18 U.S.C. § 3664(e), and which the Court must resolve before it may treat the resulting losses as Defendant's, Fed. R. Crim. P. 32(i)(3)(B). The Order does not resolve it. It declares the question misconceived without naming a single one of the events, and it does so while the motion presenting them remains pending. A denial of relief on causation that never engages the intervening causes of record is not a ruling on the dispute; it is the absence of one.

**E. The Order states that "[t]he Government has filed a brief in opposition" (Doc. 330, at 1). It did not, and the Order never cites Defendant's response to the filing it treats as the Government's brief.**

The Order recites that "[t]he Government has filed a brief in opposition," citing No. 5:19-cr-22, Doc. 610 and No. 3:23-cr-48, Doc. 288. Doc. 330, at 1. Doc. 288 is the Special Master's response, not the Government's; the Special Master stated in it that any legal defense of the reference "falls within the Government's purview." Doc. 288, at 2. The Government's only filing directed to Docs. 269 and 278 was its four-page Omnibus Response, which "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." Doc. 279, at 2. The filing the Order cites as "Doc. 610" is the Government's Consolidated Position Regarding Restitution (No. 3:23-cr-48, Doc. 308), filed August 17, 2026—eight days after Defendant's Reply (Doc. 292)—and the Order adopts its arguments throughout: "As the Government notes . . . ." Doc. 330, at 5, 11. It does more than adopt them. The Order's account of the sentencing hearing and of the Presentence Report at page 2,

and its causation ruling at pages 10–11, reproduce the Consolidated Position's pages 10 and 20 nearly word for word, with the Government's argument relabeled as Defendant's admission. Part I.D, *supra*.

Defendant answered the Consolidated Position on August 23, 2026, in an eighty-five-page Response with two volumes of exhibits. Doc. 316; Docs. 316-1, 316-2. The Order, signed August 28, 2026, does not cite Doc. 316 anywhere. It cites the Reply (Doc. 292) at three points, each to reject a discrete factual assertion, Doc. 330, at 6 n.2, 8, and it cites Doc. 300 once, *id.* at 10; it does not engage the Response in which the Government's consent theory, its Term Sheet and MOU arguments, its Meghji affidavit, its authorities, and its causation and offset positions were each answered. Part II sets those answers out. An Order that adopts one party's brief "as the Government notes" without addressing the response to it has decided the Motion on half the record.

### F. The Order's account of the Special Master's control and of the Beckett sale is contradicted by the Government's own affidavit and by the instruments (Doc. 330, at 6–7 & nn.1–2, 9 & n.4).

The Order concludes that Defendant "had already lost control" of NHC and the Specified Affiliated Companies "through the June 27, 2019, Memorandum of Understanding," so that the Special Master "only took control over whatever remaining interest, if any, Defendant had." Doc. 330, at 6. The Government's own affiant dates the contribution of the Specified Affiliated Companies to NHC not to 2019 but to October 2024. Doc. 308, Ex. C ¶ 4; Doc. 316, at 14–15. And if control passed to NHC, then control lay with NHC—and the Special Master became the

record owner of the NHC equity, with "all associated economic, legal, voting, and beneficial rights." Doc. 260, at 2. Two weeks later, signing "solely as Special Master," he removed both AAI-appointed NHC directors, Kathy Million and Lonna Carter. Million Decl. ¶¶ 25–26. An officer who controlled nothing could not remove a company's directors.

The Order's footnote 2 disposes of the consent right in one line: the "affirmative consent of an AAI Director" requirement applied only "[p]rovided that there is no default under any Loan," and "several of the loans were in default." Doc. 330, at 6 n.2. That one-line default theory is the same theory the Government and the Special Master have since advanced to justify disposing of the Damovo asset, Doc. 334, at 3–4; Doc. 335, and it cannot be reconciled with the state-court judgment the Order itself cites for the MOU's meaning. *See id.* at 6 n.1 (quoting *Southland Nat'l Ins. Corp. v. Lindberg*, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), Judgment ¶¶ 47, 108). "Loan" is a defined term in the MOU: the loans "as they were to be amended and restructured under Article III," assumed by NHC, and made subject to "events of default and remedies for events of default set forth on Attachment B . . . (the 'Default and Remedy Terms')." Doc. 55-1, MOU Art. III, § 1(g); Doc. 316, at 16–18. The Wake County Superior Court held that "Article III of the MOU is an unenforceable agreement to agree," that "[t]he terms of the loan agreement are not settled . . . [and] none of the terms in Article III may be enforced," and that "[t]he loan amendment process set forth in Article III of the MOU had not yet been completed"; it then severed Article III and enforced the remainder. *Southland*, Amended Judgment and Order (May 26,

2022) ¶¶ 98(ix), 129, 131, 132–36 (Doc. 340-1), *aff'd*, 289 N.C. App. 378 (2023), *disc. rev. improvidently allowed*, No. 173PA23 (N.C. Oct. 17, 2025). The restructured Loans and the Default and Remedy Terms that alone define a "default under any Loan" therefore never came into existence; the Interim Loan Amendment executed with the MOU "waive[d] any and all claims for any Events of Default" predating it; and no Article III default has ever been declared. Doc. 340, at 3–8; Doc. 316, at 16–19 & Def. Ex. 1, Tab A ¶¶ 8–9, 14–18. A default under the superseded pre-MOU covenants, or an interest underpayment under the IALA—which is all the E.D.N.C. ruling the Order cites addressed—is not a "default under any Loan" within the proviso. The Order thus relies on the *Southland* judgment for the proposition that Defendant relinquished control, and disregards the same judgment's holding that the only mechanism by which the consent right could be stripped was never created. The consent right passed intact to the Special Master with the NHC equity, Doc. 260, at 2, and the Government's affiant admits how it was exercised: the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement," "NHC provided its consent to the transaction as the Manager of . . . Entrust Global," the Special Master's own board designee voted to approve the sale, and the Special Master furnished a letter, reviewed by the board before it voted, stating that he would not object. Doc. 308, Ex. C ¶¶ 9, 19–21; Doc. 316, at 11–13. Termination required the Grantor's written approval (Trust Agreement § 9.1(e)); a sale of substantially all Beckett assets was a "Fundamental BKX Matter" approvable only on the Grantor's instruction (*id.* § 7.2(a)(vi)); Entrust Global is the Grantor; NHC is its Manager; and

the Special Master owns NHC. There is no version of these facts in which NHC supplied the Grantor's consent but the officer who owns NHC did not.

The Order's statement that "Beckett's purchaser did not require or otherwise request that the Special Master approve the sale," Doc. 330, at 9 n.4, is beside the point: the Trust Agreement required the approval, and he gave it; and the Appointment Order conditioned every liquidation on the Special Master's obligation to "seek Court approval to liquidate," Doc. 56, at 6–7; Doc. 288, at 3, which was never sought. The Order's reliance on the "Term Sheet," Doc. 330, at 7, is likewise misplaced: it is a negotiating document the Government circulated, never entered by the Court and never signed by Defendant, and it cannot amend the Appointment Order, the Assignment, or the Trust Agreement. And the Order's statement that Defendant "never asked this Court to find otherwise," *id.*, is incorrect: Docs. 172, 190, 238, 269, and 278 asked for exactly that. One further fact bears on the neutrality the Order found. When Defendant moved to disqualify the Special Master for his conduct of the Beckett sale, it was the Government that went and obtained the affidavit of NHC's acting chief executive—the entity the Special Master owns and controls—and filed it in support of the Special Master's position, adopting his account of Beckett as its own. Doc. 308, Ex. C; Doc. 316, at 20. The prosecution gathering sworn evidence to defend the neutral against the defendant's disqualification motion is not the posture of a party before a neutral; it is the posture of co-parties. The Order does not address it, and Defendant raises it here for the Court's consideration on reconsideration.

### G. The Order states that Defendant "has not objected to any" fee petitions (Doc. 330, at 9).

Defendant's Motion sought vacatur of paragraph 14 of the Appointment Order—the fee-payment provision itself—and a full accounting of all fees paid from the estate. Doc. 269-5 ¶¶ 1, 5. Defendant's Rule 17(c) subpoenas for the records that would permit item-by-item objection were opposed by the Government and the Special Master and denied. Docs. 248, 261, 266, 304. A defendant cannot be faulted for failing to object item by item to charges he has been prevented from examining. The Order's related observation that the Special Master's hourly fees are paid "along with Defendant's defense counsel" from the estate, Doc. 330, at 8, does not answer the objection. Current counsel do not charge the Special Master or the estate: "[n]either Kenneth N. Barnes nor Vivek Ramachandran has billed or been paid from the administrative fund . . . ; the professionals the Special Master references were Defendant's former counsel." Doc. 292, at 22 n.2. It was those former counsel who went unpaid. In July 2026, as Defendant's then-counsel, Litson PLLC, reported to him in writing at the time, the Special Master told them that there was no money for professional fees at that time unless and until another asset was sold; fourteen days later he moved for approval of his own compensation and his advisors', which the Court granted; Litson PLLC was never paid from the estate; and the Special Master has since opposed the fee motion of Defendant's prior counsel, Katten. Lindberg Decl. (Litson) ¶¶ 6, 9–10 (Ex. A hereto); Docs. 263, 327, 336, 338.

There is, moreover, a reason Defendant has not yet objected to the fee petitions one by one, and it is not acquiescence. The fees at issue were paid from the estate to

an officer whose appointment Defendant contends is unconstitutional and whose report was built through ex parte contact that the Special Master himself now admits. Doc. 343 (Martinez Aff. ¶¶ 8–9, 11). The proper time to seek disgorgement of fees paid under an unconstitutional appointment is after the Court rules on the constitutional challenge and sets the appointment or the Report aside; a fee-by-fee objection before that ruling would concede the premise that the fees were lawfully earned. When that ruling is made, Defendant will ask that every fee paid from the estate to the Special Master and his professionals be returned. In light of the extensive ex parte communications now admitted of record, Defendant makes that demand now and preserves it: the estate should be restored the fees paid to an officer who fixed the loss against Defendant while conferring with the prosecution outside his presence.

**H. The Order applies the wrong constitutional provision and the wrong standard (Doc. 330, at 4, 7–8).**

The Order analyzes Defendant's claim under "the Due Process Clause of the Fourteenth Amendment." Doc. 330, at 4. This is a federal prosecution; the claim arises under the Due Process Clause of the Fifth Amendment and under Article III. Defendant preserves both grounds. The Order then dismisses *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961), as "dicta," Doc. 330, at 7–8. It was not. The appellants there attacked the appointment of the receiver as special master on four grounds; the Second Circuit took the receiver-disqualification ground first and held that it was "clearly sound": "Although in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the

judicial duties here imposed." *Id.* at 526 (citing *Tumey*, 273 U.S. at 522). The court then said that "we could stop at this point," and reached the remaining grounds only so as not to "leave the District Court uncertain whether it ought not appoint another special master." *Id.* Its judgment was "vacated insofar as it appoints a special master." *Id.* at 528. A ground the court holds "clearly sound," that is by the court's own statement sufficient to the disposition, and on which the reference is in fact vacated, is a holding. Doc. 316, at 30. And it holds that Defendant "proffers no credible 'direct,' 'personal,' or 'substantial' pecuniary interest," and that the proposition that "the more the Special Master administers, 'the larger the fund from which he is paid'" is, "[e]ven if true, . . . irrelevant." Doc. 330, at 8. That is not the test. The constitutional inquiry is objective and requires no proof of actual bias: whether the arrangement "would offer a possible temptation to the average man as a judge," *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); whether, "under a realistic appraisal of psychological tendencies and human weakness," the probability of bias is "too high to be constitutionally tolerable," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009) (quoting *Withrow*). An officer whose compensation is drawn from the estate he values, liquidates, and adjudicates has an interest that is direct, personal, and substantial, and "[e]ven if true, this is irrelevant" is not a finding that it is not. *United States v. Konrad*, 730 F.3d 343, 352 n.12 (3d Cir. 2013), on which the Order relies, found no conflict only because the master's hourly fee was paid from a source independent of the $6,000 figure she calculated in a discrete Criminal Justice Act computation—the opposite of this case. Doc. 292, at 21

n.1; Doc. 316, at 34 n.2. And an unconstitutional failure to recuse is structural error "not amenable" to harmless-error review. *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).

The record also contains a concrete instance of that interest at work, and it is not new. On May 14, 2026—twelve days before sentencing—the Special Master presented Defendant with a "Consent, Waiver, and Acknowledgement" whose operative clauses would waive Defendant's "right to object to any sale, the manner of the sale, the timing of the sale, and the price at which the Primary Restitution Assets are sold," and would release, and covenant not to sue, a beneficiary class that expressly includes "the Special Master" himself—presented not as a counterparty's request but as "cooperation" the Special Master "deems . . . necessary" under the Appointment Order. Doc. 190, at 10 & Ex. W. Defendant refused to sign it. Within hours of that refusal, on May 22, 2026—four days before sentencing—the Special Master filed with the sentencing court his Statement Concerning Defendant's Cooperation, itemizing Defendant's non-execution of waivers among its "clarifications" to Defendant's cooperation showing and announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. 159, at 3, 5 & nn.5–6; Lindberg Supp. Decl. ¶ 7 (to be filed with Defendant's replies in support of Docs. 331 and 332). An officer who conditions a favorable account of the defendant's cooperation, on the eve of sentencing, on a personal release running to himself, and who places an adverse statement before the sentencing judge within hours of being refused, has an interest that is direct,

personal, and his own. That is the "possible temptation" *Tumey* describes, and it is "irrelevant" to nothing. This sequence was placed before the Court in the first post-sentencing motions, filed within the objection period, Doc. 172 (June 9, 2026); Doc. 190, at 10, 20–23 (Parts V–VI) (June 11, 2026), and has been repeated since, Doc. 269, at 5–6 & n.2; Doc. 281, at 47; Doc. 329, at 4, 7, 15. It is not new. The Government did not answer it then, and its practice since has been to leave Defendant's motions unanswered and later to describe the issues they raise as waived. Neither the silence nor the label holds water: an objection raised within the time allowed, on the record, and never answered is preserved, not waived, and the Order's statement that no credible interest was "proffer[ed]" cannot be reconciled with a record in which the interest was proffered, documented, and unrebutted.

The Order's neutrality analysis also could not have considered the ex parte point at all: Defendant's motions concerning the ex parte communications, Docs. 331 and 332, and the Special Master's admissions in response—that his team communicated "one-on-one—outside the presence of either Defendant's counsel or the government—with various third parties, including potential victims," and "continue[s]" to do so "on a daily (or near daily) basis," Doc. 343 (Martinez Aff. ¶¶ 8–9, 11)—were all filed after the Order was entered on August 31, 2026. This is a new development, and it bears directly on the neutrality the Order found. The officer whose report fixes the restitution figure, whose compensation is drawn from the estate, and who was communicating ex parte with the Government, victims, and third parties about the substance of that figure is not a neutral; a magistrate judge in that

position would not be permitted to sit, and the Order does not address why a special master standing in the same position may. And because the Special Master admits that those communications were never tallied and cannot be reconstructed, Doc. 343 (Martinez Aff. ¶¶ 9–10), no genuine de novo determination is possible on the record they produced. Defendant has not been fully apprised of those contacts. The issue is preserved here, and it is an independent ground for reconsideration.

### I. The Order announces adoption of the Special Master's report before ruling on Defendant's objections and treats the valuation objections as "informational" (Doc. 330, at 11–12).

The Order states that "[t]he Court finds that sufficient factual evidence in the record submitted by the parties supporting the requested restitution award," that it "has conducted a de novo [review] of the Special Master's recommendations," that it "will issue a separate order addressing the specific objections to the restitution amounts," and that it "does intend to adopt the Special Masters' report, with a few modifications." Doc. 330, at 12. Announcing the result before adjudicating the objections is not the de novo determination § 3664(d)(6) requires, and "sufficient factual evidence" cannot be found on a record in which the Government has offered none of its own. Doc. 316, at 3–5. Nor can the valuation objections be set aside as "provided [] for informational purposes," Doc. 330, at 11: the Court cannot determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), or resolve the disputed credits, without knowing what the Special Master sold, for how much, and where the proceeds went. Doc. 316, at 63–65. The Beckett disposition—a business independently appraised at $1,003,924,000 and sold for approximately $134 million

with the price withheld as "confidential"—is not "informational." Doc. 256-1, at 3; Doc. 256-2; Doc. 288, at 16, 18.

### J. The Order announces that restitution will be fixed "based on the parties' pleadings," without an evidentiary hearing, in a case the parties jointly told the Court "may require a lengthy hearing or hearings" and that the Court bifurcated for that purpose (Doc. 330, at 12).

The Order closes by stating that the Court "does intend to adopt the Special Masters' report, with a few modifications in light of the parties' arguments at the hearing held on August 10, 2026, and based on the parties' pleadings." Doc. 330, at 12. The August 10 hearing was a hearing on the pending motions, Doc. 312, not an evidentiary hearing on the amount or cause of any victim's loss, and the Government declined at that hearing to respond to the pending motions issue by issue. Doc. 316, at 80–81. What the Order describes, therefore, is a restitution determination of approximately $1.655 billion made on the papers, with every disputed fact resolved against the defendant without evidence being taken on it.

The facts in dispute are not peripheral. They include whether the transfers the Special Master counts as loss were regulator-reviewed restructurings of the same assets (Part I.D, *supra*; Doc. 300, at 29–31 & Exs. DS-1–DS-21); whether, and to what extent, the losses were caused by the Ares, Oaktree, Montshire/Alban, and Quadro events and the Rehabilitator's bond sale rather than by the offense (Doc. 234, at 10–11, 24–31); whether the Special Master controlled NHC and consented to the Beckett sale (Part I.F, *supra*); whether the "default under any Loan" proviso was ever triggered (id.); the amount of the mandatory credits and offsets, which Defendant

computes at more than the figure claimed (Doc. 132, at 3, 7–25; Doc. 300); the $263 million interest component; and the value and disposition of every Primary Restitution Asset the Special Master has sold (Part I.I, *supra*). On each, the Government's only evidence is the Presentence Report and an affidavit sworn "to the best of [the affiant's] knowledge, information and belief." Doc. 316, at 13–14. The statute does not permit those disputes to be resolved by adoption. "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with the burden on the Government, 18 U.S.C. § 3664(e); the Court "may require additional documentation or hear testimony," *id.* § 3664(d)(4); a disputed portion of the presentence report requires a ruling on the dispute, Fed. R. Crim. P. 32(i)(3)(B); and the Court "may permit the parties to introduce evidence on the objections," *id.* R. 32(i)(2). A restitution order that the record does not permit a reviewing court to evaluate must be vacated. *United States v. Leftwich*, 628 F.3d 665, 667–68 (4th Cir. 2010).

More than that: a hearing is what everyone in this case, including the Court, said would happen. In the Joint Motion to Bifurcate, Defendant and the Government told the Court that "[t]he restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims," that "[i]t is anticipated that the restitution issues in this case may require a lengthy hearing or hearings," and that sentencing should be held "before any necessary hearings to finalize restitution." Doc. 107 ¶¶ 8, 12. The Court adopted those representations as findings—"the restitution issues in this case may require a

lengthy hearing or hearings"; bifurcation "will allow the sentencing hearing to move forward and for restitution to be finalized at a later date after any necessary hearings on such issues"—and ordered that "[f]ollowing the sentencing hearing, the Court will schedule one or more hearings (if necessary) to finalize restitution." Doc. 108 ¶¶ 8, 12, 15 & at 4. At the sentencing hearing itself, the Government asked the Court to enter the preliminary order "understanding that, within the next 90 days, people are going to want to be heard about aspects of that," Sentencing Tr. 66:10–12; defense counsel stated that the order was "obviously subject to the objections of numerous parties and further hearings with the Court," *id.* at 66:20–22; and the Court entered it saying that "certainly there may be some additional litigation over that, but the Fourth Circuit wants us to order forfeiture, even when there's a contest about the amounts to later be determined," *id.* at 66:23–67:2, and that it was ordering the amount "at this time, understanding that there may be some dispute." *Id.* at 67:16–17. The "further hearings," the "contest about the amounts to later be determined," and the "one or more hearings . . . to finalize restitution" have never taken place. The only hearing since sentencing was the August 10 motions hearing, at which Defendant asked that the Government be required to respond to each motion and the Government declined. Doc. 316, at 80–81.

The Special Master expected the same. On July 16, 2026, in the weekly meeting with the Government and in a separate conversation with Defendant's then-counsel, the Special Master and his counsel addressed the zero-coupon principal-protected bonds—the instrument whose sale before maturity for approximately $394

million against a par value of $1,006,239,867 is the single largest contested item, Doc. 234, at 11; Doc. 295. As Defendant's counsel reported to him in writing that same day—Defendant, incarcerated, did not attend—the Special Master and his counsel said that a planned meeting with prior counsel on the bonds had never taken place, that it was too late to change the report, but that they would not push back hard at the final hearing and were, in substance, inviting Defendant to prove the point there. Lindberg Decl. (Litson) ¶¶ 6, 8, 11 (Ex. A hereto). The officer who wrote the report thus told the defense that the bond issue would be proved up at the final hearing. Counsel reported that the Government's only stated concern in the same meeting was timing. *Id.* ¶ 7. Every participant—the parties in their joint motion, the Court in its bifurcation order and at sentencing, and the Special Master in July—proceeded on the understanding that restitution would be determined at a hearing. No hearing on any restitution issue has been held. A restitution determination made without one is inconsistent with the bifurcation motion itself—the joint motion in which the Government asked for exactly this sequence—and rests on a new narrative, in which restitution objections were waived at sentencing and the amount may be fixed on the pleadings, that neither Defendant nor his prior counsel ever agreed to, and that the Government did not advance until after the bifurcated sentence had been imposed.

Whether the "(if necessary)" condition in the bifurcation order is met is not a close question. It was met the moment the Government elected to "concur[]" with the Special Master rather than prove its case, Doc. 279, at 2, and to leave Defendant's sworn disaffiliation record, his causation showing, and his offset computations

unanswered. A court that has found the issues "complex," has ordered hearings to resolve them, has entered a preliminary order on the express understanding that the amounts were contested, and has then received from the Government no evidence at all, cannot fix the amount "based on the parties' pleadings" without deciding every contested fact against the defendant by default. In any case, the whole of the restitution determination—not one item of it—must rest on hearings. The questions of causation and proximate causation are fact-intensive by nature; the offsets, credits, and non-attributable losses Defendant has documented total $3,765,418,383, more than twice the figure claimed, and, applied against it, yield net restitution of zero, Doc. 281, at 7, 30–31; Doc. 316, at 55–56; and on every one of those questions the burden of proof lies with the Government, 18 U.S.C. § 3664(e), which has offered no evidence to carry it. A determination that fixes $1.655 billion on that record, without a hearing, does not resolve those disputes; it forfeits them to the party that bears the burden. Defendant asks that the Court reconsider that portion of the Order and set the evidentiary hearing the bifurcation order contemplates, at which the Government bears its burden and Defendant may test the evidence against him.

### K. Each misstatement is load-bearing, and the correction requires vacatur.

The Order's denial of relief follows from its premises: that Defendant agreed to the Presentence Report's restitution narrative and raised no objection; that his plea admitted the amount and cause of the losses; that he designed the reference himself; that the Special Master inherited nothing and approved nothing; and that the Government answered the Motion. Remove those premises and the Order's reasoning

has nothing to stand on. A sentence and a restitution award resting on "assumptions . . . which were materially untrue" violate due process, *Townsend*, 334 U.S. at 741, and because restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), the same rule governs the restitution determination. The proper course is to vacate the Order, correct the record, and decide Docs. 269 and 278 on the record as it actually exists.

## II. THE ORDER DOES NOT CONSIDER DEFENDANT'S RESPONSE TO THE GOVERNMENT'S CONSOLIDATED POSITION (DOC. 316) OR THE PORTIONS OF HIS REPLY (DOC. 292) THAT ANSWER THE GROUNDS ON WHICH THE ORDER RESTS

The sequence matters. Defendant filed his Motion on July 31, 2026 (Doc. 269) and his Second Motion on August 6, 2026 (Doc. 278). The Government's Omnibus Response deferred to the Special Master. Doc. 279, at 2. The Special Master responded on August 7, 2026 (Doc. 288), and Defendant replied on August 9, 2026 (Doc. 292). The Government's Consolidated Position followed on August 17, 2026 (Doc. 308), and Defendant's Response to it on August 23, 2026 (Doc. 316). The Order, signed August 28, 2026, adopts the Consolidated Position's arguments "as the Government notes," Doc. 330, at 5, 11, and never cites Doc. 316. Defendant sets out below the answers the Order does not consider, and incorporates Docs. 292 and 316 in full.[11]

[11] The Motion also stood unopposed by the party the rules obligate to answer it. The Government must "respond to all potentially dispositive defense motions," W.D.N.C. LCrR 47.1(d), within the time the rule prescribes, LCrR 47.1(e). Its Omnibus Response stated only that it "concurs" with the Special Master, that a "substantive reply at a more minute level" would be "unproductive," and that it "stands ready" to respond "[i]f the Court would like." Doc. 279, at 2–3 & n.2. The Special Master, for his part, stated that any legal defense of the reference "falls within the Government's purview." Doc. 288, at 2. "Each defers to the other; no one answers." Doc. 292, at 1.

### A. Adoption of the Special Master's report is not the de novo determination §§ 3664(d)(6) and 3664(e) require (Doc. 316, at 3–10).

Section 3664(d)(6) permits a reference only for "proposed findings of fact and recommendations . . . subject to a de novo determination of the issue by the court," and § 3664(e) places the burden of proving "the amount of the loss sustained by a victim as a result of the offense" on "the attorney for the Government." The Government does not carry that burden by asking the Court to adopt the Special Master's numbers; adoption is not proof. Doc. 316, at 3. The Special Master's own reports "presumed that the balances used in the IALA were accurate," Doc. 245, at 9, and describe the valuation as a "current guess" from a "desktop exercise" that does "not constitute formal valuations or fairness opinions," *id.* at 36 n.31, 37. A recommendation resting on presumed balances and an admitted guess is not the loss determination § 3664(e) requires the Court to make on the Government's proof, and a report produced by an officer who should be disqualified "may not be submitted to the district court or otherwise disseminated in any manner." *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004); Doc. 316, at 3–4. The Order's finding of "sufficient factual evidence," Doc. 330, at 12, does not address any of this.

### B. The Government's own affidavit establishes that the Special Master approved the termination of the Beckett Trust and the sale of Beckett, and its load-bearing averments are sworn only on information and belief (Doc. 316, at 11–19).

The Meghji affidavit—the Government's only new evidence—admits that the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement," that "NHC provided its consent to the transaction as the Manager of . .

. Entrust Global," and that the Special Master's board designee voted to approve the sale after reviewing the Special Master's letter. Doc. 308, Ex. C ¶¶ 9, 19–21. Because the Special Master owns NHC, those admissions establish that he supplied the Grantor-side approvals the termination and the sale required. Doc. 316, at 11–13. The affiant qualifies each of the five averments on which the Government's control and valuation arguments depend—including the premise that Defendant had lost control, the 2021 ownership of Collectivus, the "small portion" characterization of Beckett, and the existence and content of the Special Master's letter—"to the best of [his] knowledge, information and belief," and such averments are not competent to establish a disputed fact. *Id.* at 13–14 (citing *Causey*, 162 F.3d at 803 n.4; Fed. R. Evid. 602). The Order relies on the same affidavit's conclusions, Doc. 330, at 6–7 & n.2, 9 n.4, without addressing either point, and without the evidentiary hearing that § 3664(e) requires if any part of the question is treated as disputed. Doc. 316, at 14–15.

### C. Consent and waiver cannot cure the structural Article III and due-process defects, and the consent the Order invokes was the Government's design (Doc. 316, at 23–33; Doc. 292, at 15–19).

The Order rests on the propositions that Defendant "agreed" to the reference, "did not object" to the Appointment Order, and represented that restitution is "substantial." Doc. 330, at 3, 9–10. Defendant answered each. The reference was the Government's design, imposed under threat of proceeding without him, Doc. 316, at 23–26, 31–32 (Part I.C, *supra*); "substantial" is not $1.655 billion, and an agreement that victims need restitution "as soon as possible" is an argument for the face-value

transactions the Government and the Rehabilitator blocked, not an admission of whatever figure the Special Master later chose, Doc. 316, at 40–41; Doc. 234, at 6–11. And consent cannot cure a structural defect: "the parties cannot by consent cure the constitutional difficulty," and "notions of consent and waiver cannot be dispositive." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986). Consent validates a non-Article III process only "so long as Article III courts retain supervisory authority over the process" and "the essential attributes of judicial power are reserved to Article III courts." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–79 (2015) (quoting *Schor*, 478 U.S. at 851). Here the Special Master took custody of the estate, liquidated it, cleared title, and distributed proceeds—irreversible acts no later review can undo. Doc. 292, at 17. Whatever consent existed was consent to a Court-supervised process in which the Special Master would "seek Court approval to liquidate"; it lapsed when he sold Beckett without that approval. *Id.* at 17–18. And even a defendant's consent "cannot, without more, authorize a restitution order not authorized by the statutory source." *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995). A defendant cannot stipulate his way into an illegal sentence, and MVRA restitution is criminal punishment. *Ellingburg*, 146 S. Ct. 564. The disqualifying financial-interest ground, moreover, cannot be waived at all, 28 U.S.C. § 455(b)(4), (e), and can be consented around under Rule 53(a)(2) only "with the court's approval" and "after the master discloses any potential grounds for disqualification"—neither of which occurred. Doc. 292, at 18–19. The Order addresses none of these authorities.

### D. The reference exceeds its only statutory basis, and the Special Master's "no approval required" position concedes an unauthorized disposition (Doc. 292, at 4–15; Doc. 316, at 30–31).

The Order holds that "the Special Master Order here did not make the Special Master a general receiver." Doc. 330, at 5–6. But the Appointment Order, as the Special Master's own Response catalogs, empowered him to identify assets for liquidation, to "select an appropriate method and timetable and seek Court approval to liquidate," to "oversee and help accomplish the liquidation," to "clear title to all assets for transfer to bona-fide buyers," to receive and distribute restitution payments, to retain a law firm, and to be paid from the assets he administers. Doc. 288, at 3. "Those are the functions of a receiver administering an estate, not of an officer proposing findings," Doc. 292, at 5, and a court-appointed officer who takes custody of the res, holds its title, and liquidates it is a receiver in function whatever the caption calls him, Doc. 316, at 30–31. Section 3664(d)(6) authorizes "proposed findings of fact and recommendations as to disposition"—nothing more—and an order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006) (quoting *Broughton-Jones*, 71 F.3d at 1147). The Special Master's central factual defense—that Court approval "was not required," Doc. 288, at 13, 15—is an admission, not a defense: the Appointment Order permitted liquidation only on the condition that he "seek Court approval to liquidate available assets," Doc. 56, at 6–7, and he concedes the Beckett sale closed with no approval sought or obtained, Doc.

288, at 15. Doc. 292, at 6–7, 13–15. The Order does not address the scope of § 3664(d)(6), the Court-approval condition, or the concession.

### E. The Beckett Trust existed until September 30, 2025, and the disposition ran through the board the Special Master controlled (Doc. 292, at 3–4, 7–13).

The Special Master's assertion "on information and belief" that the trust was terminated by a 2024 refinancing, Doc. 288, at 14, is refuted by the Delaware Secretary of State's records, which show The Beckett Collectibles Trust "Voluntarily Cancelled" effective September 30, 2025—more than seven months after the Special Master took control of the NHC equity—and by the sworn Million Declaration, which establishes that the refinancing was approved through the trust, that the trust and its Independent Trustee continued unchanged, and that "through February 27, 2025, no proposal to dissolve, wind up, or cancel the trust . . . was ever placed before the NHC board." Doc. 292, at 7–11 & Ex. 5; Million Decl. ¶¶ 9, 11, 13–14, 21–22, 27; 12 Del. C. §§ 3808(c)–(d), 3810(d). Under the Memorandum of Understanding no sale of NHC assets could be approved "without the affirmative consent of at least one AAI Director," and after the Special Master removed both AAI directors the only AAI-side consent available was his own designee's. Doc. 292, at 11–13. The result is undisputed: an asset independently appraised at $1,003,924,000 "was disposed of for approximately $134 million with no motion, no notice, no order, and no accounting on this Court's docket." *Id.* at 14–15. The Order's footnote 2 rejects the AAI-director point on the "no default" proviso alone, Doc. 330, at 6 n.2, without addressing the Article

III restructuring, the Wake County ruling, or the Delaware record. Doc. 316, at 16–19.

**F. The Government's authorities do not reach the constitutional question, and the compensation structure is a disqualifying interest under the objective test (Doc. 316, at 30–38; Doc. 292, at 19–23).**

The Order relies on *Burks*, *Adams*, *Hitt*, *Guastella*, and *Takata* for the proposition that courts "routinely" combine the roles of special master and receiver. Doc. 330, at 5. Each is an appointment order or footnote in which no party raised, and no court decided, whether an officer who is paid from and liquidates the estate may also adjudicate the loss; "[a]n unraised question is not a resolved one." Doc. 316, at 30. *Richardson v. Perales* and *Withrow* concern the combination of investigative and adjudicative functions in a salaried public official with no personal stake; neither involves an adjudicator paid from the res he adjudicates. *Id.* at 33–35. The controlling principle is the one *O'Connor* and *Tumey* state, and *O'Connor* states it as a holding: confronting the very arrangement at issue—a receiver appointed also to serve as special master—the Second Circuit held that "in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest . . . disqualif[ies] him from performing the judicial duties" of a special master, 291 F.2d at 526, and vacated the reference. Doc. 316, at 30. The Special Master is paid from "the assets administered by the Special Master," Doc. 56 ¶ 14—the very res whose value he quantifies and whose liquidation he directs—and he supplies both the loss figure the Government adopts and the proposed order that fixes it. That his fee is hourly "does not make the interest less 'direct' or 'substantial'; it makes the officer's

solvency depend on the estate he administers and adjudicates." Doc. 316, at 35. The Constitution does not permit the same person to serve as accuser and adjudicator, *In re Murchison*, 349 U.S. 133, 136–37 (1955), and the defect is structural, *Williams*, 579 U.S. at 14. The Order's fee opacity point is unanswered as well: the Special Master declines to disclose where the approximately $19 million in fees generated by the Beckett sale went, or even the sale price. Doc. 292, at 22, 30 n.3.

**G. De novo review does not cure the defect (Doc. 292, at 19–20; Doc. 316, at 35–36).**

De novo review saved the reference in *United States v. Raddatz*, 447 U.S. 667, 681–84 (1980), only because the reference was statutorily authorized, concerned a single discrete issue, left the ultimate decision with the district judge, and involved a magistrate with no financial stake. None of that holds here. "De novo review of legal conclusions cannot reverse a completed fire sale, restore conveyed assets, or reconstruct an accounting never made," and a party "is entitled to a neutral and detached judge in the first instance." Doc. 292, at 19–20 (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). The Special Master admits he gathered information ex parte, "outside of the rules of evidence," taking "into account documents and information that exist outside of the formal record." Doc. 288, at 10. The Court's de novo review is only as complete as the record he curated.

**H. The Government has not proven causation, and the plea's "directly or indirectly harmed" language does not waive it (Doc. 316, at 38–52; Doc. 292, at 23–29).**

The Order holds that because the plea obligates Defendant to pay restitution to persons "directly or indirectly harmed," and because § 3663A(a)(3) permits agreed

restitution to persons other than the statutory "victim," the Court need not find proximate cause. Doc. 330, at 11. Defendant answered that argument, and the Fourth Circuit has rejected it on this very language. In *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009), the plea agreements promised restitution to "all victims directly or indirectly harmed by the defendant's 'relevant conduct,'" *id.* at 216, and the court held that those paragraphs "do not provide a valid basis" for restitution where the offense "did not directly and proximately cause" the loss, *id.* at 215–18; Doc. 316, at 47–48. Section 3663A(a)(3) expands the class of payees; it does not eliminate the requirement that the loss compensated be one the defendant's criminal conduct caused, and paragraph 10(a) itself limits restitution to harm "by the defendant's criminal conduct." Doc. 40 ¶ 10(a). The Order does not cite *Squirrel.* Nor does it address the intervening-cause record: the Government's own chart disallows credit for the Clanwilliam sale loss, the early zero-coupon-bond sales, the NCIC diminution, the ECL loss, and the UKAT refinance failure on the express ground that each resulted from decisions made by the rehabilitators or the Special Master "after LINDBERG defrauded them," Doc. 308, at 5–6—a concession that those later decisions produced those losses. Doc. 316, at 38–41. The Government "cannot treat those later decisions as irrelevant when they would reduce the defendant's exposure and decisive when they increase it." *Id.* at 40. Those decisions are superseding causes, *Robers v. United States*, 572 U.S. 639, 646 (2014), and the Government's concession that it "does not have sufficient evidence" to connect the Conservatrix and Vista/Cell 1.16 losses to the offense, Doc. 308, at 7–8, confirms that causation must be proven

claimant by claimant. Doc. 316, at 41. The Order rejects the intervening-cause argument as "misconstru[ing] the proximate cause inquiry," Doc. 330, at 10–11, without addressing the Government's own chart, *Squirrel*, *Robers*, or the Fourth Circuit's decision in this case. *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (unpublished per curiam), *amended* (June 15, 2026).

The loss figure fails independently. The MVRA's burden "never shift[s]" where the Government offers no competent support, *United States v. Steele*, 897 F.3d 606, 613–14 (4th Cir. 2018); *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017), and restitution may not require a defendant to "pay back more money than he stole," *Stone*, 866 F.3d at 226 (quoting *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017)). The Special Master's figures rest on "the principal amounts owed"—the debt, not the value, Doc. 288, at 4 n.16—and his valuation defense rests on "information and belief" about a price that "remains confidential." Doc. 288, at 16, 18; Doc. 292, at 24–27. The Order does not address the debt-for-value error or the withheld price.

## I. The mandatory credits and offsets cannot be "disallowed" on an "unless and until monetized" theory, and the valuation objections are not merely "informational" (Doc. 316, at 52–65).

The Government's chart disallows nearly every credit on the theory that the defendant should be credited only "if and when" an asset is monetized. Doc. 308, at 3. That inverts the statute: for a property offense the measure is value on the date of loss or of sentencing, less the value of any part returned "as of the date . . . returned," 18 U.S.C. § 3663A(b)(1)(B)—a present determination, not a future contingency—and the Court must credit amounts recovered so that no order overstates the loss, §

3664(f)(1)(A), (j)(2). Doc. 316, at 52–53. Defendant placed in the record, item by item, reductions totaling $3,765,418,383—more than twice the figure proposed—which reduce net restitution to zero. Doc. 316, at 53–55; Doc. 281, at 30; Doc. 300. The Order does not mention a single one of them; it says only that the valuation objections need not be resolved because the valuations were "provided [] for informational purposes." Doc. 330, at 11. That conflates two different things: objections to the estimated value of remaining assets are one matter; mandatory statutory credits for value already received, and the exclusion of losses the offense did not cause, are another, and the statute does not permit a final order without resolving them. Doc. 316, at 63–65.

### J. Judicial estoppel does not apply, the objection is timely, and the § 3664(d)(5) deadline cannot be used to force an inaccurate award (Doc. 292, at 30–33; Doc. 316, at 73–75).

Judicial estoppel requires a position "clearly inconsistent" with an earlier one, adoption by the court, and an "unfair advantage." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). None is present: objecting that a reference exceeded its statutory and constitutional bounds is not inconsistent with having sought a lawful § 3664(d)(6) reference; no final restitution order has adopted the Special Master's figures; and there is no unfair advantage in insisting that a criminal sentence conform to its authorizing statute. Doc. 292, at 30–31. Defendant could not have contested valuation numbers the Special Master never disclosed until his Response—and still withholds—and he pressed the Article III question in this Court, on appeal (Doc. 192), and by mandamus (No. 26-1967). *Id.* at 32–33. The ninety-day deadline of § 3664(d)(5) is directory, not jurisdictional, *Dolan v. United States*, 560 U.S. 605 (2010), and

"cannot be wielded as a sword to force a rushed, inaccurate award"; the lawful path is a complete accounting and a determination on the merits. Doc. 316, at 73–74. The Order addresses none of this.

The Court should reconsider Docs. 269 and 278 with Docs. 292 and 316 before it and, for the reasons those filings give, grant them.

## III. THE ISSUES PRESERVED IN THE ADDENDUM ARE INCORPORATED, AND THE GOVERNMENT AND THE SPECIAL MASTER—HAVING DECLINED THREE OPPORTUNITIES TO ANSWER THEM—MAY NOT BE AFFORDED ANOTHER

Defendant incorporates by reference the Addendum to this Motion, "Comprehensive Statement of Facts and of All Issues Raised and Not Addressed." The Addendum sets out (Part One) a structured index of the factual basis and of every issue Defendant has raised concerning restitution, the Special-Master reference, and the process by which the $1.655 billion figure and his sentence were fixed; (Part Two) the verbatim text of each filing in which those issues were raised, from the Response to the Special Master's Report (Doc. 132) through every filing Defendant has made since the sentencing hearing of May 26, 2026—each motion, response, reply, notice, and declaration, with its docket number and the filing to which it responded; (Part Three) the consolidated index of issues by theme; and (Part Four) the enumerated objections to the Order, the record of the responses the Government and the Special Master did not make, and the index of every post-sentencing filing. Each issue is raised again here and preserved for de novo determination by this Court and for review by the Fourth Circuit, and each of those filings, with its exhibits, is incorporated by reference and preserved in full. Nothing in this Part re-argues the

merits; the merits have been briefed, and the Government has elected not to answer them.

For the avoidance of doubt, the filings so incorporated include Docs. 172–174, 190, 198, 201–202, 211–213, 219–220, 225, 227–228, 234–238, 248, 251–254, 256–257, 259–260, 267, 269–271, 277–278, 280–283, 285, 289–296, 300–303, 309, 316–324, 329, 331–333, and 339–340, together with the parallel entries in No. 5:19-CR-22.

The Government and the Special Master were given three opportunities to answer those issues on the merits, and each time they expressly declined. **First**, in its Omnibus Response of August 6, 2026 to Docs. 172, 190, 201, 202, 225, 234, 238, and 269, the Government stated that it "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here," and that a "substantive reply at a more minute level" would be "unproductive." Doc. 279, at 2 & n.2. It added that "[i]f the Court would like the United States to respond to any particular argument by the Defendant, . . . the United States stands ready to do so." *Id.* at 2–3. The Special Master stated that any legal defense of the reference "falls within the Government's purview." Doc. 288, at 2. Government counsel's position was the same in the parties' weekly meeting with the Special Master on July 16, 2026, as Defendant's then-counsel reported to him in writing that day: the Government's only stated concern was timing, and Assistant United States Attorney Bain-Creed argued, in substance, that Defendant's filing would take money from victims because the Special Master had to respond to it. Lindberg Decl. (Litson) ¶¶

6–8, 11 (Ex. A hereto). **Second**, at the hearing of August 10, 2026, Defendant explicitly asked the Court to require the Government to respond to each pending motion, issue by issue. Doc. 316, at 80–81; Aug. 10, 2026 Hr'g Tr. __. The Government's ensuing Consolidated Position (Doc. 308) again did not respond motion by motion; it selected the issues it wished to address, did not answer the forty-seven categories of offsets, credits, and causation defenses Defendant had presented, Doc. 316, at 51, and conceded that it "does not have sufficient evidence" to connect whole categories of claimed losses to the offense, Doc. 308, at 7–8. **Third**, when Defendant moved to compel production of the data underlying the restitution figure and the ex parte communications on which it was built (Docs. 331, 332), the Government and the Special Master answered that the data was "not relevant" and "not critical," declined to produce it, and did not dispute the offset facts but rejected them "as a matter of law." Doc. 341, at 13, 16 & n.4; Doc. 344, at 3, 8, 12.[12]

A party that has been given three opportunities to respond to specific, sworn factual showings, and has each time declined on the ground that the facts are "not relevant" or that answering them would be "unproductive," has made its election. The Court should not now afford the Government or the Special Master a fourth opportunity to contest facts they chose not to contest when the rules and the Court required them to. Under 18 U.S.C. § 3664(e) the burden on every disputed restitution fact was theirs; under Rule 32(i)(3)(B) every controverted matter required a ruling;

[12] The Fourth Circuit's decision in this case requires that the causal connection between the offense and each claimant's loss be proven claimant by claimant. *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (unpublished per curiam), *amended* (June 15, 2026); Doc. 316, at 41. The Government has never attempted that showing.

and under LCrR 47.1(d) every dispositive motion required a response. The facts set out in the Addendum therefore stand unrebutted on this record, and Defendant respectfully submits that they must be treated as such by this Court and, on review, by the Court of Appeals. That is not a sanction; it is the consequence of the Government's own litigating choices. Any response to this Motion should be confined to the grounds for reconsideration stated in Parts I and II; it may not be used to supply, for the first time, the merits response the Government three times declined to make.

Defendant accordingly asks that the Court (1) treat each fact and issue in the Addendum as raised, preserved, and unanswered; (2) decline to permit any further response on those issues; and (3) proceed to the de novo determination that § 3664(d)(6) requires on the record as it stands.[13]

## CONCLUSION

For the reasons stated, Defendant respectfully requests that the Court: (1) reconsider and vacate the Order of August 31, 2026 (Doc. 330); (2) correct the record by withdrawing the statements identified in Part I—including the findings that Defendant "admitted, and the evidence shows," that he proximately caused the claimed losses, that he agreed to the Presentence Report's restitution narrative and lodged no objection, that he designed the reference, and that the Government filed a

[13] Defendant addresses the plain-error framework because the responses raise forfeiture; he does not concede that these preserved, ongoing objections are subject to it, and he expressly preserves each of these points—including his Fifth Amendment due-process, Sixth Amendment, Article III and separation-of-powers, Eighth Amendment Excessive Fines, and Ex Post Facto challenges, and his challenges under 18 U.S.C. § 3664 and Rule 53—for review by the Fourth Circuit.

brief in opposition—and substituting findings consistent with the docket, the Factual Basis, the sentencing transcript, and the sworn declarations; (3) consider Docs. 292 and 316 and, on the full record, grant Docs. 269 and 278—declaring the reference unconstitutional as applied, disqualifying and removing the Special Master, and setting aside the Report, its Supplements, the Preliminary Order of Restitution (Doc. 161), and the proposed Final Order (Doc. 245-1); (4) treat the facts and issues in the Addendum as preserved and unanswered, without further opportunity for response; (5) set this Motion for hearing, and set the evidentiary hearing or hearings on restitution that the parties jointly requested and the Court ordered before sentencing, Doc. 107 ¶¶ 8, 12; Doc. 108 ¶¶ 8, 12, 15 & at 4, at which the Government must carry its burden under 18 U.S.C. § 3664(e) on loss, proximate cause, foreseeability, superseding cause, and net loss after all mandatory credits, on the record as it stands; (6) in light of the ex parte communications now admitted of record between the Special Master, the Government, and third parties, Doc. 343 (Martinez Aff. ¶¶ 8–11), recuse and remove the Special Master from the reference and direct that the Government attorneys who participated in those communications be recused from further participation in the sentencing and restitution phases of this matter; and (7) grant such other relief as is just.

Defendant requests oral argument and an evidentiary hearing on this Motion. The Order rests on disputed questions of record fact—what Defendant admitted, what he objected to, who drafted the Appointment Order, and what the Special Master did—on which the sworn evidence is one-sided and has never been tested in

open court. Rule 32(i)(3)(B) and § 3664(e) require that those disputes be resolved, and the bifurcation order contemplated that they would be resolved at a hearing. None has been held.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

# EXHIBIT 11

Consent Motion for Instruction Regarding Proposed Damovo Transaction

Causey v. Southland Nat'l Ins. Corp., No. 19CVS008664-910 (Wake Cnty. Super. Ct. filed Aug. 17, 2026)

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| WAKE COUNTY | 19CVS008664-910 |

| | | |
|---|---|---|
| MIKE CAUSEY, COMMISSIONER OF INSURANCE OF NORTH CAROLINA,<br><br>Petitioner,<br><br>v.<br><br>SOUTHLAND NATIONAL INSURANCE CORPORATION, SOUTHLAND NATIONAL REINSURANCE CORPORATION, BANKERS LIFE INSURANCE COMPANY, COLORADO BANKERS LIFE INSURANCE COMPANY, North Carolina Domiciled Insurance Companies,<br><br>Respondents. | ) | **CONSENT MOTION FOR INSTRUCTION REGARDING PROPOSED DAMOVO TRANSACTION** |

NOW COME Respondents Bankers Life Insurance Company ("BLIC"), Colorado Bankers Life Insurance Company ("CBL"), and Southland National Insurance Corporation ("SNIC"), all in liquidation, and Southland National Reinsurance Corporation in rehabilitation ("SNRC") (collectively, "Respondents"), and with the consent of Petitioner, Commissioner of Insurance Mike Causey, as the duly-appointed Rehabilitator and Liquidator of Respondents, move this Court pursuant to N.C. Gen. Stat. §§ 58-30-20(a)(11), 58-30-120(b), and 58-30-85(b) for an order instructing them to provide consents associated with the sale of certain Specified Affiliated Companies ("SACs") only if there is an agreement to place all



Electronically Filed Date: 8/17/2026 4:15 PM Wake County Clerk of Superior Court

transaction related consent fees into escrow that would be delivered to the federal Special Master for a subsequent determination as to their treatment under a Final Order of Restitution to be entered by the federal court overseeing the criminal case ("Federal Court") against Greg Lindberg. This Motion is to preserve the status quo until such a ruling can be made by the Federal Court. In support of this Motion, Respondents show the following:

1. Respondents are each licensed North Carolina domestic life, accident, and health insurers. SNRC is a licensed North Carolina captive insurance company that has engaged in the business of reinsurance.

2. Prior to being placed into Rehabilitation[1] by order of this Court, Respondents were engaged in the business of selling annuities, life, accident, and critical condition insurance policies to consumers in North Carolina and elsewhere. Respondents satisfied their obligations to policyholders through cash payments or transfers, with their revenues derived from the sale of annuities and insurance policies and the collection of premiums. Respondents also placed some of their revenues in other investments, which should have grown the money before their obligations became due.

3. As this Court is aware, the June 27, 2019, MOU contract requires Greg Lindberg to place many of his companies—the SACs—under the control of a New

---

[1] Respondents SNIC, BLIC, and CBL are now in liquidation pursuant to this Court's orders entered December 30, 2022 and May 2, 2023. Mike Dinius and John Murphy of Noble Consulting Services, Inc. (the "SDLs") were appointed Special Deputy Liquidators of CBL, BLIC, and SNIC, and Special Deputy Rehabilitators of SNRC.

Holding Company ("NHC") with an independent board tasked with managing the SACs to prioritize repaying the insurance companies so that they could meet their policyholder obligations. NHC must act "consistent with the protection of the best interests of the Policyholders and in accordance with North Carolina law" under the MOU.

4. One group of SACs is the Damovo Group.[2] The Damovo Group should have been contributed to NHC in September 2019. Had that happened, the Damovo Group would have been properly managed by NHC's independent board to ensure they performed well and that their revenues went toward repaying policyholders.

5. Instead, the Damovo Group has continued to operate outside of NHC's direct management and control.[3]

6. There is presently an offer from a third party to purchase the Damovo Group.[4]

---

[2] The Damovo Group of companies includes the following SACs: Damovo Belgium NV/SA; Damovo Costa Rica SRL; Damovo Holdings Deutschland GmbH; Damovo Deutschland Verwaltungs GmbH; Damovo Deutschland GmbH & Co. KG; Damovo Global Services (UK) Limited; Netfarmers GmbH; Damovo Ireland Limited; Damovo Luxembourg S.a.r.l.; Damovo Österreich GmbH; Damovo Polska sp. Zo.o; Damovo Schweiz AG; Damovo Sverige.AB; Damovo USA Inc.; Lares Holdings, LLC; and Lares, LLC.

[3] The Damovo Group is under the direct control of Trustee Hugh. S. Wilson pursuant to a June 17, 2021 Trust Agreement that was approved by the Review Panel in *Southand National Ins. Corp., v. Lindberg,* 19-CVS-13093-910 (N.C. Super. Ct.). Imposition of the trust was viewed as necessary to avoid adverse regulatory and banking issues for the Damovo Group. Ex. A, Damovo Trust Agreement.

[4] The proposed purchaser has represented to Respondents that the Damovo Group of companies are burdened with debt that exceed the fair market value of the companies, and so there are not "sale proceeds" from the transaction in the traditional sense of value transferred in the form of a purchase price. Respondents do not know the underlying economics of the deal, but the consent fees represent value available from the Damovo Group SACs that the parties to the transaction have labeled consent fees.

7. One requirement of the proposed transaction is that the purchaser is required to secure consents to the transaction from a number of parties, including Respondents, NHC, and the Joint Provisional Liquidators of four Bermudan insurance companies also previously owned by Greg Lindberg ("JPLs").[5]

8. Respondents' understanding and belief is that the purchaser has offered approximately $13 million to the JPLs for their consent[6] and approximately $4.5 million to NHC for its consent.[7]

9. The purchaser has offered Respondents $10 for their consent, after negotiations with the JPLs and NHC for their fee amounts had, upon information and belief, concluded. Respondents were shocked by the $10 offer.

10. By virtue of being identified as SACs, the Damovo Group has also been designated a Primary Restitution Asset in the federal criminal proceedings against Greg Lindberg. *See,* Order Granting Motion for Appointment of Special Master, *United States v. Lindberg*, 23-CR-48, D.E. 56 (W.D.N.C. Jan. 23, 2025).

---

[5] While there have been claims that the parties involved in the Damovo transaction understood NHC and Respondents to be one and the same entity, there is self-evidently no factual support for this conclusion and the purchaser sought separate consents from the entities. Any such parties could have determined the facts by reviewing the record in this proceeding even cursorily, but it does not matter how the transaction came to this juncture. It must be treated going forward under federal restitution law by the Federal Court.

[6] It is understood by Respondents that the JPLs' consent fee is in reality a settlement of their adversary proceeding filed in the United States Bankruptcy Court for the Southern District of New York by or on behalf of PB Life and Annuity Co Ltd, Northstar Financial Services (Bermuda) Ltd, Omnia Ltd and PB Investment Holdings Ltd. *See In re PB Life and Annuity Co., Ltd.*, No. 20-12791 (LGB) (Bankr. S.D.N.Y) and *Johnston v. Lindberg*, No. 1:23-AP-01000 (LGB) (Bankr. S.D.N.Y) (the "Adversary Proceeding").

[7] Respondents understand that NHC has not yet provided its final consent to the proposed transaction.

11. The Preliminary Order of Restitution in that case establishes the amount that each victim is owed. Preliminary Order of Restitution, *Lindberg*, 23-CR-48, D.E. 161.

12. The federal Special Master has submitted a proposed Final Order of Restitution that is under consideration by the Federal Court ("Final Order of Restitution"). *Lindberg*, 23-CR-48, D.E. 245-1, also attached as Exhibit B. The proposed Final Order of Restitution provides that: "the loss amounts for each of the persons due restitution shall be reduced, credited, or otherwise adjusted downward to the extent any persons due restitution receives compensation for the same loss(es) comprising their restitution award through any source, including, without limitation, execution on a judgment, payments to release litigation claims, or cash extracted from assets previously transferred by the Defendant to reduce such loss(es) and for no other independent consideration." *Id.* at 10. This is consistent with 18 U.S.C. 3664(j)(2), which prohibits double recovery for the same loss by crime victims through restitution.

13. Whether characterized as traditional sale proceeds or consent fees, value emerging from the sale of a SAC that has been designated a Primary Restitution Asset must be treated consistently with the MOU, North Carolina law, and federal restitution law. The JPLs' consent fee represents a litigation settlement for their Adversary Proceeding against the SACs that seeks recovery for the same losses from Greg Lindberg's crimes for which federal restitution is designated. The Federal Court must therefore determine, once it has entered a Final Order of

Restitution, how the JPLs' consent fees should be treated to avoid double recovery of restitution from SACs in violation of 18 U.S.C. 3664(j)(2). Double recovery by the JPLs would prejudice Respondents' policyholders and creditors. Respondents do not seek any ruling in that regard from this Court, but rather only approval of a mechanism to preserve the status quo until the Federal Court is in a position to rule.

14. N.C. Gen. Stat. § 58-30-20 permits a receiver appointed pursuant to Chapter 58 of the North Carolina General Statutes to apply for an order deemed necessary to prevent "any . . . threatened or contemplated action that might lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors, or shareholders, or the administration of any proceeding under this Article." Moreover, N.C. Gen. Stat. § 58-30-120(b) permits the liquidator to do such acts that may be necessary or appropriate for the accomplishment of or in aid of the purpose of liquidation. A rehabilitator is given the same authority in N.C. Gen. Stat. § 58-30-85(b).

15. This Court can instruct Respondents under N.C. Gen. Stat. §§ 58-30-20(a)(11), 58-30-120(b), and 58-30-85(b) that they can consent to the proposed Damovo transaction only if the consent fees are placed into escrow to be directed to the federal Special Master. This would allow the Damovo transaction to move forward and will not result in prejudice to the JPLs, NHC, nor prejudice the rights of policyholders or creditors of Respondents. The escrow would preserve all funds in status quo for correct treatment under federal restitution law and a Final Order of Restitution as to all parties.

16. Respondents could have consented without action of this Court to a Damovo transaction that did not lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors, or shareholders, or the administration of this proceeding. Respondents cannot consent to the proposed transaction as currently postured because it would prejudice the rights of policyholders or creditors of Respondents. Respondents would receive, essentially, no value for their consent under the present proposed terms, no value from the sale of a SAC, and no recovery for loss from Lindberg's crimes through federal restitution from the sale of a Primary Restitution Asset, while the JPLs would potentially receive a prohibited double recovery.

17. Respondents do not wish to delay or derail the proposed transaction by merely withholding consent. Rather, Respondents seek through this filing to allow the proposed transaction to move forward while ensuring that the value derived from the sale of the Primary Restitution Asset is properly preserved in status quo through an escrow mechanism.

18. To that end, Respondents respectfully request this Court to enter an order instructing them to provide consents associated with the Damovo Group sale only if the Respondents, NHC, and the JPLs, all agree to place all consent fees into escrow that would be delivered to the federal Special Master for a subsequent

determination by the Federal Court overseeing the criminal case against Greg Lindberg under a Final Order of Restitution.[8]

19. Counsel for Respondents have conferred with Counsel for the Petitioner regarding this Motion. The Petitioner consents to the relief requested herein.

WHEREFORE, Respondents respectfully request that this Court enter an order:

1. Instructing that, pursuant to N.C. Gen. Stat. §§ 58-30-20(a)(11), 58-30-120(b), and 58-30-85(b), the Liquidator and Rehabilitator acting through the SDRs may provide consents associated with the Damovo Group transaction only if Respondents, NHC, and the JPLs agree to place all consent fees into escrow that would be delivered to the federal Special Master for a subsequent determination by the Federal Court overseeing the criminal case against Greg Lindberg of how they should be treated under a Final Order of Restitution ("Consents");
2. Instructing that the content of any Consents and the terms of the escrow are within the discretion of the SDRs as to Respondents;
3. Affirming and approving in all respects the conduct of the Liquidator, Rehabilitator, his employees, agents, the SDRs and counsel in connection with this Motion; and
4. Granting such other relief the Court deems appropriate.

[8] This request by the Respondents does not mean that no value from the Damovo transaction should be directed to NHC for its operating expenses as contemplated by the MOU. Respondents do not wish to disturb NHC's consent fee, but rather to prevent any unlawful double recovery by the JPLs. This is essential for the purpose of the MOU to be realized by NHC, and for the restitution assets to be monetized properly.

Respectfully submitted, this the 17th day of August, 2026.

WILLIAMS MULLEN

By: /s/ *Wes J. Camden*
Wes J. Camden
NC State Bar No. 33190
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
wcamden@williamsmullen.com
Telephone: (919) 981-4000
Facsimile: (919) 981-4300

*Attorneys for the Respondents*

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a copy of the foregoing pleading or paper was served was served upon all parties and counsel identified below by electronic mail to the electronic mail addresses set out below, pursuant to Rule 5(b)(1) of the North Carolina Rules of Civil Procedure:

M. Denise Stanford
Special Deputy Attorney Generals
Insurance Section
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
dstanford@ncdoj.gov
*Attorneys for Petitioner*

James A. Roberts III
Lewis & Roberts, PLLC
PO Box 17529
Raleigh, NC 27619-7529
jar@lewis-roberts.com
*Counsel for NOLHGA*

Joel A. Glover
Faegre Drinker Biddle & Reath, LLP
1144 15th Street, Suite 3400
Denver, CO 80202
Joel.glover@faegredrinker.com
*Counsel for NOLHGA*

This 17th day of August, 2026.

/s/ Wes J. Camden
Wes J. Camden

EXHIBIT A

EXECUTION VERSION

DATED 17 June 2021

**DAMOVO FINANCIAL SERVICES LLC**

**AND**

**ROBERT GADDY**

**AND**

**HUGH S. WILSON**

---

# IRREVOCABLE TRUST INSTRUMENT

RELATING TO A CHANGE OF CONTROL TRUST
FOR THE DAMOVO GROUP

---

LATHAM & WATKINS

London
99 Bishopsgate
London EC2M 3XF
(44) 020 7710 1000 (Tel)
(44) 020 7374 4460 (Fax)

## TABLE OF CONTENTS

## CONTENTS


| Clause | | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 3 |
| 2. | ESTABLISHMENT OF TRUST | 6 |
| 3. | DURATION OF THE TRUST | 7 |
| 4. | POWERS OF THE TRUSTEE | 7 |
| 5. | EXERCISE OF POWERS AND RESTRICTIONS ON EXERCISE | 8 |
| 6. | TRUSTEE WARRANTIES AND UNDERTAKINGS | 9 |
| 7. | POWERS OF THE BENEFICIARY | 9 |
| 8. | PROVISION OF INFORMATION TO TRUSTEES | 10 |
| 9. | CONFIDENTIALITY | 10 |
| 10. | RESIDUAL TRUSTS AND END OF TRUST PERIOD | 11 |
| 11. | TREATMENT OF DIVIDENDS | 11 |
| 12. | VOTING | 11 |
| 13. | INDEPENDENCE OF DAMOVO GROUP BOARDS | 12 |
| 14. | EXONERATION OF TRUSTEES | 12 |
| 15. | INDEMNITY | 13 |
| 16. | APPOINTMENT, RETIREMENT AND REMOVAL OF TRUSTEES | 13 |
| 17. | REMUNERATION AND PAYMENT OF TRUST COSTS | 14 |
| 18. | CLAIMANT'S OBLIGATIONS | 15 |
| 19. | RIGHTS OF SETTLOR CREDITORS | 15 |
| 20. | TAX MATTERS | 15 |
| 21. | NOTICES | 16 |
| 22. | AMENDMENT OF TRUST INSTRUMENT | 16 |
| 23. | COUNTERPARTS | 16 |
| 24. | ASSIGNMENT | 16 |
| 25. | THIRD PARTY RIGHTS | 17 |
| 26. | LAW | 17 |
| SCHEDULE 1 | ADMINISTRATIVE POWERS | 4 |
| SCHEDULE 2 | TRUSTEE REMUNERATION | 5 |

**THIS TRUST INSTRUMENT** is made the 17 day of June 2021

**BETWEEN:**

(1) **DAMOVO FINANCIAL SERVICES, LLC** a company registered in Delaware whose registered office is at 2140 S Dupont Highway, Camden, Kent County, Delaware 19934 (**"the Settlor"**);

(2) **ROBERT GADDY** whose address is at 7206, Kepley Road, Chapel Hill, North Carolina NC27517, USA (the **"Original Beneficiary"**); and

(3) **HUGH S. WILSON** whose address is at 575 Circle Drive, Denver, Colorado 80206-4112 USA (**"the Original Trustee"**);

each, a **"Party"** and together, the **"Parties"**

**RECITALS**

A. The Settlor, as legal and beneficial owner of the entire issued share capital of the Company (as defined below), has resolved to put in place the trust constituted by this Instrument so that, during its term, GL (as defined below) shall not have any ability to direct or influence save in the limited situations specified by this Instrument, or continue to be the ultimate beneficial owner of, the Damovo Group (as defined below).

B. As more particularly set out in the terms of this Instrument the assets to be acquired by the Trust shall be the entire issued and outstanding ordinary shares in the Company (as defined below) representing 100 per cent of the voting rights available to members of the Company and related rights, the Trust is irrevocable and only capable of dissolution in limited, prescribed circumstances, the Trustees are and will be independent of GL and shall not include a Restricted Person and the Beneficiaries shall not include GL or any GL Affiliate (as defined below).

C. The Settlor and the Original Trustee shall enter into the Trust Note (as defined below).

D. The Trust hereby created shall, save to the extent expressly or impliedly excluded, be made subject to the provisions of the Trustee Act 1925 and the Trustee Act 2000.

**NOW THIS INSTRUMENT WITNESSES** as follows:

**1. DEFINITIONS AND INTERPRETATION**

1.1 In this Instrument unless the context otherwise requires the following expressions have the following meanings respectively:-

**"Adverse Proceeding"** means the appeal and final resolution of the jury verdict in the trial of Greg Lindberg in the Western District of North Carolina;

**"Beneficiary"** means the Original Beneficiary or such other person or persons as designated from time to time by the Settlor as a Beneficiary in addition to or in place of the Original Beneficiary or any other Beneficiary so designated (or both) by giving no less than 5 business days' notice in writing of such designation to the Trustees, provided that such person shall not include GL or any GL Affiliate;

**"Code"** means the Internal Revenue Code of 1986 of the United States, as amended from time to time;

**"Company"** means UK Atlanta Holdings LLC a company registered in North Carolina (no. 1720481) whose registered office is at 2626, Glenwood Avenue, Ste 550, Raleigh, North Carolina, 27713, USA ;

**"Control"** means with respect to any specified person, the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" shall have meanings relative to the foregoing. Without limiting the generality of the foregoing, a person shall be deemed to Control any other person in which it owns, directly or indirectly, more than 50% of the ownership interests;

**"Damovo Group"** means together or separately the Company and any subsidiaries and subsidiary undertakings of the Company from time to time;

**"Disposition"** means a sale encumbrance, lien on or other disposition or disposal of all or any portion of the Trust Assets directly or indirectly; any partial disposition via issuance of shares, restricted shares; any issuance of employee stock-based compensation; the sale or other disposition of all or a material portion of the assets of the Company or any subsidiary; or the merger or other conversion of the Company; other than by reason of the application of such Trust Assets towards the Trust Costs as permitted herein;

**"GL"** means Greg Lindberg whose address is at 410 S. Rampart #390, Las Vegas, NV 89145.

**"GL Affiliate"** means (i) Global Growth Holdings Inc.; (ii) a corporation, limited partnership, general partnership, limited liability company, joint venture, association, company or other organisation under the Control of GL or Global Growth Holdings Inc.; and (iii) any person with a familial relationship with GL including, but not limited to, GL's current, former or (if applicable) future spouse or any of GL's children (natural or adopted);

**"Global Growth Holdings Inc."** means Global Growth Holdings Inc., a company registered in Delaware (no. 7918372) whose registered office is at 251 Little Falls Drive, Wilmington, Delaware 19808, c/o Corporation Service Company, United States;

**"Group Company"** means any company within the Damovo Group;

**"Maturity Date"** means the earlier of:

(a) the occurrence of a Disposition involving the sale or transfer of all Trust Assets; or

(b) the date of 17 June 2031;

**"Original Trustee"** has the meaning given in the Parties section of this Instrument;

**"person"** means a natural person, corporation, limited partnership, general partnership, limited liability company, joint venture, association, company, trust, bank trust company, land trust, business trust, statutory trust, or other organisation, whether or not a legal entity, and a government or agency or political subdivision thereof;

**"Regulations"** means U.S. Treasury Regulations promulgated under the Code;

**"Related Trustee"** means a trustee in respect of a trust settled by Global Growth Holdings, Inc. or any other GL Affiliate or business interest of GL from time to time where such trustee is required pursuant to the relevant terms of the trust to act independently from GL, any GL Affiliate or any business interest of GL provided that such trustee does not have a personal or other relationship (apart from a business relationship in its role as such a trustee);

**"Representatives"** means, in relation to a Party, its respective employees, agents, external legal advisers, accountants, consultants and financial advisers and, in the case of a company, also its respective directors and officers and providers of finance (and any of their respective employees, agents and external advisors);

**"Restricted Person"** means GL, any GL Affiliate and any other person who has personal, contractual, business, familial or other relationship with GL, Global Growth Holdings Inc. or any other of GL's Affiliates or business interests from time to time, in each case extending to any entity that was a GL Affiliate even if they are no longer a GL Affiliate but for the purposes of this definition: (i) a GL Affiliate shall exclude any existing member of the board of directors of an existing Group Company; and (ii) an individual shall not be considered to be a Restricted Person solely by reason of being a Related Trustee (and being party to agreements relating to their performance of that role);

**"Settlor Group"** means together or separately the Settlor and any subsidiaries and subsidiary undertakings of the Settlor from time to time;

**"Shares"** means the entire issued and outstanding ordinary shares in the Company transferred on or around the date of this Instrument from the Settlor to the Trustee to hold pursuant to the terms of the Trust;

**"Share Transfer Note Letter"** means the transfer note dated the same date as this Instrument pursuant to which the Original Trustee subscribes for the Shares;

**"Tax"** means:

(a) all taxes, levies, imposts, duties, social security contributions, surcharges, charges or withholdings, in each case in the nature of taxes, whether of the United Kingdom or elsewhere and shall include any amount payable as a consequence of any claim, direction, order or determination of any tax authority competent to impose, administer, levy, assess or collect any of the foregoing;

(b) any amount of tax which is the subject of or results in a charge, security or right to sell imposed by, or provided by statute to, a tax authority over any of the assets of the Trust; and

(c) all interest, penalties, surcharges, fines and other charges relating to any of the above or to a failure to make any return, comply with any reporting requirements or supply any information in connection with any of the above and the cost of removing any charge or other encumbrance imposed by a tax authority,

whether or not directly or primarily chargeable against or attributable to the Trustees and regardless of whether any Trustees has, or may have any right of reimbursement against any other person;

**"Trust"** means the trust created by this Instrument;

**"Trust Assets"** means the Shares, and all cash, property income, capital accretion or otherwise representing or derived from the Shares, any receivables and all related rights during the Trust Period and such other assets (if any) as the Trustees may come to hold on the terms of the Trust following the date of this Instrument;

**"Trust Costs"** has the meaning given in Clause 17.2;

**"Trust Documents"** means this Instrument and the Trust Note;

**"Trust Note"** means the promissory note dated on or around the date of this Instrument issued to the Settlor by the Trustees;

**"Trust Period"** has the meaning given in Clause 3;

**"Trustees"** means the Original Trustee while serving as trustee and such other person or persons as may be the trustees or trustee in place of or in addition to the Original Trustee for the time being, appointed in accordance with the terms set out in this Instrument and **"Trustee"** means any one of them.

For the purpose of the interpretation of this Instrument:

(a) words denoting the singular shall include the plural and vice versa;

(b) words denoting the masculine gender shall include the feminine gender and vice versa;

(c) no account shall be taken of clause headings which have been inserted for ease of reference only;

(d) references to any statutory provision shall be read and construed to references to such provision as is amended or re-enacted from time to time;

(e) references to clauses and Schedules are to be read and construed as references to clauses and Schedules of this Instrument;

(f) general words shall not be given a restrictive meaning because they are followed by words which are particular examples of the acts, matters or things covered by the general words and "including", "include" and "in particular" shall be construed without limitation;

(g) references to a person's loss of or ceasing to have "capacity" or being subject to an "incapacity" or similar shall mean any legal, physical or mental disability which renders that person incapable of managing his own affairs or in the case of a Trustee the administration of the Trust and the decision of the Settlor reached in good faith and after such inquiry as the Settlor deems appropriate as to when such disability exists or ceased to exist or does not exist shall be conclusive and binding and neither the Settlor nor the Trustees shall be liable for any action which may be taken by them or any other person pursuant to any such decision; and

(h) a reference to the Settlor shall include, where appropriate, any successor company resulting from any reconstruction or amalgamation of the Settlor.

## 2. ESTABLISHMENT OF TRUST

2.1 The Settlor and the Original Trustee by execution of this Instrument intend to and establish the Trust which shall operate as an irrevocable trust and shall be administered by the Trustees in accordance with this Instrument.

2.2 The Trust shall be established under the name "The Damovo Group Trust" and any correspondence, activities and operations in respect of the Trust shall be administered under such name.

2.3 The Original Trustee shall be the first Trustee of the Trust.

2.4 The Settlor shall have the power to designate from time to time any person or persons to be a Beneficiary whether in addition to or in place of the Original Beneficiary or any other Beneficiary so designated (or both) by giving no less than 5 business days' notice in writing of

such designation to the Trustees, provided that such person shall not include GL or any GL Affiliate and such a designation may specify the shares in which the Beneficiaries shall be entitled to the Trust Assets.

2.5 On every change in the Beneficiaries in accordance with Clause 2.3 a memorandum should be endorsed on or permanently annexed to this Instrument stating the names and addresses of the persons who are the Beneficiaries for the time being. The Trustee shall be entitled to rely on such memorandum (of the latest memorandum if more than one) as sufficient evidence that the persons named therein are duly designated Beneficiaries.

2.6 The Trustees shall hold the Trust Assets during the Trust Period on trust for each Beneficiary equally or in such shares as may be designated by the Settlor in any notice designating a Beneficiary.

## 3. DURATION OF THE TRUST

3.1 The Trust shall remain in existence and endure for the period beginning on the date of this Instrument and ending on the first occurring of:

(a) the reversal of the conviction in the Adverse Proceeding via reversal, acquittal, dismissal, final decision of the government to not re-try the case following any mistrial or remand for new trial, pardon, commutation or other exoneration or discharge of any sentence, provided such reversal, acquittal, dismissal or decision is final with no further right to appeal, retrial or other recourse available to the government, together with written confirmation from the Company that the expiration of the Trust will not materially adversely affect the operations of the Group; or

(b) the Trustees being satisfied (having consulted with the board of the Company) that the Trust is no longer required by reason of another trust having been interposed in the ownership structure such that no Restricted Person will become the ultimate beneficial owner of the Group following termination of the Trust; or

(c) the death of GL; or

(d) the Maturity Date; or

(e) the termination of the Trust as required pursuant to a final and binding court order,

(the **"Trust Period"**).

## 4. POWERS OF THE TRUSTEE

4.1 Subject to the provisions of Clause 5 below, The Trustees shall have all powers necessary and desirable to exercise all rights, privileges and discretions related to the Trust Assets at their absolute discretion including, but not limited to, those powers as set out in Schedule 1 to this Instrument insofar as the exercise of those powers shall not be inconsistent with the trust created by this Instrument.

4.2 During the Trust Period, without prejudice to Clause 9.1 the Trustees shall use all powers available to them pursuant to this Instrument to procure that no part of the Trust Assets (including the Shares and any other Trust Assets from time to time) shall be transferred directly or indirectly to a Restricted Person, other than as expressly permitted under Clause 11.

4.3 Each power shall be a separate power in addition to and without prejudice to the generality of all other powers vested in the Trustees, subject to the provisions of Clause 5 below and the Trustees may exercise all or any of those powers from time to time, without the intervention of

any Beneficiary, in such manner and to such extent as the Trustees in their absolute discretion see fit.

4.4 In the exercise of their powers and discretions, the Trustees may consider any recommendations made to them by the relevant Company's board of directors but the relevant Company's board of directors shall have no power to direct the Trustees to comply with such recommendations.

4.5 Notwithstanding the powers conferred on the Trustees by virtue of this Instrument or applicable law, none of the Trustees shall be obliged by this Instrument or by applicable law to perform any service or action other than or additional to:

(a) being the legal owner(s) of the Shares and any other Trust Asset, subject to and in accordance with this Instrument for the benefit of the Beneficiary;

(b) attending, in person or by proxy, and voting at the extraordinary general meetings or annual general meetings of the relevant Company;

(c) complying with the obligations of the Trustee under this Instrument; and

(d) making a Disposition of Trust Assets back to the Settlor in accordance with this Instrument,

without prejudice to the foregoing the Trustees shall not owe a duty of care to any Group Company.

## 5. EXERCISE OF POWERS AND RESTRICTIONS ON EXERCISE

5.1 No power, authority or discretion conferred on the Trustees by this Instrument or by law shall (despite anything to the contrary expressed or implied in this Instrument) be exercised if it causes any part of the Trust Assets to become applicable for the benefit of a Restricted Person (provided, however, that it is stipulated that a payment of any amounts owing to the Settlor pursuant to Clause 10.1, or any payments on the Trust Note, whether of principal, fees, or interest, shall not be a violation hereof) and shall not constitute a Disposition.

5.2 The Trustees shall:

(a) not make or enter into an agreement to make a Disposition (including pursuant to paragraph (b) below) without the prior written consent of the Settlor;

(b) not make a Disposition to the Settlor or any Restricted Person other than upon expiry of the Trust Period by reason of the events or circumstances described in sub-Clause 3.1(a); and

(c) to the extent that is reasonably practicable, co-operate with the Settlor in respect of a broader refinancing of the Settlor Group and / or a transaction involving the sale of all of the equity of the Damovo Group.

5.3 The Trustees shall use such powers as are then available to it in their capacity as registered holder of the Shares to procure that:

(a) no Group Company shall enter into any arrangements in respect of any refinancing in respect of the Damovo Group without the prior written approval of the Settlor; and

(b) the Damovo Group shall, to the extent that is reasonably practicable, co-operate with the Settlor in respect of a broader refinancing of the Settlor Group and / or a transaction involving the sale of all of the equity of the Damovo Group.

5.4 The Trustees shall not and are not permitted to perform any business of the Trust in the United Kingdom.

## 6. TRUSTEE WARRANTIES AND UNDERTAKINGS

6.1 Each Trustee hereby warrants, represents and undertakes to the Settlor that:

(a) Save, in the case of a Trustee that is a Related Trustee, in relation the representations below which relate to its business relationship or fees received in connection with any Related Trustee role that the relevant Trustee holds from time to time (and any agreements relating to the performance by the Trustee of that role):

(i) it is independent of, and not associated with, and does not have any personal, business or other relationship with, GL, any GL Affiliate or any Restricted Person;

(ii) it is, independent of, and not associated with, and does not have any personal, business or other relationship with any entity, business, asset or person owned by GL any GL Affiliate or any Restricted Person or, to the best of its knowledge, any entity, business, asset or person controlled, directly or indirectly, GL, any GL Affiliate or any Restricted Person; and

(iii) to the best of its knowledge and belief, it has not received any financial support or assistance, other than the Fees paid or payable by the Trust under this Instrument, from GL, any GL Affiliate or any Restricted Person;

(b) excluding the Trust Assets and any assets of any trust of which the relevant Trustee is a Related Trustee, it does not own, directly or indirectly, any shares, rights, warrants or options to acquire or subscribe for, any shares or other securities, any other voting interest, or any property or interest in property in the Company or any entity owned or controlled by GL, any GL Affiliate or any Restricted Person;

(c) it is capable of and shall at all times perform its duties as Trustee independent of, and without any influence from, GL, any GL Affiliate or any Restricted Person;

(d) it is capable of and shall at all times perform its duties as Trustee in accordance with all applicable laws;

(e) it is not and will not become resident in the United Kingdom for United Kingdom tax purposes and does not and will not act as Trustee in the course of a business which it carries on in the United Kingdom through a branch, agency or permanent establishment there;

(f) it is not and will not become a Restricted Person; and

(g) it is not acting upon and will not act upon any instruction or recommendation from a Restricted Person in the performance of its duties as Trustee.

6.2 Each Trustee covenants and undertakes to the Settlor to ensure that the matters as set out in sub-clauses 6.1(a)(i) to 6.1(f) shall remain true and correct for as long as he remains a trustee of the Trust.

## 7. POWERS OF THE BENEFICIARY

Save as provided by law, the Beneficiaries shall have no powers in the respect of the Trust or the Trust Assets during the Trust Period.

## 8. PROVISION OF INFORMATION TO TRUSTEES

8.1 The Trustees shall be entitled to rely upon any information relevant to the Trust and the Trust Assets supplied to them by the Settlor or by any Group Company, or any Representative or agent thereof, as conclusive evidence of the matter to which it relates and without prejudice to the generality of Clause 15 shall (fraud, wilful misconduct and gross negligence excepted) be in no way liable to the Settlor, the Beneficiary or any other person claiming for any loss caused or allegedly caused as a consequence of the Trustees relying on such information.

8.2 The Settlor shall, upon any reversal of the conviction of the Adverse Proceeding via reversal, acquittal, dismissal, final decision of the government to not re-try the case following any mistrial or remand for new trial, pardon, commutation or other exoneration or discharge of any sentence, as described in Clause 3.1(a), provide to the Trustee such evidence and confirmation from legal counsel that the Trustee may reasonably request that the relevant reversal, acquittal, dismissal or decision has taken place and is final with no further right to appeal, retrial or other recourse available to the government.

8.3 Without prejudice to the Trustee's duties in respect of the Trust, the Trustees may but are not required to retain at the expense of the Trust and to rely upon the expertise of independent consultants in performing their duties.

8.4 The Settlor and the Beneficiary confirm that the Trustees shall be entitled to rely on (i) Principal Amount of the Trust Note as being representative of fair market value for the Shares; (ii) a rate of 25% as being an appropriate rate of interest; and (iii) a valuation multiple of 19.1 x EBITDA as being an appropriate valuation metric for the Company, in each case as at the date of this Instrument for the purpose of agreeing the principal value and rate of interest to be included in the Trust Note and in full satisfaction of the Trustee's duties to agree the same under the Trust.

## 9. CONFIDENTIALITY

9.1 Subject to Clauses 9.2 and 9.3, each Party:

(a) shall treat as strictly confidential the provisions of this Instrument and any confidential information relating to the Damovo Group which they receive in connection herewith (whether before or following the date of this Instrument) (together "**Confidential Information**"); and

(b) shall not, except with the prior written consent of the other Parties (which shall not be unreasonably withheld or delayed), make use of (save for the purposes of performing its obligations under this Instrument) or disclose to any person (other than its Representatives in accordance with Clause 9.2) any Confidential Information.

9.2 Clause 9.1 shall not apply if and to the extent that the Party using or disclosing Confidential Information can demonstrate that:

(a) such disclosure is or reasonably appears to be required by law or by any stock exchange or any supervisory, regulatory, governmental or anti-trust body having applicable jurisdiction, (including, for the avoidance of doubt, any tax authority having applicable jurisdiction); or

(b) the Confidential Information concerned has come into the public domain other than through its fault (or that of its Representatives) or the fault of any person to whom such Confidential Information has been disclosed in accordance with this Clause 8.4.

9.3 Each Party undertakes that it shall (and shall procure that its affiliates shall) only disclose Confidential Information to Representatives where it is reasonably required for the purposes of

exercising its rights or performing its obligations under this Instrument or the other Trust Documents and only where the Representatives are informed of the confidential nature of the Confidential Information and the provisions of this Clause 8.4. In addition, the Parties agree that to the extent that any public communication, press announcement or any formal communication is required to be made in connection with this Instrument and the matters contained herein, each Party shall, acting in good faith, consult with the other Parties and take into account any reasonable feedback prior to making such announcement or communication.

9.4 The provisions of this Clause 10 shall survive termination or lapse, as the case may be, and shall continue for a period of five years from the date of this Instrument or (if later) two years from the date following the termination of this Instrument.

9.5 In no event shall any Trustee be required to make a public announcement or communication, save for any announcements or communication required by applicable laws or regulation.

## 10. RESIDUAL TRUSTS AND END OF TRUST PERIOD

10.1 At the end of the Trust Period, the Trust Assets shall be first used to settle in full all amounts owing on the Trust Note and, subject to full repayment and settlement of the Trust Note having occurred, the Trustees shall (subject to any prior exercise by them of their powers under this Instrument) make arrangements for the distribution of any residual Trust Assets to one or more of the Beneficiaries then living and in such proportion(s) equally or otherwise as may have been designated in writing to the Trustees by the Settlor.

10.2 A transfer by the Trustees to the Settlor of the Trust Assets (including the proceeds of any Disposition) on the Maturity Date or, if earlier, the termination of this Instrument shall constitute the payment to the Settlor by the Original Trustee or any other Trustee who has acceded to the Trust Note as debtor of the Principal Amount (as defined in the Trust Note) plus all accrued but unpaid interest (after provision of all Trust Costs) in full, regardless of whether the value of the Trust Assets shall have decreased below the outstanding balance of the Principal Amount (as defined in the Trust Note) (plus all accrued but unpaid interest) at the time of such payment.

10.3 For the purposes of valuing the Shares at the end of the Trust Period the Trustees shall use a valuation multiple no greater than the valuation multiple used to determine the Principal Amount in the Trust Note (being a valuation multiple of 19.1 x EBITDA on a debt free cash free basis).

## 11. TREATMENT OF DIVIDENDS

11.1 Following any deductions required for all Trust Costs as set forth in Clause 17, the Trustee shall use all net cash from any cash dividends received by the Trust in relation to the Shares to make interest payments or, with the prior consent of the Settlor, principal payments, in respect of the Trust Note pursuant to the terms as set out in therein and such payment shall not be deemed to be Disposition.

## 12. VOTING

12.1 Subject to the provisions in Clause 5, the Trustees shall be entitled to vote in respect of the Shares held in the Trust Assets at any general meeting of the relevant Company.

12.2 None of the Beneficiaries and no Restricted Person shall be entitled in any way to compel, control or force the exercise in any particular manner of any voting or other rights which may from time to time be exercisable by the Trustees.

12.3 The Trustees shall be entitled to rely on all information as set forth in Clause 8 in exercising their rights to vote Shares.

## 13. INDEPENDENCE OF DAMOVO GROUP BOARDS

13.1 During the Trust Period, the Trustees shall use such powers as are available to them in their capacity as registered holder of the Shares to procure that there shall be:

(a) no change to the board of directors of the Company, except in the event of death, resignation or disability of a director; and

(b) no Restricted Person shall become a member of any board of directors of any member of the Damovo Group.

## 14. EXONERATION OF TRUSTEES

14.1 None of the Trustees shall be liable for any loss or damage to the Trust Assets or the income thereof arising from any improper investment or purchase made or retained by the Trustees or other action taken or omitted to be taken by the Trustees (subject to the terms of this Instrument) in good faith unless such loss or damage is attributable to fraud, wilful misconduct or gross negligence on the part of the Trustees (or any of them).

14.2 The Trustees shall:

(a) be under no obligation to procure that the Trust prospers;

(b) be under no obligation to ensure that the Trust Assets increase in value;

(c) be under no obligation to ensure that Trust diversifies or makes any investment for and on behalf of the Trust;

(d) save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, not be liable for any loss, reduction in value, destruction, damage, seizure or sequestration of the Trust Assets (or any part thereof) to the Settlor or any Beneficiary; or

(e) be under no obligation to take any action in relation to the Trust unless that action is appropriately funded in compliance with applicable law from the Trust Assets available to the Trustee.

14.3 Save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, neither the Settlor nor any Beneficiary shall have recourse to any of the personal assets of Trustees as a result of any breach of the terms of this Instrument, including but not limited to any enforcement action brought against the principal private residence or any other residence maintained by any Trustee. Save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, the Trust Assets shall be the only source of funds to satisfy a claim for damages by the Settlor against the Trustee for any reason. None of the Trustees shall be considered to have a conflict of interest by virtue of the fact that any of them have personal investments in industries or businesses of a similar nature of any business or going concern carried out by any part of the Trust Assets from time to time.

14.4 None of the Trustees shall be liable as above for a delegation or appointment made, or permitted to continue, by the Trustees, absent fraud, wilful misconduct or gross negligence.

14.5 The duty of care imposed upon the Trustees by law is not excluded by any term of this Instrument.

## 15. INDEMNITY

15.1 No Trustee shall be liable for any loss or damage to the Trust Assets (or any part thereof) or to the Settlor or any Beneficiary, caused by any act or omission of the Trustee, or other event or thing whatsoever, whether with respect to trust administration, modification, investment, management or distribution, any election, allocation or division, or the purchase or retaining of any property legally requiring remedial action or any other matter pertaining to the Trustee's services as such, unless the loss or damage is due to the Trustee's own gross negligence, wilful misconduct, bad faith or fraud (herein "**Indemnified Acts**"). Each Trustee serving at any time with respect to a trust hereunder shall be fully indemnified from the Trust Assets (and thereafter, if the Trust Assets cannot adequately indemnify the Trustees, will be indemnified by the Settlor and the Settlor shall procure indemnification from the Settlor Group) for any liability, attorneys' fees or other reasonable expenses or costs incurred by, or judgment, amount paid in settlement or other damages assessed against, the Trustee with respect to all Indemnified Acts, and such amounts incurred in defending an action brought or threatened in respect of Indemnified Acts shall be paid out of the Trust Assets (or by the Settlor if the Trust Assets cannot adequately cover such amounts) in advance of final disposition upon delivery to the Settlor of a legal opinion of trust counsel that indemnification is likely to be warranted and the Trustee's written agreement to refund such amounts if it is ultimately determined that indemnification is not warranted.

15.2 Unless the Trustees have actual notice that an event has occurred affecting the beneficial interests in any trust hereunder, the Trustees shall not be liable to any beneficiary for distributions made as though the event had not occurred.

15.3 In addition, the Trustee shall have the benefit of all powers, privileges and immunities conferred upon a trustee by statute or by the law of England and Wales.

15.4 This Clause 15 survives the completion of any Trustee's service as Trustee and the termination of this Instrument.

## 16. APPOINTMENT, RETIREMENT AND REMOVAL OF TRUSTEES

16.1 Any Trustee may, at any time, by written notice given to the Company and any co-trustee, retire from office one month after the date when the notice is received by the Company (or any shorter period agreed in writing by the Company) provided that where the retiring Trustee is the sole Trustee any such retirement shall take effect upon the appointment by the Company of a replacement Trustee pursuant to Clause 16.3.

16.2 The Company may following receipt of the Settlor's consent (such consent not to be unreasonably withheld or delayed):

(a) remove any Trustee from office by giving 30 days' prior written notice to that Trustee (unless such notice is waived by such Trustee and subject to as provided in Clause 16.3) without giving any reason for the removal. This power can only be exercised if there will be, on the removal, at least one remaining person as Trustee, or if the Trustee simultaneously designates a replacement Trustee;

(b) appoint a person (or persons) in place of any Trustee who ceases to be a Trustee for any reason; and

(c) appoint additional Trustees (without limitation as to number),

in each case provided that no Restricted Person shall be appointed as a Trustee at any time and provided that the new Trustee(s) shall accede to this Instrument and the Trust Note.

16.3 In the event that a Trustee gives notice to retire from office, dies, ceases to have capacity, becomes bankrupt or insolvent or unable to pay its debts as they fall due the Company shall, following receipt of the Settlor's consent (such consent not to be unreasonably withheld or delayed) replace the relevant Trustee (and in the event of the Trustee's death, loss of capacity, bankruptcy or insolvency, the removal of the relevant Trustee may be made immediately by written notice) provided that no Restricted Person shall be appointed as a Trustee at any time and provided that the new Trustee(s) shall accede to this Instrument and the Trust Note.

16.4 Subject to the requirements set out in Clause 16.2, any person may be appointed as Trustee, on the terms and conditions the Company agrees with that person, wherever that person is domiciled or resident (or is incorporated or carries on business, if it is a corporation), save that no person may be appointed as Trustee if it is resident in the United Kingdom for United Kingdom tax purposes or if it will act as Trustee in the course of a business which it carries on in the United Kingdom through a branch, agency or permanent establishment there or, if it is a corporation, if it is incorporated in any part of the United Kingdom.

16.5 A retiring or removed Trustee shall execute all transfers or other documents, and do all acts necessary to vest the Trust Assets in the new or continuing Trustees. A retiring or removed Trustee who is liable under this Instrument in any way shall not be bound to transfer the Trust Assets unless reasonable security is provided to indemnify that Trustee against the liability. In the event that the retiring or removed Trustee fails to take such acts the continuing Trustee or, in the case where the sole Trustee has retired or been removed, the Beneficiary shall have the power to execute all transfers or other documents, and do all acts necessary to vest the Trust Assets in the new or continuing Trustees, provided that reasonable security is provided to indemnify the retiring or removed Trustee against the liability.

16.6 Unless there is a sole Trustee, this Clause 16.6 shall govern the proceedings of the Trustees:

(a) the trusts, powers and discretions vested in the Trustees by this Instrument shall be exercised by all the Trustees acting together;

(b) without prejudice to sub-clause 16.6(a), if there are more than two Trustees then any disagreements between Trustees on the exercise of the trusts, powers and discretions vested in them shall be determined by majority vote;

(c) without prejudice to sub-clauses 16.6(a) and 16.6(b), if no majority is reached by the Trustees in respect of a matter between Trustees on the exercise of the trusts, powers and discretions vested in them, then the Company may pursuant to the terms set out in this Instrument (i) appoint a replacement Trustee; or (ii) appoint an additional Trustee, in each case such that a majority vote can be reached; and

(d) unless otherwise agreed by the Trustees, a resolution in writing signed by each Trustee (whether on the same document or in counterparts) shall be as valid as if it has been passed at a meeting of the Trustees.

16.7 On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Instrument stating the names of the persons who are the Trustees for the time being and shall be signed by the persons so named. Any person dealing with the affairs of this Trust shall be entitled to rely upon any such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the persons named therein are duly constituted the Trustees.

## 17. REMUNERATION AND PAYMENT OF TRUST COSTS

17.1 Each Trustee shall be remunerated by the Trust by the Settlor, out of the Trust Assets or, if agreed between the Trustee and Company, by the Company (or any other company in the

Damovo Group as agreed between the Company and the Trustee), in such amount and on such terms as set out in Schedule 2 to this Instrument.

17.2 The Trustees shall pay from the Trust Assets all trust costs and Taxes, including, but not limited to expenses incurred in the establishment of the Trust and any costs and Taxes incurred in connection with the establishment of the Trust, in the administration and devolution of the Trust Assets, the determination and payment of Taxes thereon, the services and expenses of agents retained by the Trustees in execution of their duties and other expenses described in this Instrument (the **"Trust Costs"**), and the Trustees shall be entitled to reimbursement for any Trust Costs incurred and advanced on behalf of the Trust. To the extent that the Trustees consider that there is not sufficient cash in the Trust Assets to pay or reimburse such expenses they shall request payment by the Settlor and the Settlor shall, subject to compliance with applicable laws, make such payment.

**18. CLAIMANT'S OBLIGATIONS**

18.1 Any person entitled to, or claiming, any benefit under the Trust shall produce any evidence and information required by the Trustees for the purposes of the Trust. Payment of any benefit under the Trust to any person shall be conditional on that person producing any evidence or information that the Trustees may require.

18.2 The Trustees shall be entitled to deduct from any benefit payable any Tax or duty for which the Trustees are or may be liable in respect of the benefit concerned.

18.3 The Trustees shall not be accountable for, or obliged to see to, the application of any payment made under this Instrument if it is made:

(a) directly to a minor, to his parent or guardian or to the person with whom he resides; or

(b) to any individual or institution who or which is or appears to be responsible for the care of a person to whom the payment is otherwise to be made;

if the Trustees in their absolute discretion consider that that person's incapacity does not warrant their making the payment to him direct.

**19. RIGHTS OF SETTLOR CREDITORS**

19.1 Nothing in this Instrument and the Trust hereby constituted is intended to impact on the rights of any existing creditors of the Settlor or its affiliates.

**20. TAX MATTERS**

20.1 The Trust shall not constitute a "business trust" within the meaning of Regulations Section 301.7701-4(b) or any other business entity for federal income tax purposes, but shall instead constitute a trust within the meaning of Regulations Section 301.7701-4(c) and a "grantor trust" under Subpart E of Part 1, Subchapter J of the Code (Code Sections 671 and following) in the United States. As such, all income and deductions of the Trust are treated for income tax purposes as income and deductions of the Settlor.

20.2 The Settlor and the Trustees agree that they will file all tax returns in a manner consistent with the intent set out in Clause 20.1 unless otherwise required by a taxing authority. Except as otherwise expressly provided herein, any tax elections required or permitted to be made by the Trust under the Code or otherwise will be made by the Settlor. The Trust will not elect to be treated as a corporation for any tax purpose. In addition, notwithstanding any other provision of this Agreement, the Trustees shall pay to the Settlor such amounts from the net income of the Trust as shall be necessary for the Settlor, or advised by the Settlor to pay any U.S. or non-U.S. federal, state and local income tax on the net income of the Trust that is required to be paid

by the Settlor or its owners pursuant to Subpart E of the Code and the comparable provisions of any state or local income tax law or regulation. For purposes of this Clause 20.2, the "Settlor" shall include the person (individual or entity) ultimately liable for payment of U.S. or non-U.S. federal, state, and local income tax on the income of the Trust that is deemed to pass through the Settlor for Tax law purposes. The amount payable by the Trust to the Settlor for a particular tax period pursuant to this Clause 20.2 shall be determined based on a reasonable estimate of the amount of Tax that would be due based on the highest applicable tax rate applied to the amount of net income of the Trust for that tax period that would be deemed to pass through to the Settlor from the Trust. The Trust shall pay the amount required pursuant to this Clause 20.2 at least 10 days prior to the relevant statutory deadline for payment of the applicable Tax.

20.3 Notwithstanding the foregoing provisions of this Clause 20, if the Trustee shall receive any notice of Tax due or deficiency from any jurisdiction that has or appears to have taxing authority over the Trust, nothing shall prevent the Trustees from satisfying such amounts from the Trust Assets.

## 21. NOTICES

Any notice or information to be given hereunder by the Settlor to the Trustees shall be validly given if it is signed by any member of the board of directors of the Settlor or such person or persons as are authorised by the Board.

## 22. AMENDMENT OF TRUST INSTRUMENT

The Trustees may at any time by deed amend any of the provisions of this Instrument in any respect, provided that such amendment shall not have effect if:

(a) it would affect the purpose of the Trust;

(b) it would confer on the Settlor or any Restricted Person a benefit or possibility of a benefit out of the Trust Assets or income thereof except to the extent contemplated hereunder and pursuant to the Trust Note;

(c) it would extend the power conferred in this Clause 22 to remove the restrictions in this Clause;

(d) it would reduce or adversely affect the right or interest of any Beneficiary insofar as such right or interest has been granted, awarded or allocated pursuant to the prior exercise by the Trustees of their powers under this Instrument; or

(e) the deed making the amendment has not been executed by the Settlor (unless the Settlor is in liquidation or has previously confirmed in writing to the Trustees that its consent to any future amendment is no longer necessary).

## 23. COUNTERPARTS

This Instrument may be executed in any number of counterparts and by the parties on separate counterparts but shall not be effective until each Party has executed at least one counterpart and each counterpart shall constitute an original of this Instrument but all other counterparts shall together constitute one and the same instrument.

## 24. ASSIGNMENT

24.1 No benefits or rights under this Instrument can be assigned, charged or alienated in any way. No payment shall be made in respect of any benefit or right if:

(a) the person entitled to it has, to the knowledge of the Trustees, purported to assign or charge that payment (or any part of it or any interest in it); or

(b) the Trustees know of any act or event which would or may reasonably result in the benefit or right (or any part of or interest in it) belonging to that person to become vested in, or charged in favour of, any person(s) other than that person or his legal personal representatives.

24.2 Subject to other provisions of this Instrument, the Trustees shall have full discretion as to the payment or application of any benefit forfeited to, or for the benefit of, such person.

## 25. THIRD PARTY RIGHTS

25.1 The named beneficiaries shall be entitled to the rights and benefits of, and rely on, Clause 16 and Clause 23 and shall, in each case, have the right to enforce the relevant terms by reason of the Contracts (Rights of Third Parties) Act 1999.

25.2 Except as provided for in Clause 25.1, a person who is not a party to this Instrument shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

25.3 Each party represents to the other that their respective rights to terminate, rescind or agree any amendment, variation, waiver or settlement under this Instrument are not subject to the consent of any person that is not a party to this Instrument.

## 26. LAW

26.1 The Trust and the Instrument and any non-contractual obligations arising out of or in connection therewith shall be governed by and construed in accordance with the laws of England and Wales.

26.2 The Parties (and each Group Company) shall submit to the exclusive jurisdiction of the English courts, in relation to any dispute or claim arising under the Trust, this Instrument or any non-contractual obligation arising out of or in connection therewith, notwithstanding that one or more of the Trustees may from time to time be resident or domiciled elsewhere than in England.

DocuSign Envelope ID: E2BF87AE-4E4D-4502-B8B8-9E8E1310F2E2

This agreement has been entered into as a deed on the date stated at the beginning of it.

Signed and delivered as a deed by **DAMOVO FINANCIAL SERVICES, LLC**

DocuSigned by:
Greg Lindberg
094F2DEFCB30443

Authorised Signatory

In the presence of: DocuSigned by: Catia Perry 6650A15977B44EB...

Name: Catia Perry

Address: 2148 Madison Ave
Montgomery, AL 36107

Position: Executive Assistant

SIGNED AND DELIVERED as a Deed by **HUGH S. WILSON** in the presence of Clare Maloney Wilson

**HUGH S. WILSON** ..........................................

In the presence of ..........................................

Name: Clare Maloney Wilson

Address: 575 Circle Dr

Denver Co 80206

Position: Spouse

SIGNED AND DELIVERED as a Deed by **ROBERT GADDY** in the presence of

**ROBERT GADDY** ..............................

In the presence of ..............................

Name: Janet Chen

Address: 604 Tinkerbell Rd.
Chapel Hill, NC 27517

Position: Assistant Director, NCSU

## SCHEDULE 1

## ADMINISTRATIVE POWERS

Subject to the limitations set forth herein, the Trustees powers shall include, but shall not be limited to:

1.1 the power to receive notice of, attend and vote at any general meeting of the ordinary shareholders of the relevant Company, including all or any adjournment of such meetings;

1.2 the power to sign any resolution as the registered holder of the Shares;

1.3 the power to complete and return proxy cards, consents to short notice and any other documents required to be signed by the registered holder of the Shares;

1.4 the power to otherwise execute, deliver and do all deeds, instruments and acts insofar as may be done in the Trustees' capacity as the registered holder of the Shares in exercising its powers as Trustees under the Trust;

1.5 to power to insure the Trust Assets (to the extent appropriate);

1.6 the power to procure that each of the Trustees obtains professional indemnity insurance for so long as they are a Trustee of the Trust together with any run-off cover deemed prudent by the relevant Trustee in respect of such professional indemnity insurance;

1.7 the power to perform the obligations of the Trustees under the Trust Note;

1.8 the power to perform the obligations of the Trustees under this Instrument;

1.9 the power to open a bank account or bank accounts for and on behalf of the Trust and carry on normal banking processes;

1.10 the power to file any tax returns the Trustees may determine in their absolute discretion are required and pay (or refrain from paying) Taxes and estimated income taxes on any reasonable basis the Trustees may determine in their absolute discretion without any liability whatsoever for overpayment, underpayment or non-payment of such Taxes or for any loss, interest or penalty because of such overpayment, underpayment or non-payment;

1.11 the power to collect, compromise, release or otherwise settle claims; to institute suits (at law or in equity); to collect any property or interest of the Trust Assets; to be reimbursed for expenses of litigation; and to be indemnified out of the Trust Assets for all such expenses prior to instituting any such legal action;

1.12 the power to accept the payment or transfer of further assets to the Trustees to hold on the terms of the Trust whether from the Settlor or a third party, where the Trustees believe that this is necessary or beneficial for the operation of the Trust; and

1.13 the power to amend this Instrument (i) to comply with any relevant court order; or (ii) to cure ambiguities or correct minor errors that are not inconsistent with the other provisions of this Instrument.

## SCHEDULE 2

## TRUSTEE REMUNERATION

1.1 The Original Trustee shall be paid the sum of €20,000 (plus VAT, if applicable) per (whole or partial) calendar month (the "***Fees***"), for as long as he remains a Trustee. The Fees shall be paid by the Settlor or, if agreed between the Trustee and Company, by the Company (or any other company in the Damovo Group as agreed between the Company and the Trustee). To the extent applicable, the Fees shall be paid to the Trustee net of any withholding tax amounts.

1.2 The Fees shall be paid into a bank account nominated in writing by the Original Trustee in arrears each calendar month following the date of this Instrument (or on the Business Day next following such date to the extent that such date is not a Business Day).

1.3 Any other Trustee shall have his or its remuneration determined by the Settlor at the time of appointment of such Trustee and the terms of such remuneration shall be recorded in the relevant deed of accession to this Instrument.

1.4 Any Trustee shall be deemed to be an independent contractor and nothing in this Instrument shall give rise to an employment relationship between the Trustee (or its director or officers) and any other entity. No Trustee shall be required to perform his or its duties in the United Kingdom or any other locale.

EXHIBIT A

EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-CR-48-MOC

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREG E. LINDBERG** | **FINAL ORDER OF RESTITUTION** |

**THIS MATTER** is before the Court on the Second Supplement to Report and Recommendations Regarding Restitution submitted by Joseph W. Grier, III, the Special Master (the "Special Master") appointed by this Court in the Order Appointing Special Master (the "Special Master Order," Doc. No. 56), and on various motions and other filings submitted by Defendant and other interested parties regarding restitution. This Order represents the Court's findings and conclusions regarding all such filings as they relate to restitution.

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). Defendant pled guilty to Count One (conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor fraud) and Count Thirteen (money laundering conspiracy) pursuant to a written plea agreement. As part of his plea agreement, Defendant agreed to pay restitution to victims of the conduct charged in the indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court."

EXHIBIT A

On December 5, 2024, the United States and Defendant jointly moved the Court to enter an order appointing a special master and requesting that the Court provide the Special Master with various powers and duties regarding the restitution process. (Doc. No. 54). The Court entered the Special Master Order on January 23, 2025. (Doc. No. 56). As requested by the parties, the Special Master Order directed the Special Master to, among other things: (a) verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses; and (b) fashion a proposed restitution order. As set forth in the Special Master Order, in order to "fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i)."

On March 20, 2026, the Special Master filed his Report and Recommendations Regarding Restitution (Doc. No. 106) (the "Initial Report," and collectively with a first supplement to the report filed on May 15, 2026 (Doc. No. 146) (the "First Supplement") and a final supplement to the report filed on July 23, 2026 (Doc. No. ___) (the "Final Supplement"), the "Restitution Report").[1] The Initial Report and First Supplement: (1) focused on the first two of the foregoing three determinations sought by the Special Master Order, (A) who the payees of restitution are in this Case and (B) the amount of restitution ordered for each payee; and (2) deferred issues concerning the timing or priority of payments to the payees of restitution until a later time.

The Initial Report triggered several responses from third parties interested in the outcome of the restitution process in this Case, including by: the Commissioner of the Vermont Department of Financial Regulation, Kaj Samsom, solely in his capacity as Rehabilitator of Vista Life &

[1] Capitalized terms not defined herein shall have the meanings assigned thereto in the Restitution Report.

Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Vista") (Doc. No. 115); the North Carolina Insurance Companies (Doc. No. 123); Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM, in their capacities as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix") (Doc. No. 130); ULICO (Doc. No. 136); NOLHGA (Doc. No. 137); and the Bermuda Insurance Companies (Doc. No. 138) (collectively, the "Non-Defendant Responses"). Defendant also filed an initial response to the Initial Report on May 4, 2026 (Doc. No. 132) ("Defendant's Initial Response").

After taking into consideration all of the various positions advanced and arguments made within Defendant's Initial Response and the Non-Defendant Responses, the Special Master filed the First Supplement on May 15, 2026, adjusting some of the Special Master's recommendations to the Court, leaving most of the recommendations unchanged, and holding open for further investigation and consideration certain newly identified arguments that the Special Master lacked the time to fully consider in advance of Defendant's sentencing hearing.

The sentencing hearing in this Case occurred on May 26, 2026 (the "Sentencing Hearing"). During the Sentencing Hearing, the Court orally pronounced the sentence upon Defendant and signed a consent order and judgment of forfeiture (Doc. No. 160) and a preliminary order of restitution (Doc. No. 161) (the "Preliminary Restitution Order"). The Court subsequently issued a written judgment on May 29, 2026 (Doc. No. 162), incorporating its oral pronouncement of the sentence, the consent order and judgment of forfeiture, and the Preliminary Restitution Order. As indicated by Defendant's counsel and attorneys for the government during the sentencing hearing and as expressly stated in the Preliminary Restitution Order, the Special Master was to further

EXHIBIT A

investigate the specifically enumerated open restitution issues in the 60 days following sentencing and make a final recommendation to the Court during such period.

Following entry of the Preliminary Restitution Order: Vista filed a motion seeking reconsideration of Vista's exclusion from the parties awarded restitution in this Case (Doc. No. 171) (the "Reconsideration Motion"); Defendant filed a supplement to the Defendant's Initial Response (Doc. Nos. 174–88) and various emergency motions, objections, and other documents, within which various restitution-related arguments were embedded (Doc. Nos. 172, 173, 190, 198, 201, 202, 211, 212, 213, 219, 220, 234, & 238) (collectively, "Defendant's Supplemental Responses")[2]; Conservatrix filed with the Fourth Circuit Court of Appeals a petition for writ of mandamus to compel this Court to treat Conservatrix among the parties awarded restitution in this Case, which petition the Fourth Circuit denied with prejudice (*see* Doc. Nos. 189, 193, 203 & 204); and Vista filed a motion affirmatively seeking restitution from the Court pursuant the Crime Victims' Rights Act,18 U.S.C. § 3771 (Doc. No. 221) (the "CVRA Motion").

Thereafter, the Special Master filed the Final Supplement, which made recommendations to the Court concerning the timing or priority of payments to the payees of restitution, restated the Special Master's positions on the arguments made in the Non-Defendant Responses and Defendant's Initial Response, and addressed Defendant's contentions from Defendant's Supplemental Responses.

Based on the Court's review of (I) the Restitution Report, the Non-Defendant Responses, Defendant's Initial Response, Defendant's Supplemental Responses, Vista's Reconsideration Motion, and Vista's CVRA Motion, (II) the arguments and representations made by Defendant during the Sentencing Hearing, (III) the evidence and arguments presented during a hearing held

---

[2] Defendant also filed a Notice of Appeal of the judgment, order of restitution, and consent order and judgment of forfeiture on June 11, 2026. (Doc. Nos. 191 & 192).

to consider restitution-related issues in this Case, (IV) victim impact statements submitted to the Court, and (V) the record in this Case more generally, the Court finds and concludes as follows[3]:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Special Master has conducted a thorough and impartial investigation of all the restitution-related issues relevant to this Case in accordance with the power and duties set forth in the Special Master Order. At the Sentencing Hearing, Defendant specifically "recognize[d] the excellent work of the Special Master and of its financial advisor in this case."

Except as expressly provided otherwise herein, the Court generally agrees with the Special Master's factual findings and legal conclusions appearing in the Restitution Report, all of which are incorporated herein by reference and adopted as the Court's own findings and conclusions. The Court's omission in this Order of a specific reference to any finding or conclusion in the Restitution Report shall not imply that the Court failed to review, or did not concur, with such finding or conclusion. Defendant has not raised genuine issues of material fact that affect the Court's general view of the factual findings and legal conclusions appearing in the Restitution Report.

Pursuant to the Plea Agreement, Defendant committed to paying "full restitution" to CBL, BLIC, SNIC, SNRC, Northstar, Omnia, PBLA, ULICO, and PBIHL for the conduct charged in the Bill of Indictment.

Based on the Bill of Indictment and the particular circumstances of this Case, a person must meet the following criteria in order to potentially qualify as a person due restitution in connection with this Case:

Either (1)

- an insurance company,

[3] To the extent any finding of fact includes conclusions of law, such finding shall be also deemed a conclusion of law, and vice versa.

- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact diverted to a Defendant-affiliated entity,
- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies, and
- which diverted assets actually lost value as a proximate result of Defendant's activities.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

The following victims qualify for restitution based on the foregoing criteria: CBL; BLIC; SNIC; SNRC; Northstar; Omnia; PBLA (including ULICO); and PBIHL.

Conservatrix does not qualify as a person due restitution because no unreturned assets belonging to Conservatrix were diverted to a Defendant-affiliated entity. It also appears that neither Defendant nor Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies to Conservatrix or Conservatrix's regulator(s).

Vista does not qualify as a person due restitution because it does not appear that Vista relied on any material misrepresentations or omissions concerning those affiliated investments or asset management strategies made by Defendant or Defendant's agents to Vista or Vista's regulator(s), at least not in the same manner as those described in the indictment.

Defendant agrees with the Special Master that Defendant's restitution responsibility should be calculated based on the outstanding balances owed on Affiliate Investments, using the principal balances shown in the IALA as the starting point. The Court finds this to be an appropriate methodology for calculating restitution losses in this Case, including the exclusion of "non-IALA" investments from the analysis.

To the extent the Special Master's recommendations deviate from the principal balances agreed to by the Defendant and the North Carolina Insurance Companies in the IALA, the Special Master's recommended deviations are fair and appropriate and the Court adopts them.

Defendant's acquisition of Agera—and assurances that Defendant would be able to rehabilitate, or otherwise adequately address the insurance companies' hardships attributable to, Agera—was critical to Defendant's fraud on the Bermuda Insurance Companies. Defendant benefitted substantially from all of the Affiliate Investments in Agera, even those that were made before Defendant controlled the investing insurance company or before Defendant controlled Agera. As such, Defendant should not receive any credit or offsets towards restitution based upon the Agera investments.

Given the substantial amount of time that has elapsed since the restitution losses were incurred and the circumstances of this Case more generally, it is necessary to apply an interest component to the Affiliate Investments' unpaid principal to account for the "time value of money." An interest rate equal to 2.19% per annum fairly and reasonably accounts for the time value of money under the circumstances present in this Case and is necessary to make the victims whole in this Case. The Court does not believe, or intend, that such interest honors the victims' disappointed expectations or provides the victims the benefit of any bargain they had with Defendant. Indeed, this interest rate is not only less than the interest rate Defendant agreed to pay in the Affiliate Investments themselves and is less than the reduced interest rates Defendant agreed to pay in the IALA, but it is also less—as the North Carolina Insurance Companies highlight in their objection—than the "applicable federal rate" used to avoid adverse tax consequences triggered by "interest free loans."

The Special Master's analysis appropriately accepts and immediately accounts for Defendant's following Asserted Recoveries: quarterly interest payments and other partial payments made by Defendant to the victims on Affiliate Investments; a $25 million partial payment made directly to ULICO; the $289 million in aggregate sale proceeds distributed to the victims from the sale of the Clanwilliam Group of Companies; and approximately $39 million of the requested approximately $80 million in certain preferred equity payments made to the victims itemized in the Final Supplement.

Defendant's following Asserted Recoveries were made for consideration independent of paying down the Affiliate Investments' balances: $5 million redemption fee paid to CBL; the approximately $28 million in reimbursements to expenses incurred by SNIC; $3 million subordination fee paid to CBL; CBL's purchase of "Eye Care Leaders" out of bankruptcy; ULICO's sales of real estate; and the Bermuda Insurance Companies' sales of assets unrelated to the IALA totaling approximately $9.8 million. As such, Defendant should not receive any credit or offsets towards restitution for these Asserted Recoveries.

Defendant has failed to rebut with genuine issues of material fact the recommendations of the Special Master that Defendant's restitution obligation should NOT be reduced on account of the following requested offsets: 2018 value of the equity interest in the North Carolina Insurance Companies; the North Carolina Insurance Companies' failure to refinance "UKAT"; the "Insurance-Holdco Debt" attributable "to acquisitions driven by the GBIG management team"; proceeds from sales of "zero coupon bonds"; "losses" based on the early liquidation of the "zero coupon bonds"; the "below-market" sale of CWG; and the sale of "Finnazen/Blue Violet." As such, Defendant should not receive any credit or offsets towards restitution for these Asserted Recoveries.

Except as otherwise included in the Special Master's calculations, the Bermuda Insurance Companies and the North Carolina Insurance Companies failed to demonstrate that transfers by those entities to entities referred to as "SFL" or "SASL" should be counted toward Defendant's restitution obligation.

ULICO has not unreasonably failed to monetize the preferred equity interest referenced in the Defendant's Initial Response and Defendant's Supplemental Responses. As such, Defendant should not receive any credit or offsets towards restitution at this point. Defendant's restitution obligations shall be reduced as appropriate if and when ULICO monetizes this interest.

None of the $20 million placed in escrow to resolve possible Irish income tax liabilities that may result from the sale of the Clanwilliam Group of Companies have been paid to persons due restitution in this Case. As such, Defendant should not receive any credit or offsets towards restitution at this point. Defendant's restitution obligations shall be reduced if and when any of that $20 million is distributed to persons due restitution in this Case.

The Guaranty Associations did not provide compensation to the North Carolina Insurance Companies within the meaning of 18 U.S.C. § 3664(j)(1), and the facts and circumstances of this Case do not justify treating the Bermuda Insurance Companies differently than the North Carolina Insurance Companies for purposes of restitution. As such, partial restitution payments should be paid to all payees awarded restitution through this Order *pari passu* and *pro rata* based on the restitution loss amounts set forth herein.

Having reviewed the entire written record in this Case, and viewing the facts in a light most favorable to Defendant, the Court finds that there are no contested material factual issues regarding restitution that require an evidentiary hearing. The findings of fact and law by the Special Master

have not been successfully rebutted by any party and are hereby adopted. Based upon the foregoing Findings of Fact and Conclusions of Law, **IT IS, THEREFORE ORDERED** that:

Defendant shall make restitution to the following payees in the amounts listed below.

| NAME OF PAYEE | RESTITUTION AMOUNT |
|---|---|
| Colorado Bankers Life Insurance Company | $795,000,000 |
| Bankers Life Insurance Company | $18,000,000 |
| Southland National Insurance Company | $124,000,000 |
| Southland National Reinsurance Corporation | $0.00 |
| Northstar Financial Services (Bermuda) Ltd. | $179,000,000 |
| Omnia Ltd. | $43,000,000 |
| PB Life and Annuity Co., Ltd. / Universal Life Ins. Co. | $413,000,000 |
| PB Investment Holdings Ltd. | $44,000,000 |
| **TOTAL** | **$1,616,000,000** |

The restitution recovery of any payee is limited to the amount of their loss, and Defendant's liability to a payee under this Order ceases if and when the payee receives full restitution.

As the assets available to pay restitution are liquidated into cash, the Special Master would distribute the available funds (net of an administrative expenses incurred by the Special Master, or funding or replenishing any administrative expense reserves, as approved by the Court) to the persons due restitution on a *pari passu* and *pro rata* basis based on the restitution loss amounts awarded by the Court in this Case; *provided, however*, that, the loss amounts for each of the persons due restitution shall be reduced, credited, or otherwise adjusted downward to the extent any persons due restitution receives compensation for the same loss(es) comprising their restitution award through any source, including, without limitation, execution on a judgment, payments to release litigation claims, or cash extracted from assets previously transferred by the Defendant to reduce such loss(es) and for no other independent consideration.

Defendant shall notify the Court, the Special Master, the U.S. Attorney's Office, and, during any period of supervised release, the U.S. Probation Office of any material change in Defendant's economic circumstances that might affect Defendant's ability to pay restitution.

Pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

Nothing in this order shall impair, limit, or alter the civil rights otherwise available to any person, including, without limitation, any right to enforce judgments, contractual obligations, or other claims against Defendant for dollar amounts that may exceed the restitution assigned herein.

Defendant shall receive a credit reducing the foregoing restitution amounts for: (i) all future cash payments made to the foregoing payees by Defendant, through the Special Master or otherwise, with respect to the same loss(es); (ii) for all cash received by any of the foregoing payees from any of the "Primary Restitution Assets" or "Secondary Restitution Assets," as those terms are defined in the Special Master Order; and (iii) for all civil damages recovered by the foregoing payees as compensation for the same loss(es). The foregoing restitution amounts already account for monetary recoveries realized by the payees prior to the entry of this Order.

Defendant shall remain responsible for paying all Court-approved fees, expenses, and other compensation incurred by the Special Master in fulfilling the Special Master's duties under the Special Master Order. Defendant shall not receive a credit reducing the foregoing restitution amounts for the Court-approved administrative expenses incurred by the Special Master and paid by Defendant. Defendant shall not receive a credit reducing the foregoing restitution amounts for any incurred expenses of any kind by any party (including resulting income taxes) incidental to liquidating any of the "Primary Restitution Assets" or "Secondary Restitution Assets."

**EXHIBIT A**

The restitution ordered herein shall be enforceable as a judgment of the United States pursuant to 18 U.S.C. §§ 3664 and 3613. At the request of any payee named in this Order, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such payee in the amount specified above. Likewise, at the request of the Special Master, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of the Special Master in the aggregate amount of restitution imposed by this Order.

This Order is subject to amendment by the Court sua sponte or upon application by any interested party, including the Special Master.

The restitution ordered herein shall be due and payable immediately.

Vista's Reconsideration Motion is **DENIED**.

Vista's CVRA Motion is **DENIED**.

To the extent not previously addressed, all additional relief requested in Defendant's Supplemental Responses is **DENIED**.

**SO ORDERED**.

Signed: _______________ ____, 2026

____________________________________
Max O. Cogburn Jr.
United States District Judge

# EXHIBIT 12

Notice of Appeal, No. 5:19-cr-22, Doc. 538 (W.D.N.C. June 11, 2026)

Fourth Circuit Docket, United States v. Lindberg, No. 26-4310

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Greg E. Lindberg, *et al.*,<br><br>*Defendants*. | No. 5:19-cr-22 |

## NOTICE OF APPEAL

Defendant Greg Lindberg, by and through undersigned counsel, hereby provides notice of his appeal to the United States Court of Appeals for the Fourth Circuit from the final judgment entered on May 29, 2026. Dkt. No. 513.

Dated: June 11, 2026

Respectfully submitted,

/s/ Kenneth Barnes

Kenneth N. Barnes
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel For Defendant Greg E. Lindberg

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing document to be filed on June 11, 2026, with the Clerk of the Court for the United States District Court for the Western District of North Carolina using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

/s/ Kenneth Barnes
Kenneth N. Barnes,

**General Docket**
**United States Court of Appeals for the Fourth Circuit**

**Court of Appeals Docket #:** 26-4310 **Docketed:** 06/12/2026
US v. Greg Lindberg
**Appeal From:** United States District Court for the Western District of North Carolina at Statesville
**Fee Status:** fee paid

**Case Type Information:**
**1)** Criminal
**2)** Direct Criminal
**3)** null

**Originating Court Information:**
**District:** 0419-5 : 5:19-cr-00022-MOC-DCK-1
**Court Reporter:** Deborah Cohen-Rojas, Official Court Reporter
**Court Reporter:** Tracy Dunlap, Official Court Reporter (Inactive)
**Court Reporter:** Tammy Hightower, Court Reporter Coordinator
**Court Reporter:** Rebecca Maxcy, Official Court Reporter
**Court Reporter:** Michelle A. McGirr, Official Court Reporter
**Court Reporter:** Cheryl Nuccio, Official Court Reporter
**Ordering Judge:** Kenneth D. Bell, U. S. District Court Judge
**Presiding Judge:** Max O. Cogburn, Jr., U. S. District Court Judge
**Ordering Judge:** Frank D. Whitney, Senior U. S. District Court Judge
**Ordering Judge:** David Shepardson Cayer, U. S. Magistrate Judge
**Ordering Judge:** David C. Keesler, U. S. Magistrate Judge
**Date Filed:** 03/18/2019

| Date Order/Judgment: | Date Order/Judgment EOD: | Date NOA Filed: | Date Rec'd COA: |
|---|---|---|---|
| 05/29/2026 | 05/29/2026 | 06/11/2026 | 06/12/2026 |

**Prior Cases:**
20-4470 **Date Filed:** 09/10/2020 **Date Disposed:** 06/29/2022 **Disposition:** opn.p.arg

**Current Cases:**

| | Lead | Member | Start | End |
|---|---|---|---|---|
| Related | | | | |
| | 24-1898 | 26-1749 | 06/11/2026 | |
| | 26-1749 | 26-4309 | 06/12/2026 | |
| | 26-1749 | 26-4310 | 06/12/2026 | |
| | 26-4309 | 26-1965 | 07/27/2026 | |
| | 26-4309 | 26-1967 | 07/27/2026 | |
| | 26-4310 | 26-4314 | 06/16/2026 | |
| Seriatim | | | | |
| | 26-4309 | 26-4310 | 07/24/2026 | |

UNITED STATES OF AMERICA
Plaintiff - Appellee

Anthony Joseph Enright, Assistant U. S. Attorney
Direct: 704-344-6222
Email: usancw.appeals@usdoj.gov
[COR NTC Government]
OFFICE OF THE UNITED STATES ATTORNEY
Western District of North Carolina
Suite 1650
227 West Trade Street
Charlotte, NC 28202

Jeremy Raymond Sanders
Direct: 202-616-2650
Email: jeremy.sanders@usdoj.gov
[COR NTC Government]
U. S. DEPARTMENT OF JUSTICE
Criminal Division
1400 New York Avenue, NW
Washington, DC 20005

v.

| | |
|---|---|
| GREG E. LINDBERG<br>Defendant - Appellant | Joseph Alexander Little, IV<br>Direct: 615-985-8205<br>Email: alex@litson.co<br>[COR NTC Retained]<br>LITSON PLLC<br>Suite 300<br>54 Music Square East<br>Nashville, TN 37203<br><br>Vivek Ramachandran<br>Direct: 202-860-4084<br>Email: vramachandran@dhammalaw.com<br>[COR NTC Retained]<br>DHAMMA LAW PLLC<br>Suite N<br>418 Broadway<br>Albany, NY 12207 |

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

GREG E. LINDBERG

Defendant - Appellant

| | | |
|---|---|---|
| 06/12/2026 | 1<br>1 pg, 57 KB | Criminal case docketed. Originating case number: 5:19-cr-00022-MOC-DCK-1. Date notice of appeal filed: 06/11/2026. Case manager: RPhillips. [1001995905] [26-4310] RP [Entered: 06/12/2026 09:56 AM] |
| 06/12/2026 | 2<br>2 pg, 592.52 KB | FEE NOTICE issued to Kenneth N. Barnes - initial notice. Fee or application to proceed as indigent due 06/29/2026 Originating case number: 5:19-cr-00022-MOC-DCK-1. Mailed to: Kenneth N. Barnes, Brandon N. McCarthy, Rachel M. Riley. [1001995940] [26-4310] RP [Entered: 06/12/2026 10:32 AM] |
| 06/12/2026 | 3<br>6 pg, 146.5 KB | DOCKETING NOTICE issued Re: [1] criminal case. Originating case number: 5:19-cr-00022-MOC-DCK-1. Mailed to: Kenneth N. Barnes, Brandon N. McCarthy, Rachel M. Riley. [1001995956] [26-4310] RP [Entered: 06/12/2026 10:43 AM] |
| 06/17/2026 | 4<br>1 pg, 62.17 KB | APPEARANCE OF COUNSEL by Anthony J. Enright for US. [1001998853] [26-4310] Anthony Enright [Entered: 06/17/2026 01:01 PM] |
| 06/22/2026 | 5<br>2 pg, 248.21 KB | APPEARANCE OF COUNSEL by Vivek Ramachandran for Greg E. Lindberg. [1002001222] [26-4310] Vivek Ramachandran [Entered: 06/22/2026 06:01 PM] |
| 06/25/2026 | 6<br>1 pg, 83.95 KB | NOTICE ISSUED re: misrouted fee received/transmitted to NC Western District in paper form. Amount: $605.00. Mailed to: GREG E LINDBERG, #34828-058 FCI Atlanta FEDERAL CORRECTIONAL INSTITUTION P.O. BOX 150160 ATLANTA, GA 30315. [1002003737] [26-4310] JK [Entered: 06/25/2026 12:38 PM] |
| 06/26/2026 | 7<br>5 pg, 1017.43 KB | DOCKETING STATEMENT by Greg E. Lindberg.. [1002004993] [26-4310]--[Edited 06/30/2026 by RP - replaced to remove address] Vivek Ramachandran [Entered: 06/26/2026 09:35 PM] |
| 06/29/2026 | 8<br>1 pg, 88.39 KB | Docket correction requested re: transcipt order forms from Greg E. Lindberg. [1002005244] [26-4310] RP [Entered: 06/29/2026 09:48 AM] |
| 07/02/2026 | 9<br>3 pg, 344.71 KB | TRANSCRIPT ORDER FORM by Greg E. Lindberg for. [1002008739] [26-4310] Vivek Ramachandran [Entered: 07/02/2026 07:39 PM] |
| 07/07/2026 | 10<br>5 pg, 243.29 KB | TRANSCRIPT ORDER ACKNOWLEDGMENT filed for Tammy Hightower (DCR). Identify by proceeding and date all transcript ordered from this court reporter: Bond Revocation Hearings on November 12, 2024 and November 21, 2024. Names of all parties ordering transcript from this reporter: Greg E. Lindberg.. Originating case number: 5:19-cr-00022-MOC-DCK-1. [1002009048] Transcript due from Tammy Hightower, Court Reporter Coordinator (DCR) on 08/13/2026. [26-4310] RP [Entered: 07/07/2026 10:05 AM] |
| 07/07/2026 | 11<br>5 pg, 247.87 KB | TRANSCRIPT ORDER ACKNOWLEDGMENT filed for Michelle A. McGirr. Identify by proceeding and date all transcript ordered from this court reporter: Motion Hearing/Status Conference on October 13, 2023. Names of all parties ordering transcript from this reporter: Greg E. Lindberg.. Originating case number: 5:19-cr-00022-MOC-DCK-1. [1002009053] Transcript due from Michelle A. McGirr, Official Court Reporter on 08/13/2026. [26-4310] RP [Entered: 07/07/2026 10:09 AM] |
| 07/07/2026 | 12<br>5 pg, 242.72 KB | TRANSCRIPT ORDER ACKNOWLEDGMENT filed for Cheryl Nuccio. Identify by proceeding and date all transcript ordered from this court reporter: Jury Trial on February 18, 2020; Motion Hearing on May 13, 2020; Motion Hearing on August 19, 2020. Names of all parties ordering transcript from this reporter: Greg E. Lindberg.. Originating case number: 5:19-cr-00022-MOC-DCK-1. [1002009056] Transcript due from Cheryl Nuccio, Official Court Reporter on 08/13/2026. [26-4310] RP [Entered: 07/07/2026 10:12 AM] |
| 07/14/2026 | 13<br>1 pg, 131.28 KB | APPEARANCE OF COUNSEL by J. Alex Little for Greg E. Lindberg. [1002014392] [26-4310] Joseph Little [Entered: 07/14/2026 08:22 PM] |
| 07/16/2026 | 14<br>1 pg, 105.66 KB | APPEARANCE OF COUNSEL by Jeremy R. Sanders for US. [1002016154] [26-4310] Jeremy Sanders [Entered: 07/16/2026 04:31 PM] |
| 07/17/2026 | 15<br>2 pg, 120.63 KB | DISCLOSURE STATEMENT by US. Was any question on Disclosure Form answered yes? No [1002016575] [26-4310] Jeremy Sanders [Entered: 07/17/2026 10:43 AM] |
| 07/24/2026 | 16<br>4241 pg, 158.82 MB | Emergency MOTION by Greg E. Lindberg for stay pending appeal.. Date and method of service: 07/24/2026 ecf. [1002021599] [26-4310] Vivek Ramachandran [Entered: 07/24/2026 04:55 PM] |
| 07/24/2026 | 17<br>5 pg, 122.08 KB | MOTION by Greg E. Lindberg to exceed length limitations for motion. Date and method of service: 07/24/2026 ecf. [1002021603] [26-4310] Vivek Ramachandran [Entered: 07/24/2026 04:56 PM] |
| 07/24/2026 | 18<br>8 pg, 157.16 KB | MOTION by Greg E. Lindberg to expedite decision. Date and method of service: 07/24/2026 ecf. [1002021604] [26-4310] Vivek Ramachandran [Entered: 07/24/2026 04:57 PM] |
| 07/24/2026 | 19<br>1 pg, 79.24 KB | NOTICE ISSUED to US requesting response to Motion to expedite decision [18], Motion to exceed length limitations [17], Motion for stay pending appeal [16]. Response due: 07/28/2026[1002021607]. [26-4310] RP [Entered: 07/24/2026 04:59 PM] |

| | | |
|---|---|---|
| 07/27/2026 | 20<br>0 pg, 0 KB | Errata sheet for briefs by Greg E. Lindberg. Identify brief: OPENING. Corrected electronic brief must be filed separately by counsel. [1002022904] [26-4310] Vivek Ramachandran [Entered: 07/27/2026 06:33 PM] |
| 07/28/2026 | 21<br>1 pg, 81.5 KB | Docket correction requested from Greg E. Lindberg. Re: [20] errata sheet. Access to errata sheet has been restricted to case participants. [1002023071] [26-4310] RP [Entered: 07/28/2026 09:06 AM] |
| 07/28/2026 | 22<br>13 pg, 202.11 KB | RESPONSE/ANSWER by US to notice requesting response [19], Motion to expedite decision [18], Motion to exceed length limitations [17], Motion for stay pending appeal [16]. Nature of response: in opposition. [1002023976] [26-4310] Jeremy Sanders [Entered: 07/28/2026 07:15 PM] |
| 07/29/2026 | 23<br>281 pg, 10.73 MB | REPLY by Greg E. Lindberg to response [22].. [1002023998] [26-4310] Vivek Ramachandran [Entered: 07/29/2026 07:09 AM] |
| 07/29/2026 | 24<br>0 pg, 0 KB | (ENTRY RESTRICTED) REPLY by Greg E. Lindberg to response [22].. [1002023999] [26-4310]--[Edited 07/29/2026 by RP- corrected at ECF #25] Vivek Ramachandran [Entered: 07/29/2026 07:11 AM] |
| 07/29/2026 | 25<br>1 pg, 80.28 KB | Docket correction requested from Greg E. Lindberg. Re: [24] reply. Access to reply has been restricted to case participants. [1002024063] [26-4310] RP [Entered: 07/29/2026 08:55 AM] |
| 07/29/2026 | 26<br>5 pg, 100.59 KB | MOTION by Greg E. Lindberg to exceed length limitations for reply. Date and method of service: 07/29/2026 ecf. [1002024081] [26-4310] Vivek Ramachandran [Entered: 07/29/2026 09:05 AM] |
| 07/29/2026 | 27<br>1 pg, 79.23 KB | NOTICE ISSUED to US requesting response to Motion to exceed length limitations [26]. Response due: 07/31/2026[1002024145]. [26-4310] RP [Entered: 07/29/2026 09:39 AM] |
| 07/29/2026 | 28<br>4382 pg, 161 MB | Amended petition/motion by Greg E. Lindberg amending [16] Motion. Document: 2026-07-29 - FINAL FORMATTED Amended Motion to Stay Restitution (1340).pdf; EX A - 172 - Lindberg's Emergency Motion to Stay (1).pdf; EX B - 190 - Lindberg's Emergency Motion to Stay (1).pdf; EX C - 201 - Lindberg's Emergency Motion to Enforce Plea Agreement (1).pdf; EX D - 202 - Lindberg's Emergency Motion to Enforce Plea Agreement (1).pdf; EX E - Docs 234 and 235_Part1.pdf; EX E - Docs 234 and 235_Part2.pdf; EX E - Docs 234 and 235_Part3.pdf; EX E - Docs 234 and 235_Part4.pdf; EX F - 248 - Filed Motion for Issuance of Subpoenas (with Exhs)(7-23-26).pdf; EX G - Email Correspondence re Government Objection.pdf; EX H - Notice of Correction re Beckett Collectibles Valutation.pdf. [1002024777] [26-4310] Vivek Ramachandran [Entered: 07/29/2026 03:34 PM] |
| 07/29/2026 | 29<br>3 pg, 94.85 KB | RESPONSE/ANSWER by US to notice requesting response [27], Motion to exceed length limitations [26]. [1002024969] [26-4310] Jeremy Sanders [Entered: 07/29/2026 05:28 PM] |
| 08/14/2026 | 30<br>1 pg, 55.11 KB | COURT ORDER filed denying Motion to exceed length limitations [26], denying Motion to exceed length limitations [17]; denying Motion to expedite decision [18]; denying Motion for stay pending appeal [16] Copies to all parties. [1002035128] [26-4310] AW [Entered: 08/14/2026 03:25 PM] |
| 08/24/2026 | 31<br>3 pg, 152.63 KB | BRIEFING ORDER filed. No paper copies required unless case has been tentatively calendared or copies otherwise ordered. All filings must comply with Appendix Pagination & Brief Citation Guide. [1002039646] Opening brief and appendix due 09/28/2026. Response brief due 10/19/2026. [26-4310] RP [Entered: 08/24/2026 09:06 AM] |
| 09/22/2026 | 32<br>6 pg, 71.21 KB | MOTION by Greg E. Lindberg to extend filing time for opening brief and appendix.. Date and method of service: 09/22/2026 ecf. [1002059982] [26-4310] Vivek Ramachandran [Entered: 09/22/2026 09:27 PM] |
| 09/23/2026 | 33<br>1 pg, 54.74 KB | ORDER filed granting Motion to extend filing time [32] Number of days granted: 30. Opening brief and appendix due 10/29/2026. Response brief due 11/19/2026. No paper copies required unless case has been tentatively calendared or copies otherwise ordered. Copies to all parties. [1002060234] [26-4310] RP [Entered: 09/23/2026 10:20 AM] |

Select All Clear All

- Documents and Docket Summary
- Documents Only

- Include Page Numbers

**Selected Pages:** 0 **Selected Size:** 0 KB **(Max: 250 MB)**
**Totals reflect accessible documents only and do not include unauthorized restricted documents.**

View Selected

---

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/29/2026 13:34:45 | | | |
| **PACER Login:** | kholcomb96 | **Client Code:** | |
| **Description:** | Docket Report (filtered) | **Search Criteria:** | 26-4310 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT 13

E-mail of AUSA Daniel Ryan dated June 12, 2026, as forwarded by Brandon N. McCarthy, Esq., to Plaintiff on June 12, 2026

Gmail

Greg Lindberg <gel@greglindberg.com>

# FW: Please send PCDC motion to BOP GC today so they dont designate Greg today

1 message

**McCarthy, Brandon N.** <brandon.mccarthy@katten.com> Fri, Jun 12, 2026 at 5:21 PM
To: Greg Lindberg <gel@greglindberg.com>, Richard McDonald <rmcdonald@magmapower.com>, Korby Holcomb <kholcomb@apexinternationalsas.com>, Tug Swaffar <tugs@apexinternationalsas.com>

DOJ retaliation begins…

See below

**Brandon N. McCarthy**
Partner

**Katten**
Katten Muchin Rosenman LLP
2121 North Pearl Street, Suite 1100 | Dallas, TX 75201-2591
direct +1.214.765.3680
brandon.mccarthy@katten.com | katten.com
Bio | vCard

---

**From:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Sent:** Friday, June 12, 2026 4:13 PM
**To:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>; Friedman, Addison (USMS) <Addison.Friedman@usdoj.gov>
**Cc:** Robert Blake <rblake@wyattlaw.net>; Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>; Washington, Dana (USANCW) <Dana.Washington@usdoj.gov>
**Subject:** RE: Please send PCDC motion to BOP GC today so they dont designate Greg today

*EXTERNAL EMAIL – EXERCISE CAUTION*

Brandon,

Thanks for letting us know. Given the events of the last few days, we are considering whether we still support Mr. Lindberg's request to delay reporting to BOP, which was premised on his continuing to cooperate with the Special Master's efforts. Regarding your question about timing, I do not know when the Court might rule.

Dan

**From:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>
**Sent:** Friday, June 12, 2026 4:41 PM
**To:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>; Friedman, Addison (USMS) <Addison.Friedman@usdoj.gov>
**Cc:** Robert Blake <rblake@wyattlaw.net>
**Subject:** [EXTERNAL] RE: Please send PCDC motion to BOP GC today so they dont designate Greg today

Dan-
We are still counsel of record until Alex Little (Nashville) substitutes next week. So I wanted to follow up on this request again, as I am afraid BOP may designate Greg before Judge gets to rule. Given all the recent action, Greg being moved will make things much more difficult for everyone. Not sure if we should alert the Court (?) of the time sensitive nature of the request? Or we may have conflicting directives from BOP and the Court. Rob/Dan, what do you think? Do we think a ruling is imminent?

*Dan - here is Alex Little's email if you want to sub him in for the weekly calls: Alex Little: alex@litson.co

Thanks

Brandon N. McCarthy
Partner
Katten
Katten Muchin Rosenman LLP
2121 North Pearl Street, Suite 1100 | Dallas, TX 75201-2591
direct +1.214.765.3680
brandon.mccarthy@katten.com | katten.com
Bio | vCard

-----Original Message-----
From: McCarthy, Brandon N.
Sent: Tuesday, June 9, 2026 12:16 PM
To: Daniel Ryan <Daniel.Ryan@usdoj.gov>; Friedman, Addison (USMS) <Addison.Friedman@usdoj.gov>
Subject: Please send PCDC motion to BOP GC today so they dont designate Greg today

Dan
Hey. Do you mind forwarding the motion and proposed order to General Counsel for BOP. I just did not want him to get designated before the judge had a chance to rule on the proposed order. And then he get moved. Know what I mean?
Thanks

===========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.
===========================================================
NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).
===========================================================